ACCEPTED
13-14-00725-cv
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/23/2015 9:14:46 AM
CECILE FOY GSANGER
CLERK

No. 13-14-00725-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/23/2015 9:14:46 AM
CECILE FOY GSANGER
Clerk

# Court of Appeals
## for the Thirteenth Judicial District
## Corpus Christi – Edinburg, Texas

Dos Republicas Coal Partnership,
*Appellant,*

v.

David Saucedo as Floodplain Administrator and
County Judge of the Maverick County Commissioners Court
and the Maverick County Commissioners Court,
*Appellees.*

## REPLY BRIEF OF APPELLANT

On appeal from the 293rd Judicial District Court
Maverick County, Texas
Cause Number 14-03-29340-MCV

Leonard Dougal
State Bar No. 06031400
Mallory Beck
State Bar No. 24073899
JACKSON WALKER L.L.P.
100 Congress
Suite 1100
Austin, Texas 78701
ldougal@jw.com
T: (512) 236-2233
F: (512) 391-2112

Bill Cobb
State Bar No. 00796372
Matthew Ploeger
State Bar No. 24032838
Jenny L. Smith
State Bar No. 24079357
COBB & COUNSEL
401 Congress Avenue
Suite 1540
Austin, Texas 78701
bill@cobbxcounsel.com
(512) 693-7570
(512) 687-3432 – Facsimile

*Attorneys for Appellant Dos Republicas Coal Partnership*

# TABLE OF CONTENTS

Table of Contents .................................................................................... ii

Index of Authorities ................................................................................ iv

Introduction ............................................................................................. 1

Argument .................................................................................................. 3

I.     Appellees' over-expansive view of the Ordinance's purpose
does not alter the conditions for granting a permit................................ 3

      A.     Appellees' interpretation of the Ordinance, which confers
standardless discretion on the Floodplain Administrator,
would render the Ordinance unconstitutionally vague.............. 4

      B.     The Ordinance's statement of purpose does not authorize
the Floodplain Administrator to regulate surface coal
mining or water quality, which are both regulated
exclusively by state agencies. ...................................................... 9

           1.     Surface coal mining is regulated exclusively by the
Railroad Commission. ........................................................ 9

           2.     The Ordinance does not and cannot regulate flood
water quality or contaminants. ........................................ 12

II.     As a matter of law, DRCP's Permit Application satisfied the
conditions to receive a permit................................................................ 17

      A.     Appellees' assertions with respect to Padilla's testimony
are based on misconceptions about what a permit
application must show.................................................................. 20

           1.     DRCP was not required to eliminate pre-existing
dangers from flooding....................................................... 21

           2.     The Ordinance does not address water quality or
"contaminants." .................................................................. 25

      B.     Appellees waived factor (d), the compatibility of the
proposed use with existing and anticipated development........ 26

III.     The duty to grant the permit is not discretionary where, as here,
the Ordinance's conditions are met. ...................................................... 29

IV.    The Floodplain Administrator's failure to provide any written explanation of his decision evidences an abuse of discretion and is arbitrary and capricious...................................................................31

    A.    The requirement of a written explanation is inherent in the concept of judicial review.......................................................31

    B.    There is no evidence of any [climate] changed circumstances that justify the disparate treatment of the 1998 and 2013 permit applications.................................................33

V.    Appellees' novel contention that the Floodplain Administrator's due process violation was "remedied" by instituting an action for an extraordinary writ is without merit.........35

Prayer ................................................................................................................36

Certificate of Compliance .............................................................................38

Certificate of Service .....................................................................................38

iii

**CASES**

*Bradley v. State ex rel. White*, 990 S.W.2d 245 (Tex. 1999) ...................... 6, 29, 30

*City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773 (Tex. App.—Dallas 1992, writ denied) ..................................................34

*City of Dallas v. TCI W. End, Inc.*, No. 13-0795, 2015 WL 2147986 (Tex. May 8, 2015) .............................................................................5

*City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896 (Tex. App.—Austin 1993, writ denied)...........................................................................32

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005)............................................18

*City of San Antonio v. Greater San Antonio Builders Ass'n*, 419 S.W.3d 597 (Tex. App.—San Antonio 2013, pet. denied) .................................. 11, 12, 17

*City of W. Lake Hills v. Westwood Legal Def. Fund*, 598 S.W.2d 681 (Tex. Civ. App.—Waco 1980, no writ) ...........................................................14

*Coffee City v. Thompson*, 535 S.W.2d 758 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.) .................................................................................7

*Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489 (Tex. 1993)............................................................... 11, 12, 17

*Hager v. Romines*, 913 S.W.2d 733 (Tex. App.—Fort Worth 1995, no writ)...18

*Jackson v. Neal*, No. 13-07-00164-CV, 2009 WL 140507 (Tex. App.—Corpus Christi-Edinburg Jan. 22, 2009, no pet.) .........................................27

*Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556 (Tex. 2014)...................................6

*Lee v. GST Transp. Sys., LP*, 334 S.W.3d 16 (Tex. App.—Dallas 2008, pet. denied) ..................................................................................6

*Lindig v. City of Johnson City*, No. 03-11-00660-CV, 2012 WL 5834855 (Tex. App.—Austin Nov. 14, 2012, no pet.) ............................................................7

*Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572 (Tex. 2006)..................................18

*Mack v. Moore*, 669 S.W.2d 415 (Tex. App.—Houston [1st Dist.] 1984, no writ) ................................................................................................................18

*Methodist Hosps. of Dallas v. Mid–Century Ins. Co. of Tex.,* 259 S.W.3d 358 (Tex. App.—Dallas 2008, no pet.) ........................................................6

*Nall v. Plunkett*, 404 S.W.3d 552 (Tex. 2013).....................................................27

*Pak-a-Sak, Inc. v. City of Perryton*, 451 S.W.3d 133 (Tex. App.—Amarillo 2014, no pet.) ..............................................................................................7, 29

*Perry v. S.N.,* 973 S.W.2d 301 (Tex. 1998) .........................................................33

*R.R. Comm'n of Texas v. Coppock*, 215 S.W.3d 559 (Tex. App.—Austin 2007, pet. denied)...................................................................................................10

*Southern Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676 (Tex. 2013) ....................................................................................... 10, 12, 17

*Starr County v. Starr Industrial Services, Inc.*, 584 S.W.2d 352 (Tex. App.—Austin 1979, writ ref'd n.r.e.)................................................. 27, 28

*Texas Antiquities Comm. v. Dallas Cnty. Cmty. Coll.,* 554 S.W.2d 924 (Tex. 1977) .................................................................................................. 6, 8, 29

*Texas Health Facilities Commission v. Charter Medical-Dallas, Inc.,* 665 S.W.2d 446 (Tex. 1984).....................................................................................32

*Walker v. Hitchcock Indep. Sch. Dist.*, No. 01-11-00797-CV, 2013 WL 3771302 (Tex. App.—Houston [1st Dist.] July 16, 2013, no pet.)..............................34

**STATUTES**

TEX. NAT. RES. CODE § 134.002 .............................................................9

TEX. NAT. RES. CODE § 134.020 ...........................................................10

TEX. WATER CODE § 16.312 ..................................................................16

TEX. WATER CODE § 16.3145 ................................................................16

TEX. WATER CODE § 26.011 ..................................................................13

TEX. WATER CODE § 26.023 ..................................................................13

TEX. WATER CODE § 26.171 ..................................................................14

TEX. WATER CODE § 26.172 ..................................................................14

TEX. WATER CODE § 26.176 ..................................................................14

TEX. WATER CODE § 26.180 ..................................................................14

**OTHER AUTHORITIES**

National Flood Insurance Program: Program Description, Fed. Emer.
Mgmt. Agency, at 5 (Aug. 1, 2002), *available at*
http://www.fema.gov/media-library-data/20130726-1447-20490-
2156/nfipdescrip_1_.pdf..............................................................23

*Texas Nonpoint Source Management Program*, TCEQ/TSSWCB joint
publication SFR-68/04, at 93 (2005)............................................22

**RULES**

TEX. R. APP. P. 33.1...............................................................................26

TEX. R. APP. P. 43.2...............................................................................36

TEX. R. EVID. 801..................................................................................34

TO THE HONORABLE COURT OF APPEALS:

Appellant Dos Republicas Coal Partnership ("DRCP") respectfully submits this Reply Brief.

**INTRODUCTION**

To understand why the Floodplain Administrator's denial of DRCP's permit application was improper, the Court need only review the testimony of the Floodplain Administrator. Judge Saucedo testified, repeatedly, that he would <u>never</u> grant a permit allowing mining in the floodplain, and there was <u>nothing</u> DRCP could do (or demonstrate) that would change his mind. Burdened with this testimony, Appellees contort the purpose and structure of the Ordinance to justify his foreordained rejection.

Appellees' arguments rest on the mistaken assertion that the Floodplain Administrator is not constrained by the Ordinance's ten mandatory factors for evaluating permit applications. Although the Floodplain Administrator testified that the permit application must be measured against the ten enumerated factors, Appellees only now assert that the Ordinance's general statement of purpose, separate and apart from the operative provisions of the Ordinance, gives the Floodplain Administrator broad power to reject otherwise satisfactory permit applications based on his

1

judgment as to the "best interests of the county." But the Ordinance's general statement of purpose simply does not (and cannot) give the Floodplain Administrator a general police power beyond the limits of the operative provisions of the Ordinance itself. This is especially true where, as here, he does so with no explanation or evidence to support his diktat. Appellees' interpretation of the Ordinance would give the Floodplain Administrator boundless, limitless, and standardless discretion to veto projects that he disfavors, untethered from the express conditions for issuing permits that are imposed by the Ordinance. Indeed, Appellees' erroneous interpretation would render the Ordinance unconstitutionally vague and subject to arbitrary and capricious enforcement. It therefore must be rejected.

Further, Appellees' interpretation and corresponding arrogation of power would render the Ordinance preempted by state law and regulations, which exclusively regulate both surface coal mining and the discharge of water from mining operations. It is undisputed that DRCP has received all relevant permits from all relevant state agencies for its surface coal mining operations, but Appellees wish to second-guess and override the authority

of these regulatory agencies because they disagree with the expert decisions those agencies have made.

Appellees' attempts to shoehorn his assumption of veto power into the ten enumerated factors themselves fairs no better. Appellees labor under a misconception of what the Ordinance requires of applicants. Contrary to Appellees' assumptions, permit applicants are <u>not</u> required to demonstrate that the proposed use will *prevent* flooding. At most, the application should demonstrate that the proposed use will not excessively increase the dangers of flooding. The Ordinance recognizes that flooding will occur regardless of the measures taken by the government or by private landowners. Here, the uncontroverted evidence is that Appellant's mining activities will not increase the dangers of flooding, but in fact, that they will actually reduce the risks. Thus, Appellant's permit application demonstrates prevention efforts far beyond what the Ordinance requires.

## ARGUMENT

### I. Appellees' over-expansive view of the Ordinance's purpose does not alter the conditions for granting a permit.

Appellees' brief is based on the faulty premise that the Floodplain Administrator may alter the conditions for granting or denying a permit

based on his over-expansive understanding of the purpose of the Ordinance. Appellees rely upon article 4, section C(2) of the Ordinance, which provides: "Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors." 1 RR, Exhibit 5, Article 4, Section C(2) [Tab 3]. Appellees' assertion that the admonition to consider "all provisions" gives the Floodplain Administrator unfettered, standardless discretion is beyond farcical: this interpretation would render the Ordinance unconstitutionally vague and invalid. Further, this interpretation (and the Floodplain Administrator's application of it here) conflicts with the exclusive authority granted to the RRC and TCEQ by state law and, thus, is preempted.

A. **Appellees' interpretation of the Ordinance, which confers standardless discretion on the Floodplain Administrator, would render the Ordinance unconstitutionally vague.**

The model ordinance adopted by Maverick County provides ten specific factors against which a permit application must be judged. It is through an even-handed application of these standards that the policy goals behind the Ordinance are achieved. That is, the policy goals are mediated by and through the ten expressly enumerated factors. But the policy goals

4

themselves do not create an additional, ill-defined, omnibus factor that the Floodplain Administrator may consider, which would make the express factors immaterial and superfluous. *City of Dallas v. TCI W. End, Inc.*, No. 13-0795, 2015 WL 2147986, at *2 (Tex. May 8, 2015) ("We must avoid adopting an interpretation that "renders any part of the statute meaningless.'") (quoting *Crosstex Energy Servs, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014)). If Appellees were correct, then there would be no need for any statute or ordinance to provide requirements and factors; the statute or ordinance could simply state some general policy goals and administrators could then decide how best to accomplish those goals. But that, of course, is not how the rule of law works.

Appellees' assertion is truly remarkable. They maintain that an administrator may ignore the operative standards enumerated in the ordinance in favor of their own interpretation of the ordinance's "purpose" untethered to the actual requirements and factors mandated in the ordinance. To the contrary, the Ordinance's purpose is mediated through its operative provisions; it does not add to them. And "[e]ven if we liberally construe a statute to achieve its purposes, we may not enlarge or alter the plain meaning of its language." *Lee v. GST Transp. Sys., LP*, 334 S.W.3d 16,

20 (Tex. App.—Dallas 2008, pet. denied); *Methodist Hosps. of Dallas v. Mid–Century Ins. Co. of Tex.*, 259 S.W.3d 358, 360-61 (Tex. App.—Dallas 2008, no pet.). Nor will a court "ignore the words' common meanings to achieve a purpose or object that is ambiguous at best." *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 569 (Tex. 2014).

By asserting that the Floodplain Administrator may rely on the general statement of purpose of the Ordinance to deny a permit, Appellees are asserting that the Floodplain Administrator's discretion is not limited to the standards set forth in the operative provisions of the Ordinance, but, rather, on unspecified and unknowable factors of the Floodplain Administrator's choosing. As the Texas Supreme Court has explained, this sort of standardless discretion "leav[es] a situation ripe for 'resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Bradley v. State ex rel. White*, 990 S.W.2d 245, 253 (Tex. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)); *Texas Antiquities Comm. v. Dallas Cnty. Cmty. Coll.*, 554 S.W.2d 924, 928 (Tex. 1977) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on *ad hoc* and subjective basis, with the attended [sic] dangers of arbitrary and discriminatory

6

applications." (quoting *Grayned,* 408 U.S. at 109); *Pak-a-Sak, Inc. v. City of Perryton*, 451 S.W.3d 133, 137 (Tex. App.—Amarillo 2014, no pet.) ("That is, [an ordinance] may not be so vague and standardless as to leave a governing body free to decide, without any legally fixed guidelines, what is prohibited in each particular case."); *Lindig v. City of Johnson City*, No. 03-11-00660-CV, 2012 WL 5834855, at *5 (Tex. App.—Austin Nov. 14, 2012, no pet.) (mem. op.) ("[T]he seemingly boundless discretion vested in the Building Official to interpret and apply the term ['substantial work'] invites arbitrary and discriminatory application."); *Coffee City v. Thompson*, 535 S.W.2d 758, 763 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.) ("An ordinance leaving the question of issuing or denying building permits to the arbitrary discretion or determination of the city secretary without any rule or standard to follow is invalid.").

Here, the Floodplain Administrator repeatedly testified there was nothing DRCP could do to satisfy him and convince him to grant a permit. 1 RR, Exhibit 9 at 28:12-14, 29:21-25, 39:10-14. He testified unequivocally that he would never approve its application for mining operations in the floodplain regardless of what the permit application established. He further testified that he based this position on his personal experience and his

7

determination as to what was in the best interests of the county. But the Ordinance does not empower him to ignore the standards expressly enumerated in the operative provisions of the Ordinance.

In sum, the statement of purpose does not give the Floodplain Administrator license to override the applicable language of those operative provisions or the enabling statute. It cannot add to the requirements for obtaining a permit. Otherwise, the operative provisions of the Ordinance are meaningless because the statement of purpose gives the Floodplain Administrator the power to deny or grant permits without respect to the express, enumerated factors. The purpose of the Ordinance is served by the express factors mandated in the Ordinance; the statement of purpose does not give rise to supernumerary and superordinate power to deny permits the Floodplain Administrator deems not in the county's best interests. As the Texas Supreme Court has explained, "[w]e adhere to the settled principle that statutory delegations of power may not be accomplished by language so broad and vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Texas Antiquities Comm. v. Dallas Cnty. Cmty. Coll. Dist.*, 554 S.W.2d 924, 928 (Tex. 1977) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)).

**B.** **The Ordinance's statement of purpose does not authorize the Floodplain Administrator to regulate surface coal mining or water quality, which are both regulated exclusively by state agencies.**

Even if Appellees' arrogation of a general police power could be countenanced, their interpretation and application of the Ordinance would render it preempted by state statutes and regulations of surface coal mining and water quality. Here, the Floodplain Administrator's purported bases for denying the permit are preempted by state statutes and regulations.

**1.** **Surface coal mining is regulated exclusively by the Railroad Commission.**

The Floodplain Administrator testified that he would never approve a permit for mining operations in the floodplain based on his "personal experiences" and determination that mining in the floodplain is not in the "best interests of the county." But the Texas Natural Resources Code grants the Railroad Commission exclusive jurisdiction to regulate the operation and location of surface coal mines. TEX. NAT. RES. CODE § 134.002(5) ("[T]his state wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state under the federal Act."); *R.R. Comm'n of Texas v. Coppock*, 215 S.W.3d 559, 570 (Tex. App.—Austin

9

2007, pet. denied).[1] Indeed, the code contains a procedure by which the RRC may designate an area, including a floodplain, as not suitable for surface coal mining operations. TEX. NAT. RES. CODE § 134.020(b)(4) ("On petition under Section 134.017, the commission may designate a surface area unsuitable for certain types of surface coal mining operations if those operations will . . . affect natural hazard land, including areas subject to frequent flooding and areas of unstable geology, in which the operations could substantially endanger life and property."). Consequently, the decision of whether a surface coal mining operation should be prohibited in the floodplain is clearly within the RRC's exclusive jurisdiction, and the Floodplain Administrator's attempt to usurp this authority is a clear abuse of discretion. *See Southern Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678-79 (Tex. 2013) (ordinance may not override state permit); *Dallas Merchant's &*

---

[1]     "The natural resources code specifies that the Commission has been granted exclusive jurisdiction over surface coal mining and reclamation activities, has been charged with enforcing the relevant portions of the code, and has been given the authority to issue rules pertaining to mining and reclamation activities that are consistent with the code. *See* TEX. NAT. RES. CODE ANN. §§ 134.011 (Commission given broad powers, including power to adopt rules, issue and revoke permits, conduct hearings, issue orders requiring miners to take certain actions, and order cessation of mining activities), 134.012(a)(1) (Commission has exclusive jurisdiction), 134.013 (West 2001) (Commission required to adopt rules relating to surface coal mining and reclamation), 134.161-.181 (West 2001) (enforcement powers of Commission)." *R.R. Comm'n of Texas v. Coppock*, 215 S.W.3d 559, 570 (Tex. App.—Austin 2007, pet. denied).

*Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993); *City of San Antonio v. Greater San Antonio Builders Ass'n*, 419 S.W.3d 597, 601 (Tex. App.—San Antonio 2013, pet. denied) ("An ordinance that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with a state statute.").

Nor does the Floodplain Administrator have the power to enforce RRC regulations or second-guess the RRC's determinations. Appellees appear to want to disavow any suggestion that the Floodplain Administrator considered mining regulations in denying the permit. Resp. at 27-28. Yet this is exactly opposite of what they told the trial court below, where Appellees argue at length that the RRC should not have issued a permit to DRCP. 2 CR 857-66; *see also* Br. at 60-62. Indeed, Appellees argued that "[t]he County Judge was doing his job in protecting this community from the Railroad Commission." 2 CR 879-80. But any concerns regarding purported dangers from mining activities were addressed and satisfied during the permitting process at the RRC, where Appellant was an active participant, and provided testimony. *Re: The Application of Dos Republicas Coal Partnership for Renewal/Revision/Expansion of Surface Coal Mining And Reclamation Permit No. 42A, Eagle Pass Mine*, Docket No. C5-0003-SC-42-C, Testimony of Judge

David Saucedo, 10 Tr. 38-107, (Mar. 23, 2012). The Floodplain Administrator's disagreement with the RRC's conclusions is not a legitimate reason to deny the permit. Neither the Ordinance nor the enabling statute give the Floodplain Administrator the authority to override the RRC. *See Southern Crushed Concrete*, 398 S.W.3d at 678-79; *Dallas Merchant's,* 852 S.W.2d at 490–91; *City of San Antonio*, 419 S.W.3d at 601. Moreover, Appellees' second-guessing of the RRC's approval consists entirely of supposition and assumptions about what might happen in a flood. 2 CR 856-67. Nowhere do Appellees cite any actual evidence to support this speculation, nor could they. The only evidence presented to the Floodplain Administrator or the trial court came from Paul Padilla, a licensed engineer and hydrology expert and the only expert to testify or offer evidence in this case. As discussed further below, Mr. Padilla testified that DRCP's mining plan will not detrimentally affect flood water dangers or downstream properties. *See* Part II, *infra.*

### 2. The Ordinance does not and cannot regulate flood water quality or contaminants.

Appellees' assertion that the presence of the enabling legislation for the Ordinance within the Water Code constitutes a delegation of the power

12

to regulate water quality to the County is meritless. Resp. at 24. The Water Code is quite clear that "[t]he commission [TCEQ] has the sole and exclusive authority to set water quality standards for all water in the state." TEX. WATER CODE § 26.023; TEX. WATER CODE § 26.011 ("Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter."). Further, the enabling legislation does not address water quality or pollution. Rather, commensurate with its purpose of promoting the availability of federal flood insurance (more on this below), it is found in Subchapter I ("Flood Insurance") of Chapter 16 of Subtitle C ("Water Development").

In contrast, water quality regulation is found in Subtitle D, Chapter 26, which states clearly that "The commission [TCEQ] has the sole and exclusive authority to set water quality standards for all water in the state." TEX. WATER CODE § 26.023; TEX. WATER CODE § 26.011 ("Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter."). Notably, subchapter E of chapter 26 describes local governments' functions

13

related to water quality, none of which gives a county or Floodplain Administrator the authority to regulate water quality or otherwise impede a use that has been approved by the TCEQ. Rather, for example, local governments are authorized to inspect public water (§ 26.171), make recommendations to the TCEQ (§ 26.172), establish rules related to disposal systems owned or operated by the local government (§ 26.176), and for some cities to establish monitoring and abatement programs, which must be approved by the TCEQ, for pollution not traceable to a specific source (§ 26.180). TEX. WATER CODE §§ 26.171-.180; *see also, e.g.*, *City of W. Lake Hills v. Westwood Legal Def. Fund*, 598 S.W.2d 681, 686 (Tex. Civ. App.—Waco 1980, no writ) (explaining that the functions and services listed in section 26.177 "are in the nature of 'information gathering'"). As the court explained in *City of West Lake Hills*, "[a]lthough the Legislature recognized the importance of cooperative efforts between state and local governmental bodies, the state is assigned responsibility for promulgating rules and regulations to control pollution problems. . . . . The legislative scheme simply does not contemplate independent regulatory action by a city." *City of W. Lake Hills*, 598 S.W.2d at 686. Appellees can point to nothing that grants Maverick County the authority exercised by the Floodplain Administrator here.

14

Indeed, the Ordinance itself provides no basis for Appellees' claimed authority to regulate water quality or pollutants. Notably, the statement of purpose, on which Appellees rely so heavily, says nothing about flood water quality or contaminants. Notably, the Ordinance's findings of fact make clear that the danger that the Ordinance is intended to address is flood water *height* and *velocity*, not water quality or contaminants. 1 RR, Exhibit 5, Article 1, Section B(2) [Tab 3] ("These flood losses are created by the cumulative effect of obstructions in floodplains which cause an increase in flood heights and velocities, and by the occupancy of flood hazards areas by uses vulnerable to floods and hazardous to other lands because they are inadequately elevated, floodproofed or otherwise protected from flood damage."). Not surprisingly, then, the Ordinance's definitions do not include "contaminant," "pollutant," or any other term related to water quality. In fact, no provision of the Ordinance relates to water quality or even refers to (much less establishes) any water quality standard against which a permit application must be judged. Nor is there anything that suggests that Floodplain Administrators have the necessary expertise to regulate water quality.

Further, the purpose of the enabling statute that authorizes local governments to adopt these ordinances does not relate to water quality. Rather, the purpose is to allow property owners to obtain flood insurance under a federal program. TEX. WATER CODE § 16.312 ("The purpose of this subchapter is to evidence a positive interest in securing flood insurance coverage under this federal program and to so procure for those citizens of Texas desiring to participate and in promoting the public interest by providing appropriate protection against the perils of flood losses and in encouraging sound land use by minimizing exposure of property to flood losses."); *id.* § 16.3145 ("The governing body of each city and county shall adopt ordinances or orders, as appropriate, necessary for the city or county to be eligible to participate in the National Flood Insurance Program."). It was not intended to establish a separate regulatory regime for water quality. Nor was it intended to grant counties free license to prevent land uses they deem unwanted.

Further, Appellees' assertion that recognizing that the TCEQ has exclusive authority to regulate water quality would nullify the Ordinance is spurious. Resp. at 24-25. The Ordinance, properly interpreted, is limited to consideration of the height and velocity of flood waters, not water *quality*. It

16

is only under Appellees' erroneous interpretation of the Ordinance, which would give the Floodplain Administrator the authority to regulate water quality in addition the enumerated authority to regulate flood water height and velocity, that would create a conflict with the TCEQ's exclusive authority. Under the proper interpretation, the Ordinance and the TCEQ regulate different things.

Appellees' interpretation of the Ordinance clearly exceeds the authority granted to the County in the enabling legislation and, in any case, is preempted by the Water Code's delegation of that authority exclusively to the TCEQ. *See Southern Crushed Concrete*, 398 S.W.3d at 678-79; *Dallas Merchant's,* 852 S.W.2d at 490–91; *City of San Antonio*, 419 S.W.3d at 601. The Floodplain Administrator's exercise of this non-existent authority is a clear abuse of discretion.

## II. As a matter of law, DRCP's Permit Application satisfied the conditions to receive a permit.

Appellees assert that the Floodplain Administrator and trial court were not required to accept the uncontroverted testimony of Paul Padilla, a licensed engineer and hydrology expert and the only expert to testify or offer evidence in this case. But there is no reasonable basis for rejecting or

discounting Padilla's testimony. Thus, as the only expert evidence on the issue, which is one that necessitates expert opinion, it is conclusive on the fact questions at issue here. In *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005), the Texas Supreme Court recognized that flood water management involves scientific and technical issues that require expert opinion evidence. *Id.* at 829; *see also Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 583 (Tex. 2006) ("Expert testimony is required when an issue involves matters beyond jurors' common understanding."). In such situations, an expert's uncontroverted testimony is conclusive. *City of Keller*, 168 S.W.3d at 820; *Hager v. Romines*, 913 S.W.2d 733, 735 (Tex. App.—Fort Worth 1995, no writ) ("Further, if expert testimony is required on an issue, and that expert testimony is uncontroverted, the testimony is considered conclusively established."); *Mack v. Moore,* 669 S.W.2d 415, 419 (Tex. App.—Houston [1st Dist.] 1984, no writ) (same).

The Floodplain Administrator's vague allusions to "personal experience" simply are not relevant or competent evidence in evaluating whether the Permit Application satisfies the Ordinance.[2] Further, the

---

[2]      Appellees insist that the Floodplain Administrator's deposition testimony that "he relied on his personal experiences with flooding in Maverick County" is

18

Floodplain Administrator's "personal experience with and knowledge of significant flooding in the area" (Resp. at 5) likewise does not address the relevant considerations of the Ordinance. It is undisputed that there has been and will be flooding that takes place in the floodplain. The Ordinance expressly recognizes this, yet, as discussed below, it does not prohibit all development in the floodplain. Nor does the Floodplain Administrator's "experience" related to other sedimentation ponds that have overflowed have any bearing on the permit application. As Padilla testified, sedimentation ponds are designed to overflow. As the Texas Supreme Court has explained, issues related to floodwater management require expert evidence, and Padilla's uncontroverted expert evidence is more than sufficient to satisfy each of the conditions set forth in the Ordinance.

---

competent evidence. Resp. at 29. But it is not evidence relevant to any actual factor contained in the Ordinance. Further, as discussed above, the Texas Supreme Court has held that issues related to flood water management require expert evidence. The Floodplain Administrator's vague references to unsubstantiated personal experiences and what he's "seen happen in the past" simply do not qualify. 1 RR, Exhibit 9, at 49:18-23 (Q. "[W]as there any other evidence that you considered when denying the permit? A. . . . one of the major factors to me is – is what I've actually seen in that community, what I've seen happen in the past with prior flooding."); 1 RR, Exhibit 9 at 46:14-22 (when asked what evidence he had to support his denial, the Floodplain Administrator merely responded with "what I've seen in the past").

Despite the fact that the only factors the Floodplain Administrator purported to contest in the trial court were factors (a)-(c), Appellees now, for the first time, assert that the Floodplain Administrator also based his rejection of the Permit Application on factor (d). As discussed below, Appellees' late attempt to assert factor (d) should be rejected as untimely and waived. In any case, it is another futile effort by Appellees' to shoehorn the Floodplain Administrator's erroneous consideration of irrelevant issues into permissible factors.

A. **Appellees' assertions with respect to Padilla's testimony are based on misconceptions about what a permit application must show.**

With respect to factors (a)-(c), Appellees raise essentially the same two arguments. First, Appellees assert that Padilla's testimony must be disregarded because he failed to consider the effect of a hypothetical back-to-back storm as well as a purported rain event in June of 2013. Second, Appellees assert that Padilla's testimony must be disregarded because he did not consider possible contaminants. Appellees' arguments misconstrue the Ordinance's requirements and the record in this case.[3]

---

[3] As noted above, Appellees' lengthy argument in the trial court that the RRC and TCEQ should not have approved DRCP's mining plan because of its purported

20

### 1. DRCP was not required to eliminate pre-existing dangers from flooding.

Initially, there is zero evidence in the record that Maverick County received 17 inches of rain in 10 hours in June 2013. Br. at 36. Appellees' frequent references to such an event are improper and must be disregarded.

But more fundamentally, Appellees' argument assumes that DRCP was required to prove that the proposed use would <u>eliminate</u> <u>all</u> potential damage from any possible flood event. This is simply preposterous. The Ordinance is not intended to mitigate all dangers from flooding, as recognized within the Ordinance, itself. Rather, the Ordinance requires that the proposed use not exacerbate the dangers from flooding by increasing the height, velocity, and debris in the flood water. *Texas Nonpoint Source Management Program*, TCEQ/TSSWCB joint publication SFR-68/04, at 93 (2005) ("To participate in the NFIP, a community must adopt and enforce a

---

effects on downstream residents is based entirely on speculation and assumptions, not any actual evidence. *See, e.g.*, 2 CR 857-66. Throughout, Appellees rail against supposed problems with the RRC's and TCEQ's determinations based on nothing more than the fact that flooding happens in the floodplain and it makes them uncomfortable. *Id.* To be absolutely clear, there is no evidence in the record before this Court or in the proceedings before the RRC and TCEQ that downstream residents are at any greater risk due to flooding under DRCP's proposed mining plan. Appellees' fears and baseless speculation about purported of dangers to downstream residents simply have no evidentiary support.

floodplain management ordinance which prevents new development from increasing the flood threat and protect new and existing buildings from anticipated flood events." (emphasis added)). Section D of the Ordinance provides that the Ordinance may restrict or prohibit uses that "cause excessive increases in flood heights or velocities" and to control development that "may increase flood damage." 1 RR, Exhibit 5, Article 1, Section D(1), D(4) [Tab 3] (emphasis added).[4]

Moreover, the Ordinance fully recognizes that "[t]he degree of flood protection required by this ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations. On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes." 1 RR, Exhibit 5, Article 3, Section G [Tab 3]. Further, FEMA has noted that "[t]he 1-percent-annual-chance flood," the standard adopted for all NFIP-complaint ordinances, "was chosen on the basis that it provides a higher

---

[4]     Although Article 1, Section D(1) of the Ordinance also recites that the ordinance restricts or prohibits uses "that are dangerous to health, safety or property in times of flood," this description is nonetheless under the umbrella of "reducing flood losses" within the ordinance, recognizing that the ordinance is focused on reducing *property* loss in times of flood, and reducing—rather than eliminating—threats from flooding in the floodplain.

level of protection while not imposing overly stringent requirements or the burden of excessive costs on property owners." National Flood Insurance Program: Program Description, Fed. Emer. Mgmt. Agency, at 5 (Aug. 1, 2002), *available at* http://www.fema.gov/media-library-data/20130726-1447-20490-2156/nfipdescrip_1_.pdf. The Ordinance is not intended to, nor could it, protect or prevent against all possible flooding events. And applicants like DRCP are not required to show that their proposed uses will eliminate the dangers from floods.

In any case, it is undisputed that, as Padilla testified, DRCP's proposal actually *decreases* the pre-existing risks from flooding events. Under DRCP's mining plan, there is a decreased risk of damage caused by flooding or erosion due to the proposed sedimentation ponds. 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 13; 1 RR 40:14-41:21. Specifically, DRCP's Permit Application and Mr. Padilla's unrebutted expert testimony establish that DRCP's proposed mining plan will have a zero net effect on flooding in the Elm Creek watershed outside of the mining project area. 1 RR 53:21-23. Moreover, DRCP's mining plan decreases the likelihood that materials will be swept downstream because the use of sedimentation ponds contains the flow within the channel. 1 RR, Exhibit 3, at 5 [Tab 5]; 1 RR, Exhibit 1 at ¶ 15.

Indeed, the sediment load leaving the mine area will be lower if DRCP conducts its proposed mining operation with sedimentation ponds than if DRCP does nothing at all in the floodplain. 1 RR 54:1-2. Although the Floodplain Administrator may doubt the efficacy of such ponds because, based on dubious and inapposite "personal experience," they may overflow, the ponds are, in fact, *designed* to overflow. 1 RR 56:9-14. The uncontroverted expert testimony establishes that DRCP's mining plan and its use of sedimentation ponds would not constitute a new danger for those living downstream; to the contrary, they would decrease the pre-existing risks from inevitable flooding.

The Floodplain Administrator testified that he denied the permit based, in part, on his personal experiences observing the devastation from flooding. *See, e.g.*, 1 RR, Exhibit 9, at 49:18-23, 46:14-22. That is simply not the issue. As the Ordinance recognizes, there will be flooding if DRCP's proposed use is permitted; and there will be flooding if it is prohibited.[5] The issue is the effect, if any, of the proposed use on the velocity and height of

---

[5]  Even Judge Saucedo recognizes that flooding occurs, regardless of DRCP's proposed mining plan. 1 RR, Exhibit 9 at 49:23-25 (discussing flooding in the past, and recognizing that DRCP is "not responsible for the flooding").

24

flood waters.  The Floodplain Administrator's personal observations of past flooding events simply does not address this issue.

### 2. The Ordinance does not address water quality or "contaminants."

Similarly, Appellees erroneously believe that the Ordinance requires consideration of potential contaminants.  As discussed above, nothing in the Ordinance addresses contaminants.  *See* Part I.B.2, *supra*.  Water quality is regulated exclusively by the TCEQ, which has already approved DRCP's proposed mining operations.  The Ordinance provides no basis for the Floodplain Administrator to deny a permit based on hypothetical fears regarding potential "contaminants."

Moreover, although Padilla agreed that sulfur "could be" considered a contaminant, he did not testify that the sulfur was dangerous or that the levels involved would pose any health risk.  Indeed, he also testified that dirt is a "contaminant."  1 RR 75:5-8.  And while he testified that he would not want to drink the water coming out of the sedimentation ponds, who would?  Neither DRCP nor any other landowner is required to ensure that the flood water coming off of its property is potable.  People do not drink flood water, and there is no evidence that dangerous levels of any contaminant would be

present in flood waters leaving DRCP's property or that there would be any danger to drinking water. Indeed, the Floodplain Administrator merely raised the "possibility" of contamination, but could not identify any particular contaminants or contamination that might occur under DRCP's mining plan. 1 RR, Exhibit 9 at 34:10-23.

## B. Appellees waived factor (d), the compatibility of the proposed use with existing and anticipated development.

Appellees have waived any argument that factor (d) was a basis for the Floodplain Administrator's rejection of DRCP's permit application. In his deposition, the Floodplain Administrator testified that his denial was based on factors (a)-(c). 1 RR, Exhibit 9 at 46 ("Q: The floodplain permit was denied because of the factors in 2(a), (b) and (c)? A: Yes, sir."). Nor did Appellees contest factor (d) in the trial court. 2 CR 874-79. Appellees' attempt to assert factor (d) for the first time in this Court should be rejected as untimely and waived. TEX. R. APP. P. 33.1(a)(1); *Nall v. Plunkett*, 404 S.W.3d 552, 555-56 (Tex. 2013) (holding issues not raised and briefed in lower courts are waived); *Jackson v. Neal*, No. 13-07-00164-CV, 2009 WL 140507, at *4 & n.3 (Tex. App.—Corpus Christi-Edinburg Jan. 22, 2009, no pet.) (mem. op.) ("This argument, however, was not raised in the trial court and is,

26

therefore, waived."). Try as they might, Appellees' latest attempt fails to transform the Floodplain Administrator's erroneous consideration of irrelevant factors (such as neighborhood sentiment), into permissible categories.

In any case, Appellees' arguments regarding factor (d) are meritless. Appellees assert that factor (d) requires the consideration of the compatibility of the proposed use with uses on neighboring properties and neighborhood opposition. Appellees once again conveniently forget that this Ordinance is about floodplain management, not the approval of a coal mine. Nor is it a zoning ordinance. Neighborhood opposition is simply not something that this narrow floodplain-management Ordinance is intended to—or does in fact—cover. As in *Starr County v. Starr Industrial Services, Inc.*, 584 S.W.2d 352, 356 (Tex. App.—Austin 1979, writ ref'd n.r.e.), "[n]owhere in the [Ordinance] is local opposition mentioned for consideration as a standard to govern the [Floodplain Administrator's] decision," and, thus, the Floodplain Administrator's consideration of such local opposition, and the "best interests of the County," was arbitrary and capricious, and

constitutes an abuse of discretion.[6] *Id.* at 356.  Nothing in the Ordinance or any other law gives county residents located miles away from DRCP's property the right to veto DRCP's approved use of its land.  Those decisions are left to the state RRC and TCEQ, both of which have approved the proposed mining operation.  1 RR, Exhibit 7; 1 RR, Exhibit 8.  Indeed, the residents who are opposed have already fully litigated their opposition to the RRC's approval of the mine and its location.  1 RR, Exhibit 8 at ¶ 9 (identifying those persons and entities who obtained party status in RRC hearing); *see generally Re: The Application of Dos Republicas Coal Partnership for Renewal/Revision/Expansion of Surface Coal Mining And Reclamation Permit No. 42A, Eagle Pass Mine*, Docket No. C5-0003-SC-42-C (RRC, Surface Mining and Reclamation Division 2012).  Factor (d) simply does not give the Floodplain Administrator the authority to override the outcome of the RRC's decision and the subsequent litigation.

Moreover, factor (c) already addresses the effect of the proposed use on flood damage to other properties.  1 RR, Exhibit 5, Article 4, Section

---

[6]     In any case, the unrebutted and uncontradicted evidence in this case establishes that the proposed use would *reduce* the effects of flooding events on downstream properties and, thus, would be, under any reasonable meaning of the words, "in the best interests of the county."

28

C(2)(c) [Tab 3]; 1 RR 42-43.  Appellees can cite nothing that suggests that factor (d) encompasses consideration of the compatibility of all land uses within the county.[7]  It certainly cannot transform a narrow ordinance addressing flood damage prevention into a general, county-wide development scheme.  But even if it did, "neighborhood sentiment" still would not fall within this factor unless the meaning of "compatibility" is so broad as to be essentially standardless and, thus, unconstitutionally vague. *Bradley*, 990 S.W.2d at 253; *Texas Antiquities Comm.*, 554 S.W.2d at 928; *Pak-a-Sak*, 451 S.W.3d at 137.  Neither this factor, nor indeed anything else in the Ordinance, permits the Floodplain Administrator to deny a permit because he deems that a mine is inconsistent with a use miles away, or allows the Floodplain Administrator to consider his estimation of popular opposition to the proposed use of the property.

III. **The duty to grant the permit is not discretionary where, as here, the Ordinance's conditions are met.**

Appellees' assertion that the Ordinance is discretionary by definition is simply another manifestation of its mistaken assertion that the Ordinance

---

[7]     In fact, Padilla testified that after the seven-year life of the mining plan, the land will be restored to its original condition and "then can be used in whatever comprehensive plan the county wishes."  1 RR 43-44.

29

invests the Floodplain Administrator with authority to evaluate permit applications without regard to the ten factors enumerated in the Ordinance. *See* Part I, *supra.* Indeed, this interpretation would give the Floodplain Administrator such standardless discretion that it would create "a situation ripe for 'resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Bradley*, 990 S.W.2d at 253 (quoting *Grayned,* 408 U.S. at 109)).

Properly interpreted, however, the Ordinance does not grant the Floodplain Administrator free reign to reject otherwise compliant applications based on his personal feelings, desires, opinions, or grandiose notions of the best interests of the county. Once the requirements and factors enumerated in the Ordinance are satisfied, it is the Floodplain Administrator's duty under the Ordinance to grant the permit.[8] Because the unrebutted and uncontradicted evidence in this case is that the proposed use

---

[8]    Appellees' assertion that the Floodplain Administrator had to consider all 21 pages of the Ordinance is frivolous. *See* Resp. at 6, 9, 22. Of the 21 pages, 3 are certification pages, 7 are definitions, 2 relate to variance procedures, 3 relate to building standards, and 4 include general provisions, findings and statement of purpose. 1 RR, Exhibit 5 [Tab 3]. Only 2.5 pages relate to the duties of the Floodplain Administrator and the requirements and factors that the Floodplain Administrator must determine have been met in order to grant the permit. *Id.* None of the provisions on the remaining 18.5 pages relate to the permitting procedure. *Id.*

would not increase, but actually would *reduce* the dangers posed by flooding events, the Floodplain Administrator had a ministerial duty to grant the permit. *See* Part II, *supra*; Br. at 20-39.

Further, Appellees concede that the Floodplain Administrator considered factors outside of the ten factors mandated in the Ordinance. Resp. at 11. Because, under the proper interpretation of the Ordinance, the requirements and factors set forth in article 4, section C of the Ordinance are the exclusive standards by which a permit application must be judged, the Floodplain Administrator's consideration of other factors is, per se, an abuse of discretion. Br. at 49-64.

**IV. The Floodplain Administrator's failure to provide any written explanation of his decision evidences an abuse of discretion and is arbitrary and capricious.**

**A. The requirement of a written explanation is inherent in the concept of judicial review.**

Appellees' argument that principles of law requiring a written explanation of an administrator's decision apply only to "state agencies" is specious. As explained in DRCP's opening brief, the power of Texas courts to judicially review the Floodplain Administrator's decision necessarily "implies a power to require the [Floodplain Administrator] to supply any

31

reasons or explanations necessary for the reviewing court to understand the [Floodplain Administrator's] final order" so that there may be "meaningful judicial review" rather than a "charade of the real thing." *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 900 (Tex. App.—Austin 1993, writ denied); *see generally* Br. at 42-44. Although some of the cases cited may involve state agencies, the principles apply with equal force to counties, and the Floodplain Administrator.

Similarly, Appellees' citation to *Texas Health Facilities Commission v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446 (Tex. 1984), is inapposite. Although that case does stand for the proposition that the scope of judicial review of administrative decisions "is governed by the enabling statute in the area under adjudication," *id.* at 449, that "scope" refers to the standard of review the court should apply to the agency's decision. *Id.* It does not refer to the requirement that the administrator provide a written explanation. Indeed, it is hard to apply any standard of review (except *de novo*) where the administrator fails to provide any written explanation for his decision.

Again, Appellees act as if the Floodplain Administrator has unfettered discretion to reject permit applications for unspecified reasons that only he

knows. This is the very essence of the kind of arbitrary and capricious administrative actions that Texas courts reject. The Floodplain Administrator's two-sentence order provides no basis on which to uphold his naked exercise of standardless discretion. This Court should reject his attempt to insulate his arbitrary and capricious actions by hiding his reasons for denying the Permit Application.

**B.** **There is no evidence of any [climate] changed circumstances that justify the disparate treatment of the 1998 and 2013 permit applications.**

Showing true desperation, Appellees attempt to tie the Floodplain Administrator's denial of DRCP's permit application to controversial climate change theories. Resp. at 30. Appellees cite a New York Times article, which was published (and deals with events) occurring well after the trial – and thus was not, of course, part of the trial record and, therefore not properly before this Court. *See Perry v. S.N.*, 973 S.W.2d 301, 303 (Tex. 1998) ("We may not consider factual assertions that appear solely in the appellate briefs and not before the trial court.").

Moreover, because Appellees cite to the article in an attempt to prove the truth of the matters discussed therein, the article is rank hearsay. TEX. R. EVID. 801(d); *Walker v. Hitchcock Indep. Sch. Dist.*, No. 01-11-00797-CV, 2013

WL 3771302, at *6 (Tex. App.—Houston [1st Dist.] July 16, 2013, no pet.) (mem. op.) ("[N]ewspaper articles that are offered to prove the truth of what the article is reporting are inadmissible hearsay."); *City of Austin v. Houston Lighting & Power Co.*, 844 S.W.2d 773, 791 (Tex. App.—Dallas 1992, writ denied) ("Generally, Texas courts consider newspaper articles inadmissible hearsay.").

Further, nothing in the article suggests that there was "a change in relevant circumstances between 1998 and 2013." Resp. at 30. Indeed, even if the events described in the article could possibly suggest a change in circumstances, they occurred in 2015 and, thus, could not have formed any part of the Floodplain Administrator's consideration of the Permit Application. Appellees' misleading assertion to the contrary must be rejected. Further, events in other parts of Texas do not provide any relevant evidence about Maverick County or the Permit Application at issue here. A vague prediction that there may be more "extreme weather events" does not change the analysis in this case. There is simply no evidence in or outside the record of any relevant changes that would justify in the disparate treatment of the two Permit Applications. This is just the latest permutation

34

of Appellees' revisionist justifications of the Floodplain Administrator's denial of the Permit Application.

## V. Appellees' novel contention that the Floodplain Administrator's due process violation was "remedied" by instituting an action for an extraordinary writ is without merit.

Appellees assert that DRCP's "argument assumes DRCP has a property interest in a permit it has requested but not yet been granted." Resp. at 35. But DRCP's argument assumes no such thing. It is undisputed that DRCP has a property interest in the mining area itself, as well as having a property interest in its state-issued permits from the RRC and TCEQ, which authorize DRCP to conduct mining operations on its property. Br. at 64-65. Further, Appellees assert that DRCP has not "contended that Judge Saucedo's actions stripped it of its ability to use its land in accordance with its existing permits." Resp. at 35. But this is *precisely* what DRCP has argued. The Floodplain Administrator's actions have deprived DRCP of its property interests in its state permits and the use of its property in accord with those permits. Appellees' assertions to the contrary is wishful or mistaken.

Moreover, Appellees' assertion that DRCP received due process because it had to pursue an extraordinary writ in order to impel the Floodplain Administrator to perform his duties is absurd. Not surprisingly,

Appellees cite no authority for the incredible proposition that a due process violation is "remedied" through a mandamus proceeding.

## PRAYER

Pursuant to TEX. R. APP. P. 43.2, Dos Republicas Coal Partnership respectfully requests that this Court reverse the trial court's final judgment and render judgment in its favor and issue a writ of mandamus ordering the Floodplain Administrator and the Maverick County Commissioners Court to issue a floodplain development permit to DRCP. In the alternative, Dos Republicas Coal Partnership requests that the final judgment be reversed and the case remanded for the trial court to determine any remaining issues of fact, or for resolution of any other issues identified by the Court. Finally, DRCP requests any and all other relief to which it is may be entitled.

Respectfully Submitted,

*/s/ Bill Cobb*

Bill Cobb
State Bar No. 00796372
Matthew Ploeger
State Bar No. 24032838
Jenny L. Smith
State Bar No. 24079357
COBB & COUNSEL
401 Congress Avenue, Suite 1540
Austin, Texas 78701
bill@cobbxcounsel.com
(512) 693-7570
(512) 687-3432 – Facsimile


Leonard Dougal
State Bar No. 06031400
Mallory Beck
State Bar No. 24073899
JACKSON WALKER L.L.P.
100 Congress, Suite 1100
Austin, Texas 78701
E: ldougal@jw.com
T: (512) 236-2233
F: (512) 391-2112


**Attorneys for Appellant**
**Dos Republicas Coal Partnership**

37

**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), and relying on the word count function in the word processing software used to produce this document, I hereby certify that the total word count in this document is 7,488.

*/s/ Bill Cobb*
Bill Cobb

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of July, 2015, a true and correct copy of the foregoing document has been served upon the following attorneys by electronic service and email.

Alfonso Nevarez C.
Nevarez Law Group, PC
780 Rio Grande Street
Eagle Pass, Texas 78852
anc@nevarezlawgroup.com
mvw@nevarezlawgroup.com

Rolando Jasso
State Bar No. 10491500
Claudio Heredia
State Bar No. 09505300
Knickerbocker, Heredia, Jasso, & Stewart P.C.
468 East Main Street
Eagle Pass, Texas 78852-4598
rmjasso@khjslaw.com
chlaw750@yahoo.com

Law Office of Beth Watkins
926 Chulie Drive
San Antonio, Texas 78216
(210) 225-6666—phone
(210) 225-2300—fax
Beth.Watkins@WatkinsAppeals.com

*/s/ Bill Cobb*
Bill Cobb

**APPENDIX**

Tab 1    Order Denying Dos Republicas Coal Partnership's Amended Petition for Writ of Mandamus (5 CR 2940)

Tab 2    Findings of Fact and Conclusions of Law (5 CR 3207-12)

Tab 3    Maverick County Flood Damage Prevention Ordinance (1 RR, Exhibit 5)

Tab 4    April 3, 2014 Letter Denying DRCP's Floodplain Development Permit Application (1 RR, Exhibit 4)

Tab 5    Supplemental Floodplain Analysis, Executive Summary (1 RR, Exhibit 3, at 2-6)

# TAB 1

NO. 14-03-29340-MCV

| | | |
|---|---|---|
| DOS REPUBLICAS COAL PARTNERSHIP, | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | |
| DAVID SAUCEDO as FLOODPLAIN | § | MAVERICK COUNTY TEXAS |
| ADMINISTRATOR and COUNTY JUDGE | § | |
| OF THE MAVERICK COUNTY | § | |
| COMMISIONERS COURT and THE | § | |
| MAVERICK COUNTY COMMISIONERS | § | |
| COURT | § | |
| *Defendant* | § | 293rd JUDICIAL DISTRICT |

## ORDER DENYING PLAINTIFF
## DOS REPUBLICAS COAL PARTNERSHIP'S AMENDED PETITION FOR
## WRIT OF MANDAMUS

On October 9, 2014, came to be heard Plaintiff Dos Republicas Coal Parnership (DCCP) Amended Petition for Writ of Mandamus. The Court, having reviewed the Plaintiff's Writ, and the responses, pleadings, briefs, evidence and testimony from both Plaintiff and Defendants therein, and having considered same, is of the opinion that Plaintiff DCCP's Amended Petition for Writ of Mandamus should be **DENIED**.

IT IS THEREFORE, **ORDERED** that the Plaintiff DCCP's Amended Petition for Writ of Mandamus is hereby **DENIED**.

Signed this ___10th___ day of October, 2014.

FILED

AT 3:57 O'CLOCK P M

OCT 10 2014

DISTRICT CLERK, MAVERISK COUNTY, TEXAS

_____, DEPUT

_____
PRESIDING JUDGE

2935

2940

# TAB 2

| | | |
|---|---|---|
| DOS REPUBLICAS COAL PARTNERSHIP, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| DAVID SAUCEDO as FLOODPLAIN | § | MAVERICK COUNTY, TEXAS |
| ADMINISTRATOR and COUNTY JUDGE | § | |
| OF THE MAVERICK COUNTY | § | |
| COMMISIONERS COURT and THE | § | |
| MAVERICK COUNTY COMMISIONERS | § | |
| COURT, | § | |
| | § | |
| Defendants. | § | 293rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiff's Amended Motion for Writ of Mandamus in the above-captioned cause came on for hearing before the Court on October 9, 2014. All parties were present through their attorneys. After considering the pleadings, the evidence, and the arguments of counsel, the Court entered it's Order Denying Plaintiff's Amended Motion for Writ of Mandamus on October 10, 2014. On October 27, 2014, Plaintiff requested that this Court enter findings of fact and conclusions of law, which are hereby submitted as follows:

### FINDINGS OF FACT

1. On August 15, 1996, the Maverick County Commissioners Court approved and adopted the Maverick County Flood Damage Prevention Ordinance ("Ordinance"). The Ordinance was adopted pursuant to the National Flood Insurance Program and was established to minimize flood losses in Maverick County, Texas.[1]

---

[1] Plaintiff Exhibit 5, *Maverick County Flood Damage Prevention Ordinance*, pg. 1

1

3201

3207

2. Through the Ordinance, the Maverick County Commissioners Court appointed the County Judge as the Floodplain Administrator with the authority to review, and either approve or deny all applications for development permits required by adoption of the Ordinance. [2]

3. As per Article 4, Section C(1), an Application for a Development Permit must be presented to the Floodplain Administrator and must include the information contained in Subsections (a)-(e). [3]

4. As per Article 4, Section C(2), approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of the Ordinance and the relevant factors contained in Subsections (a)-(j) (the "factors"). [4]

5. On November 3, 2011, Dos Republicas Coal Partnership ("DRCP") filed an Application for Floodplain Permit with Maverick County, as required by the Ordinance. DRCP filed a Supplemental Application on September 4, 2013, after a new FEMA floodplain map was adopted.

6. After reviewing DRCP's Application and taking into consideration all of the provisions of the Ordinance, the Floodplain Administrator decided that DRCP satisfied the requirements contained in Article 4, Section C(1) contained in the Ordinance, but had concerns with factors (a)-(c) contained in Article 4, Section C(2). [5]

7. Factors (a)-(c) cited by Floodplain Administrator are:

   (a) The danger to life and property due to flooding or erosion damage;
   (b) The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner; and
   (c) The danger that materials may be swept onto other lands to the injury of others. [6]

8. As a result of DRCP's failure to address the concerns the Floodplain

---

[2] Id. at pg. 12

[3] Id. at pg. 13

[4] Id. at pgs. 13-14

[5] <u>Plaintiff Exhibit 9</u>, Excerpts from Transcript dated October 2, 3014, *Oral and Video Deposition of the Corporate Representative of the Maverick County Commissioners Court (David Raul Saucedo)*, pg. 69 lines 7-22

[6] Id. at pgs. 70-71 lines 24-10

2

3202

**3208**

Administrator had with factors (a)-(c), the Floodplain Administrator denied DRCP's Development Permit [7]. DRCP was notified of the Floodplain Administrators decision in a letter dated April 3, 2014.[8] Thereafter, DRCP filed this cause on March 25, 2014.

9.  At the October 9, 2014 hearing, DRCP called its expert, civil engineer Paul Padilla. He had prepared the Supplemental Floodplain Analysis to the original 2011 Floodplain Application, which was submitted to the Floodplain Administrator as a Supplemental Application. Paul Padilla testified regarding the requirements for a floodplain permit, and whether DRCP met all the requirements[9].

10. The Court finds that DRCP's expert Paul Padilla failed to demonstrate through his testimony that all ten factors contained in Article 4, Section C (2) (a)-(j) of the Ordinance were satisfied, so as to support the granting of the Permit. Specifically, Mr. Padilla failed to address factors (a)-(c) which the Floodplain Administrator referenced as his reason for denying DRCP's Development Permit.[10]

11. The Court finds that DRCP's expert, Paul Padilla, failed to demonstrate through his testimony that in his analysis he considered the specific rainfall events Maverick County is and has been susceptible to which have caused significant flooding and damage in Maverick County.[11]

12. The Court finds that DRCP's expert, Paul Padilla, failed to demonstrate through his testimony that in his analysis he considered the contaminants and/or sediment contained in the sedimentation ponds that will overflow in the event of a flood event in Maverick County.[12]

13. The Permit Procedures are outlined in Article 4, Section C of the Ordinance. There is no requirement in the Ordinance that the Floodplain Administrator's written denial of the Permit specifically address the requirements and/or factors which he considered as the basis for his decision.[13]

14. The Court finds that the "best interest of [Maverick] county" was not a basis

---

[7] *Deposition of David Raul Saucedo*, pg. 69 lines 7-14

[8] Plaintiff Exhibit 4, Defendant's letter of denial, April 3, 2014

[9] Excerpts from Transcript dated October 9, 2014, *Hearing on Abatement and Writ of Mandamus*, p.31

[10] Id. pg. 69 lines 9-21

[11] *Id.* at lines 18-21

[12] *Id.* at lines 9-17

[13] *Floodplain Prevention Ordinance*, pgs.13-14

3203

3209

for Defendants' decision standing alone, but was merely referenced when considering the Ordinance was designed to minimize flood losses in flood hazard areas of Maverick County, Texas.

15. The Court finds that the Floodplain Administrator's personal experiences were not a basis for Defendants' decision standing alone, but knowledge of the specific rainfall events in Maverick County which have caused significant flood damage in Maverick County was a mere reference when considering factors (a)-(c) contained in the Ordinance.

16. The Court finds that the Texas Coal Mining Regulations was not a basis for Defendants' decision standing alone, but was a mere reference when considering factors (a)-(c) contained in the Ordinance.

17. The Court finds that the floodwater quality was not a basis for Defendants' decision standing alone, but was a mere reference when considering the factors contained in the Ordinance; specifically, the danger to life and property due to flooding or erosion damage, and the danger that materials may be swept onto other lands to the injury of others.

18. The Court finds that the Floodplain Administrator denied DRCP's permit based on the concern that if the permit was approved, the occurrence of a flooding event (such as the flooding events experienced by Maverick County in the past) will carry sediment and/or contaminants downstream into the homes of Maverick County citizens and into Elm Creek.

19. The Court finds that the Floodplain Administrator based his decision to deny DRCP's Development Permit on all of the provisions of the Ordinance and the relevant factors, as he was authorized to do by Article 4 of the Ordinance.[14]

20. The Court finds that the Floodplain Administrator did not abuse his discretion when rendering his decision to deny DRCP's Development Permit.

## CONCLUSIONS OF LAW

1. A district court may issue a writ of mandamus to rectify an abuse of discretion, when a Commissioners Court acts illegally, unreasonably, or arbitrarily.

---

[14] *Deposition of David Raul Saucedo*, pg. 69 lines 7-14

4

3204

3210

2. A Commissioners Court abuses its discretion—necessitating mandamus relief—when it either: (A) fails to perform a purely ministerial act, or (B) fails to consider a factor the Legislature directs it to consider, or considers an irrelevant factor.

3. Defendants considered all of the provisions of the Ordinance as well as the relevant factors as per Article 4, Section C(2) of the Ordinance, and denial of DRCP's Development Permit did not constitute an abuse of discretion.

4. Defendants were not required to provide the reasons for denying DRCP's Development Permit Application and Supplemental Application at the time of issuing the denial, and the failure to do so, did not constitute an abuse of discretion.

5. Defendants did not consider any irrelevant factors when denying DRCP's Development Permit Application and Supplemental Application and the denial of same did not constitute an abuse of discretion.

6. Defendants' reference to the best interest of the county, floodwater quality, surface coal mining regulations, and personal experience was not a basis for Defendants' decision standing alone and that reference did not render Defendants' denial of DRCP's Development Permit Application and Supplemental Application arbitrary and capricious.

7. The Ordinance does not deprive DRCP of the use of its property because Defendants' denial of DRCP's Development Permit Application does not deprive it of all economically viable uses of its property, therefore due process is not an issue, and the denial was not arbitrary or capricious or an abuse of discretion.

8. The Floodplain Administrator was required, under Article 4, Section C(2) to approve or deny DRCP's Development Permit Application and Supplemental Application based on all of the provisions of the Ordinance, and the relevant factors listed in (a)-(j).

9. The Floodplain Administrator was not required, and did not have a ministerial duty to grant DRCP's Development Permit Application and Supplemental Application if the Floodplain Administrator found that the application did not meet the provisions of the Ordinance and relevant factors.

5

3211

3205

10. DRCP's Development Permit Application and Supplemental Application did not satisfy the requirements of the Ordinance and the act of approving or denying it was not a ministerial act, therefore, the Floodplain Administrator's denial of the permit was not illegal, arbitrary or capricious or an abuse of discretion.

SIGNED this 5th day of December, 2014.

_____
JUDGE PRESIDING

FILED
AT 433 O'CLOCK P M
DEC 05 2014
IRENE RODRIGUEZ
DISTRICT CLERK, MAVERICK COUNTY TEXAS
BY_____ DEPUTY

3206

3212

# TAB 3

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/22/2014 3:27:24 PM
DORIAN E. RAMIREZ
Clerk

60.3(b) Revised as of October 1, 1989

FLOOD DAMAGE PREVENTION ORDINANCE

ARTICLE I

STATUTORY AUTHORIZATION, FINDINGS OF FACT, PURPOSE AND METHODS

SECTION A.  STATUTORY AUTHORIZATION

The Legislature of the State of ___Texas___ has in (statutes) VTS-Water Code 16.318 delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses.  Therefore, the County Commissioners
                                                        (governing body)
of ___Maverick County___ , ___Texas___ , does ordain as
         (local unit)          (State)
follows:

SECTION B. FINDINGS OF FACT

  (1) The flood hazard areas of ___Maverick County___ are subject to periodic inundation which results in loss of life and property, health and safety hazards, disruption of commerce and governmental services, and extraordinary public expenditures for flood protection and relief, all of which adversely affect the public health, safety and general welfare.

  (2)  These flood loses are created by the cumulative effect of obstructions in floodplains which cause an increase in flood heights and velocities, and by the occupancy of flood hazards areas by uses vulnerable to floods and hazardous to other lands because they are inadequately elevated, floodproofed or otherwise protected from flood damage.

SECTION C.  STATEMENT OF PURPOSE

It is the purpose of this ordinance to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to:

  (1)  Protect human life and health;

  (2)  Minimize expenditure of public money for costly flood control projects;

-1-

Plaintiff Exhibit 5

EXHIBIT
5   ARL
    10/09/14

(3)   Minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

(4)   Minimize prolonged business interruptions;

(5)   Minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, streets and bridges located in floodplains;

(6)   Help maintain a stable tax base by providing for the sound use and development of flood-prone areas in such a manner as to minimize future flood blight areas; and

(7)   Insure that potential buyers are notified that property is in a flood area.

SECTION D.   METHODS OF REDUCING FLOOD LOSSES

In order to accomplish its purposes, this ordinance uses the following methods:

(1)   Restrict or prohibit uses that are dangerous to health, safety or property in times of flood, or cause excessive increases in flood heights or velocities;

(2)   Require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;

(3)   Control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of flood waters;

(4)   Control filling, grading, dredging and other development which may increase flood damage;

(5)   Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

# ARTICLE 2

## DEFINITIONS

Unless specifically defined below, words or phrases used in this ordinance shall be interpreted to give them the meaning they have in common usage and to give this ordinance its most reasonable application.

ALLUVIAL FAN FLOODING - means flooding occurring on the surface of an alluvial fan or similar landform which originates at the apex and is characterized by high-velocity flows; active processes of erosion, sediment transport, and deposition; and unpredictable flow paths.

APEX - means a point on an alluvial fan or similar landform below which the flow path of the major stream that formed the fan becomes unpredictable and alluvial fan flooding can occur.

AREA OF SHALLOW FLOODING - means a designated AO, AH, or VO zone on a community's Flood Insurance Rate Map (FIRM) with a one percent chance or greater annual chance of flooding to an average depth of one to three feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and where velocity flow may be evident. Such flooding is characterized by ponding or sheet flow.

AREA OF SPECIAL FLOOD HAZARD - is the land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year. The area may be designated as Zone A on the Flood Hazard Boundary Map (FHBM). After detailed ratemaking has been completed in preparation for publication of the FIRM, Zone A usually is refined into Zones A, AE, AH, AO, A1-99, VO, V1-30, VE or V.

BASE FLOOD - means the flood having a one percent chance of being equalled or exceeded in any given year.

BASEMENT - means any area of the building having its floor subgrade (below ground level) on all sides.

CRITICAL FEATURE - means an integral and readily identifiable part of a flood protection system, without which the flood protection provided by the entire system would be compromised.

DEVELOPMENT - means any man-made change in improved and unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials.

ELEVATED BUILDING - means a nonbasement building (i) built, in the case of a building in Zones A1-30, AE, A, A99, AO, AH, B, C, X, and D, to have the top of the elevated floor, or in the case of a building in Zones V1-30, VE, or V, to have the bottom of the lowest horizontal structure member of the elevated floor elevated above the ground level by means of pilings, columns (posts and piers), or shear walls parallel to the floor of the water and (ii) adequately anchored so as not to impair the structural integrity of the building during a flood of up to the magnitude of the base flood. In the case of Zones A1-30, AE, A, A99, AO, AH, B, C, X, and D, "elevated building" also includes a building elevated by means of fill or solid foundation perimeter walls with openings sufficient to facilitate the unimpeded movement of flood waters. In the case of Zones V1-30, VE, or V, "elevated building" also includes a building otherwise meeting the definition of "elevated building," even though the lower area is enclosed by means of breakaway walls if the breakaway walls met the standards of Section 60.3(e)(5) of the National Flood Insurance Program regulations.

EXISTING CONSTRUCTION - means for the purposes of determining rates, structures for which the "start of construction" commenced before the effective date of the FIRM or before January 1, 1975, for FIRMs effective before that date. "Existing construction" may also be referred to as "existing structures."

EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the floodplain management regulations adopted by a community.

EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means the preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

FLOOD OR FLOODING - means a general and temporary condition of partial or complete inundation of normally dry land areas from:

   (1)  the overflow of inland or tidal waters.
   (2)  the unusual and rapid accumulation or runoff of surface waters from any source.

FLOOD HAZARD BOUNDARY MAP (FHBM) - means an official map of a community, issued by the Administrator, where the boundaries of the flood, mudslide (i.e., mudflow) related erosion areas having special hazards have been designated as Zones A, M, and/or E.

FLOOD INSURANCE RATE MAP (FIRM) - means an official map of a community, on which the Federal Emergency Management Agency has delineated both the areas of special flood hazards and the risk premium zones applicable to the community.

FLOOD INSURANCE STUDY - is the official report provided by the Federal Emergency Management Agency. The report contains flood profiles, water surface elevation of the base flood, as well as the Flood Boundary-Floodway Map.

FLOODPLAIN OR FLOOD-PRONE AREA - means any land area susceptible to being inundated by water from any source (see definition of flooding).

FLOODPLAIN MANAGEMENT - means the operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works and floodplain management regulations.

FLOODPLAIN MANAGEMENT REGULATIONS - means zoning ordinances, subdivision regulations, building codes, health regulations, special purpose ordinances (such as a floodplain ordinance, grading ordinance and erosion control ordinance) and other applications of police power. The term describes such state or local regulations, in any combination thereof, which provide standards for the purpose of flood damage prevention and reduction.

FLOOD PROTECTION SYSTEM - means those physical structural works for which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the areas within a community subject to a "special flood hazard" and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

FLOOD PROOFING - means any combination of structural and non-structural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures and their contents.

FLOODWAY (REGULATORY FLOODWAY) - means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

LOWEST FLOOR - means the lowest floor of the lowest enclosed area (including basement). An unfinished or flood resistant enclosure, usable solely for parking or vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; provided that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirement of Section 60.3 of the National Flood Insurance Program regulations.

MANUFACTURED HOME - means a structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" does not include a "recreational vehicle".

MANUFACTURED HOME PARK OR SUBDIVISION - means a parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

MEAN SEA LEVEL - means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referenced.

NEW CONSTRUCTION - means, for the purpose of determining insurance rates, structures for which the "start of construction" commenced on or after the effective date of an initial FIRM or after December 31, 1974, whichever is later, and includes any subsequent improvements to such structures. For floodplain management purposes, "new construction" means structures for which the "start of construction" commenced on or after the effective date of a floodplain management regulation adopted by a community and includes any subsequent improvements to such structures.

NEW MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by a community.

RECREATIONAL VEHICLE - means a vehicle which is (i) built on a single chassis; (ii) 400 square feet or less when measured at the largest horizontal projections; (iii) designed to be self-propelled or permanently towable by a light duty truck; and (iv) designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

FUNCTIONALLY DEPENDENT USE - means a use which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities, port facilities that are necessary for the loading and unloading of cargo or passengers, and ship building and ship repair facilities, but does not include long-term storage or related manufacturing facilities.

HIGHEST ADJACENT GRADE - means the highest natural elevation of the ground surface prior to construction next to the proposed walls of a structure.

HISTORIC STRUCTURE - means any structure that is:

(a) Listed individually in the National Register of Historic Places (a listing maintained by the Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register;

(b) Certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district;

(c) Individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of Interior; or

(d) Individually listed on a local inventory or historic places in communities with historic preservation programs that have been certified either:

(1) By an approved state program as determined by the Secretary of the Interior or;

(2) Directly by the Secretary of the Interior in states without approved programs.

LEVEE - means a man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding.

LEVEE SYSTEM - means a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

START OF CONSTRUCTION - (for other than new construction or substantial improvements under the Coastal Barrier Resources Act (Pub. L. 97-348)), includes substantial improvement and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition, placement, or other improvement was within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for basement, footings, piers or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

STRUCTURE - means a walled and roofed building, including a gas or liquid storage tank, that is principally above ground, as well as a manufactured home.

SUBSTANTIAL DAMAGE - means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

SUBSTANTIAL IMPROVEMENT - means any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before "start of construction" of the improvement. This includes structures which have incurred "substantial damage", regardless of the actual repair work performed. The term does not, however, include either: (1) Any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary conditions or (2) Any alteration of a "historic structure", provided that the alteration will not preclude the structure's continued designation as a "historic structure."

VARIANCE - is a grant of relief to a person from the requirement of this ordinance when specific enforcement would result in unnecessary hardship. A variance, therefore, permits construction or development in a manner otherwise prohibited by this ordinance. (For full requirements see Section 60.6 of the National Flood Insurance Program regulations.)

VIOLATION — means the failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without the elevation certificate, other certifications, or other evidence of compliance required in Section 60.3(b)(5), (c)(4), (c)(10), (d)(3), (e)(2), (e)(4), or (e)(5) is presumed to be in violation until such time as that documentation is provided.

WATER SURFACE ELEVATION — means the height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929 (or other datum, where specified), of floods of various magnitudes and frequencies in the floodplains of coastal or riverine areas.

 

## ARTICLE 3

### GENERAL PROVISIONS

#### SECTION A.    LANDS TO WHICH THIS ORDINANCE APPLIES

The ordinance shall apply to all areas of special flood hazard
with the jurisdiction of ____Maverick County____.
                              (local unit)

#### SECTION B.    BASIS FOR ESTABLISHING THE AREAS OF SPECIAL FLOOD HAZARD

The areas of special flood hazard identified by the Federal
Emergency Management Agency on its Flood Hazard Boundary Map
(FHBM), Community Number 480470 ___, dated __December 20, 1977___, and
any revisions thereto are hereby adopted by reference and
declared to be a part of this ordinance.

#### SECTION C.    ESTABLISHMENT OF DEVELOPMENT PERMIT

A Development Permit shall be required to ensure conformance with
the provisions of this ordinance.

#### SECTION D.    COMPLIANCE

No structure or land shall hereafter be located, altered, or have
its use changed without full compliance with the terms of this
ordinance and other applicable regulations.

#### SECTION E.    ABROGATION AND GREATER RESTRICTIONS

This ordinance is not intended to repeal, abrogate, or impair any
existing easements, covenants, or deed restrictions. However,
where this ordinance and another ordinance, easement, covenant,
or deed restriction conflict or overlap, whichever imposes the
more stringent restrictions shall prevail.

#### SECTION F.    INTERPRETATION

In the interpretation and application of this ordinance, all
provisions shall be; (1) considered as minimum requirements; (2)
liberally construed in favor of the governing body; and (3)
deemed neither to limit nor repeal any other powers granted under
state statutes.



## SECTION G.    WARNING AND DISCLAIMER OR LIABILITY

The degree of flood protection required by this ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations.  On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes.  This ordinance does not imply that land outside the areas of special flood hazards or uses permitted within such areas will be free from flooding or flood damages.  This ordinance shall not create liability on the part of the community or any official or employee thereof for any flood damages that result from reliance on this ordinance or any administrative decision lawfully made thereunder.

# ARTICLE 4

## ADMINISTRATION

### SECTION A. DESIGNATION OF THE FLOODPLAIN ADMINISTRATOR

The _____County Judge_____ is hereby appointed the
Floodplain Administrator to administer and implement the
provisions of this ordinance and other appropriate sections of 44
CFR (National Flood Insurance Program Regulations) pertaining to
floodplain management.

### SECTION B. DUTIES & RESPONSIBILITIES OF THE FLOODPLAIN ADMINISTRATOR

Duties and responsibilities of the Floodplain Administrator shall
include, but not be limited to, the following:

(1) Maintain and hold open for public inspection all records
pertaining to the provisions of this ordinance.

(2) Review permit application to determine whether proposed
building site, including the placement of manufactured homes,
will be reasonably safe from flooding.

(3) Review, approve or deny all applications for development
permits required by adoption of this ordinance.

(4) Review permits for proposed development to assure that
all necessary permits have been obtained from those Federal,
State or local governmental agencies (including Section 404 of
the Federal Water Pollution Control Act Amendments of 1972, 33
U.S.C. 1334) from which prior approval is required.

(5) Where interpretation is needed as to the exact location
of the boundaries of the areas of special flood hazards (for
example, where there appears to be a conflict between a mapped
boundary and actual field conditions) the Floodplain
Administrator shall make the necessary interpretation.

(6) Notify, in riverine situations, adjacent communities and
the State Coordinating Agency which is ___T.N.R.C.C.___,
prior to any alteration or relocation of a watercourse, and
submit evidence of such notification to the Federal Emergency
Management Agency.

(7) Assure that the flood carrying capacity within the
altered or relocated portion of any watercourse is maintained.

(8) When base flood elevation data has not been provided in accordance with Article 3, Section B, the Floodplain Administrator shall obtain, review and reasonably utilize any base flood elevation data and floodway data available from a Federal, State or other source, in order to administer the provisions of Article 5.

SECTION C.   PERMIT PROCEDURES

(1) Application for a Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may include, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured homes, and the location of the foregoing in relation to areas of special flood hazard. Additionally, the following information is required:

a.   Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substantially improved structures;

b.   Elevation in relation to mean sea level to which any nonresidential structure shall be floodproofed;

c.   A certificate from a registered professional engineer or architect that the nonresidential floodproofed structure shall meet the floodproofing criteria of Article 5, Section B(2);

d.   Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development.

e.   Maintain a record of all such information in accordance with Article 4, Section (B)(1).

(2) Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

a.   The danger to life and property due to flooding or erosion damage;

b.   The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

c.   The danger that materials may be swept onto other lands to the injury of others;

d.   The compatibility of the proposed use with existing and anticipated development;

e. The safety of access to the property in times of flood for ordinary and emergency vehicles;

f. The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and facilities such as sewer, gas, electrical and water systems;

g. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site;

h. The necessity to the facility of a waterfront location, where applicable;

i. The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use;

j. The relationship of the proposed use to the comprehensive plan for that area.

## SECTION D. VARIANCE PROCEDURES

(1) The appeal Board as established by the community shall hear and render judgement on requests for variances from the requirements of this ordinance.

(2) The Appeal Board shall hear and render judgement on an appeal only when it is alleged there is an error in any requirement, decision, or determination made by the Floodplain Administrator in the enforcement or administration of this ordinance.

(3) Any person or persons aggrieved by the decision of the Appeal Board may appeal such decision in the courts of competent jurisdiction.

(4) The Floodplain Administrator shall maintain a record of all actions involving an appeal and shall report variances to the Federal Emergency Management Agency upon request.

(5) Variances may be issued for the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the State Inventory of Historic Places, without regard to the procedures set forth in the remainder of this ordinance.

(6)   Variances may be issued for new construction and substantial improvements to be erected on a lot of one-half acre or less in size contiguous to and surrounded by lots with existing structures constructed below the base flood level, providing the relevant factors in Section C(2) of this Article have been fully considered.  As the lot size increases beyond the one-half acre, the technical justification required for issuing the variance increases.

(7)   Upon consideration of the factors noted above and the intent of this ordinance, the Appeal Board may attach such conditions to the granting of variances as it deems necessary to further the purpose and objectives of this ordinance (Article 1, Section C).

(8)   Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

(9)   Variances may be issued for the repair or rehabilitation of historic structures upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum necessary to preserve the historic character and design of the structure.

(10)   Prerequisites for granting variances:
        a.   Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief.

        b.   Variances shall only be issued upon, (i) showing a good and sufficient cause; (ii) a determination that failure to grant the variance would result in exceptional hardship to the applicant, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisances, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

        c.   Any application to whom a variance is granted shall be given written notice that the structure will be permitted to be built with the lowest floor elevation below the base flood elevation, and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest floor elevation.

(11) Variances may be issued by a community for new construction and substantial improvements and for other development necessary for the conduct of a functionally dependent use provided that (1) the criteria outlined in Article 4, Section D(1)-(9) are met, and (ii) the structure or other development is protected by methods that minimize flood damages during the base flood and create no additional threats to public safety.

# ARTICLE 5

## PROVISIONS FOR FLOOD HAZARD REDUCTION

### SECTION A.  GENERAL STANDARDS

In all areas of special flood hazards the following provisions are required for all new construction and substantial improvements.

(1)  All new construction or substantial improvements shall be designed (or modified) and adequately anchored to prevent flotation, collapse or lateral movement of the structure resulting from hydrodynamic and hydrostatic loads, including the effects of buoyancy;

(2)  All new construction or substantial improvements shall be constructed by methods and practices that minimize flood damage;

(3)  All new construction or substantial improvements shall be constructed with materials resistant to flood damage;

(4)  All new construction or substantial improvements shall be constructed with electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities that are designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding.

(5)  All new and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

(6)  New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the system and discharge from the systems into flood waters; and,

(7)  On-site waste disposal systems shall be located to avoid impairment to them or contamination from them during flooding.


### SECTION B.  SPECIFIC STANDARDS

In all areas of special flood hazards where base flood elevation data has been provided as set forth in (i) Article 3, Section B, (ii) Article 4, Section B(8), or (iii) Article 5, Section C(3), the following provisions are required:

(1)  Residential Construction - new construction and substantial improvement of any residential structure shall have the lowest floor (including basement), elevated to or above the base flood elevation.  A registered professional engineer, architect, or land surveyor shall submit a certification to the Floodplain Administrator that the standard of this subsection as proposed in Article 4, Section C(1)a., is satisfied.

(2)  Nonresidential Construction - new construction and substantial improvements of any commercial, industrial or other nonresidential structure shall either have the lowest floor (including basement) elevated to or above the base flood level or together with attendant utility and sanitary facilities, be designed so that below the base flood level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and effects of buoyancy.  A registered professional engineer or architect shall develop and/or review structural design, specifications, and plans for the construction, and shall certify that the design and methods of construction are in accordance with accepted standards of practice as outlined in this subsection.  A record of such certification which includes the specific elevation (in relation to mean sea level) to which such structures are floodproofed shall be maintained by the Floodplain Administrator.

(3)  Manufactured Homes -

Require that all manufactured homes to be placed within Zone A on a community's FHBM or FIRM shall be installed using methods and practices which minimize flood damage.  For the purposes of this requirement, manufactured homes must be elevated and anchored to resist flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors.  This requirement is in addition to applicable State and local anchoring requirements for resisting wind forces.

SECTION C.   STANDARDS FOR SUBDIVISION PROPOSALS

(1)  All subdivision proposals including the placement of manufactured home parks and subdivisions shall be consistent with Article 1, Sections B, C, and D of this ordinance.

(2)  All proposals for the development of subdivisions including the placement of manufactured home parks and subdivisions shall meet Development Permit requirements of Article 3, Section C; Article 4, Section C; and the provisions of Article 5 of this ordinance.

(3)  Base flood elevation data shall be generated for subdivision proposals and other proposed development including the placement of manufactured home parks and subdivisions which is greater than 50 lots or 5 acres, whichever is lesser, if not otherwise provided pursuant to Article 3, Section B or Article 4, Section B (8) of this ordinance.

(4)  All subdivision proposals including the placement of manufactured home parks and subdivisions shall have adequate drainage provided to reduce exposure to flood hazards.

(5)  All subdivision proposals including the placement of manufactured home parks and subdivisions shall have public utilities and facilities such as sewer, gas, electrical and water systems located and constructed to minimize or eliminate flood damage.

## CERTIFICATION

It is hereby found and declared by ___Maverick County___
                                        (local unit)

that severe flooding has occurred in the past within its
jurisdiction and will certainly occur within the future; that
flooding is likely to result in infliction of serious personal
injury or death, and is likely to result in substantial injury or
destruction of property within its jurisdiction; in order to
effectively comply with minimum standards for coverage under the
National Flood Insurance Program; and in order to effectively
remedy the situation described herein, it is necessary that this
ordinance become effective immediately.

Therefore, an emergency is hereby declared to exist, and this
ordinance, being necessary for the immediate preservation of the
public peace, health and safety, shall be in full force and
effect from and after its passage and approval.

                                    APPROVED; _____
                                                  (community official)
                                              Rogelio Escobedo
                                              Maverick County Judge

PASSED: ___August 12, 1996___
              (date)

I, the undersigned, ___Sara Montemayor-County Clerk___, do hereby
certify that the above is a true and correct copy of an ordinance
duly adopted by the ___Honorable Commissioners' Court___, at a regular
meeting duly convened on ___August 12, 1996___.

_____
(Secretary or responsible person)

(SEAL)

THE STATE OF TEXAS
COUNTY OF MAVERICK

I, Sara Montemayor, Clerk of the County Court of Maverick County, Texas, do hereby certify that the following is a true and correct EXCERPT taken from the minutes of the Hon. County Commissioners' Court meeting of August 12, 1996, a quorum thereof being present, to-wit:

ITEM - 26 APPROVAL OF RESOLUTION FOR THE NATIONAL FLOOD INSURANCE PROGRAM

A motion was duly made by Commissioner Martinez, seconded by Commissioner Ibarra, and unanimously carried to approve resolution for the National Flood Insurance Program.

WITNESS my hand and seal of said office, at Eagle Pass, Texas, this the 15th of August, 1996.

Sara Montemayor
County Clerk
Maverick County, Texas

THE STATE OF TEXAS
COUNTY OF MAVERICK


    I, Sara Montemayor, Clerk of the County Court of Maverick
County, Texas, do hereby certify that the following is a true and
correct EXCERPT taken from the minutes of the Hon. County
Commissioners' Court meeting of August 12, 1996, a quorum thereof
being present, to-wit:


    ITEM - 27 APPROVAL TO ADOPT AND CERTIFY A LEGAL AND
    ENFORCEABLE ORDINANCE WHICH MEETS OR EXCEEDS THE MINIMUM
    STANDARD CRITERIA AS STATED IN SECTION 60.3 OF THE NATIONAL
    FLOOD INSURANCE PROGRAM REGULATIONS


    A motion was duly made by Commissioner Martinez, seconded by
Commissioner Ibarra, and unanimously carried to approve to adopt
and certify a legal and enforceable ordinance which meets or
exceeds the minimum standard criteria as stated in Section 60.3
of the National Flood Insurance Program Regulations.


WITNESS my hand and seal of said office, at Eagle Pass, Texas,
this the 15th of August, 1996.

                              Sara Montemayor
                              County Clerk
                              Maverick County, Texas

# TAB 4



# COUNTY OF MAVERICK

## Office of the County Judge
### David R. Saucedo

April 3, 2014

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/22/2014 3:27:24 PM
DORIAN E. RAMIREZ
Clerk

Dos Republicas
415 Madison Street
Eagle Pass, Texas 78852

RE:   Supplemental Floodplain Analysis
      Dos Republicas Coal Partnership:  Eagle Pass Mine
      Request for Floodplain Permit

Dear Floodplain Administrator:

I am in receipt of Dos Republicas Request for Floodplain Permit.  After reviewing the Request, I am hereby denying it.

Sincerely,

David R. Saucedo
County Judge

cc: Rolando Salinas- Attorney
    Claudio Heredia- Attorney



ARL
4   10/09/14

500 Quarry Street Suite 3 ∘ Eagle Pass, Texas, 78852 ∘ Tel. (830) 773-3824 ∘ Fax (830) 773-6450
e-mail: david.saucedo@co.maverick.tx.us

Plaintiff Exhibit 4

# TAB 5

## EXECUTIVE SUMMARY

Multatech Engineering, Inc. (Multatech) was contracted to evaluate the hydrologic and hydraulic effects resulting from the construction of the Eagle Pass Mine, and its associated ponds, access road, haul roads, collection ditches, railroad loop, loading facility, and mining activity, where it encroaches three existing Zone A floodplains as delineated on the current FEMA DFIRM map 48323C0350D dated April 4, 2011 (see Figure 2). Surface mining is a temporary use of the land; the land will be reclaimed after mining, to approximate original Contours per the requirements of the Railroad Commission of Texas.

The proposed mining activities and improvements are located within the Elm Creek drainage basin, west of Elm Creek and west of the existing Union Pacific Railroad (see Figure 1). The three Zone A floodplains are: the Unnamed Tributary "A" of Elm Creek (previously studied by Wilson & Company, Inc.), the Unnamed Tributary "B" of Elm Creek, and the existing floodplain of Elm Creek which tops the Union Pacific Railroad and encroaches into Mined Area "B" west of the railroad tracks.

Dos Republicas Coal Partnership has received permit approval from the Texas Railroad Commission to proceed with mining activities and now requests issuance of a floodplain development certificate from Maverick County to proceed with the proposed construction.

### Previous Wilson Study of Unnamed Tributary "A"

An earlier study prepared by Wilson & Company, Inc. in 2011 evaluated the channelization of the Unnamed Tributary "A" of Elm Creek, located at the northern portion of the site. Multatech evaluated the study to determine if any updates were necessary as a result of the latest FEMA information available. The Wilson study was found to be satisfactory and complete for adequately modeling the conveyance of the 100-year flood event through the proposed D-1 diversion channel. No modifications to the model or analysis were found to be necessary. The Wilson study is sufficient to demonstrate no adverse impact will result from the proposed improvements.

### Elm Creek/ CD-2 Analysis

The CD-2 collection ditch runs parallel to and west of the existing railroad (see Figure 4). This collection ditch has been designed and located to intercept sediment laden runoff from mined area "B" and convey it to the proposed sedimentation pond SP-1. The new DFIRM (Digital Flood Insurance Rate Map) dated April 4, 2011 shows the Elm Creek floodplain limits top the existing railroad tracks and extend along the railroad on the west side of the tracks where CD-2 is located. The previous FIRM from 1977 did not show the floodplain limits extending west of the tracks. Therefore Multatech analyzed the effects of the proposed CD-2 interception and conveyance of flow to re-delineate the floodplain limits in this area.

The existing drainage areas west of the Union Pacific Railroad that drain into CD-2 were delineated. Multatech determined the flow west of the track does contribute to the flood elevations and the fact that the Elm Creek 100-yr flood overtops the railroad tracks. The channelization of this drainage area eliminates the floodplain encroachment into mined area "B".

The proposed conditions model of CD-2 shows the current channel cross section will primarily convey the 100-year flood event within the channel banks as depicted in the Topographic Workmap. Where the 100-year flood event overtops the channel banks, the floodplain limits are contained within the Dos Republicas Coal Partnership site boundary. (The channel is designed for the 25-year event per TCEQ regulations and is not intended to convey the 100-year flood event). The conveyance capacity of the CD-2 channel dramatically decreases the extent of the floodplain limits of Elm Creek on the west side of the railroad.

## Unnamed Tributary "B" / CD-5 Analysis

The existing Unnamed Tributary "B" of Elm Creek is located in the southeastern portion of the site permit boundary (see Figure 6). Dos Republicas Coal Partnership is proposing to channelize onsite flow into CD-5 which discharges into sedimentation pond SP-3 as part of their erosion and sediment control plan for the site. CD-5 roughly correlates to the drainage basin of Unnamed Tributary "B". 165-acres of offsite flow is proposed to be diverted to the adjacent drainage basin to the west, the basin of Unnamed Tributary "C". Some of the runoff will be intercepted by channel D-3 and a proposed control levee will divert the remainder.

The existing conditions hydraulic model reveals the floodplain limits exceed the Zone A limits depicted on the existing DFIRM map and the floodplain was found to extend beyond the permit boundary to the northwest. Although the drainage area decreased, the 100-year runoff increased due to the change in curve number value.

The HEC-RAS model results for CD-5 show the proposed channel section will primarily convey the 100-year flood event within the channel banks (the channel is designed for the 25-year event per TCEQ regulations and is not intended to convey the 100-year flood event). Where the 100-year flood event overtops the channel banks, the floodplain limits are contained within the Dos Republicas Coal Partnership site boundary.

The diversion of offsite flow into the adjacent drainage basin of Unnamed Tributary "C" warranted additional analysis. The hydrologic evaluation revealed that although 165-acres of offsite area was being diverted from the Trib. "B" basin into the Trib. "C" basin, the net increase in drainage area was only 50.87-acres because the proposed CD-5 drainage area includes some of the existing Trib. "C" drainage area. The net gain in 100-year runoff equated to 75-cfs, which is about 5% of the total runoff for the basin. The Unnamed Tributary "C" model showed a negligible rise in the 100-year water surface elevation; the rise ranged from 0.04' to 0.14'. Please refer to the table below for a comparison of the existing and proposed water surface profile elevations. This analysis demonstrates that diversion of the offsite 165.1-acres will not cause an adverse impact.

## Conclusion

Multatech confirms that the Wilson study of the Unnamed Tributary "A" and this supplemental study of Unnamed Tributary "B" and Elm Creek/ CD-2 are sufficient to demonstrate no adverse impact will result from the proposed improvements. Dos Republicas Coal Partnership has permit approval from the Railroad Commission for surface mining activities. This Supplemental Floodplain Permit application is submitted to address the activities mentioned above. These studies and the application as supplemented, demonstrate compliance with the Ordinance in



order for Maverick County to issue a Floodplain Development Permit for this project. The details of the compliance with the Ordinance are set forth in the next part of this report.

### *Summary of Compliance with the Maverick County Floodplain Development Ordinance:*

Article 4, Section C - Permit Procedures:

1. Application for a Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may included, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured home, and the location of the foregoing in relation to areas of special flood hazard. Additionally the following information is required:

   a. Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substanitally improved structures.

      - **The floor elevation of the office/shop is 839.0-ft. The pad elevation of the coal handling facility is 808.0-ft. These are the lowest finish floor elevations on the site; these buildings are located west of Tributary "A", north and west of the railroad loop. These facilities are not located within the existing or proposed floodplain**

   b. Elevation in relation to mean sea level to which any nonresidential structure shall be floodproofed.

      - **Not applicable; no structures are located within the existing or proposed floodplain; no structures will require floodproofing.**

   c. A certificate from a registered professional engineer or architect that the nonresidential floodproofed structure shall meet the floodproofing criteria of Article 5, Section B(2).

      - **Not applicable; no structures are located within the existing or proposed floodplain; no structures will require floodproofing.**

   d. Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development.

      - **Please refer to the body of the report for detailed analysis and discussion. Note that all modifications occur within the property owned or leased by Dos Republicas Coal Partnership. Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.**

e. Maintain a record of all such information in accordance with Article 4, Section (B)(1).

- Dos Republicas Coal Partnership will work with Maverick County to ensure that all records relating to this Development Permit are available to the public in the offices of Maverick County.

2. Approval or denial of a Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

a. The danger to life and property due to flooding or erosion damage.

- Since the existing flood waters are being channelized into proposed sedimentation ponds there is a decreased risk of damage caused by flooding or erosion. There are no permanent structures located within the existing or proposed floodplain.

b. The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner

- Based on the channel HEC-RAS models, the 100-year flood waters will be primarily contained within the channels and there is very minimal risk of property damage or other damage to the property owner.

c. The danger that materials may be swept onto other lands to the injury of others

- Since the existing flood waters are being channelized into proposed sedimentation ponds, foreign debris is less likely to be swept downstream because the flow is contained within the channel.

d. The compatibility of the proposed use with existing and anticipated development.

- The proposed, and approved use, for the land is the development of a surface coal mine. However, surface mining is a temporary use for the land. The land will be reclaimed, after mining, to approximate original contours and to the current use of the land per the requirements of the Railroad Commission of Texas.

e. The safety of access to the property in times of flood for ordinary and emergency vehicles.

- Since the existing flood waters are being channelized into proposed sedimentation ponds safety of access to the property will likely be improved by the proposed drainage improvements. Culverts will be installed to allow for vehicular crossing of the propopsed channel.

f. The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and faciltiies such as sewer, gas, electrical and water systems.

- Since the existing flood waters are being channelized into proposed sedimentation ponds there is a decreased risk of damage caused by flooding or erosion. Note that all floodplain modifications occur within the property owned or leased by Dos Republicas Coal Partnership.

Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.

g. The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site.

  ▪ **Please refer to the body of the report for detailed analysis and discussion. Note that all floodplain modifications occur within the property owned or leased by Dos Republicas Coal Partnership. Also following mining operations the property will be re-claimed and the floodplain will be restored as required by the Railroad Commission of Texas.**

h. The necessity to the facility of a waterfront location, where applicable.

  ▪ **Not applicable.**

i. The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use.

  ▪ **Due to the nature of the extraction of coal, from the Eagle Pass Mine, there are no feasible alternate locations for the structures shown in the attached Development Permit.**

j. The relationship of the proposed use to the comprehensive plan for that area.

  ▪ **As mentioned in (2) d. above, the proposed, and approved use, for the land is the development of a surface coal mine. Since the mine will only be a temporary use for the land, the comprehensive use includes not only mining but also the reintroduction of range, and grazing land, after the cessation of mining and the completion of reclamation activities, per the Railroad Commission of Texas regulations.**

# Authorities

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

990 S.W.2d 245
Supreme Court of Texas.

Scott BRADLEY, Petitioner,

v.

The STATE of Texas on the Relation
of Dale WHITE, Respondent.

No. 97–1135. | Argued Sept.
28, 1998. | Decided April 8, 1999.

State brought quo warranto action when mayor purported to remain in office after removal trial conducted by board of aldermen. The 342nd District Court, Tarrant County, Bob McGrath, J., entered summary judgment for mayor, and State appealed. The Court of Appeals, 956 S.W.2d 725, reversed and rendered. Mayor filed petition for review. The Supreme Court, Baker, J., held that testimony of aldermen in proceeding in which board of aldermen were adjudicating whether to remove mayor from office violated rule prohibiting judge from acting as witness in trial over which judge is presiding, and thus, board of aldermen did not lawfully remove mayor from office.

Reversed and rendered.

Abbott, J., filed a concurring opinion.

**Attorneys and Law Firms**

**\*246** Bob E. Shannon, Joe R. Greenhill, Scott K. Field, Austin, E. Eldridge Goins, Jr., James W. Morris, Jr., Jeffrey S. Wigder, Dallas, for Petitioner.

Ann Diamond, Tim Curry, Marshall M. Searcy, Jr., Dee J. Kelly, William N. Warren, Michael Schattman, Barbara P. Neely, Fort Worth, for Respondent.

**Opinion**

Justice BAKER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice O'NEILL and Justice GONZALES join.

This is a quo warranto case. Scott Bradley asserts that the Board of Aldermen of the Town of Westlake, Texas did not lawfully remove him as Mayor under section 21.002(f) of the Texas Local Government Code because the removal

proceedings violated Texas Rule of Civil Evidence 605. [1] We agree. Therefore, we reverse the court of appeals' judgment for the State and render judgment for Bradley.

## I. BACKGROUND

In May 1994, Scott Bradley was elected Mayor of Westlake, a general-law municipality. He was reelected in May 1996. On April 14, 1997, Howard Dudley, a Westlake alderman, filed a complaint against Bradley alleging official misconduct and incompetency. Specifically, Dudley alleged that Bradley (1) canceled a special town meeting called by alderman Carroll Huntress and removed the public notice of the meeting; (2) directed the Town Secretary to exclude from the meeting agenda an item Huntress requested and to remove a part of the proposed minutes from another town meeting; and (3) caused the Town Engineer to prepare a false boundary map of Westlake, and then presented the falsified map to the Board of Aldermen as part of an ordinance.

On April 28, 1997, the Westlake Board of Aldermen sat as a court to hear the charges against Bradley and to decide whether there was sufficient cause for his removal from the Mayor's office. During the trial, Dudley and another alderman, Al Oien, testified against Bradley. Dudley testified that he had provided Bradley with a request for and notice of the meeting Bradley allegedly canceled. Oien testified that when the Board passed the ordinance at issue, no map was attached to it. At the end of the trial, four of the five aldermen, including Dudley and Oien, found Bradley guilty of the charges. On motion made by Oien and seconded by Dudley, the Board voted to remove Bradley as Mayor of Westlake. Days later, the aldermen appointed Dale White as Mayor. Bradley refused to recognize the aldermen's judgment on the grounds that the removal procedure violated applicable procedural rules, substantive state law, and his federal and state constitutional rights.

On May 20, 1997, the State of Texas, on relation of Dale White, filed a quo warranto action seeking a declaration that White, not Bradley, was the lawful Mayor. The State alleged that: (1) the aldermen had lawfully removed Bradley from the Mayor's office under Texas Local Government Code section 21.002(f); (2) the aldermen had lawfully appointed Dale White as Mayor; (3) White had taken the oath of office on May 2, 1997, and therefore, lawfully held office as Mayor; and (4) Bradley had unlawfully usurped and intruded into the Mayor's office since his lawful removal. The State filed a

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

motion for summary **\*247** judgment asserting as grounds the allegations in its quo warranto petition.

Bradley filed a cross-motion for summary judgment. In his summary judgment motion Bradley alleged the following affirmative defenses: (1) Texas Local Government Code section 21.002 violates the Texas Constitution's separation of powers doctrine; (2) section 21.002 is unconstitutionally vague; (3) Bradley's removal trial violated his federal and state procedural due process rights; (4) a section 21.002 removal trial is penal in nature, and Bradley was denied his state constitutional right to a jury trial; (5) the aldermen were disqualified under the Texas Constitution to sit as judges in the removal trial because they had a pecuniary interest in the outcome; (6) the removal trial violated Texas Rules of Civil Evidence 605, 607, and 611b, and Texas Rules of Civil Procedure 18b, 527, 528, 544, and 571; (7) the removal trial violated the Texas Open Meetings Act; (8) the evidence at trial did not support Bradley's removal; (9) the removal judgment became a nullity when a new board of aldermen granted Bradley's motion for new trial; and (10) the removal judgment became a nullity when Bradley filed an appeal bond with the new board of aldermen.

The trial court denied the State's motion for summary judgment and granted Bradley's motion for summary judgment without specifying upon which of Bradley's summary judgment grounds it based its judgment. The court of appeals held that the State had conclusively proved the elements of its quo warranto action. 956 S.W.2d at 745. The court of appeals also held that Bradley had not conclusively proved all essential elements of his defense in quo warranto as a matter of law nor had he defeated at least one element of the State's quo warranto claim. Accordingly, the court of appeals reversed the trial court's judgment and rendered summary judgment for the State.

## II. APPLICABLE LAW

### A. STANDARD OF REVIEW—CROSS MOTIONS FOR SUMMARY JUDGMENT

 [1]    [2]    [3]    [4]    When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *See Commissioners Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex.1997); *Jones v. Strauss,* 745 S.W.2d

898, 900 (Tex.1988). The reviewing court should render the judgment that the trial court should have rendered. *See Agan,* 940 S.W.2d at 81; *Members Mut. Ins. Co. v. Hermann Hosp.,* 664 S.W.2d 325, 328 (Tex.1984). If a party brings the case to this Court and we reverse the court of appeals, we should render the judgment that the court of appeals should have rendered. *See Agan,* 940 S.W.2d at 81; *Tobin v. Garcia,* 159 Tex. 58, 316 S.W.2d 396, 400–01 (1958). When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meritorious. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995). We do not consider constitutional challenges when we can dispose of a case on nonconstitutional grounds. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 13 (Tex.1994).

### B. REMOVAL PROCEDURES

The Texas Local Government Code governs a mayor's removal from office in a general-law municipality. *See* TEX. LOC. GOV'T CODEE § 21.002. A mayor may be removed from office for official misconduct, intentional violation of a municipal ordinance, habitual drunkenness, incompetency, or a cause prescribed by a municipal ordinance. *See* TEX. LOC. GOV'T CODEE § 21.002(c). When a complaint is made against the mayor, the complaint must be presented to an alderman of the municipality. *See* TEX. LOC. GOV'T CODEE § 21.002(f). **\*248** The alderman shall then file the complaint, serve the mayor with a copy, set a date for trial of the case, and notify the mayor and the other aldermen to appear on that day. *See* TEX. LOC. GOV'T CODEE § 21.002(f). A majority of the municipality's aldermen constitutes a court in the mayor's removal trial with one of the aldermen presiding over the trial. *See* TEX. LOC. GOV'T CODEE § 21.002(f). If two-thirds of the members of the court who are present at the trial find the mayor guilty of the complaint's charges and find that the charges are sufficient cause for removal from office, the court's presiding officer shall enter a judgment removing the charged officer and declaring the office vacant. *See* TEX. LOC. GOV'T CODEE § 21.002(h).

Section 21.002 removal proceedings are subject to the procedural rules governing the justice courts and to procedural rules governing district and county courts, to the extent these govern justice courts. *See* TEX. LOC. GOV'T CODEE § 21.002(h); TEX.R. CIV. P. 523 ("All rules

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

governing the district and county courts shall also govern the justice courts, insofar as they can.") In addition, the Texas Rules of Civil Evidence apply to section 21.002 trials. *See* TEX.R. CIV. EVID. 101(b) ("[E]xcept as otherwise provided by statute, these rules govern civil proceedings in all Texas courts other than small-claims courts.").

### C. TEXAS RULE OF CIVIL EVIDENCE 605

"The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve this point." TEX.R. CIV. EVID. 605. Texas Rule of Civil Evidence 605 is identical to its federal counterpart. *See* FED.R.EVID. 605. Not surprisingly, there are few reported federal or state cases involving Rule 605 violations. Most cases that do involve judges testifying at the trial over which they are presiding are decided on due process grounds. *See, e.g.,Brown v. Lynaugh,* 843 F.2d 849, 851 (5 [th] Cir.1988); *Tyler v. Swenson,* 427 F.2d 412, 415 (8 [th] Cir.1970)*; Terrell v. United States,* 6 F.2d 498, 499 (4 [th] Cir.1925)*; Haynes v. State of Missouri,* 937 S.W.2d 199, 202 (Mo.1996); *Wilson v. Oklahoma Horse Racing Comm'n,* 910 P.2d 1020, 1024 (Okla.1996). These cases hold that a judge testifying as a witness violates due process rights by creating a constitutionally intolerable appearance of partiality. *See Brown,* 843 F.2d at 851 ("[I]t is difficult to see how the neutral role of the court could be more compromised, or more blurred with the prosecutor's role, than when the judge serves as a witness for the state."); *Tyler,* 427 F.2d at 416 ("The danger ... of subjecting [the judge's] impartiality to doubt and of placing the [party against whom the judge testifies] at an unfair disadvantage ... is very obvious."); *see also In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)(disapproving of the "spectacle" of a trial judge presenting testimony which he must consider in adjudicating guilt or innocence).

Rule 605 is similarly concerned with the appearance of partiality. *See Hensarling v. State,* 829 S.W.2d 168, 170 (Tex.Crim.App.1992)(referring to Texas Rule of Criminal Evidence 605, which is identical to Texas Rule of Civil Evidence 605 and noting that the Rule's purpose is to preserve the judge's posture of impartiality before the parties and the jury); WRIGHT & GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6062 (1990)(referring to Federal Rule of Evidence 605).

Comments of the Federal Advisory Committee on Proposed Rules indicate that Federal Rule of Evidence 605 purports to protect the appearance of impartiality. The Committee describes Federal Rule of Evidence 605 as:

> a broad rule of incompetency, rather than [a rule of] incompetency only as to material matters, leaving the matter to the discretion of the judge, or recognizing no incompetency. The choice is the result of inability to evolve satisfactory answers to questions which arise when the judge abandons the bench for the witness stand. Who rules on objections? **\*249** Who compels him to answer? Can he rule impartially on the weight and admissibility of his own testimony? Can he be impeached or cross-examined effectively? Can he, in a jury trial, avoid conferring his seal of approval on one side in the eyes of the jury? Can he, in a bench trial, avoid an involvement destructive of impartiality?

FED.R.EVID. 605 advisory committee's note.

Indeed, one of the few federal cases to apply Rule 605 held that it was reversible error for a trial judge's law clerk to testify about facts favorable to the plaintiff because the danger that the jury would identify the law clerk with the trial judge was obvious. *See Kennedy v. Great Atl. & Pac. Tea Co.,* 551 F.2d 593, 598 (5 [th] Cir.1977). The court held that the "potential for prejudice" was so great that it rendered inquiry into actual prejudice to the parties "fruitless." *See Kennedy,* 551 F.2d at 598.

 [5] Rule 605 does not only apply to members of the judiciary, but also to those performing judicial functions that conflict with a witness's role. *See Gary W. v. Louisiana Dept. of Health and Human Resources,* 861 F.2d 1366, 1368 (5 [th] Cir.) (applying Rule 605 to prohibit deposition of special master appointed to ensure compliance with protective order in family law case); *Central Platte Natural Resources Dist. v. State of Wyoming,* 245 Neb. 439, 513 N.W.2d 847, 864 (1994) (applying Rule 605 and holding that court properly excluded testimony of doctor who assisted in decision making process in administrative adjudication); *but see Williams v.*

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

*State,* 11 Ark.App. 11, 665 S.W.2d 299 (1984) (permitting testimony from trial court's bailiff, called as a rebuttal witness to impeach a defense witness's credibility).

### III. ANALYSIS

**[6]** Because the trial court did not specify upon which ground it rendered summary judgment for Bradley, we can render judgment for Bradley if one of Bradley's summary judgment grounds is meritorious. *See Star–Telegram,* 915 S.W.2d at 473. We first consider Bradley's nonconstitutional summary judgment grounds. *See Moriel,* 879 S.W.2d at 13. One of Bradley's summary judgment grounds is that he was not lawfully removed from office as the State's quo warranto action alleges because Oien and Dudley testified against him while they sat in judgment over his removal trial, violating Texas Rule of Civil Evidence 605. The court of appeals responded to Bradley's Rule 605 argument by citing case law that holds that aldermen who assert a complaint against a mayor are not disqualified from judging the mayor's removal hearing. *See Riggins v. Richards,* 97 Tex. 229, 77 S.W. 946, 949 (1904). The court of appeals then noted that section 21.002 allows all citizens of general-law municipalities, including aldermen, to file a complaint against a mayor. *See* TEX. LOC. GOV'T CODEE § 21.002(f). However, the court of appeals did not discuss the aldermens' dual roles as judges and *witnesses* against Bradley in the removal trial.

Although Oien and Dudley are not members of the judiciary, they assumed judicial roles in the removal trial, roles which conflicted with their roles as witnesses. Section 21.002 required the aldermen to sit as a "court" over the removal "trial." *See* TEX. LOC. GOV'T CODEE § 21.002(f), (g), and (h). Oien and Dudley, along with their fellow aldermen, decided whether Bradley had committed the acts the complaint described and if so, whether these acts warranted removal.

Oien and Dudley testified against Bradley about the facts that served as the basis for the complaint and then adjudicated whether Bradley was guilty of the complaint's charges. Their testimony created the appearance of bias that Rule 605 seeks to prevent and such a potential for prejudice to Bradley that inquiry into actual prejudice is fruitless. *Accord Kennedy,* 551 F.2d at 598. Therefore, we need not and do not conduct a harm analysis.

**\*250** The concurring opinion asserts that section 21.002 is void for vagueness because the statute does not specify which justice court and district court rules apply to removal trials. The concurrence concedes, however, that the language of section 21.002 and Texas Rule of Civil Procedure 523 indicate that Texas Rule of Civil Evidence 605 applies to removal trials. The concurrence suggests that, nevertheless, Rule 605 should not apply because aldermen may be the only people familiar with the facts that form the basis for the complaint against a mayor.

Here, however, there is no indication that Oien and Dudley's testimony was necessary to the removal proceedings. On the contrary, the record reveals that it was not. Bradley himself admitted the substance of the first complaint. He testified at the removal trial that he canceled the meeting Huntress had called and removed the posted public notice of the meeting. [2] Bradley's concession rendered Dudley's testimony—that he had provided Bradley with notice of and a request for the meeting—unnecessary. The aldermen voted that Bradley was guilty of canceling the meeting and removing notice of the meeting and that those actions alone were sufficient cause for removal. Accordingly, Oien's testimony, which dealt solely with the falsified-map charge, was not necessary to the removal proceedings either.

### IV. CONCLUSION

We conclude that Oien and Dudley, by testifying, violated Texas Rule of Civil Evidence 605. Therefore, the Board of Aldermen did not lawfully remove Bradley as Mayor. Because Bradley conclusively negated an element of the State's quo warranto action—that the aldermen had lawfully removed Bradley under section 21.002—the court of appeals improperly reversed the trial court's judgment for Bradley. We do not need to consider any of Bradley's other summary judgment grounds. Accordingly, we reverse the court of appeals' judgment and render judgment for Bradley on the State's quo warranto action. We declare that Bradley was the lawful Mayor of the Town of Westlake when the State filed its quo warranto action.

Justice ABBOTT filed a concurring opinion.

Justice ABBOTT, concurring.

Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)

42 Tex. Sup. Ct. J. 513

The Court holds that the Westlake Board of Aldermen violated Texas Rule of Civil Evidence 605 when board members who sat as judges in Bradley's removal court also testified as witnesses against him. In so doing, the Court sidesteps a more fundamental flaw in the removal: the statute governing removal proceedings is unconstitutionally vague and thus denies Bradley due process and due course of law. *See* U.S. CONST. amend. XIV, § 1; TEX. CONST. art. I, § 19. Because I would hold the statute used to remove Bradley is void for vagueness, I concur in the Court's judgment.

## I

The statute providing for removal of a mayor in a general-law municipality such as Westlake states that "a majority of the aldermen constitutes a court to try and determine the case against the mayor," and the removal proceeding "is subject to the rules governing a proceeding or trial in a justice court." TEX. LOC. GOV'T CODE § 21.002(g), (h). Bradley asserts that a removal proceeding is a civil proceeding, and civil justice court rules provide for, among other things, venue change, [1] empaneling of juries, [2] a right to appeal, [3] and **\*251** a right to move for new trial. [4] Bradley further argues that Rules of Civil Procedure and Evidence apply through Texas Rule of Civil Procedure 523, which states that "[a]ll rules governing the district and county courts shall also govern the justice courts, insofar as they can be applied, except where otherwise specifically provided by law or these rules." TEX.R. CIV. P. 523. Bradley contends that these applicable rules provide for recusal of judges, [5] prohibit judges from testifying in cases in which they sit, [6] and allow the right to full cross-examination and impeachment of witnesses. [7]

The State responds that "to graft onto § 21.002 all of the rules of civil procedure would render the statute virtually meaningless" and "would lead to an absurd result." Following the State's logic, the court of appeals concluded that justice court rules should apply when they are "not in conflict with" the intended structure of removal proceedings. 956 S.W.2d 725, 738.

Both approaches are flawed. Bradley's contention founders upon the clear text of the statute. Although section 21.002(h) states that a removal proceeding is subject to the rules governing a justice court trial, several justice court rules directly contravene requirements of section 21.002. For

example, Bradley requested a venue change and jury trial that justice court rules provide for, but both requests conflict with the statute's express statement that "[a] majority of the aldermen constitutes a court to try and determine the case against the mayor." TEX. LOC. GOV'T CODE § 21.002(g). This specific textual provision of the statute precludes Bradley's proposal to apply all justice court rules and all rules of civil procedure. *See* TEX. GOV'T CODE § 311.026 (codifying the common-law doctrine for statutes *in pari materia,* which states that when an irreconcilable conflict occurs between a general and a special statutory provision, the special provision prevails as an exception to the general provision). As the State contends, application of all the justice court rules and rules of civil procedure would lead to an "absurd result."

The interpretation of the statute that the State urges suffers from its own flaws. The State's argument leaves it to the caprice of the aldermen—many of whom are untrained in the rules of procedure and evidence—to pick and choose which rules may apply to a removal proceeding, and to choose which rules may not apply because they are "in conflict with" the structure of removal proceedings. A mayor subject to these removal proceedings would not know exactly which rules apply until the aldermen make that decision—a decision that may not be made until the proceedings are already underway. In effect, the State asks the Court to swap the "absurd result" that follows from Bradley's contentions for the arbitrariness that follows from its own proposal.

The Court should not be constrained to choose the lesser of the evils presented by the parties. Instead, the statute's unavoidable incongruities and ambiguities lead me to conclude, as Bradley argues in the alternative, that it is unconstitutionally vague.

## II

Under the United States Constitution, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). They "may trap the innocent **\*252** by not providing fair warning" and they "impermissibly delegate[ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09, 92 S.Ct. 2294.

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

In order to avoid these dangers, the Due Process Clause requires that laws be reasonably clear. As the Supreme Court explained, due process:

> ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review.

*Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

Responding to these concerns, the United States Supreme Court and this Court have long applied the principle that statutory language may not be so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), *quoted in Texas Antiquities Comm. v. Dallas County Community College Dist.,* 554 S.W.2d 924, 928 (Tex.1977) (plurality opinion).

Although the vagueness standard applies most frequently to penal statutes, a civil statute may also be so vague that it violates due process. *See A.B. Small Co. v. American Sugar Ref. Co.,* 267 U.S. 233, 239–40, 45 S.Ct. 295, 69 L.Ed. 589 (1925) (explaining that the rationale of previous vagueness cases is not limited only to criminal cases because "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all"); *Jones v. City of Lubbock,* 727 F.2d 364, 373 (5th Cir.1984); *Texas Antiquities Comm.,* 554 S.W.2d at 927–28 (plurality decision striking down a civil statute as unconstitutionally vague). The degree of clarity that the vagueness standard requires, however, "varies according to the nature of the statute, and the need for fair notice or protection from unequal enforcement." *Jones,* 727 F.2d at 373; *see also Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("[Vagueness] standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."); *Texas*

*Antiquities Comm.,* 554 S.W.2d at 927 (plurality decision stating that "varying degrees of specific standards" have been required in testing vagueness and breadth of legislative delegations, "[d]epending upon the nature of the power, the agency, and the subject matter"). In the case of this statute, the Court should consider that few actors deserve more clarity than elected officials who can be removed from office at the hands of other competing elected officials.

### III

The statute at issue, which provides for removal of a mayor in a general-law municipality, is a civil statute. *See Meyer v. Tunks,* 360 S.W.2d 518, 520–21 (Tex.1962) (action to remove a county officer is civil in nature). Our vagueness review must therefore apply a more tolerant standard for civil statutes.[8]

The statute fails even under that deferential standard. In *Texas Antiquities Committee,* a plurality of the Court professed that "[t]here has been called to our **\*253** attention no case in Texas or elsewhere in which ... powers ... are more vaguely expressed or less predictable than those permitted by the phrase in question." *Texas Antiquities Comm.* 554 S.W.2d at 927.[9] The exercise of powers under this statute is hardly more predictable. In the context of a proceeding to remove a mayor in which his fellow aldermen are directed to sit as a court, the phrase "subject to the rules governing a proceeding or trial in a justice court" may at first glance seem clear. When one is forced to apply the provision, however, the inherent ambiguities become inescapable. The confusion and potential disregard for Bradley's rights that his petition describes—as well as similar predicaments described by amici[10] — illustrate this lack of a comprehensible standard.

A significant number of civil rules for a justice court either conflict directly with the statute's scheme for removal proceedings,[11] or they provide no relevant guidance to a board of aldermen.[12] Whether other justice court rules apply has been and will continue to be a matter of guesswork for aldermen, mayors, and even reviewing courts, leaving a situation ripe for "resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned,* 408 U.S. at 109, 92 S.Ct. 2294. For example, does the successful party recover costs as provided by Civil Rule 559?[13] Can the removal "court" order a new trial, as provided by Civil Rules 567–

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

70?[14] If so, could a new trial be ordered by newly elected aldermen taking the place of the aldermen who presided over the original trial?

Texas Rule of Civil Procedure 523, which states that rules governing district and county courts shall also govern justice courts, creates an assortment of other conundrums. Do Evidence Rule 605, prohibiting a judge from testifying as a witness, and Texas Rule of Civil Procedure 18b, providing for recusal of interested judges, apply to aldermen sitting as removal judges? Evidently the Court believes that Civil Procedure Rule 605 applies, and both of these rules would seem to apply under the language of both the statute and Civil Procedure Rule 523. However, these rules stand opposed to the reality that the very aldermen who sit as a court to try the mayor may also be the ones who bring the charge, "may have substantial knowledge of the evidence to be presented," or may have had past differences with the mayor. *See Quinn v. City of Concord,* 108 N.H. 242, 233 A.2d 106, 108 (1967); *see also Rutter v. Burke,* 89 Vt. 14, 93 A. 842, 849 (1915) (holding that a mayor who acted as accuser, prosecutor, and witness was not disqualified from voting, because "the Constitution of the city council, its exclusive jurisdiction as a trier, and the diversity of duties imposed upon it, preclude the idea that impartiality can be made the test" of the right of a board member to sit in a proceeding); *State v. Common Council,* 72 Wis.2d 672, 242 N.W.2d 689, 698 (1976) **\*254** ( "[T]he mere fact that [a council member] had stated under oath ... that there were grounds to remove [the city clerk] did not disqualify him from subsequently sitting as an impartial adjudicator."); 4 MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 12.259.20, at 595 (3rd ed. 1992) ("[I]n a proceeding to remove, members of the council are not disqualified because of the fact that they were members of a committee to investigate and afterwards preferred charges; the fact that they may have formed an opinion concerning the accused is regarded as immaterial."). Indeed, the aldermen may well be the only people familiar with the facts underlying the removal proceeding. *Cf. id.* § 12.259.25, at 598 ("Particularly, an objection for bias against ... a member of a hearing tribunal will not be sustained where to do so would destroy the only tribunal with power in the premises."). Rare would be the occasion when a mayor could be tried by truly disinterested, unbiased, and uninformed aldermen. Yet that is the fiction that the Court forces upon the parties.

Ignoring these probabilities and applying these rules sets the stage for future enigmas. For instance, the statute states that "a majority of the aldermen constitutes a court." Assuming, as the Court does, that Evidence Rule 605 or Civil Procedure Rule 18b apply, what occurs if at least half of the aldermen must be recused because of bias or the necessity that they testify? The statute provides no guidance—"no rule or standard at all."[15] Neither does the Court.

## IV

Admittedly, courts "will often strain to construe legislation so as to save it against constitutional attack." *Scales v. United States,* 367 U.S. 203, 211, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). Nevertheless, even if the Court assumed the burden of repairing this paradoxical statute, the task would require such a revision of the Legislature's words that the Court would exceed the bounds of its proper role in our divided government. The "constructions" urged by the parties would require us either to ignore specific words of the statute or to write our own ad hoc exceptions into the statute. As one scholar has recognized, "there is a difference between adopting a saving construction and rewriting legislation altogether." TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–30, at 1032 (2d ed., 1988). We are invited to do the latter, but I believe we should decline the invitation. *See West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 651, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("It is, of course, beyond our power to rewrite the State's requirement....") (Frankfurter, J., dissenting); *United States v. Reese,* 92 U.S. 214, 221, 23 L.Ed. 563 (1875) ("To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty.").

Rewriting a statute rife with traps and uncertainties is the power and duty of the Legislature. As the controversy at hand evinces, the decisions of local governments affect the lives of their citizens as profoundly and concretely as those of any other level of government. Sometimes a mayor's conduct necessitates removal proceedings. Nevertheless, such proceedings can reverse a majority of the local citizens' judgment as to who is best to lead them. Consequently, our state government owes a duty not only to the mayor but to his colleagues and constituents to ensure that such proceedings are neither arbitrary nor unfair, and never unconstitutional. This vague and unwieldy statute fails to carry out the task. I urge the Legislature to mend it soon.

**Bradley v. State ex rel. White, 990 S.W.2d 245 (1999)**

42 Tex. Sup. Ct. J. 513

**All Citations**

990 S.W.2d 245, 42 Tex. Sup. Ct. J. 513

Footnotes

1    Because the removal trial was held April 28, 1997, the former Texas Rules of Civil Evidence apply. Former Texas Rule of Civil Evidence 605 is identical to current Texas Rule of Evidence 605. *See* TEX.R. EVID. 605.

2    Bradley testified that he canceled the meeting and removed the notice because it was an illegally called meeting.

1    *See* TEX.R. CIV. P. 528.

2    *See* TEX.R. CIV. P. 544.

3    *See* TEX.R. CIV. P. 573.

4    *See* TEX.R. CIV. P. 567.

5    *See* TEX.R. CIV. P. 18b.

6    *See* TEX.R. CIV. EVID. 605 (currently TEX.R. EVID. 605).

7    *See* TEX.R. CIV. EVID. 607 (currently TEX.R. EVID. 607); TEX.R. CIV. EVID. 611(b) (currently TEX.R. EVID. 611 (b)).

8    *See Chavez v. Housing Auth.,* 973 F.2d 1245, 1249 (5 [th] Cir.1992) (A civil statute that does not implicate the First Amendment is sufficiently unclear to violate due process if it is " 'so vague and indefinite as really to be no rule or standard at all' or if it is 'substantially incomprehensible' "); *Jones,* 727 F.2d at 373 (same).

9    The vague phrase in *Texas Antiquities Committee* was "buildings ... and locations of historical ... interest." *Id.*

10   Amici Paul Skelton and Marian Hill describe their experiences with removal proceedings in Parker and Seven Points, Texas. Skelton argues that the court of appeals' construction of the removal statute violates separation of powers and due process guarantees. Hill argues that the removal statute in question is unconstitutionally vague.

11   *See* TEX.R. CIV. P. 527–32 (relating to motions to transfer and venue changes); TEX.R. CIV. P. 540, 542, 544–56 (relating to juries).

12   *See* TEX.R. CIV. P. 524 (justices to keep a civil docket); TEX.R. CIV. P. 533 (requisites for writ or process from justice courts); TEX.R. CIV. P. 543 (dismissal for plaintiff's failure to appear); TEX.R. CIV. P. 560 (judgment for specific articles of property); TEX.R. CIV. P. 561 (enforcing a judgment for property).

13   *See* TEX.R. CIV. P. 559.

14   *See* TEX.R. CIV. P. 567–70.

15   *See Chavez,* 973 F.2d at 1249; *Jones,* 727 F.2d at 373.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

844 S.W.2d 773
Court of Appeals of Texas,
Dallas.

CITY OF AUSTIN, Appellant,

v.

HOUSTON LIGHTING & POWER COMPANY
and Houston Industries, Inc., Appellees.

No. 05–89–01354–CV.   |   Oct. 7,
1992.   |   Rehearing Denied Nov. 18, 1992.

City which participated in nuclear facility construction project sued managing participant for breach of contract, fraud, and violation of Deceptive Trade Practices Act (DTPA). The 101st Judicial District Court, Dallas County, Clarence A. Guittard, J., rendered take-nothing judgment for managing participant. City appealed. The Court of Appeals, Kinkeade, J., held that: (1) managing participant had no implied duty to perform contract with skill and care; (2) certain newspaper articles were not hearsay; and (3) managing participant did not violate DTPA.

Affirmed.

**Attorneys and Law Firms**

 **\*777**  Fulbright & Jaworski, Roger Townsend, Ronald J. Palmer, Ben Taylor, Jeff Dykes, Jeffrey S. Wolff, Houston, Carrington, Coleman, Sloman & Blumenthal, James E. Coleman, Marvin S. Sloman, Dallas, Liddell, Sapp, Zivley, Hill & Laboon, John L. Hill, Jr., Roy Atwood, Houston, City of Austin, Iris J. Jones, Acting City Atty., John T. Gooding II, Mark G. Yudof, Austin, for appellant.

Graves, Dougherty, Hearon & Moody, Robert J. Hearon, Jr., Thomas B. Hudson, Jr., Matthew G. Dore, Michael Diehl, Selden W. Bobbitt, Austin, Baker & Botts, Finis E. Cowan, J. Gregory Copeland, Houston, Baker & Botts, Joe R. Greenhill, Minton, Burton, Foster & Collins, Roy Q. Minton, Martha S. Dickie, Austin, for appellees.

Before THOMAS, KINKEADE and OVARD, JJ.

**OPINION**

KINKEADE, Justice.

City of Austin (Austin) appeals a take-nothing judgment rendered in favor of Houston Lighting & Power Company and its parent company, Houston Industries, Inc. (collectively HL & P), in this action for breach of a contract to build a nuclear power plant, fraud, and violation of the Deceptive Trade Practices Act (DTPA). In six points of error, Austin argues that the trial court erred by (1) sustaining HL & P's special exceptions to Austin's cause of action for breach of the implied duty to perform the contract with skill and care, (2) overruling Austin's hearsay objections to the admission of several newspaper articles, (3) refusing Austin's requested jury questions and instructions, (4) overruling Austin's objections to jury question two, and (5) overruling Austin's motion for new trial. HL & P raises what it characterizes as two conditional cross-points, but what this Court would term counterpoints. *See Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex.1967); *Ragsdale v. Progressive Voters League,* 743 S.W.2d 338, 342 (Tex.App.—Dallas 1987), *rev'd on other grounds,*790 S.W.2d 77 (Tex.1990). HL & P argues that we should affirm the trial court's judgment because there is no evidence that any failure by HL & P to provide information caused any cost increase and because Austin is not a "consumer" as to HL & P as defined by the DTPA. Because the trial court did not err by (1) granting HL & P's special exceptions, (2) admitting the newspaper  **\*778**  articles, (3) refusing to submit Austin's requested jury questions and instructions, (4) overruling Austin's objections to jury question two, and (5) denying Austin's motion for new trial, we overrule all of Austin's points of error and need not address HL & P's cross-points in which HL & P asks only for affirmance. We affirm the trial court's judgment.

**FACTUAL HISTORY**

The Lower Colorado River Authority (LCRA), Central Power & Light (CP & L), the City of San Antonio (San Antonio), Austin, and HL & P all belong to the South Texas Interconnected Systems. Formed in the 1940's, this interconnected group provides for the sharing of electricity in emergencies and the staggered building of additional units to the individual systems to take advantage of each other's generation powers. On July 14, 1971, the group met and discussed for the first time the possibility of building a jointly owned nuclear power plant.

On December 14, 1971, all of the participants in this interconnected entered into a preliminary agreement to share the costs of studies to determine the feasibility of licensing,

constructing, and operating a jointly owned two-unit nuclear powered electric generating plant. The group formed a study committee, which employed the Nuclear Utilities Systems Corporation to conduct feasibility studies. Upon completion of these feasibility studies, each participant would decide whether to agree to participate and build the South Texas Project (the project).

In its report presented to the study committee on January 13, 1972, Nuclear Utilities Systems estimated that it would take twenty-two staff members of HL & P to handle the project and estimated the cost of the project at $902 million for both units. The report also projected October 1, 1980, as the completion date for unit one and March 1, 1982, for unit two. Having tentatively decided, after receiving this report, to build a jointly owned nuclear power plant and wanting to avoid delays in proceeding with preliminary work pending completion and execution of a participation agreement, all of the participants entered into an interim agreement on June 15, 1972. In this agreement, the participants chose HL & P as the project manager. HL & P agreed to serve as the project manager without compensation, except for the reimbursement of project-related expenses, including overhead. In the construction of a nuclear power plant, regulations require the project manager to act as licensee and to represent the project before the Nuclear Regulatory Commission (NRC).

In September 1972, LCRA and Austin decided not to participate in the project. On September 6, 1972, LCRA authorities passed a resolution not to participate in the project because they felt that nuclear power plants were still in the experimental stage and that the economics of such plants were questionable. Austin chose not to participate because its voters did not approve the bonds for the project.

On July 1, 1973, San Antonio, CP & L, and HL & P executed the participation agreement, which provided for the joint licensing, construction, operation, and maintenance of the project. Each participant owned an undivided interest as follows: San Antonio, thirty percent (30%); CP & L, thirty percent (30%); and HL & P, forty percent (40%). Under the participation agreement, the owners agreed to share all costs proportionately. The agreement provided for a management committee, composed of an officer or general manager from each participant, and a project manager. The agreement also provided that the project manager could be removed by a simple majority vote.

As project manager, HL & P's responsibility included hiring an Architect/Engineer(A/E)-constructor to design and build the plant. In June 1972, after an allegedly intensive investigation, HL & P tentatively recommended Brown & Root to the study committee for the position of A/E-constructor on the project. Before making a final commitment to hire Brown & Root, however, HL & P wanted to further test Brown & Root's capabilities by having it do additional site-study work for the project and assist **\*779** in developing the specifications for the project's nuclear steam supply system. The steam supply system takes the steam produced by the heat from the nuclear reactor and transfers it to the turbine generator, which in turn rotates and produces electricity.

On June 11, 1974, after Brown & Root completed these tasks to all of the participants' satisfaction, HL & P and Brown & Root signed a contract in which Brown & Root agreed to act as the A/E-constructor for the project. Brown & Root contracted for a fixed profit, or "cost plus" basis, and the contract required it to complete ninety percent of the total engineering work before starting construction. All of the participants previously had employed Brown & Root to perform various construction projects and were satisfied with its work. They also knew that Brown & Root had no previous nuclear experience and that this was the first nuclear power plant Brown & Root had contracted to design and build.

Brown & Root's responsibilities as A/E-constructor included aiding HL & P in evaluating and selecting the steam supply system unit for the project. At the July 13, 1973 management committee meeting, HL & P discussed in detail its and Brown & Root's bid analyses and recommended the selection of the Westinghouse 3800 unit based on Westinghouse's final contract. The participants accepted HL & P's recommendation and signed a contract with Westinghouse in 1974.

### Austin's Entry into the Project

In late 1972 and early 1973, Austin began experiencing problems with fuel availability. Austin relied entirely on natural gas for its electricity generation. On May 24, 1973, the Austin City Council received a report from the mayor's Energy Study Commission, which recommended that Austin participate in a joint venture for the development of coal or lignite power or a joint venture for a nuclear power plant. It did not specifically recommend that Austin participate in the project.

In a November 1973 bond election, Austin voters approved $161 million for Austin to participate in the project. On December 14, 1973, Austin's representative, R.L. Hancock, began attending the management committee meetings. At that meeting, he received all the back copies of the management committee's meeting minutes. Austin never asked about the contents of the previous meeting minutes or for any other documents before signing the participation agreement. On December 21, 1973, Austin joined the other participants in the project by executing the first amendment to the participation agreement. With the execution of the amendment, Austin became a sixteen percent undivided interest owner with the three other cotenants. The entry of Austin into the project reapportioned the other participants' undivided interests as follows: San Antonio, 28%; CP & L, 25.2%; and HL & P, 30.8%.

At the time Austin entered the project, it knew that (1) the participants had chosen HL & P to act as project manager and that HL & P's only involvement with nuclear power plants was its recent experience with its Allens Creek project, (2) Brown & Root had signed a letter of intent to act as the A/E-constructor on a "cost plus" basis, and (3) the size of the steam supply system had been increased from 1150 megawatts to 1250 megawatts. Before entering the participation agreement, Austin made no inquiry into the selection process used in choosing the steam supply system, the budget, or Brown & Root's technical capability to perform the job. Austin asked only about the status of the contract with Brown & Root.

Between 1974 and 1979, the entire nuclear power industry changed. In 1974, Congress separated promotion of nuclear power from its regulation with the creation of the NRC. Once the NRC took over the regulatory function, safety requirements increased significantly. Between 1975 and 1979, the NRC issued new regulations about every two weeks. These regulations were partly in response to a 1975 fire that struck the Brown's Ferry nuclear plant in Alabama and the March 28, 1979 accident that occurred at the Three Mile Island nuclear plant in Pennsylvania. As a result of **\*780** a series of investigations of the Three Mile Island accident, the NRC toughened its enforcement of regulations and regulatory guides at all nuclear plants. The NRC stopped all licensing reviews, shut down all plants with reactors similar to those at Three Mile Island for a period of time, and more rigidly interpreted its regulations.

**Construction of the Project**

In January 1973, the project participants agreed on the final site selection in Matagorda County, just outside of Bay City, Texas. CP & L purchased the property, and, in December 1973, Brown & Root submitted its first cost and schedule estimate for the project. In May 1974, HL & P submitted the preliminary safety analysis report to the NRC. This ended the preliminary design phase. HL & P then turned its attention toward getting the limited work authorization, which HL & P needed in order to obtain a construction permit.

In June 1975, Brown & Root issued a revised preliminary construction cost estimate. This estimate projected an increase of costs from $1 billion to $1.27 billion. Concerned about this estimate, HL & P subjected Brown & Root to a thorough audit of its overall administration and management of the project. This audit identified many concerns as to Brown & Root's performance, including whether it could meet the scheduled operating dates. Although HL & P told Brown & Root of its concerns at that time, it did not inform the management committee of its discoveries. On August 4, 1975, HL & P sent a letter to the participants informing them that Brown & Root had not properly validated the cost estimate and expressed concern that the cost estimate was incorrect and needed modification.

In September 1975, pursuant to the limited work authorization permit received in August 1975, Brown & Root began clearing the plant site and performing other preliminary non-safety-related construction. After satisfying the NRC's requirements, the project received its construction permit, which allowed Brown & Root to begin safety-related construction in December 1975, ten days ahead of schedule. In early 1976, in response to Brown & Root's complaints about Westinghouse's failure to produce design documents on time, HL & P hired an engineering consultant to determine how Westinghouse's many design changes to its 3800 unit affected the schedule. The audit showed that the changes had affected the schedule. HL & P shared the results of this audit with Westinghouse but not with the management committee.

*1976 Decision to Start Safety–Related Construction*

In 1971, based on the performance of A/E-constructors on other nuclear projects, Brown & Root estimated that it would take a total of one million engineering man-hours to complete

the project's engineering work. By September, 22, 1975, this number had increased to almost 2 million, sixty percent of which Brown & Root had already used. At the March 1976 management committee meeting, Brown & Root represented that it had completed this percentage. The project, however, ultimately required fifteen to twenty million engineering man-hours. Therefore, in hindsight, Brown & Root actually had completed less than eight percent of the total engineering work eventually performed on the project.

At each monthly management committee meeting, HL & P provided the participants with (1) a monthly progress report, which included an engineering progress report, (2) a construction progress report, and (3) an executive summary report. These reports visually showed which items were on or behind schedule and provided a written explanation.

At the March 1976 management committee meeting, Brown & Root reported that its engineering and construction were both on schedule. When asked whether its engineering could support the construction schedule, Brown & Root's representative responded, "Hell, yes." After receiving this assurance from Brown & Root, the management committee voted to let safety-related construction begin. As noted earlier, Brown & Root already had started construction under a limited work authorization **\*781** in September 1975. It already had dug the hole for the reactor containment building, had started placing rebar, and had poured some nonpermanent structural concrete. In April 1976, Brown & Root began safety-related construction, which meant that it started pouring the concrete for the permanent structures.

### *1977 Management Analysis Company Audit*

The project remained close to schedule for the next year. In 1977, however, Brown & Root fell behind the original schedule set for the project. In response, HL & P hired the Management Analysis Company, a managing consultant that advises utilities, pipeline companies, suppliers, A/Es, and constructors on financial planning matters as well as project construction and operations management. HL & P asked Management Analysis to perform an evaluation and audit of HL & P's project management organization and to identify problems that could critically impact the achievement of the project. Management Analysis presented its findings in a draft report to HL & P in June 1977. The report identified three major concerns: (1) project procurement; (2) the cost

and schedule estimate; and (3) project organization, including policy and procedure manuals.

HL & P determined that the draft report furnished enough information to correct the problems and directed Management Analysis not to prepare a final report, though it felt that some of the information in the draft report was inaccurate. On June 10, 1977, HL & P gave an oral report to the management committee of Management Analysis's findings and the major items that HL & P thought it needed to pursue with corrective action. None of the committee members requested a copy of the written report. In response to the report, HL & P undertook several actions to carry out Management Analysis's recommendations. Also in response to the report, the management committee formed a task force composed of people from Brown & Root, HL & P, and Management Analysis to develop a realistic cost and schedule estimate.

In September 1978, the task force presented an interim report, which added eighteen months to the schedule and estimated the final cost at $2 billion. The task force further determined that significant cost and schedule increases were necessary and that it needed six additional months to develop a more definitive estimate. HL & P sent Austin a copy of this report. In November 1978, HL & P met with Austin's mayor, its city council, assistants, and staff, and its Citizens' Electric Utility Commission at the airport in Houston to provide them with an update on the project. HL & P allegedly tried to answer questions and make Austin's representatives aware of the uncertain status of the estimates. Later, newspaper articles appeared in Austin newspapers discussing whether Austin's management committee representative had kept the city council sufficiently informed about the problems at the project. In August 1979, HL & P presented the task force's new, more definitive "baseline" cost estimate of $2.7 billion to the management committee. The committee, however, did not adopt the estimate until May 1980.

### *1980 NRC Show Cause Order.*

The NRC requires the licensee of a nuclear power plant to set up and execute a quality assurance program. Quality assurance includes all those planned and systematic actions necessary to provide adequate confidence that a structural system or component will perform satisfactorily in service. Periodically, the NRC's inspection force looks at a project's

construction activity records to determine whether that project is meeting the NRC's quality assurance requirements.

Between October 10, 1979 and February 7, 1980, the NRC investigated the project. The NRC determined that Brown & Root had not conducted certain quality assurance activities in compliance with the NRC's requirements. Although the deficiencies primarily resulted from Brown & Root's failure to carry out an effective quality assurance program, the NRC held **\*782** HL & P, as the project manager and licensee, responsible. The NRC served a notice of violation, imposed a $100,000 civil fine, and issued a show cause order on HL & P. The show cause order outlined the actions that HL & P needed to take to convince the NRC to allow the project's safety-related construction activities to continue uninterrupted. Although HL & P felt that several of the NRC's findings were inaccurate, it paid the fine without objection so it that could save money in the long run, continue the plant's construction, and maintain good relations with the NRC.

### *Termination of Brown & Root as the A/E–Constructor*

In September 1981, after Brown & Root reported that it expected to progress toward the completion date at a rate of only 0.5% per month for the next eighteen months, the management committee decided to remove Brown & Root as the A/E. In September 1981, Bechtel replaced Brown & Root as the A/E. After Brown & Root refused to remain in the limited capacity of constructor, HL & P replaced it in that capacity with Ebasco. At the time that Brown & Root left the project, the participants had spent $1.78 billion, $1 billion of which was accounted for by equipment and materials. When Bechtel took over, it presented a new cost estimate of $5.5 billion to complete the project. After taking over for Brown & Root, Bechtel's only major rework was to move the pipes coming from the cooling pond. To keep track of the cost of any rework, repairs, or regulatory charges that might have resulted from Brown & Root's mistakes, Bechtel set up a special account. Bechtel charged a total of $250 million to that account.

Between 1981 and 1988, Bechtel completed construction of the project. Unit one became operational in August 1988, and unit two became operational in June 1989. The final cost of the project was about $6.013 billion, an excess of $5 billion over the original $902 million Nuclear Utilities Systems study estimate. The number of HL & P staff needed to complete the

project eventually peaked at 600, an increase of 578 personnel over the original study estimate of 22.

### PROCEDURAL HISTORY

In December 1981, the participants sued Brown & Root. They alleged that Brown & Root (1) was not qualified, (2) had breached its construction contract calling for performance to the highest standards, (3) had a deficient quality assurance program, and (4) had lied when it told the management committee that Brown & Root was ready to begin safety-related construction in April 1976. The participants recovered $750 million.

Austin then brought this suit against HL & P to recover its sixteen percent share of the cost overruns. Austin alleged breach of contract, fraud, and DTPA violations. Austin limited its complaints to the events that occurred between 1973 and 1981 while Brown & Root was the A/E-constructor on the project and during which the participants spent $1.78 billion. The trial court allowed the parties to use the discovery obtained in the earlier Brown & Root litigation.

Austin based its contract claims on two alternate theories. First, Austin asserted that, if HL & P had told the management committee in April 1976 that Brown & Root's engineering was inadequate to support construction at that time, the committee would have voted to delay construction to allow engineering to catch up and the plant could have been built for $3.2 billion. Second, Austin asserted that if HL & P had provided more information in 1978, the construction of the plant would have been deferred for a year and the plant could still have been built for $3.2 billion. HL & P defended by asserting that (1) the information that it allegedly withheld was frequently not information in the usual sense, but only hindsight opinions or speculations or unproved allegations from the Brown & Root litigation, (2) Austin provided no causal link between any failure of HL & P to provide information and any increase in the project's costs, (3) the $3.2 billion estimate was not attainable in any event, and (4) the project's actual cost and schedule was entirely **\*783** reasonable and could not have been improved upon even if further information had been provided.

Before trial, the parties filed numerous pretrial motions. Disposition of some of the motions required the court to interpret the participation agreement. In opinions accompanying its rulings on these motions, the trial court

held that under the agreement the project's management lay with the management committee and that HL & P as project manager had the duty to supply information to the management committee on major matters and on significant factors affecting the project's cost and schedule. Based on one of these opinions, the court sustained HL & P's special exceptions to Austin's mismanagement claims that HL & P (1) had breached provisions of the Brown & Root and Westinghouse contracts, (2) had not exercised reasonable skill and care, (3) had breached fiduciary duties, and (4) had failed to perform as a prudent utility manager and struck those causes of action. During the trial, Austin asked the court to reconsider its sustaining of HL & P's special exceptions to Austin's mismanagement claims. The court overruled Austin's motion and issued another opinion standing by its earlier interpretations of the participation agreement.

The court's jury charge included questions as to breach of contract, fraudulent nondisclosure, and DTPA violations. The jury found that HL & P did not supply the owners with all of the information required under the participation agreement but that Austin incurred no additional costs on the project as a result of HL & P's failure to furnish the required information. As to fraud, the jury found that a relationship of trust and confidence existed between Austin and HL & P. The jury also found that HL & P did not fail to disclose specified matters with the intent to induce Austin to enter the participation agreement. As to the alleged DTPA violations, the jury found none occurred. Based on the jury's findings, the trial court entered a take-nothing judgment in HL & P's favor.

### DUTY OF IMPLIED SKILL AND CARE

In its first point of error, Austin contends that the trial court erred when it sustained HL & P's special exceptions and struck Austin's cause of action for HL & P's breach of its duty implied in law to perform with skill and care its obligations as project manager under the participation agreement. Austin argues that the trial court misconstrued the participation agreement when it found that the agreement did not impose this duty. For the reasons discussed below, we overrule Austin's first point of error.

### Standard of Review

 **[1]**    **[2]**    **[3]**    The trial court has broad discretion in hearing, construing, and sustaining special exceptions. *Bader*

*v. Cox,* 701 S.W.2d 677, 686 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). The court, however, must liberally construe the pleading attacked and accept as true all material factual propositions alleged and all factual statements reasonably inferred from the allegations. *Id.* This Court will not disturb the trial court's rulings absent an abuse of discretion. *Bader,* 701 S.W.2d at 686.

HL & P specially excepted to Austin's fifth amended petition and moved to strike Austin's mismanagement claims that HL & P (1) did not exercise reasonable skill and care in the performance of its obligations under the participation agreement, (2) breached fiduciary duties, and (3) did not perform as a prudent utility manager. The trial court struck Austin's mismanagement claims based on the court's construction of the participation agreement.

 **[4]**    **[5]**    **[6]**    **[7]**    On appeal, Austin does not argue that the participation agreement was ambiguous. When no ambiguity exists, the trial court construes the contract as a matter of law. *Westwind Exploration v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985). To determine the contract's meaning, the court considers the wording of the instrument in light of the surrounding circumstances at the time the parties entered into it and applies the pertinent rules of construction.  **\*784** *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). The court gives effect to the parties' intentions as expressed in the instrument. *Gracia v. RC Cola–7–Up Bottling Co.,* 667 S.W.2d 517, 520 (Tex.1984). The parties' objective, not subjective, intent controls. *Pinehurst,* 432 S.W.2d at 518; *Dallas Bank & Trust Co. v. Frigiking, Inc.,* 692 S.W.2d 163, 166 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

 **[8]**    **[9]**    Implied terms arise from the parties' presumed intentions as gathered from the instrument as a whole. *Summers v. Consolidated Capital Special Trust,* 783 S.W.2d 580, 583 (Tex.1989); *Danciger Oil & Ref. Co. v. Powell,* 137 Tex. 484, 490, 154 S.W.2d 632, 635 (1941); *Ingram Freezers v. Atchison, T. & S.F. Ry.,* 464 S.W.2d 915, 919 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.). It must appear either that the implied terms were so clearly within the parties' contemplation that they thought it unnecessary to express them or appear that it is necessary to infer the terms to carry out the contract's full purpose. *Danciger,* 154 S.W.2d at 635; *Ingram,* 464 S.W.2d at 919.

### Existence of the Duty in Every Contract

 [10]    Austin argues that the trial court misconstrued the participation agreement because the duty of skill and care is implied in every contract regardless of the parties' intentions. To support this proposition, Austin relies on *Coulson v. Lake LBJ Municipal Utility District,* 734 S.W.2d 649, 651 (Tex.1987); *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947); and *Westbrook v. Watts,* 268 S.W.2d 694, 697 (Tex.Civ.App.—Waco 1954, writ ref'd n.r.e.). Austin relies on *Public Service Enterprise Group, Inc. v. Philadelphia Electric Co.,* 722 F.Supp. 184, 209 (D.N.J.1989) (*PECO ),* to further argue that this implied duty applies to agreements to manage nuclear power plants. HL & P responds that a duty of skill and care exists in the participation agreement only if the parties intended to include it.

Austin misplaces its reliance on *Scharrenbeck, Coulson, Westbrook,* and *PECO.* None of these cases:

(1) involve an agreement among participants to share expenses,

(2) involve a duty by the managing participant to provide material information to the other cotenants,

(3) involve a management committee with budget and manpower control and the authority to replace the manager by a simple majority vote, or

(4) imply a duty to perform with reasonable skill and care where the parties expressed otherwise.

In *Scharrenbeck,* Montgomery Ward agreed to repair a water heater. After making the repairs, the repairman's failure to check the flue caused a fire that destroyed Scharrenbeck's home. Scharrenbeck sued for negligence, and Montgomery Ward asserted the absence of any duty owed to Scharrenbeck. The court held "[a]ccompanying every contract is a common law duty to perform with care, skill, reasonable expedience and faithfulness *the thing agreed to be done.*" *Scharrenbeck,* 204 S.W.2d at 510 (emphasis added). The court appears to hold that a duty to perform with skill and care attaches only to the performance of the acts the parties agreed to perform. This requires the trial court to make a determination of the parties' presumed intentions as gathered from the instrument as a whole. Austin fails to cite to any authority, and we can find none, that interprets *Scharrenbeck* to mean that

this implied duty exists in every contract regardless of the parties' intentions. After a review of the whole contract, it is evident that the parties intended in this contract to place ultimate control of the project in an independent management committee and that HL & P's duty to perform with skill and care attached only to HL & P's duty to provide material information to that management committee.

In *Coulson,* an engineer contracted with the defendant to prepare plans and specifications to provide the defendant with utilities. The engineer prepared the plans and specifications, but the defendant refused to pay him. In its response to the engineer's subsequent suit, the defendant alleged that the plans "were not prepared in a good and **\*785** workmanlike manner and do not meet the standards of reasonable engineering practice." *Coulson,* 734 S.W.2d at 650. The parties asked the court to decide which party had the burden to prove negligent performance. The court held that an engineer was entitled to a presumption that the work he performed was good and workmanlike and not negligently done when he proved compliance with the express terms of his professional contract. In relation to this issue, the court cited the *Scharrenbeck* holding "that the common law duty to perform with skill and care accompanies every contract." *Id.* at 651. The court, however, did not hold that an implied duty existed regardless of the parties' intentions. In *Coulson,* the engineer expected compensation, and there is no indication that, under the contract, the defendant had the right to review the engineer's work. Here, HL & P received no compensation for its services, and the management committee reserved the right to review HL & P's work and to remove it as project manager.

In *Westbrook,* the court was asked to decide the correctness of a jury-charge definition of "good and workmanlike manner," an express term in the contract. In relation to that issue, the court stated, "[t]here is the general requirement applicable to all contracts where one is required to perform a service that it will be performed with reasonable care or skill." *Westbrook,* 268 S.W.2d at 697. The court, however, was not asked to and did not decide whether this duty existed regardless of the parties' intentions.

In *PECO,* the nuclear power plant owners sued PECO, the operating owner, for breach of contract, negligence, misrepresentation, and fraud in connection with the NRC's shutdown of the plant in 1987, after the NRC was informed that operators at the plant were routinely sleeping on duty. *PECO,* 722 F.Supp. at 186, 187. Although PECO received

several warnings from the NRC in 1985 that the plant was not up to industry standards, PECO never passed along these criticisms to the other owners. *Id.* at 188–89. The joint operating agreement among the owners required PECO to "operate and maintain" the plant as an "independent contractor" responsible for the results obtained, and, in the agreement, PECO pledged to operate and maintain the station for the owners as if it were owned solely by PECO. *Id.* at 186. PECO agreed to provide these services without making a profit. *Id.* at 197. The agreement also established an owners' committee to coordinate the administration of all plant operation and maintenance matters and to review the plant's general performance and operations. The agreement further required PECO to provide a daily status report to the owners' committee. As the plant's licensed operator, PECO was responsible for the plant's safe operation and had a duty to follow the laws and regulations covering nuclear power plants. One of those regulations required the constant presence of a licensed or senior operator at the controls during the plant's operation. *Id.* at 188. The owners alleged that PECO's misrepresentations about the plant's operation prevented them from acting to prevent the plant's shutdown.

PECO moved to dismiss the owners' tort claims, alleging that the owners' breach of contract action precluded their tort cause of action. In determining whether the owners could maintain both causes of action, the court had to decide the source of PECO's duty to refrain from the complained-of conduct. The court held that, given the nature of PECO's contractual obligations to efficiently operate and maintain the plant and to keep the owners informed of the plant's status, "the contract could certainly be interpreted under Pennsylvania [law] to include an implied promise by PECO to render its services with reasonable skill and care." *Id.* at 209.

Here, although the participation agreement imposed upon HL & P duties similar to those imposed in PECO, it did not provide HL & P with "independent contractor" status or specifically state that HL & P was responsible for the results obtained. Without these additional obligations, it does not appear necessary to infer a duty of reasonable skill and care in the agreement, especially considering the agreement's provision that allows the management **\*786** committee to remove HL & P with a simple majority vote.

### "Best Judgment" Standard

 **[11]**    Austin next contends that the trial court misconstrued the participation agreement by rejecting Austin's argument that the agreement meant to deviate from the stricter reasonable skill and care standard only in the two limited instances where it expressly specified the lower "best judgment" standard. Austin argues that only when the parties have expressly rejected an "ordinary prudence" standard in favor of a "best judgment" standard will the courts remove the "prudent conduct" or "reasonable care" standard and impose a "best judgment" standard. Austin relies on *Anbeck Co. v. Zapata Corp.,* 641 S.W.2d 608 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.), to support its contention.

Austin misplaces its reliance on *Anbeck.* In *Anbeck,* the appellant argued that, because the parties' agreement gave the corporation the right to make all material decisions for the corporation's subsidiary, a corresponding legal duty to use "reasonable diligence" in its management of the subsidiary necessarily accompanied this right. Because the contract did not expressly provide for this obligation, the court needed to determine whether the written contract implied a covenant that the corporation would manage the subsidiary with reasonable diligence and due care. *Id.* at 611. The court found that the agreement included covenants only that the corporation would not use certain names in the corporation's subsidiary and that the corporation would use its best efforts to provide the subsidiary with up to $1,000,000 in working capital. The court held that the agreement's use of "best efforts" in one limited instance did not imply a general duty to use reasonable skill and care. *Anbeck,* 641 S.W.2d at 613–14.

A similar situation existed here. The participation agreement required HL & P to make the day-to-day decisions for the project. The participation agreement, however, only specified a standard of performance in two limited situations:

(1) Section 10.2.8 of the agreement required the project manager to:

[f]ollow the practices and procedures which have been reviewed and approved by the Management Committee or, in the absence of such approved practices and procedures, which reflect the *best judgment* of the Project Manager.

(2) Section 24.1 of the agreement provided:

Pending the resolution of any dispute by arbitration or judicial proceedings, the Project Manager shall proceed with the Preconstruction Work, Construction Work,

or Station Work in a manner consistent with this Participation Agreement and the Project Agreements and with the *best judgment* of the Project Manager....

(Emphasis added.) Because the agreement did not expressly provide for a reasonable skill and care standard as urged by Austin, the court needed to determine whether the written contract implied such a covenant. Both of the cited provisions involve situations in which HL & P would be acting without the supervision of the management committee. Under the remaining provisions of the participation agreement, HL & P is subject to management committee supervision and review. We conclude, as did the trial court, that this limited use of the "best judgment" standard of performance does not necessarily imply a general duty to use reasonable skill and care under other parts of the contract.

### HL & P's Self–Interest

 **[12]**    Austin also contends that the trial court misconstrued the participation agreement by determining that, because of HL & P's status as part owner, it would be motivated by self-interest to perform well and that, therefore, a general duty to perform with reasonable skill and care need not be implied. Austin argues that HL & P's self-interest was not a sufficient motivator because HL & P received additional forms of compensation that the other owners did not. Austin asserts that HL & P (1)  **\*787**  charged the other owners $473 million for its diverse contractual services, (2) benefitted economically by spreading its internal costs among the other owners, (3) benefitted politically by virtue of the economic muscle it enjoyed as purchasing agent and the employer of several thousand workers, and (4) recouped its losses by increasing its rate base.

The evidence shows that:

  (1) the participation agreement did not provide for the project manager to receive compensation for its services. Rather, the other participants agreed to pay their proportionate share of the actual costs incurred by HL & P as determined by independent audits, which neither Austin nor any of the other participants questioned, and

  (2) HL & P could not simply pass along its cost increases to the public by increasing its rate base. To get a rate base increase, HL & P must prove to the Texas Public Utility Commission that its costs in building the project were prudently incurred rather than incurred

through some mismanagement. *See* Application of Gulf State Utils. Co. for Authority to Change Rates, 14 Tex. PUC Bull. 1943, 2429 (1988) (interpreting §§ 2, 38, 39, and 41 of the Public Utility Regulatory Act, TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon 1980 & Supp. 1992)).

The evidence does not show that:

  (1) HL & P campaigned for or otherwise sought the job of project manager. Rather, the participants chose HL & P after consideration of the Nuclear Utilities Systems report, which recommended that HL & P act as project manager for the first project and that one of the other participants assume that duty for later projects,

  (2) HL & P negotiated or bargained for increased political clout as the purchasing agent for the project. Further, the participation agreement provided for the removal of the project manager with a simple majority vote, or

  (3) HL & P received any additional compensation for performing the duties of project manager.

### Mutual Right of Control

 **[13]**    Austin additionally contends that the trial court erred when it analogized business relationships to this case and determined that an implied duty of skill and care did not apply in all contracts. Austin argues that the law of partnerships and joint ventures does not apply to this participation agreement because there was no mutual right of control. Austin relies on *State v. Houston Lighting & Power Co.,* 609 S.W.2d 263 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), to support its contention.

In *Houston Lighting & Power Co.,* the parties asked the court to decide whether the cities of Austin and San Antonio were liable for ad valorem taxes on their undivided interests in the same project and under the same participation agreement as the one at issue in this lawsuit. *Id.* at 265. HL & P and CP & L had paid their share of the taxes. Austin and San Antonio refused to pay the taxes assessed against their interests in the properties comprising the project. The cities claimed an exemption because their interests in the project were devoted exclusively to public use. The State argued that the court for tax purposes should treat the project as a legal entity in the nature of a partnership or a joint venture, which is,

itself, liable for 100 percent of the taxes assessed against the involved properties.

The court stated that a joint venture is like a partnership and is usually limited to one enterprise. The essential elements of a joint venture are (1) mutual right of control, (2) community of interest, (3) agreements to share profits as principals, and (4) agreements to share losses, costs, and expenses. *Id.* at 267. The court, limiting its analysis solely to whether the participants agreed to share profits, determined that they did not and as a result that no partnership or joint venture existed and that the project was not liable for the assessment or payment of any taxes against the **\*788** project. *Id.* at 268. Contrary to Austin's assertion that the court in that case found that the participation agreement showed no mutual right of control, the court did not discuss that element of partnership. Further, the court specifically stated in its review of the facts that the "[m]anagement is by a committee made up of one representative from each participant." *Id.* at 266. This finding refers to the management committee and implies a mutual right of control.

Because the participants did not agree to share profits as co-owners of the project, we agree with Austin that the project is neither a partnership nor a joint venture. We disagree, however, that the trial court's analogy to cases involving partnerships and joint ventures is inappropriate given Austin's contention that the duty to use reasonable skill and care is imposed in *all* contracts. As illustrated by the cases relied upon by the trial court,[1] that duty is not imposed in every instance. Those cases reveal that courts, in deciding not to impose such a duty upon partnerships and joint ventures, primarily rely on the partners' or joint venturers' mutual right to control the business or their agreement to share losses, costs, and expenses. Although the participants in the instant case did not agree to share profits as co-owners of the project, this element of a partnership or joint venture is not pertinent to this analogy. The participants met all of the other requirements of a partnership or joint venture: (1) a mutual right of control, (2) a community of interest, and (3) an agreement to share losses, costs, and expenses. The trial court, therefore, appropriately analogized to those types of business relationships to show that an implied duty to use reasonable skill and care does not exist in *every* contract.

### The Management Committee's Powers

 **[14]** Austin further contends that the trial court misconstrued the participation agreement because the management committee's powers are limited. Austin argues that the participation agreement does not grant the management committee the power to exercise "general supervision" over the project manager. Austin relies on sections 4.25 and 10.2.4 of the participation agreement for this proposition.

Section 4.25, the definition portion of the agreement, provides in part as follows:

> PROJECT MANAGER: The Participant responsible for the planning, construction and operation of the various components of the South Texas Project in accordance with this Participation Agreement and the Project Agreements.

This provision is a definition. It identifies the party with the responsibilities enumerated in section 10 of the agreement. This provision adds nothing to those responsibilities.

Section 10.2.4 of the agreement provides as follows:

> [The project manager shall] [p]rovide for the engineering, design, contract preparation, purchasing, construction, reconstruction, repair, retirement, replacement, supervision, training, expediting, inspection, testing, start-up, protection, operation, maintenance and accounting of, or with respect to, each component.

 **\*789** Austin relies on the "provide for" language in this provision to make its assertion that the parties' intended to impose an implied duty of skill and care on HL & P's performance. Austin asserts that this language specifically and expressly delegates to HL & P, as project manager, the ability to control or to manage the matters pertaining to engineering, design, purchasing, construction, quality assurance, selection of contractors, and operation of the project.

The term "provide for" does not necessarily impose strict contract liability. *See Sherman Simon Enters. v. Lorac Serv. Corp.,* 724 S.W.2d 13, 16 (Tex.1987). In *Sherman Simon,* the court held that an automobile rental agency satisfied an agreement to provide insurance coverage for one of

its customers when it secured a policy from an insurance company. *Id.* Here, Austin introduced no evidence that shows that the parties had the intent or contemplated that HL & P would design and/or construct the project itself. Accordingly, HL & P fulfilled its obligations pursuant to section 10.2.4 when it contracted with Brown & Root and Westinghouse to perform those services as independent contractors. *See Seaview Hosp., Inc. v. Medicenters of Am., Inc.,* 570 S.W.2d 35, 39–40 (Tex.Civ.App.—Corpus Christi 1978, no writ) (distinguishing between a contract to "furnish" services and a contract to "perform" services).

Although the participation agreement does not specifically state that the management committee has "general supervision" of the project, the agreement does specifically provide that the management committee has the right to:

(1) resolve disputes among the participants arising under the agreement (§ 9.3.5);

(2) review and act upon the project manager's recommendations concerning:

a. the utilization of employees (§ 9.3.6.2),

b. the annual budget for capital expenditures (§ 9.3.6.3),

c. the operating practices and procedures (§ 9.3.6.11);

(3) remove the project manager with a simple majority vote (§ 25); and

(4) approve all agreements (§ 31).

Based on these contract provisions, we conclude that the management committee's powers are not limited and that the management committee, not HL & P, maintains ultimate control over the project.

### Exculpatory Clause

Austin contends that the trial court in its first opinion misconstrued the participation agreement because the participation agreement's exculpatory clause does not absolve HL & P of its implied duty to use skill and care. Austin argues that its claim against HL & P for mismanagement is a contract claim, not a claim for "tortious conduct." Austin further argues that the exculpatory clause is too vague to be enforceable.

**[15]** **[16]** **[17]** An action in contract is for the breach of a duty arising out of a contract, either express or implied. An action in tort is for a breach of a duty imposed by law. *International Printing Pressmen & Assistants' Union v. Smith,* 145 Tex. 399, 409, 198 S.W.2d 729, 735 (1947). Where the plaintiff may not maintain a cause of action without proving the contract's contents, and the action's gist is the breach of the contract, whether by malfeasance or nonfeasance, it is an action on the contract. *Smith,* 145 Tex. at 409, 198 S.W.2d at 735; *Manzo v. Ford,* 731 S.W.2d 673, 677 (Tex.App.—Houston [14th Dist.] 1987, no writ). This categorization of the claim is true though it is labeled an action for negligent performance. *Manzo,* 731 S.W.2d at 677.

**[18]** Austin's action is for damages for HL & P's failure to perform its duties as project manager with reasonable skill and care, a duty Austin asserts is impliedly imposed on HL & P by the contract regardless of the parties' intention. The right for which Austin seeks redress arose by virtue of the parties' agreement. We conclude that Austin's action is founded upon contract. *See Smith,* 145 Tex. at 410, 198 S.W.2d at 736.

Section 21 of the participation agreement, the tortious conduct exculpatory clause, provides in pertinent part:

> **\*790** Participants shall have no remedies against another Participant for tortious conduct arising out of the ownership of the South Texas Project, or any portion thereof, or out of Preconstruction Work, Construction Work or Station Work except when the claim results from Willful Action.

Because this exculpatory clause precludes only actions based on tortious conduct, it is inapplicable in this situation.

### Duty of Implied Skill and Care Summation

Because (1) the duty of reasonable care and skill is not implied in all contracts, (2) the agreement does not provide HL & P with independent contractor status or state that HL & P is responsible for results obtained, (3) it is not necessary to infer the duty to carry out the contract's full purpose, (4) the limited use of "best judgment" does not necessarily imply a general duty of reasonable skill and care, (5) HL & P is motivated by self-interest, and (6) the management committee maintains ultimate control over the project, the trial court did not err when it sustained HL & P's special exceptions and struck

Austin's cause of action alleging that HL & P had breached its duty implied in law to perform its obligations as project manager under the participation agreement with skill and care. We overrule Austin's first point of error.

### HEARSAY

In its fourth point of error, Austin contends that the trial court erred when it overruled Austin's hearsay objection to the admission of three newspaper articles. Austin argues that:

(1) the articles were relevant only if the statements made by the officials were true,

(2) the articles allowed the jury to infer that the reporter believed the statements, which belief may have been erroneous,

(3) HL & P's repeated references to and quotations from the articles, during jury argument, established harm and caused the probable rendition of an improper verdict.

HL & P contends that it offered the newspaper articles to show that the information Austin denied receiving was available in the city's newspapers at the relevant times. HL & P claims that the articles were not hearsay because they were admitted to show that Austin was on notice about the project's problems and to show the state of the public's knowledge in the City of Austin, not to prove the truth of the matters asserted in the articles. HL & P argues that (1) during voir dire and in its opening statement, Austin told the jury that it intended to offer evidence about the state of public knowledge in the city, (2) Austin fulfilled this promise through the presentation of many witnesses who claimed not to have known information about the project and who testified that had HL & P made the information available they would have acted differently, (3) HL & P used two of the articles to put in context Austin's mayor's testimony about the statements she made to the Austin public following the airport meeting, and (4) any error in these articles' admission was harmless because the articles' contents were cumulative of other evidence.

For the reasons discussed below, we overrule Austin's fourth point of error.

### Standard of Review

**[19]** **[20]** **[21]** To get a reversal of judgment based on the trial court's error in admitting or excluding evidence, the complaining party must show that (1) the trial court committed an error and (2) the error was reasonably calculated to cause and probably did cause rendition of an improper verdict. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). Further, the party must show that the whole case turned on the admission of the unexcluded evidence. *Shenandoah Assocs. v. J & K Properties,* 741 S.W.2d 470, 490 (Tex.App.—Dallas 1987, writ denied). When a trial court gives an instruction that limits the purpose for which the jury can consider the evidence, this Court must assume that the jury properly followed the trial court's **\*791** instruction. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). The erroneous admission of evidence that is merely cumulative of properly admitted evidence is harmless error. *McInnes v. Yamaha Motor Corp.,* 673 S.W.2d 185, 188 (Tex.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). To make this determination, this Court must review the entire record. *Gee,* 765 S.W.2d at 396.

**[22]** **[23]** **[24]** **[25]** Hearsay is an out-of-court statement offered as evidence to prove the truth of the matter asserted. TEX.R.CIV.EVID. 801(d); *Matter of Honsaker,* 539 S.W.2d 198, 201 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Generally, Texas courts consider newspaper articles inadmissible hearsay. *Deramus v. Thornton,* 160 Tex. 494, 505, 333 S.W.2d 824, 831 (1960); *Sherrill v. Estate of Plumley,* 514 S.W.2d 286, 290 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); *Hearn v. Covington,* 22 S.W.2d 1073, 1073 (Tex.Civ.App.—Beaumont 1929, no writ). When a party offers a statement simply to show that it was made rather than to show its truth or falsity, however, the hearsay rule does not bar its admission. *Pope v. Darcey,* 667 S.W.2d 270, 273 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Further, newspaper articles not offered for the truth of the matters asserted but used merely to show notice of those matters are not hearsay. *See Hiram v. United States,* 354 F.2d 4, 7 (9th Cir.1965). The hearsay rule also does not bar the admissibility of news reports used to show public perceptions of the subject matter covered by the articles. *See Tejas Gas Corp. v. Herrin,* 705 S.W.2d 177, 180–81 (Tex.App.—Texarkana 1985), *rev'd on other grounds,* 716 S.W.2d 45 (Tex.1986); *Lone Star Gas Co. v. Smith* 405 S.W.2d 238, 239 (Tex.Civ.App.—Waco 1966, no writ); *King v. City of Dallas,* 374 S.W.2d 707, 711–12 (Tex.Civ.App.—Dallas 1964, writ ref'd n.r.e.); *see also Democratic Party v. National Conservative Political Action Comm.,* 578 F.Supp.

797, 829 (E.D.Pa.1983), *aff'd in part and rev'd in part on other grounds,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).

### *"Nuclear woes muffled?"*

### AUSTIN AMERICAN
### STATESMAN, November 30, 1978

 **[26]**   HL & P first discussed the November 30, 1978 newspaper article during the cross-examination of R.L. Hancock, Austin's representative on the management committee. The article discussed various problems at the project and alleged that Hancock did not timely relay the information he received concerning those problems to the city council. The article included quotations from several Austin City Council members, listed the problems, and included Hancock's explanations for why he had limited the information he relayed concerning those problems.

Austin objected to this article's introduction, arguing that the headline and the quotations contained in the article were hearsay. HL & P responded that it was introducing the article only to show that accusations were made against Hancock and the gravity of those accusations, not to show that any of the statements in the article were in fact accurate. The court at first overruled the objection, but later sustained a similar objection and instructed the jury that the statements in the article, made by persons other than Hancock, were not admitted for the truth of the statements, but only to show that the statements were made and that the matter had the attention of the city council. HL & P questioned Hancock further about whether the article made accusations that he did not inform Austin's City Council about the problems at the project. HL & P did not refer to or question Hancock about any specific quotation in the article.

HL & P stated that its intention in introducing the article was to show that Austin's City Council had made accusations against Hancock and not to show the article's truth or falsity. The hearsay rule, therefore, did not bar the article's admission. *Pope,* 667 S.W.2d at 273. Further, the trial court instructed the jury to consider the article only for that purpose. We assume that the jury followed the instruction.  **\*792** *Brookhollow,* 642 S.W.2d at 167. Austin points to no evidence showing that the jury failed to follow the court's limiting instruction.

If the court committed error by allowing the introduction of this article, the error was harmless because this evidence merely was cumulative of evidence admitted afterward. *McInnes,* 673 S.W.2d at 188. HL & P later introduced and read, without objection, most of a memo Hancock sent Austin's city manager responding to his request for further information on the November 30 article. Other than the quotations, the memo contained the same information as the article about the council's accusations.

Because the trial court limited the use of the article to show that the city council had made accusations against Hancock, and we assume that the jury followed the court's instruction, the article was not barred by the hearsay rule and the trial court did not err when it allowed the article's admission. If the hearsay rule, however, did bar the article's admission, the error was harmless because the evidence was cumulative of other evidence admitted without objection.

### *"Council unimpressed by report*
### *after HL & P briefing on STNP"*

### DAILY TEXAN, November 21, 1978

 **[27]**   HL & P introduced the November 21, 1978 newspaper article during its cross-examination of Carole McClellan Rylander, Austin's mayor in 1978. The article discussed the briefing that Austin City Council members received from HL & P at the meeting at the airport in Houston a few days earlier. The article included quotations from Rylander and other council members and summarized HL & P's statements at the airport meeting. Further, it conveyed that, despite HL & P's statements at the airport meeting, Austin's council members continued to have questions about the project's cost and schedule.

HL & P introduced the article in response to Rylander's statement that she would have to look specifically at the clippings from that time to see what she had said to the public upon her return from the meeting in Houston. Austin immediately objected to the article's admission on hearsay grounds. The trial court sustained the objection and instructed the jury that the newspaper article was not admitted for the truth of any matters stated in it, but only for the purpose of showing what the discussion was in the City of Austin at the time the account was published. HL & P continued questioning Rylander about specific quotes she had allegedly made in the article and read a portion of the article to the

jury. Austin again objected complaining, "[T]his has nothing to do with any discussion that's taken place in Austin." The trial court overruled Austin's objection. HL & P continued questioning Rylander, limiting itself to the portion of the article read to the jury and Rylander's quotations. In its jury argument, HL & P repeated some of Rylander's alleged quotations from the article. HL & P made no reference to quotations made by the other city council members.

HL & P introduced the November 21 newspaper article to show what Austin's citizens were reading at that time concerning the project. The hearsay rule, therefore, did not bar the article's admission. *See Tejas Gas Corp.,* 705 S.W.2d at 180–81. The trial court instructed the jury to consider the article only for that purpose, and we assume the jury followed that instruction. *Brookhollow,* 642 S.W.2d at 167. The evidence does not show that HL & P went beyond its stated purpose or that the jury failed to follow the court's limiting instruction. Additionally, the article summarized HL & P's statements at the airport meeting, a transcription of which Austin introduced during its direct examination of Rylander. Because the trial court limited the use of the article to show what Austin's citizens were reading at the time, and we assume the jury followed that instruction, the article was not barred by the hearsay rule and the trial court did not err when it allowed the article's admission. If the court did err in allowing the introduction of this article, the error was harmless since the evidence was cumulative of other evidence admitted without objection.

*\*793 "City officials delayed telling council about Nuke troubles"*

**AUSTIN AMERICAN STATESMAN, January 31, 1982**

 **[28]**   HL & P introduced the January 31, 1982 newspaper article during its examination of Lee Cooke, Austin's mayor at the time of trial and a former Austin City Council member. The article discussed the communication problems among Hancock, Austin's City Manager's office, and Austin's City Council. It included quotations from Hancock, Rylander, and other Austin officials.

After HL & P read the article's headline to Cooke and commented that Hancock's picture accompanied the article, the following exchange occurred:

Q: Still having troubles between the City Council and the representative to the management committee on the City Council complaining that they never got the word on what was going on down at the South Texas Project; is that correct, Mayor?

A: I was not there. I can't make an assumption that this reporter accurately portrayed what happened.

Q: Well, right next to this picture of Mr. Hancock, Mr. Hancock is quoted as saying, R.L. Hancock says the City Manager's office should pass news to the council. Is that right, sir?

A: That's what that says.

HL & P asked no further questions concerning this article nor made any further references to it.

When HL & P introduced the November 21 and 30, 1978 newspaper articles, Austin requested and received an instruction to the jury to consider those articles only for the limited purpose of showing what the discussion was in the City of Austin at the time the account was published. Austin did not request a limiting instruction either at the time HL & P introduced this newspaper article or at pretrial.

When the jury should consider the tendered evidence for only one purpose, it is the opponent's burden to secure a limiting instruction. Absent such a request, the admission of the evidence without limitation is not a ground for complaint on appeal. TEX.R.CIV.EVID. 105(a); *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 642 (Tex.1987).

Because Austin did not request a limiting instruction, it waived its right to complain. Assuming that Austin did not waive its right to complain, any error was harmless. There were two previous limiting instructions given with the November 21 and 30 newspaper articles and the witness's testimony accompanying the introduction of the article questioned the article's accuracy. We hold that the lack of a limiting instruction did not amount to such a denial of Austin's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. TEX.R.APP.P. 81(b)(1).

**Hearsay Summation**

The trial court admitted the November 21 and 30 newspaper articles for the limited purpose of showing that the statements were made and for the limited purpose of showing the state of public knowledge in the City of Austin at the relevant times. Thus, the articles were not hearsay. When Austin did not request a limiting instruction with the January 31 newspaper article, it waived its right to complain about its admission in its entirety. Alternatively, if Austin did not waive its right to complain, any error in admitting the article was harmless.

Because Austin waived its right to complain of the admission of the January 31 newspaper article and because we assume that the jury followed the trial court's instructions and appropriately limited its consideration of the remaining articles, the hearsay rule did not bar the articles' admission. Therefore, the trial court did not err in allowing the articles' admission into evidence. We overrule Austin's fourth point of error.

## *794 JURY CHARGE

In its second and third points of error, Austin contends that an erroneous jury charge caused the jury to render an improper verdict. Austin argues that the trial court erred when it refused to include (1) section 10.2.7 of the participation agreement in the definition of HL & P's duties to inform and (2) a "substantial factor" question or instruction in the causation issue.

## Standard of Review

 [29]    [30]    [31]    Under the Texas Rules of Civil Procedure, the trial court must, whenever feasible, submit the cause upon broad-form questions and must give proper instructions and definitions to enable the jury to render a verdict. TEX.R.CIV.P. 277. Explanatory instructions are the tools that aid the jury in rendering a just and proper verdict. The trial court should submit instructions only when it determines that the instructions will help the jury to understand the meaning and effect of the law and the presumption created thereby. *Texaco Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 819 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988). The complaining party must tender to the court in writing a substantially correct definition or instruction. TEX.R.CIV.P. 278. The trial court has wide discretion to determine the sufficiency of definitions and instructions. *K–Mart Corp.*

*Store No. 7441 v. Trotti,* 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e. per curiam,* 686 S.W.2d 593 (1985). To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings, the evidence presented, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav.,* 710 S.W.2d 551, 555 (Tex.1986). We will deem an alleged error reversible only if, when viewed in light of the totality of the circumstances, it amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1); *Island Recreational Dev.,* 710 S.W.2d at 555; *Geotech Energy v. Gulf States Telecommunications & Info. Sys., Inc.,* 788 S.W.2d 386, 390 (Tex.App.—Houston [14th Dist.] 1990, no writ).

## HL & P's Contractual Duty to Make Recommendations

 [32]    In its second point of error, Austin contends that the trial court erred when it refused to include section 10.2.7 of the participation agreement in the definition of HL & P's duties to inform. Austin argues that, under section 10.2.7, HL & P had a duty to make competent recommendations to the management committee. Austin asserts that it supported its request to include section 10.2.7 with written pleadings and proof that HL & P did not make competent recommendations concerning (1) the choice of a nuclear steam supply system, (2) the selection of Brown & Root, and (3) the decision to start safety-related construction.

HL & P argues that jury question one dealt with whether HL & P provided information to the management committee and that the duty to make recommendations did not fall within the participation agreement's definition of information. HL & P further argues that Austin never objected to the omission of section 10.2.7 in the pretrial opinions listing the participation agreement sections imposing informational duties.

The court limited its charge to those sections of the participation agreement that it determined mandated HL & P to provide information. The charge included the following definition and instruction:

> 'Information required by the Participation Agreement' means the information that HL & P was required to supply to the Participants by the following provisions of the Participation Agreement.

10.2 The Project Manager for all aspects of the South Texas Project, except the construction, operation, and maintenance of the Construction Power Line, shall:

10.2.3 Supply the Participants with copies of all studies made, license and **\*795** permit applications filed, and licenses and permits obtained;

10.2.5 Promptly supply the Participants with information on major matters and significant factors which affect construction and operating schedules;

10.2.6 Provide the Management Committee and any committee created by it with all necessary records and information pertaining to matters within its [the Management Committee's] designated responsibilities.

10.2.10 Keep the Participants fully and promptly advised of material changes in conditions or other material developments affecting the performance of its [HL & P's] responsibilities.

In answering question 1, 2, and 3, you should consider only HL & P's duty to supply the information required by the foregoing provisions of the Participation Agreement; do not consider any other duties that HL & P may have had as project manager.

Austin requested that the trial court include a portion of section 10.2.7 as follows:

10.2.7 Prepare recommendations covering the matters which are to be reviewed and acted upon by the Management Committee.

The trial court refused Austin's request.

In its entirety section 10.2.7 reads as follows:

10.2.7 Prepare recommendations covering the matters which are to be reviewed and acted upon by the Management Committee *and any committee created by the Management Committee for the purpose of reviewing such recommendations, including, but not limited to, insurance coverages to be obtained during the periods covered by and with respect to Preconstruction Work, Construction Work and Station Work, or any phases thereof.*

(Emphasis added.) Although section 10.2.7 states that the project manager shall make recommendations to the management committee, we must read that section in conjunction with section 9.3.6, which sets forth the management committee's responsibility concerning the recommendations. Section 9.3.6 further defines and limits the project manager's recommendation duties to the areas of insurance, employee utilization, budgets, and the making of policies and procedures for the plant's construction, maintenance, and operation. When sections 9.3.6 and 10.2.7 are read together, it is clear that the language "but not limited to" in section 10.2.7 refers back to section 9.3.6. The first subsection under 9.3.6 specifically refers to insurance coverage. The remaining fifteen subsections define the other areas on which the management committee expected HL & P to make recommendations.

Austin's proposed instruction implied a general duty by HL & P to make recommendations. The proposed instruction, however, did not properly place HL & P's duty in context. When section 10.2.7 is read in its entirety and in conjunction with section 9.3.6, we conclude that HL & P's duty to make recommendations was limited to the sixteen specific areas set forth in section 9.3.6. Austin's proposed instruction, therefore, would not have aided the jury in understanding HL & P's duty to supply Austin with information or the law or in rendering a just and proper verdict. *See Texaco,* 729 S.W.2d at 819–20. Because Austin's proposed instruction would not have aided the jury in understanding the law or in rendering its verdict, the trial court did not err in refusing to submit the instruction to the jury. We overrule Austin's second point of error.

### "But For" v. "Substantial Factor" Causation

 **[33]** In its third point of error, Austin contends that the trial court erred in submitting the question on causation. Austin argues that the language "in reasonable probability" that the trial court used in jury question two erroneously applied "but for" causation to the question of increased costs. Austin asserts that the applicable burden of proof in contract cases is "substantial factor" causation and that "but **\*796** for" causation requires a higher burden of proof.

To show liability for damages in a breach of contract case, the plaintiff must show that the defendant's breach was

a "substantial factor" in causing the injury. 5 CORBIN, CORBIN ON CONTRACTS § 999 (1964). The plaintiff need not show the proportionate fault of each wrongdoer. *White Budd Van Ness v. Major–Gladys Drive,* 798 S.W.2d 805, 819–20 (Tex.App.—Beaumont 1990, writ dism'd), *cert. denied,* 502 U.S. 861, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991); *Hunt v. Ellisor & Tanner, Inc.,* 739 S.W.2d 933, 938 (Tex.App.—Dallas 1987, writ denied).

Question two of the court's jury charge read as follows:

> Were any costs incurred in the construction of [the project] that, in reasonable probability, would not have been incurred if HL & P had furnished to the Participants all the information as and when required by the Participation Agreement?

The jury responded "No." No definition or instruction concerning causation accompanied this question.

Austin requested that the trial court include the following question in the jury charge:

> Was HL & P's failure to supply information to Austin, if you have found that it did so fail, a substantial factor in increasing the cost of the South Texas Project?

The trial court refused Austin's request. Austin also requested that the trial court include the following instruction in connection with question two and/or three:

> HL & P's failure(s), if any, to supply information caused an increase in cost if they were a substantial factor in bringing about that result.

The trial court also refused this request.

Austin fails to cite, and we cannot find, any authority for its propositions that the term "in reasonable probability" has the same meaning as "but for" causation or that the precise term "substantial factor" must appear in the jury issue. On its face, the issue submitted by the trial court does not impose a stricter standard than Austin's requested issue or instruction. No significant difference exists between the submitted issue and the requested issue or instruction. Because the submitted issue imposed the correct standard concerning causation, and

Austin's proposed instruction would not have aided the jury in understanding the law or in rendering its verdict, the trial court did not err when it refused Austin's requested question and instruction. We overrule Austin's third point of error.

**MOTION FOR NEW TRIAL**

In its fifth and sixth points of error, Austin contends that the trial court erred when it overruled Austin's motion for new trial because the jury's findings that Austin did not incur any costs as a result of HL & P's failure to provide information and that any deceptive trade practice or unconscionable conduct by HL & P did not adversely affect Austin are against the great weight and preponderance of the evidence. Austin argues that (1) starting safety-related construction too soon caused cost overruns, (2) safety-related construction started too soon on the project, (3) HL & P knew that the project was not ready to start safety-related construction in April 1976, (4) HL & P misinformed Austin about the project's readiness to start safety-related construction, and (5) HL & P's misinformation caused cost overruns on the project that would otherwise not have been incurred.

**Standard of Review**

 [34]    [35]    [36]    When determining a factual sufficiency point of error, this Court must consider and weigh all the evidence in the case. It should set aside the verdict and remand the cause for a new trial only if it concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of probative force in support of the verdict. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). This Court, however, is not a factfinder. We do not **\*797** pass upon the witnesses' credibility or substitute our judgment for that of the trier of fact, even if there is conflicting evidence that would support a different conclusion. *Harco Nat'l Ins. Co. v. Villanueva,* 765 S.W.2d 809, 810 (Tex.App.—Dallas 1988, writ denied). The existence of some evidence of probative force in support of the verdict, however, does not mean that the verdict is not contrary to the overwhelming weight of all the evidence. *In re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

**Failure to Provide Information—Jury Question No. 2**

### *Evidence Contrary to Jury Finding*

 [37]    In its fifth point of error, Austin contends that the following evidence is contrary to the jury's finding that HL & P's failure to furnish information to Austin about the inadequacy of Brown & Root's engineering to support safety-related construction did not cause any increase in the cost of the project:

(1) Robert Allen, a consultant for Austin and former head of power plant construction for Bechtel, testified that, when nuclear projects begin safety-related construction, costs tend to increase dramatically.

(2) Because there were too few engineering drawings to support the safety-related construction, work was performed out of sequence, which contributed to inefficiencies, rework, loss of efficient use of personnel, increased costs, and schedule delays.

(3) When HL & P received the project's construction permit in 1976, structural engineering could not support construction.

(4) All of the participants, other than HL & P, hired Gibbs and Hill, a well-recognized A/E, to study the baseline estimate prepared by the task force composed of HL & P, Brown & Root, and Management Analysis. The Gibbs and Hill study reported, "At the time construction was initiated, engineering was behind schedule in issuing construction drawings and subsequent issues were not far enough ahead of construction needs to support the ongoing construction program efficiently."

(5) HL & P's sworn answers to interrogatories sent by Brown & Root during the Brown & Root litigation read, "HL & P believes that Brown & Root construction went to the field too early." "The number of design drawings prepared was totally inadequate to support construction efficiently. If candid reports concerning the amount of engineering completed at the end of 1975 had been given to the management committee, it is likely that construction would not have started in the spring of 1976 and a key project mistake would have been avoided." "HL & P believes the fact that [Brown & Root] engineering and design work was never able to support construction, inevitably caused project work to proceed in a manner involving waste and inefficiency." "In truth, 60 percent of the engineering had not been completed by the latter part of 1975 but rather, probably not in excess of five to ten percent of the engineering necessary to support construction had been completed and the percentage may have been ... materially smaller."

(6) The 1977, 1978, and 1979 Management Analysis reports concluded that the project began safety-related construction too soon.

(7) HL & P discussed for hours with Brown & Root the decision whether to start safety-related construction in 1976 for hours with Brown & Root and knew that it was a calculated risk.

(8) Brown & Root started safety-related construction only at HL & P's request.

(9) Despite knowing that only sixty percent of the engineering was complete, HL & P recommended to the management committee that safety- **\*798** related construction begin on the project.

(10) At the March 12, 1976 management committee meeting, Brown & Root, when asked whether engineering could support the project construction schedule, responded "Hell, yes," even though it knew that response was untrue.

(11) If Austin had known that Brown & Root's engineering was inadequate to support the safety-related construction in April 1976, Austin would have recommended either that the work on the project stop until Brown & Root's engineering could catch up with construction and find solutions for and fix the problems or that the project be canceled.

(12) If the other participants had indicated that they were not ready to start safety-related construction or were not willing to vote for it, then HL & P would not have been able to start safety-related construction.

(13) Each day the project was delayed, the project's cost increased by $750,000 based on the carrying costs of the investment, which included interest on the money borrowed, the cost of the support staff, and the cost of keeping the construction force on the job, and the cost of replacement power.

***Evidence Supporting Jury Finding***

The following evidence supports the jury's finding:

(1) Donley Jordan, HL & P's chief executive officer and chairman of the board, testified, "Everybody in the Houston Lighting & Power Company organization who had anything to do with the South Texas Project felt it was the right thing to do to go forward with safety related construction, and that there was no undue risk involved in it." He also stated that no one at Brown & Root told HL & P that Brown & Root believed it was extremely risky to begin safety-related construction in spring 1976. He also testified that HL & P took the position during the Brown & Root litigation that starting safety-related construction was a key project mistake because at that time no one knew what it would take to complete a nuclear power plant and that HL & P had asked its lawyers to draft a petition as broad as they thought the participants had a chance to prove. He also stated that, looking back, he knew of no one who has done a detailed study on the project that said that the project should not have started safety-related construction at that time. He further testified that at the time the decision was made to start safety-related construction, all the participants had the same information as HL & P.

(2) Ed Turner, HL & P's general manager of power plant engineering and construction for the project, and Ralph Hernandez, an HL & P engineer, testified that they had no concern in March 1976 about Brown & Root's engineering being adequate to support safety-related construction. Hernandez also testified that sufficient engineering drawings were available and that no problems occurred in 1977 through 1980 that resulted from the failure to have sufficient engineering drawings complete at the time safety-related construction began in April 1976.

(3) Brown & Root did not tell HL & P that its engineering was inadequate to support safety-related construction. At the April 1976 management committee meeting, Brown & Root told HL & P that engineering was sixty-three percent complete and purchasing was twenty-two percent complete.

(4) The project met every scheduled construction activity in 1976. These acts could not have occurred without having sufficient engineering drawings available.

**\*799** (5) The decision to start safety-related construction was made in September 1975 when the management committee was reviewing the utilization of the limited work authorization permit.

(6) No inefficient cost, inordinate amount of rework, or inordinate amount of work performed out of sequence was a result of beginning the safety-related construction work in April 1976.

(7) Based on the critical path analysis, work on the project progressed at a better than average or at an average rate for comparable plants built during that time until late 1979. This indicates that the engineering was adequate to support construction up to 1980.

(8) Darrell Halligan, Bechtel's vice president for the project's operations, testified that the amount of engineering that Brown & Root had available prior to beginning safety-related construction was comparable to other nuclear projects that he had supervised.

(9) Jack Mooney, Brown & Root's engineering manager and the person who told the participants at the March 12, 1976 management committee meeting that Brown & Root was ready to begin safety-related construction, testified that there were adequate engineering drawings available to start safety-related construction in April 1976. He also testified that his speech to the management committee and the decision to start safety-related construction was made by him without influence from either Brown & Root's management or HL & P personnel.

(10) Robert Traylor, Management Analysis's cofounder, testified that his company found no cost or schedule problems that resulted from beginning safety-related construction in 1976.

After considering all of the evidence, we conclude that the jury's finding that any failure to provide information did not cause excess project costs is not against the great weight and preponderance of the evidence. The evidence, therefore, supports the jury's finding. Because the jury's finding that any failure to provide information did not cause excess project costs is not against the great weight and preponderance of the evidence, the trial court did not err when it overruled Austin's motion for new trial. We overrule Austin's fifth point of error. Because of our disposition of Austin's fifth point of error, we need not address HL & P's first conditional cross-point

requesting this Court to affirm the trial court's judgment as to Austin's breach of contract claim.

### Austin's DTPA Claims

In its sixth point of error, Austin argues that HL & P's unconscionable conduct adversely affected Austin. On appeal, Austin appears to rest its DTPA claim solely on HL & P's conduct in relation to the decision to begin safety-related construction in 1976.

 [38]    [39]    An "unconscionable action or course of action" means an act that (1) takes advantage of a consumer's lack of knowledge to a grossly unfair degree or (2) results in a gross disparity between the value received and consideration paid. TEX.BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987); *Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985). Taking advantage of a consumer's lack of knowledge to a grossly unfair degree requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated. *Chastain,* 700 S.W.2d at 584. A gross disparity between value received and consideration paid means a glaring and flagrant disparity. *Id.* at 583. A consumer's proof of gross unfairness and gross disparity does not require proof that the defendant acted intentionally, knowingly, or with conscious indifference. *Chastain,* 700 S.W.2d at 583.

### *Evidence Contrary to Jury Finding*

Austin relies on the same evidence set forth above under its fifth point of error to **\*800**  support its argument here that the jury's finding that HL & P's unconscionable conduct did not affect Austin was against the great weight and preponderance of the evidence.

### *Evidence Supporting Jury Finding*

 [40]    The following evidence supports the jury's finding that HL & P did not take advantage of Austin to a grossly unfair degree:

(1) Management Analysis did not base its statement that Brown & Root began safety-related construction too soon on the fact that there were an inadequate number of engineering drawings or engineering studies. Rather, Management Analysis repeated a statement made by

Knox Broom, one of Brown & Root's senior vice presidents, at the September 21, 1978 management committee meeting, that the engineering drawings were only eight percent complete at the time Brown & Root started safety-related construction, thus propagating a myth, which others repeated without performing additional analysis or studies, that Brown & Root was not prepared to start safety-related construction when it did.

(2) Brown & Root's statement in 1976 that sixty percent of the engineering was complete was accurate considering the information available at that time. Brown & Root based its statement on an estimate that the project would take two million engineering man-hours to complete and that Brown & Root had used sixty percent of those man-hours at that time. By 1978, the estimate of engineering man-hours grew to twenty million. In hindsight, this meant that Brown & Root had actually completed less than eight percent of the engineering before beginning safety-related construction. Broom based his statement on the revised engineering man-hour estimate.

(3) Kleinrath reached his conclusion that Brown & Root's engineering was inadequate to start safety-related construction based on only four or five engineering drawings provided by Austin's lawyers.

(4) Mooney, Brown & Root's engineering manager in April 1976, testified that neither Management Analysis nor Gibbs and Hill ever discussed with him whether Brown & Root's engineering was sufficient to begin safety-related construction. Prior to testifying, he reviewed all the engineering drawings produced by Brown & Root up to March 12, 1976. By March 12, 1976, almost 700 engineering drawings were complete or issued.

(5) Ralph Hernandez, an HL & P engineer whose responsibilities in 1976 included providing HL & P with an overview of Brown & Root's structural engineering, reviewed the drawings available before April 1976. Based on this review, he testified that engineering was sufficient to support construction. He further testified that engineering did not fall behind construction until the first quarter of 1978.

After a review of the evidence, we conclude that (1) the jury heard evidence that, at the time the decision was made to start safety-related construction, HL & P believed that Brown & Root's engineering was sufficient to support safety-related construction and (2) any statements HL & P made to that

effect were not unconscionable in a manner that would take unfair advantage of Austin. We further conclude that the true percentage of engineering drawings completed by Brown & Root in March 1976 could only be determined in hindsight at the end of the project. HL & P had to base its decision on the information available at the time.

The following evidence supports the jury finding that there was not a gross disparity between the value of the plant that Austin received and the consideration it paid:

(1) Of the plants available for Austin to use to generate electricity, the project is the cheapest to operate. Utilities **\*801** place into operation the cheapest plants first.

(2) In its 1973 generating plan, Austin determined that the cost of electric energy was the result of capital investment, fuel, maintenance, and operations. Its goals in its 1987 generating plan were to:

—meet long-term customer demand;

—provide electricity with adequate reliability;

—minimize the cost of generating electricity to the rate payers; and

—diversify energy resources.

(3) Without the project, Austin would pay $40–$100 million/year more to operate its system. Over the project's lifetime, this adds up to an $11.6 billion savings (represented to the jury as $2.5 billion in 1989 dollars).

(4) Austin will experience savings as a result of the project's reliability. Reliability means the frequency with which outages will occur, the number of customers affected, and how long those outages will last. Without the project, these events will occur more frequently and be of longer duration. Austin's target energy reserve was twenty percent. Without the project, there will be several times that its reserve will fall below that number. The project's reliability value equals $6.7 billion ($1.2 billion in 1989 dollars).

(5) Austin's cost to build and operate the project for a lifetime is $9.065 billion ($3.375 billion in 1989 dollars). This amount includes: the amount that Austin will pay to service its debt; Austin's share of the total capital cost to build the project, less Austin's share of the Brown & Root settlement; the cost to operate

the project over its useful lifetime, which includes routine maintenance, operating personnel, and nuclear fuel; capital additions, which includes upgrading the plant and insuring continual compliance with quality and safety requirements; and the cost of decommissioning the plant.

(6) Based on fuel savings and reliability only, the project's lifetime value to Austin exceeds its costs by $9.206 billion ($357 million in 1989 dollars).

(7) In addition to fuel and reliability savings, the project also added diversity to the types of plants available to Austin to generate electricity.

(8) It would have cost Austin $432 million (in 1989 dollars) more to own and operate a coal plant over its lifetime.

After a review of the evidence, we conclude that the jury could have found that the project's value to Austin exceeds Austin's share of the construction costs. Because the evidence shows that HL & P did not take advantage of Austin's lack of knowledge and that no disparity exists between the value Austin received and the consideration it paid, the jury's finding that no deceptive trade practice or unconscionable act by HL & P adversely affected Austin is not against the great weight and preponderance of the evidence. We overrule Austin's sixth point of error. Because of our disposition of Austin's sixth point of error, we need not address HL & P's second cross-point concerning whether Austin is a "consumer" as to HL & P as defined by the DTPA or whether HL & P is liable for any DTPA violations by Brown & Root.

#### CONCLUSION

Because (1) the duty of reasonable skill and care is not implied in the participation agreement, (2) the newspaper articles are not hearsay, (3) the jury charge was proper, (4) the jury's findings are not against the great weight and preponderance of the evidence, and (5) the trial court properly denied Austin's motion for new trial, the trial court committed no reversible errors. We overrule all of Austin's points of error.

We affirm the trial court's judgment.

**All Citations**

844 S.W.2d 773

Footnotes

1     *See Ferguson v. Williams,* 670 S.W.2d 327, 331 (Tex.App.—Austin 1984, writ ref'd n.r.e.) (managing partner held not liable for mismanagement of a joint venture despite six specific acts of negligence); *accord, Marcus v. Green,* 13 Ill.App.3d 699, 300 N.E.2d 512, 520 (1973) (partner responsible for violation of scaffolding safety statute entitled to indemnity from partnership as risk inherent in partnership business); *Charlton v. Sloan,* 76 Iowa 288, 41 N.W. 303, 304 (1888) (partner not charged with loss resulting from unwise lease); *Hurter v. Larrabee,* 224 Mass. 218, 112 N.E. 613, 614 (1916) (partner with duty to supervise books not charged when there was only "mere negligence" in failure of duty to supervise); *Thomas v. Milfelt,* 222 S.W.2d 359, 365 (Mo.App.1949) (partner not charged with losses unless they result from fraud, culpable negligence, or bad faith); *J.E. Crosbie, Inc. v. King,* 192 Okl. 53, 133 P.2d 543, 546 (1943) (partners assume risk of loss that comes from bad judgment); *Knipe v. Livingston,* 209 Pa. 49, 57 A. 1130, 1130 (1904) (deceased partner who had been lax in collecting accounts and had carried bad debts as assets was not charged with resulting losses); *Binning v. Miller,* 55 Wyo. 478, 102 P.2d 64, 76 (1940) (absent fraud, culpable negligence, or bad faith, cotenant who acted in good faith not liable for exercising poor judgment).

---

**End of Document**            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 2147986
Supreme Court of Texas.

City of Dallas, Petitioner,
v.
TCI West End, Inc., Respondent

No. 13–0795 | OPINION
DELIVERED: May 8, 2015

**Synopsis**
**Background:** City brought action against developer for demolishing a historic building in violation of city ordinances and for fraud. Texas Historical Commission (THC) intervened to recover damages for demolition of historic structure without appropriate written permission from municipality. The 160th Judicial District Court, Dallas County, No. 06–04868–H, Jim Jordan, J., entered judgment on special jury verdict for city and THC in part, and granted developer's motion for judgment notwithstanding the verdict (JNOV) in part. The Dallas Court of Appeals affirmed in part, reversed in part, and rendered judgment, 407 S.W.3d 292. City's petition for review was granted.

**Holdings:** The Supreme Court held that:

[1] statutes authorizing municipalities to bring civil actions and to recover civil penalties for violations of ordinances provided City authority to bring action against developer, and

[2] statute authorizing municipalities to recover civil penalties for violation of ordinances applied to instances in which a defendant violated an ordinance after receiving notice of an ordinance's provisions or failed to take action necessary for compliance with the ordinance after receiving such notice.

Reversed and remanded.

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Attorneys and Law Firms**

Barbara E. Rosenberg, Christopher D. Bowers, James B. Pinson, Assistant City Attorneys, Christopher J. Caso, City Attorney's Office, Melissa A. Miles, City of Dallas, Warren

M.S. Ernst, Dallas City Attorney, Dallas, Janet Marie Spugnardi, City Attorney's Office, Irving, Jennifer Anne Richie, City of Waco Legal Serv. Dept., Waco, Jennifer Avalon Whit DeCurtis, Messer, Rockfeller & Fort, PLLC, Marsha L. Foulks, Attorney at Law, Frisco, for Petitioner City of Dallas.

Melissa Ann Johnson, Mitchell Madden, Thomas V. Murto III, Holmgren Johnson: Mitchell Madden, LLP, Robert B. Gilbreath, Hawkins Parnell Thackston & Young LLP, Dallas, for Respondent TCI West End, Inc.

Jarold Lee Apple, How Frels Rohde Woods & Duke, R. Michael Northrup, Cowles & Thompson, P.C., Dallas, for Amicus Curiae The National Trust for Historic Preservation.

Joe H. Thrash, Assistant Attorney General, Austin, for Intervenor Texas Historical Commission

H. Grady Chandler, Attorney at Law, Garland, for Other Interested Party Dorbet, Inc.

Lawrence J. Friedman, Friedman & Feiger, LLP, Dallas, for Other Interested Party Weir Industries, Inc.

**Opinion**

PER CURIAM

**\*1** Section 54.012(3) of the Texas Local Government Code authorizes a municipality to pursue a civil action against a property owner to enforce an ordinance "for zoning that provides for the use of land or classifies a parcel of land according to the municipality's district classification scheme."TEX. LOC. GOV'T CODEE § 54.012(3). Despite section 54.012(3)'s clear and unambiguous language, the court of appeals held that a municipality cannot pursue a civil action under that statute for violations of "general zoning ordinances regulating the use of land." 407 S.W.3d 292, 301 (Tex.App.–Dallas 2013). Because the court of appeals' holding is incompatible with the statute's plain language, we reverse the court's judgment and remand the case to the court of appeals for further proceedings.

The City of Dallas contends that TCI West End, Inc. (TCI) demolished a building located in a historic overlay district in violation of a city ordinance. *See* Dallas City Ordinance No. 21391, as amended by Ordinance No. 22158, § 7.1 (requiring building owner, prior to demolishing or altering building located in historic overlay district, to apply for determination as to whether structure is "contributing

structure" subject to strict demolition requirements); *see also id.* at § 4 (incorporating chapter 51A of the Dallas City Code); Dallas, Tex. City Code § 51A–4.501(a)–(p) (regulating historic overlay districts). [1] Among other claims, the City sued TCI for civil penalties under section 54.017 of the Texas Local Government Code, as authorized by section 54.012 of the code. *See*TEX. LOC. GOV'T CODEE § 54.012 (listing types of ordinances municipality can enforce by civil action), .017 (authorizing civil penalties for ordinance violations). Following a jury verdict in the City's favor, the trial court rendered judgment awarding the City $750,000 in civil penalties.

The court of appeals reversed, holding that sections 54.012 and 54.017 apply only to health and safety ordinances, not "general zoning ordinances regulating the use of land." 407 S.W.3d at 301. In the alternative, the court held that the City presented no evidence that TCI was informed about the relevant ordinance provision before demolishing the building, as required to obtain civil penalties under section 54.017. *Id.* at 301. On rehearing, one justice dissented on both counts, explaining that (1) sections 54.012 and 54.017 do not contain the health-and-safety limitation imposed by the court and (2) sufficient evidence supported the jury's finding that TCI had actual notice of the ordinance provision before demolishing the building. *Id.* at 302–05.

 **[1]**  Although other issues have been raised on appeal, the threshold issues are (1) whether sections 54.012(3) and 54.017 are limited to enforcement of "health and safety" zoning ordinances; and (2) whether section 54.017 requires that actual notice be effected *before* violation of the applicable ordinance. [2] These matters present questions of law that we review de novo. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex.2008).

 **\*2**  **[2]**   **[3]**   **[4]** Our primary objective in construing a statute is to give effect to the Legislature's intent as expressed in the statute's plain language. *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). We consider the statute as a whole, rather then viewing individual provisions in isolation, and presume the Legislature selected the statute's language with care, choosing each word for a purpose and purposefully omitting words not chosen. *Id.* We must avoid adopting an interpretation that "renders any part of the statute meaningless." *Crosstex Energy Servs, L.P. v. Pro Plus, Inc.,* 430 S.W.3d 384, 390 (Tex.2014).

Section 54.012, which is located in chapter 54, subchapter B of the local government code, authorizes a municipality to pursue a civil action against a property owner to enforce several categories of ordinances, including "an ordinance ... for zoning that provides for the use of land or classifies a parcel of land according to the municipality's district classification scheme." TEX. LOC. GOV'T CODEE § 54.012. [3] The remaining provisions in subchapter B address the rules, procedures, and relief available for a civil action authorized by section 54.012. *See id.* §§ 54.013–.020. Among other available remedies, section 54.017 permits a municipality to recover civil penalties, up to specified limits, upon proof that:

> (1) the defendant was actually notified of the provisions of the ordinance; and
>
> (2) after the defendant received notice of the ordinance provisions, the defendant committed acts in violation of the ordinance or failed to take action necessary for compliance with the ordinance.

*Id.*§ 54.017.

The court of appeals determined that all the provisions in subchapter B, including sections 54.012(3) and 54.017, "relate only" to health and safety matters and thus do not apply to general zoning ordinances regulating the use of land. 407 S.W.3d at 301. The court further held that the City's historic-district regulation does not qualify for enforcement as a health-and-safety ordinance under subchapter B because its stated purpose is to "protect buildings of historical, cultural, and architectural significance" in the historic overlay district. *Id.* (citing Dallas City Ordinance No. 21391, as amended by Ordinance No. 22158). As a result, the court concluded that the ordinance can only be enforced under chapter 211 of the local government code, *id.* which governs municipal zoning and has a stated purpose of "promoting the public health, safety, morals, or general welfare and protecting and preserving places and areas of historical, cultural, or architectural importance and significance,"TEX. LOC. GOV'T CODEE § 211.001.

To support this construction of subchapter B, the court of appeals cited a Texas Attorney General opinion limiting the statute's application to health and safety matters because (1) it is entitled "Municipal Health and Safety Ordinances" and (2) section 54.012 specifically refers to those types of matters in some of its subsections. *Id.* (citing Tex. Att'y Gen. Op. No. GA–0267 (2004)). The court also cited *Hollingsworth*

*v. City of Dallas,* 931 S.W.2d 699 (Tex.App.–Dallas 1996, writ denied), in which the court had previously resolved an apparent conflict between the injunctive-relief provisions in chapters 54 and 211 as they pertain to general zoning ordinances regulating the use of land. In *Hollingsworth,* a property owner had argued that the City of Dallas could not obtain injunctive relief for a zoning-ordinance violation without complying with section 54.106, which authorizes injunctive relief only on "a showing of substantial danger of injury or an adverse health impact to any person or to the property of any person other than the defendant." *Id.* at 702; TEX. LOC. GOV'T CODEE § 54.016. Section 211.012(c)'s injunctive-relief remedy includes no similar requirement. [4] TEX. LOC. GOV'T CODEE § 211.012(c). The court resolved the conflict in favor of section 211.012's application because it specifically applies to ordinances regulating the use of land and section 54.016 does not. 931 S.W.2d at 703 (construing statutes to avoid creating a conflict and determining that "the Legislature intended section 211.012 to apply to ordinances regulating the use of land and intended section 54.016 to apply to other types of ordinances not at issue").

**\*3** We hold that the court of appeals' interpretation of section 54.012(3) as incorporating a health-and-safety limitation is contrary to the plain and unambiguous language in the statute and would render meaningless and redundant language in that section expressly circumscribing other categories of ordinances enforceable under subchapter B.

Section 54.012(3) expressly authorizes municipalities, such as the City, to enforce ordinances "for zoning that provides for the use of land or classifies a parcel of land according to the municipality's district classification scheme." TEX. LOC. GOV'T CODEE § 54.012(3). Section 54.012(3)'s language plainly encompasses the zoning ordinance at issue in this case, and neither the words "health" and "safety" nor analogous limitations are included anywhere therein. In comparison, at least three other subsections of section 54.012 expressly limit the types of ordinances that may be enforced to those involving health or safety matters or use comparable terminology. *See id.* § 54.012(1) (pertaining to ordinances "for the preservation of public safety, relating to [building construction]"), .012(2) (referring to ordinances "relating to the preservation of public health or to the fire safety of a building or other structure or improvement"), .012(6) (applying to ordinances "relating to dangerously damaged or deteriorated structures or improvements").

As a general principle, we eschew constructions of a statute that render any statutory language meaningless or superfluous. *Crosstex,* 430 S.W.3d at 390. By interposing a limitation into subsection (3) that the Legislature deliberately chose to include in some—but not all—of section 54.012's subparts, the court of appeals' construction of the statute defeats the purpose of the Legislature's carefully chosen words. This we cannot abide.

We likewise do not attribute decisive weight to subchapter B's title because "[t]he heading of a title, subtitle, chapter, or section does not limit or expand the meaning of a statute." *See* TEX. LOC. GOV'T CODEE § 311.024; *see also Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 809 (Tex.2010).

Nor do we perceive a fatal conflict between chapter 54, subchapter B and chapter 211 that would render the former wholly inapplicable to a general land-use ordinance despite its plain language. Chapter 54 provides municipalities with general authority to enforce ordinances whereas chapter 211 grants municipalities specific authority to pass substantive ordinances regulating zoning. Whatever conflict may exist between the injunctive relief available under each of these statutory schemes, we cannot say that the statutes are mutually exclusive merely because they overlap in scope. Although both statutory schemes authorize recovery of civil penalties, the availability of the particular remedies hinge on distinct procedural mechanisms. Chapter 54 creates a framework for pursuing civil penalties for specific conduct while chapter 211 permits, but does not require, municipalities to adopt civil penalties for the violation of an ordinance adopted under that chapter. Compare TEX. LOC. GOV'T CODEE § 54.017 *with id.* § 211.012(b). The City's election to forego adopting specific civil penalties for violations of specific zoning ordinances does not preclude the City from pursuing the remedies already available to it under chapter 54, subchapter B, on the terms provided therein.

**\*4** Applying section 54.012(3)'s plain language, we conclude that chapter 54, subchapter B authorizes a suit for civil penalties based on a violation of the land-use restrictions embodied in Dallas City Ordinance No. 21391, as amended by Ordinance No. 22158. The court of appeals' contrary holding is erroneous.

**[5]** In an alternative holding, the court of appeals determined that the City's civil-penalty claim would fail on the merits due to legally insufficient evidence that TCI had received actual notice of the ordinance provision before

it demolished the building in violation of the ordinance. Although acknowledging the existence of evidence that TCI had actual notice of some of the requirements for obtaining a demolition permit for buildings in the historic district, the court held that the City "presented no evidence that [TCI] was ever informed of the ordinance provisions themselves *before the building was demolished*." 407 S.W.3d at 301 (emphasis added).

Regardless of the validity of the court's assessment of the evidence, which we need not consider, the court's analysis fails because section 54.017 authorizes an award of civil penalties if the defendant violated an ordinance after receiving notice of its provisions *or failed to take action necessary for compliance with the ordinance after receiving such notice*. TEX. LOC. GOV'T CODEE § 54.017(a). The statute's use of "or," a disjunctive, identifies two alternative bases for recovering civil penalties. *See id.*; *see also City of Lorena v. BMTP Holdings, L.P.,* 409 S.W.3d 634, 642 (Tex.2013). The City asserts that the court of appeals erred because there is some evidence that, even if TCI did not receive actual notice of the ordinance provisions until after it had already violated the ordinance by demolishing the building, TCI could have sought a post-demolition permit or taken other steps "necessary for compliance with the ordinance after receiving such notice." In response, TCI contends that it could not possibly have complied with the

ordinance after it demolished the building, because "to bring itself into compliance with the ordinance *after* demolition, [TCI] would have to obtain approval from the Landmark Commission *before* the demolition."

The court of appeals did not address these arguments. Instead, it concluded that there was no evidence that TCI had actual notice before it "violated an ordinance" by demolishing the building, without considering whether TCI could have "take[n] action necessary for compliance with the ordinance after receiving such notice." Without addressing whether, in fact, TCI could have taken action to comply with the ordinance after receiving actual notice of the ordinance, we agree with the City that the court of appeals erred in failing to consider whether the civil-penalty award could be sustained under this alternative statutory ground.

Accordingly, without hearing oral argument, we reverse the portion of the court of appeals' judgment concluding that chapter 54, subchapter B does not authorize the City's enforcement action against TCI and remand the cause to that court for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 59.1.

**All Citations**

--- S.W.3d ----, 2015 WL 2147986, 58 Tex. Sup. Ct. J. 888

---

Footnotes

1    The ordinance defines a "contributing structure" as one that "retains its essential architectural integrity of design and whose architectural style is typical or integral to [the] district."

2    The City has not appealed adverse holdings by the trial court and court of appeals on its other claims.

3    Although the statute has been amended since the events giving rise to this litigation, the changes are not material to the issues on appeal; accordingly, we cite the current version of the statute for convenience.

4    Section 211.012(a) authorizes a municipality to adopt ordinances to enforce (1) the provisions of chapter 211, subchapter A, which imbues municipalities with the authority to adopt general zoning regulations, and (2) any ordinance or regulation adopted thereunder. TEX. LOC. GOV'T CODEE § 211.012. Section 211.012(c) provides that "in addition to other remedies," a municipal authority may obtain an injunction "[i]f a building or other structure is erected, constructed, reconstructed, altered, repaired, converted, or maintained ... in violation of this subchapter or an ordinance or regulation adopted under this subchapter."

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

851 S.W.2d 896
Court of Appeals of Texas,
Austin.

CITY OF EL PASO and Public
Utility Commission of Texas,
v.
EL PASO ELECTRIC COMPANY.

No. 3–92–038–CV. | March 10, 1993.
| Rehearing Overruled May 26, 1993.

Electric company and city sued for judicial review of final order issued by public utility commission in fuel reconciliation proceeding. The 147th Judicial District Court, Travis County, F. Scott McCown, J., affirmed agency order in one part and reversed it in another, remanded case to commission, and commission and city appealed. The Court of Appeals, Powers, J., held that: (1) commission was required to provide explanation for choice of meaning it assigned to word "prospectively" which produced inconsistent treatment of capacity costs in two back-to-back reconciliation periods, and (2) commission was not obliged to deduct all profit from off-system sales in calculating company's known and reasonably predictable fuel costs.

Affirmed.

**Attorneys and Law Firms**

**\*897** Norman J. Gordon, Diamond, Rash, Gordon & Jackson, P.C., El Paso, for City of El Paso.

Dan Morales, Atty. Gen., Mary A. Keeney, Asst. Atty. Gen., Austin, for Public Utility Com'n of Texas.

John F. Williams, Clark, Thomas, Winters & Newton, Austin, for El Paso Elec. Co.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

**Opinion**

POWERS, Justice.

El Paso Electric Company and the City of El Paso sued for judicial review of a final order issued by the Public Utility Commission in a contested case, a "fuel-reconciliation proceeding" initiated by the Company in which the City

intervened. *See* Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69 (West Supp.1993); Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 19 (West Supp.1993). In its final judgment, the district court affirmed the agency order in one part and reversed it in another, remanding the case to the Commission. The Commission and the City appeal. *See* APTRA § 20. We will affirm the district-court judgment.

**FUEL–RECONCILIATION PROCEEDINGS**

An electric utility is generally entitled to recover through its rates any sums expended for reasonable and necessary operating expenses, including the cost of fuel and fuel-related items. PURA § 39(a). A utility incurs these fuel costs directly when it generates its own electric power; it incurs them indirectly, as an element of the price paid, when the utility buys electric power from another. Although the Company generates its own electric power, it also purchases electric power under a contract with Southwestern Public Service Company.

Before 1983, the Commission calculated an electric utility's operating expenses (and hence the utility's rates) based on actual fuel costs, authorizing the utility to "pass through" automatically to its customers any increases or decreases in such costs. [1] The legislature forbade the practice in 1983. [2] To accommodate the new legislation, **\*898** the Commission promulgated a set of rules known collectively as the "fuel rule." 8 Tex.Reg. 3540 (1983) (16 Tex.Admin.Code § 23(b), since amended).

As a practical matter, the Commission cannot embark upon and decide a new rate case with each variation in fuel prices. The agency therefore adopted, for its ratemaking, the device of a "fixed fuel factor." This factor is the sum of a utility's "known costs" for fuel plus its "reasonably predictable fuel costs." The latter element renders the sum a mere estimate of the utility's fuel costs. Nevertheless, the estimate is fixed for ratemaking purposes as the utility's hypothetical fuel cost; it is used in calculating the utility's total operating expenses and, ultimately, the rates the utility is permitted to charge its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), 23.23(c). Because actual fuel costs may vary from the estimate, after the rates go into effect, the utility may recover through its rates more or less than the net income its rates were designed to produce. Consequently, the fuel rule provides for periodic

adjustments or "reconciliations" of the difference between actual fuel costs and the hypothetical cost represented by the fixed-fuel factor. 16 Tex.Admin.Code § 23.23(b)(2)(H). The reconciliation may be part of a general rate case or an independent reconciliation proceeding. *Id.* Depending on the result of the reconciliation, the utility may be required to refund to its customers an over-recovery of fuel costs or it may be permitted to recoup an under-recovery through surcharges to its customers. 16 Tex.Admin.Code §§ 23.23(b)(2)(B), (F), (G).

## PURCHASED–POWER CAPACITY COSTS

Not every fuel-related cost is includable in a utility's fixed-fuel factor; consequently, not every fuel-related cost is recoverable through the reconciliation process. One excludable item is denominated "purchased power capacity costs." The term "capacity costs" refers to one element of the price charged by a seller of electric power—an element that represents the seller's fixed costs in generating the power. (Another element, denominated "energy charges," represents the seller's variable costs in generating the power—the cost of fuel, for example). A Commission regulation presently excludes from a utility's fixed-fuel factor the capacity-cost element of purchased power "unless the utility demonstrates that such treatment is justified by special circumstances." 16 Tex.Admin.Code § 23.23(b)(2)(B)(ii). The Commission's regulations did not always allow for exceptions when "justified by special circumstances." Before the regulation was adopted, the Commission issued its final order in an earlier contested case under the agency's docket number 6350.

## Docket Number 6350

Docket number 6350 was a general rate case that included a reconciliation proceeding. The Company satisfied the Commission that special considerations justified reconciliation treatment of the capacity costs the Company paid to Southwestern, during the period March 1984 through July 1985, even though such costs would *not* ordinarily be entitled to such treatment. The Commission's final order in docket number 6350 demonstrates that the special considerations were "equitable" in nature: (1) the purchases of power from Southwestern had benefitted the Company's customers; (2) capacity costs were a necessary element of the Southwestern charges; and (3) it would be inequitable to penalize the Company for successfully

reducing its customers' bills by purchasing cheaper power from Southwestern. The Commission's decision in this earlier case preceded by about nine months the amendment of the fuel rule to allow expressly for the reconciliation of capacity costs upon a demonstration of "special circumstances"; that is to say, the Commission viewed the equitable considerations as amounting to an *implied* exception to a general rule that capacity costs were non-reconcilable. It appears to **\*899** us self-evident, therefore, that "equitable" considerations could come within the *express* exception presently made by section 23.23(b)(2)(B)(ii) for "special circumstances." No argument is made to the contrary in the present appeal.

The Commission's final order in docket number 6350 also adopted a part of the examiner's report wherein he stated that he agreed with a witness's view that the capacity costs paid to Southwestern "should be treated as a non-reconcilable expense *prospectively.*" This gives rise to a part of the present controversy.

## Docket Number 8588

The contested case now before us on appeal was conducted under the Commission's docket number 8588. It is not a rate case but rather an independent reconciliation proceeding. In this proceeding, the Company requested reconciliation of $4,202,090 in capacity costs paid to Southwestern between July 31, 1985, and April 25, 1986, a period of about nine months. The period is the interval between the last day of the reconciliation period covered in docket number 6350 (July 31, 1985) and the effective date of the new rates established in that contested case (April 25, 1986). As special circumstances justifying reconciliation of the capacity costs paid in that period, the Company pointed to the Commission's final order in docket number 6350, wherein the agency had declared that capacity costs should be treated as non-reconcilable "prospectively." The word "prospectively" meant, according to the Company, from and after the effective date (April 25, 1986) of the new rates established in docket number 6350. Hence, by force of that order, the Company was entitled to reconciliation of capacity costs paid in the nine-month interval before the new rates became effective.

In its finding of fact 14 in docket number 8588, the Commission rejected the Company's contention, stating simply that the Company had "failed to show special circumstances warranting inclusion" of such capacity costs in the reconciliation. The sole basis for this conclusion is found

in a portion of the examiner's report, which the Commission adopted in its final order: The word "prospectively," as used in the final order in docket number 6350, meant from and after July 31, 1985—the end of the reconciliation period covered in docket number 6350—as opposed to the Company's contention that the word meant from and after April 25, 1986, the effective date of the rates set in the Commission's final order in docket 6350.

The Company sued for judicial review of this aspect of the Commission's final order in docket number 8588. The district court reversed the agency order on the ground that it was arbitrary and capricious in failing adequately to explain why the capacity charges were admitted to reconciliation in the one period and denied reconciliation in the next succeeding period. The court remanded the case to the Commission to supply an explanation. In the Commission's only point of error and in the City's first point of error, they complain of this aspect of the district-court judgment.

### Discussion and Holdings

 [1]   In its final order in the present case, the Commission gave a *single* ground for its decision regarding capacity costs: the Company failed to demonstrate the requisite "special circumstances" because the word "prospectively," as used in the final order adjudicating docket number 6350, meant from and after July 31, 1985. The final order in the present case, excluding capacity costs from reconciliation, must stand or fall on that basis. We are not at liberty to sustain the order on some other basis *we* might imagine as being sufficient for the different treatment in the two cases—for example, an apparent difference in the material factual circumstances as between the two proceedings. We may judge the sufficiency of the Commission's order solely on the basis given by the agency itself for its decision; to do otherwise would constitute an invasion of the agency's province. *Morgan Drive Away, Inc. v. Railroad Comm'n,* 498 S.W.2d 147, 152 (Tex.1973);  **\*900**  *Professional Mobile Home Transp. v. Railroad Comm'n,* 733 S.W.2d 892, 904 (Tex.App.—Austin 1987, writ ref'd n.r.e.).

 [2]   We note first that the examiner's purported explanation —that the word "prospectively" meant from and after July 31, 1985—adds nothing to enlighten the Commission's naked conclusion that the Company had failed to demonstrate the necessary special circumstances. Both the conclusion and the purported explanation are equally opaque. The word

"prospectively" was ambiguous in context, and nothing in the record before us suggests why the Commission preferred one date over another. We are left ultimately with the stark conclusion that "prospectively" means from and after July 31, 1985, *merely because that is what the examiner in docket number 8588 decided it meant.* Was the Commission legally obliged to supply an actual reason or explanation for its choice of meanings? We believe it was.

We cannot find that the legislature has imposed upon the Commission, by an explicit statutory enactment, a duty to supply an explanation or reason for its action. But such a requirement need not have a statutory origin. It is preeminently a concomitant of a court's duty of judicial review, a duty assigned the trial court and this court in PURA § 69. This statute contemplates meaningful judicial review, not a charade of the real thing; therefore it implies a power to require the Commission to supply any reasons or explanations necessary for the reviewing court to understand the Commission's final order.

> If the administrative action is to be tested by the basis upon which it purports to rest, that must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "*We must know what a decision means before the duty becomes ours to say whether it is right or wrong.*"

*S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (emphasis added) (citations omitted); *see also S.E.C. v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[T]he orderly functioning of the process of review *requires* that the grounds upon which the administrative agency acted be *clearly disclosed* and adequately sustained.") (emphasis added); *see generally* Bernard Schwartz, *Administrative Law* § 7.29, at 429 (2d ed. 1984); Kenneth C. Davis, *Administrative Law Text* § 16.07, at 326 (3d ed. 1972). The requirement of explanations or reasons is frequently imposed when it appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations. Louis Jaffe,

*Judicial Control of Administrative Action* 587 (1965); *see, e.g., Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Secretary of Agric. v. United States,* 347 U.S. 645, 653, 74 S.Ct. 826, 831, 98 L.Ed. 1015 (1954). The requirement for explanatory "reasons" should not be confused with a statutory requirement that binds an agency to supply findings of fact in support of its conclusions of law, as in APTRA § 16(b). "Reasons differ from findings in that reasons relate to law, policy, and discretion rather than to facts." Davis, *supra,* at 326. Nevertheless, agencies frequently use findings of fact to explain the conclusions which express their choices in matters of discretion, law, and policy. Schwartz, *supra,* at 428–30.

 **[3]** We believe the Supreme Court of Texas, in *Public Utility Commission—v. Gulf States Utilities,* 809 S.W.2d 201, 212 (Tex.1991), adopted a requirement that agencies must supply explanations or reasons when these are necessary to an intelligent understanding of their final orders. There, the court reversed a Commission decision because the agency record revealed that the Commission had apparently considered only a *single* factor in taking a particular discretionary action (dividing between a utility and its ratepayers the benefit of proceeds received from the sale of a utility asset). The court noted that numerous *other* factors, including equitable considerations, **\*901** appeared applicable to the agency's decision in the matter. In reversing the Commission's final order, the court wrote that the agency "ignored" the other, apparently applicable factors, while referring only to the testimony of two witnesses whose conclusions were not explained in the record, and "the Commission did not articulate its reasons for" deciding the issue based on the single factor alone. In its remand, the court refrained from instructing the Commission to consider particular factors and from prohibiting its consideration of other factors, leaving the agency free to choose and "set forth the factors it considers relevant" together with an explanation of "how these factors are evaluated in the present case." *Id.* at 211–12. While the court nominally reversed the agency order for a want of "substantial evidence," it is readily apparent that the court did so only because of the rather peculiar meaning "substantial evidence" bears in Texas administrative law—a meaning that generally incorporates into a single legal precept both arbitrary and capricious agency action under APTRA § 19(e)(6) and a true want of substantial evidence under APTRA § 19(e)(5). *See generally* Kerry McGrath, *Substantial Evidence Review in Texas—Still Insubstantial After All These Years,* 44 Baylor L.Rev. 223 (1992).

We hold, therefore, that the Commission's final order erroneously omitted to supply a necessary explanation for the choice of meaning it assigned to the word "prospectively," producing thereby the inconsistent treatment of capacity costs in the two back-to-back reconciliation periods. As in *Gulf States,* the agency order in docket number 8588 referred only to the statement of an individual (the hearing examiner in docket number 6350) whose naked conclusion was not explained in the record. We agree with the trial court that the failure to supply the necessary explanation was an abuse of discretion under APTRA § 19(e)(6); it is immaterial that under the peculiar Texas view of "substantial evidence" the omission would also amount to a want of "substantial evidence" under APTRA § 19(e)(5).

The City and the Commission raise several arguments to the contrary. They first complain the Company offered no "evidence" of special circumstances. It is clear from the record, however, that the Company was not relying upon evidentiary grounds for its contention that such special circumstances existed in docket number 8588, the case we now review. Rather, the Company was relying upon legal grounds—that the final order in docket number 6350, properly construed, encompassed the nine months for which reconciliation was requested in docket number 8588. Indeed, the Commission in docket number 8588 rejected the claim for reconciliation *on legal grounds,* not evidentiary or factual grounds, by basing the agency ruling on a construction of the previous order, albeit in a manner contrary to that advocated by the Company. We do not understand that the term "special circumstances" means evidentiary grounds exclusively, and no party suggests that it does.

The City and the Commission argue next that the examiner's report in docket number 6350 was "clear" in *affirmatively* and *expressly prohibiting* "prospective recovery of capacity charges," meaning "all capacity charges not placed in issue in that docket." We disagree.

The relevant part of the examiner's report declares: (1) the examiner agreed that capacity costs "should be treated as a non-reconcilable expense prospectively"; (2) however, that would be inequitable (for specified reasons) with respect to "past payments" of such costs; (3) therefore, the examiner recommends that "prior" capacity-cost expenses be included "in the reconciliation balance." These declarations *are* clear on one point—capacity costs paid before July 31, 1985, the end of the reconciliation period in docket number 6350, would be reconcilable expenses under the

examiner's recommendation. The declarations are *not* clear in the sense urged by the City and the Commission—that they *affirmatively* and *expressly prohibit* reconciliation of the capacity costs presently in dispute. In fact, the City offers no argument in support of its conclusion that the declarations are "clear" in excluding *these* capacity **\*902** costs from reconciliation; the Commission offers only the opaque generality that an administrative agency's interpretation of its order is entitled to judicial deference.

We find in the declarations nothing to suggest that the Commission, by adopting its examiner's report in docket number 6350, prohibited reconciliation of capacity-cost expenses in the period July 31, 1985—April 25, 1986. Indeed, the examiner's declarations reasonably imply in context that capacity costs paid in the period were entitled to the same equitable justification because April 25, 1986, was the date when the examiner's declarations first acquired legal force and effect by the Commission's adoption of them. The terms of the examiner's recommendation do not suggest that the equitable considerations became inoperable on July 31, 1985, or that the expressions "past payments" and "prior" capacity-cost expenses referred to a date other than the effective date of the order in docket number 6350.

The City and the Commission argue that the Company's contention amounts to no more than a complaint of "regulatory lag" during the nine months between the end of the reconciliation period in docket number 6350 and the effective date of the final order in that contested case. And, they properly point out, losses occasioned merely by regulatory lag are not recoverable by a utility. We disagree with the theory. "Regulatory lag" refers to delay in the "decisional process" of a regulatory agency. *Railroad Comm'n v. Lone Star Gas Co.,* 656 S.W.2d 421, 423 (Tex.1983). The Company does not complain of any delay in the "decisional process" in docket number 6350. It complains instead of the apparently arbitrary meaning assigned *in the present case* to the word "prospectively" as that word was adopted in the Commission's final order in docket number 6350. That choice of meaning, and not any delay in the "decisional process," fixed the time period in dispute.

Finally, the City and the Commission argue that the phrase "arbitrary and capricious," recited in the district-court judgment as the basis for reversing the Commission's final order, does not encompass the agency's failure to explain its different treatment of capacity costs as compared to docket number 6350. Hence, they contend, apparently, that the

Commission's final order could not be reversed on the ground that it was "arbitrary and capricious." In support of their argument, the City and the Commission cite judicial decisions that *were* decided on arbitrary and capricious grounds on an apparent theory that these exhaust the possibilities and define the limits of arbitrary and capricious action under APTRA § 19(e)(6). *See Lewis v. Metropolitan Sav. and Loan Ass'n,* 550 S.W.2d 11 (Tex.1977); *Railroad Comm'n v. Alamo Express,* 158 Tex. 68, 308 S.W.2d 843 (1958); *Public Util. Comm'n v. South Plains Elec. Coop.,* 635 S.W.2d 954 (Tex.App.— Austin 1982, writ ref'd n.r.e.). We disagree with the theory. In any case, we are obliged to affirm the district-court judgment if it is correct on any legal ground. We have discussed those grounds above.

For the reasons given, we overrule the Commission's only point of error and the City's first point of error.

## OFF–SYSTEM SALES REVENUES

Section 23.23(b)(2)(A) requires that a utility maintain and provide the Commission information showing, among other things, the utility's "off-system sales revenues." These are revenues derived from a utility's sales of excess electric power to other utilities. Under § 23.23(b)(2)(B)(i), the net revenues from these sales may be set off against costs in calculating, for reconciliation purposes, a utility's "known or reasonably predictable fuel costs."

In the reconciliation period of docket number 8588, the case we now review, the Company received from off-system sales a net revenue equal to $3,099,564 above its costs for fuel and fuel-related items. In its final order, the Commission declined to deduct any part of this sum in calculating the Company's known or reasonably predictable fuel costs. The agency noted in its order, however, that in future reconciliation periods the agency would deduct 75 **\*903** percent of such revenues in calculating known or reasonably predictable fuel costs. [3] In its finding of fact 11, the Commission stated: (1) profits from off-system sales result jointly from the Company's efforts to make such sales and from the availability of electric power generated from facilities paid for, in effect, by the Company's customers; (2) consequently, in future reconciliation periods the Commission would assign 75 percent of the profits to the customers' benefit and 25 percent to the Company's benefit to encourage the Company to continue making such sales; and (3) for the reconciliation period covered in docket number

8588, however, the profits from off-system sales would continue to be excluded from the reconciliation calculations.

In its second point of error, the City argues the Commission erred by not deducting *all* off-system sales revenues from the Company's known and reasonably predictable fuel costs and contends the district court erred in affirming this aspect of the agency order.

### Discussion and Holdings

 **[4]**    The City argues the Commission was obliged to deduct *all* profits from off-system sales, in calculating the Company's known and reasonably predictable fuel costs, because the agency lacked the power to divide such profits and to assign one part to the Company's benefit and another part to its customers' benefit. The City bases its argument on PURA § 41(c) which defines the "net income" factor used to fix a utility's rates under PURA § 39(a). [4] PURA § 41(c) defines "net income" as "the *total revenues* of the public utility less all reasonable and necessary expenses as determined by the Commission." (emphasis added). The substance of the City's argument is that the statutory term "total revenues" implies an entirety; hence it is not divisible in an agency proceeding that pertains to ratemaking. We disagree.

In PURA the Commission received from the legislature powers that are broad and flexible:

> The commission has the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction. [PURA § 16(a) ]

> The commission is hereby vested with all authority and power ... to insure compliance with the obligations of public utilities in this Act. [PURA § 37]

> It shall be the duty of the [commission] to insure that every rate ... shall be just and reasonable. [PURA § 38]

> In fixing a reasonable return on invested capital, the [commission] shall consider ... the efficiency of the utility's operations, and the quality of the utility's management. [PURA § 39(b) ].

The breadth of discretion implied by these statutory expressions is contradicted absolutely by the straightjacket theory that the City erects upon an implication imputed to the term "total revenues." Granted that some more particular provision in PURA might have denied the Commission discretion to apportion net revenues from off-system sales, expressly or by necessary **\*904** implication, we believe the term "total revenues" is not such a provision. We believe, for example, that the legislature did not intend that any implication imputed to the term "total revenues" should deny the Commission discretion to divide such revenues if the division was necessary to insure a rate that is "just and reasonable" or to secure "efficiency" in utility operations and an acceptable "quality" in utility management. And we point out that efficient operations and high-quality management were the Commission's express objectives in choosing to apportion sales revenues in this case.

The City suggests no general principle which prohibits the division and apportionments made in the present case; the City relies solely upon the implication it attributes to the term "total revenues." This implication is not the Commission's interpretation of that expression, for section 23.23(b)(2)(B)(i) of that rule contemplates consideration of other "conditions or events" that bear upon a utility's fuel and fuel-related costs in the reconciliation context. The division and apportionment of future revenues in this case amounts to an agency interpretation of the fuel rule. We see nothing unreasonable or *ultra vires* in that interpretation, and the fuel rule pertains ultimately to a utility's operating *expenses,* not its *revenues.*

We, therefore, overrule the City's contention that the Commission exceeded its power and discretion when it apportioned the off-system sales revenues.

The City contends there was insufficient evidence adduced in the agency proceeding to support a reasonable conclusion that an allocation of a part of the benefit to the Company would provide an incentive to make future sales of a like kind for the ultimate benefit of its customers. The argument refers to that part of the Commission's finding of fact 11 which stated the agency's reason for allocating 25 percent of the profits to the benefit of the Company in the future. The Commission's declaration merely explained why the agency made the allocation; it does not purport to be the declaration of a fact inferred by the agency from evidence adduced in the contested case. *See* Davis, *supra.* We overrule the City's contention.

**[5]** The City contends finally that providing the Company an incentive to make off-system sales was not a relevant statutory factor in establishing reconcilable fuel costs; consequently, the Commission's decision on that basis amounted to an abuse of discretion under *South Plains Electric Cooperative,* 635 S.W.2d at 957. We disagree.

In promulgating the fuel rule, the Commission responded to the legislative prohibition against fuel-adjustment "pass-throughs." It has not been suggested that the fuel rule, based in part upon predicted fuel costs with periodic reconciliations to actual costs, is an unreasonable rule or one out of harmony with PURA. We have held that the rule lay within the Commission's statutory power to enact at its discretion. The rule establishes, at bottom, an arrangement by which a hypothetical cost of fuel may be used to calculate a

utility's "reasonable and necessary operating expenses" for purpose of PURA § 39(a), while allowing concurrently for a consideration of some of the stated factors listed in PURA § 39(b) "in addition to other applicable factors." If nothing else, the allocation refers directly to "the efficiency of the utility's operation." In the words of PURA § 39(a), it is at least another "applicable factor." We overrule the City's contention.

For the reasons given, we overrule the City's second point of error.

Finding no error, we affirm the district-court judgment.

**All Citations**

851 S.W.2d 896

Footnotes

1    *See* 16 Tex.Admin.Code § 23.23(b)(2)–(8) (1981, since amended).

2    PURA § 43(g)(1) provides that "[a] rate or tariff set by the commission shall not authorize a utility to automatically adjust and pass through to its customers changes in fuel or other costs of the utility." The provision was added by Acts 1983, 68th Leg., p. 647, ch. 146, § 2, effective August 29, 1983.

3    No party suggests that the futurity aspect of this part of the agency order should preclude judicial review. We see no reason why it should. *See* Bernard Schwartz, *Administrative Law* § 9.1, at 522–25 (2d ed. 1984).

4    In a determination of allowable fuel costs, the original version of the Fuel Rule listed six costs to be considered, plus "other costs associated with generated and purchased power." 8 Tex.Reg. 3540 (1983) (16 Tex.Admin.Code § 23.23(b)(2)(B), since amended). The rule further instructed that "the commission shall consider revenues and costs from these other activities, *including off-system sales,* to assure that the ratepayers receive an appropriate *portion* of benefits associated with such revenues." *Id.* (emphasis added). Nothing in PURA or in the Commission's current regulations deals explicitly with the calculation of off-system sales in the reconciliation of fuel costs.

Although the current version of the Fuel Rule does not contain specific reference to off-system sales, the general language has been amended to require consideration of "other costs *and revenues* associated with generated or purchased power." 16 Tex.Admin.Code § 23.23(b)(2)(B)(i) (emphasis added).

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

168 S.W.3d 802
Supreme Court of Texas.

The CITY OF KELLER, Petitioner,
v.
John W. WILSON, Grace S. Wilson, Johnny
L. Wilson and Nancy A. Wilson, Respondents.

No. 02–1012. | Argued Oct. 19,
2004. | Decided June 10, 2005.
| Rehearing Denied Sept. 2, 2005.

**Synopsis**
**Background:** Landowners brought action against city to recover damages for inverse condemnation and for violations of Water Code. The 96th District Court, Tarrant County, Jeff Walker, J., entered judgment on jury verdict in favor of landowners. City appealed. The Fort Worth Court of Appeals, 86 S.W.3d 693, affirmed. City filed petition for review.

**Holdings:** The Supreme Court, Brister, J., held that:

[1] both the "exclusive" and "inclusive" standards for no-evidence review are correct, in that the two standards reach the same result, and

[2] no evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking.

Judgment of Court of Appeals reversed; case remanded.

O'Neill, J., filed concurring opinion in which Medina, J., joined.

**Attorneys and Law Firms**

**\*807** Dabney D. Bassel, Larry Bracken, Law Snakard & Gambill, P.C., Fort Worth, Douglas H. Conner III, L. Stanton Lowry, Boyle & Lowry, L.L.P., Irving, for petitioner.

James B. Barlow, Barlow & Garsek, Fort Worth, Robert L. Russell Bush, Bush & Morrison, Arlington, David R. Casey, Hurst, for respondents.

Jay Doegey, Assistant City Attorney for the City of Corpus Christi, Texas, Corpus Christi, Theodore P. Gorski Jr., Office of the City Attorney for City of Fort Worth, Mark G. Daniel, Evans Gandy Daniel & Moore, Fritz Quast, Taylor Olson Adkins Sralla & Elam, LLP, Fort Worth, Monte Akers, Texas Municipal League, Austin, Michael A. Bucek, Senior Assistant City Attorney, Irving, Robert F. Brown, Brown & Hofmeister, L.L.P., Richardson, Bruce S. Powers, Assistant County Attorney, Michael A. Stafford, Harris County Attorney, Houston, for Amicus Curiae.

**Opinion**

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, and Justice GREEN joined, and in which Justice O'NEILL and Justice MEDINA joined as to Parts I through IV.

Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

**I. Factual and Procedural History**

The City of Keller is one of several fast-growing communities on the outskirts of **\*808** Fort Worth.[1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the

Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide drainage for a 100–year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property, and deed both to the City upon completion. [2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $300,000.

 [1]    To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result. [3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations—including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention. [4] In its legal sufficiency review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary." [5] The City challenges **\*809** this omission as applying the wrong scope of review.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard). [6] But we have also stated that a reviewing court must consider "*all* of the evidence" in the light favorable to the verdict (the "inclusive" standard). [7] Sometimes we have mentioned neither reviewing all evidence nor disregarding some part of it. [8] Finally, we have sometimes expressly mentioned both. [9]

Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different. [10] Because this **\*810** important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

## II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert [11] addressed the standards for reviewing legal and factual sufficiency in the most-cited law review article in Texas legal history. [12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding," [13] the author summarized and attempted to clarify Texas law up to 1960. [14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

According to the article:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital

fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact. [15]

We have quoted a similar formulation on many occasions. [16]

Notably, Justice Calvert then proceeded to put the question before us in the proper context:

> It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding. [17]

 **[2]** Clearly, the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence **\*811** (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above).

 **[3]** **[4]** As the following examples show, this has remained the rule since. We do not presume to categorize all circumstances in which contrary evidence must be considered in a legal sufficiency review. Evidence can be disregarded whenever reasonable jurors could do so, [18] an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

### A. Contextual Evidence

In Justice Calvert's first situation—a complete absence of evidence of a vital fact—it is generally irrelevant whether a reviewing court considers contrary evidence. [19] If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting

evidence may not appear until all the evidence is reviewed in context.

 **[5]** **[6]** For example, publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. [20] A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict. [21]

 **[7]** **[8]** Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless. [22] Even writings executed at different times must be considered together if they pertain to the same transaction. [23]

 **[9]** It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties." [24] Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer [25] may be legally insufficient between **\*812** business parties. [26] In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not. [27]

 **[10]** More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. [28] If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite it by disregarding the middle word alone.

 **[11]** Thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

### B. Competency Evidence

 **[12]**   **[13]**   It has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.[29] Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were otherwise, incompetent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be considered.

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise.[30] Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support a verdict against his employer if the evidence shows that legal conclusion to be incompetent.[31]

 **[14]**   **[15]**   This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient.[32] In **\*813** such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.[33] And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.[34]

 **[16]**   After we adopted gate-keeping standards for expert testimony,[35] evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well.[36] Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.[37] Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified.[38]

 **[17]**   Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

### C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla.[39] But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied.[40]

 **[18]**   **[19]**   In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists.[41] "When the circumstances are equally consistent with either of two facts, neither fact may be inferred."[42] In such cases, we must "view each piece of circumstantial **\*814** evidence, not in isolation, but in light of all the known circumstances."[43]

Justice Calvert argued there was "no necessity for the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences.[44] Nevertheless, he recognized that "[t]he opposing inference is present and it does no harm to note its presence."[45]

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both.[46] Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes.[47]

 **[20]**   Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

### D. Conclusive Evidence

 **[21]**   **[22]**   Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact.[48] He argued that this is to some extent not a "true" no-evidence claim, as proponents may have to show not only that no evidence supports the verdict

but that the opposite was proved as a matter of law. [49] There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference." [50] By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence; [51] indeed, uncontroverted issues **\*815** need not be submitted to a jury at all. [52]

Reviewing legal sufficiency in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

 **[23]** Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-access claim if it is undisputed that access remains along 90 percent of a tract's frontage. [53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary. [54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent. [55]

 **[24]** Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises condition is conclusive evidence he needed no warning about it. [56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her. [57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake. [58]

 **[25]** It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total, [59] or it may not. [60] Circumstances in which a body is found may conclusively establish suicide, [61]

or allow **\*816** jurors to infer otherwise. [62] Evidence is conclusive only if reasonable people could not differ in their conclusions, [63] a matter that depends on the facts of each case.

 **[26]** There is another category of conclusive evidence, in which the evidence *is* disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock,* we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father. [64] The evidence was directly disputed—the child's mother testified she had conjugal relations with no one else during the relevant time. [65] Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary. [66]

Similarly, in *Texas & New Orleans Railroad Co. v. Compton,* we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train. [67] Again, the evidence was hotly disputed—while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had. [68] Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either. [69]

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "[t]wenty nuns testify that the defendant was with them at the time, far from the scene of the crime ... [and] [t]wenty more nuns testify that they saw the informant commit the crime." [70] But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

> If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended

something else than the usual meaning which the law imposes upon them, he would still be held....[71] While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

 [27]  [28]  Proper legal-sufficiency review prevents reviewing courts from substituting **\*817** their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

### E. Clear–and–Convincing Evidence

 [29]  Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive. Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia,* appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review.[72] As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated."[73] If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy the higher burdens as well, thus rendering their differences meaningless.[74]

Accordingly, we have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination,[75] defamation,[76] and punitive damages.[77] In such cases, again, evidence contrary to a verdict cannot be disregarded.

### F. Consciousness Evidence

 [30]  Further, we have had to particularize legal-sufficiency review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in *Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts."[78] As then Chief Justice Greenhill noted in concurring, speeding and running a red light may not be legally sufficient evidence of gross negligence if one's wife and daughter are bleeding to death in the back seat.[79] Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of.[80]

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in **\*818** such cases requires proof that the insurer denied coverage after it became reasonably clear.[81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear.[82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear.[83]

This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason.[84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently.[85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims.[86]

This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an expert report may foreclose bad faith recovery,[87] it will not do so if the insurer had some reason to doubt the report.[88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

### III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing **\*819** courts must disregard evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

### A. Credibility Evidence

**[31]** **[32]** Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.[89] They may choose to believe one witness and disbelieve another.[90] Reviewing courts cannot impose their own opinions to the contrary.[91]

**[33]** Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.[92]

For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the latter.[93] And we have affirmed a gross negligence verdict based on testimony

that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that.[94]

**[34]** **[35]** Nor is it necessary to have testimony from both parties before jurors **\*820** may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.[95] Thus, an architect's uncontradicted testimony that he relied on a 20–year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties.[96] Nor was an insured's uncontradicted testimony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture.[97] Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.[98]

**[36]** **[37]** **[38]** **[39]** Of course, "[t]he jury's decisions regarding credibility must be reasonable."[99] Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.[100] And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

### B. Conflicting Evidence

**[40]** **[41]** It is the province of the jury to resolve conflicts in the evidence.[101] Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.[102]

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding.[103] We have affirmed a bad-faith verdict for legal sufficiency despite "significant evidence" that the insurer acted in **\*821** good faith.[104] We have found some evidence of lost profits, even though income tax returns showed the contrary.[105] And we have affirmed

a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident. [106]

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing the evidence in the light favorable to the verdict required us to do so.

Of course, it is not always clear whether evidence is conflicting. Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case. [107] Similarly, evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement regarding the terms of another. [108]

 **[42]**    But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review.

### C. Conflicting Inferences

 **[43]**    Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes. [109] Even if a defendant admits approaching an intersection from the wrong way on a one-way street, jurors may infer the plaintiff failed to keep a proper lookout, as that is one possible inference from the accident itself. [110] Similarly, jurors may infer that relatives tore down posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them. [111]

 **[44]**    Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could,

and disregard all other inferences in their legal sufficiency review.

### IV. Reconciling the Standards

 **[45]**    Having noted the dual lines of authority stating the scope of no-evidence review, and the proper application and exceptions to each, we turn to the question of which one is correct. For the reasons  ***822**  discussed below, we believe the answer is both.

### A. Goals: The Standards Must Be The Same

 **[46]**    Whether a court begins by reviewing all the evidence or disregarding part in a legal-sufficiency review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. [112] A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. [113]

 **[47]**    Similarly, there is no disagreement about how a reviewing court should view evidence in the process of that review. Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. [114] But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it. [115]

Given these premises, it is no coincidence that the two standards should reach the same result—indeed they *must*. Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

 **[48]**    Further, the two must coincide if this Court is to perform its constitutional duties. Although factual sufficiency has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included legal sufficiency, as that is a question of law, not of fact. [116] Construing either standard to require us to do less would be

just as unconstitutional as construing either to allow us to do more.

This is not to say judges and lawyers will always agree whether evidence is legally **\*823** sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries—affirming jury verdicts based on evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

### B. Other Motions: The Standards Must Be The Same

 **[49]**   Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the nonmovant's case and disregard all contrary evidence. [117] But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict. [118] And we have sometimes stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it. [119]

By contrast, cases concerning judgments non obstante veredicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them, [120] we have generally reviewed such orders by considering all the evidence in a light favorable to the **\*824** verdict that was set aside. [121] In later years we have sometimes adopted the exclusive standard, [122] but our

opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved. [123]

The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. [124] Reviewing courts do *not* disregard the evidence supporting the motion;  **\*825**  if they did, all summary judgments would be reversed.

In practice, however, a different scope of review applies when a summary judgment motion is filed without supporting evidence. [125]  In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

### C. Federal Courts: The Standards Are The Same

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer—the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc.* that the two tests are the same. [126]

Under Rule 50 of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." [127]  In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

> The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a Rule 50 motion. Some decisions have stated that review is limited to that evidence favorable to the

nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.

On closer examination, this conflict seems more semantic than real. Those decisions holding that review under Rule 50 should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [128]. In *Wilkerson,* we stated that "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party. [129] But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence,* not the evidence that the court should *review.* In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a **\*826** matter of law, the court should review all of the evidence in the record. [130]

We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

### D. Objections: The Standards Are Not The Same

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

First, the courts of appeals often use the two standards in illustrations of the difference between legal and factual sufficiency, with the exclusive standard tied to the former and the inclusive standard to the latter:

> When [reviewing] legal sufficiency, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary.... When we review factual sufficiency, we consider and weigh *all* of the evidence and will set aside

the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. [131]

But there have always been exceptions to this distinction. [132] As demonstrated in Parts II and III above, it is generally true that the *result* of legal-sufficiency review is to disregard contrary evidence, but there are exceptions when a reviewing court cannot. It is not surprising that in drawing the general distinction between legal and factual sufficiency, courts have not complicated that distinction by listing the several exceptions in which the scope of review—though not the standard of review—may overlap.

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used. [133] But if that is true, the opposite should also be the case—appellate courts are less likely to consider contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

 **\*827** Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment," [134] we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict —the same facts may support different conclusions, [135] or may support one part of a verdict but not another. [136] Nor can evidence supporting a verdict be identified by which party offered it—parties depend on admissions and cross-examination during their opponent's case, and minimize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice

should wear a blindfold, [137] the metaphor was surely never intended to suggest that justice disregards the facts.

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the inclusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

### E. Conclusion: The Standards Are The Same

As both the inclusive and exclusive standards for the scope of legal-sufficiency review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both—properly applied—must arrive at the same result, we see no compelling reason to choose among them.

 **[50]** **[51]** The key qualifier, of course, is "properly applied." The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about legal sufficiency in particular cases, **\*828** the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

> The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the

Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [138] of "reasonable minds." [139]

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

> Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge. [140]

### V. Application to the Facts

It remains to apply the scope of review to the facts presented.

**[52]** A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur.[141] The majority pointed to the following proof. First, the Wilsons' expert testified that the revised plan was certain to **\*829** create flooding.[142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result.[143] Third, the City "did not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding.[144]

**[53]** Of course, the City *did explain* why it approved the new plan—because three sets of engineers said the omitted ditch was unnecessary—but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The critical question in this case was the City's state of mind—the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

**[54]** Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.[145] Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons' expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially certain of the result in some cases, but not in the context of this one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is **\*830** real or imagined—and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong.[146]

Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the Wilsons had to prove—not that the City *might* have disbelieved the engineers' reports, but that it *did.* This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result.[147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons'

properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under article I, section 17 of the Texas Constitution. Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.

Justice O'NEILL filed a concurring opinion in which Justice MEDINA joined.

Justice JOHNSON did not participate in the decision.

Justice O'NEILL, joined by Justice MEDINA, concurring.

The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." 168 S.W.3d at 807. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully **\*831** articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8–acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $300,000. The Court

holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so." 168 S.W.3d at 829. Even if this were an appropriate review standard—which it hasn't been until today—I believe the jury had a reasonable basis upon which to disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding, and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

**I**

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." 86 S.W.3d 693, 704. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." 168 S.W.3d at 830. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the

drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second." **\*832** 86 S.W.3d at 703. Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. *Id.* at 705. Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "[c]ourts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." 168 S.W.3d at 820. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured

that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. 86 S.W.3d at 706. But the Wilsons disputed whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. *See id.* at 705.

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448–50 (Tex.1997).

In *Castañeda,* a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the **\*833** jury could have disregarded that evidence. *Castañeda,* 988 S.W.2d at 194–95. In that case, we performed a traditional legal sufficiency analysis and concluded there was no evidence that the defendant acted in bad faith. *Id.* at 194. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case." *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau,* another bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau,* 951 S.W.2d at 448. The Court conceded that "[w]ere we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id.* at 450 (citing TEX. CONST. art. I, § 15, art. V, §§ 6, 10).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially

certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See* TEX. CONST. art. I, § 15, art. V, § 6; *see also Nicolau,* 951 S.W.2d at 450.

**II**

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. TEX. CONST. art. I, § 17. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to the City. Municipalities review subdivision plats "to ensure that subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex.1985); *see* TEX. LOC. GOV'T CODE § 212.002. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality. *See, e.g., City of Round Rock,* 687 S.W.2d at 302; *see also Cootey v. Sun Inv., Inc.,* 68 Haw. 480, 718 P.2d 1086, 1091 (1986) (holding that "[t]he permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with ... the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer, **\*834** and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority ... which

resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County,* 136 Wash.2d 946, 968 P.2d 871, 879 (1998); *see also Pepper v. J.J. Welcome Constr. Co.,* 73 Wash.App. 523, 871 P.2d 601, 606 (1994). In *Phillips,* the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "[i]f the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips,* 968 P.2d at 878. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper,* 871 P.2d at 606. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "[t]he fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id.* The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id.* I am persuaded by the reasoning of the courts in *Phillips* and *Pepper,* and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. 86 S.W.3d at 707. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allow[ed] the water flowing from the Sebastian easement to discharge, uncontrolled, across the

Wilson property." *Id.* As noted above, however, it was the developers' plan—not the City's actions—that allowed the water to flood the Wilson property. Because the City's action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the **\*835** "proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale,* 146 S.W.2d at 736. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See* TEX. WATER CODE § 11.086(a), (b) (providing that "[n]o person may divert or impound the natural flow of surface waters in this state ... in a manner that damages the property of another by the overflow of the water diverted or impounded" and that

"[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat —not the City's approval—caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under Article I, Section 17 of the Texas Constitution.

### III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," TEX. CONST. art. I, § 17, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur in the Court's judgment.

**All Citations**

168 S.W.3d 802, 48 Tex. Sup. Ct. J. 848

Footnotes

1     The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

2     Evidence at trial and briefs by amici indicate that cities normally acquire title to these easements to ensure they are properly mowed and maintained after the developers' departure.

3     TEX. CONST. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004).

4     86 S.W.3d 693, 715, 717.

5     *Id.* at 700.

6     *See, e.g., Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Burkard v. ASCO Co.,* 779 S.W.2d 805, 806 (Tex.1989) (per curiam); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988); *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912).

7     *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Burk Royalty v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970);

*De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 97 (1955); *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 498 (1952).

8   *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *La.-Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex.1999); *Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998); *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998).

9   *See, e.g., Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 298 S.W.2d 79, 81 (1956) ("[T]he duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.") (quotation omitted) (emphasis added), *and Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914) ("[W]e must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict.... In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

10  *See, e.g.,* W. Wendell Hall, *Standards of Review in Texas,* 34 ST. MARY'S L.J. 1, 159–62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts,* 53 SMU L.R. 1497, 1498, 1507–11 (2000); Phil Hardberger, *Juries Under Siege,* 30 ST. MARY'S L.J. 1, 40–41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court,* 75 TEX. L.REV. 1699, 1699–1700, 1704–19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

11  Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

12  Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361 (1960).

13  *Id.* at 361.

14  "Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

15  *Id.* at 362–63.

16  *See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex.1991); *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

17  Calvert, *supra* note 12, at 364.

18  *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *Uniroyal,* 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

19  Calvert, *supra* note 12, at 364 ("If there is an absolute absence of evidence of a vital fact ... an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.").

20  *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158–59 (Tex.2004); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Guisti v. Galveston Tribune,* 105 Tex. 497, 150 S.W. 874, 877–78 (1912).

21  *Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex.2002) (considering remarks in context of series of talk-show programs); *Turner,* 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

22  *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.2004).

23  *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999).

24  *Tiller v. McLure,* 121 S.W.3d 709, 714 (Tex.2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610–11 (Tex.2002); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999).

25  *See George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 852–53 (Tex.App.-Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of intentional infliction), *rev'd on other grounds,* 900 S.W.2d 337, 338 (Tex.1995).

26  *See Tiller,* 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

27 *See, e.g., id.* at 713–14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears,* 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

28 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684, 685 (Tex.2004) (holding no evidence supported defect as comments from deposition "were read out of context").

29 *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex.2004) (citing *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (1912)). This rule was changed for hearsay evidence in 1983. *See* TEX.R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

30 *Tex. & P. Ry. Co. v. Ball,* 96 Tex. 622, 75 S.W. 4, 6 (1903).

31 *Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 579 (Tex.2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 360 (Tex.1971) (holding truck driver was not in course of employment during social visit to his father).

32 *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782–83 (1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

33 *See Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996).

34 *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

35 *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

36 *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714, 720 (Tex.1997).

37 *Id.* at 711, 724–30.

38 *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254–57 (Tex.2004).

39 Calvert, *supra* note 12, at 364.

40 *Id.* at 364–65.

41 *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 900 (Tex.1937); Calvert, *supra* note 12, at 365.

42 *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991); *see also Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984) (citing *Tex. Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex.1968)).

43 *Lozano,* 52 S.W.3d at 167.

44 Calvert, *supra* note 12, at 365.

45 *Id.*

46 *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 938 (Tex.1998).

47 *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *McCann,* 99 S.W.2d at 900.

48 Calvert, *supra* note 12, at 363–64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703–10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113 (Tex.1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

49 Calvert, *supra* note 12, at 363–64. *But see, e.g., Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991) ("Cecil's points that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

50 *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997)).

51 *Tex. & N.O.R Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 528, 530 (1947); *see also Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

52 *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 822 (1947) ( "Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler,* 132 Tex. 350, 123 S.W.2d 340, 341 (Tex.1939).

53 *County of Bexar v. Santikos,* 144 S.W.3d 455, 460–61 (Tex.2004).

54 *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 97–98 (Tex.2004).

55 *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998).

56 *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709–10 (Tex.2003) (per curiam).

57 *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 930 (Tex.1996).

58 *King v. Graham,* 126 S.W.3d 75, 78–79 (Tex.2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

59 *Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204, 206 (Tex.1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).

60 *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309–10 (Tex.1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).

61 *See, e.g., Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963).

62 *See Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976).

63 *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 340 (Tex.1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

64 811 S.W.2d 557, 560 (Tex.1991).

65 *Id.* at 558.

66 *Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

67 135 Tex. 7, 136 S.W.2d 1113, 1115 (1940).

68 *Id.*

69 *Id.*

70 *Clewis v. State,* 922 S.W.2d 126, 133 n. 12 (Tex.Crim.App.1996) (en banc) (citation omitted).

71 *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

72 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

73 *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004).

74 Our sister court reviews the legal sufficiency of criminal convictions by considering "*all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004); *see also Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex.Crim.App.2005).

75 *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002).

76 *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

77 *Garza,* 164 S.W.3d at 627.

78 616 S.W.2d 911, 922 (Tex.1981).

79 *Id.* at 926 (Greenhill, C.J., concurring).

80 *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234–35 (Tex.2004).

81 *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55–56 (Tex.1997).

82 *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

83 *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262–63 (Tex.2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998)(affirming bad-faith verdict after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez,* 133 S.W.3d 320, 330 (Tex.App.-Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 704–06 (Tex.App.-Fort Worth 2003, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.,* 98 S.W.3d 227, 249–50 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive

evidence); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 167 (Tex.App.-Austin 1998, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

84 *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 740 (Tex.2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 452 (Tex.1996) (same).

85 *See, e.g., Univ. of Houston v. Clark,* 38 S.W.3d 578, 583 (Tex.2000) (noting good-faith test considers *all* circumstances on which official acted).

86 *See, e.g., PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

87 *See, e.g., Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 194–95 (Tex.1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

88 *See, e.g., State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

89 *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Edrington v. Kiger,* 4 Tex. 89, 93 (1849).

90 *McGalliard,* 722 S.W.2d at 697; *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952) (holding it was up to jurors "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *Houston, E. & W.T. Ry. Co. v. Runnels,* 92 Tex. 305, 47 S.W. 971, 972 (1898).

91 *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

92 *Runnels,* 47 S.W. at 972.

93 *Cochran v. Wool Growers Cent. Storage Co.,* 140 Tex. 184, 166 S.W.2d 904, 907 (1942) (noting the Court "read the entire statement of facts").

94 *Harbin v. Seale,* 461 S.W.2d 591, 594 (Tex.1970); *compare Harbin v. Seale,* 454 S.W.2d 271, 272 (Tex.Civ.App.-Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd,* 461 S.W.2d 591 (Tex.1970).

95 *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 653–54 (Tex.1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels,* 47 S.W. at 972; *Cheatham v. Riddle,* 12 Tex. 112, 118 (1854).

96 *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 100 (Tex.2004).

97 *Anchor Cas. Co. v. Bowers,* 393 S.W.2d 168, 169–70 (Tex.1965).

98 *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex.1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

99 *Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002).

100 *See* TEX.R. CIV. P. 166a(c); *Wal–Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 817 (Tex.2002) (finding no evidence that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4,* 19 S.W.3d 322, 325 (Tex.2000); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

101 *See, e.g., Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 754 (Tex.1993); *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex.1993); *Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957); *Howard Oil Co. v. Davis,* 76 Tex. 630, 13 S.W. 665, 667 (1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

102 *See, e.g., Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex.1999); *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex.1992); *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

103 *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48–49 (Tex.1998).

104 *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 286 (Tex.1998).

105 *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262–63 (Tex.1983).

106 *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 502 (1952).

107 *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542–43 (Tex.2002) (plurality op.).

108 *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

109 *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 341–42 (Tex.1998).

110 *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 98–99 (1955).

111 *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *id.* at 162–63 (Hecht, J., concurring and dissenting).

112 *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 297 (Tex.1983) (per curiam).

113 *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" & "Insufficient Evidence,"* 69 TEX. L.R. 515, 517–20 (1991).

114 *Gragg,* 151 S.W.3d at 552; *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Havner,* 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 75 (Tex.1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby,* 778 S.W.2d 67, 68 (Tex.1989) (per curiam); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898 (Tex.1937).

115 *See St. Joseph Hosp.,* 94 S.W.3d at 519–20 (Tex.2002) (plurality op.); *Giles,* 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556–57 (Tex.Comm'n.App.1927)).

116 *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 620 (Tex.2004) (citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (1894)).

117 *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965); *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60, 61 (1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (1940).

118 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex.1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (1953); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (1941); *Chicago, R.I. & G. Ry. Co. v. Carter,* 261 S.W. 135, 135 (Tex.Com.App.1924, judgm't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094–95 (Tex.Com.App.1923, holding approved, judgm't adopted).

119 *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 483 (Tex.1984); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976); *Jones v. Nafco Oil & Gas, Inc.,* 380 S.W.2d 570, 574 (Tex.1964).

120 Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw,* 134 Tex. 500, 137 S.W.2d 7, 13 (Tex.1940); *Hines v. Parks,* 128 Tex. 289, 96 S.W.2d 970, 971 (Tex.1936). *Cf. Deal v. Craven,* 277 S.W. 1046, 1047 (Tex.Com.App.1925, judgm't adopted) ("It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.").

121 *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998) ("[W]e consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it."); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) ("In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.") (emphasis added); *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (same); *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974) (same); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker,* 152 Tex. 503, 260 S.W.2d 600, 603–04 (1953) (affirming trial court's implied disregard of one jury answer based on "consideration of the transcript as a whole"); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952) ("[W]e must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.") (emphasis added); *Neyland v. Brown,* 141 Tex. 253, 170 S.W.2d 207, 211 (Tex.1943) (considering judgment non obstante veredicto "in the light of the record as a whole"); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 225 (1942) ("[W]e must view LeMaster's testimony, *as well as all other testimony in the record,* from a standpoint most favorable to him.") (emphasis added); *McAfee v. Travis Gas Corp.,* 137

Tex. 314, 153 S.W.2d 442, 445 (1941) ("[W]e must regard the evidence contained in this record in its most favorable light for McAfee ... because of the instructed verdict and judgment non obstante veredicto."); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424–29 (Tex.2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

122 *See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003) (per curiam); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980); *Freeman v. Tex. Comp. Ins. Co.,* 603 S.W.2d 186, 191 (Tex.1980); *Dodd v. Tex. Farm Prods. Co.,* 576 S.W.2d 812, 814–15 (Tex.1979); *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex.1978); *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex.1977); *Sobel v. Jenkins,* 477 S.W.2d 863, 865 (Tex.1972); *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 193 (Tex.1966).

123 *See Tiller,* 121 S.W.3d at 713 (citing *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001)); *Miller,* 102 S.W.3d at 709 (same); *Best,* 786 S.W.2d at 671 (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985)); *Tomlinson,* 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981)); *Campbell,* 573 S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263, 265 (Tex.1974)); *Campbell,* 406 S.W.2d at 193 (citing *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697–98 (1914)).

124 *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex.1984).

125 *See* TEX.R. CIV. P. 166a(i).

126 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

127 FED.R.CIV.P. 50(a)(1).

128 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

129 *Id.* at 57, 69 S.Ct. 413.

130 *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097 (citations omitted).

131 *Carter v. Steverson & Co.,* 106 S.W.3d 161, 166 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long,* 144 S.W.3d 64, 67 (Tex.App.-El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.,* 136 S.W.3d 26, 29 (Tex.App.-San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 113 n. 3 (Tex.App.-Beaumont 2001, pet. denied); *Molina v. Moore,* 33 S.W.3d 323, 329 (Tex.App.-Amarillo 2000, no pet.); *Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 n. 3 (Tex.App.-Austin 2000, pet. denied); *see also In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam) (holding court of appeals erred in failing to distinguish between legal and factual sufficiency review by not weighing all the evidence when conducting the latter).

132 *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

133 Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

134 *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994).

135 *See, e.g., CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102 (Tex.2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

136 *See, e.g., Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

137 *See* Judith Resnik, *Managerial Judges,* 96 HARV. L.R.. 374, 382–83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

138 Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim"

Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas,* 46 S. TEX. L.REV. 33, 75 (2004); Robert L. Dabney, Jr. *We Were There,* HOUSTON B.J. Nov.-Dec.1999, at 42, 44.

139    Calvert, *supra* note 12, at 364.

140    *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring).

141    86 S.W.3d 693, 709.

142    *Id.* at 703, 705.

143    *Id.* at 705.

144    *Id.* at 704–05.

145    *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *see also State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

146    *Cf. Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140 (Tex.2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

147    *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004) (emphasis added).

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

419 S.W.3d 597
Court of Appeals of Texas,
San Antonio.

CITY OF SAN ANTONIO, Appellant

v.

GREATER SAN ANTONIO BUILDERS
ASSOCIATION and Indian Springs
Greater San Antonio Builders Association
and Indian Springs Ltd., Appellees.

No. 04–13–00013–CV. | Nov. 20, 2013.

**Synopsis**
**Background:** Builders' association and owner of land within city limits brought declaratory judgment action against city seeking declaration that city's fair notice ordinance, which required all development project permit seekers to complete city's fair notice form, conflicted with and was preempted by provisions of Local Government Code. The 37th Judicial District Court, Bexar County, denied city's plea to the jurisdiction, and city appealed. The Court of Appeals, 2013 WL 2247468, affirmed. The 37th Judicial District Court, David A. Berchelmann, Jr., J., granted summary judgment in favor of builders' association and landowner. City appealed.

**Holdings:** The Court of Appeals, Karen Angelini, J., held that

[1] city's fair notice ordinance, which required all development project permit seekers to complete city's fair notice form in addition to an original application for the project under vested rights chapter of Local Government Code, conflicted with and was preempted by provisions of Local Government Code;

[2] trial court was not required to apply severance clause in fair notice ordinance in order to strike any invalid parts of ordinance and leave remainder of ordinance in effect;

[3] terms of fair notice ordinance altered manner in which vested rights accrued, and were not merely "technical requirements" relating to the form and content of permit applications; and

[4] trial court did not abuse its discretion in awarding attorney fees to builders' association and landowner.

Affirmed.

**Attorneys and Law Firms**

**\*599** Norbert J. Hart, Michael D. Bernard, City Attorney's Office, R. Gaines Griffin, Law Offices of Davidson, Troilo, Ream & Garza, Dan Pozza, Law Offices of Dan Pozza, San Antonio, TX, for Appellant.

S. Mark Murray, Law Office of S. Mark Murray, San Antonio, TX, for Appellee.

Sitting: KAREN ANGELINI, MARIALYN BARNARD, and REBECA C. MARTINEZ, Justices.

**OPINION**

Opinion by: KAREN ANGELINI, Justice.

The City of San Antonio appeals from a declaratory judgment invalidating its fair notice ordinance. We affirm.

**BACKGROUND**

*Chapter 245 of the Texas Local Government Code*
In Texas, title 7 of the local government code governs the regulation of land use, structures, businesses, and related activities. Chapter 245, which is contained in title 7 of the local government code, governs the issuance of local permits by a regulatory agency. TEX. LOC. GOV'T CODE ANN.. §§ 245.001–.007 (West 2005). In 2005, the Texas Legislature amended chapter 245 to include a provision stating that certain development rights accrue "on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought." *See id.* § 245.002(a–1). Thus, under chapter 245, a development project is governed by the regulations in effect at the time of the application for the project's first permit, rather than by any intervening regulations passed by the regulatory agency. *See id.* Chapter 245 expressly provides that it may be enforced through declaratory relief. *Id.* § 245.006(a).

*Fair Notice Ordinance*

In February 2006, the City of San Antonio passed the fair notice ordinance. Section 35–410 of the ordinance requires permit applicants to complete a form, the fair notice form, with all permit applications. San Antonio, Tex., Unified Development Code, § 35–410 (2006). The express purpose of section 35–410 is "to provide standard procedures for an applicant to accrue rights under Chapter 245 of the Texas **\*600** Local Government Code." *Id.* The provisions of section 35–410 apply to "any application for a permit by which an applicant desires to accrue rights under Chapter 245 of the Texas Local Government Code." *Id.* § 35–410(a). "To accrue rights under Chapter 245 of the Texas Local Government Code, an applicant shall submit a complete application for a required permit ... within 45 days of the submission of the Fair Notice Form." *Id.* § 35–410(e).

### Declaratory Judgment Action

In July 2006, the Greater San Antonio Builders Association (GSABA) and Indian Springs, Ltd., filed the underlying declaratory judgment action, alleging the fair notice ordinance conflicted with chapter 245. GSABA is a non-profit organization whose members include individuals and entities who are concerned with issues affecting the real estate industry in the greater San Antonio area. Many members also own real property in the City. Indian Springs is a Texas limited partnership that owns real property in the City. The City is a regulatory agency as that term is defined in chapter 245. *See id.* § 245.001(4) (providing that "regulatory agency" "means the governing body of, or a bureau, department, division, board, commission, or other agency of, a political subdivision acting in its capacity of processing, approving, or issuing a permit").

The City filed a plea to the jurisdiction challenging the standing of GSABA and Indian Springs. The trial court denied the City's plea to the jurisdiction, and the City appealed this interlocutory order. We affirmed the order denying the plea to the jurisdiction. *City of San Antonio v. Greater San Antonio Builders Ass'n,* No. 04–12–00745–CV, 2013 WL 2247468, at \*4 (Tex.App.-San Antonio 2013, no pet.).

### Summary Judgment Motions

GSABA and Indian Springs presented the merits of their declaratory judgment action in two traditional summary judgment motions. The first summary judgment motion addressed the ordinance as it affected two categories of plaintiffs: (1) those who had vested rights in their property and had such rights before the enactment of the ordinance and whose rights had been previously acknowledged by the City by way of a vested rights permit or similar document, and (2) those who had vested rights in their property before the enactment of the ordinance but whose vested rights had not been previously acknowledged by the City. The second summary judgment motion addressed the ordinance as it affected a third category of plaintiffs: those who owned a project, but had not yet obtained vested rights at the time the fair notice ordinance was enacted. Cumulatively, the summary judgment motions asserted that, in passing the fair notice ordinance, the City substantively impaired or encumbered vested rights that had already accrued under chapter 245, and substantively impaired or encumbered vested rights that would accrue under chapter 245 in the future. The trial court granted both summary judgment motions, and rendered a final judgment in favor of GSABA and Indian Springs. The City appealed.

### STANDARD OF REVIEW

We review a trial court's summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156–57 (Tex.2004); *City of San Antonio v. En Seguido, Ltd.,* 227 S.W.3d 237, 240 (Tex.App.-San Antonio 2007, no pet.). When reviewing a summary judgment we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Joe,* 145 S.W.3d at 156–57; *En Seguido,* 227 S.W.3d at 240. The party moving for a "traditional" summary **\*601** judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Joe,* 145 S.W.3d at 156–57; *En Seguido,* 227 S.W.3d at 240; TEX.R. CIV. P. 166a(c).

### DECLARATORY JUDGMENT

On appeal, the City argues the fair notice ordinance, like all ordinances, was entitled to a presumption of validity, and GSABA and Indian Springs failed to satisfy their burden to overcome this presumption in the summary judgment proceedings below. The City further argues there is no conflict between chapter 245 and the fair notice ordinance; to the contrary, the fair notice ordinance is consistent and in harmony with chapter 245. In response to these arguments, GSABA and Indian Springs argue they met their summary judgment burden by conclusively establishing that the fair notice ordinance conflicts with chapter 245.[1]

 **[1]** **[2]** **[3]** **[4]** When reviewing the validity of a city ordinance, we begin with the presumption that the ordinance is valid. *City of Brookside Village v. Comeau,* 633 S.W.2d 790, 792 (Tex.1982); *RCI Entm't, Inc. v. City of San Antonio,* 373 S.W.3d 589, 595 (Tex.App.-San Antonio 2012, no pet.). The party challenging the ordinance bears the burden to establish its invalidity. *RCI Entm't,* 373 S.W.3d at 595. An ordinance that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with a state statute. *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 490–91 (Tex.1993); *RCI Entm't,* 373 S.W.3d at 595. We will not hold an ordinance and a state statute repugnant to each other if we can reach a reasonable construction leaving both in effect. *In re Sanchez,* 81 S.W.3d 794, 796 (Tex.2002); *RCI Entm't,* 373 S.W.3d at 595–96. However, if it is not possible to reconcile the ordinance and the state statute, the state statute trumps the ordinance. *See Dallas Merchant's,* 852 S.W.2d at 490–92.

 **[5]** **[6]** **[7]** Historically, the right to develop property in Texas was subject to regulatory changes brought by the local regulatory agency. *Harper Park Two, LP v. City of Austin,* 359 S.W.3d 247, 249 (Tex.App.-Austin 2011, pet. denied). However, the Texas legislature modified this rule by enacting chapter 245. *See id.;* TEX. LOC. GOV'T CODE ANN.. § 245.002(a–1). The effect of chapter 245 is to freeze most of the regulatory agency's land-use regulations as they existed at the time the first permit application is filed through completion of the project. *City of San Antonio v. Rogers Shavano Ranch, Ltd.,* 383 S.W.3d 234, 245–46 (Tex.App.-San Antonio, 2012, pet. denied); *Harper Park Two,* 359 S.W.3d at 250. The rights to which a permit applicant is entitled under chapter 245 are commonly referred to as "vested rights." Vested rights attach to a project, not to a particular property owner. *Rogers Shavano Ranch,* 383 S.W.3d at 246; *Harper Park Two,* 359 S.W.3d at 250. Thus, vested rights follow any conveyances or transfer of rights related to the project. *Rogers Shavano Ranch,* 383 S.W.3d at 246; **\*602** *Harper Park Two,* 359 S.W.3d at 250. Chapter 245 defines a "project" as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." TEX. LOC. GOV'T CODE ANN.. § 245.001(3). "Because the term project is defined as *an* endeavor, rights vest in a particular project and are no longer vested if the project changes." *En Seguido,* 227 S.W.3d at 242–43 (emphasis in original).

In enacting chapter 245, the legislature found the statute's requirements were necessary to prevent "administrative and legislative practices that often result[ed] in unnecessary governmental regulatory uncertainty that inhibit[ed] the economic development of the state[,] increased the costs of housing and other forms of land development[,] and often resulted in the repeal of previously approved permits causing decreased property and related values, bankruptcies, and failed projects." *See* Act of May 11, 1999, 76th Leg., R.S., ch. 73, § 1(b), 1999 Tex. Gen. Laws 432; *see also Harper Park Two,* 359 S.W.3d at 250.

 **[8]** In the case before us, the City asserts the fair notice ordinance is necessary for it to carry out its responsibilities under chapter 245. According to the City, the fair notice ordinance ensures it will have enough information about a project to determine whether the project has changed and, therefore, is subject to current development regulations. GSABA and Indian Springs counter that the fair notice ordinance impairs and encumbers important substantive rights. They take the position that the fair notice ordinance allows the City to prevent owners from obtaining or utilizing vested rights that have already been authorized by the legislature.

The summary judgment evidence submitted by GSABA and Indian Springs included the deposition testimony of Roderick J. Sanchez, the City's Director of Development Services. Sanchez testified that his department interprets and enforces the fair notice ordinance. Sanchez acknowledged that what constituted vested rights was defined by state statute, and the definition of vested rights did not vary based on the location of the project. Nevertheless, Sanchez stated there were no circumstances under which the City would recognize vested rights in the absence of a completed fair notice form. If an owner seeking recognition of vested rights did not submit the fair notice form, his application would be deemed incomplete and the City would not begin its review to determine whether or not the owner had vested rights. Sanchez noted that the information an owner was required to provide under the fair notice ordinance was much more detailed than the information that was required before the passage of the fair notice ordinance. Before the passage of the fair notice ordinance, an owner could identify an endeavor without having all the information required on the City's fair notice form, and the City would issue vested rights permits without all of this information. Sanchez also acknowledged that before the passage of the fair notice ordinance, but after chapter 245 was enacted, the City required only "evidence of

a project" to recognize vested rights, and this evidence could have been as simple as a master development plan.

The summary judgment evidence submitted by GSABA and Indian Springs also included the fair notice ordinance and the fair notice form mandated by the ordinance. The fair notice ordinance provides that the City will not recognize vested rights unless and until the owner completes and submits the fair notice form. **\*603** *See* San Antonio, Tex., Unified Development Code § 35–712(a)(1)–(b)(2) (2006). The fair notice form requires an owner to identify any existing vested rights permit numbers if such permits have already been approved for the proposed project. The form also requires a site plan for most types of development projects. According to the form, this site plan "shall include lot layout, general building footprint with approximate square footage of building(s), and land use." [2] The fair notice form provides that all fields on the form must be completed for the form to be valid.

Under chapter 245, the filing of the first permit, or plan for development, or plat application, in a development project determines the regulations that will be used to govern the remainder of the project. Specifically, section 245.002(a–1) provides: "Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought." TEX. LOC. GOV'T CODE ANN.. § 245.002(a–1). When read in context, it is clear that the term "original application" contemplates an original permit application. Chapter 245 further provides: "If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project." *Id.* § 245.002(b). Thus, chapter 245 expressly defines the documents that cause the accrual of vested rights and the time when this accrual occurs. [3]

Nevertheless, as shown above, the fair notice ordinance creates an additional procedure for obtaining recognition of vested rights under chapter 245. This additional procedure may wholly preclude the recognition of vested rights accruing under chapter 245. In other words, the fair notice ordinance effectively redefines the manner in which vested rights accrue under chapter 245. Under the fair notice ordinance, the City can deny the exercise of vested rights based upon the owner's failure to provide information beyond that which was required to vest rights in the first place. Thus, the fair notice ordinance directly conflicts with chapter 245.

For these reasons, we hold that GSABA and Indian Springs overcame the presumption of validity and conclusively established that the fair notice ordinance conflicts with chapter 245.

In arguing that the summary judgments were improperly granted, the City criticizes the trial court for not trying to harmonize **\*604** the ordinance and the statute. However, the City does not explain how the ordinance and the statute could be harmonized. Having examined chapter 245, the ordinance, and the summary judgment evidence, we conclude the ordinance and chapter 245 cannot be harmonized.

The City also faults the trial court for not severing the objectionable provisions from the fair notice ordinance. The City, however, did not present the severance clause argument in its response to the first summary judgment motion. "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX.R. CIV. P. 166a(c). Thus, because this argument was not presented to the trial court, we may not consider it on appeal as a ground for reversal of the first summary judgment motion.

[9]  The City did present the severance clause argument in its response to the second summary judgment motion. There, the City argued that "[i]f the court believes that some of the requirements of the [f]air [n]otice [o]rdinance are so burdensome that vested rights might be prevented from recognition, the [c]ourt should use the severability clause contained in Section 6 of [the] [o]rdinance [ ] to strike out only the invalid parts and leave the remainder of the [o]rdinance in effect." The severance clause provides:

> Should any Article, Section, Part, Paragraph, Sentence, Phrase, Clause or Word of this ordinance, for any reason be held illegal, inoperative, or invalid, or if any exception to or limitation upon any general provision herein contained be held to be unconstitutional or invalid or ineffective, the remainder shall, nevertheless, stand effective and valid as if it had been enacted and ordained without the portion held

to be unconstitutional or invalid or ineffective.

San Antonio, Tex., Ordinance 2006–02–16–0241 (February 16, 2006).

Here, GSABA and Indian Springs challenged the validity of the entire ordinance; they did not challenge the validity of a particular article, section, part, paragraph, sentence, phrase, clause, or word of the ordinance. Additionally, the trial court concluded the entire ordinance was invalid, not merely part of it. Under these circumstances, we conclude the trial court did not err in failing to apply the severance clause to salvage parts of the ordinance.

 **[10]**    Finally, the City claims that section 245.002(f) expressly authorizes its fair notice ordinance. [4] We disagree. Section 245.002(f) does not go so far as to authorize a regulatory agency to wholly redefine the manner in which vested rights accrue under chapter 245. It merely provides that a regulatory agency is not prohibited from requiring compliance with technical application requirements. *See* TEX. LOC. GOV'T CODE ANN.. § 245.002(f).

We hold the trial court did not err in granting summary judgment in favor of GSABA and Indian Springs.

### ATTORNEY'S FEES

 **[11]**    Next, the City challenges the trial court's attorney's fees award. The trial court awarded GSABA and Indian Springs $115,000.00 in attorney's fees incurred at the trial level, and additional amounts in  ***605**  the event of an appeal. The City

stipulated that $115,000.00 was a reasonable and necessary attorney's fee for the work performed at the trial level. On appeal, the City argues the attorney's fees award was neither equitable nor just. The City argues the taxpayers should not be burdened with paying attorney's fees because the City was merely attempting to regulate development in accordance with the law.

We review the award of attorney's fees for an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998); *Peacock v. Schroeder,* 846 S.W.2d 905, 912 (Tex.App.-San Antonio 1993, no writ). Attorney's fees awarded under the Declaratory Judgment Act must be "equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2008). As we concluded earlier in this opinion, the fair notice ordinance conflicts with chapter 245. GSABA and Indian Springs were successful in demonstrating this conflict between the ordinance and the state statute, and in obtaining a declaratory judgment in their favor. *See Peacock,* 846 S.W.2d at 912 (holding the trial court did not clearly abuse its discretion in awarding all of the stipulated attorney's fees to a party who obtained a declaratory judgment in his favor). We hold the trial court did not abuse its discretion in awarding GSABA and Indian Springs attorney's fees.

### CONCLUSION

The trial court's judgment is affirmed.

### All Citations

419 S.W.3d 597

---

Footnotes

1    GSABA and Indian Springs also argue the summary judgments should be upheld because the fair notice ordinance is an unconstitutional retroactive law. Arguably, this issue is not properly presented because GSABA and Indian Springs did not specifically make this argument in the first summary judgment motion. And, as to the second summary judgment motion, GSABA and Indian Springs only raised this issue in their brief, which was not filed until after the City filed its response. Nevertheless, we need not reach this argument because we uphold the summary judgments on the ground that the ordinance conflicts with chapter 245.

2    The undisputed summary judgment evidence showed that this information would generally not be available at the early stages of a project when a first permit application would be submitted.

3    Chapter 245 defines "permit" as "a license, certificate, approval, registration, consent, permit, contract or other agreement for construction related to, or provision of, *service from a water or wastewater utility owned,* operated, or controlled by a regulatory agency, or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought." TEX. LOC. GOV'T CODE ANN. . § 245.001(1) (emphasis added). However, the fair notice ordinance omits a utility service agreement

as a document that may trigger the accrual of vested rights. According to the fair notice ordinance, there are only four acceptable documents that trigger the accrual of vested rights: a master development plan, a plat application, a plat, or a building permit. San Antonio, Tex., Unified Development Code § 35–712(b)(3)(A)–(D) (2006).

4  Section 245.002(f) provides:

> This chapter does not prohibit a regulatory agency from requiring compliance with technical requirements relating to the form and content of an application in effect at the time the application was filed even though the application is filed after the date an applicant accrues rights under Subsection (a–1).

> TEX. LOC. GOV'T CODE ANN.. § 245.002(f).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

598 S.W.2d 681
Court of Civil Appeals of Texas, Waco.

The CITY OF WEST LAKE HILLS, Texas, Appellant,
v.
WESTWOOD LEGAL DEFENSE FUND, Appellee.

No. 6157.　|　April 17, 1980.

City appealed from judgment entered in the 126th District Court, Travis County, James F. Dear, Jr., J., permanently enjoining city from enforcing by criminal action an ordinance requiring licensing of private sewage facilities located within city's extraterritorial jurisdiction. The Court of Civil Appeals, James, J., held that: (1) city could not enforce ordinance by criminal action; (2) city ordinance was not valid exercise of powers granted to city under statute allowing each city to pass ordinances regulating tapping of sewers and cesspools and regulating house draining and plumbing, or under statute generally granting to cities power to license; and (3) municipal court had no jurisdiction to try violations of ordinance which might occur in extraterritorial jurisdiction.

Affirmed.

**Attorneys and Law Firms**

 **\*682**  John McAllen Scanlan, Scanlan & Buckle, Austin, for appellant.

David H. Walter, Bender, Walter & Wahlberg, Austin, for appellee.

**OPINION**

JAMES, Justice.

This is an appeal from a judgment permanently enjoining the Appellant, City of West Lake Hills, from enforcing by criminal action an ordinance which requires the licensing of private sewage facilities located within the city's extraterritorial jurisdiction. We affirm the judgment.

The Appellant, City of West Lake Hills, is a general law city having a population of less than 5000 people. On or about October 12, 1977, the City Council passed an ordinance, 108-B, attempting to control pollution flowing from private sewage facilities. Ordinance 108-B, among other things, sets forth standards for the operation and construction of private sewage facilities [1] and required inspection and licensing of all such facilities existing within the city's limits or within the city's extraterritorial jurisdiction. Inspections were to be made by the city for a fee of $25 unless an owner hired his own engineer or registered sanitarian to inspect the facility, in which case a fee of $15 would be levied to cover the cost of processing reports required to be submitted by a private inspector. If the facility met the express standards of the ordinance, a license immediately issued; if not, the city was required to specify the reasons for rejecting the application for license and the city was authorized to issue interim licenses while the facility was modified to comply with the standards. Most licenses were to be issued for a 5-year period, but a license could be revoked at any time for non-compliance. Enforcement of the ordinance was by criminal action brought in the city's municipal court. Offenses proscribed by the ordinance included, inter alia: 1) using or permitting the use of an unlicensed private sewage facility on property owned or possessed by the offender; and 2) failure of an owner to make application for a license for an existing private sewage facility on property within 90 days after notice by the city. Convictions were punishable by a fine of not more than $200 for each separate offense.

The evidence establishes that the ordinance in question was passed solely upon  **\*683**  the city's initiative and not as a joint effort between the city and any state or county authority.

The Appellee, Westwood Legal Defense Fund, is a coalition of homeowners, all of which reside in a subdivision known as Westwood, which is located entirely outside the corporate limits but within the extraterritorial jurisdiction of the City of West Lake Hills. The Appellee filed this suit to enjoin West Lake Hills from enforcing its Ordinance 108-B insofar as it applied to facilities located outside the city's corporate limits, pleading that the city lacks express or implied legislative authority to regulate by licensing any private sewage facilities located outside the city's corporate limits; that the ordinance is hopelessly in conflict with state law since the Legislature has granted exclusive authority for the regulation of private sewage facilities to the Texas Water Commission and the commissioners court of any county, citing Secs. 26.031 and 26.032 of the Texas Water Code; that the ordinance imposes a fine not to exceed $200 for any violation thereof, that such a fine is penal in nature and is prohibited by state law, citing Art. 970a, Sec. 4; that the penalty further conflicts with state law since Sec. 26.214 of the Texas Water Code provides the exclusive remedy as well as proper

venue for violations of private sewage facility orders; that the scheme of the ordinance is arbitrary, capricious and unreasonable; that the ordinance represents a violation of the constitutional prohibition against the enactment of retroactive or ex post facto laws; and that the ordinance constitutes an unconstitutional taking of property without due process.

The case was submitted to the trial court on stipulated facts and written briefs and the court rendered judgment granting a permanent injunction prohibiting the City of West Lake Hills from enforcing by criminal action that provision of Ordinance 108-B which requires the licensing of private sewage facilities located within the city's extraterritorial jurisdiction. The trial court's judgment recited that "the CITY OF WEST LAKE HILLS, TEXAS, Ordinance 108-B is a valid exercise of legislatively granted powers to the CITY OF WEST LAKE HILLS, TEXAS, and that such Ordinance is in all respects valid and enforceable except as hereinafter set out:

"a. That DEFENDANT CITY OF WEST LAKE HILLS, TEXAS, Ordinance 108-B exceeds the authority granted to the DEFENDANT CITY OF WEST LAKE HILLS by the State of Texas only in its attempt to require the licensing of private sewage facilities in the DEFENDANT'S extraterritorial jurisdiction.

"b. That the Municipal Court of the CITY OF WEST LAKE HILLS, TEXAS, has no jurisdiction to try violations of Ordinance 108-B alleged to have occurred in the DEFENDANT CITY'S extraterritorial jurisdiction."
Further the judgment expressly recited that "Nothing contained herein should be interpreted as expressing any opinion over any of the provisions of Ordinance 108-B as they apply within the city limits of the CITY OF WEST LAKE HILLS, TEXAS."

The City appeals claiming simply that the court erred in finding its Ordinance 108-B invalid in the two respects set forth above. We overrule the City's contentions.

 [1]   [2]   A city can exercise only those powers that are expressly or impliedly conferred by law, and a power will be implied only when such power is reasonably incident to those expressly granted or is essential to the object and purposes of the corporation. Davis v. City of Taylor, 67 S.W.2d 1033, 123 Tex. 39 (1934); Anderson v. City of San Antonio, 67 S.W.2d 1036, 123 Tex. 163 (1934); Foster v. City of Waco, 255 S.W. 1104, 113 Tex. 352 (1923). Furthermore, any fair, reasonable, or substantial doubt as to the existence of a power

will be resolved against the municipality. Foster v. City of Waco, cited supra. The City argues that the power exercised in Ordinance 108-B is in fact expressly or at least impliedly conferred by Sec. 26.177 of the Texas Water Code, which in its pertinent parts provides:

 **\*684**  "(a) Every city in this state having a population of 5,000 or more inhabitants shall, and any city of this state may, establish a water pollution control and abatement program for the city.

"(b) The water pollution control and abatement program of a city shall encompass the entire city and may include areas within its extraterritorial jurisdiction which in the judgment of the city should be included to enable the city to achieve the objectives of the city for the area within its territorial jurisdiction. The city shall include in the program the services and functions which, in the judgment of the city or as may be reasonably required by the commission, will provide effective water pollution control and abatement for the city, including the following services and functions:

"(1) the development and maintenance of an inventory of all significant waste discharges into or adjacent to the water within the city and, where the city so elects, within the extraterritorial jurisdiction of the city, without regard to whether or not the discharges are authorized by the department;

"(2) the regular monitoring of all significant waste discharges included in the inventory prepared pursuant to Subdivision (1) of this subsection;

"(3) the collecting of samples and the conducting of periodic inspections and tests of the waste discharges being monitored to determine whether the discharges are being conducted in compliance with this chapter and any applicable permits, orders or rules of the department, and whether they should be covered by a permit from the commission;

"(4) in cooperation with the department, a procedure for obtaining compliance by the waste discharges being monitored, including where necessary the use of legal enforcement proceedings; and

"(5) the development and execution of reasonable and realistic plans for controlling and abating pollution or potential pollution resulting from generalized discharges of

waste which are not traceable to a specific source, such as storm sewer discharges and urban runoff from rainwater."

The city contends that this statute constitutes a broad, general grant of power to cities to formulate plans for the control of pollution and that such plans can reasonably include licensing of private sewage facilities and enforcement by criminal action. The city supports its argument by citing Attorney General's Opinion No. H-304 (1974), wherein the Attorney General concludes that:

> "A city has broad powers to establish water pollution control programs under (Sec. 26.177), Texas Water Code. These powers can include regulation of private sewage facilities in the city and in its extraterritorial jurisdiction."

 **[3]**　　**[4]**　　**[5]**　　**[6]**　　In construing a statute, it is our duty to examine the entire act and construe it as a whole. One provision of a statute will not be given a meaning out of harmony or inconsistent with other provisions, even though it might be susceptible to such construction if standing alone. Merchants Fast Motor Lines, Inc. v. Railroad Commission of Texas, 573 S.W.2d 502 (Tex.1978); Barr v. Bernhard, 562 S.W.2d 844 (Tex.1978); Gerst v. Oak Cliff Savings & Loan Assn., 432 S.W.2d 702 (Tex.1968). For this reason we cannot accept the City's argument, nor can we agree with the Attorney General's Opinion to the extent that it may support the City's position in this case. If Sec. 26.177 of the Texas Water Code were the only statutory provision relating to the control and abatement of pollution, there might be some merit to the argument. However, Sec. 26.177 is only one provision in a much more complex and comprehensive legislative scheme. When Chapter 26 is viewed in its entirety, regardless of the broad, general language of Sec. 26.177, it is clear that the section was not intended to authorize cities on their own initiative to regulate private sewage facilities by licensing such facilities. For example, Sec. 26.031 of the Texas Water Code, relating to "private sewage facilities," provides that:

 **\*685**　"(b) Whenever it appears that the use of private sewage facilities in an area is causing or may cause pollution or is injuring or may injure the public health, the commission may hold a public hearing in or near the area to determine whether an order should be entered controlling or prohibiting the installation or use of private sewage facilities in the area.

"(d) If the commission finds after the hearing that the use of private sewage facilities in an area is causing or may cause pollution or is injuring or may injure the public health, the commission may enter an order as it may consider appropriate to abate or prevent pollution or injury to public health.

"(f) The commission may provide in the order for a system of licensing of private sewage facilities in the area, including procedures for cancellation of a license for violation of this section, the license, or the orders or rules of the department. The commission may also provide in the system of licensing for periodic renewal of the licenses, but this may not be required more frequently than once a year.

"(g) The commission may delegate the licensing function and the administration of the licensing system to the executive director or to any local government whose boundaries include the area or which has been designated by the commission under Sections 26.081 through 26.086 of this code as the agency to develop a regional waste disposal system . . .

"(h) The board also may prescribe and require the payment of reasonable license fees. . . .

"(i) If the commission or the executive director has the responsibility for performing the licensing function, the license fees shall be paid to the department. . . .

"(j) If a local government has the responsibility for performing the licensing function, the fees shall be paid to the local government." (emphasis ours)

Sec. 26.032 of the Texas Water Code further provides that:

"(a) Whenever it appears to the commissioners court of any county that the use of private sewage facilities in an area within the county is causing or may cause pollution or is injuring or may injure the public health, the county may proceed in the same manner and in accordance with the same procedures as the commission to hold a public hearing and enter an order, resolution, or other rule as it may consider appropriate to abate or prevent pollution or injury to public health.

"(b) The order, resolution, or other rule may provide the same restrictions and requirements as are authorized for an order of the commission entered under this section.

"(c) Before the order, resolution, or other rule becomes effective, the county shall submit it to the commission and obtain the commission's written approval.

"(e) Where a system of licensing has been ordered by the commission or the commissioners court of a county, no person may install or use private sewage facilities required to be licensed without obtaining a license."

These two sections of the Water Code (Secs. 26.031 and 26.032) specifically grant the power to license private sewage facilities to the Texas Water Commission and to the Commissioners Courts of Texas counties. On the other hand, Sec. 26.177, granting the power to "control and abate water pollution," does not specifically grant the power to license such facilities nor does the language of Sec. 26.177 in any way track or resemble the language of Secs. 26.031 or 26.032. Furthermore, Sec. 26.031 expressly states that the power to license may be delegated to a city by the commission. In order to give any effect to this specific provision, we would have to conclude that the power granted to the cities by Sec. 26.177 does not include the power that can be delegated by the Water Commission under Sec. 26.031.

 **\*686** **[7]** The city contends that Secs. 26.031 and 26.032 cannot be construed to limit the powers granted under Sec. 26.177 since neither 26.031 nor 26.032 expressly prohibits regulation of private sewage facilities by cities. As a general rule, however, in the construction of statutes a general clause is limited or controlled by a special provision. It is said that this rule is based upon the principle that a specific clause or statute more clearly evidences the intention of the Legislature. City of Baytown v. Angel (Houston 14th CA 1971) 469 S.W.2d 923, NRE.

In the instant case the specific assignment of the power to license private sewage facilities (Secs. 26.031 and 26.032) limits the more general grant of power to the cities. In our opinion it is clear that the Legislature intended to reserve to the State the ultimate power to regulate in the area of pollution control. Even though the counties have express authority to develop licensing requirements, such requirements must be approved by the state. Sec. 26.032(c). Even though the cities may assist in obtaining compliance with pollution standards, these efforts must be in cooperation with the Texas Department of Water Resources. Sec. 26.177(b)(4). Although the Legislature recognized the importance of cooperative efforts between state and local governmental bodies, the state is assigned responsibility for promulgating rules and regulations to control pollution problems. Sec. 26.177 lists

five specific functions and services that are or may be assigned to the cities. None of these functions and services specifically requires passage of rules and regulations for controlling pollution. Instead, the functions and services listed in Sec. 26.177 are in the nature of "information gathering" functions which would ultimately be very valuable to assist the state in designing and in enforcing its rules and regulations. Sec. 26.177(b)(3), for example, expressly states that the city's inspection and collection services are designed to determine whether the discharges are meeting applicable permits, rules, or orders of the state department and whether they should be covered by a permit from the state commission. In our opinion, Sec. 26.177 requires (in the case of cities over 5000) or allows (in the case of cities less than 5000) cities to monitor pollution levels both in their corporate limits and in their extraterritorial jurisdictions. The information gathered in this monitoring could (or should) be used by cities in developing plans for growth and expansion, which may of course include consideration of problems in the extraterritorial jurisdiction. The information would further be vital to the initiation of action by the state under Sec. 26.031(b), or by the county under Sec. 26.032(a), if pollution problems were detected by the city in regard to private or public sewage facilities within or surrounding the city. However, the legislative scheme simply does not contemplate independent regulatory action by a city.

 **[8]** **[9]** The city argues alternatively that Ordinance 108-B is a valid exercise of powers granted to it under Art. 1076 and Art. 1015(39), R.C.S. Art. 1076 directs that "Every city in this State, however organized, having underground sewers or cesspools, shall pass ordinances regulating the tapping of said sewers and cesspools, regulating house draining and plumbing"; and Art. 1015(39) is a general grant of the power to license. All powers granted to a city can only be exercised within the corporate limits of a city unless the power is expressly extended to apply to areas outside these limits. City of Sweetwater v. Hamner (Ft. Worth CA 1924) 259 S.W. 191, writ dismissed; Ex parte Ernest, 138 Tex.Cr.R. 441, 136 S.W.2d 595 (1940). The Appellees in this case only challenge the power of the city to regulate private sewage facilities located wholly within the city's extraterritorial jurisdiction rather than within the city's corporate limits. Neither Art. 1076 nor Art. 1015(39) expressly authorizes regulations applying outside the corporate limits and cannot therefore be relied on in this case. The question of the validity of Ordinance 108-B as it applies to facilities located within the city limits of City of West Lake Hills is not raised by this case and we do not decide that issue.

 **\*687** **[10]** **[11]** The Appellant City assigns as a separate point of error the conclusion of the trial court that the municipal court has no jurisdiction to try violations of Ordinance 108-B alleged to have occurred in the extraterritorial jurisdiction of the city. As a general rule, a municipal court only has jurisdiction to enforce violations occurring within the corporate limits of the city. Art. 1195, R.C.S. A municipal court may, however, have jurisdiction to try offenses occurring outside the corporate limits if the offenses constitute violations of city ordinances which validly apply to the area in which the offense occurred. Treadgill v. State, 160 Tex.Cr.R. 658, 275 S.W.2d 658 (1955); Parker v. City of Ft. Worth (Ft. Worth CA 1955) 281 S.W.2d 721, no

writ. Having found that the city had no authority to apply its licensing regulations in the extraterritorial jurisdiction, we must also hold that the municipal court has no jurisdiction to try violations of the ordinance which may occur in the extraterritorial jurisdiction.

Judgment of the trial court is affirmed.

AFFIRMED.

**All Citations**

598 S.W.2d 681

Footnotes

1    "Private sewage facility" was defined as "any septic system, or other facility, system, or method for the storage, treatment, or disposal of sewage other than an organized disposal system." (An "organized disposal system" being "any public or private system for the collection, treatment, and disposal of sewage operated in accordance with the terms and conditions of a permit from the Water Quality Board.")

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

535 S.W.2d 758
Court of Civil Appeals of Texas,
Tyler.

COFFEE CITY et al., Appellants,
v.
B. J. THOMPSON, Appellee.

No. 882. | March 25, 1976.
| Rehearing Denied April 22, 1976.

Property owner brought action against town, mayor, town secretary and member of town council, seeking to have zoning ordinance declared null and void and seeking writ of mandamus or mandatory injunction for issuance of building permit. The 3rd Judicial District Court, Henderson County, R. W. Lawrence, J., entered judgment for plaintiff, and defendants appealed. The Court of Civil Appeals, McKay, J., held that town zoning ordinance was vague, uncertain, indefinite and incomplete, and therefore invalid; and that city zoning ordinance was invalid because of its failure to provide for zoning commission, and such defect was not cured by validating act.

Affirmed.

**Attorneys and Law Firms**

**\*759** F. Wilbert Lasater, Potter, Lasater, Guinn, Minton & Knight, Tyler, Jack Y. Hardee, Fields, Fields & Hardee, Athens, for appellants.

A. D. Henderson, Palestine, for appellee.

**Opinion**

McKAY, Justice.

Appellee, B. J. Thompson, brought suit against the Town of Coffee City, Texas; Roland Wayne Phillips, individually and as mayor of Coffee City; Mary Phillips, individually and as city secretary of Coffee City; Paul Phillips and Wilbert Davis. Appellee sought to have the zoning ordinance of the Town of Coffee City declared null and void, and prayed for a writ of mandamus or mandatory injunction for the issuance of a building permit for the construction of a building in which to operate a package store for the sale of alcoholic beverages. The property of appellee was zoned 'residential'

by the zoning ordinance of Coffee City. Trial was before the court without a jury.

The trial court rendered judgment that the zoning ordinance was invalid and null and void, and ordered the Town of Coffee City, Mary Phillips, city secretary, and all other officials to grant appellee's building permit to construct a building for the operation of a package liquor store. Appellants bring this appeal from the portion of the judgment holding the zoning ordinance, being Ordinance No. 1, null and void, and of no further force and effect. We affirm.

The trial court made and filed Findings of Fact and Conclusions of Law. The Town **\*760** of Coffee City was incorporated under the laws of Texas on December 18, 1969. At the first election Wayne Phillips was elected mayor, Paul Phillips was elected councilman, and Mary Phillips was appointed city secretary, all of whom are parties individually and in their official capacities. On January 19, 1970, Ordinance No. 1 [1] was adopted by the Town Council. Under the local option provisions of the Texas Liquor **\*761** Control Act, the Town of Coffee City legalized the sale of all alcoholic beverages, for off-premises consumption only, on February 22, 1970.

Under the provisions of Ordinance No. 1 appellee's property was classified as 'residential'. On August 2, 1973, appellee filed with the city secretary and Town Council an application and request that his property be changed from 'residential' classification to 'commercial' classification, and such request was denied on September 12, 1973, by the Council. [2]

On October 4, 1973, appellee filed an application for a building permit with the city secretary to construct a building for use as a package store and the sale of other alcoholic beverages. The appropriate filing fee was tendered with such application. On October 25, 1973, the application for the building permit was refused on the ground that the property in question was zoned 'residential' under Ordinance No. 1.

At the time of the adoption of Ordinance No. 1, January 19, 1970, the town did not have a Zoning Commission or a Planning and Zoning Commission, nor did it have such a commission at the time of trial.

Cora Bradley had an undivided interest in appellee's property at the time of the adoption of Ordinance No. 1 and had actual notice of the proposed ordinance and requested that the property be zoned 'residential'.

The appellants, Roland Wayne Phillips, mayor, and his brother, Paul Phillips, a member of the Town Council, jointly own the package store, Kilo Drive-In, in Coffee City, and it is the only package store in the Town of Coffee City located on Highway No. 155. At all times material to this case Coffee City had a population not less than 200 nor more than 1,000 inhabitants.

Prior to the meeting of the Council on January 19, 1970, written notices of such meeting were posted in three public places **\*762** in the Town of Coffee City at least three days prior to such meeting. No personal notice was given to any property owner prior to the council meeting of January 19, 1970, regarding the proposed adoption of Ordinance No. 1. Subsequent to the passage of Ordinance No. 1, the entire ordinance was published in the Athens Review, Athens, Texas, a weekly newspaper of general circulation in Henderson County, Texas.

The trial court found in conclusions of law that Ordinance No. 1 is invalid (1) because it is vague and indefinite in that it does not contain a prohibition of commercial use such as the use sought by appellee in a residential area nor does it define or furnish guidelines for commercial or residential use; (2) because the Town of Coffee City failed to provide for a Zoning Commission in order to exercise zoning powers as required by Art. 1011f;[3] (3) because of the failure of the Town of Coffee City to follow the procedural requirements of Art. 1011d; (4) because of the failure of the Town of Coffee City to give personal notice to the appellee's predecessors in title and for failure to comply with the notice requirements of Art. 1011d. The Court also found that Art. 974d—18, does not validate Ordinance No. 1 in that the validating act has no application to an invalid ordinance such as the instant one.

Appellant brings three points of error contending that the trial court erred in declaring Ordinance No. 1 invalid (1) for vagueness, (2) for failure of the Town of Coffee City to provide for a Zoning Commission, and (3) for failure of the Town of Coffee City to give personal notice to appellee's predecessors in title and for failure to comply with the procedural requirements of Art. 1011d.

Appellants' first point complains that the trial court erred in finding Ordinance No. 1 invalid because it is vague and indefinite. Appellants argue that the ordinance is not uncertain simply because it does not define 'residential' and 'commercial', and that the word 'residential' has a clear and well understood meaning—that is, the use of

property for living purposes as distinguished from use for business or commercial purposes. Appellants further say that an ordinance may be adequate as a rule of civil conduct even though it may be too indefinite and uncertain to be enforced by criminal prosecution. Appellants cite Vaccaro v. Rougeou, 397 S.W.2d 501 (Tex.Civ.App.—Houston 1966, writ ref'd n.r.e.), a restrictive covenant case, as authority for the meaning of the words 'residential' and 'commercial'.

Appellants make the further argument that appellee knew his property was zoned residential before he acquired it and before he applied for a building permit, and that he does not have standing to assert the rights of others.

On the other hand, appellee contends that the ordinance is vague, ambiguous, uncertain and incomplete because (1) it fails to prohibit commercial uses of property classified or zoned residential; (2) it fails to provide any guideline for the city secretary in either issuing or denying a building permit; and (3) it fails to define uses permitted in the areas zoned residential and the areas zoned commercial. Appellee argues that since the ordinance fails to expressly restrict the use of properties zoned residential to residential use, that is, it fails to prohibit a commercial use of property zoned residential, it would have to be implied that a commercial use is not permitted in a residential area, and be implied that a residential use is not permitted in area zoned commercial. Appellee points out that the ordinance has no provision making it unlawful or prohibiting the use of property for commercial purposes in a residential area, nor does Ordinance 1 contain a directive to the city secretary requiring her to deny a building permit for construction of a commercial building simply because it is located in the residential zone.

 [1]    [2]    [3]    In Lone Star Gas Co. v. Kelly, 140 Tex. 15, 165 S.W.2d 446 (Tex.Comm'n.App.1942, opinion adopted), it is said, 'A statute **\*763** which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.'

Sanders v. State Department of Public Welfare, 472 S.W.2d 179 (Tex.Civ.App.—Corpus Christi 1971, writ dism'd), contains this language:

> 'It is a general principle of law that a statute or regulation must be definite to be valid. Due process of law in legislation requires definiteness or certainty. If a regulation is incomplete,

vague, indefinite and uncertain, and it forbids the doing of an act which is so vague, that men of common intelligence must necessarily guess at its meaning and that such men differ as to application, it violates the first essential of due process of law.'

See 56 Am.Jur.2d Municipal Corporations, Sec. 367, p. 394.

Applying the above principles to the ordinance here in question, we are of the opinion such ordinance is vague, uncertain, indefinite and incomplete and, therefore, invalid. It does not prohibit the building of a residence upon a commercially zoned area, nor does it prohibit the erection of a commercial building upon an area zoned residential. It simply describes a certain area as commercial, and then it declares all other property is zoned residential. It does not describe what type or kind of residential structures may be built. Some buildings, such as an apartment building, may have both residential and commercial use.

 [4]   The ordinance does not provide any criteria or guidelines for the city secretary to follow in granting or refusing building permits; and, therefore, it must be implied that the city secretary has discretionary authority without restriction in issuing or denying such permits. An ordinance leaving the question of issuing or denying building permits to the arbitrary discretion or determination of the city secretary without any rule or standard to follow is invalid. Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 517, 19 A.L.R. 1387 (1921); Crossman v. City of Galveston, 112 Tex. 303, 247 S.W. 810, 815, 26 A.L.R. 1210 (1923); City of Houston v. Freedman, 293 S.W.2d 515 (Tex.Civ.App.—Galveston 1956, writ ref'd n.r.e.); 56 Am.Jur.2d Municipal Corporations, Sec. 369, p. 396.

The only provision (Sec. IV) in the ordinance for an application for a building permit to come before the Town Council results from the withholding of the issuance of a building permit by the city secretary if she 'shall conclude that the applicant is not truthfully representing the cost of construction . . .'

We overrule appellants' point one.

Appellants say by their point two that the trial court erred in declaring Ordinance No. 1 invalid for failure of the Town Council to provide for a Zoning Commission.

Art. 1011a, provides that, 'For the purpose of promoting health, safety, morals, and for the protection and preservation of places and areas of historical and cultural importance and significance, or the general welfare of the community, the legislative body of cities and incorporated villages is hereby empowered' to regulate the use of property. Art. 1011b, provides that the municipal legislative body may divide the municipality into districts, and that 'within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land. All such regulations shall be uniform for each class or kind of building throughout each district, but the regulations in one district may differ from those in other districts.'

Art. 1011f, reads in part as follows:
'In order to avail itself of the powers conferred by this Act, such legislative body Shall appoint a commission, to be known as the Zoning Commission, to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein. Such Commission Shall make a preliminary report and hold public hearings thereon before submitting its final report, and such legislative body Shall not hold its public **\*764** hearings or take action until it has received the final report of such Commission; . . . Written notice of all public hearings before the Zoning Commission on proposed changes in classification Shall be sent to owners of real property lying within two hundred (200) feet of the property on which the change in classification is proposed, such notice to be given, not less than ten (10) days before the date set for hearing, to all such owners who have rendered their said property for city taxes as the ownership appears on the last approved city tax roll . . .' (Emphasis added.)

Appellants contend that Art. 974d—18, a validation statute affecting cities and towns of 1,000 inhabitants or less, which became effective in 1973, cured any failure by Coffee City to appoint a Zoning Commission or give notice to property owners and validated the act of the Town Council in enacting Ordinance No. 1. Section 3 of Art. 974d—18 provides:

> 'All governmental proceedings and acts performed by the governing bodies of such cities and towns and all officers thereof since their incorporation, or attempted incorporation, are hereby in all respects validated as of the respective date of the proceedings and acts.'

Since the provisions of Art. 1011f relating to a Zoning Commission are made mandatory in character by using the word Shall concerning the appointment of such a Commission, it appears that the Town Council of Coffee City, in order to avail itself of the power to enact a zoning ordinance, was required to appoint a Zoning Commission. No Zoning Commission was appointed; therefore, Ordinance No. 1 can be valid only if it is made valid by Art. 974d—18. We have found no Texas case, nor have we been cited one, which directly decides this question.

 **[5]** Validating acts are remedial and are to be liberally construed. Perkins v. State, 367 S.W.2d 140, 147 (Tex.1963). It was held in State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065, 1078 (1932) that:

> '. . . where the act of some agent of the state or of some agency which must derive its power to act from the Legislature is void for the reason that, at the time the act was performed legislative power therefor had not been given, the Legislature may, in the absence of constitutional prohibition, supply by law operating retrospectively the power originally lacking so that the act which was originally void is valid and binding.'

The case of State v. Town of Bullard, 312 S.W.2d 435 (Tex.Civ.App.—Texarkana 1958, writ ref'd n.r.e.), cited by Appellant cites, follows and quotes from Bradford.

Burch v. City of San Antonio, 518 S.W.2d 540 (Tex.1975) held that the Legislature has the power to enact curative or remedial legislation and that such legislation should be given liberal construction.

There seems to be no question that if the Town Council of Coffee City had attempted to appoint a Zoning Commission or Board and there were irregularities in such procedure such irregularities would be cured by the validation statute. And if the Town Council had appointed a Zoning Commission and then there had been some irregularity in the adoption of a zoning ordinance it was the intention of the Legislature that such irregularities would be cured. But it is difficult for us to see an intention on the part of the Legislature to permit the Town Council of Coffee City to ignore a mandatory statute requiring the appointment of a Zoning Commission. The Town Council had not availed itself of the powers to

enact a zoning ordinance, and we see no intention on the part of the Legislature to permit the Council to totally ignore Art. 1011f.

In City of Hutchins v. Prasifka, 450 S.W.2d 829 (Tex.1970), the court held that a validation act like the one here did not authorize the City Council to change a zoning classification of property by resolution—that there was no intent seen on the part of the Legislature to change a resolution into an ordinance, and that the property remained as it had been zoned before the resolution, and the resolution was not 'validated' into an ordinance.

 **\*765** The case of City of Mason v. West Texas Utilities Co., 237 S.W.2d 273 (Tex.1951), held that curative or remedial statutes should generally 'be given the most comprehensive and liberal construction possible,' but also held:

'The fundamental rule controlling the construction of a statute is to ascertain the intention of the Legislature expressed therein. That intention should be ascertained from the entire act, and not from isolated portions thereof. This Court has repeatedly held that the intention of the Legislature in enacting a law is the law itself; and hence the aim and object of construction is to ascertain and enforce the legislative intent, and not to defeat, nullify, or thwart it . . . It is settled that the intention of the Legislature controls the language used in an act, and in construing such act the court is not necessarily confined to the literal meaning of the words used therein, and the intent rather than the strict letter of the act will control.' See 62 C.J.S. Municipal Corporations s 432, pp. 827—8.

In City of Waco v. City of McGregor, 523 S.W.2d 649 (Tex.1975), McGregor maintained that a validating act, Art. 974d—12, validated its attempted annexation by ordinance of a strip of land 261 feet wide down U.S. Highway 84 approximately five miles and then extending northerly to include a 900 acre tract owned by McGregor and used as a municipal airport. Under Art. 970a McGregor could annex an unincorporated area contiguous to its corporate limits, not a part of any other city, within its extraterritorial limits of one-half (1/2) mile, 'provided, however, that such limitation shall not apply to the annexation of property owned by the city annexing the same.' The 900 acre McGregor airport was within the extraterritorial limits of Waco. After stating that 'curative statutes are liberally construed only to effectuate the intent of the legislature in enacting them and not to other ends', the court held that legislative intent must be applied, and that the McGregor ordinance violated Art. 970a, and that the validating statute, Art. 974d—12, 'was not intended to

and did not validate the annexation of either noncontiguous or nonadjacent territory,' and that 'the portion of the stem along Highway 84 which intrudes into the exclusive extraterritorial jurisdiction of Waco is not adjacent to McGregor and so McGregor's attempted annexation of that portion of the stem was not validated by Article 974d—12. Since that part of the stem is not validly annexed, the airport is not contiguous to McGregor and so McGregor's attempted annexation of the airport was not validated by Article 974d—12.' See City of West Lake Hills v. State ex rel. City of Austin, 466 S.W.2d 722 (Tex.1971).

This court held in Rogers v. Raines, 512 S.W.2d 725 (1974, writ ref'd n.r.e.), that the same validating act as here involved, Art. 974d—18, did not validate an attempted incorporation of a town or village where the area sought to be incorporated did not constitute a town or village.

Appellant concedes 'that initially Ordinance No. 1 was not legally enacted because of the failure of the town of Coffee City to follow the various procedural requirements,' but relies entirely upon Art. 974d—18 to validate the ordinance.

In Bolton v. Sparks, 362 S.W.2d 946 at page 950 (Tex.1962), the court said:

> 'The courts of this State have held ordinances and amendments to ordinances invalid where the express, mandatory provisions of our zoning statute have not been complied with. The steps directed to be taken for notice and hearing, when provided for in the law, are intended for the protection of the property owner, and are his safeguards against the exercise of arbitrary power. Each act required is essential to the exercise of jurisdiction by the City Council, and each must be rigidly performed. . . .'

In Storm Bros. v. Town of Balcones Heights, 239 S.W.2d 842 (Tex.Civ.App.—El Paso 1950, writ ref'd n.r.e.), there was some question raised about the procedure followed in appointing the members of the Zoning Commission, and the court held that the members of the Zoning Commission having been appointed and being de facto **\*766** members and serving as such, the validating act cured the defects complained of.

 **[6]**    As is said in Lawton v. City of Austin, 404 S.W.2d 648 (Tex.Civ.App.—Austin 1966, writ ref'd n.r.e.), the police powers of the State are exercised by the Legislature enacting zoning laws, and the State has delegated some of this legislative authority to municipalities. Arts. 1011a—1011j. 'The Legislature, of course, may put such restrictions on and provide the manner in which municipalities may exercise the delegation of this authority as it sees fit.' Lawton v. City of Austin, supra.

63 Tex.Jur.2d Zoning, Sec. 69, p. 836, reads in part:

> 'In order to avail itself of the powers conferred by the Zoning Enabling Act, the governing body of a municipality must appoint a zoning commission to recommend the boundaries of the various original districts and appropriate regulations to be enforced therein. The zoning commission must make a preliminary report and hold public hearings thereon before submitting its final report, and the governing body of the municipality may not hold its public hearings or take action until it has received the final report of the zoning commission . . .'

The case of Peters v. Gough, 86 S.W.2d 515 (Tex.Civ.App.—Waco 1935, no writ), opinion by Judge Alexander, held that the statutory requirements in Arts. 1011a—1011j 'are intended for the protection of the property owner and are his safeguards against an arbitrary exercise of the powers granted by the statute. Hence, it would appear that such preliminary steps required by the statute are essential to the exercise of such jurisdiction.' To the same effect is Tonroy v. City of Lubbock, 242 S.W.2d 816 (Tex.Civ.App.—Amarillo 1951, writ ref'd n.r.e.); City of Amarillo v. Wagner, 326 S.W.2d 863 (Tex.Civ.App.—Amarillo 1959, writ ref'd n.r.e.); City of San Antonio v. Pope, 351 S.W.2d 269 (Tex.Civ.App.—Eastland 1961, no writ).

Some of the above cases point out that Art. 1011f provides that, 'In order to avail itself of the powers conferred by this Act, such legislative body Shall appoint a commission,' and certain order steps must be taken.

In City of Kermit v. Spruill, 328 S.W.2d 219 (Tex.Civ.App.—El Paso 1959, writ ref'd n.r.e.), the court said:

'While the legislature may validate an ordinance passed by a municipal corporation which would otherwise be void, because of procedural defects in the manner of enactment, notice and public hearing, provided there is no constitutional objection to an act which would have embraced every power exercised in the ordinance; it does not follow that every such validating act is sufficient to cure substantive defects which render the application or subject of the ordinance ambiguous, vague or uncertain.'

In Richardson v. State, 199 S.W.2d 239 at page 244 (Tex.Civ.App.—Dallas 1946, writ ref'd n.r.e.), is found this language:

'Acts curing defects in the incorporation of municipalities under the general law apply where a legal incorporation was sought to be established—that is, where the law was attempted to be followed, but in some particulars was not followed, and where, if the forms of law had not been omitted, the incorporation would have been valid. They do not apply where it was sought to incorporate in violation of law.'

We have concluded that it was not the intention of the Legislature to validate Ordinance No. 1 of the town of Coffee City when Coffee City had not availed itself of the power to enact a zoning ordinance and that such failure was a substantive defect. It had not appointed a Zoning Commission nor had it attempted to do so. There was no Zoning Commission to make a preliminary report or to hold public hearings or to make a final report to the Town Council. [7] We are of the opinion that the reasoning in Richardson v. State, supra, pertaining to a validating act attempting to cure defects in the incorporation of a municipality, is applicable here. The analogy is that acts curing defects in zoning ordinances **\*767** apply where a legal zoning ordinance was sought to be established—that is, where the law was attempted to be followed, and where, if the town of Coffee City had availed itself of the power to zone and then certain procedures had not been followed, the ordinance would have

been validated. The validating act did not apply where it was sought to zone in violation of law.

 [8] Accordingly, we find Ordinance No. 1 of the town of Coffee City to be invalid because of the failure of the Town Council to provide for a Zoning Commission. We overrule appellants' point two.

Appellants' third point complains of the finding of the trial court that Ordinance No. 1 is invalid for failure to give personal notice to appellee's predecessor in title and for failure to comply with the procedural requirements of Art. 1011d. In view of disposition of points one and two, this point is overruled.

Appellee presents a cross-point complaining of the failure of the trial court to find Ordinance No. 1 invalid because it does not have any substantial relationship to the public health, safety, morals and general welfare of the public as required by Art. 1011a. Appellee points out that the only property in the town of Coffee City located on Highway 155 which was zoned commercial belongs to Mayor Phillips, his brother (who is a member of the Town Council) and to Mayor Phillips' mother, and that Highway 155 is heavily traveled and carries substantially all of the traffic through the town. Moreover, there are only three tracts of land within the corporate limits located on Highway 155 and one of these is owned by the Phillips family, one by Henderson County used as a park, and the third tract is the tract known as the Cora Bradley tract involved here. The Phillips' tract had three residential houses located on it and was zoned commercial while the Bradley tract had one house on it, and it was zoned residential. Ordinance No. 1 provides for seven (7) specifically described areas zoned commercial, and there are six (6) alcoholic beverage stores located in these areas which are scattered at random over the town. The record reflects that the property in the town was zoned residential or commercial according to the request of the individual owner. In our opinion this does not show an attempt to regulate in accordance with a comprehensive plan as required by Art. 1011c.

The witness, Street, a Council member at the time the ordinance was adopted testified that, as zoned, Mayor Phillips and his brother would have the only liquor store on Highway 155, and that this result was known and discussed at the time the ordinance in question was adopted.

Exhibit P—1 shows that the corporate limits of the town consists mainly of long, narrow strips along public roads and such strips have no regular shape and appear to be several miles in length.

 [9]    A zoning ordinance must bear a substantial relation to the public health, safety, morals or general welfare, and if by the terms of the ordinance or as established by the evidence as a matter of law it does not do so, then such ordinance is void. Weaver v. Ham, 149 Tex. 309, 232 S.W.2d 704 (1950); City of Corpus Christi v. Jones, 144 S.W.2d 388, 397 (Tex.Civ.App.—San Antonio 1940, writ dism'd); 56 Am.Jur.2d Municipal Corporations, Sec. 438, p. 487.

 [10]    The record reveals that the Town of Coffee City was incorporated on December 18, 1969; that the first election of officers was held on January 7, 1970; that Ordinance No. 1 was passed January 19, 1970; and that a local option election for the sale of all alcoholic beverages was held on February 22, 1970.

In Vol. 1, Antieau, Municipal Corporation Law, Sec. 516, p. 5—48, is found this language:

'When the judiciary finds it fairly obvious that a municipal ordinance was motivated by a desire to advance the interests of a particular individual, corporation or group, the courts have been quite willing to invalidate the particular exercise of municipal power as not having a reasonable **\*768** tendency to protect the public health, safety, morality or general welfare.'

If it could be said the trial court erred in failing to find the ordinance invalid because it bore no substantial relation to the public health, safety, morals or general welfare, in view of our disposition of this cause, it was harmless error. Rule 434, T.R.C.P.

The judgment of the trial court is affirmed.

**All Citations**

535 S.W.2d 758

Footnotes

1    'ORDINANCE I.
'AN ORDINANCE FOR THE ISSUANCE OF BUILDING PERMITS PRESCRIBING REGULATIONS CONCERNING THE SETBACK OF COMMERCIAL IMPROVEMENTS FROM HIGHWAY AND ROAD RIGHT-OF-WAY DEFINING COMMERCIAL PROPERTY, AND RESIDENTIAL PROPERTY, PROVIDING THAT NO PERSON MAY BE ISSUED A BUILDING PERMIT FOR A STRUCTURE TO BE USED FOR A LIQUOR OR PACKAGE STORE OR A STORE FOR THE SALE OF BEER AND/OR WINE ON OR OFF PREMISES UNLESS SUCH PERSON SHALL HAVE BEEN A RESIDENT OF COFFEE CITY, TEXAS, FOR AT LEAST ONE (1) YEAR PRIOR TO FILING SUCH APPLICATION, PROVIDING THAT NO PERSON SHALL ENGAGE IN THE RETAIL LIQUOR BUSINESS OR IN THE BUSINESS OF RETAILING BEER AND/OR WINE ON OR OFF PREMISES UNLESS SAID PERSON SHALL HAVE BEEN A RESIDENT OF COFFEE CITY, TEXAS, FOR AT LEAST ONE (1) YEAR, ESTABLISHING FEES FOR BUILDING PERMITS AND PROVIDING PENALTIES FOR THE VIOLATION OF THIS ORDINANCE IN ANY SUM NOT LESS THAN TEN ($10.00) DOLLARS AND NOT MORE THAN ONE HUNDRED ($100.00) DOLLARS EACH AND EVERY DAY OR A FRACTION THEREOF DURING WHICH THIS ORDINANCE IS VIOLATED IN DECLARING EACH SUCH DAY TO BE A SEPARATE OFFENSE.
'BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF COFFEE CITY, TEXAS:
'SECTION I.
'This entire ordinance is and shall be deemed an exercise of the police power of the State of Texas, and of the Town of Coffee City, for the public safety, comfort, convenience and protection of the town and citizens of said town, and all of the provisions hereof shall be construed for the accomplishment of that purpose.
'SECTION II.
'The following property in the city limits of Coffee City, Texas, shall be and is hereby zoned commercial property:
(The metes and bounds description is omitted.)
'All of the rest of the property in the city limits of Coffee City, Texas, not hereinabove zoned as commercial property is hereby zoned as residential property and shall hereafter be residential property.
'SECTION III.

'No person shall erect any structure of any nature upon any commercial property within the limits of the town of Coffee City, Texas, unless said structure is set back from the boundary of the highway or public road right-of-way a minimum of forty (40) feet distance. No part of any structure shall extend or obtrude toward the highway or public road so as to be within the forty feet limit herein prescribed.

'SECTION IV.

'No person shall commence the construction of any building or structure of any nature whatsoever within the limits of the town unless that person has first obtained a building permit. Any person desiring a building permit shall make application to the City Secretary and shall accompany said application by the fee hereinafter prescribed. The City Secretary shall determine whether the proposed structure complies with all ordinances of the town and shall upon the receipt of the proper fee then issue a building permit. Each application for a building permit shall state the cost of the construction of the proposed building or other structure and the fee for such building permit shall be One Dollar ($1.00) for each Thousand Dollars ($1,000.00). If the City Secretary shall conclude that the applicant is not truthfully representing the cost of construction, she may withhold the issuance of the building permit, in which event the issuance of a permit shall be determined by the town council at its next regular or called meeting.

'SECTION V.

'All applications for building permits shall specify the purpose for which the proposed structure is to be used. Such application shall further state the name in full of the applicant, the age of applicant, and the length of residence in the corporate city limits of Coffee City. No permit shall be issued to any person for the construction of a building to be used as a package store or liquor store and no permit shall be issued to any person for the construction of a building to be used as a place of business for the retail sale of beer and/or wine either on or off premises as such terms are defined in the Liquor Control Act of the State of Texas unless the owner of such building shall have been a resident of the City of Coffee City, Texas, for not less than one (1) year prior to the filing of such application. No person shall engage in the retail sale of liquor or engage in the retail sale of beer and/or wine either on or off premises unless such person shall have been a bona fide resident of Coffee City, Texas, for at least one (1) year prior to the commencement of business. Nothing in this section, however, shall apply to or affect any person who is engaged in the business of retailing liquor, beer and/or wine on or off premises on the effective date of this act in Coffee City, Texas, and this section further does not affect any person who has heretofore made application for a building permit for the purpose of constructing a building to be used as a package or liquor store or for retailing beer and/or wine for on or off premises consumption.

'SECTION VI.

'Any person, firm or corporation violating any of the provisions of this ordinance of (sic) failing to observe any of the provisions hereof, shall be deemed guilty of a misdemeanor and upon conviction shall be fined in any sum not less than Ten Dollars ($10.00) nor more than One Hundred Dollars ($100.00) and each and every day or fraction of a day during which this ordinance or any part thereof shall be violated shall be deemed a separate offense and punishable as such.

'SECTION VII.

'Each and every provision, paragraph, sentence and clause of this ordinance has been separately considered and passed by the Town Council of the Town of Coffee City, and each said provision, paragraph, sentence and clause would have been separately passed without any other provision, and if any provision, paragraph, sentence or clause hereof should be ineffective, invalid, or unconstitutional for any cause, it shall not impair or affect the remaining portion nor any other part hereof, but the valid portion shall be enforced in the manner as if it had been passed alone.

'SECTION VIII.

'The fact that the Town of Coffee City, Texas, now has no ordinance governing the matters regulated herein and the fact that construction of building (sic) and other structures is not now regulated so as to protect the citizens of the Town of Coffee City in their property and persons as aforesaid, creates an emergency, which is here and now declared, and this ordinance shall take effect and be in force, from and after its passage and publication, as provided by law. 'PASSED AND APPROVED THIS THE 19TH DAY OF JANUARY, 1970.'

2   Among the reasons given for denying the request to rezone were:

(1) that the property is best suited for residential property, there being a residence close by; (2) that a tract of land adjacent to the land sought to be rezoned has been set aside for a public park and the best use of the property would be to remain residential since it is adjacent to and would be close to a public park; (3) that to rezone this property would constitute spot zoning; (4) that to rezone the property would interfere with the best interest and welfare of the citizens of Coffee City, Texas; (5) that the application to rezone the property is not in proper form and order; (6) a request was made when the property was originally zoned for residential, that it be zoned residential; (7) there have been complaints from citizens in Coffee City, Texas, to leave the property as residential property.

3       All references are to Vernon's Texas Annotated Civil Statutes unless otherwise noted.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

852 S.W.2d 489
Supreme Court of Texas.

DALLAS MERCHANT'S AND CONCESSIONAIRE'S
ASSOCIATION et al., Petitioners,
v.
CITY OF DALLAS, Respondent.

No. D–2159. | April 7, 1993. |
Rehearing Overruled June 3, 1993.

Merchants association challenged validity of home-rule city's zoning ordinance dispersing location of alcohol-related businesses. The 134th District Court, Dallas County, Anne Ashby Packer, J., granted relief, and city appealed. The Court of Appeals, 823 S.W.2d 347, reversed and rendered, and further appeal was taken. The Supreme Court, Hightower, J., held that ordinance of home-rule city prohibiting sale of alcoholic beverages within 300 feet of residential areas was preempted by Texas Alcoholic Beverages Code.

Reversed.

Enoch, J., dissented and filed opinion in which Hecht and Cornyn, JJ., joined.

**Attorneys and Law Firms**

*489 Richard M. Lannen, Diane Snelson, Eric V. Moy#e, Eric R. Cromartie, David C. Godbey, Andrew L. Siegel, Dallas, for petitioners.

Dan Morales, Austin, John Rogers, Dallas, W. Reed Lockhoof, Austin, Analeslie U. Muncy, Fort Worth, Angela Washington, *490 Sam A. Lindsay, Dallas, for respondent.

**OPINION**

HIGHTOWER, Justice.

In this cause, we consider whether an ordinance of a home-rule city prohibiting the sale of alcoholic beverages within 300 feet of a residential area is preempted by the Texas Alcoholic Beverage Code (TABC). In 1990, the Dallas Merchants and Concessionaires Association, the Texas Package Stores Association, and other individuals (hereinafter "Merchants") filed suit against the City of Dallas

("City") for declaratory and injunctive relief. The trial court held that the ordinance was preempted by the TABC. The court of appeals reversed. 823 S.W.2d 347. We hold that an ordinance of a home-rule city prohibiting the sale of alcoholic beverages within 300 feet of a residential area is preempted by the TABC. Consequently, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

On September 30, 1987, the Dallas City Council ("Council") passed Ordinance No. 19694 ("Ordinance"), which created new zoning categories for South Dallas. The Ordinance imposed a D–1 overlay on certain areas of South Dallas and exempted certain areas that are outside of and do not effect the residential areas of South Dallas. In this D–1 overlay area, no business is allowed to sell or serve alcoholic beverages within 300 feet of residentially zoned properties not located on a freeway service road or other specified road. However, a business in a D–1 overlay area may sell or serve alcoholic beverages if the Council grants a specific use permit (SUP). On October 12, 1988, the Council approved Resolution 883306, which established the guidelines for evaluating SUP applications for selling or serving alcoholic beverages in areas of South Dallas affected by the D–1 overlay. In June 1990, the Merchants filed suit against the City.

Following a bench trial, the trial court rendered judgment which, among other things, granted the declaratory and injunctive relief requested by the Merchants. The trial court concluded that the D–1 overlay provisions of the Ordinance conflicted with the TABC and was void to that extent under article XI, section 5 of the Texas Constitution.[1] The trial court also permanently enjoined the City from enforcing the D–1 overlay provisions of the Ordinance. The court of appeals reversed and rendered judgment.

**I.**

The Merchants argue that the Ordinance is preempted by the TABC. We agree.

**PREEMPTION OF HOME–RULE CITIES**

[1] To determine whether the Ordinance is preempted by the Texas Alcoholic Beverage Code, we must decide whether the Legislature, by enacting and amending the TABC, preempted ordinances of home-rule cities that prohibit the sale of alcoholic beverages under these circumstances. Home-rule

cities have broad discretionary powers, provided that no ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." TEX. CONST. art. XI, § 5. Home-rule cities possess the full power of self government and look to the Legislature not **\*491** for grants of power, but only for limitations on their power. *MJR's Fare of Dallas v. City of Dallas,* 792 S.W.2d 569, 573 (Tex.App.—Dallas 1990, writ denied).

 **[2]**   **[3]**   **[4]**   **[5]**   An ordinance of a home-rule city that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with the state statute. *See City of Brookside Village v. Comeau,* 633 S.W.2d 790, 796 (Tex.1982), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982). However, "the mere fact that the legislature has enacted a law addressing a subject does not mean the complete subject matter is completely preempted." *City of Richardson v. Responsible Dog Owners,* 794 S.W.2d 17, 19 (Tex.1990). "[A] general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *City of Beaumont v. Fall,* 116 Tex. 314, 291 S.W. 202, 206 (1927). Thus, if the Legislature chooses to preempt a subject matter usually encompassed by the broad powers of a home-rule city, it must do so with unmistakable clarity. *See City of Sweetwater v. Geron,* 380 S.W.2d 550, 552 (Tex.1964).

### TEXAS ALCOHOLIC BEVERAGE CODE

 **[6]**   In 1977, the Legislature codified the Texas Liquor Control Act into the TABC. [2] Prior to the codification, several courts of appeals held that various ordinances of home-rule cities prohibiting the sale of alcoholic beverages were not preempted by the Texas Liquor Control Act. *See, e.g., City of Clute v. Linscomb,* 446 S.W.2d 377 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ); *Louder v. Texas Control Board,* 214 S.W.2d 336 (Tex.Civ.App.—Beaumont 1948, writ ref'd n.r.e.); *Eckert v. Jacobs,* 142 S.W.2d 374 (Tex.Civ.App.—Austin 1940, no writ). Subsequent to the codification, the Eleventh Court of Appeals held that the TABC did not preempt ordinances prohibiting the sale of alcoholic beverages. *See Young, Wilkinson & Roberts v. City of Abilene,* 704 S.W.2d 380, 383 (Tex.App.—Eastland 1985, writ ref'd n.r.e.) ("We hold that the Constitution and general statutes of this State do not deny the City [a home rule city] the right to regulate the area of the City in which liquor could be sold."); *Abilene Oil Distributors v.*

*City of Abilene,* 712 S.W.2d 644 (Tex.App.—Eastland 1986, writ ref'd n.r.e.).

Subsequently, in 1987, the Legislature added section 109.57 to the TABC and further amended it in 1991 to read in part:

(a) Except as expressly authorized by this code, a regulation, charter, or ordinance promulgated by a governmental entity of this state may not impose stricter standards on premises or businesses required to have a license or permit under this code than are imposed on similar premises or businesses that are not required to have such a license or permit.

(b) It is the intent of the legislature that this code shall exclusively govern the regulation of alcoholic beverages in this state, and that except as permitted by this code, a governmental entity of this state may not discriminate against a business holding a license or permit under this code.

(c) Neither this section nor Section 1.06 of this code affects the validity or invalidity of a zoning regulation that was formally enacted before June 11, 1987 and that is otherwise valid, or any amendment to such a regulation enacted after June 11, 1987 if the amendment lessens the restrictions on the licensee or permittee or does not impose additional restrictions on the licensee or permittee. For purposes of this subsection, "zoning regulation" means any charter provision, rule regulation, or other enactment governing the location or use of buildings, other structures, and land.

TEX.ALCO.BEV.CODE ANN. § 109.57(a), (b) & (c) (Vernon Supp.1992). The Legislature's intent is clearly expressed in section 109.57(b) of the TABC—the regulation of alcoholic beverages is exclusively governed by the provisions of the TABC unless otherwise **\*492** provided. [3] TEX.ALCO.BEV.CODE ANN. § 109.57(b) (Vernon Supp.1992). Section 109.57 clearly preempts an ordinance of a home-rule city that regulates where alcoholic beverages are sold under most circumstances. [4] Accordingly, we hold that, to the extent of any conflict, the TABC preempts the Ordinance. [5]

### II.

The City argues that if section 109.57 preempts an ordinance of a home-rule city regulating where alcoholic beverages

are sold, sections 61.37, 109.31, 109.32, and 109.33 will be rendered meaningless. [6] We disagree.

**\*493** [7] Section 109.57 expressly states that the TABC will exclusively govern the regulation of alcoholic beverages except as otherwise provided by the TABC. [7] TEX.ALCO.BEV.CODE ANN. § 109.57 (Vernon Supp.1992). Thus, the TABC allows ordinances of home-rule cities to prohibit the sale of alcoholic beverages only under limited circumstances. Pursuant to section 109.31, the sale of liquor may be prohibited within residential areas only by charter. TEX.ALCO.BEV.CODE ANN. § 109.31 (Vernon 1978). Under section 109.32, the sale of beer may be prohibited within residential areas by ordinance or charter. TEX.ALCO.BEV.CODE ANN. § 109.32 (Vernon 1978). These options are still available to the City. However, in this case, the Ordinance attempts to prohibit the sale of liquor and beer in non-residential areas. An ordinance may not prohibit the sale of beer in non-residential areas or the sale of liquor in residential or non-residential areas. *See* TEX.ALCO.BEV.CODE ANN. §§ 109.31–32 (Vernon 1978).

[8] Section 109.33 permits a county or city to prohibit the sale of alcoholic beverages by a dealer whose place of business is within 300 feet of a church, school, or public hospital. TEX.ALCO.BEV.CODE § 109.33(a) (Vernon Supp.1992). This option is still available to the City. [8] However, in this case, the Ordinance attempts to prohibit the sale of alcoholic beverages within 300 feet of a residential area—not within 300 feet of a church, school or public hospital.

[9] Likewise, section 61.37 does not conflict with section 109.57. Section 61.37 states that a city secretary will merely certify whether an ordinance or charter prohibits the sale of alcoholic beverages in the area where alcoholic beverages will potentially be sold. TEX.ALCO.BEV.CODE ANN. § 61.37 (Vernon 1978). Under this section, certification is properly withheld only if an ordinance or charter prohibits the **\*494** sale of alcoholic beverages in a manner allowed by the TABC. *See* TEX.ALCO.BEV.CODE ANN. § 61.37 (Vernon 1978).

We recognize the benefits of ordinances which prohibit the sale of alcoholic beverages under these circumstances. However, the express language of section 109.57 compels this court to give effect to the Legislature's clear intent—the Ordinance is preempted to the extent it conflicts with the

TABC. Therefore, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Dissenting opinion by ENOCH, J., joined by HECHT and CORNYN, JJ.

ENOCH, Justice, dissenting.
The city of Dallas faces a severe impediment to its redevelopment efforts for a portion of its community (South Dallas) that suffers disproportionately from poverty and crime. The Dallas Merchant's and Concessionaire's Association, the Texas Package Stores Association, Inc., and the five grocery and liquor store owners [1] who are petitioners in this Court all readily concede that alcohol-related businesses are overly concentrated in certain areas of the City of Dallas, that this concentration of such businesses causes severe problems in these areas, and that the City of Dallas adopted Ordinance No. 19694 to reduce this concentration and alleviate these problems. Today the Court adopts petitioners' argument that, regardless, the Legislature requires these matters to only be addressed by the Texas Alcoholic Beverage Commission in Austin, and not by the Dallas City Council. As much as we all are concerned about community restoration, I too would have joined the majority if the law required this result. But, the Court's decision is not mandated by the law. Therefore I dissent.

Ordinance No. 19694 prohibits the location of businesses selling or serving alcoholic beverages within 300 feet of residentially zoned property in certain areas of the city without a special use permit. The issue before us is whether this limited restriction on the location of alcohol-related businesses is preempted by TEX.ALCO.BEV.CODE § 109.57(a) and (b). Section 109.57(a) provides that an ordinance "may not impose *stricter standards on premises or businesses*" required to be licensed under the Code than on similar premises or businesses. (emphasis added). Section 109.57(b) states that "it is the intent of the legislature that this code shall exclusively govern the *regulation of alcoholic beverages* in this state, and that except as permitted by this code, a governmental entity of this state may not *discriminate* against a business holding a license or permit under this code." (Emphasis added.)

In my view, Ordinance No. 19694 does not "impose stricter standards on alcohol-related businesses or premises" within the meaning of section 109.57(a). Rather, it restricts the

location of such businesses in some areas under some conditions. Nor does the ordinance attempt a "regulation of alcoholic beverages." The ordinance has nothing to do with beverages. Nor does the ordinance "discriminate" against alcohol-related businesses. It merely imposes a restriction on their location to alleviate community problems which petitioners concede such businesses cause. [2] This Ordinance is not, on its face, inconsistent or in conflict with state law. The ordinance is a reasonable supplement to state law to address a local problem. Both should remain in effect.

Assuming for the sake of argument that "location" may be considered a type of **\*495** "standard" governing businesses, the law would still not mandate the outcome claimed by the Court. The Local Government Code states:

> If a zoning regulation adopted under this subchapter ... imposes higher standards than those required under another statute or local ordinance or regulation, *the regulation adopted under this subchapter controls.* If the other statute or local ordinance or regulation imposes higher standards, that statute, ordinance, or regulation controls.

TEX.LOC.GOV'T CODE ANN. § 211.013(a) (Vernon 1988) (emphasis added).

The Court's reading of section 109.57 of the Alcoholic Beverage Code creates a direct conflict between it and section 211.013(a). 852 S.W.2d 489, 493 n. 7. Where possible, courts are to construe language used in statutes so as to harmonize all relevant laws, not create conflict. *La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984); *State v. Standard Oil Co.,* 107 S.W.2d 550, 559 (Tex.1937). Since it is possible, this court must construe the Local Government Code and the Alcoholic Beverage Code so that both provisions are given effect.

Section 109.57(a) prohibits a city from imposing stricter standards on *premises or businesses* licensed under the Alcoholic Beverage Code than are imposed on *similar premises or businesses* not required to have a license. TEX.ALCO.BEV.CODE ANN. § 109.57(a) (Vernon 1978) (emphasis added). The Alcoholic Beverage Code defines "premises" as "the grounds and all buildings, vehicles, and appurtenances pertaining to the grounds, including any adjacent premises if they are directly or indirectly under the

control of the same person." TEX.ALCO.BEV.CODE ANN. § 11.49(a) (Vernon 1978). Section 11.49(a) refers only to the *physical* premises; it does *not* define "premises" to include the *location* of a licensed business. The Ordinance does not attempt to regulate the physical premises. Additionally, nothing in the Ordinance addresses how the business of selling alcohol is to be conducted. The Ordinance only regulates the location of the business.

The Court recognizes that a city ordinance will not be held repugnant to a general law of the state "if any other reasonable construction leaving both in effect can be reached," 852 S.W.2d at 491, (citing to *City of Richardson v. Responsible Dog Owners,* 794 S.W.2d 17 (Tex.1990)). Because a reasonable reading of these two statutes prevents the conflict the reasoning of the Court creates, there is no basis for restricting the City of Dallas' grant of authority to promulgate zoning regulations under sections 211.001–.013 of the Local Government Code.

The Court's holding seriously hampers the ability of municipalities to combat problems associated with the sale of alcohol. The City of Dallas did not seek to prohibit the sale of alcohol, merely to disperse the locations for its sale in order to achieve a reduction in the problems associated with the sale of alcohol such as increased crime, drinking on premises, litter, loitering, public intoxication, urinating in public, and harassment of children and elderly residents. [3] As petitioners admit, if cities cannot restrict the location of alcohol-related businesses, then only the Texas Alcoholic Beverage Commission can, in the course of granting licenses to businesses. Yet it would be virtually impossible for the Commission to obtain sufficient information in licensing proceedings to determine whether, how and where to impose such restrictions in the dozens of cities where they might be used. Petitioners admit that the Commission has not undertaken this responsibility to date, and it is farfetched to think the Commission would even try. The suggestion that the Legislature has decided that the Commission should address the local problems involved here instead of home-rule cities is most unlikely. Only those local planning, zoning and legislative bodies have, or can be expected to have, a pulse on the particular land use needs of their jurisdiction.

**\*496** I agree with the Court that "if the Legislature chooses to preempt a subject matter encompassed by the broad powers of a home-rule city, it must do so with unmistakable clarity." 852 S.W.2d at 491. Whatever may be said of section 109.57, it cannot seriously be argued that the statute makes

*unmistakably clear* that the Legislature has preempted the City of Dallas from exercising its broad zoning powers to improve living conditions within its borders. Preemption is even less likely when one considers the result.

I would affirm the judgment of the court of appeals, thus I respectfully dissent.

HECHT and CORNYN, JJ., join in this dissenting opinion.

**All Citations**

852 S.W.2d 489

Footnotes

1   In the findings of fact, the trial court stated in part:
    14. None of the SUPs filed by any Establishment within the areas zoned D–1 by Ordinance 19694 had been granted.
    15. The criteria adopted by the Dallas City Council make it virtually impossible for any existing Establishment to qualify for a SUP.
    16. Ordinance 19694 conflicts with and is preempted by the Texas Alcoholic Beverages Code ("TABC"), in that: the Ordinance and the SUP standards impose location restrictions that are inconsistent with the TABC; the Ordinance and the SUP standards attempt to regulate the sale of alcoholic beverages, other than beer, by ordinance; the Ordinance and the SUP standards discriminate against establishments holding permits issued under the TABC, and; the Ordinance and the SUP standards impermissibly attempt to disenfranchise the choice of the voters of the areas affected by Ordinance 19694 in violation of the Local Option provisions and procedures set forth in the TABC.

2   "[The TABC] is intended as a recodification only, and no substantive change in the law is intended by this Act." Acts 1977, 65th Leg., ch. 194, § 7.

3   While the dissent contends that the legislature did not deny home rule cities the ability to regulate with unmistakable clarity under these circumstances, how much more clear must the legislature be than Section 109.57(b), which states: "It is the intent of the legislature that this code [TABC] shall exclusively govern the regulation of alcoholic beverages in this state...." TEX.ALCO.BEV.CODE ANN. § 109.57(b) (Vernon Supp.1992). In addition, Senator McFarland, who was a member of the Conference Committee on H.B. 1652 which enacted Section 109.57, indicated that Section 109.57 was intended to clarify that the TABC governed the location of licensees and permittees and that cities could only regulate the location of licensees and permittees in the instances provided by the TABC. Specifically, Senator McFarland stated,
    [I]t [Section 109.57] says except as authorized by this code [a governmental entity may not regulate the location of a business holding a license or a permit] and there's numerous provisions throughout the code which governmental entities have the authority by zoning or other ordinances, to limit the location of businesses or the type of businesses selling alcoholic beverage.
    Debate of conference committee report on Tex.H.B. 1652 on the floor of the Senate, 70th Leg. (June 1, 1987) (colloquy between Senators McFarland and Washington).

4   Section 109.57(d) of the TABC states:
    (d) This section does not effect the authority of a governmental entity to regulate, in a manner as otherwise permitted by law, the location of:
    (1) a massage parlor, nude modeling studio, or other sexually oriented business; or
    (2) an establishment that derives 75 percent or more of the establishment's gross revenue from the on-premise sale of alcoholic beverages.
    Because none of the parties assert that the Ordinance implicates this provision, we express no opinion concerning its applicability.
    Since the following cases pre-date the enactment of section 109.57, they are not applicable when determining the preemptive effect of section 109.57. *See Abilene Oil Distributors v. City of Abilene,* 712 S.W.2d 644 (Tex.App.—Eastland 1986, writ ref'd n.r.e.); *Young, Wilkinson & Roberts v. City of Abilene,* 704 S.W.2d 380 (Tex.App.—Eastland 1985, writ ref'd n.r.e.); *T & R Assoc., Inc. v. City of Amarillo,* 688 S.W.2d 622, 625 (Tex.Civ.App.—Amarillo, writ ref'd n.r.e.); *Massengale v. City of Copperas Cove,* 520 S.W.2d 824, 829 (Tex.Civ.App.—Waco 1975, writ ref'd n.r.e.; *Derkard v. City of Port Lavaca,* 491 S.W.2d 748, 751 (Tex.Civ.App.—Corpus Christi 1973, no writ); *City of Clute v. Linscomb,* 446 S.W.2d 377 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ); *Discount Liquors No. 2, Inc. v. Texas Liquor Control Board,* 420 S.W.2d 422, 423, 425 (Tex.Civ.App.—Amarillo 1967, writ ref'd n.r.e.); *Louder v. Texas*

*Liquor Control Board,* 214 S.W.2d 336 (Tex.Civ.App.—Beaumont 1948, writ ref'd n.r.e.); *Eckert v. Jacobs,* 142 S.W.2d 374 (Tex.Civ.App.—Austin 1940, no writ).

The dissent argues that if this court holds that the TABC preempts an ordinance regulating where alcoholic beverages are sold, sellers of alcoholic beverages will not have to comply with any city ordinance. This argument is without merit. Section 109.57(a) provides that an ordinance may not impose stricter standards on alcohol related businesses than on non-alcohol related businesses. TEX.ALCO.BEV.CODE § 109.57(a) (Vernon Supp.1992). For example, under section 109.57(a), an ordinance requiring all businesses with the same kind of premises to have a fire extinguisher on their premises would not violate section 109.57(a). On the other hand, an ordinance requiring an alcohol related business to have two fire extinguishers and only required a non-alcohol related business with the same kind of premises to have one fire extinguisher would violate section 109.57(a).

Section 61.37 reads in pertinent part:

(a) The County Clerk of the county in which an application for a license is made shall certify whether the location or address given in the application is in a wet area and whether the sale of alcoholic beverages for which the license is sought is prohibited by any valid order of the commissioners court.

(b) The city secretary or clerk of the city in which an application for a license is made shall certify whether the location or address given in the application is in a wet area and whether the sale of alcoholic beverages for which the license is sought is prohibited by charter or ordinance.

TEX.ALCO.BEV.CODE ANN. § 61.37 (Vernon 1978). Section 109.31 reads:

A city by charter may prohibit the sale of liquor in all or part of the residential sections of the city.

TEX.ALCO.BEV.CODE ANN. § 109.31 (Vernon 1978). Section 109.32 reads in pertinent part:

(a) An incorporated city or town by charter or ordinance may:

(1) prohibit the sale of beer in a residential area; and

(2) regulate the sale of beer and prescribe hours when it may be sold, except a city or town may not permit the sale of beer when its sale is prohibited by this code.

TEX.ALCO.BEV.CODE ANN. § 109.32 (Vernon 1978). Section 109.33 reads in pertinent part:

(a) The commissioners court of a county may enact regulations applicable in areas in the county outside an incorporated city or town, and the governing board of a city or town may enact regulations applicable in the city or town, prohibiting the sale of alcoholic beverages by a dealer whose place of business is within 300 feet of a church, public school, or public hospital.

TEX.ALCO.BEV.CODE ANN. § 109.33 (Vernon Supp.1992).

The dissent incorrectly asserts that Section 211.013 of the Local Government Code allows a home rule city to impose higher standards upon licensees and permittees. This conclusion is erroneous because of Section 109.57(a) of the TABC. Section 109.57(a) states than an ordinance promulgated by a governmental entity may not impose stricter standards on premises or businesses of a permittee than on similar premises and businesses not required to have a license or permit. The Ordinance imposes a stricter standard than allowed by the TABC, specifically, by regulating the location of businesses required to have licenses or permits under the TABC in circumstances not allowed by the TABC. Section 109.57(a) was by its terms enacted to exempt licensees and permittees from Section 211.013 of the Local Government Code.

The application of the doctrine of expressio unius est exclusio alterius further demonstrates the weakness of the dissent's conclusion that the City may regulate in this instance. That doctrine provides that the inclusion of a specific limitation excludes all others. *Royer v. Ritter,* 531 S.W.2d 448, 449 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.). Sections 109.31–33 and 109.57(d) provide specific instances when a governmental entity, such as a home-rule city, may regulate the location of an alcohol related business. Thus, by expressly stating under what circumstances a governmental entity may regulate the location of an alcohol related business, it follows that there are no other instances when a governmental entity may regulate the location of an alcohol related business. The parties do not assert and we can not find any applicable grant of power to governmental entities to regulate the location of the sale of alcohol in this case.

In addition to regulating alcoholic beverages pursuant to sections 109.31–33, a city may make recommendations or protest the issuance of a permit by the Texas Alcoholic Beverage Commission. *See* TEX.ALCO.BEV.CODE ANN. § 11.41(a) (Vernon 1978).

The five business owners are Solomon Tadesse, d/b/a S & M Grocery, Nguyen Ha Lam, d/b/a M & D Liquor, Son Ngoc Nguyen, d/b/a Bingo Liquor, Youg Suk Bragdon, d/b/a K & B Grocery, and Thung Vam Tarn, d/b/a Lee's Grocery.

This is not to say that any ordinance restricting the location of alcohol-related businesses would be allowed by state law. Obviously, an ordinance that prohibited the location of such businesses within a much larger distance from residential

property might have the effect of eliminating those businesses altogether. Such an ordinance would conflict with state law. But an ordinance which is both written and applied to impose a limited restriction on location for a valid purpose does not conflict with section 109.57.

3    Several community leaders in the South Dallas/Fair Park area testified that these problems were exacerbated by the excessive concentration of alcohol related businesses in the area.

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

913 S.W.2d 733
Court of Appeals of Texas,
Fort Worth.

Anthony Ray HAGER, Individually and
d/b/a Hager's Flying Service, Appellant,
v.
Thomas R. ROMINES and
Betty Romines, Appellees.

No. 2–95–066–CV.    |    Dec. 28, 1995.

Farmers whose crop was allegedly damaged by aerial applicator's crop dusting of nearby field sued applicator for negligence. The 97th District Court, Clay County, Roger E. Towery, J., denied defendant's motion for instructed verdict and awarded damages on jury verdict for plaintiffs. Defendant appealed. The Court of Appeals, Livingston, J., held that plaintiffs could not recover absent evidence that defendant did not act as reasonably prudent aerial applicator.

Reversed and rendered.

**Attorneys and Law Firms**

 **\*734** Stephen C. Howell, Stephen L. Tatum, Geffrey W. Anderson, Brown, Herman, Scott, Dean & Miles, L.L.P., Fort Worth, for appellant.

Ron Poole, William K. Altman & Associates, Wichita Falls, for appellee.

Before LIVINGSTON, BRIGHAM and HOLMAN, JJ.

**OPINION**

LIVINGSTON, Justice.

Thomas and Betty Romines grew tomatoes and jalapeños on one-half acre of land in Clay County, Texas. When their plants began dying from exposure to herbicide, they sued Hager Flying Service and Anthony Ray Hager, who had applied herbicide from a crop dusting airplane to a nearby field the same day the Romineses noticed that their tomato plants were sick. At trial, the court denied Hager's motion for instructed verdict. The jury awarded Thomas and Betty Romines $45,000 as damages. Hager appeals in five points

of error. We sustain point of error one, reverse the judgment entered for the Romineses, and render judgment for Hager.

 **[1]**    In his first point of error, Hager argues that the trial court erred when it overruled his motion for instructed verdict because the Romineses presented no evidence of a violation of the standard of care applicable to their claim of negligence. The Romineses claimed that Hager was negligent in his application of herbicide to a nearby field and that their tomato and jalapeño plants were damaged because of the negligence. In reviewing whether the trial court erred in refusing to instruct a verdict in Hager's favor, our task is to determine whether: (1) a specified defect in the opponent's pleading makes it insufficient to support a judgment; (2) the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (3) the evidence is insufficient to raise a fact issue that must be established before the opponent is entitled to judgment. *Boswell v. Farm & Home Sav. Ass'n,* 894 S.W.2d 761, 768 (Tex.App.—Fort Worth 1994, writ denied); *Rowland v. City of Corpus Christi,* 620 S.W.2d 930, 932–33 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); *see also* TEX.R.CIV.P. 268.

 **[2]**    **[3]**    To avoid an instructed verdict, the Romineses had to offer evidence for each element of their negligence claim. The elements of a negligence claim are: (1) the existence of a duty on the part of one party to another; (2) a breach of the duty; (3) damages to whom the duty was owed; and (4) causation. *See Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975). For breach of duty, they must have presented evidence that Hager did not exercise the care that a reasonably prudent aerial applicator would have exercised under the same or similar circumstances. *See Parkway Co. v. Woodruff,* 857 S.W.2d 903, 919 (Tex.App.—Houston [1st Dist.] 1993, no writ), *aff'd as modified,* 901 S.W.2d 434 (Tex.1995). We find that the standard of care in the aerial **\*735** application of herbicide, as well as the violation of such standard, must be established by expert testimony. Expert testimony is necessary when the alleged negligence is of such a nature that it is not within the experience of a layman. *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). Not only is flying an airplane not within the realm of experience of the ordinary, prudent person or juror, [1] applying herbicide and pesticide aerially requires use of specialized equipment and techniques that are not familiar to the ordinary person.

 **[4]**    **[5]**    Thus, the question before us is whether the Romineses presented sufficient evidence of breach of the duty of care to raise a fact issue on that element. We hold that

they did not. Hager testified as an expert about the standard of care applicable to aerial applicators. He also testified that he had not breached that standard of care. A party may give expert testimony if the party is qualified to do so. *See, e.g., Tijerina v. Wennermark,* 700 S.W.2d 342, 347 (Tex.App. —San Antonio 1985, no writ), *overruled on other grounds by Cosgrove v. Grimes,* 774 S.W.2d 662, 665 (Tex.1989). Further, if expert testimony is required on an issue, and that expert testimony is uncontroverted, the testimony is considered conclusively established. *Mack v. Moore,* 669 S.W.2d 415, 419 (Tex.App.—Houston [1st Dist.] 1984, no writ). The Romineses needed to controvert Hager's testimony with their own expert testimony so that Hager's testimony about his compliance with the standard of care would not be conclusive.

 **[6]** The Romineses called two expert witnesses, Floyd Mahaney and Ricks Pluenneke. Mahaney was a herbicide and pesticide specialist with the Texas Department of Agriculture who testified about the effect of herbicide on tomato plants. He also testified about a possible "drift pattern" between the Romineses' tomato field and the field to which Hager had applied herbicide. He concluded that herbicide might have drifted because weeds between the two fields showed effects from herbicide. However, he could not identify the herbicide that hurt the tomatoes as Grazon P + D, the herbicide that Hager had sprayed. He did not testify about herbicide effects on jalapeño plants. Also, he did not give any testimony that showed that Hager had not acted as a reasonably prudent aerial applicator.

Pluenneke was an expert on plant physiology and agronomy. He testified that Hager had caused the damage to the tomato and jalapeño plants based on his knowledge of the plants involved and of the herbicide. However, this is not testimony that Hager had not acted as a reasonably prudent aerial

applicator. In fact, Pluenneke did not even know whether Hager had applied the herbicide with a coarse or fine spray, which could affect the herbicide's ability to drift.

On appeal, the Romineses claim that Hager's testimony on cross-examination shows that he violated the standard of care. The Romineses' attorney asked Hagar, "[W]ould you agree that, if it was some Grazon P + D out of your airplane on June 3rd, 1990, that got on the Romines tomato field, that you would have been negligent?" Hagar agreed. The Romineses say that this is expert testimony of a violation of the standard of care because they proved that it was Hager's Grazon P + D that caused the damage to the tomato and jalapeño plants. Two witnesses observed from one-half mile away that Hager's crop dusting airplane flew over the Romineses' home. Two witnesses testified that they could smell the spray even though they were upwind from the field that Hager sprayed. One testified that he could see "stuff" drifting in the air. However, independent of causation evidence, Hager's testimony does not indicate that he did not adhere to the standard of care. The Romineses' argument is an attempt to bootstrap lay witnesses' testimony on causation into expert testimony on a violation of the standard of care. No expert witness ever testified that Hager had violated the standard of care. Because the Romineses failed to present evidence on a breach of the standard **\*736** of care, their claim should not have been submitted to a jury.

Accordingly, we reverse the judgment of the trial court and render judgment that the Romineses take nothing against Hager.

**All Citations**

913 S.W.2d 733

Footnotes

1    *McKinney v. Air Venture Corp.,* 578 S.W.2d 849, 851 (Tex.Civ.App.—Fort Worth 1979, writ ref'd n.r.e.).

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 140507
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Corpus Christi-Edinburg.

Phillip JACKSON and Mary Jackson, Appellants,

v.

Mayor Samuel Loyd NEAL and District
Attorney Carlos Valdez, Appellees.

No. 13-07-00164-CV.    |    Jan. 22, 2009.

On appeal from the 28th District Court of Nueces County,
Texas, Nanette Hasette, J.

**Attorneys and Law Firms**

Phillip Jackson, Mary J. Jackson, Corpus Christi, TX, pro se.

Jenny C. Boyd, Asst. County Atty., Carol Estes Bray, Asst.
City Atty., Corpus Christi, TX, for Appellees.

Before Chief Justice VALDEZ and Justices RODRIGUEZ
and BENAVIDES.

**MEMORANDUM OPINION**

Memorandum Opinion by Justice RODRIGUEZ.

 **\*1**  Appellant, Phillip Jackson, a prison inmate, appeals,
pro se, on behalf of himself and his mother, appellant
Mary Jackson. The Jacksons filed suit in DeWitt County
against appellees, former Mayor Samuel Loyd Neal and
District Attorney Carlos Valdez. [1] By their suit, the Jacksons
challenged civil forfeiture proceedings. The trial court
granted summary judgment in favor of Neal and dismissed,
without prejudice, the Jacksons' claims under chapter 14 of
the Texas Civil Practice and Remedies Code. *See* TEX. CIV.
PRAC. & REM.CODE ANN. § 14.001-.014 (Vernon 2002)
(setting out the process for certain inmate litigation). Eight
issues are presented for our review. We affirm.

## I. Background

### A. Order Transferring Venue

Valdez filed a motion to transfer venue from DeWitt County
to Nueces County asserting that DeWitt County was not a
county of proper venue because the Jacksons pleaded no facts
to support venue there. Valdez pleaded facts supporting venue
in Nueces County under the general venue statute and also
urged that transfer of venue was for the convenience of the
parties. *See id.* § 15.002(a)(1)-(3), (b) (Vernon 2002). Without
challenging the facts relied upon by Valdez, the Jacksons
argued in their response that venue was proper in DeWitt
County because they would be prejudiced by the transfer.
Prior to submission of the motion, Phillip requested that a
bench warrant be issued. It appears from the record, however,
that no hearing was held and, on November 16, 2006, after
considering the motion by written submission, the trial court
transferred the case to Nueces County. The order did not
specify the grounds upon which the transfer was granted.

On December 19, 2006, the Jacksons appealed the order
transferring venue. In March 2007, this Court dismissed
the appeal for lack of jurisdiction. *See Jackson v. Neal,*
No. 13-06-700-CV, 2007 Tex.App. LEXIS 1786, *2, 2007
WL 687289 (Tex.App.-Corpus Christi Mar.8, 2007, no
pet.)(mem.op.) (per curiam) (dismissing the appeal because
the law does not provide for judicial review of an
interlocutory order transferring venue) (citing TEX. CIV.
PRAC. & REM.CODE ANN. § 15.064 (Vernon 2002);
TEX.R.APP. P. 42.3(a)).

### B. Order Granting Neal's
### Motion for Summary Judgment

Neal filed a motion for summary judgment and severance.
In his supporting affidavit, Neal set out that he had neither
involvement in nor knowledge of the seizure or forfeiture
proceedings relevant to this case. The Jacksons responded
arguing that Neal was the "head of" and the "key factor in" the
civil conspiracy, "was directly involved with the theft, grand
theft and fraud," and entered "into [an] agreement with all
other defendant[s] to take [their] property by a[n] illegal and
unconstitutional manner."The Jacksons attached no evidence
to their response. On February 8, 2007, the trial court granted
the motion, entered summary judgment against the Jacksons,

and ordered that they take nothing as to all claims against Neal. The trial court did not sever the claims against Neal.

### C. Order Granting Valdez's Motion to Dismiss

**\*2** Valdez filed a motion to dismiss and to assess costs. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 14.001-014 (Vernon 2002). Valdez argued that Phillip did not comply with mandatory declaration requirements of section 14.004(a) and failed to file a certified copy of his trust account statement in accordance with section 14.006(f).*See id.* §§ 14.004(a); 14.006(f); *see also id.* § 14.003(a)(2), (b)(4). Philip filed his response asserting that he had fulfilled all chapter 14 requirements. On February 8, 2007, following a hearing where Mary appeared but Phillip did not, [2] the trial court granted Valdez's motion and ordered that the case be dismissed without prejudice. The trial court denied Valdez's request to assess fees. This appeal ensued.

### II. The Pro Se Appellants

As parties, Phillip and Mary may each appear in his or her own person, and each may prosecute or defend his or her own rights. *See* TEX.R. CIV. P. 7 ("Any party to a suit may appear and prosecute or defend his rights therein, either in person or by an attorney of the court."). Because they are not attorneys, however, they may not represent others. *See* TEX. GOV'T CODE ANN. § 81 .102(a) (Vernon 2005) (setting out state bar membership requirements); *Jimison v. Mann,* 957 S.W.2d 860, 861 (Tex.App.-Amarillo 1997, no writ) (per curiam) (striking documents filed by a layperson having no authority to file them on behalf of another); *see also Shafer v. Frost Nat'l Bank,* No. 14-06-00673-CV, 2008 Tex.App. LEXIS 3676, ----10-14, 2008 WL 2130418 (Tex.App.-Houston [14th Dist.] May 22, 2008, no pet.)(mem.op.) (concluding that a pro se plaintiff unlicensed to practice law may not represent or defend the rights of other pro se plaintiffs); *Clary v. Cockrell,* No. 12-02-00319-CV, 2004 Tex.App. LEXIS 5983, \*2, n. 1, 2004 WL 1475103 (Tex.App.-Tyler June 30, 2004, no pet.)(mem. op. designated for publication) (providing that pro se inmate Clary, who is not an attorney, may not represent other named parties).

Phillip is not an attorney and may not represent or defend the rights of Mary. Therefore, we consider Phillip's arguments only to the extent the arguments relate to his own claims or rights. We do not address any arguments made on behalf of Mary. Moreover, Mary neither filed a brief nor adopted Phillip's appellate brief and reply briefs. With these limitations in mind, we proceed to the merits of the appeal.

### III. Venue Issues

By issues five, six, and seven, Phillip challenges the order transferring venue from DeWitt County to Nueces County. He asserts that venue was proper in DeWitt County and that he was prejudiced when the case was transferred to Nueces County.

### A. Applicable Law and Standard of Review

Section 15.002 of the civil practice and remedies code provides as follows:

  (a) Except as otherwise provided by this subchapter or Subchapter B or C, all lawsuits shall be brought:

  (1) in the county in which all or a substantial part of the events or omissions giving rise to the claim occurred;

  **\*3** (2) in the county of defendant's residence at the time the cause of action accrued if defendant is a natural person;

  (3) in the county of the defendant's principal office in this state, if the defendant is not a natural person; or

  (4) if Subdivisions (1), (2), or (3) do not apply, in the county in which the plaintiff resided at the time of the accrual of the cause of action.

  (b) For the convenience of the parties and witnesses and in the interest of justice, a court may transfer an action ... where the court finds:

  (1) maintenance of the action in the county of suit would work an injustice to the movant considering the movant's economic and personal hardship;

  (2) the balance of interests of all the parties predominates in favor of the action being brought in the other county; and

  (3) the transfer of the action would not work an injustice to any other party.

(c) A court's ruling or decision to grant or deny a transfer under Subsection (b) is not grounds for appeal or mandamus and is not reversible error.

TEX. CIV. PRAC. & REM.CODE ANN. § 15.002 (Vernon 2002)."A party who seeks to maintain venue of the action in a particular county" in reliance on section 15.002, the general venue rule of the civil practice and remedies code, "has the burden to make proof ... that venue is maintainable in the county of suit."TEX.R. CIV. P. 87(2)."A party who seeks to transfer venue of the action to another specified county" under section 15.002 or under mandatory venue sections 15.011-15.017, "has the burden to make proof ... that venue is maintainable in the county to which transfer is sought."*See id.*The trial court shall transfer venue to a county of proper jurisdiction if the county in which the action is pending is not a proper county. TEX. CIV. PRAC. & REM.CODE ANN. § 15.063(1) (Vernon 2002).

In determining whether venue was proper, we must consider the entire record. *Id.*§ 15.064(b); *Wilson v. Tex. Parks & Wildlife Dep't,* 886 S.W.2d 259, 260-62 (Tex.1994). If there is any probative evidence in the record demonstrating venue was proper in the county where judgment was rendered, we must uphold the trial court's ruling. *See Bonham State Bank v. Beadle,* 907 S.W.2d 465, 471 (Tex.1995); *Morris v. Tex. Parks & Wildlife Dep't,* 226 S.W.3d 720, 723 (Tex.App.-Corpus Christi 2007, no pet.). Furthermore, we take as true [a]ll venue facts, when properly pleaded, ... unless specifically denied by the adverse party." TEX.R. CIV. P. 87(3).

## B. Analysis

### 1. Proper Venue

Valdez argues, and we agree, that Phillip pleaded no facts to support venue in DeWitt County under the general venue statute and, thus, did not meet his burden of proof that venue was maintainable in the county of suit. *See id.* 87(2)(a). Valdez did, however, meet his burden of proving that venue is maintainable in Nueces County, Texas, the county to which transfer is sought. *See id.*

 **\*4** Valdez set out in his motion to transfer that venue is proper in Nueces County because (1) all or a substantial part of the events or omissions giving rise to Phillip's claim occurred in Nueces County, (2) defendants Neal and Valdez,

natural persons, resided in Nueces County at the time the cause of action, if any, accrued, and (3) the principal offices of all identified defendants were in Nueces County. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(a)(1)-(3). Phillip did not specifically deny any of the sworn venue facts asserted by Valdez; therefore, Valdez's venue facts must be considered true. TEX.R. CIV. P. 87(3). And, because subsections (1), (2), and (3) apply to this case, subsection (4) does not, and Phillip's residence is not a factor in determining proper venue. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(a)(1)-(4). Thus, the facts undisputably show proper venue in Nueces County.

### 2. Convenience

In this case, Valdez also asserted convenience as a basis for transfer. The trial court granted the transfer without specifying the grounds. "Generally, we must affirm such general orders if any ground in the accompanying motion is meritorious."*Garza v. Garcia,* 137 S.W.3d 36, 37 (Tex.2004). When a motion asserts convenience as well as other grounds, the statute precludes reversal on convenience grounds. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(c). Because the motion here asserted convenience as one ground, and the statute precludes reversal of any ruling made on convenience grounds, we must affirm the transfer. *Garza,* 137 S.W.3d at 39 ("We acknowledge the court of appeals' concern that the usual presumption in favor of nonspecific orders will make many venue orders 'immune from review.' But in transfer orders based on convenience, that appears to have been precisely the Legislature's intent.").

### 3. Mandatory Venue

Phillip argues that section 15.019, a mandatory venue section for inmate litigation, applies. *See*TEX. CIV. PRAC. & REM.CODE ANN. § 15.019 (Vernon 2002) ("[A]n action that accrued while the plaintiff was housed in a facility operated by or under contract with the Texas Department of Criminal Justice shall be brought in a county in which the facility is located."). This argument, however, was not raised in the trial court and is, therefore, waived. *See In the Interest of B.L.D.,* 113 S.W.2d 340, 350-52 (Tex.2008). Moreover, this provision does not apply to Phillip. Section 15.019 provides for venue in the county of incarceration if the cause of action accrued while the inmate was incarcerated in that county. *See*TEX. CIV. PRAC. & REM.CODE ANN.

§ 15.019. The facts show that Phillip, although an inmate in DeWitt County when the lawsuit was filed, was not an inmate in DeWitt County at the time the cause of action allegedly arose. Thus, this argument fails.

### 4. Fair and Impartial Trial

Phillip also argues that transfer of the case to Nueces County prejudiced him because Valdez is the "most powerful man in Nueces County, Texas" and he "would not receive a fair proceeding."Phillip and Mary each filed affidavits stating that a transfer of venue to Nueces County would prejudice both plaintiffs and that there [was] a combination against [them] instigated by influntial [sic] persons by reason of which [they could not] expect a fair and impartial trial ... in 'Nueces County.' " The assertions made by Phillip track the language of Texas Rule of Civil Procedure 257. SeeTEX.R. CIV. P. 257. Phillip's use of this rule, however, is misplaced. Rule 257 provides that the inability to obtain a fair and impartial trial of a civil case may be grounds for a transfer of venue. Id. Phillip uses the rule as a defensive measure to support the maintenance of his action in DeWitt County. Even were we to consider Phillip's argument, a motion based on rule 257 must be supported by competent affidavits of the party seeking the transfer and three credible residents of the county where the suit is pending. See id.;Acker v. Denton Publ'g, 937 S.W.2d 111, 118 (Tex.App.-Fort Worth 1996, no writ). Phillip did not satisfy this requirement. Therefore, this argument is also without merit. [3] We overrule Phillip's venue issues five, six, and seven.

### 5. Due Process

**\*5** By his third issue, Phillip generally argues that he was "denied due process of law in the first hearing by the denial [of] the opportunity to be heard."By the language in his brief, Phillip appears to be arguing that he was denied due process when the trial court did not allow him the opportunity to present evidence at a hearing on Valdez's motion to transfer venue after Phillip requested a bench warrant.

We review a trial court's denial of a bench warrant motion for an abuse of discretion. *See In the Interest of Z.L.T., J.K.H.T., and Z.N.T.,* 124 S.W.3d 163, 165 (Tex.2003); *Pedraza v. Crossroads Security Sys.,* 960 S.W.2d 339, 342 (Tex.App.-Corpus Christi 1997, no pet.). To determine whether a trial court abused its discretion, we must decide whether it acted without reference to any guiding rules or principles; whether the act was arbitrary or unreasonable.*Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985).

"It is well-established that litigants cannot be denied access to the courts simply because they are inmates."*In the Interest of Z.L.T.,* 124 S.W.3d at 165 (citing *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). However, an inmate does not have an absolute right to appear in person in every court proceeding. *Id.;Pedraza,* 960 S.W.2d at 342. "[T]he inmate's right of access to the courts must be weighed against the protection of our correctional system's integrity."*Z.L.T.,* 124 S.W.3d at 165,*see Pedraza,* 960 S.W.2d at 342. The supreme court identified the following factors that the trial court should consider when deciding whether to grant a request for a bench warrant:

> the cost and inconvenience of transporting the prisoner to the courtroom; the security risk the prisoner presents to the court and public; whether the prisoner's claims are substantial; whether the matter's resolution can reasonably be delayed until the prisoner's release; whether the prisoner can and will offer admissible, noncumulative testimony that, cannot be effectively presented by deposition, telephone, or some other means; whether the prisoner's presence is important in judging his demeanor and credibility; whether the trial is to the court or a jury; and the prisoner's probability of success on the merits.

*Z.L.T.,* 124 S.W.3d at 165;*see Pedraza,* 960 S.W.2d at 342. The trial court has no responsibility to independently inquire into the applicability of the factors; rather, the inmate has the burden to establish his right to relief. *See Z.L.T.,* 124 S.W.3d at 166. If the inmate fails to identify with sufficient specificity the grounds for the ruling he seeks under the factors identified above, the trial court does not abuse its discretion in denying his request. *See id.*

In his motion for a bench warrant, Jackson requested the following:

> Now comes, Phillip Jackson # 1189921, pro se, humbly request the Honorable Court to issue a order

from the bench, for a bench warrant for Phillip Jackson, that I may be present at the hearing on November 16, 2006 and said order to the sheriff of DeWitt County to deliver Phillip Jackson to the Honorable Court for said hearing. Thank you! Plaintiff['s] address, Stevenson Unit, 1525 FM 766, Cuero, Texas 77954.

**\*6** On November 16, 2006, the trial court granted Valdez's motion to transfer the case to Nueces County without issuing a bench warrant, thereby impliedly denying Phillip's request. *See Z.L.T.,* 124 S.W.3d at 165. Phillip's bench warrant motion contains no information by which the trial court could assess the necessity of his appearance at a venue hearing. The motion contains no basis or argument for granting the motion. *Pedraza,* 960 S.W.2d at 342. It does not reference any of the factors identified in *Z.L.T. See In the Interest of Z.L.T.,* 124 S.W.3d at 165-66. As in *Z.L.T.,* the only information in the motion pertinent to Phillip's request is that he is incarcerated in Cuero, Texas, over 100 miles from Nueces County. *See id.* at 166 (noting that the only relevant information in the bench warrant motion was that the prisoner was incarcerated "more than 200 miles from the trial court"). Because Phillip failed to meet his burden to prove his entitlement to a bench warrant, we cannot say the trial court abused its discretion in implicitly denying Phillip's request for a bench warrant. *See id.* We overrule Phillip's third issue.

## IV. Summary Judgment Issues

Phillip does not challenge the summary judgment granted in favor of Neal in his original brief. In his reply brief, Phillip, for the first time, challenges the propriety of the summary judgment on due process grounds, after Neal raised facts related to these issues in his responsive brief. [4] *See* TEX.R.APP. P. 38.3.

Rule 38.3 states that the "appellant may file a reply brief addressing any matter in the appellee's brief." *Id.* However, an appellant may not use a reply brief to raise new issues. *Lopez v. Montemayor,* 131 S.W.3d 54, 61 (Tex.App.-San Antonio 2003, pet. denied); *see Anderson Producing, Inc. v. Koch Oil Co.,* 929 S.W.2d 416, 424 (Tex.1996) (declining to consider issue first raised in reply brief). Because Phillip failed to raise his due process challenges in his initial brief, we conclude that he has waived these complaints for appellate

review. [5] We overrule Phillip's reply issues regarding the summary judgment granted in favor of Neal.

## V. Motion to Dismiss Issues

### A. Rulings on Phillip's Motions

By his first two issues, Phillip complains that he was denied due process when the trial court dismissed his claims before ruling on two motions-Phillip's motion to stay the proceedings and Phillip's motion to proceed in forma pauperis-while his appeal of the order transferring venue was pending. [6] We disagree.

### 1. Motion to Stay

An appeal from an interlocutory order does not stay the commencement of a trial or other proceedings in the trial court, except in limited circumstances. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014 (Vernon 2008). None of the specific circumstances apply in this case. *See id.* Additionally, rule 29 .5 of the Texas Rules of Appellate Procedure sets out that the trial court retains jurisdiction during an appeal of an interlocutory order and, unless prohibited by statute, may make any rulings or orders that do not interfere with temporary orders issued by the court of appeals or with the appellate court's jurisdiction. TEX.R.APP. P. 29.5.

**\*7** In this case, there are no statutory restrictions that apply to the trial court making further rulings, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014; the trial court's rulings did not interfere with temporary orders because none were issued; and, the rulings did not interfere with our jurisdiction because we concluded that we had none. *See Jackson,* No. 13-06-700-CR, 2007 Tex.App. LEXIS 1786, at \*2, 2007 WL 687289. Therefore, the trial court did not deny Phillip due process when it granted Valdez's motion to dismiss without ruling on Phillip's motion to stay.

### 2. Motion to Proceed in Forma Pauperis

Again, Phillip has made no concise argument with citation to authorities and to the record in support of his contention that the trial court denied him due process when it failed to rule on his motion for pauper status before it dismissed his claim

and while the venue appeal was pending. *See* TEX.R.APP. P. 38.1(i). Indeed, it is his claim of poverty, not the ruling he seeks on his motion, that mandates the requirements of chapter 14. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 14.002(a). The trial court's dismissal was not based on Phillip's failure or his inability to pay fees. It was based on Phillip's non-compliance with requirements of chapter 14. We overrule Phillip's first and second issues.

### B. Chapter 14 Requirements

In his responsive brief, Valdez asserts that appellant's claim is frivolous because Phillip failed to sufficiently set forth the operative facts regarding a previous filing and failed to submit a certified copy of his trust account. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 14.004(a); 14.006(f). By a reply issue, Phillip claims, for the first time, that he satisfied the requirements of chapter 14 of the Texas Civil Practice and Remedies Code, and, thus, the trial court abused its discretion in dismissing his claim. *See* TEX.R.APP. P. 38.3. However, as set out above, the rules of appellate procedure do not allow an appellant to include in his reply brief a new issue that responds to a matter that was raised in the appellee's brief but that was not raised in the appellant's original brief. *Id.;* *Lopez,* 131 S.W.3d at 61; *see Anderson Producing,* 929 S.W.2d at 424. Because Phillip failed to raise this chapter 14 issue in his initial brief, he has waived these complaints for our review. We overrule Phillip's reply issues regarding the trial court's granting of the motion to dismiss.

### V. Remaining Issues

Phillip presents two additional issues for our review. In issue four, Phillip claims that he has suffered a monetary and property loss by appellees' illegal forfeiture action or seizure without any violation of chapter 59 of the Texas Code of Criminal Procedure or federal law. Phillip does not, however, develop his arguments regarding this issue and does not provide this Court with appropriate citations to authorities and to the record. *See* TEX.R.APP. P. 38.1(i). Because this issue is inadequately briefed, we overrule Phillip's fourth issue.

**\*8** By his eighth issue, Phillip asks, "Did the Stevenson Unit mailroom enter into a conspiracy with the appellee ... by the delayed notice date on November 19, 2007[sic] and was not give [sic] to the appellant until November 28, 2007. [sic]" Phillip brings this argument for the first time on appeal; therefore, his eighth issue is waived. *See B.L.D.,* 113 S.W.2d at 350-52.

### VI. Conclusion

We affirm.

**All Citations**

Not Reported in S.W.3d, 2009 WL 140507

### Footnotes

1    The Jacksons also identify the City of Corpus Christi, John Doe, and Jane Doe as appellees. However, we find nowhere in the record that they were served with citation. Only Valdez and Neal answered and participated in the proceedings below. Therefore, based on our review of the record, the City and John and Jane Doe were never parties to the lawsuit and, therefore, cannot be appellees in this appeal.

2    Mary's appearance at the hearing is not supported by the record but is undisputed by Valdez. No reporter's record of the hearing has been filed in this appeal. From our review of the appellate record, the hearing, if any, on February 7, 2007, was for the purpose of presenting Valdez's motion to dismiss. It is not clear whether Neal's motion for summary judgment was argued at the hearing. The orders granting the two motions were both signed on February 8, 2007.

3    Phillip also argues that rule 259 applies. *See* TEX.R. CIV. P. 259 (providing that if a motion under rule 257 is granted, the cause shall be removed, if a county of proper venue cannot be found, from a district court to any county in the same or an adjoining district or to any district where an impartial trial can be had). This argument was not raised in the trial court and is, therefore, waived. *See In the Interest of B.L.D.,* 113 S.W.2d 340, 350-52 (Tex.2008). Even had Phillip not waived the argument, rule 259 applies only when a rule 257 motion is granted. In this case, the trial court did not grant such a motion.

4    Phillip complains of the trial court's alleged failure to bench warrant him for the February 2007 hearing. He also asserts that he did not receive notice of the granting of the summary judgment.

5    We also note that Phillip provides no further argument with record cites and citation to authority to support these contentions. *See* TEX.R.APP. P. 38.1(i) (providing that this court will only consider contentions that are supported by clear

and concise arguments with appropriate citations to authorities and the record); *Moser v. Roberts,* 185 S.W.3d 912, 916 (Tex.App.-Corpus Christi 2006, no pet.). Therefore, Phillip has waived error because the issues are inadequately briefed. In addition, we have not found a motion for a bench warrant requesting Phillip's appearance at this February hearing or facts regarding notice of the granting of the summary judgment in the appellate record.

6    Phillip alleges that the trial court agreed, in open court, not to rule on Valdez's motion to dismiss until the appeal of the venue order was concluded; however, he provides no record support for this assertion. *See* TEX.R.APP. P. 38.1(i). Therefore, we will not address arguments related to the trial court's alleged agreement to stay the proceedings in this case.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

438 S.W.3d 556
Supreme Court of Texas.

Gary Wayne JASTER, Petitioner,

v.

COMET II CONSTRUCTION, INC., Joe
H. Schneider, Laura H. Schneider, and
Austin Design Group, Respondents.

No. 12–0804. | Argued Oct.
9, 2013. | Decided July 3, 2014.

**Synopsis**

**Background:** Homeowner brought action against contractor for damages arising from allegedly improper design and construction of house foundation. Contractor filed third-party indemnity complaint against architectural designer and licensed professional engineer, and architectural designer cross-claimed against contractor and engineer for indemnity. The 274th Judicial District Court, Hays County, 2010 WL 10092095, William Henry, J., denied engineer's motion to dismiss third-party and cross claims for deficient filing. Engineer appealed. The Austin Court of Appeals, 382 S.W.3d 554, affirmed. Engineer filed petition for review, which was granted.

**[Holding:]** On an issue of apparent first impression, the Supreme Court, Boyd, J., held that certificate-of-merit requirement did not apply to third-party plaintiffs and cross-claimants.

Affirmed.

Willett, J., filed concurring opinion in which Devine, J, joined and Lehrmann, J., joined in part.

Hecht, C.J., filed dissenting opinion in which Green and Guzman, joined and Brown, J., joined in part.

**Attorneys and Law Firms**

**\*558** David Kenneth Sergi, David K. Sergi & Associates, P.C., San Marcos, TX, for Other interested party.

Andrew L. Kerr, Cynthia E. Ellis Rosen, John Alex Huddleston, Strasburger & Price LLP, San Antonio, TX, for Petitioner.

Kemp W. Gorthey, Attorney at Law, Austin, TX, for Respondent Austin Design Group.

Henderson L. Buford III, Buford & Associates, Austin, TX, for Respondent Comet II Construction, Inc.

**Opinion**

Justice BOYD announced the Court's disposition and delivered a plurality opinion, in which Justice JOHNSON, Justice WILLETT, and Justice DEVINE joined.

Chapter 150 of the Texas Civil Practice and Remedies Code requires "the plaintiff" in "any action or arbitration proceeding for **\*559** damages arising out of the provision of professional services by a licensed or registered professional" architect, engineer, land surveyor, or landscape engineer to file a supporting expert affidavit "with the complaint." The issue in this case is whether this requirement applies to a defendant or third-party defendant who files a third-party claim or cross-claim against a licensed or registered professional. Concluding that cross-claimants and third-party plaintiffs are not "the plaintiff" in an "action or arbitration proceeding," we hold that the statute's expert affidavit requirement does not apply to them.

**I.**

**Background**

Mahmoud Dawoud purchased a home from Comet II Construction, Inc. About ten years later, Dawoud sued Comet[1] for negligence, negligent misrepresentations, fraud, deceptive trade practices, and breach of contract, alleging that Comet defectively designed and constructed the home's foundation. Comet denied any liability and asserted third-party claims against Austin Design Group, from whom Comet had purchased the foundation plans, and against Gary Wayne Jaster, the licensed professional engineer who had prepared the plans. Comet sought contribution and indemnity from the third-party defendants, alleging that they "are or may be liable to [Comet] for all or part of [Mahmoud's] complaint." Austin Design Group filed a counterclaim against Comet and a cross-claim against Jaster, seeking contribution and indemnity and

asserting that, "[t]o the extent there is any defect in the foundation, whether by design or construction, it is the fault of [Jaster or Comet] and not the fault of Austin Design Group."

Jaster filed a motion to dismiss Comet's third-party claim and Austin Design Group's cross-claim, arguing that they were each "the plaintiff" as to those claims, that he was a licensed professional engineer, and that they had failed to file an expert affidavit (which the statute refers to as a "certificate of merit") as chapter 150 requires. In response, Comet filed an amended third-party petition, this time attaching a certificate of merit. [2] Jaster then filed an amended motion to dismiss, arguing that Comet did not comply with the statute because it did not file the certificate of merit with the original third-party petition and thus did not file it "with the complaint."

The trial court denied Jaster's motion to dismiss, and Jaster filed this interlocutory appeal. [3] With one justice dissenting, the court of appeals affirmed, concluding that chapter 150 does not require third-party plaintiffs or cross-claimants to file a certificate of merit. 382 S.W.3d 554. Jaster filed a petition for review, which we granted.

## II.

### "The Plaintiff" in an "Action" Under Section 150.002

 [1]    Jaster contends that section 150.002 of the Texas Civil Practice and Remedies Code requires dismissal of the claims that Comet and Austin Design **\*560** Group asserted against him in this case. The 2005 version of this section, which governs this action, provided:

> In any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, registered professional land surveyor, or licensed professional engineer competent to testify, holding the same professional license as, and practicing in the same area of practice as the defendant, which affidavit shall set forth specifically at least one negligent

act, error, or omission claimed to exist and the factual basis for each such claim.

Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 20.01, 2003 Tex. Gen. Laws 847, 896–97, *amended by* Act of May 12, 2005, 79th Leg., R.S., ch. 189, § 4, 2005 Tex. Gen. Laws 348, 348 *and* Act of May 27, 2005, 79th Leg., R.S., ch. 208, § 2, 2005 Tex. Gen. Laws 369, 370 *and* Act of May 27, 2009, 81st Leg., R.S., ch. 789, § 2, 2009 Tex. Gen. Laws 1991, 1992 (current version codified at TEX. CIV. PRAC. & REM.CODE § 150.002). [4] "The plaintiff's failure to file the affidavit in accordance with this section shall result in dismissal of the complaint against the defendant" and "[t]his dismissal may be with prejudice." *Id.* § 150.002(e). [5]

The parties do not dispute that Jaster is a licensed professional engineer and thus a "licensed or registered professional," [6] or that the claims that Comet and Austin Design Group assert against him arise out of the provision of professional services. Neither Comet nor Austin Design Group filed a certificate of merit when they originally filed their claims against him. The only issue in this appeal is whether the statute required them to do so.

Jaster argues: (1) for purposes of section 150.002, "there is no meaningful distinction" between an original "plaintiff" and a third-party plaintiff or a cross-claimant because they all assert affirmative claims for relief and are subject to the same pleading requirements; (2) third-party claims and cross-claims are "actions," and thus must comply with the statute's requirements for "any action"; and (3) not applying the requirement to third-party plaintiffs and cross-claimants thwarts "the statute's purpose to protect licensed professionals from unmeritorious or frivolous claims." In response, Comet and Austin Design Group contend: (1) because the statute uses the word "plaintiff" rather than the more inclusive term "claimant," the certificate-of-merit requirement **\*561** applies only to a party that initiates a lawsuit; (2) requiring a defendant who denies the plaintiff's allegations to file a certificate of merit that supports the plaintiff's claims would be "absurd," "unfair," and "unreasonable"; and (3) if applying the requirement only to "the plaintiff" undermines the statute's purpose, the Legislature should address that problem, not the courts. [7] After briefly reviewing the courts of appeals' decisions addressing this issue, we consider the language of the statute and its context, and conclude that they compel us to agree with Comet and Austin Design Group.

## A. Judicial Constructions of Section 150.002

Three Texas courts of appeals have addressed section 150.002's certificate-of-merit requirement in the context of third-party plaintiffs or cross-claimants.[8] First, in *DLB Architects, P.C. v. Weaver,* the Dallas Court of Appeals applied the requirement to a defendant who asserted third-party claims for contribution and indemnity against out-of-state architects. 305 S.W.3d 407, 411 (Tex.App.-Dallas 2010, pet. denied). The third-party plaintiff argued that the requirement applies only to architects licensed in Texas, and the court rejected that argument. *Id.* at 410–11. But neither party argued that the requirement did not apply to third-party plaintiffs, and the court applied the requirement without addressing that issue. *Id.*

Next, the Fort Worth Court of Appeals became the first to expressly address the issue in *CTL/Thompson Texas, LLC v. Morrison Homes,* 337 S.W.3d 437 (Tex.App.-Fort Worth 2011, pet. denied). In that case, a homebuilder sued a land developer and several engineers over a real estate transaction and filed a certificate of merit with the original petition. *Id.* at 439. The land developer brought cross-claims against the engineers, but instead of filing a certificate of merit, he incorporated the homebuilder's certificate of merit into his cross-petition by reference. *Id.* The engineers argued that the statute required the developer to file his own certificate of merit to support the cross-claims. *Id.* at 440. The court of appeals held that the statute does not apply to a defendant who merely files cross-claims against another defendant. *Id.* at 445–46. The court rejected the engineer's reliance on *DLB Architects* on the ground that it involved a defendant who filed third-party claims against a new third-party defendant, rather than cross-claims against a defendant who was already in the case. *Id.* The court reasoned that there is no need to require a cross-claimant to file a certificate of merit because "the plaintiff will have already filed [one]," or "if not, the plaintiff's claims are subject to dismissal." *Id.* at 445. But because the plaintiff will not have already filed a certificate of merit addressing the conduct of a new third-party defendant, the court reasoned that a third-party plaintiff should be required to do so, even if a cross-claimant is not. *Id.* at 445–46.

Finally, in the case before us today, the Austin Court of Appeals held that the statute does not require third-party plaintiffs or cross-claimants to file a certificate of merit. The court identified many respects in which third-party plaintiffs and cross- **\*562** claimants are both similar to and yet

different from original plaintiffs. 382 S.W.3d at 559–60. The majority observed that "the statute does not specifically address defendants filing third-party complaints and cross-claims" and suggested that "there are multiple options of how the certificate-of-merit requirement could be applied to them," depending on whether the claims are original to the defendant or derived from the plaintiff's claims and whether they assert the claims against new parties or parties already in the suit. *Id.* at 560. After considering the potential "unintended consequences of an expansive definition of 'plaintiff,' " *id.* at 561, the majority noted that the statute uses the word "plaintiff" instead of "claimant" and does so without defining it to include third-party plaintiffs and cross-claimants. *Id.* at 561–62. Considering the "difficulties in judicially imposing ... a broader definition of 'the plaintiff,' " the majority decided to "resist the urge to judicially create a solution to the statute's failure to address third-party complaints and cross-claims," and held that the statute "does not require a certificate of merit from a defendant who files a third-party complaint or cross-claim." *Id.* at 562.

The dissenting justice in the Austin Court of Appeals concluded that requiring plaintiffs who sue certain professionals to file a certificate of merit but not requiring defendants who sue such professionals to do so is "an absurd result." *Id.* at 565 (Henson, J., dissenting). In her view, the majority's construction undermines the statute's purpose "to provide a method by which courts can quickly dismiss meritless claims" and ignores the reality that, from the licensed or registered professional's perspective, "third-party plaintiffs and cross-claimants are certainly 'plaintiffs' with regard to the third-party claims and cross-claims[.]" *Id.* at 564–65.

## B. The Language of the Statute

 [2]   [3]   [4]   [5]   [6]   We resolve the issue in this case by looking to the language of the statute, which we construe de novo. *Nathan v. Whittington,* 408 S.W.3d 870, 872 (Tex.2013). We must enforce the statute "as written" and "refrain from rewriting text that lawmakers chose." *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 443 (Tex.2009). We limit our analysis to the words of the statute and apply the plain meaning of those words "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). While we must consider the specific statutory language at issue, we must do so while looking to the statute as a whole, rather than as "isolated provisions." *TGS–NOPEC Geophysical Co. v. Combs,* 340

S.W.3d 432, 439 (Tex.2011). We "endeavor to read the statute contextually, giving effect to every word, clause, and sentence." *In re Office of Att'y Gen.,* 422 S.W.3d 623, 629 (Tex.2013). We thus begin our analysis with the statute's words and then consider the apparent meaning of those words within their context. [9]

#### 1. The Words of the Statute

[7]  [8]  Section 150.002 requires "the plaintiff" in "any action or arbitration proceeding" *563 to file a certificate of merit. Chapter 150 does not define the terms "plaintiff" or "action," so we must give them their common, ordinary meaning unless the statute clearly indicates a different result. *See Molinet,* 356 S.W.3d at 411. That is not to say that we must (or may only) give undefined words their *only* meaning, for words can have more than one meaning. The dissent asserts that, "[w]hen a word is used sometimes to mean one thing and sometimes another, neither is 'plain,' 'common,' or 'ordinary' to the exclusion of the other." *Post* at 578. We disagree. When a statute uses a word that it does not define, our task is to determine and apply the word's common, ordinary meaning. The fact that the word may sometimes be used to convey a different meaning is the very reason why we look for its common, ordinary meaning. To determine its *common, ordinary* meaning, we look to a wide variety of sources, including dictionary definitions, treatises and commentaries, our own prior constructions of the word in other contexts, the use and definitions of the word in other statutes and ordinances, and the use of the words in our rules of evidence and procedure. [10]

We begin by reviewing dictionary definitions of the words "plaintiff" and "action." *See Epps v. Fowler,* 351 S.W.3d 862, 873 (Tex.2011) (Hecht, J., dissenting) ("The place to look for the ordinary meaning of words is ... a dictionary."). Dictionaries consistently define a "plaintiff" as a party or person who brings or files a "civil suit" or "legal action." *See, e.g.,* BLACK'S LAW DICTIONARY 1171 (7th ed.1999) (defining "plaintiff" as "[t]he party who brings a civil suit in a court of law"); Garner, Bryan, A DICTIONARY OF MODERN LEGAL USAGE 665 (2nd ed.1995) (defining "plaintiff" as "the party who brings suit in a court of law"); MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 888 (10th ed.1993) (defining "plaintiff" as "a person who brings a legal action"). Thus, both the statute and the dictionary definitions recognize a direct relationship between the words "plaintiff" and "action." Jaster contends that "any action," as used in section 150.002, includes each separate

claim or cause of action that any party may assert, including an original plaintiff's claims, third-party claims, and cross-claims. This, however, is not the common, ordinary meaning of "action."

[9]  [10]  [11]  [12]  The common meaning of the term "action" refers to an entire lawsuit or cause or proceeding, not to discrete *564 "claims" or "causes of action" asserted within a suit, cause, or proceeding. BLACK'S LAW DICTIONARY at 28 (defining "action" as "[a] civil or criminal judicial proceeding"). "The term 'action' is generally synonymous with 'suit,' which is a demand of one's rights in court." *Thomas v. Oldham,* 895 S.W.2d 352, 356 (Tex.1995); *see also In re Marriage of Combs,* 958 S.W.2d 848, 850 (Tex.App.-Amarillo 1997, no pet.) (holding that an "action" is "a demand for one's legal right and has been held synonymous with 'suit' "). A suit, in turn, is "any proceeding in a court of justice by which an individual pursues that remedy in a court of justice which the law affords him." *H.H. Watson Co. v. Cobb Grain Co.,* 292 S.W. 174, 176 (Tex.1927) (citing *Weston v. City Council of Charleston,* 27 U.S. 449, 464, 2 Pet. 449, 7 L.Ed. 481 (1829)). Although the word "suit" can be "more general in its comprehension than the word 'action,' " both terms refer to a judicial proceeding in which parties assert claims for relief. *Id.* Thus, under the common definition, "[a]n action is a judicial proceeding, either in law or in equity, to obtain certain relief at the hands of the court." *Elmo v. James,* 282 S.W. 835, 839 (Tex.Civ.App.-Fort Worth 1926, writ dism'd w.o.j.). Historically, "action" referred to a judicial proceeding in a court of law, while "suit" referred to a proceeding in a court of equity. BLACK'S LAW DICTIONARY at 29.

[13]  [14]  A "cause of action," by contrast, "has been defined 'as a fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief.' " *A.H. Belo Corp. v. Blanton,* 133 Tex. 391, 129 S.W.2d 619, 621 (1939) (quoting 1 TEX. JUR. p. 61 sec. 15). As we recently noted, this is "the generally accepted meaning" of the term "cause of action." *Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex.2012) (quoting *In re Jorden,* 249 S.W.3d 416, 421 (Tex.2008)). Thus, a "cause of action" and an "action" are not synonymous; rather, the "cause of action" is the right to relief that entitles a person to maintain "an action." *Id.* "The right to maintain an action depends upon the existence of a cause of action, which involves the combination of a right on the part of the plaintiff and a violation of such right by the defendant." *Bell v. Moores,* 832

S.W.2d 749, 752 (Tex.App.-Houston [14th Dist.] 1992, writ denied). [11]

 [15]  [16]  A "cause of action" is thus similar to a "claim," in that they both refer to a legal right that a party asserts in the suit that constitutes the action. *See Torch Energy Advisors Inc. v. Plains Exploration & Prod. Co.,* 409 S.W.3d 46, 56 (Tex.App.-Houston [1st Dist.] 2013, no pet.) (noting that the ordinary meaning of "claim" is "the assertion of an existing right; any right to payment or to an equitable remedy," and "the aggregate of operative facts giving rise to a right enforceable by a court"). Thus, a "cause of action may exist before a suit is instituted." *Magill,* 409 S.W.3d at 679. But for there to be a "suit" or "action," it is "essential that it rest in a court, with the power to hear it. Without such a forum, it is not 'a suit,' since it lacks that which is as necessary to make it a suit as the petition itself." *United **565** Prod. Corp. v. Hughes,* 137 Tex. 21, 152 S.W.2d 327, 330 (1941) (quoting *Pecos & N.T. Ry. Co. v. Rayzor,* 106 Tex. 544, 172 S.W. 1103, 1104 (1915)). Recognizing these distinctions, this Court has used the terms "case," "cause," "suit," "lawsuit," "action," and "proceeding" interchangeably, while using the terms "claim," "cause of action," and "chose in action" to refer to the facts giving rise to a right that is enforceable in that proceeding. *See, e.g., State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 698–708 (Tex.1996).

Consistent with the common, ordinary usage of these terms, the Dallas Court of Appeals has expressly concluded that "the term *action* in section 10.01 [of the Civil Practice and Remedies Code] means 'suit,' " not "cause of action." *Bradley v. Etessam,* 703 S.W.2d 237, 241 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (emphasis in original). Similarly, the Amarillo Court of Appeals has concluded that a counter-claim is not an "action" as the Family Code uses that term. *Combs,* 958 S.W.2d at 850. [12]

Thus, according to the terms' common, ordinary meanings, section 150.002 requires "the plaintiff" to file a certificate of merit in "any [lawsuit] or arbitration proceeding" against a licensed professional, and "the plaintiff" is a party who initiates the "action" or suit, not any party who asserts claims or causes of action within the suit. Third-party plaintiffs and cross-claimants do not initiate a lawsuit or legal proceeding. Because they share some similarities with plaintiffs, the law treats them similarly in limited respects. *See, e.g., Getty Oil Co. v. Ins. Co. of N. Am.,* 845 S.W.2d 794, 800 (Tex.1992) (noting that a defendant who asserts a cross-claim "becomes a plaintiff *for res judicata purposes* " with respect

to compulsory claims relating to the cross-claim) (emphasis added); TEX.R. CIV. P. 85 (providing that a defendant's original answer "may present a cross-action, which *to that extent* will place defendant in the attitude of a plaintiff) (emphasis added). But that does not mean that the law treats them similarly in *all* respects. We thus conclude that, under the common, ordinary meaning of the terms, Comet and Austin Design Group are not "the plaintiffs" in this "action," because they are not the parties who initiated the suit.

**2. The Context of the Words**

Having identified the common meaning of the terms "plaintiff" and "action," we must also consider the context in which those words appear within section 150.002 and the statute as a whole. [13] The dissent **566** considers it obvious that "a third-party plaintiff is a plaintiff." *Post* at 576. We agree that the terms "plaintiff" and "action" may sometimes be used more broadly than their common meanings would support. [14] To conclude that they are used that way here, however, either a statutory definition or the context of the language must clearly demonstrate that they are. So we must consider the entire statute in this case, to determine whether something other than the words' common meaning "is apparent from the context" here. *Molinet,* 356 S.W.3d at 411. Doing so, we conclude that the context does not support a different meaning but instead confirms the common meanings we have identified.

 [17]  We begin our review of the context by recognizing that the statute requires the plaintiff to file a certificate of merit in "any action *or arbitration proceeding.*" TEX. CIV. PRAC. & REM.CODE § 150.002(a) (emphasis added). By using the terms "action" and "arbitration proceeding" together with the conjunction "or," the statute treats the two terms as having a similar meaning. The meaning of individual words "may be ascertained by reference to words associated with them in the statute; and ... where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other." *Harris Cnty. v. Eaton,* 573 S.W.2d 177, 181 (Tex.1978). Giving the term "action" its common meaning recognizes its similarity and relationship to the term "arbitration proceeding," so that in both terms the statute refers to a legal proceeding in which a plaintiff asserts a claim or cause of action. Indeed, if the term "action" referred to a claim or cause of action rather than a lawsuit or legal proceeding, there would be no reason for the statute to refer

to an "arbitration proceeding" at all, because parties resolve claims and causes of action in both types of legal proceedings. *See, e.g.,* TEX. CIV. PRAC. & REM.CODE § 171.002 (addressing "claims" subject to arbitration); *In re Labatt Food Serv. L.P.,* 279 S.W.3d 640, 645–46 (Tex.2009) (holding that a wrongful death "cause of action" must be resolved through arbitration, which "merely changes the forum in which the claims are to be resolved").

Next, we consider that the statute requires the plaintiff to file a certificate of merit "*in* " an action or arbitration proceeding. TEX. CIV. PRAC. & REM.CODE § 150.002(a) (emphasis added). As a matter **\*567** of ordinary language, it would be at least unusual, if not grammatically incorrect, to say that a plaintiff is "required to file" something "in" a "claim" or "in" a "cause of action." Rather, a party asserts a claim or cause of action "in" a pleading that is filed "in" a lawsuit or "action." The context of section 150.002(a), which requires the plaintiff to file the certificate of merit "with the complaint" and "in any action," thus indicates the common meaning of the term "action" as a lawsuit or legal proceeding.

Similarly, we note that the statute requires the certificate of merit to "set forth specifically" the defendant's conduct giving rise to liability "for *each theory of recovery* " and "the factual basis for *each such claim.*" TEX. CIV. PRAC. & REM.CODE § 150.002(b) (emphases added). Rather than requiring the factual support for "the action," as if that term meant a "claim" or "cause of action," this language demonstrates the statute's recognition of the difference between a "claim" and an "action." Subsection (a) requires the plaintiff to file a certificate of merit "in an action," and subsection (b) requires the certificate to state the factual basis for each legal theory or "claim" asserted in that action.

Turning to the meaning of the term "plaintiff," we observe that, throughout the Civil Practice and Remedies Code, the definitions and usage of the term "plaintiff," as opposed to the term "claimant," are consistent with its common meaning. When addressing frivolous pleadings and claims in chapter 9, for example, the statute uses the term "claimant," rather than the term "plaintiff," and expressly defines the term "claimant" to include "a plaintiff, counterclaimant, cross-claimant, third-party plaintiff, or intervenor, seeking recovery of damages." TEX. CIV. PRAC. & REM.CODE § 9.001(1). The statute consistently utilizes the same approach when addressing proportionate responsibility in chapter 33, *see id.* § 33.011(1), damages in chapter 41, *see id.* § 41.001(1), liability for stalking in chapter 85, *see id.* § 85.001(1), and

liability for a year 2000 computer failure in chapter 147, *see id.* § 147.001(2). And when addressing medical liability claims (to impose an expert affidavit requirement similar to chapter 150's certificate-of-merit requirement), the statute uses a similar but slightly different approach, using the term "claimant" and defining that term to mean any person "seeking or who has sought recovery of damages in a health care liability claim." *Id.* § 74.001(a)(2). These provisions demonstrate that when the Legislature wants to use a single term that encompasses third-party plaintiffs, cross-claimants, and counter-claimants along with plaintiffs, it uses the term "claimant," and defines that term accordingly.

By contrast, the Code repeatedly uses the word "plaintiff" to refer to a party who initiates the suit, rather than to every party who asserts a claim for relief within a suit. When addressing the general rule for venue in chapter 15, for example, the statute provides that "all *lawsuits shall be brought,*" when other rules do not apply, "in the county in which *the plaintiff* resided at the time of the accrual of the cause of action." *Id.* § 15.002(a)(4) (emphases added). Similarly, although (as noted above) the medical liability act generally refers to "claimants," when addressing discovery procedures it refers instead to "*the plaintiff,*" who must serve standard discovery answers and responses "within 45 days after the date of *filing of the original petition.*" *Id.* § 74.352(a) (emphases added). And when addressing forum non conveniens motions in chapter 71, the statute uses the word "plaintiff" and defines it broadly to mean "a party seeking recovery of damages for personal injury or wrongful death," but the statute then expressly provides **\*568** that "[t]he term does not include a counterclaimant, cross-claimant, or third-party plaintiff." *See id.* § 71.051(h)(2). These provisions demonstrate that when the Legislature wants to use a term that includes only a party who initiates a lawsuit, thus excluding third-party plaintiffs, cross-claimants, and counter-claimants, it uses the term "plaintiff," rather than the term "claimant." [15]

Finally, we note that this Court's practice in the Texas Rules of Civil Procedure is also consistent with the common meanings and the statutory usage of the terms "plaintiff" and "third-party plaintiff" to refer to distinct types of parties in a suit. Rule 38, for example, which governs third-party practice, provides that "a defending party, as a third-party plaintiff," may bring claims against a non-party "who is or may be liable *to him* or *to the plaintiff.*" TEX.R. CIV. P. 38(a) (emphases added). [16] The person against whom the third-party plaintiff asserts such claims, "hereinafter called the third-party defendant," may then assert any defenses

"the *third-party plaintiff* has to *the plaintiff's* claim." *Id.* (emphases added). The third-party defendant must assert any compulsory counterclaims against the third-party plaintiff and any compulsory cross-claims against "other third-party defendants," and "[t]he plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of *the plaintiff's* claim against the *third-party plaintiff.*" *Id.* (emphases added). And our rules are also consistent with the statute's broader usage of the term "claimants." *See* TEX.R. CIV. P. 169(a)(1) (creating expedited procedure for certain suits in which "all claimants, other than counter-claimants" seek monetary relief aggregating $100,000 or less).

Having identified the common meanings of the terms "plaintiff" and "action" as referring to a party who initiates a lawsuit, in contrast to a "claimant" who asserts a claim for relief within a lawsuit, and having determined that the context of those terms supports those common meanings, we conclude that section 150.002's certificate-of-merit requirement applies to a party who initiates the lawsuit, and not to defendants or third-party defendants who assert claims for relief within a suit.

### C. Absurdity and the Purpose of the Statute

Jaster argues that construing section 150.002 to allow a party to bring third-party claims or cross-claims without filing a certificate of merit when a certificate of merit would be required if the same party filed the same claim as a separate suit achieves "an absurd result" and "thwarts" the purpose of the statute. **\*569** *See* 382 S.W.3d at 565 (Henson, J., dissenting). Jaster is correct that courts should not enforce the plain meaning of a statute's text if doing so "leads to absurd or nonsensical results." *Molinet,* 356 S.W.3d at 411. We do not agree, however, that the application of the common meanings of the words used in section 150.002 leads to "absurd results," and we will not ignore the words' common meanings to achieve a purpose or object that is ambiguous at best.

 [18]    The "bar for reworking the words our Legislature passed into law is high, and should be. The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity." *Combs v. Health Care Serv. Corp.,* 401 S.W.3d 623, 630 (Tex.2013). [17] While the dissent and others may think it "odd" for the statute to require claimants to file a certificate of merit when they initiate a lawsuit but not when they assert claims as part of an existing lawsuit, there are legitimate reasons why the Legislature may have

chosen this approach. For one, as the majority in the court of appeals noted, third-party plaintiffs and cross-claimants do not control the time and place of suit, and may not have adequate time to obtain the necessary expert analysis by the time their third-party claim or cross-claim is due. 382 S.W.3d at 560. [18]

In addition, as Comet and Austin Design Group argue and the court of appeals' majority also noted, many defendants (like Comet in this case) deny the existence of any design defect, but alternatively assert third-party claims against a design professional, seeking contribution and indemnity in the event that the plaintiff prevails. It would be far more "odd" to require such defendants to file an expert's certificate supporting the merits of the plaintiff's claim, thus requiring the defendants to **\*570** abandon their denial of the merits. Instead of trying to craft a necessarily complicated certificate-of-merit requirement that would appropriately address defendants who dispute any defect and those who do not, those who seek contribution and indemnity and those who seek affirmative rather than derivative relief, and those who file only cross-claims against existing defendants and those who file third-party claims against new defendants, the Legislature may have decided that the better course was to impose a simpler requirement that applies only to a plaintiff who initiates a lawsuit.

 [19]    Ultimately, the most that can be said about the alleged "absurdity" of the statute as we read it is that it provides licensed and registered professionals with early protection against most, but not all, meritless claims. Even so, all claimants who assert such claims must support them with adequate and sufficient evidence, and summary judgment will be appropriate against those who cannot. Though some might argue that this approach was not the best policy choice, "we read unambiguous statutes as they are written, not as they make the most policy sense." *Health Care Servs.,* 401 S.W.3d at 629. Even if the result seems to us to be unreasonable, "reasonableness is not the standard for eschewing plain statutory language." *In re Blair,* 408 S.W.3d 843, 859 (Tex.2013) (Boyd, J., concurring). That high standard is absurdity, and we cannot say that this statute achieves an absurd result.

Nor can we conclude that the statute's plain meaning is inconsistent with the statute's purpose. Ultimately, the dissent concludes that interpreting the statute in accordance with the common, ordinary meaning of its words "partially impairs the statute's purpose." But with regard to the issue before us,

all we know of the statute's purpose is that its purpose is to require "the plaintiff" in "any action" to file a certificate of merit "with the complaint." Other than that, the statute does not express its purpose.

 [20]     Nevertheless, the dissent asserts that the statute's "manifest object" is "to require a prima facie showing of liability at the time certain professionals are sued for malpractice," *post* at 579, and this Court has observed, albeit in a different context, that its purpose is "to deter meritless claims and bring them quickly to an end." *CTL/Thompson Tex., LLC v. Starwood Homeowner's Ass'n, Inc.,* 390 S.W.3d 299, 301 (Tex.2013). But deciding exactly *which* licensed and registered professionals the Legislature intended to protect (those sued as defendants, those brought into a case as third-party defendants, or both?) and *which* meritless claims the Legislature intended to bring quickly to an end (those filed by a party who initiates a lawsuit, those filed by defendants after they are brought into a lawsuit, or both?) presents a different question. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." *Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987). We must look to the statute's text to determine the policy choices that the Legislature made when deciding how to achieve the "manifest object" of section 150.002. "[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Id.* at 526, 107 S.Ct. 1391. We "are bound, not only by the ultimate purposes [the Legislature] has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." **\*571** *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.,* 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). The language of section 150.002 indicates that its purpose is to deter and end meritless claims that "the plaintiff" asserts "with the complaint" that initiates an "action." The Legislature has to balance many interests, and for the reasons we have explained, it may have decided that requirement strikes the proper balance. We must rely on the words of the statute, rather than rewrite those words to achieve an unstated purpose.

 [21]     [22]     [23]     Finally, we address the dissent's complaint that our analysis of the statute demands too much "precision" from the Legislature, at least if the goal of our analysis is to "giv[e] effect to the Legislature's intent in the enactment." *Post* at 579. We disagree and instead conclude that "[w]e must assume that the Legislature has done its very best

to express its intent in the words of the statute itself." *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 328 (Tex.1994) (Hecht, J., concurring and dissenting). We can acknowledge the possibility that, although the Legislature used the words "plaintiff" and "action" in chapter 150, it really meant "claimant" and "cause of action." Indeed, "[i]t is at least theoretically possible that legislators—like judges or anyone else—may make a mistake." *Brown v. De La Cruz,* 156 S.W.3d 560, 566 (Tex.2004). But even if that's the case here, "courts are not empowered to 'fix' the mistake by disregarding direct and clear statutory language that does not create an absurdity." *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 638 (Tex.2010) (citing *Brown,* 156 S.W.3d at 566). "Courts are not responsible for omissions in legislation, but we are responsible for a true and fair interpretation of the law as it is written." *Id.* at 637. In other words, as today's dissenting justice has explained, "[a] court must be careful not to substitute its own view of what should have been intended for what *was* intended." *Lane Bank Equip. Co. v. Smith S. Equip., Inc.,* 10 S.W.3d 308, 321 (Tex.2000) (Hecht, J., concurring).

We conclude that construing the terms "the plaintiff" and "any action" in section 150.002 according to their common meanings does not lead to absurd results or undermine the statute's stated purpose.

## III.

### Conclusion

We hold that the certificate-of-merit requirement in section 150.002 of the Civil Practice and Remedies Code applies to "the plaintiff" who initiates an action for damages arising out of the provision of professional services by a licensed or registered professional, and does not apply to a defendant or third-party defendant who asserts such claims. We therefore affirm the court of appeals' judgment upholding the trial court's denial of Jaster's motion to dismiss.

Justice WILLETT filed a concurring opinion, in which Justice LEHRMANN joined in part, and in which Justice DEVINE joined.

Chief Justice HECHT filed a dissenting opinion, in which Justice GREEN and Justice GUZMAN joined, and in which Justice BROWN joined in all but Part II.

Justice WILLETT, joined in part by Justice LEHRMANN, and joined by Justice DEVINE, concurring.

I join the plurality opinion [1] but write separately to underscore the centrality of **\*572** semantic context in statutory interpretation and the perils of resting on a statute's supposed purpose.

### I. Context Indicates that Third–Party Plaintiffs Need Not Comply with Section 150.002.

I agree with the dissent that some words, taken in isolation, do not yield a platonic form free of ambiguity. However, context sheds light on meaning, and I believe the language of this statute, viewed in context, excludes third-party plaintiffs from the expert-affidavit requirement. Thus, the plurality opinion's analysis of the context does not just support its analysis of isolated words—it forms an essential foundation for understanding those words.

Judges must navigate a narrow course "between a sterile literalism which loses sight of the forest for the trees, and a proper scruple against imputing meanings for which the words give no warrant." [2] For that reason, "[l]anguage cannot be interpreted apart from context." [3] Meaning is bound to and bound by context. Words derive substance from the ecosystem of language in which we find them, and we must "consider the entire text, in view of its structure and of the physical and logical relation of its many parts." [4] The meaning of language, plain or not, must be drawn from the surrounding context, particularly everyday words and phrases that are inordinately context-sensitive. Such a contextual reading here demonstrates that "the plaintiff" who files "the complaint" in an "action ... for damages" refers to the original plaintiff in the suit, and not a third-party plaintiff.

I agree with the plurality opinion's analysis of the word "action" in light of the statute's context and briefly add several other contextual considerations that support the plurality opinion's conclusion that the statute does not require third-party plaintiffs to file expert affidavits.

### A. "Plaintiff" Refers Only to the Original Plaintiff.

If action refers to a civil suit as a whole and not to individual claims, the meaning of "plaintiff" is necessarily circumscribed. The statute says "*the* plaintiff." Use of "the" indicates that the language is trying to pinpoint one particular party in the action or arbitration proceeding. Since "action" must be referring to the suit as a whole, this singular emphasis on a *particular* plaintiff seems to rest most naturally with the plaintiff who initiated the suit. Likewise, the required affidavit is to be filed with "*the* complaint." Again, this signals a focus on a particular party at a particular moment in the lawsuit. "*The* complaint" most naturally refers to the initial pleading that puts the "action" or suit into motion. Of course, other plaintiffs may come along through intervention or joinder. But when "the" shows up before both "plaintiff" and "complaint," it indicates the targeting of someone and something specific—the plaintiff and petition that put the suit in motion. This makes sense in light of the role of motions to dismiss—they are designed as sentinels that guard the gate and thus most naturally target the party who first comes knocking. Moreover, the manifest object of the provision is fulfilled after the initial plaintiff meets the requirement. There is no **\*573** obvious need to require each additional plaintiff who sues the defendant to file a separate affidavit in order for this threshold protection to be provided because the initial affidavit has already provided the desired filtering effect.

### B. A Claim Seeking Contribution and Indemnity Is Not an Action "For Damages."

Additionally, section 150.002 does not apply to third-party plaintiffs seeking indemnity and contribution because the affidavit requirement is limited to actions "for damages." I would read this as damages sought by "the plaintiff" who seeks a direct right to recover against the design professional. Here, Comet does not seek damages—it seeks only contribution and indemnity. When a defendant files a third-party action against a third-party defendant seeking contribution and indemnity, the defendant does not increase the possible scope of damages that the plaintiff will ultimately recover. The only changing dynamic is the proportionate share of the damages to be paid. Thus, a claim for contribution and indemnity is not an action "for damages" because it does not provide an independent basis for any new damages. It only adds another variable in determining how the damages already sought by the original plaintiff will be allocated

among co-liable parties. Thus, actions for contribution and indemnity are not actions "for damages."

When the language of section 150.002 is viewed as a whole, the meaning of "plaintiff" becomes clear. "Action" refers to civil proceedings, or the lawsuit as a whole. "The plaintiff" therefore is the original plaintiff. Moreover, a third-party plaintiff seeking only contribution and indemnity does not have a claim "for damages." Thus, a third-party plaintiff need not comply with the expert-affidavit requirement.

## II. Analysis of "Action" and "Plaintiff" in Isolation Does Not Free Them of Ambiguity.

In analyzing "action" and "plaintiff," the plurality opinion relies on dictionaries, other statutory provisions, and caselaw. These are helpful tools but often insufficient. "[T]he choice among meanings must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures." [5] Reliance on caselaw definitions faces a similar problem. In both circumstances, the words are not considered in the context of their use in the statute before us. With caselaw, the problem is exacerbated because entirely different circumstances may have animated our former interpretation of a particular word. Evidence of meaning from other statutes is also useful, but this can be tricky, as words in statutes may take on unique or varying shades of meaning depending on the context and the purpose for which they are used. Because these tools for analyzing isolated words have limitations, context becomes essential to clarity.

## III. Jaster's Purposive Approach Does Not Dethrone the Primacy of Text.

Jaster and the court of appeals' dissent rely more heavily than CHIEF JUSTICE HECHT on the statute's alleged purpose. Both advocate use of the absurdity doctrine to effectuate the statute's purpose. That purpose, according to Jaster, is to shelter design professionals from the **\*574** waste of defending non-meritorious claims. He complains that Comet's reading of the statute would frustrate this purpose because the design professional directly sued by the original plaintiff is protected, while the design professional who is dragged into the lawsuit by a defendant eager to pass along or share liability is not. Parties similarly situated are treated differently, which may seem illogical and unfair. But this

result does not rise to the kind of absurdity that would justify deviation from a fair reading of the text in favor of a putative purpose.

Liberal use of the absurdity doctrine too often devolves into purposive interpretation of statutes. And reliance on legislative purpose always tempts but rarely tempers. That temptation reaches its zenith when the upshot of a straightforward reading seems illogical or unjust. But a fair reading may well require an unfair result. When interpreting the Legislature's words, we cannot revise them under the guise of interpreting them. "Making law *work* is a proper goal for judges only at the retail level; substance is in the main for the political branches." [6]

Plus, careful textual commitment can encourage careful drafting. When legislatures come to see courts as editors rather than adjudicators, busy legislators may leave the judiciary to tighten the screws on loose language down the road. Vague legislation is sometimes inadvertent and sometimes intentional, but it is always a recipe for increased litigation and judicial guesswork. By sticking to our limited role, judges do more to improve the quality of the law than they ever could by decamping from text to hunt the snark of unvoiced legislative purpose.

In order to carefully police our limited role, the bar for application of the absurdity doctrine must remain high. Peculiarity or unfairness is not sufficient to trigger the absurdity doctrine. As we held recently—and unanimously —statutory language "can often work peculiar outcomes, including over- or under-inclusiveness.... [but] mere oddity does not equal absurdity.... The absurdity backdrop requires more than a curious loophole." [7] In general, "if the legal deck is stacked via technical statutory requirements, the Legislature should reshuffle the equities, not us." [8] Here, the failure of the statute to protect design professionals from third-party plaintiff claims while furnishing protection from original plaintiffs may be "quirky," but that is "quite different from proving it was quite impossible that any rational Legislature could have intended it." [9]

Indeed, a rational Legislature could have wanted to exclude third-party plaintiffs because requiring their compliance with section 150.002 creates a "quirky" result of its own. Section 150.002 requires submission of an expert affidavit along with the complaint that sets forth "specifically at least one negligent act, error, or omission claimed to exist and the

factual basis for each such claim." It is not clear whether this affidavit must lay out some factual basis for each essential element of a negligence claim, but it must at least lay out the factual basis for the "negligent act, error, or omission." A persuasive affidavit regarding a negligent act will often require evidence of the alleged defect resulting from the design professional's supposed **\*575** negligence. However, this kind of evidence will often also constitute evidence helpful to establish the original plaintiff's claim against the defendant home-builder before the plaintiff has presented his case-in-chief, moved for summary judgment, or even engaged in full discovery. In other words, application of section 150.002 to a third-party plaintiff will often place the defendant/third-party plaintiff in the unenviable position of either breaking ground for his own burial or foregoing his right to indemnity or contribution. While this may not amount to an absurd result, it certainly awakens our sense of unfairness in the same manner as the supposed absurdity of not holding third-party plaintiffs to the same heightened pleading requirement as original plaintiffs. It is not our place to choose between these anomalous results.

Careful textual analysis here points to a clear result, and the plurality opinion rightly declines to engage in the purposive analysis urged by Jaster. Here, context clearly indicates that the text does not require third-party plaintiffs to file an expert affidavit with the third-party petition.

Chief Justice HECHT, joined by Justice GREEN and Justice GUZMAN, and in all but Part II by Justice BROWN, dissenting.

In this case and another decided today, *In re Ford,* [1] the Court has written more on the subject of who is a "plaintiff" than I imagine all the other courts in the English-speaking world have ever written, all together. The distinction is a dubious one.

The cases are quite different, of course—the issue in this case is who *the* plaintiff is, while in *Ford* the issue is who *a* plaintiff is, and although both cases involve statutes in the Texas Civil Practice and Remedies Code, [2] the statutes are in separate volumes. So it is hardly surprising that the cases reach different, and arguably contradictory, outcomes. Without trying to put too fine a point on it, the Court holds in this case that a third-party plaintiff cannot be *the* plaintiff in any action, and is of two minds about whether an intervenor can be *the* plaintiff, while in *Ford* the Court holds that *both*

a third-party plaintiff *and* an intervenor can be *a* plaintiff, so long as they are not also defendants. Not to complicate matters, the author of the Court's opinion in *Ford* agrees that this case is correctly decided, but the author of the Court's opinion in this case dissents in *Ford*. And another dissenter in *Ford* joins the opinion in this case—but that begins to complicate matters.

I suspect that these cases will leave many readers scratching their heads. Though the Court is trying to adhere to the statutory text, whatever the result, it opens itself to the criticism that its analysis is picky and detached from reality. Intending to be careful, the Court risks being viewed as conducting a contest among the Pharisees in the Temple of Textualism over who is the most devout.

Faithfulness to the principle that the words of a statute are the law may necessitate embracing a result that is peculiar or worse, yet unavoidable. But *unnecessarily* embracing such a result undermines the principle by suggesting that more and less reasonable interpretations are to be treated equally. The Judiciary's sole objective in interpreting statutes is to give effect to the Legislature's intent expressed in its words. Out of respect for the Legislative Branch, we must read their words the way **\*576** they have written them—to make sense. I am not confident we have achieved that result in this case and therefore respectfully dissent.

### I

By statute, "the plaintiff" in "any action or arbitration proceeding" for malpractice by certain professionals must ordinarily file "with the complaint" an affidavit supporting each theory of recovery. [3] All we have to decide is whether this requirement applies when a professional is sued by a third-party plaintiff—a defendant suing a non-party. [4] One might think this would be pretty easy: a third-party *plaintiff* is, in name itself, a plaintiff, and a suit is an action, so yes, the requirement applies. But the reader will by now have seen from the plurality and concurring opinions that the issue is far more complicated than that.

The answer, according to the plurality opinion, depends on the "plain", "common", and "ordinary" meaning of the statute's operative words, "the plaintiff" and "any action". [5] The plurality opinion then embarks on what is the most exhaustive treatment of that subject in the law of **\*577** Texas, if not

all of American jurisprudence. It is masterful. I would not challenge a word, and there is certainly nothing left to add. All I can do of any use is to summarize the plurality opinion's analysis and then offer a few reflections.

### According to the plurality opinion:

The word "action" is sometimes used "more broadly" to refer to a "cause of action", but an "action" is really an entire lawsuit, and a "cause of action" is only a "right to relief", or at least a "claim" to such a right. [6] A person with a "cause of action" can bring an "action", which is "generally synonymous with 'suit' ", except that "the word 'suit' can be 'more general in its comprehension than the word "action" ' ". [7] Historically, an "action" was a legal proceeding and a "suit" was an equitable one. [8] The important thing is that both an "action" and a "suit" are "proceedings", though actually, all three words, while different, have been used interchangeably, along with "case", "lawsuit", and "cause". [9] An "action" is a "cause", but it is not a "cause of action". That is, except for one time in Rule 85 of the Texas Rules of Civil Procedure. [10]

### Furthermore:

Dictionaries define "plaintiff" as the person who initiates an "action" or "suit". [11] Third-party plaintiffs and cross-claimants "share some similarities" with "plaintiffs", and the law treats them similarly "in limited respects". For example, third-party plaintiffs and cross-claimants initiate proceedings against third-party defendants and cross-defendants, and they are plaintiffs for res judicata purposes. [12] But third-party plaintiffs and cross-claimants are not "plaintiffs" in an "action" because they initiated only part of the suit, not the whole suit. [13] There must be "a direct relationship between the words 'plaintiff' and 'action.' " [14] All "plaintiffs" are "claimants", but not all "claimants" are "plaintiffs", and "[t]hroughout the Civil Practices and Remedies Code," that is the way those words are defined and used. When the Legislature says "plaintiff", it means the person initiating suit, and when it says "claimant", it means "plaintiffs" and others who assert "causes of action". [15] Actually, that is not quite right. Chapter 74 uses the terms "plaintiff" and "claimant" interchangeably in the very same sentence. [16] Also, some "plaintiffs" do not initiate suit but intervene or are involuntarily joined, but by being included among the

"plaintiffs" who do initiate suit, they become "plaintiffs", though maybe not under the statute in this case, a question we need not decide. [17]

*Conclusion:* Third-party plaintiffs are not plaintiffs.

**\*578** To the plurality opinion's splendid analysis and conclusion, I respectfully offer five reservations.

*First:* The plurality opinion has proven beyond any doubt that sometimes third-party plaintiffs are plaintiffs and sometimes not, sometimes third-party actions are actions and sometimes not, and while sometimes the variations can be explained, sometimes they cannot be. Any remaining doubt is quickly dispelled by searching caselaw and statutes for the terms "third-party plaintiff", "third-party action", and "third-party cause of action", and noting the various, inconsistent ways in which those terms are used. When a word is used sometimes to mean one thing and sometimes another, neither is "plain", "common", or "ordinary" to the exclusion of the other. Ironically, the plurality opinion's labors to prescribe definite meanings for "plaintiff" and "action" only demonstrate that for it, the words "plain", "common", and "ordinary" have no real meaning at all.

*Second:* The underlying assumption of the plurality opinion's approach is that when it finally arrives at the real meaning of the inescapably imprecise words, "plaintiff" and "action", trudging through dictionaries, cases, and statutes, parsing and explaining, and finally discarding what it considers to be misuses of the words, the end result will be what the Legislature intended without going through the same process. When lawyers and judges have put words to various, inconsistent uses over time, legislators simply cannot be presumed, alone of all creatures, to be precise—or closer to the point, to have been more precise in one statute than they were in others. And in Chapter 150, they, in fact, were not precise at all.

For example, a "complaint", with which a certificate must be filed, is not part of Texas civil procedure. Obviously, a "petition" is intended. Would the Court hold that Chapter 150 is dead letter because it applies only to the filing of a "complaint", which is certainly not a "petition"? Heavens, no, the plurality opinion says. That would be absurd. [18]

For another example, a certificate must be filed by "the plaintiff" in an "arbitration proceeding", but in an arbitration proceeding, the person seeking relief is uniformly referred

to as a "claimant", not as a "plaintiff". [19] Does this mean that certificates of merit need never be filed in arbitration proceedings? I suppose the Court would think that absurd, too.

Yet if there is any justification for interpreting "action" strictly, "plaintiff" somewhat strictly, and "complaint" loosely, all three words in the same sentence, it is not apparent. More importantly, the process of interpreting statutes cannot legitimately ascribe a precision to them that the process **\*579** of writing them gave no indication, and probably was incapable, of producing. At least, it cannot do so with the professed purpose of giving effect to the Legislature's intent in the enactment. Judicial interpretation should not imagine a Legislature that does not exist.

*Third:* As the plurality opinion candidly acknowledges, "the terms 'plaintiff' and 'action' may sometimes be used more broadly than their common meanings would support." [20] When the Legislature has used the same words to mean different things from time to time, at least once in the same sentence, how is it possible to determine *from the words alone* what it meant *this time?* In Chapter 74 of the Civil Practice and Remedies Code, the Legislature uses "plaintiff" to mean "claimant", which includes third-party plaintiffs. [21] How can the Court ascertain, from nothing more than the words themselves, that the Legislature did not intend the same meaning in Chapter 150?

*Fourth:* The plurality opinion demonstrates that judicial interpretation of statutes cannot focus on text alone; it must examine the text in context. The plurality and concurring opinions profess agreement that context is important, but by context, both mean only surrounding words, not the reality they are intended to affect. The concurring opinion warns against "a sterile literalism which loses sight of the forest for the trees", but staring at little clumps of trees—losing sight of the forest for the groves—is no more fertile an approach.

The context the Court ignores is the world in which the words it has so carefully examined operate. It has long been the Court's rule that "a statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out and the other defeat such manifest object, it should receive the former construction." [22] But the rule is disregarded in a Rabbinic fixation with individual words. The plurality opinion's impressive analysis may be correct *in the abstract.*

It may be that "plaintiff" and "action" should always have only the meanings the Court ascribes to them. But that has never been true—hence, the need for lengthy analysis—and to demand such exactitude in this case impairs the statute's purpose.

The manifest object of Chapter 150 is to require a prima facie showing of liability at the time certain professionals are sued for malpractice. Remarkably, and tellingly, the Court states that it simply cannot tell what the manifest object of Chapter 150 is because it cannot be sure exactly which professionals are to be protected or precisely from what claims. An obvious answer, especially when the Legislature has not said otherwise, is: *all.* The concurring opinion admits that imposing the requirement only on a plaintiff suing a defendant and not on a third-party plaintiff suing a third-party defendant "may be 'quirky' ", [23] but the concurring opinion and the plurality opinion conceive two reasons why this was exactly what the Legislature intended.

One is that a third-party plaintiff may be caught off-guard by a lawsuit and not have enough time to procure the required affidavit before the third-party petition must be filed. [24] But the third-party plaintiff will **\*580** never have less than 51 days, [25] and that time may be extended by motion or agreement. It is possible that the Legislature could have considered this time pressure sufficient reason to except an entire group of claims from a requirement intended to protect all professionals, but it is just as likely that the Legislature thought the opposite and did not create the loophole the Court finds today.

Another motive the Court thinks the Legislature might have had for excluding third-party plaintiffs from the statutory requirement is that to include them is "necessarily complicated" because third-party plaintiffs and cross-claimants may be seeking "affirmative rather than derivative relief" or only "contribution and indemnity". [26] But the Court simply presumes that it is "appropriate[ ]" to tailor the affidavit requirement to each such situation. It is far simpler, and no less appropriate, to treat all claimants the same: a charge of malpractice cannot be made against these professionals without something more than mere allegations to back it up. And the cross-claimant seeking only contribution and indemnity can use a certificate previously filed by a plaintiff.

*Fifth:* Despite every effort, the Court itself cannot plough a straight furrow. Third-party plaintiffs are not covered by the statute, even if the third-party action is severed, so that the third-party plaintiff becomes *the plaintiff* in the severed action and its initiator, just as if the third-party action had been filed separately to begin with. And when parties joined as plaintiffs after the action has been initiated are the first to assert a malpractice claim against a professional, the Court cannot say for sure whether they are plaintiffs or not. It feebly hints that they may be plaintiffs by association, falling prey to the smudging of meanings it is trying to rectify, then declines to answer its own question lest its explanation be advisory. [27]

## II

And the plough hits a rock in *Ford*. That case involves Section 71.051 regarding *forum non conveniens.* The statute requires dismissal of actions falling under that doctrine, as determined by applying several factors, but excepts cases in which "the plaintiff is a legal resident of this state." [28] The statute also defines "plaintiff" as "a party seeking recovery of damages for personal injury or wrongful death" but expressly excludes third-party plaintiffs. [29]

The problem in the case is this. A nonresident plaintiff sued his deceased brother's estate for injuries suffered in a vehicular accident in Mexico in which the brother, who owned and maintained the vehicle, was killed. The estate, in turn, sued Ford, and then so did the plaintiff. At that point, the case could have been dismissed under Section 71.051. But the decedent's wrongful death beneficiaries, some of whom are residents, intervened, also suing Ford, but not, of course, suing the defendant estate. If the intervenors are plaintiffs, the case cannot be dismissed. But are they third-party plaintiffs, statutorily excluded from "plaintiffs"? No, the Court holds, because in context, the third-party plaintiffs referred to in the **\*581** statute must also be defendants, and the intervenors are more aligned with the plaintiff than with the defendant.

I join in the Court's opinion in *Ford*, though the Court's detailed analysis of the text and the alignment of the parties is similar to the Court's analysis in the present case, which as I have said, I find misguided. Unquestionably, however, had the intervenors filed their own suit, it could not have been dismissed and could have been consolidated with the original plaintiff's suit, or if that suit had been dismissed, the plaintiff could have intervened in the other suit. Thus, the

action involving all the parties and claims can be brought in Texas without being dismissed under Section 71.051. So the question becomes: are the procedural differences in the way the case was brought and the way it could have been brought significant to the ostensible purpose of Section 71.051? The answer is plainly no. Without answering that question, the dissents would dismiss the intervenors' claims because, in this action, they are more aligned with the defendant's. In the dissents' view, the intervenors simply made an error that cost them their case in Texas.

In my view, while it is possible to read the statute as the dissents do, it is at least as reasonable to read it as the Court does, and it is impossible to think the Legislature intended, as between the two, the interpretation that leads to different results for essentially identical parties. And we should not think, as the dissents do, that the Legislature, in trying to preserve a Texas forum for Texas residents, craftily laid a trap so that by suing one way rather than another, they would lose their rights altogether.

In both this case and *Ford*, we must interpret statutory language that, in the circumstances presented, is imprecise. In both cases, the statutory purpose is evident, not something that we must supply. "The evident purpose of what a text seeks to achieve is an essential element of context that gives meaning to words." [30] When that purpose can be determined from the text, as it can easily be in these cases, "[a] textually permissible interpretation that furthers rather than obstructs [a statute's] purpose should be favored." [31]

## III

Finally, I add a brief word in response to the argument that a stricter judicial adherence to text will produce more careful statutory drafting. For one thing, I doubt whether that is true, or even possible. This Court pores over every word, every comma, in its opinions, trying to be as exact as possible, and still disagreements regularly arise—often even among us—about what was really said. The legislative process does not usually allow for the same care to be taken in the choice of language. There are many authors, the text is subject to amendments of all sorts, friendly and unfriendly, and in the end, the product is often one of compromise, which is essential to the legislative process.

More importantly, the Judiciary is not, in my view, entitled to insist that the Legislature write for our approval. Our

objective in interpreting statutes is to find *the Legislature's* intent in the words *it* enacted, not what a group of grammarians and researchers might have intended by those words. This does not justify substituting our meaning for the Legislature's, or what we might consider desirable policies for those it has chosen. But proper statutory **\*582** interpretation does require us to give careful consideration to the reality in which and for which the Legislature acted. For legislators, each statute has a purpose, which is the context in which the words speak. When we can find that purpose without inventing it, and pursue it without adding or detracting from it, it should inform our interpretation.

\* \* \* \* \* \*

Since the Tower of Babel, expression is inexact. Joseph Heller has written powerfully of the importance of context:

> "Help!" he shrieked shrilly in a voice strangling in its own emotion, as the policemen carried him to the open doors in the rear of the ambulance and threw him inside. "Police! Help! Police!" The doors were shut and bolted, and the ambulance raced away. There was a humorless irony in the ludicrous panic of the man screaming for help to the police while policemen were all around him. Yossarian smiled

wryly at the futile and ridiculous cry for aid, then saw with a start that the words were ambiguous, realized with alarm that they were not perhaps, intended as a call for police but as a heroic warning from the grave by a doomed friend to everyone who was not a policeman with a club and gun and a mob of other policemen with clubs and guns to back him up. "Help! Police!" the man had cried, and he could have been shouting of danger. [32]

The starting point of textual analysis must be the words chosen, but it cannot be the ending point, lest the exercise be criticized as verbomania. In my view, the Court in this case rejects a simple, reasonable—and yes, plain—interpretation of a statute in favor of a demanding but inconsistent word analysis that partially impairs the statute's purpose. The Court narrowly avoids doing the same thing in *Ford*. We would not interpret our own work this way, and it is no more appropriate because the work is that of another Branch of Government. I respectfully dissent.

### All Citations

438 S.W.3d 556, 57 Tex. Sup. Ct. J. 1005

### Footnotes

1    Dawoud also sued Comet's principals, Joe and Laura Schneider. We refer to all three defendants jointly as "Comet."

2    Comet later filed a second amended third-party petition, attaching the same certificate of merit.

3    The statute expressly authorizes an interlocutory appeal from an order granting or denying a motion to dismiss. *See* TEX. CIV. PRAC. & REM.CODE § 150.002(f).

4    Our references to section 150.002 are to the 2005 version of the statute, which the parties agree governs this case. The Legislature has since amended section 150.002, but the current version still imposes the certificate-of-merit requirement on "the plaintiff" in "any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional," including a licensed professional engineer. *See* TEX. CIV. PRAC. & REM.CODE § 150.002(a). Thus, our construction of the 2005 version also applies to the current version of the statute.

5    This provision was found in subsection (d) in the 2005 version of the statute and was substantively the same for purposes of this case. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 20.01, 2003 Tex. Gen. Laws 847, 896–97 (amended 2005, 2009) (current version codified at TEX. CIV. PRAC. & REM.CODE § 150.002(e)).

6    Chapter 150 defines "licensed or registered professional" to include licensed architects, licensed professional engineers, registered professional land surveyors, registered landscape architects, and firms in which such licensed or registered professionals practice. *See* TEX. CIV. PRAC. & REM.CODE § 150.001(1–a).

7    Comet and Austin Design Group argue additional grounds for affirming the appellate court's judgment, but we need not reach them in light of our construction of the statute.

8 We recently addressed section 150.002 in *CTL/Thompson Tex., L.L.C. v. Starwood Homeowners Ass'n,* but that appeal did not involve the issue of whether the certificate-of-merit requirement applies to parties other than a "plaintiff." 390 S.W.3d 299 (Tex.2013).

9 By contrast, the dissent begins with its own conclusion, suggesting that the resolution of this case should "be pretty easy" because, after all, it says (without citation), "a third-party *plaintiff* is, in name itself, a plaintiff, and a suit is an action." *Post* at 576 (Hecht, C.J., dissenting) (emphasis in original). We cannot be quite so cavalier when fulfilling our duty to construe Texas statutes, and we cannot begin our analysis with our own unsupported conclusions on the very issue before us. We begin, instead, with the language of the statute.

10 Examples of our reliance on these various sources to determine a word's common, ordinary meaning are too numerous to cite, but for examples from opinions we issued just within the past two years, see *Zanchi v. Lane,* 408 S.W.3d 373, 378 (Tex.2013) (relying on dictionary definitions, our prior decisions, the rules of procedure, and statutory definitions for the common meaning of "party"); *Rachal v. Reitz,* 403 S.W.3d 840, 845 (Tex.2013) (relying on dictionary definitions and treatises for the common meaning of "agreement"); *Morton v. Nguyen,* 412 S.W.3d 506, 510–12 (Tex.2013) (relying on our prior decisions, dictionary definitions, and the Restatement for the common meanings of "rescission" and "refund"); *City of Hous. v. Bates,* 406 S.W.3d 539, 545–47 (Tex.2013) (relying on dictionary definitions and a city ordinance for the common meanings of "leave" and "salary"); *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 181 (Tex.2013) (per curiam) (relying on dictionary definition of "novelty"); *Prairie View A & M Univ. v. Chatha,* 381 S.W.3d 500, 512 n. 16 (Tex.2012) (relying on dictionary definitions and our prior opinions for the common meaning of "requisite"); *Evanston Ins. Co. v. Legacy of Life, Inc.,* 370 S.W.3d 377, 382–83 (Tex.2012) (relying on our prior opinions, other statutes, and treatises for the common meaning of "property"); *Traxler v. Entergy Gulf States, Inc.,* 376 S.W.3d 742, 747 (Tex.2012) (relying on dictionary definition for common meanings of "distribution" and "transmission").

11 *See also Magill v. Watson,* 409 S.W.3d 673, 679 (Tex.App.-Houston [1st Dist.] 2013, no pet.) (a "cause of action" consists of "those facts entitling one to institute and maintain an action at law or in equity"); *City of Texarkana v. Cities of New Boston,* 141 S.W.3d 778, 788 (Tex.App.-Texarkana 2004, no pet.) (stating that a "pleading" is the vehicle for "alleging a cause of action" and thus the "means by which one party institutes a lawsuit."); *Elmo v. James,* 282 S.W. 835, 839 (Tex.Civ.App.-Fort Worth 1926, writ dism'd w.o.j.) ("The facts necessary to be alleged and proved in order to obtain the relief sought, and on account of which the action is instituted, logically constitute the cause of action.").

12 Generally, our rules of civil procedure also recognize the distinction between an "action," "suit," or "cause" and a "cause of action" or "claim." *Compare, e.g.,* TEX.R. CIV. P. 86 (referring to transfer of venue "from the county where *the action* is pending") (emphasis added) *and* TEX.R. CIV. P. 89 (providing that the "cause" shall be transferred and "such suit" filed in the new county, but if "the cause" is "severable as to parties defendant" it must be "ordered transferred as to one or more defendants but not as to all") *with* TEX.R. CIV. P. 91a.7 (providing for dismissal of a baseless "cause of action" and award of attorney's fees incurred "with respect to the challenged cause of action," except in "an action" by or against a governmental entity or public official).

13 We agree with the concurring opinion's observation that, because our "tools for analyzing isolated words have limitations, context becomes essential to clarity." *Post* at 573 (Willett, J., concurring). But as the concurring and dissenting justices have previously acknowledged, *both* the words *and* the context matter. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 632 (Tex.2008) ("When Searching for Statutory Meaning, Words Matter–And So Does Context.") (Willett, J., joined by Hecht, J., dissenting). If we have engaged in an "exhaustive" (if not "masterful," "splendid," and "impressive") analysis, *post* at 576–77 (Hecht, C.J., dissenting), of the common, ordinary meanings of "plaintiff" and "action," we have done so only and precisely because "words matter." Far from being "detached from reality," *post* at 575 (Hecht, C.J., dissenting), when it comes to fulfilling our role of interpreting statutes, the language of the law *is* our reality, at least unless we decide to start writing the law ourselves. Because the statute does not define the determinative words, we determine and apply their plain, ordinary, common meaning "*unless* a different meaning is apparent from the context." *Molinet,* 356 S.W.3d at 411 (emphasis added). Having determined the words' common, ordinary meanings, we now consider whether the context compels a different meaning.

14 We have identified one instance within the Civil Practice and Remedies Code, for example, where it appears that the term "plaintiff" is used interchangeably with the broader term "claimant." *See* TEX. CIV. PRAC. & REM.CODE § 74.351(c) ("If the claimant does not receive notice of the court's ruling granting the extension until after the 120–day deadline has passed, then the 30–day extension shall run from the date the plaintiff first received the notice."). Similarly, we have identified one instance within our Rules of Civil Procedure where it appears that the term "action" is used as a short-hand reference to refer to a cross-claim. *See* TEX.R. CIV. P. 85 (providing that a defendant's original answer may "present a cross-action").

15 We note that, as the Civil Practice and Remedies Code recognizes, there may be more than one plaintiff in a single lawsuit, "whether the plaintiffs are included by joinder, by intervention, because the lawsuit was begun by more than one plaintiff, or otherwise." TEX. CIV. PRAC. & REM.CODE § 15.003(a). The recognition that those added to the suit by joinder or intervention may become "plaintiffs" is also consistent with the common meaning of the term, as such joinder or intervention simply places them among those who initiated the suit. *See, e.g.,* TEX.R. CIV. P. 40 (explaining circumstances in which "[a]ll persons may join in *one action as plaintiffs* ") (emphasis added). Because this case does not present the issue of whether section 150.002 requires each individual plaintiff in a multi-plaintiff suit and those added as plaintiffs by joinder or intervention to file separate certificates of merit, we may not address that issue here without rendering an advisory opinion.

16 Thus, as the dissent agrees, a third-party plaintiff, under Rule 38, is not a "plaintiff" but "a *defendant* suing a non-party." *Post* at 576 (emphasis added).

17 One example of an absurd result may be found in section 150.002(a)'s use of the word "complaint." As the dissent notes, while parties in federal courts file "complaints," *see, e.g.,* FED.R.CIV.P. 3 ("A civil action is commenced by filing a complaint with the court."), parties in Texas courts file "petitions," *see, e.g.,* TEX.R. CIV. P. 22 ("A civil suit in the district or county court shall be commenced by a petition filed in the office of the clerk."), so a " 'complaint' ... is not part of Texas civil procedure." *Post* at 578. The dissent wonders why we do not "hold that Chapter 150 is dead letter because it applies only to the filing of a 'complaint', which is certainly not a 'petition.' " *Post* at 578. The absurdity doctrine answers that question. To construe section 150.002 of the *Texas* Civil Practice & Remedies Code so that it does not apply to any suit filed in *Texas* courts would present the kind of "exceptional" result that would qualify as "absurd." At a minimum, it would completely nullify the statute as to all such suits, and we cannot "lightly presume that the Legislature may have done [such] a useless act." *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex.1998). We therefore construe the term "complaint" to mean "petition," contrary to its common meaning, but we do so because the context of the term within the statute as a whole compels that result, not because we think doing so promotes a better public policy or would be more effective in promoting what we assume to be the statute's purpose.

18 The dissent suggests that section 150.002(c) alleviates any such time-crunch issues because the "time may be extended by motion or agreement." *Post* at 580. The "such time" to which this provision refers, however, appears to be the thirty-day extension that subsection (c) grants for cases "in which the period of limitation will expire within 10 days of the date of filing and, because of such time constraints, the plaintiff has alleged that [a certificate of merit] could not be prepared." TEX. CIV. PRAC. & REM.CODE § 150.002(c). Although the parties do not present, and we do not decide, that issue here, it at least appears that subsection (c)'s justice-based extension is available only when the plaintiff files the action within 10 days before limitations expires. If that is so, then subsection (c) would not be nearly as adequate as the dissent suggests.

1 JUSTICE LEHRMANN does not join the plurality opinion, but joins the remainder of this concurrence.

2 *N.Y. Trust Co. v. Comm'r of Internal Revenue,* 68 F.2d 19, 20 (2d Cir.1933) (L. Hand, J.).

3 *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011).

4 ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 167 (2012).

5 Frank H. Easterbrook, *Text, History, and Structure in Statutory Construction,* 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994).

6 *Id.* at 64 (emphasis in original).

7 *Combs v. Health Care Servs. Corp.,* 401 S.W.3d 623, 630 (Tex.2013).

8 *Roccaforte v. Jefferson Cnty.,* 341 S.W.3d 919, 928 (Tex.2011).

9 *Combs,* 401 S.W.3d at 631.

1 442 S.W.3d 265, 2014 WL 2994622 (Tex.2014).

2 Unless otherwise indicated, all statutory references are to the Texas Civil Practice and Remedies Code.

3 TEX. CIV. PRAC. & REM.CODE § 150.002(a) ("In any action or arbitration proceeding for damages arising out of the provision of professional services by a licensed or registered professional, the plaintiff shall be required to file with the complaint an affidavit of a third-party licensed architect, licensed professional engineer, registered landscape architect, or registered professional land surveyor who: (1) is competent to testify; (2) holds the same professional license or registration as the defendant; and (3) is knowledgeable in the area of practice of the defendant and offers testimony based on the person's: (A) knowledge; (B) skill; (C) experience; (D) education; (E) training; and (F) practice."); § 150.002(b) ("The affidavit shall set forth specifically for each theory of recovery for which damages are sought, the negligence, if any, or other action, error, or omission of the licensed or registered professional in providing the professional service, including any error or omission in providing advice, judgment, opinion, or a similar professional skill claimed to exist and the factual basis for each such claim."); § 150.002(c) ("The contemporaneous filing requirement of Subsection (a) shall not apply

to any case in which the period of limitation will expire within 10 days of the date of filing and, because of such time constraints, the plaintiff has alleged that an affidavit of a third-party licensed architect, licensed professional engineer, registered landscape architect, or registered professional land surveyor could not be prepared. In such cases, the plaintiff shall have 30 days after the filing of the complaint to supplement the pleadings with the affidavit. The trial court may, on motion, after hearing and for good cause, extend such time as it shall determine justice requires."); § 150.001(1–a) (" 'Licensed or registered professional' means a licensed architect, licensed professional engineer, registered professional land surveyor, registered landscape architect, or any firm in which such licensed or registered professional practices, including but not limited to a corporation, professional corporation, limited liability corporation, partnership, limited liability partnership, sole proprietorship, joint venture, or any other business entity.").

4   TEX.R. CIV. P. 38(a) ("At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party petition not later than thirty (30) days after he serves his original answer. Otherwise, he must obtain leave on motion upon notice to all parties to the action.").

5   *Ante* at 562 ("We limit our analysis to the words of the statute and apply the plain meaning of those words 'unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.' "); *id.* at 563 ("Chapter 150 does not define the terms 'plaintiff' or 'action,' so we must give them their common, ordinary meaning unless the statute clearly indicates a different result.").

6   *Ante* at 564.

7   *Ante* at 564.

8   *Ante* at 564.

9   *Ante* at 565.

10  *Ante* at 564 n. 11; *see* TEX.R. CIV. P. 85 ("The original answer ... may present a cross-action....").

11  *Ante* at 565.

12  *Ante* at 569.

13  *Ante* at 569.

14  *Ante* at 563.

15  *Ante* at 567.

16  *Ante* at 566 & n. 14; *see* TEX. CIV. PRAC. & REM.CODE § 74.351(c) ("If the claimant does not receive notice of the court's ruling granting the extension [to file an expert report] until after the 120–day deadline has passed, then the 30–day extension shall run from the date the plaintiff first received the notice.").

17  *Ante* at 568 n. 15.

18  *Ante* at 569 n. 17.

19  *See Rules and Procedures,* AMERICAN ARBITRATION ASSOCIATION, https://www.adr.org/aaa/faces/rules (last visited July 1, 2014) (no reference in rules to "plaintiff"); *Code of Arbitration Procedure,* FINANCIAL INDUSTRY REGULATORY AUTHORITY, http://www.finra.org/Arbitration AndMediation/Arbitration/Rules/CodeofArbitrationProcedure/ (last visited July 1, 2014); Rules of the Judicial Arbitration and Mediation Services, available at *ADR Clauses, Rules, and Procedures,* JAMS, http://www.jamsadr. com/rules-clauses/ (last visited July 1, 2014); *Arbitration Rules,* WORLD INTELLECTUAL PROPERTY ORGANIZATION, http://www.wipo. int/amc/en/arbitration/rules/newrules.html (last visited July 1, 2014); *ICC Rules of Arbitration,* INTERNATIONAL CHAMBER OF COMMERCE, http://www. iccwbo.org/products-and-services/ arbitration-and-adr/arbitration/icc-rules-of-arbitration (last visited July 1, 2014); *Rules and Procedures,* INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION, https://www.icdr. org/icdr/faces/i_search/i_rule? (the international division of AAA).

20  *Ante* at 566.

21  *Supra* note 567.

22  *Citizens Bank of Bryan v. First State Bank, Hearne,* 580 S.W.2d 344, 348 (Tex.1979).

23  *Ante* at 574.

24  *Ante* at 575.

25  A defendant sued on Monday has 21 days in which to answer, TEX.R. CIV. P. 15, and 30 more days in which to file a third-party petition as a matter of right, TEX.R. CIV. P. 38.

26  *Ante* at 570.

27  *Ante* at 568 n. 15.

28    TEX. CIV. PRAC. & REM.CODE § 71.051(e).

29    *Id.* § 71.051(h)(2) (counterclaimants and cross-claimants are also excluded).

30    ANTONIN SCALIA & BRYAN GARNER, READING LAW 20 (2012).

31    *Id.* at 63.

32    JOSEPH HELLER, CATCH–22 425 (Dell ed.1985) (1961).

**End of Document**                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

334 S.W.3d 16
Court of Appeals of Texas,
Dallas.

Thomas LEE, Helen Wilems, Individually and as
Representative of the Estate of Felicia Marie Lee,
Deceased, Hartford Casualty General Agency, Inc.,
Southern County Mutual Insurance Co., Copart of
Houston, Inc., Copart of Texas, Inc., and Houston
Copart Salvage Auto Auctions, LP, Appellants,
v.
GST TRANSPORT SYSTEM, LP,
and Henry Daneford, Appellees.

No. 05–08–00118–CV.　|　Oct. 1, 2008.

**Synopsis**
**Background:** Northbound motorist and his employer
brought action against southbound motorist, passenger's
mother, individually and as representative of her daughter's
estate, insurance companies, and salvage company, alleging
southbound motorist was negligent in fatal car accident.
Passenger's mother filed a competing lawsuit against
northbound motorist and his employer in another county. The
14th Judicial District Court, Dallas County, Mary Murphy,
J., denied mother's plea to abate and asserted dominant
jurisdiction. Mother appealed.

**[Holding:]** The Court of Appeals, Molly Francis, J., held that
"amended petition" filed by mother in the competing lawsuit
did not relate back to presuit discovery petition filed earlier
by mother in that suit, and thus the present suit was filed first,
giving the court dominant jurisdiction.

Affirmed.

**Attorneys and Law Firms**

**\*17** Braden W. Sparks, Braden W. Sparks, P.C., Dallas, TX,
for Appellant.

E. John Gorman, Ronald L. Bair, Bairhilty, PC, Houston, TX,
for Appellee.

Before Justices MOSELEY, RICHTER, and FRANCIS.

**OPINION**

Opinion by Justice FRANCIS.

Two competing lawsuits arising out of a fatality collision
were filed in district courts in Dallas and Madison
counties. Both trial courts asserted dominant jurisdiction.
This interlocutory appeal comes to us on an agreed order
on a controlling question of law. *See* TEX. CIV. PRAC. &
REM.CODE ANN. § 51.014(d) (Vernon 2008). The issue
presented is: "Under the 'relation-back' and/or the 'first-filed'
doctrine(s), which is the court of dominant jurisdiction?"
To answer the issue, we must decide whether the relation-
back doctrine, embodied in section 16.068 of the Texas Civil
Practice and Remedies Code, applies to a presuit discovery
petition when determining which lawsuit was filed first. For
reasons set out below, we conclude it does not. Consequently,
we conclude the Dallas County case was the first-filed suit
and affirm the trial court's order denying abatement.

Felicia and Thomas Lee were traveling south on Interstate
45 in Madison County when Thomas Lee lost control of his
car, crossed the median, and collided with a northbound GST
Transport Systems tractor-trailer **\*18** truck driven by Henry
Daneford. Felicia Lee was killed on impact. Six weeks later,
on October 10, 2006, Felicia's mother, Helen Wilems, filed a
rule 202 petition in the 12th Judicial District Court in Madison
County to take oral depositions of several GST employees
and others to investigate a potential claim and for use in an
anticipated suit by Wilems. *See* TEX.R. CIV. P. 202. The
trial court granted the request and ordered the depositions of
several GST employees, including Daneford.

One week later, on December 5, 2006, GST and Daneford
filed a lawsuit in the 14th Judicial District Court in Dallas
County against Thomas Lee; Wilems, individually and
as representative of her daughter's estate; two insurance
companies; and the salvage company with possession of the
Lees' vehicle. GST and Daneford alleged Thomas Lee, a
Dallas County resident, was negligent in the accident and
sought damages for injuries to Daneford and property damage
to the tractor-trailer rig. They also sought injunctive relief
against all the defendants to preserve the vehicle driven by
Thomas Lee.

Wilems then filed a "First Amended Petition" in Madison
County under the same cause number as the presuit discovery
petition, alleging a wrongful death claim against GST and

Daneford. Both sides filed pleas to abate or dismiss the competing lawsuit in the respective county, arguing they were the first to file suit. In her plea in Dallas County, Wilems argued the filing of her wrongful death claim in Madison County related back to the date of the filing of her rule 202 petition, making her suit the first filed. Ultimately, both trial courts denied the pleas to abate and/or dismiss and, in their orders, asserted dominant jurisdiction. This appeal addresses the Dallas County order denying Wilems's plea in abatement.

**[1]** **[2]** We review the trial court's action in granting or denying a plea in abatement using an abuse of discretion standard. *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 248 (Tex.1988). The trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

**[3]** **[4]** As a rule, when cases involving the same subject matter are brought in different courts, the court with the first-filed case has dominant jurisdiction and should proceed, and the other case should abate. *Perry v. Del Rio,* 66 S.W.2d 239, 252 (Tex.2001). The obvious reasons for abatement are conservation of judicial resources, avoidance of delay, and "comity, convenience, and the necessity for an orderly procedure in the trial of contested issues," or, in other words, "to prevent races from court to court by vigilant counsel." *Id.* The first-filed rule also has several justifications, both jurisprudential and pragmatic. The jurisprudential reason is that once a matter is before a court of competent jurisdiction, "its action must necessarily be exclusive" because it is "impossible that two courts can, at the same time, possess the power to make a final determination of the same controversy between the same parties." *Id.* A pragmatic justification for the rule is efficiency in that proceedings earlier begun may be expected to be earlier concluded. *Id.* A final justification is fairness-in a race to the courthouse, the winner's suit should have dominant jurisdiction. *Id.* [1]

**\*19** **[5]** Rule 202 allows a person to petition the court for an order authorizing the taking of an oral and written deposition to either perpetuate the testimony for use in an anticipated suit or to investigate a potential claim or suit. TEX.R. CIV. P. 202.1. The proceeding is not a separate, independent lawsuit, but is in aid of and incident to an anticipated suit. *Office Employees Int'l Union Local 277 v. Southwestern Drug Corp.,* 391 S.W.2d 404, 406 (Tex.1965) (interpreting predecessor rule); *In re Clapp,* 241 S.W.3d 913, 917 (Tex.App.-Dallas 2007, orig. proceeding); *In re*

*Raja,* 216 S.W.3d 404, 407 (Tex.App.-Eastland 2006, orig. proceeding); *Texacadian Energy, Inc. v. Lone Star Energy Storage, Inc.,* 829 S.W.2d 369, 372 (Tex.App.-Corpus Christi 1992, writ denied).

**[6]** At the time GST and Daneford filed their lawsuit in Dallas County on December 5, 2006, Wilems had not brought any cause of action arising from the collision. Rather, she had sought presuit discovery to investigate facts relating to a potential claim. Consequently, the only issue before the Madison County district court at that time was whether to allow such discovery; it had not been asked to adjudicate any claims arising from the collision.

Nevertheless, Wilems argues her amended pleading (filed after the Dallas County suit) related back to the date of the filing of the rule 202 petition. Relying on rules of civil procedure 62 through 65, she argues that her amended petition filed in the same court under the same cause number superceded and supplanted her original rule 202 petition. Then, relying on section 16.068 of the Texas Civil Practice and Remedies Code, she argues that because the pleading was amended, it related back to the date of the original filing on October 10, 2006, rendering the Madison County suit the first filed.

We do not disagree that an amended pleading supersedes and supplants earlier pleadings. TEX.R. CIV. P. 65; *Lee v. Na,* 198 S.W.3d 492, 494 (Tex.App.-Dallas 2006, no pet.). And whether it is appropriate to allege a lawsuit for the first time in an "amended petition" in the same cause number as a rule 202 petition is not an issue we need to address. Even if appropriate, we do not agree that the relation-back doctrine, as embodied in section 16.068, can be read in this case to allow the "amended pleading" to relate back to the filing date of the rule 202 petition.

**[7]** The relation-back doctrine, statutorily defined in section 16.068, originated as an equitable remedy designed to effectuate justice. *Lovato v. Austin Nursing Ctr., Inc.,* 113 S.W.3d 45, 55 (Tex.App.-Austin 2003), *aff'd,* 171 S.W.3d 845 (Tex.2005). It is designed to "protect litigants from loss of their claims by a plea of limitations in cases where that would otherwise occur and therefore should be liberally construed." *Id.* Section 16.068 provides:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a

subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense *is not subject to a plea of limitation* unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.068 (Vernon 2008) (emphasis added).

In urging we apply section 16.068 to the circumstances in this case, Wilems asserts the purpose of rule 202 "allows a party to locate and preserve evidence *before* a claim is filed, while limitations requires that it be filed soon enough to allow the opposing party to do so while it is still available." **\*20** She then argues that since both the statute and rule "deal with the passage of time and the preservation of evidence," the relation-back doctrine "should not apply in one but not the other."

 [8]    [9]    [10]    Even if we liberally construe a statute to achieve its purposes, we may not enlarge or alter the plain meaning of its language. *Methodist Hosps. of Dallas v. Mid–Century Ins. Co. of Tex.,* 259 S.W.3d 358, 360 (Tex.App.-Dallas 2008, no pet.). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *Leland v. Brandal,* 257 S.W.3d 204, 206 (Tex.2008). We look first to the statute's language to determine that intent, as we consider it a "fair assumption that the Legislature tries to say

what it means, and therefore the words it chooses should be the surest guide to legislative intent." *Id.* (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999)). If the statute's language is unambiguous, its plain meaning will prevail. *Id.*

The plain language of section 16.068 provides that an amended pleading "is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence." TEX. CIV. PRAC. & REM.CODE ANN. § 16.068. Thus, even if we accept the argument that the rule and statute share similar purposes, the plain language of the statute restricts its operation to negating a "plea of limitation" under the circumstances described in the section. Wilems does not claim that she stands to lose her cause of action on limitations grounds; rather, her complaint involves a question of where the lawsuit should be tried. Consequently, section 16.068 does not apply under the circumstances of this case.

We conclude the lawsuit filed in Dallas County on December 5, 2006 was the first filed. Accordingly, the trial court did not abuse its discretion in refusing to abate the case.

We affirm the trial court's order denying abatement.

**All Citations**

334 S.W.3d 16

Footnotes

1    There are exceptions to the dominant jurisdiction rule; however, in her brief, Wilems expressly states that none of the exceptions applies in this appeal.

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5834855
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Austin.

William L. LINDIG and Peggy L. Lindig, Appellants
v.
CITY OF JOHNSON CITY, Appellee.

No. 03–11–00660–CV.  |  Nov. 14, 2012.

From the District Court of Blanco County, 424th Judicial District, No. CV06530; Daniel H. Mills, Judge Presiding.

**Attorneys and Law Firms**

William M. McKamie, Adolfo Ruiz, McKamie Krueger, L.L.P., San Antonio, TX, Bradford E. Bulllock, Russell & Rodriguez, L.L.P., Georgetown, TX, for Appellee.

Zachary P. Hudler, Zachary P. Hudler, P.C., Johnson City, TX, Mr. Samuel V. Houston, III, The Ford Firm, P.C., San Antonio, TX, for Appellants.

Before Chief Justice JONES, Justices ROSE and GOODWIN.

*MEMORANDUM OPINION*

J. WOODFIN JONES, Chief Justice.

**\*1** The City of Johnson City sued William L. Lindig and Peggy L. Lindig, seeking an injunction and civil penalties after the Lindigs continued to remodel their residential property in Blanco County after the City issued a "stop work" order based on the Lindigs' failure to obtain a building permit. The Lindigs counterclaimed, asserting that the building-permit-fee ordinance was unconstitutionally vague on its face or as applied to them. [1] On cross-motions for summary judgment, the trial court issued a permanent injunction in the City's favor and awarded the City $42,000 in civil penalties, $95,077 in attorneys' fees, up to $40,000 in conditional attorneys' fees for an appeal, and pre- and post-judgment interest. The trial court also ordered the Lindigs to either

comply with city and state ordinances by obtaining necessary permits or demolish the structure. In four issues on appeal, the Lindigs challenge the constitutionality of the building-permit-fee ordinance on vagueness grounds and, in addition, complain of the related awards of civil penalties, attorneys' fees, and prejudgment interest. We will reverse the trial court's judgment and render in part and remand in part.

**FACTUAL AND PROCEDURAL BACKGROUND** [2]

This dispute arose nearly five years ago when the Lindigs refused to pay a $1,000 building-permit fee for "residential remodeling" construction work on a home they purchased for their daughter's use. In December 2007 the Lindigs applied for a building permit for a residential remodeling project. William Lindig averred that, when he obtained the permit application from City Hall, he was told by the City Secretary that he could begin the project without paying a fee. The following month, however, Peter McKinney, the City's Building Official, acted on the Lindigs' permit application based on concerns about compliance with the City's building code and the types of construction materials being used on the project. Upon inspecting the project, McKinney informed William Lindig that there would be a $1,000 permit fee for the project. [3] McKinney stated that the amount of the fee was based on his determination that the remodeling project should be treated as "new construction" because it involved "substantial work," including some structural framing, rewiring, and new plumbing, and would require all but two of the inspections normally required for new construction. Accordingly, McKinney assessed a permit fee of $1,000 for new construction in accordance with section 06–015 of the City's Code of Ordinances. The Lindigs refused to pay the fee, whereupon the City issued a stop-work order.

When construction continued despite the stop-work order, the City filed suit in Blanco County district court seeking injunctive relief against further construction, alleging that the Lindigs had refused to obey the City's order to cease all work until a building permit was issued. *See* Tex. Loc. Gov't Code Ann. §§ 54.012(1) (municipality may bring civil action for enforcement of ordinance relating to materials or methods used to construct buildings), .016 (West 2008) (injunctive relief available upon showing of substantial danger of injury or adverse health impact to any person or to property of any person other than defendant). The City also sought civil penalties for the Lindigs' continued noncompliance with section 06–015 after receiving notice of noncompliance in the

stop-work order. *See id.* § 54.017 (West 2008) (authorizing municipality to recover civil penalties if defendant violates ordinance after being notified of ordinance's provisions). In addition to their counterclaims, the Lindigs asserted a number of defenses to enforcement of the ordinance. The trial court denied the Lindigs' motion for partial summary judgment as to the enforceability of the ordinance and granted the City's traditional motions for summary judgment on the Lindigs' claims and the City's statutory claims for injunctive relief, civil penalties, and attorneys' fees. The only claims at issue on appeal, however, are (1) the City's actions for injunctive relief and civil penalties, and (2) the Lindigs' counterclaim under the Texas Uniform Declaratory Judgments Act for a declaration that the City's building-permit-fee ordinance is unconstitutional—both on its face and as applied to the Lindigs' construction project—because it is impermissibly vague and thus imbues the Building Official with unfettered discretion to determine the fees to charge for residential-remodeling construction.

**\*2** On appeal, the Lindigs assert that (1) the trial court erroneously concluded that the City's building-permit-fee ordinance is enforceable, (2) the trial court erroneously assessed civil penalties and attorneys' fees based on an unenforceable fee ordinance, (3) even if the fee ordinance is enforceable, fact issues precluded summary judgment on the City's claim for civil penalties and attorneys' fees, and (4) the City is not entitled to prejudgment interest either by statute or as equitable relief.

### DISCUSSION

The principal issue on appeal is whether the building-permit-fee ordinance, section 06–015 of the City's Code of Ordinances, is unconstitutionally vague on its face or as applied to the Lindigs in this case. In section 06–015, the City adopted the following fee schedule for building permits:

A. Residential Plan Review and Inspections

Includes plan review and inspections for residential structures as detailed in the Johnson City Residential Code.

| Value of Construction | Permit Fee |
| --- | --- |
| $0.00 to $2,500.00 | $85.00 |
| $2,500.01 to $5,000.00 | $100.00 |

Up to and including 5000 square feet total area

Plan Review and inspections—$1000.000 per house

5000 square feet and greater in total area

$1000.00 per house plus $0.12 per square foot beyond 5000 square feet

Plan Review re-submittals

$100.00 per re-submittal

Re–Inspections

$50.00 each for 2 or more re-inspections

B. Commercial Plan Review and Inspections

1. Building Permit Fees for New Construction

a. $250 + $0.12 cents a square foot

b. Fees for tenant finish out and shell buildings will be 75% of the above fees

2. Plumbing, Mechanical and Electrical fees for New Construction (each)

a. $80.00 + $.05 cents a square foot

b. Fees for tenant finish out and shell buildings will be 75% of the above fees

3. Fees for Additions, Alterations, Repairs, Demolition, Screening Walls, Retaining Walls and accessory Buildings.

The following fees shall be charged for small construction jobs involving additions, alterations and repairs. Larger projects that involve substantial work shall be charged as new construction at the discretion of the Building Official.

| | |
|---|---|
| $5,000.01 to $10,000.00 | $145.00 |
| $10,000.01 to $25,000.00 | $210.00 |
| $25,000.01 to $50,000.00 | $400.00 |
| $50,000.01 to $100,000.00 | $600.00 |
| $100,000.01 or more | $600.00 for the first $100,000.00 + $75 for each $25,000.00 or fraction thereof.[4] |

By its plain terms, section (A) of the fee ordinance applies to residential construction, and section (B) applies to commercial construction. Section (A) appears to provide a flat fee of $1,000 for construction involving homes under 5,000 square feet. Section (B), on the other hand, provides a sliding fee scale for new commercial construction and commercial construction involving additions, alterations, repairs, and other non-comprehensive building activities. Subsection (B)(3) includes both a cost-based permit-fee structure and a grant of authority to the Building Official to treat a commercial building project as "new construction" if the Building Official determines, in his "discretion," that the project "involves substantial work." The City has also adopted a series of international building codes, including the "International Residential Code for One- and Two–Family Dwellings" (the "IRC"). Section (A) of the fee ordinance refers to the IRC regarding the scope of its application. The IRC in turn vests the Building Official with "the authority to render interpretations of [the IRC] and to adopt policies and procedures in order to clarify the application of its provisions."

 **\*3** McKinney (the City's Building Official) testified that, pursuant to the authority granted to him under the IRC, he construed section (A) of section 06–015 to apply only to residential *new* construction but used section (B)(3) as a guideline for determining fees for both residential and commercial *remodeling* projects. McKinney further testified that he exercises discretion to deem some residential remodels to be new construction if they "involve substantial work," which results in the application of the fee outlined in section (A) rather than use of the (B)(3) cost-based permit fee he would otherwise use as a guideline for setting the fee for a commercial project. It is disputed whether McKinney derives his authority to do so from subsection (B)(3) or from his general authority under the IRC, but it is undisputed that he engaged in the process set forth in subsection (B)(3) to set the permit fee in this case. The Lindigs contend that section 06–015 is unconstitutionally vague with regard to the fee structure applicable to residential remodeling jobs—either on its face or as it has been applied to them—because (1) the fee ordinance lacks a fee structure clearly applicable to residential remodeling projects, under either section (A) or section (B), and (2) there is neither a definition of "substantial work" nor any guidelines governing the application of that term or circumscribing the Building Official's discretion to deem a remodeling project to be new construction for purposes of establishing the applicable permit fee.

Ordinances are subject to the same constitutional requirements and construction canons as statutes. *Mills v. Brown,* 159 Tex. 110, 316 S.W.2d 720, 723 (Tex.1958) ("The same rules apply to the construction of municipal ordinances as to the construction of statutes."); *cf. Texas Liquor Control Bd. v. Attic Club, Inc.,* 457 S.W.2d 41, 45 (Tex.1970) ("A rule or order promulgated by an administrative agency acting within its delegated authority should be considered under the same principles as if it were the act of the Legislature."). To determine whether a statute is unconstitutionally vague, we begin by presuming that the statute is constitutional. *Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003). The party challenging the statute's constitutionality has the burden of showing that the statute fails to meet constitutional requirements. *Id.* A statute or ordinance is unconstitutionally vague if the persons regulated by it are exposed to risk or detriment without fair warning or if it invites arbitrary and discriminatory enforcement by its lack of guidance for those charged with its enforcement. *See Comm'n for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 437 (Tex.1998); *Attic Club,* 457 S.W.2d at 45; *City of Webster v. Signad, Inc.,* 682 S.W.2d 644, 646 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). Implicit in this constitutional safeguard is the idea that laws must have an understandable meaning and must set legal standards that are capable of application. *City*

*of Mesquite v. Aladdin's Castle, Inc.,* 559 S.W.2d 92, 94 (Tex.Civ.App.-Dallas 1977), *writ ref'd n.r.e.,*570 S.W.2d 377 (Tex.1978) (per curiam).“It is established that a law fails to meet the standards of due process if it is so vague and standardless as to leave a governing body free to decide, without any legally fixed guidelines, what is prohibited in each particular case.”*Id.* Due process is violated and a law is invalid if persons of common intelligence are compelled to guess at a law's meaning and applicability. *Attic Club,* 457 S.W.2d at 45; *Pennington v. Singleton,* 606 S.W.2d 682, 689 (Tex.1980); *Signad,* 682 S.W.2d at 646.

**\*4** When applying the fair-notice test, courts allow statutes imposing economic regulation greater leeway than they allow penal statutes. *See Pennington,* 606 S.W.2d at 689; *Signad,* 682 S.W.2d at 646. “A law is not unconstitutionally vague merely because it does not define words or phrases.”*Vista Healthcare, Inc. v. Texas Mut. Ins. Co.,* 324 S.W.3d 264, 273 (Tex.App.-Austin 2010, pet. denied). Only a reasonable degree of certainty is required, *id.*(citing *Pennington,* 606 S.W.2d at 689),* and the reasonable-certainty requirement “ ‘does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.’”*Signad,* 682 S.W.2d at 646–47 (quoting *Sproles v. Binford,* 286 U.S. 374, 393, 52 S.Ct. 581, 76 L.Ed. 1167 (1932)). Moreover, “the mere fact that the parties disagree as to [an ordinance's] meaning does not mean we must necessarily guess at its meaning.”*Mills v. Fletcher,* 229 S.W.3d 765, 770 (Tex.App.-San Antonio 2007, no pet.); *see Vista Healthcare,* 324 S.W.3d at 273.

In the present case, there are no guidelines governing the application of the “substantial work” standard embodied in section 06–015 as construed and applied by the City's Building Official. Nor is there any evidence that this phrase has a peculiar or technical meaning as applied to some trade or science. Rather, the Building Official testified that he alone makes the determination based on his impressions and experience regarding the scope of the work. Significantly, the City does use objective standards in similar circumstances in two other parts of its building regulations. Pursuant to section R105.3.1.1 of the IRC, the determination of whether existing buildings in areas prone to flooding are “substantially improved or substantially damaged” is made according to the following standard:

> If the building official finds that the value of proposed work equals or exceeds 50 percent of the market value of the building or structure

before the damage has occurred or the improvement is started, the finding shall be provided to the board of appeals for a determination of substantial improvement or substantial damage.

Once the Building Official has made the determination required by section R105.3.1.1, the board of appeals determines whether the value of the proposed work constitutes “substantial improvement” by applying the following guideline:

> [A]ny repair, reconstruction, rehabilitation, addition, or improvement of a building or structure, the cost of which equals or exceeds 50 percent of the market value of the building or structure before the improvement or repair is started. If the building or structure has sustained substantial damage, all repairs are considered substantial improvement regardless of the actual repair work performed.

*IRC* § R112.2.1. The IRC then lists several exclusions from the term that provide further guidance in its application. *Id.* In comparison to the “substantial work” standard the City's Building Official employed in the Lindigs' case, these provisions provide objective guidelines for applying the term “substantial” to certain residential property requiring construction.

**\*5** As construed and applied to the Lindigs, the ordinance at issue in this case employs language similar to that found to be constitutionally infirm in *City of Webster v. Signad, Inc.* There, the court considered a vagueness challenge to a city sign ordinance that provided that any outdoor advertising signs could not be rebuilt if there was damage to “any substantial parts” of the sign. 682 S.W.2d at 645–46. The court held that the quoted phrase was fatally vague and violated due process because it did not provide operators of outdoor advertising signs with fair and adequate notice as to what sign repairs were permitted or prohibited. *Id.* at 647–48.The ordinance provided no definition or guidelines for measuring “substantial parts” of the sign, leaving the court to conclude that persons of common intelligence would be left to guess the ordinance's meaning. *Id.* at 648.While the court noted that the words “substantial parts”

are common, they are not self-explanatory. *Id.* at 647. As the court explained, "Parts of a sign may be simultaneously 'substantial' and 'insubstantial' depending on whether the test used is economic, physical, or functional." *Id.* at 648. The court illustrated the uncertainty and ambiguity that arose from application of the "substantial parts" standard as follows:

> If an economic test is used, how expensive must a repair be to rise to the level of "substantial"? If a sign is valued at $30,000, is $1,000 in damage "substantial"? If a physical test is considered, is damage to one pole of a five-pole sign "substantial"? Should "substantial parts" of the sign include other than structural parts? Section B(15) of the Ordinance defines a "sign structure" as "the support, uprights, bracing, and framework of any outdoor advertising sign"; sign panels, readily movable and changeable, are not defined as a part of the sign structure. Is damage to one or more sign panels therefore to be considered as damage to a "substantial" part of the sign? A sign with broken or inoperative lights is not functional during nighttime hours, although the cost of repairs is small in comparison with the sign's total cost. From a functional perspective, the lights are "substantial parts" of the sign, while from a cost perspective they are not. The same ambiguity arises in numerous similar practical considerations.... Operators of outdoor advertising signs receive no fair and adequate notice from section H(2) of the Ordinance as to what sign repairs are permitted or prohibited.

*Id.*

As in *Signad,* people of common intelligence do not have fair notice as to what permit fee is required under section 06–015 for a residential remodel project. Just as important, the seemingly boundless discretion vested in the Building Official to interpret and apply the term invites arbitrary and discriminatory application. *Cf. Coffee City v. Thompson,* 535 S.W.2d 758, 763 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.) ("An ordinance leaving the question of issuing or denying building permits to the arbitrary discretion or determination of the city secretary without any rule or standard to follow is invalid."). The City argues that the Building Official's discretion is not unfettered because citizens have a right to appeal his determinations to the City's board of adjustment. The City does not explain how a standardless determination by the Building Official survives a vagueness challenge merely because an appeal body can review that determination. We conclude that the absence of reasonable guidelines or standards renders the

term "substantial work" unconstitutionally vague as applied to the Lindigs regardless of who is making that determination. *See Texas Antiquities Comm. v. Dallas Cnty. Cmty. Coll.,* 554 S.W.2d 924, 928 (Tex.1977) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on *ad hoc* and subjective basis, with the attended [sic] dangers of arbitrary and discriminatory applications."(quoting *Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Although courts recognize that myriad factual situations may arise, such that statutes can and should be worded with flexibility, the public must be provided fair notice of what is required or prohibited. *Vista Healthcare,* 324 S.W.3d at 273. The "substantial work" standard applied in this case does not do so and is therefore constitutionally infirm.[5] We therefore sustain the Lindigs' first issue and conclude that section 06–015 is unconstitutionally vague to the extent it imposes a new-construction building-permit fee based on the Building Official's determination that residential remodeling construction "involves substantial work" and thus qualifies as new construction.

**\*6** Having sustained the Lindigs' first issue, we also sustain their second, third, and fourth issues relating to the damages awarded to the City based on the trial court's erroneous enforcement of the $1,000 permit fee. With regard to those issues, it appears that there remain genuine issues of material fact regarding whether the Lindigs were issued a permit number; whether the Lindigs violated the building-permit-fee ordinance or the IRC by failing to complete the permit application and obtain a permit, failing to comply with the stop-work order that referenced the absence of a permit, and failing to comply with the IRC both with regard to the application process and the materials used in construction; and whether, when, and how the Lindigs were informed about the stop-work order. These issues are distinct from whether the Lindigs were required to pay a fee to obtain a permit.[6]

### CONCLUSION

We hold that the building-permit-fee ordinance (section 06–015 of the City's Code of Ordinances) is void for vagueness as construed and applied to the Lindigs because the determination of what residential remodeling projects involve "substantial work," and thus may be treated as new construction under the permitting ordinance, lacks standards that are capable of application with a reasonable degree of certainty. We therefore reverse the trial court's

summary judgment in the City's favor and render judgment in the Lindigs' favor on their declaratory judgment claim. Specifically, we render judgment that, as applied to the Lindigs, section 06–015 is unconstitutionally vague to the extent it imposes a new-construction-permit fee based on the Building Official's determination that residential remodeling construction "involves substantial work" and thus qualifies as new construction. However, fact issues remain as to whether the Lindigs violated the building-permit-fee ordinance by failing to complete the permit application, failing to obtain a permit, and failing to comply with the stop-work order. Accordingly, we reverse the portion of the trial court's summary judgment awarding the City civil penalties and attorneys' fees and remand this cause to the trial court for further proceedings.

**All Citations**

Not Reported in S.W.3d, 2012 WL 5834855

Footnotes

1    The Lindigs' countersuit also included claims against the City's board of adjustment and various City officials, as well as additional claims against the City alleging estoppel, civil conspiracy, and an unconstitutional taking. Those claims, however, were disposed of in the trial court and are not at issue on appeal.

2    In a previous opinion of this Court, we considered the Lindigs' interlocutory appeal from a trial-court order dismissing the Lindigs' claims for want of subject-matter jurisdiction. We affirmed the trial court's judgment with regard to claims based on alleged injuries to the public at large but otherwise reversed the judgment and remanded the cause for further proceedings. *See Lindig v. City of Johnson City,* No. 03–08–00574–CV, 2009 WL 3400982, at *6 (Tex.App.-Austin Oct.21, 2009, no pet.)(mem.op.). The extensive procedural history leading up to the summary-judgment proceedings at issue in this appeal were fully set forth in our previous opinion and need not be repeated in their entirety. *See generally id.* at *1–12.In this opinion, we recount the factual and procedural history of the case only to the extent it is pertinent to the issues in this appeal.

3    The parties do not dispute that the City required the Lindigs to pay $1,000 in fees for the remodeling project, but the evidence is inconsistent regarding whether the *permit fee* itself was $1,000 or something less. Although Peter McKinney testified that the Lindigs were required to pay the $1,000 permit fee applicable to new construction projects, David Dockery, the City Manager and City Administrator, testified before the board of adjustment that the $1,000 fee was actually composed of an $850 permit fee (calculated by taking the $1,000 permit fee for new construction and subtracting $150 for two inspections that would not be required for the remodeling project) and adding a $150 "res check fee." Because this factual discrepancy does not alter our analysis, we characterize the fee as a $1,000 permit fee consistent with the parties' briefing in this case.

4    Section C of the fee ordinance includes the following "miscellaneous fees," which are not at issue in this appeal:
    Any Activity listed below shall be charged the following fee associated with the activity.

| | |
|---|---|
| Certificate of Occupancy (only charged when no permit issued for new construction) | $105.00 |
| Temporary Certificate of Occupancy (charged for all temporary certificates of occupancy) | $105.00 |
| Fence Permit | $50.00 |
| In-ground swimming pool | $300.00 |
| Spa or above-ground pool | $105.00 |
| Lawn Sprinkler | $75.00 |
| Construction Trailer | $95.00 |
| Drive Approach | $75.00 per approach |
| Sidewalk | $75.00 per lot |
| Additional Plan Review | $75.00 per hour–1 hr min. |
| Hourly Rate | $105.00 per hour |

5    The City's reliance on *Vista Healthcare, Inc. v. Texas Mutual Insurance Co.,* 324 S.W.3d 264 (Tex.App.-Austin 2010, pet. denied), is misplaced. That case is distinguishable from this case in many ways, but to the extent it affirmed the constitutionality of the guidelines applicable to reimbursement rates for medical expenditures, it also reaffirmed the settled principle that an ordinance must provide fair notice of the applicable standards. Here, there are none.

Several provisions of the IRC are germane to the issues on remand. Among those provisions are section R105.1 of the IRC, which appears to require that a permit be obtained regardless of whether there is a fee for the permit. Section R105.1 provides:

> Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish, or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, *shall first make application to the building official and obtain the required permit.*

Section R105.3 of the IRC governs applications for a permit and instructs:

> To obtain a permit, the applicant shall first file an application therefor in writing on a form furnished by the department of building safety for that purpose. Such application shall:
>
> 1. Identify and describe the work to be covered by the permit for which application is made.
> 2. Describe the land on which the proposed work is to be done by legal description, street address or similar description that will readily identify and definitely locate the proposed building or work.
> 3. Indicate the use and occupancy for which the proposed work is intended.
> 4. Be accompanied by construction documents and other information as required in Section 106.1.
> 5. State the valuation of the proposed work.
> 6. Be signed by the applicant, or the applicant's authorized agent.
> 7. Give such other data and information as required by the building official.

Upon application for a permit and pursuant to section R105.3.1 of the IRC, the City's Building Official is required to review a permit application within a reasonable time, inform the applicant in writing if the application or construction documents do not conform to the requirements of pertinent laws, and state the manner in which compliance is lacking. The record is not developed as to the extent to which the Lindigs and the City's Building Official complied with these provisions.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

206 S.W.3d 572
Supreme Court of Texas.

MACK TRUCKS, INC., Petitioner,

v.

Elizabeth TAMEZ et. al., Respondent.

No. 03–0526. | Argued Oct. 20, 2004. | Decided Oct. 27, 2006. | Rehearing Denied Dec. 22, 2006.

**Synopsis**

**Background:** Survivors of petroleum tanker driver who died when his truck burst into flames brought action against the tanker manufacturer, asserting claims for negligence, strict liability, breach of implied warranty, and misrepresentation. The 105th District Court, Nueces County, J. Manuel Banales, J., granted summary judgment for the defendant manufacturer. The survivors appealed. The Corpus Christi–Edinburg Court of Appeals, Thirteenth District, 100 S.W.3d 549, reversed and remanded. Tanker manufacturer appealed.

**Holdings:** The Supreme Court, Phil Johnson, J., held that:

[1] the Court of Appeals could not consider expert's causation testimony from bill of exceptions, and

[2] testimony on causation from post-collision fuel-fed fire expert was not admissible.

Reversed and rendered.

**Attorneys and Law Firms**

**\*575** Sean E. Breen, Randy Howry, Herman Howry & Breen, L.L.P., Austin, Robert Lee Galloway, Kellye Ruth Koehn, Thompson & Knight LLP, Houston, for petitioner.

John Blaise Gsanger, William R. Edwards, William R. Edwards III, The Edwards Law Firm, L.L.P., Corpus Christi, John Gonzales, John Gonzales & Associates, San Antonio, David O. Gonzalez, Law Offices of Baldemar Gutierrez, Alice, Glenn M. Boudreaux, Maryellen Hester, Boudreaux Leonard & Hammond, P.C., Houston, for for respondent.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

In this truck accident case the trial court excluded expert testimony as to what caused a post-accident fire that burned the truck and the driver. After excluding the expert testimony because it was not reliable, the trial court granted summary judgment. The court of appeals reversed. We hold that the trial court did not err, reverse the court of appeals' judgment, and render judgment that the plaintiffs take nothing.

**I. Background**

On October 19, 1996, Abram Tamez was operating a Mack Truck tractor hauling a trailer of crude oil. Tamez was rounding a curve in the road when the tractor and trailer overturned. A fire erupted and burned the trailer, its cargo, and the tractor. Tamez was able to climb out of the tractor, but he was badly burned and died as a result of his injuries.

As a result of Tamez's death, suit was filed[1] against the tractor's manufacturer, Mack Trucks, Inc., and others.[2] The Tamezes alleged that Mack defectively designed, manufactured and marketed the tractor. They claimed that Mack was liable for negligence, gross negligence, strict products liability, breach of warranty, and misrepresentation. All five theories were based on the same complaint: diesel fuel from the truck's fuel system originated the fire that burned Abram Tamez. Specifically, the Tamezes alleged that the tractor had design and manufacturing defects because (1) the fuel system was unreasonably prone to fail and release diesel fuel in an environment conducive to ignition and fire; and (2) the tractor had ignition sources **\*576** such as hot manifolds and electric batteries in areas likely to contain released flammable fluids. The Tamezes also alleged that Mack failed to provide warnings about the defects.

In connection with its claims against Mack, the Tamezes identified Ronald Elwell as an expert on post-collision, fuel-fed fires. Mack moved to exclude his testimony as unreliable and moved for summary judgment. Mack asserted multiple grounds for seeking summary judgment. Some grounds for its motion were directed at particular plaintiffs, while some grounds were directed at all the Tamezes. One part of Mack's motion directed at all the Tamezes was a Rule 166a(i) motion urging that the Tamezes could present no evidence that any

alleged defects caused the fire. The Tamezes responded to the no-evidence part of Mack's motion, in part, by filing Elwell's deposition and his expert report. They also later submitted Elwell's testimony from a bill of exceptions.

Pretrial matters, including a *Robinson* [3] hearing pursuant to Mack's motion to exclude Elwell's testimony, were scheduled and heard. During the *Robinson* hearing Elwell testified. He expressed the opinion that the fire was started by the tractor's battery, which was located too near the fuel tanks, igniting the tractor's diesel fuel, which in turn ignited the trailer's cargo of crude oil.

The trial court granted Mack's motion to exclude Elwell's testimony as to causation. The Tamezes later moved the trial court to reconsider its decision. The court denied the motion but allowed the Tamezes to have Elwell testify again to create a bill of exceptions. [4] The court signed an order excluding the causation portion of Elwell's testimony from being considered as evidence at any trial or hearing because it was not sufficiently reliable. Mack's motion for summary judgment was granted.

The court of appeals reversed the summary judgment, concluding that the trial court abused its discretion in excluding Elwell's causation testimony, [5] and also concluding that Elwell's testimony provided some evidence of causation. The court of appeals' opinion indicates that in reaching its decision it considered Elwell's testimony from both the *Robinson* hearing and the bill of exceptions. *See* 100 S.W.3d 549, 556, 559, 561.

Mack urges that the trial court correctly excluded Elwell's testimony on causation, did not abuse its discretion in refusing to reconsider that ruling, and properly granted summary judgment because the Tamezes presented no evidence of causation. Mack asserts, among other matters, that the court of appeals erred by (1) considering Elwell's causation testimony from both the *Robinson* hearing and the bill of exceptions; (2) reversing the trial court's ruling as to admissibility of Elwell's causation testimony; and (3) reversing the summary judgment.

We conclude that the trial court did not abuse its discretion in excluding Elwell's testimony on causation and that the court **\*577** of appeals erred in considering testimony from the bill of exceptions in evaluating the trial court's exclusion of Elwell's causation testimony. We further conclude that

the Tamezes presented no summary judgment evidence of causation and summary judgment was properly granted.

## II. Elwell's Bill of Exceptions Testimony

**[1]** Mack argues that the court of appeals erred by considering testimony admitted only for the bill when it reviewed the trial court's exclusion of Elwell's causation testimony. The Tamezes claim that whether Elwell's bill of exceptions testimony is considered is not relevant because his bill testimony added nothing to his *Robinson* hearing testimony. Further, in their brief and at oral argument the Tamezes disclaim having urged in the court of appeals that the trial court erred in (1) holding a *Robinson* hearing, (2) the manner in which the hearing was conducted, (3) the timing of the hearing, or (4) denying their motion for reconsideration. Our review of their briefs in the court of appeals confirms the Tamezes' position. They do not contend here either that the bill of exceptions testimony was improperly excluded or that the trial court erred in denying their motion to reconsider.

The purpose of a bill of exceptions is to allow a party to make a record for appellate review of matters that do not otherwise appear in the record, such as evidence that was excluded. TEX. R. APP. P. 33.2; TEX. R. EVID. 103(a)(2); *see also In re Ford Motor Co.,* 988 S.W.2d 714, 721 (Tex.1998). The court of appeals' opinion indicates that it considered Elwell's bill of exceptions testimony in evaluating the admissibility of his opinions even though the trial court did not. *See* 100 S.W.3d at 556, 559. As one example, the court of appeals referenced Elwell's opinion that at least one of the tractor's side fuel tanks became displaced during the rollover and separated the balance line connecting the two fuel tanks. *Id. at* 557. The court pointed to Elwell's testimony interpreting photographic evidence of steel straps which held the tanks as support for his opinion. *Id.* The referenced testimony as to Elwell's opinion and interpretation of photographic evidence was given as part of his bill of exceptions testimony, but he did not give similar testimony during the *Robinson* hearing.

**[2]** Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties. *See In the Interest of B.L.D.,* 113 S.W.3d 340, 350–52 (Tex.2003). We have described fundamental error as those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State, or instances in which the record affirmatively and conclusively

shows that the court rendering the judgment was without jurisdiction of the subject matter. *See McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957). The court of appeals did not classify the trial court's refusal to allow the Tamezes to present further evidence and to then reconsider its ruling to exclude Elwell's causation testimony as fundamental error, and neither do we. The court of appeals erred in considering Elwell's causation testimony from the bill of exceptions without having first determined, pursuant to properly assigned error, that the trial court erred in refusing to admit the testimony and reconsider its decision to exclude Elwell's causation opinions. Under the record and issues presented to us, we may not consider Elwell's testimony from the bill of exceptions in determining whether the trial court erred in excluding Elwell's causation **\*578** testimony. *See Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304 n. 1 (Tex.2004).

### III. Reliability of Elwell's Testimony

### A. Standard of Review

 **[3]**  **[4]**  **[5]**  An expert witness may testify regarding "scientific, technical, or other specialized" matters if the expert is qualified and if the expert's opinion is relevant and based on a reliable foundation. TEX. R. EVID. 702; *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499 (Tex.2001); *Robinson,* 923 S.W.2d at 556. In determining whether expert testimony is reliable, a court should examine "the principles, research, and methodology underlying an expert's conclusions." *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). When the testimony involves scientific knowledge, the expert's conclusions must be "grounded 'in the methods and procedures of science.' " *Robinson,* 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Otherwise, the testimony is "no more than 'subjective belief or unsupported speculation.' " *Id.* (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786). We have identified several non-exclusive factors that trial courts should consider when determining the reliability of expert testimony involving scientific knowledge.[6] We recognize that these factors may not apply when testimony is not scientific, but, rather, involves technical or other specialized knowledge. *Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 726 (Tex.1998). Even then, however, there must be some basis for the opinion to show its reliability. *Id.* An expert's

bare opinion will not suffice. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). And, there cannot be " 'too great an analytical gap between the data and the opinion proffered.' " *Gammill,* 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

 **[6]**  **[7]**  **[8]**  **[9]**  A trial court has broad discretion in determining whether expert testimony is admissible. *Zwahr,* 88 S.W.3d at 629. Its ruling will be reversed only if that discretion is abused. *K–Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000). Because the party sponsoring the expert bears the burden of showing that the expert's testimony is admissible, the burden of presenting understandable evidence that will persuade the trial court is on the presenting party. *See Robinson,* 923 S.W.2d at 557. When an expert's "processes" or "methodologies" are obscured or concealed by testimony that is excessively internally contradictory, non-responsive or evasive, a trial court will not have abused its discretion in determining that the expert's testimony is not admissible. *See GMC v. Iracheta,* 161 S.W.3d 462, 470–72 (Tex.2005).

### B. Reliability Factors

The court of appeals noted that Elwell's testimony largely applied his knowledge, training, and experience to the underlying data and that his methodology was not easily tested by objective criteria such as identifiable scientific formulas. The court of appeals concluded that under such circumstances **\*579** the reliability of Elwell's opinion is not properly measured by a *Robinson*-factor analysis, but that the "analytical gap" test should be applied. 100 S.W.3d at 555–56.

Mack argues that the court of appeals' analysis is flawed. Mack urges that Elwell's inability to demonstrate at least one of the *Robinson* factors, coupled with his inability to eliminate the crude oil tanker as the source of the fire, rendered Elwell's testimony unreliable. The Tamezes, on the other hand, argue that because Elwell's testimony was based on his training and experience, and not science, application of the analytical gap test, as opposed to use of *Robinson* factors, was appropriate. They contend that Elwell's opinion was reliable because there were no analytical gaps in his testimony. *See Gammill,* 972 S.W.2d at 726.

In *Gammill* we clarified that the list of non-exclusive factors listed in *Robinson* may not be applicable when assessing

certain kinds of expert testimony. 972 S.W.2d at 720. We held that *Robinson* factors did not apply to the mechanical engineer expert under consideration in *Gammill,* even though his claimed expertise was scientific in nature. *Id.* at 727. In so holding, however, we did not mean to imply that a trial court should never consider the *Robinson* factors when evaluating the reliability of expert testimony that is based on knowledge, training or experience, or that the factors can only be applied when evaluating scientific expert testimony. We recognized that the criteria for assessing reliability must vary depending on the nature of the evidence. *Id.* at 726.

 **[10]**    The United States Supreme Court has noted that it is not possible to "rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert."  Kumho Tire v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Nor can the Court "now do so for subsets of cases categorized by category of expert or by kind of evidence," as "[t]oo much depends upon the particular circumstances of the particular case at issue." *Id.* In *Robinson* we likewise explained that the factors mentioned do not constitute an exclusive list and that the trial court's gatekeeping inquiry will differ with each particular case depending on the "[t]he factors a trial court will find helpful in determining whether the underlying theories and techniques ... are scientifically reliable." *Robinson,* 923 S.W.2d at 557. Thus, a trial court should consider the factors mentioned in *Robinson* when doing so will be helpful in determining reliability of an expert's testimony, regardless of whether the testimony is scientific in nature or experience-based. *See Kumho Tire,* 526 U.S. at 139, 119 S.Ct. 1167; *Gammill,* 972 S.W.2d at 726.

 **[11]**    In determining reliability, the trial court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *See Amorgianos v. Amtrak,* 303 F.3d 256, 267 (2d Cir.2002). A significant part of the trial court's gatekeeper function is to evaluate the expert's qualifications, listen to the testimony, view the evidence, and determine which factors and evaluation methodology are most appropriate to apply. For example, in the present case the trial court would have been within its discretion to measure the reliability of Elwell's testimony, at least in part, by considering (1) the extent to which Elwell's theory had been or could be tested; (2) the extent to which his methodology relied upon his subjective interpretation; (3) the methodology's potential rate **\*580** of error; (4) whether

the underlying theory or methodology has been generally accepted as valid by the accident reconstruction and post-collision fire investigation community; and (5) the non-judicial uses that have been made of his methodology. These are similar to factors 1, 2, 4, 5 and 6 of those enumerated in *Robinson.* But, as we have said above, that is not to imply that the trial court was precluded from measuring Elwell's methodology by *Gammill's* analytical gap analysis.

### C. Elwell's Causation Testimony

 **[12]**    At the *Robinson* hearing, Elwell testified that the fuel and battery system on the tractor were designed improperly, and suggested safer designs. He criticized the placement of the fuel tanks and also of the batteries'[7] proximity to the fuel tanks. He criticized certain parts of the fuel system such as the crossover or "balance line" hose between the two fuel tanks and the spigots by which the hose was attached to each of the tanks. He referenced a particular report, which was not introduced, which he asserted supported his design critiques and his suggested safer designs.

Elwell's analysis and conclusion that the fire began with the fuel system and the battery system were based on the "fire triangle" theory. He explained that under the fire triangle theory, a post-collision fuel-fed fire such as the one under consideration must be analyzed with an eye toward the ignition, fuel, and oxygen sources that were available. Because the air provided oxygen, his analysis centered on the other parts required to complete the triangle, "the source of fluids that could be ignited and what would it take to ignite those fluids and fuel, of course, is the primary suspect, either fuel or crude oil in this particular case."

He did not testify that he inspected the remnants of the burned tractor and trailer or that he performed or reviewed any accident reconstruction analysis as to how the rollover occurred and how different parts of the vehicle would have been affected or harmed thereby. His *Robinson* hearing testimony did not identify a particular alleged defect of the tractor's fuel system that he concluded was the source of a diesel fuel leak that initiated the fire.

On cross-examination he testified that he had read and relied on "over 5,000" studies on the subject of the causes of post-collision fuel-fed fires. He did not specify any studies that supported his conclusion as to the specifics involved in the

accident, and none were offered as evidence for the trial court to consider in evaluating his testimony.

In coming to his conclusion that the fire began with the fuel system and battery system of the tractor, Elwell asserted that he relied on several specific factors and facts. Each of the factors and facts he enumerated supported conclusions that Tamez was burned by diesel and that the diesel ignited so quickly that Tamez could not escape.

Even assuming that what Elwell relied on and classified as "factors" and "facts" were true, however, which Mack denies, the factors and facts are merely consistent with diesel fuel having been released during the rollover and Tamez having been burned by part of the fire fed by the tractor's diesel fuel. They are not probative evidence that diesel fuel was released because of one of the asserted defects in the fuel system or that it was ignited by the battery system. He did not testify to having analyzed, tested, or investigated the characteristics of batteries like the battery in the wrecked tractor to support his **\*581** opinion that the battery system was involved in causing the fire. He failed to set out any process by which he excluded other sources for ignition of the diesel fuel such as mechanical sparks which could be generated when parts of a truck make contact with the pavement, or ignition of the cargo fuel which in turn could have ignited the diesel fuel. *See Gammill,* 972 S.W.2d at 728; *see also Robinson,* 923 S.W.2d at 559 (noting that an expert who is trying to find a cause of something should carefully consider alternative causes). For example, when Elwell was asked during the *Robinson* hearing why he concluded that the fire originated with the fuel and battery systems instead of with the crude oil cargo, his response was that "if [crude oil] remains to be burned, that after five or ten or fifteen minutes, then that's not the fuel that started the fire." He did not explain any investigation or research that supported such a conclusion. He did not elaborate on the amount of crude that was in the trailer when the wreck occurred, calculate the amount of time it would take the cargo to burn, or discuss or compare the relative ease of ignition or flash points of the crude and diesel fuel. He did not address any analysis or process by which he concluded that some part of a trailer of crude oil would continue to burn for several minutes only if it was ignited by, rather than being the ignitor of, diesel fuel from the tractor's fuel system.

In sum, Elwell did not testify at the *Robinson* hearing to a methodology by which he reached the conclusions as to the fire having been caused by defects in the tractor's fuel and battery systems. In order for Elwell's testimony on causation to be reliable, he was required to present some methodology that reliably supported his opinions that the "fuel" and "ignition" parts of the fire triangle were supplied, respectively, by the tractor's alleged fuel system defects and battery system. He did not do so. The mere fact that the fuel system had a design that could cause the hoses to separate is not evidence that the hoses separated in this case.

Elwell's testimony did no more than set out "factors" and "facts" which were consistent with his opinions, then conclude that the fire began with diesel fuel from the tractor. The reliability inquiry as to expert testimony does not ask whether the expert's conclusions appear to be correct; it asks whether the methodology and analysis used to reach those conclusions is reliable. *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004). The trial court was not required to accept his opinions at face value just because Elwell was experienced in examining post-collision fuel-fed fires. *See Gammill,* 972 S.W.2d at 726 (holding that a court should not admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert).

We conclude that the trial court did not abuse its discretion when it excluded Elwell's testimony on causation. The court of appeals erred when it determined otherwise.

### IV. The Summary Judgment

Mack moved for summary judgment on multiple grounds, including the ground that there was no evidence Mack's fuel system design was a producing or proximate cause of Tamez's injuries. The Tamezes contend that even without Elwell's testimony as to causation, they presented sufficient evidence to survive summary judgment.

### A. Standard of Review

A summary judgment motion pursuant to TEX. R. CIV. P. 166a(i) is essentially a motion for a pretrial directed verdict. *See* **\*582** *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Id.; W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting

evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005); *Johnson v. Brewer & Pritchard, P. C.,* 73 S.W.3d 193, 208 (Tex.2002).

### B. Causation

Producing or proximate cause is an element of all of the Tamezes' claims, which included negligence, misrepresentation, breach of warranty, and design, manufacturing, and marketing defects. Causation-in-fact is common to both proximate and producing cause, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the injuries in question. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995).

All the Tamezes' theories regarding the fire's cause were based on allegations that the tractor's fuel system was defectively designed and manufactured so as to be unreasonably prone to fail and release flammable fluids in an environment conducive to ignition and fire; that such defects caused the release of diesel fuel; and that a defectively designed and placed ignition source then caused ignition of the released diesel.

 **[13]** To survive summary judgment on their theory that a defect in the tractor's fuel system was the cause of the fire, the Tamezes were required to present more than evidence of a fuel leak. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600–01 (Tex.2004) (affirming summary judgment because the plaintiffs' evidence "establishe[d] only that a fire occurred, and [the plaintiffs' expert] could say no more than that he 'suspects' the electrical system caused the fire"). They had to present evidence that (1) the diesel fuel leaked because of one or more of the alleged defects, and (2) the leak caused by the defect was the ignition point for the fire. *See Iracheta,* 161 S.W.3d at 470 (holding that the possibility that the fire occurred in the manner the plaintiff suggested is not enough to support the jury's findings); *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 137 (Tex.2004).

The Tamezes point to several parts of their summary judgment evidence that they say are sufficient, individually or collectively, to defeat summary judgment: (1) an accident witness's "personal assumption," based on his averred experience with and ability to recognize the smell of diesel

fuel, that Tamez was burned by diesel fuel because Tamez was coated with a shiny, oily substance and did not smell like crude oil; (2) a notation by Mack's accident reconstruction expert noting a diesel fuel spill on the road; (3) a statement by Elwell that the design of the system was such that if there was any significant dislodgement of the fuel tanks, the fuel line would separate;[8] (4) a statement by Mack's expert witness that it was possible that a battery cable found in the tractor had arced and ignited the fire, although **\*583** the witness ultimately concluded that the crude-oil cargo caused the fire; and (5) an eyewitness's statement implying that it took the fire a short period of time to reach Tamez, who exited and crawled away from the tractor after the accident.

 **[14]** **[15]** **[16]** Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding. *See Alexander v. Turtur & Assocs.,* 146 S.W.3d 113, 119–20 (Tex.2004). Whether expert testimony is necessary to prove a matter or theory is a question of law. *See FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 89 (Tex.2004). In *Fulgham* we held that expert testimony was necessary to establish the standard of care for connecting refrigerated trailers to tractors and for the frequency and type of inspection and maintenance of such connectors, because those matters were not within the general experience and common understanding of laypersons. *Id.* at 91; *See also Turbines, Inc. v. Dardis,* 1 S.W.3d 726, 738 (Tex.App.-Amarillo 1999, pet. denied) (holding that performance of mechanical work on turbine aircraft engines is not within the experience of a layperson).

 **[17]** A lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident. *See Nissan Motor Co.,* 145 S.W.3d at 137 (stating that we have consistently required competent expert testimony and objective proof that a defect caused the condition complained of). Nor would a lay juror's general experience and common knowledge extend to determining which of the fire triangle's fuel sources, diesel from the tractor or crude from the tanker, would have first ignited, or the source for the first ignition. That part of Elwell's testimony that was properly before the trial court and the testimony of other experts as to the amount of time they

spent in studying, investigating, and working in the field of post-collision, fuel-fed fires demonstrated the intricacies of such subject matter. Issues such as those regarding the fire's cause(s) present matters beyond the general understanding and common knowledge of lay jurors. Proof of causation in this case also required expert testimony.

The summary judgment evidence presented by the Tamezes did not contain proof that any of the possible sources of diesel fuel was more likely than any other, or more likely than the crude oil cargo, to have been the source of liquids that first caught fire. Accordingly, there is no evidence that the source was one of the alleged fuel system defects. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

 [18]    The Tamezes also alleged that several ignition sources were located in areas likely to contain diesel that would be released in a wreck. The Tamezes point to expert testimony that an arced battery cable found in the tractor could possibly have ignited the fire. But, testimony that the battery or its cable could possibly have ignited the fire is not evidence that it probably did so. The expert who provided this testimony could not determine whether the cable arced before the fire was ignited or as it was being burned by an otherwise-ignited fire. As proof of what caused the fire, such evidence is speculative and is insufficient to prevent summary judgment.

*See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998).

 **\*584**    **[19]**    The plaintiffs also rely on circumstantial evidence suggesting that the fire quickly reached Tamez. That evidence is consistent with the Tamezes' theory that the fire originated with fuel from the tractor's diesel fuel system. But, such evidence does not make it more likely than not that the battery or some other allegedly improperly located ignition source ignited diesel from the tractor, as opposed to other possible sources of ignition such as the cargo of crude oil. Accordingly, the circumstantial evidence is not sufficient to prevent summary judgment. *Id.*

### V. Conclusion

The plaintiffs produced no evidence that the alleged defects of the Mack tractor were a cause-in-fact of injuries to Abram Tamez. Because causation is a required element of each of the Tamezes' claims, the trial court properly granted summary judgment. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

### All Citations

206 S.W.3d 572, 50 Tex. Sup. Ct. J. 80

Footnotes

1    Elizabeth Tamez filed suit. Elsa Guerrero, Rosendo Tamez, Sr., Dora Tamez, Rosa Elvia Gonzales, Donna Kim Cantu, and Terrie L. Zay intervened. Rosa subsequently nonsuited. For ease of reference all the claimants will be referred to collectively as "the Tamezes" or "the plaintiffs."

2    Other defendants were Fruehauf Trailer Corporation, Norco Crude Gathering, Inc., Glitsch Canada, Ltd., and Snyder Tank Corp. The claims against those defendants were either nonsuited or settled and were severed from the claims against Mack.

3    *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

4    An offer of proof is sometimes referred to as a bill of exceptions. *See* TEX.R. EVID. 103(a)(2); TEX.R.APP. P. 33 (comment to 1997 change). As the court of appeals and the parties refer to the offer of proof in this case as a bill of exceptions, we will, also.

5    After Elwell's expert testimony was excluded by the trial court, the Tamezes obtained testimony from another expert witness, Douglas Holmes. Mack moved to exclude Holmes's testimony, and the trial court orally granted the motion. The court of appeals upheld the exclusion of Holmes's testimony. 100 S.W.3d 549, 559. The Tamezes do not challenge the court of appeals' ruling as to Holmes.

6    *Id.* (identifying the following considerations regarding reliability of scientific testimony: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique).

7    The record is not clear whether the tractor had one battery or two.

8    Elwell's testimony on design defect, as opposed to his testimony on causation, was not excluded.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

669 S.W.2d 415
Court of Appeals of Texas,
Houston (1st Dist.).

Bruce R. MACK d/b/a Mace & Mack, an
association of attorneys at law, Appellant,

v.

Andy and Wilma MOORE d/b/a Andy Moore
& Son Aeronautical Specialties, Appellees.

No. 01–83–0549–CV. | April 12, 1984.

Attorney brought a suit upon a sworn account for accounting and tax services performed for clients and for attorney fees incurred in selection and prosecution of case. The County Civil Court at Law No. 3, Harris County, Hugo Touchy, J., entered judgment awarding fees for less than those requested, and attorney appealed. The Court of Appeals, Bass, J., held that: (1) where three expert witnesses testified that $4,865 was reasonable value of attorney's services and client did not impeach expert witnesses on cross-examination, the only reasonable conclusion to be drawn from the evidence was that $4,865 was the reasonable value of services rendered, and when that amount, less $1,715 for prior payments by clients, left a balance of $3,150, that was amount which attorney should have been awarded in judgment, and (2) where trial court in its conclusions of law implied that the usual and customary attorney fees were one-third of the amount of the judgment, the award of $300 in attorney fees would be increased to $1,050.

Reversed and rendered.

**Attorneys and Law Firms**

**\*416** Bruce B. Mack, Mace & Mack, Houston, for appellant.

**\*417** John Gilleland, Houston, for appellees.

Before WARREN, COHEN and BASS, JJ.

**OPINION**

BASS, Justice.

This is a suit upon a sworn account, and in the alternative for quantum meruit, seeking $3,150.00 in fees for accounting and tax services performed for appellees and $1,950.00 in attorney's fees incurred in the collection and prosecution of this case. The case was tried to the court. The appellees defended on the basis that all fees incurred had been paid in full, and further asserted that the charges alleged by appellant were not in accordance with their set fee of $90.00 per month. The appellant presented his case-in-chief and rested, and the appellees rested immediately thereafter, calling no witnesses to controvert appellant's claim.

The trial court entered judgment for appellant, finding that the appellees requested the services be performed, that the services were performed to the satisfaction of appellees, that there was no agreement whereby appellees would pay appellant a set fee per month, and that the appellees had agreed to pay the reasonable value of the services which were performed. The court then rendered judgment for appellant, finding that the reasonable value of the appellant's services was $275.00 per month, and the amount still due and owing by appellees was $1,035. Additionally, the trial court awarded appellant one third of the final judgment, or $300.00, in attorney's fees. The appellant appeals on the points that trial court's valuation of both his services and his attorneys fees was erroneous.

The appellant, Bruce R. Mack, is a licensed C.P.A. and tax attorney, with an L.L.M. in taxation. His tax experience includes numerous years as an agent and regional supervisor for the I.R.S. and as an auditor with a large public accounting firm.

In January of 1981, the appellees retained the appellant to perform certain tax work in connection with their business, including the reconciliation of their prior bank accounts and employee payroll tax records, and the preparation and filing of their income tax return for 1980. In connection with this work, appellant was to review prior years payroll tax returns and to amend as necessary, file any and all necessary reports, and then keep appellees' records current through the quarterly preparation of payroll tax returns, sales tax reports, and the monthly preparation of their profit and loss statements.

Appellant completed the agreed work, preparing all necessary returns and delivering this work to the appellees. The degree of difficulty in the preparation of these reports was greatly enhanced by various errors within the prior reports and bank statements. This required the appellant supervisory employee to have several conferences with appellees in an attempt to reconcile these errors. The appellant personally presented his final invoice of $4,865.00 to appellees, and explained the

charges as they related to the work which he performed. Appellees agreed to pay the invoice and further negotiated a set fee of 275.00 per month for future work, including the periodic preparation of the company's payroll reports etc. However, after they had paid appellant $1,715.00, of the invoice, appellees refused to pay the remaining balance, claiming the bill was paid in full. This action left $3,150.00 still due and owing on the account, and the appellant was forced to file suit to collect the balance.

Trial was to the court, and after judgment for appellant the trial judge, upon proper request, made the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On or about January 1, 1981, Defendants engaged Plaintiff to perform certain accounting and tax work for them.

2. Defendants had no agreement with Plaintiff for a set sum for the work but **\*418** were to pay the reasonable value of services rendered.

3. Plaintiff performed the services as reflected on his invoices to Defendants.

4. Defendants were satisfied with the services performed by the Plaintiff.

5. The reasonable value of the services performed by Plaintiff is $2,750.00 (10 months x $275.00) and Defendants have paid to the Plaintiff $1,715.00 leaving a balance due of $1,035.00.

6. Plaintiff had to engage John J. Eikenburg, a Texas attorney, to collect plaintiff's claim.

7. Plaintiff is entitled to attorney's fees under Article 2226, Texas Revised Civil Statutes.

### CONCLUSIONS OF LAW

1. Defendants are indebted to Plaintiff for the sum of $1,035.00.

2. The indebtedness of Defendants to Plaintiff bears interest at the rate of six percent per annum from January 1, 1982, until date of Judgment.

3. Plaintiff is entitled to attorney's fees equal to one-third of the judgment, being $300.00.

4. Plaintiff's right to collection of such indebtedness is not barred by limitations.

Initially, the appellant contends the trial court erred in not finding as a fact that the reasonable value of the services he performed and which were still due and owing to him by the appellees was $3,150.00, because there is no evidence upon which to support any other conclusion, or alternatively, the trial court's finding as to the amount due and owing is against the weight of the evidence. In this point of error, appellant combines a "matter of law" point and an "against the great weight" point in one ground of error. In essence, the appellant contends the evidence introduced at trial established the value of his services due and owing to be $3,150.00, as a matter of law, and asks us to reverse the trial court judgment and render judgment for appellant in this amount.

In the alternative, appellant asserts the finding of the trial court as to the value of his services is so against the great weight and preponderance of the evidence as to be manifestly unjust, and thus requires a reversal of the judgment and remand of the case for a new trial.

 **[1]** To determine a "no evidence" or "matter of law" point this court must disregard all evidence contrary to the trial court's finding, and if there is any remaining evidence which would support the verdict or judgment, the trial court's judgment must be upheld. If, after the removal of all contrary evidence this court finds an absence of any evidence which would support the verdict or judgment, a contrary conclusion to the verdict or judgment is required as a matter of law. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

The finding at issue before this court is the amount of the trial court's award as the reasonable value of the accounting services which were performed. The direct, positive, uncontroverted evidence as presented by the three experts, including appellant and appellant's ex-employee (the *appellees'* present accountant) was that the charges as evidence in the invoices were reasonable charges for the services which were performed. However, in spite of this fact the trial court assessed the value of those service at the arbitrary figure of $275.00 per month, the amount the parties had agreed to for the preparation of reports necessary for the maintenance of their records. This figure did not consider the extensive work required to update and correct appellees' back records, so that they were in a position to be maintained.

[2] [3] It is the general rule that since the trier of the fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, opinion evidence is insufficient to conclusively establish a fact issue at trial, and thus give rise to a directed verdict or in this case a reversal and rendition. However, in *Teal v. Powell Lumber Co.,* 262 S.W.2d 223 (Tex.Civ.App.-Beaumont, 1953, no writ), the **\*419** court applied this test to the trial judge but further stated that it is only within the province of court or jury to decide conflicting evidence, and where there is evidence on an issue and no evidence to the contrary, the court or jury has no right to disregard the evidence and decide the issue in accordance with their own wishes. *Id* at 225. In the present case, the only evidence presented on this issue supported appellant's valuation.

[4] Furthermore, in *Exxon Corporation v. West,* 543 S.W.2d 667 (Tex.Civ.App.-Houston [1st Dist.] 1976, writ ref'd, n.r.e.) Chief Justice Evans reviewed the effect of uncontroverted expert testimony and its ability to conclusively establish a fact issue. In support of this court's *reversal and rendition,* Justice Evans stated that while such evidence is generally held not to be binding on the trier of fact if more than one possible conclusion can be drawn from the facts, it may be regarded as conclusive if the nature of the subject matter require the fact finder to be guided solely by the opinion of experts and the evidence is otherwise credible and free from contradiction and inconsistency.

[5] [6] Furthermore, this rule applies even where the testifying experts are interested witnesses if their testimony is clear, direct, positive, if nothing creates a reasonable suspicion as to the witness' credibility and if the opposing party could have offered but failed to offer, any evidence in contradiction thereof. This failure to offer such contrary evidence "constitutes effective corroboration" of the witnesses' testimony. Id. at 678. *See also, Collora v. Navarro,* 574 S.W.2d 65 (Tex.1978) stating that testimony by interested lay witnesses may be the basis for a directed verdict, where the testimony "pertains to matters reasonably capable of exact statement, and is clear, direct, positive and internally void of inconsistencies and contradictions, and is uncontroverted either by testimony of other witnesses or by circumstances—in short, when there is nothing to cause any reasonable suspicion as to its truth." Id. at 69.

[7] In the present case, three expert witnesses testified as to the reasonableness of the charges for the services

rendered: the appellant, his ex-employee, the appellees' present accountant, John Mason, and an independent, disinterested C.P.A., Patrick Cantrell. Each of these witnesses reached the same conclusion, i.e., that the charges as reflected by the invoice were reasonable. Appellees called no witnesses to refute this determination nor did they otherwise impeach these witnesses on cross-examination. Therefore, here, as in *Exxon, supra,* the only reasonable conclusion which could be drawn from the evidence was that stated by appellant's experts.

The court, in making its findings of fact, stated that the amount owed and agreed by the appellees was the reasonable value of the services which were performed. That reasonable value was conclusively shown through expert testimony to have been $4,865.00. That amount, less $1,715.00 for prior payments by the appellees, left a balance of $3,150.00, which is the amount which appellant was entitled to in judgment. Since here, as in *Exxon, supra,* "it does not appear that the cause should be remanded for further proceedings in the interest of justice or for any other reason," the judgment of this court should be one of rendition. *Exxon, supra,* at 674; *Hodges Tire Co. v. Kemp,* 334 S.W.2d 627 (Tex.Civ.App.-Forth Worth 1960, no writ).

In his second point of error, the appellant asserts the trial courts findings of $300.00 in attorney's fees had no support in the evidence and asks this court to reverse and render judgment for the stated amount of $1,950.00.

[8] [9] The court in its findings of fact stated that appellant had the right to recover the reasonable cost of attorneys fees. Unlike the above expert testimony, there are factors other than the testimony of expert witnesses which could have been used by the court in its determination of what amount was "reasonable." Some of these factors which may have been considered by the court are: the complexities **\*420** of the case, the amount of time spent in preparation, the quality of counsel, and the amount of potential and actual recovery. Moreover, the judge would have been familiar with the fees in this area, and could have drawn upon his own expertise in his decision making. Therefore, since the amount and reasonableness of attorney's fees is a question of fact which allows the consideration of various intangibles incapable of review by this court, the trial court award cannot be disturbed absent an abuse of discretion and we do not find such an abuse in the case before this court.

 **[10]** Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp.1984) states that the usual and customary fees charged for the type of work performed are presumed reasonable. There was no testimony introduced stating the usual and customary fees for this type of action. Furthermore, the court in its conclusions of law implied that the usual and customary fees in this area are one-third the amount of judgment, and it apparently was on this basis that the court entered judgment of $300.00 in attorney's fees. Therefore, in light of our disposition of appellant's first point of error, the award of $300.00 is patently incorrect. Therefore, we order the judgment be reformed in accordance with the trial court's conclusions of law, and reflect the corresponding award of attorney's fees of one third the corrected judgment, or $1,050.

We accordingly reverse the judgment of the trial court and render judgment in the amount of $3,150.00 upon the unpaid account, and for $1,050.00 for the appellant's attorney's fees.

**All Citations**

669 S.W.2d 415

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

259 S.W.3d 358
Court of Appeals of Texas,
Dallas.

METHODIST HOSPITALS OF DALLAS d/
b/a Methodist Medical Center, Appellant
v.
MID–CENTURY INSURANCE
COMPANY OF TEXAS, Appellee.

No. 05–07–00897–CV.　|　July 2, 2008.

**Synopsis**
**Background:** After hospital filed hospital lien for payment of hospital bills accrued by patient injured by third-party in auto accident, and patient received settlement from third-party's insurer for the accident, hospital brought action against the third-party's insurer to enforce the lien. The 289th Judicial District Court, Dallas County, Emily Tobolowsky, J., 2007 WL 5112362, granted insurer's motion for summary judgment. Hospital appealed.

**[Holding:]** The Court of Appeals, Morris, J., held that hospital's notice of lien did not substantially comply with requirements of statute, and, thus, was unenforceable.

Affirmed.

**Attorneys and Law Firms**

**\*359** Blair Grant Francis, Joe Don Ridgell, Francis, Orr & Totusek, L.L.P., Dallas, TX, for Appellant.

Hermon L. Veness, Jr., Carnahan Thomas, L.L.P., Southlake, TX, for Appellee.

Before Justices MORRIS, WHITTINGTON, and FITZGERALD.

**OPINION**

Opinion by Justice MORRIS.

In this hospital lien case, Methodist Hospitals of Dallas d/b/a Methodist Medical Center contends the trial court erred in

concluding it had not properly secured its lien and granting a summary judgment in favor of Mid–Century Insurance Company of Texas. Asserting four points of error, Methodist contends its lien satisfied the requirements of section 55.005 of the Texas Property Code and Mid–Century was not entitled to a no-evidence summary judgment. After reviewing the summary judgment record, we conclude Methodist did not substantially comply with the requirements of section 55.005. We affirm the trial court's judgment.

**I.**

On October 11, 1999, Lori Ward was involved in a car accident with a person insured by Mid–Century Insurance Company. Ward was taken to Methodist Medical Center where she was treated for her injuries. The bill for the medical services and supplies provided to Ward by Methodist was $8,656.75.

Ward made a claim with Mid–Century for the damages she suffered as a result of the accident. Mid–Century evaluated the claim and offered her its policy limits. The claim was settled on September 6, 2000. Mid–Century issued a check dated September 20, 2000 made jointly payable to Ward and her attorney, Juan Hernandez. Hernandez testified that someone from his office picked up the check that same day.

One day later, on the afternoon of September 21, 2000, Methodist filed a written notice of lien for the medical services and supplies provided to Ward. The lien listed Ward as the injured person treated by **\*360** Methodist. In addition, however, the notice incorrectly listed the date of the accident as October 12, 1999 and stated the person liable for the accident was Ward rather than the third party insured by Mid–Century. Finally, the notice incorrectly stated the amount of the lien as $9,189.29. The lien was filed with the county clerk and was made available to the public approximately ten to twelve days later.

When Methodist discovered that the settlement proceeds from Mid–Century had been disbursed, it filed this suit against Mid–Century and Hernandez to enforce its lien.[1] Mid–Century moved for a traditional and no-evidence summary judgment arguing that Methodist failed to properly secure its lien as required by section 55.005 of the Texas Property Code. Methodist replied and filed a cross-motion for summary judgment arguing that it complied with the requirements of section 55.005 as a matter of law. After considering the

motions, the trial court granted Mid–Century's motion for summary judgment and denied Methodist's cross-motion for summary judgment. The court ordered that Methodist take nothing by its claims. This appeal ensued.

## II.

Methodist raises four issues on appeal challenging the trial court's decision to render summary judgment against it. Because we conclude Methodist's third issue is dispositive of this appeal, we begin by addressing that issue.

 **[1]** It its third issue, Methodist contends its notice of lien substantially complied with the requirements of section 55.005(b). Section 55.005(b) states that a notice of lien filed by a hospital or emergency medical services provider must contain: (1) the injured individual's name and address; (2) the date of the accident; (3) the name and location of the hospital or emergency services provider claiming the lien; and (4) the name of the person alleged to be liable for damages arising from the injury, if known. TEX. PROP.CODE ANN. § 55.005(b) (Vernon 2007). As stated above, the notice of lien filed by Methodist incorrectly stated the date of the accident and listed Ward, the injured person, as the person liable for the damages.

 **[2]** **[3]** Methodist first argues that, because a hospital lien is statutorily created, substantial compliance with the notice requirements is all that is required for the lien to be enforceable. *See Citicorp Real Estate, Inc. v. Banque Arabe Internationale D' Investissement,* 747 S.W.2d 926, 929 (Tex.App.-Dallas 1988, writ denied) (substantial compliance all that is required for statutorily created judicial lien). Even assuming substantial compliance with the notice requirements is sufficient for a hospital lien to be enforceable, we conclude the notice at issue in this case did not substantially comply with the requirements of section 55.005(b). "Substantial compliance" does not permit a party to ignore statutory requirements. *See Wesco Distribution, Inc. v. Westport Group, Inc.,* 150 S.W.3d 553, 559 (Tex.App.-Austin 2004, no pet.). Even if we liberally construe a statute to achieve its purposes, we may not enlarge or alter the plain meaning of the statutory language. *See Conn, Sherrod & Co. v. Tri–Electric Supply Co.,* 535 S.W.2d 31, 34 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).

 **[4]** Taken together, the errors made by Methodist in its notice of lien render the lien unenforceable. Of the four

statutory notice requirements, Methodist only complied with two. Methodist contends its **\*361** error in stating the date of the accident is a minor discrepancy because the actual date of the accident was only an hour and twenty-four minutes earlier. There is nothing on the notice to indicate the time of the accident, however. And the date of the accident is a critical component of the notice. Because the lien attaches only to a cause of action, judgment, or settlement based on the accident giving rise to the injuries treated by the hospital, the date of the accident listed on the notice is crucial. *See* TEX. PROP.CODE ANN. § 55.003. It is by comparing the date and the name of the responsible party, if known, that one can determine whether the accident made the subject of the legal claims is the same as the accident made the subject of the lien. There is nothing on Methodist's notice of lien that would enable someone searching the record to determine that the lien was intended to attach to the accident occurring on an earlier date.

Methodist further argues that its listing of Ward as the liable party does not render the notice out of compliance with the statute because the name of the liable party is not required. The statute requires the name of the liable party only "if known." *See id.* § 55.005(b)(4). Having undertaken to name the liable party, however, it was incumbent upon Methodist to name the correct party. Indeed, by naming Ward as the liable party, the notice of lien appears unenforceable on its face. A hospital can impose a lien only on a cause of action or claim that an individual has for injuries "caused by an accident attributed to the negligence *of another person.*" *See id.* § 55.002(a) (emphasis added). By naming Ward as both the injured party and the liable party, the notice appears to negate the element that the accident was attributed to the negligence of another person.

To adopt Methodist's argument that its notice of lien substantially complied with the requirements of section 55.005 would vitiate the requirements of the statute. We conclude the trial court properly ruled Methodist's lien was unenforceable under section 55.005. Because of our resolution of this issue, it is unnecessary for us to Methodist's the other issues.

We affirm the trial court's judgment.

**All Citations**

259 S.W.3d 358

Footnotes

1       Methodist later dismissed its claims against Hernandez.

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

404 S.W.3d 552
Supreme Court of Texas.

Justin Curtis NALL, Robert W.
Nall, and Olga L. Nall, Petitioners,
v.
John B. PLUNKETT, Respondent.

No. 12–0627. | June 28, 2013.

**Synopsis**
**Background:** Guest at New Year's Eve party brought negligence action against hosts and driver relating to personal injuries he sustained when he attempted to prevent the driver from driving intoxicated after leaving the party. The District Court, Fort Bend County, Brady G. Elliott, J., granted summary judgment in favor of hosts. Guest appealed. The Court of Appeals, Charles W. Seymore, J., 374 S.W.3d 584, reversed and remanded. Hosts sought review which was granted.

**[Holding:]** The Supreme Court held that summary judgment motion specifically addressed the negligent-undertaking claim as required for Court of Appeals to affirm summary judgment on that basis.

Reversed.

**Attorneys and Law Firms**

**\*553** David Hill Bradley, Walters Balido & Crain, L.L.P., Houston, TX, Gregory R. Ave, Jason L. Wren, Walters, Balido & Crain, L.L.P., Dallas, TX, for Petitioner Justin Curtis Nall.

Charles H. Peckham, Mary Abbott Martin, Peckham PLLC, Jon M. Stautberg, Attorney at Law, Houston, TX, for Respondent John B. Plunkett.

**Opinion**

**\*554** PER CURIAM.

This case presents an issue of summary judgment procedure. John Plunkett sued Justin Nall, Robert Nall, Olga Nall, and Justin Kowrach for personal injuries suffered at a New Year's Eve party at the Nalls' residence. Plunkett pled causes

of action against the Nalls for negligence based on an undertaking theory and for premises liability. The Nalls moved for summary judgment as to Plunkett's negligence claim on the ground that they owed no duty to Plunkett under the facts pled in his petition. The trial court rendered judgment in favor of the Nalls as to "all issues except those relating to premises liability." Plunkett appealed, arguing that summary judgment was improper because the Nalls' summary judgment motion addressed only social host liability and not the negligent-undertaking theory. The court of appeals agreed and reversed the summary judgment. 374 S.W.3d 584, 586–87. We hold that the Nalls' summary judgment motion specifically addressed the negligent-undertaking claim by arguing that our decision in *Graff v. Beard,* 858 S.W.2d 918, 921 (Tex.1993), forecloses the assumption of any duty by a social host under the facts of this case. Because Plunkett did not argue that summary judgment was improper on the merits, we do not reach any substantive issues related to the summary judgment. *See* TEX.R.APP. P. 53.4. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

Plunkett attended Justin Nall's New Year's Eve party at a home that is owned by his parents, Robert and Olga Nall. Plunkett alleges that the Nalls hosted the party and, knowing that alcohol would be consumed at the house, required all attendees who remained at the house after midnight to spend the night. Plunkett contends that the Nalls failed to confiscate car keys of those who remained after midnight or take any other actions to keep attendees from leaving. The petition states that Robert and Olga went to bed after midnight but before 2:00 a.m., without ensuring that those still in attendance would remain until they were safe to drive. Shortly after 2:00 a.m., Kowrach and a friend attempted to leave in the friend's vehicle. Plunkett alleges that he attempted to convince Kowrach not to leave, as they were both intoxicated. As Plunkett stood on the running board of the vehicle and attempted to pull the keys from the ignition, Kowrach pressed the accelerator, gathered speed, then hit the brakes. The sudden braking and Plunkett's momentum propelled him head first into the ground, lodging his head under a parked car. Plunkett suffered traumatic brain damage as a result of his injuries and will require medical care for the rest of his life.

Plunkett sued the Nalls and Kowrach. Plunkett alleged that the Nalls were liable for "common law negligence," "fail[ing] to exercise due care in their undertaking" to protect guests, and for premises liability. The Nalls moved for summary judgment, arguing that they owed no duty to Plunkett. The

trial court granted the motion as to all claims except for the premises liability claim, which Plunkett eventually nonsuited. The trial court then severed Plunkett's claims against the Nalls from his claims against Kowrach. Plunkett appealed. The only issue briefed by Plunkett on appeal was whether the trial court erred by granting summary judgment on Plunkett's undertaking claim based on the Nalls' alleged failure to address that claim.

A divided court of appeals reversed and remanded, holding that the trial court erred by granting summary judgment because the Nalls failed to address Plunkett's negligent-undertaking theory in their motion. *374 S.W.3d at 586.* The court of **\*555** appeals construed Plunkett's petition as alleging a claim for negligence based on an undertaking theory and the Nalls' summary judgment motion as arguing only that summary judgment was proper as to a negligence claim based on social host liability. *Id.* at 586–87.

**[1]** **[2]** **[3]** This procedural issue was the only issue argued by Plunkett on appeal and the only issue addressed by the court of appeals. *See id.* at 585. We review a grant of summary judgment de novo. *Exxon Corp. v. Emerald Oil & Gas Co.,* 331 S.W.3d 419, 422 (Tex.2010). In a summary judgment motion under Rule 166a(c) of the Texas Rules of Civil Procedure, a movant "shall state the specific grounds therefor," and a defendant who conclusively negates at least one of the essential elements of a cause of action is entitled to summary judgment. TEX. R. CIV. P. 166a(c). A trial court cannot grant summary judgment on grounds that were not presented. *See, e.g., FDIC v. Lenk,* 361 S.W.3d 602, 609 (Tex.2012); *see also G & H Towing Co. v. Magee,* 347 S.W.3d 293, 297 (Tex.2011) (per curiam) ("Granting a summary judgment on a claim not addressed in the summary judgment motion therefore is, as a general rule, reversible error."). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c). We have also noted that "[a]n exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous." *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 342 (Tex.1993); *see also D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.,* 300 S.W.3d 740, 743 (Tex.2009) ("A non-movant must present its objections to a summary judgment motion expressly by written answer or other written response to the motion in the trial court or that objection is waived."). However, even when a non-movant fails to except, the court of appeals cannot "read between the lines" or infer from the pleadings any grounds for granting the summary judgment other than those grounds expressly set forth before the trial court. *McConnell,* 858 S.W.2d at 343.

**[4]** **[5]** Like the court of appeals, we construe Plunkett's petition as alleging two causes of action against the Nalls: (1) "common law negligence" based on the Nalls' failure to "exercise due care in their undertaking" (the negligent-undertaking claim), and (2) premises liability. The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist. *See Torrington Co. v. Stutzman,* 46 S.W.3d 829, 838–39 (Tex.2000); *see also Osuna v. S. Pac. R.R.,* 641 S.W.2d 229, 230 (Tex.1982) ("Having undertaken to place a flashing light at the crossing for the purpose of warning travelers, the railroad was under a duty to keep the signal in good repair, even though the signal was not legally required."). In *Torrington,* we held that a jury submission for a negligence claim predicated on a negligent-undertaking theory requires a broad-form negligence question accompanied by instructions detailing the essential elements of an undertaking claim. *Torrington,* 46 S.W.3d at 838–39. Accordingly, the broad-form submission for a typical negligence claim and a negligent-undertaking claim is the same, except that an undertaking claim requires the trial court to instruct the jury that a defendant is negligent only if: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing **\*556** those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm. *Id.; see also* RESTATEMENT (SECOND) OF TORTS § 324A (providing the rule for liability to a third person for negligent performance of an undertaking).

**[6]** **[7]** The Nalls' summary judgment motion stated the issue addressed as: "Whether [the Nalls] have any duty to [Plunkett] in the factual scenario plead by [Plunkett]." The Nalls' "short answer" was that "Texas does not recognize social host liability, and [the Nalls] do not have any duty to [Plunkett] in this case." Plunkett did not file any exception to the Nalls' motion. The court of appeals construed the Nalls' motion as addressing Plunkett's negligence claim only as a social-host liability claim and not as a negligent-undertaking claim. *374 S.W.3d at 586.* We construe the Nalls' motion, however, as specifically moving for summary judgment on the duty element of Plunkett's negligence claim, making a

two-part argument that addressed the absence of a duty in both the social host context and the undertaking context. First, the Nalls correctly pointed out that, under Texas law, a host has no duty to prevent a guest who will be driving from becoming intoxicated or to prevent an intoxicated guest from driving. [1] *See Graff,* 858 S.W.2d at 918. Second, the Nalls addressed the undertaking theory asserted by Plunkett in light of *Graff.* [2] Specifically, the Nalls argued:

> [Plunkett] places a great amount of emphasis on the alleged "rule" of the Nall hosts that required a guest who was still at the home at midnight to spend the night. The court in *Graff v. Beard* also discussed the scenario wherein a home owner attempts to *assume that duty* and the problems inherent in trying to decide scope of duty in that context. The Supreme Court refuses to recognize the assumption of the duty argument in the case of a social host.

> We hold that the Nalls' summary judgment motion specifically addressed the negligent-undertaking claim by arguing that *Graff* forecloses the assumption of any duty (i.e., an undertaking) by a social host. Therefore, the court of appeals erred by reversing the trial court's judgment on procedural grounds.

**[8]** Whether the Nalls were entitled to summary judgment based on the merits of the argument above is not at issue in this appeal, and we do not address it. Texas Rule of Appellate Procedure 53.4 provides that a party may obtain a remand to the court of appeals to address issues or points *briefed in that court* but not decided by that court, or we may address those issues in the interest of judicial economy. TEX.R.APP. P. 53.4. As we previously noted, Plunkett briefed only the procedural issue on appeal to the court of appeals. He did not argue that a genuine issue of material fact precluded summary judgment on the merits. [3] We conclude that Plunkett waived the issue of whether summary judgment was proper on the merits in this case by failing to brief it in the court of appeals. *See id.* Accordingly, we grant **\*557** the Nalls' petition for review, and without hearing oral argument, we reverse the court of appeals' judgment and reinstate the trial court's judgment. *See* TEX.R.APP. P. 59.1.

**All Citations**

404 S.W.3d 552, 56 Tex. Sup. Ct. J. 818

---

Footnotes

1      The portion of the Nalls' summary judgment motion that addressed this point was introduced by the following heading: "No statutory or common law duty is owed by a social host."

2      The portion of the Nalls' summary judgment motion that addressed this point was introduced by the following heading: "Absent a legal right to restrain a guest, a host owes no duty to a guest to do so."

3      Plunkett's brief at the court of appeals provided that the issue was a "legal one—sufficiency of pleadings to support a cause of action."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

451 S.W.3d 133
Court of Appeals of Texas,
Amarillo.

Pak–a–Sak, Inc., Appellant
v.
City of Perryton, Appellee

No. 07–14–00047–CV  |  November 6, 2014

**Synopsis**
**Background:** Convenience store petitioned for review of decision by city to deny its application for permit to sell wine and beer. The County Court, Ochiltree County, affirmed denial, and store appealed. The 84th District Court, Ochiltree County, William D. Smith, J., affirmed. Store appealed.

**Holdings:** The Court of Appeals, Brian Quinn, C.J., held that:

[1] city did not exceed its statutory authority to enact ordinance prohibiting sale of beer in residential area when it enacted ordinance prohibiting sale, dispensation, or delivery of any alcoholic beverage within residential area in city;

[2] ordinance was not unconstitutionally vague; and

[3] substantial evidence supported finding that convenience store was located within residential area.

Affirmed.

**\*135  On Appeal from the 84th District Court, Ochiltree County, Texas, Trial Court No. CV–13743, Honorable William D. Smith, Presiding**

**Attorneys and Law Firms**

Benjamin Doyle, Gavin Gadberry, Underwood Law Firm, P.C., Amarillo, for Appellant.

Angelique S. Weaver, Kristi R. Weaber, Mayfield Law Firm, Amarillo, for Appellee.

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**OPINION**

Brian Quinn, Chief Justice

This is an appeal from an order denying an application for a license to sell alcoholic **\*136** beverages at a Pak–a–Sak convenience store location in the City of Perryton (the City). The denial was premised on a municipal ordinance which prohibits the sale of alcohol within a "residential area" of the City. Pak–a–Sak contends that 1) the ordinance unconstitutionally grants authority to the City in excess of that granted by the legislature under the Texas Alcoholic Beverages Code, 2) the ordinance is unconstitutionally vague and ambiguous, and 3) there is no substantial evidence to support a finding that Pak–a–Sak's location is in a residential area. We affirm.

On April 16, 2013, the City enacted Ordinance 1000–13 which states: "It shall be unlawful for any person to sell, dispense or deliver, or cause to be sold, dispensed or delivered, any beer, liquor, or any other intoxicating beverage within a residential area in the city." [1] The ordinance was enacted under the authority of § 109.32 of the Texas Alcoholic Beverage Code which provides that an incorporated city may prohibit the sale of beer in a residential area. TEX. ALCO. BEV.CODE ANN.. § 109.32 (West 2007). Neither the statute nor the ordinance define the phrase "residential area." On June 3, 2013, Pak–a–Sak submitted an Application for Wine and Beer Retailer's Off–Premises Permit (BQ license) to the City for its store at 522 SW 9th Avenue in Perryton. [2] The application was denied. That decision was appealed to the county court which upheld it. It was then appealed to the district court which did the same.

*Ultra Vires*
 [1]  As previously mentioned, Pak–a–Sak initially contends that the City exceeded legislative authorization by failing to define "residential area." That is, "[b]y failing to objectively define 'residential area,' the City [allegedly] acted outside the scope of its authority." Appellant continues by arguing that the "Texas Legislature did not provide municipalities with unlimited authority to determine when its actors may prohibit the sale of alcohol ... once a county has voted under a Local Option Election to allow the sale of alcohol, the municipality may only limit the sale in certain circumstances ... [which]

circumstances are outlined in the Texas Alcoholic Beverages Code."

The circumstance alluded to is specified in § 109.32 and states that "[a]n incorporated city or town by charter or ordinance may ... prohibit the sale of beer in a *residential area.*" TEX. ALCO. BEV.CODE ANN.. § 109.32(a)(1) (West 2007) (Emphasis added). The portion of the ordinance adopted by the City and attacked at bar reads: "[i]t shall be unlawful for any person to sell, dispense or deliver, or cause to be sold, dispensed or delivered, any beer, liquor, or any other intoxicating beverage within a *residential area* in the city." (Emphasis added). As can be seen, the limitation mentioned in the statute is identical to that specified in the ordinance. Moreover, and contrary to the insinuation of Pak–a–Sak, § 109.32 does not direct the municipality to further define the phrase "residential area." Nor did appellant cite us to authority expressly imposing such an obligation on the City. Given that the ordinance simply reiterated the limitation specified by the statute, we cannot say that the City acted outside the scope of its authority by enacting the ordinance.

### Void for Vagueness

 **[2]** Next, we address Pak–a–Sak's constitutional complaint. It believes that the phrase "residential area" is ambiguous and **\*137** susceptible to ad hoc interpretation and application. That purportedly being so, and because the City failed to provide guidelines explaining what it meant by or otherwise define the phrase, the provision is impermissibly vague and, therefore, unconstitutional because it violates due process.[3] We disagree.

 **[3]**  **[4]** The same rules apply to the construction of ordinances as to the construction of statutes. *Bd. of Adjustment of San Antonio v. Wende,* 92 S.W.3d 424, 430 (Tex.2002); *Mills v. Brown,* 159 Tex. 110, 316 S.W.2d 720, 723 (1958). Furthermore, we generally presume that an ordinance is valid, and the party challenging it has the burden to prove otherwise. *Bd. of Adjustment of San Antonio v. Wende,* 92 S.W.3d at 431; *Brookside Village v. Comeau,* 633 S.W.2d 790, 792–93 (Tex.1982).

 **[5]**  **[6]** Next, a statute or ordinance is unconstitutionally vague if it fails to give fair notice of what conduct may be punished or it invites arbitrary and discriminatory enforcement by failing to establish guidelines. *Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 437 (Tex.1998). That is, it may not be so vague and standardless

as to leave a governing body free to decide, without any legally fixed guidelines, what is prohibited in each particular case. *Lindig v. City of Johnson City,* No. 03–11–00660–CV, 2012 WL 5834855, at \*3, 2012 Tex.App. LEXIS 9563, at \*12 (Tex.App.—Austin November 14, 2012, no pet.) (mem.op.). If persons of common intelligence are compelled to guess at its meaning and applicability, then principles of due process will not let it stand. *Id.* at \*3–4, 2012 Tex.App. LEXIS 9563, at \*12–13.

 **[7]**  **[8]**  **[9]**  **[10]** Yet, it should be remembered that statutes deal with "untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Pennington v. Singleton,* 606 S.W.2d 682, 689 (Tex.1980). Thus, no more than a reasonable degree of certainty can be demanded. *Id.*; *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.,* 324 S.W.3d 264, 273 (Tex.App.—Austin 2010, pet. denied). Nor do the words of a statute fall short of providing a reasonable degree of certainty because they are undefined. *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co.,* 324 S.W.3d at 273 (stating that a "law is not unconstitutionally vague merely because it does not define words or phrases"). Nor does the existence of a dispute as to a law's meaning necessarily render the provision unconstitutionally vague. *Id.* Again, the verbiage need only provide a reasonable degree of certainty as to what is proscribed. And, the test "is relaxed" when the conduct being regulated is not normally considered constitutionally protected. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (stating that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow ...."); *accord Commission for Lawyer Discipline v. Benton,* 980 S.W.2d at 437–38 (stating that "[t]he vagueness doctrine requires different levels of clarity depending on the nature of the law in question. Courts demand less precision of statutes that impose only civil **\*138** penalties than of criminal statutes because their consequences are less severe.").[4]

 **[11]**  **[12]** We also mention that this requirement for a reasonable degree of certainty can be provided through the use of ordinary terms having adequate interpretation in common usage and understanding. *Lindig v. City of Johnson City,* 2012 WL 5834855, at \*4, 2012 Tex.App. LEXIS 9563,

at *13 (stating that "the reasonable-certainty requirement 'does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding' "); *Webster v. Signad, Inc.,* 682 S.W.2d 644, 647 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e).* Simply put, where the statute fails to define pivotal words contained therein, reference to their common usage and understanding can supply the requisite certainty.

 **[13]**    **[14]**    **[15]**    **[16]**    Also of note is that a law is not automatically vague merely because difficulty is experienced in determining whether certain marginal conduct falls within its scope. *Pennington v. Singleton,* 606 S.W.2d at 689.* This is of import because in assessing whether a statute is void for vagueness when First Amendment freedoms are not implicated, we examine the matter " 'in light of the facts of the case at hand.' " *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 495 n. 7, 102 S.Ct. 1186.* In such circumstances, a facial challenge has merit "only if the enactment is impermissibly vague in all of its applications." *Id.* at 494–95, 102 S.Ct. 1186; *accord In re Commitment of Fisher,* 164 S.W.3d 637, 654–55 (Tex.2005)* (stating that to "prevail on his facial vagueness challenge ... [one] bears the heavy burden of showing that the Act is unconstitutional in every possible application"). A complainant who engages in some conduct that is clearly proscribed "cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. at 495, 102 S.Ct. 1186.* "A court should therefore examine the complainant's conduct before analyzing the other hypothetical applications of the law." *Id.*

Here, the trial court determined that the term "residential area" had a "definite meaning that is objectively determinable in its application." Indeed, this conclusion appears supported by various definitions of the term proffered by the City's witnesses. For instance, the mayor testified it is a "geographic area of houses in which people live" or a "geographic area consisting primarily of homes where people live." A city council member testified that a residential area is "anywhere there was a grouping of houses" or a "geographic area primarily occupied by houses." The city manager defined it as an "area where people reside" or an area that "primarily consists of houses" regardless of use. Common in each is the notion that the area must generally consist of abodes wherein people live.

To the foregoing, we add that the common meaning of the term "residential" describes a location at which people

live. Indeed, it has been defined as a location "containing mostly homes instead of stores [or] businesses," "used as a place to live," or "of or relating to the places where people live." *See* MERRIAM–WEBSTER DICTIONARY, http://merriam-webster.com (last visited Nov. 6, 2014). In turn, "area" describes, in common parlance, "a part or section within a larger place." *Id.* When those definitions are combined in the context **\*139** of the statute and ordinance at issue, it is quite reasonable to construe the phrase "residential area" to encompass, at the very least, a section of the city wherein people primarily maintain homes and live. Stated differently, it is reasonably certain that what constitutes a "residential area" includes a neighborhood wherein people primarily live and maintain homes. Admittedly, the margins of the phrase may be difficult to determine. Whether they would encompass an industrial region wherein one or two people maintain a house is subject to reasonable debate. But, again, we are to analyze the attack " 'in light of the facts of the case at hand.' " And, the "facts at hand" do not depict such an area.

Instead, the record shows that the Pak–a–Sak store in question is surrounded by houses and people living in them. One need only look at the pictures of the location and its neighbors to see that. While some businesses (e.g., a beauty parlor, a dog grooming business, and an auto mechanic shop) may be operated within various of those homes, people still primarily live within the neighboring environs of that Pak–a–Sak.[5] Given this, we have before us a circumstance encompassed by a reasonable interpretation of what constitutes a "residential area." Selling beer from the Pak–a–Sak here would be conduct clearly proscribed by the ordinance; it would be conduct clearly within the common meaning of "residential area," that is, a section of the City wherein people primarily maintain homes and live. So, we cannot say that the ordinance has been shown to be vague in all of its applications as required, and we overrule the issue before us given the particular circumstances at bar.

### Substantial Evidence

 **[17]**    Finally, Pak–a–Sak argues that "the City was required to establish by substantial evidence that the location in question met the requirements of the regulation it intended to enforce" and that it "did not meet their burden of admitting substantial evidence of Pak–a–Sak's location being within a 'residential area.' " We overrule this issue as well.

**[18]** A decision has the support of substantial evidence when the evidence of record, viewed as a whole, is such that reasonable minds could have reached the same conclusion. *Texas Alcoholic Beverage Comm'n v. Sierra,* 784 S.W.2d 359, 360 (Tex.1990); *Melmat, Inc. v. Texas Alcoholic Beverage Comm'n,* 362 S.W.3d 211, 214 (Tex.App.—Dallas 2012, no pet.); *accord Texas Alcoholic Beverage Comm'n v. I Gotcha, Inc.,* No. 07–05–0411–CV, 2006 WL 2095449, at *2–3, 2006 Tex.App. LEXIS 6733, at *6–7 (Tex.App.—Amarillo July 28, 2006, pet. denied) (mem.op.) (stating that substantial evidence exists if the evidence is such that reasonable minds could have reached the same conclusion). And, the quantum of evidence need only be more than a scintilla. *Texas Alcoholic Beverage Comm'n v. I Gotcha, Inc.,* 2006 WL 2095449, at *2, 2006 Tex.App. LEXIS 6733, at *6.

As we observed in our discussion of the issue immediately preceding this one, the record contains more than a scintilla of evidence illustrating that Pak–a–Sak was located in a "residential area." Consequently, the decision by the City of Perryton to deny the permit has the support of substantial evidence.

**\*140** Having rejected each issue proffered by Pak–a–Sak, we affirm the order of the trial court.

**All Citations**

451 S.W.3d 133

Footnotes

1    There is no zoning in Perryton.
2    This occurred after a general election on May 11, 2013, in Ochiltree County permitting the sale of alcoholic beverages
3    Pak–a–Sak does not challenge § 109.32(a)(1) of the Beverage Code as unconstitutionally vague, only the ordinance.
4    Pak–a–Sak does not suggest that the opportunity to sell beer in Perryton, Texas, is of constitutional dimension.
5    At least one witness also described the neighborhood as primarily occupied by houses.

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

973 S.W.2d 301
Supreme Court of Texas.

Douglas Wayne PERRY, Janise White,
and Raul Quintero, Petitioners,
v.
S.N. and S.N., individually and a/n/f of B.N., a
minor, and a/n/f of K.N., a minor, Respondents.

No. 97–0573.    |    Argued Jan.
7, 1998.    |    Decided July 3, 1998.

Parents, individually and as next friends of their children, brought negligence action against friends of day care providers for failing to report child abuse they allegedly witnessed at day-care center. The 53rd Judicial District Court, Travis County, Paul R. Davis, Jr., J., granted friends' motion for summary judgment, and parents appealed. The Austin Court of Appeals, 944 S.W.2d 728, reversed and remanded, and friends petitioned for writ of error. The Supreme Court, Phillips, C.J., held that violation of child abuse reporting statute was not negligence per se.

Reversed and rendered.

**Attorneys and Law Firms**

**\*302** Gary E. Zausmer, Jeffrey Jury, Tom Tourtellotte, Austin, for Petitioners.

Greg Reed, Lionel J. Roach, Austin, for Respondents.

**Opinion**

PHILLIPS, Chief Justice, delivered the opinion of the Court.

Respondents' motion for rehearing is overruled. Our opinion of May 8, 1998, is withdrawn and the following is substituted in its place.

This is a suit for injuries arising out of the abuse of children at a day care center. Plaintiffs filed suit individually and as next friends of their two children, alleging that defendants witnessed the abuse and failed to report it to the police or child welfare officials. The sole issue before us is whether plaintiffs may maintain a cause of action for negligence per se based on the Family Code, which requires any person having cause to believe a child is being abused to report the abuse to state authorities and makes the knowing failure to

do so a misdemeanor. *See* TEX. FAM.CODE §§ 261.101(a), 261.109 (formerly TEX. FAM.CODE §§ 34.01, 34.07). The trial court granted summary judgment for defendants, but the court of appeals reversed and remanded plaintiffs' negligence per se and gross negligence claims for trial. *Nash v. Perry,* 944 S.W.2d 728 (Tex.App.—Austin 1997). We reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing. Because plaintiffs did not preserve their common law negligence claims, we do not decide whether there should be a common law duty to report child abuse in some circumstances.

B.N. and K.N. attended a day care center operated by Francis Keller and her husband Daniel Keller from March 25, 1991, to August 28, 1991. Their parents, S.N. and S.N., allege that during that period, Daniel Keller regularly abused B.N. and K.N. and other children at the center both physically and sexually. Mr. and Mrs. N. brought suit against the Kellers and three of the Kellers' friends, Douglas Perry, Janise White, and Raul Quintero. Plaintiffs claim that Francis Keller confided in White at an unspecified time that Daniel Keller had "abusive habits toward children." They further allege that on one occasion in August 1991, while visiting the Kellers, defendants Perry, White, and Quintero all saw Daniel Keller bring a number of children out of the day care center into the Kellers' adjoining home and sexually **\*303** abuse them. The record does not indicate whether B.N. and K.N. were among these children. According to plaintiffs, Perry, White, and Quintero did not attempt to stop Daniel Keller from abusing the children or report his crimes to the police or child welfare authorities.

**[1]** Plaintiffs' brief filed in this Court alleges additional facts that were not contained in their trial court pleadings. They now assert that Perry pleaded guilty to indecency with a child by contact and that White and Quintero were indicted but not prosecuted for sex offenses involving the children at the day care center. Plaintiffs' trial court petition, however, did not allege that Perry, White, or Quintero participated in abusing B.N. and K.N. or other children. We may not consider factual assertions that appear solely in the appellate briefs and not before the trial court. *See Estate of Arrington v. Fields,* 578 S.W.2d 173, 183 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.).

Instead, Mr. and Mrs. N. alleged only that Perry, White, and Quintero were negligent per se because they violated a statute requiring any person who "has cause to believe that a child's physical or mental health or welfare has been or may be

adversely affected by abuse" to file a report with the police or the Department of Protective and Regulatory Services. TEX. FAM.CODE § 261.109(a). Plaintiffs also asserted gross negligence and common law negligence claims. They claimed that Perry, White, and Quintero's failure to report the abuse proximately caused them harm by permitting the day care center to remain open, thus enabling Daniel Keller to continue abusing the children at the center. They sought damages for pain, mental anguish, and medical expenses, as well as loss of income when they could not work outside the home because of B.N. and K.N.'s injuries.

[2] [3] Perry, White, and Quintero moved for summary judgment on the sole ground that plaintiffs failed to state a cause of action. None of the parties presented any summary judgment evidence. A court may not grant summary judgment for failure to state a cause of action without first giving the plaintiff an opportunity to amend the pleadings. *See Pietila v. Crites,* 851 S.W.2d 185, 186 n. 2 (Tex.1993). Before any defendant moved for summary judgment, however, White filed special exceptions arguing that plaintiffs had not stated a cause of action, and plaintiffs subsequently amended their petition. Although it appears from the record that Perry and Quintero did not file special exceptions, their motions for summary judgment were based solely on the grounds argued in White's special exceptions. Thus, Mr. and Mrs. N. had a fair opportunity to correct any deficiency in their pleadings.

[4] [5] The trial court granted Perry, White, and Quintero's motions for summary judgment and severed plaintiffs' claims against those three defendants from their suit against the Kellers, which is not before us. Because defendants' motions for summary judgment argued only that plaintiffs failed to state a cognizable claim, the trial court's judgment can be upheld, if at all, only on that ground. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). When the ground for the trial court's decision is that plaintiffs failed to state a cause of action, we must take the allegations in the pleadings as true in determining whether a cause of action exists. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 309 (Tex.1987).

The court of appeals affirmed the summary judgment on plaintiffs' common law negligence claims but reversed and remanded for trial on the issues of negligence per se and gross negligence, holding that a violation of the Family Code's child abuse reporting requirement is negligence per se. 944 S.W.2d 728. Mr. and Mrs. N. have not appealed the court of appeals' judgment affirming the summary judgment against

them on common law negligence. Therefore, the question of whether Texas should impose a new common law duty to report child abuse on the facts of this case is not before us. *See generally Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 291–92 (Tex.1996); *Butcher v. Scott,* 906 S.W.2d 14, 15–16 (Tex.1995) (both refusing to recognize a common law duty to report abuse under the circumstances of those cases); *Greater Houston* **\*304** *Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (setting out factors for deciding whether a common law duty should exist). We granted defendants' application for writ of error to resolve the conflict between the court of appeals' decision remanding the negligence per se claims for trial and the decisions of three other courts of appeals declining to permit tort liability for violation of the statutory child abuse reporting requirement. *See Marshall v. First Baptist Church,* 949 S.W.2d 504, 508 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Childers v. A.S.,* 909 S.W.2d 282, 289–90 (Tex.App.—Fort Worth 1995, no writ); *Scott v. Butcher,* 906 S.W.2d 16, 20–21 (Tex.App.—Tyler 1994), *rev'd on other grounds,* 906 S.W.2d 14 (Tex.1995). [1]

[6] "It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability." *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993). The court of appeals found a duty in the following mandatory child abuse reporting provisions of the Texas Family Code:

> A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter.

TEX. FAM.CODE § 261.101(a). [2]

> (a) A person commits an offense if the person has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report as provided in this chapter.

> (b) An offense under this section is a Class B misdemeanor.

*Id.* § 261.109. [3] The court concluded that these provisions create a "statutory duty" to report child abuse, and that a violation of this duty is negligence per se. *See* 944 S.W.2d at 730.

[7]    All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort. *See, e.g., Smith v. Merritt,* 940 S.W.2d 602, 607–08 (Tex.1997) (statute making it a crime to furnish alcohol to persons under age 21 did not impose a tort duty on social hosts). "It is well-established that the mere fact that the Legislature adopts a criminal statute does not mean that this court must accept it as a standard for civil liability." *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d 274, 278 (Tex.1979). "The considerations which warrant imposing tort liability are not identical with those which warrant criminal conviction," Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 COLUM. L.REV.. 21, 22–23 (1949), and we will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability. [4] *See* **\*305** *Smith,* 940 S.W.2d at 607; *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201, 204–05 (1959); *Phoenix Refining Co. v. Powell,* 251 S.W.2d 892, 896 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.).

[8]    Before we begin our analysis of whether section 261.109 of the Family Code is an appropriate basis for tort liability, we emphasize that we must look beyond the facts of this particular case to consider the full reach of the statute. We do not decide today whether a statute criminalizing only the type of egregious behavior with which these defendants are charged—the failure of eyewitnesses to report the sexual molestation of preschool children—would be an appropriate basis for a tort action. That is not the statute the Legislature passed. Rather, the issue before us is whether it is appropriate to impose tort liability on any and every person who "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report." TEX. FAM.CODE § 261.109(a). *Cf.* Leonard, *The Application of Criminal Legislation to Negligence Cases: A Reexamination,* 23 SANTA CLARA L.REV. 427, 457–66 (1983) (contrasting the rigidity of statutory standards with the flexibility of case-by-case common law determinations of duty and breach).

[9]    The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *See Moughon v. Wolf,* 576 S.W.2d 603, 604 (Tex.1978); *East Tex. Motor Freight Lines v. Loftis,* 148 Tex. 242, 223 S.W.2d 613, 615 (1949); *Missouri, K & T. Ry. v. Saunders,* 101 Tex. 255, 106 S.W. 321, 321–23 (1908); RESTATEMENT (SECOND)

OF TORTS §§ 286, 288. Texas's first mandatory child abuse reporting statute, from which Family Code section 261.101(a) is derived, stated that "[t]he purpose of this Act is to protect children who [ ] ... are adversely affected by abuse or neglect." Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790. Similarly, the current Family Code provision governing the investigation of reports of child abuse states that "[t]he primary purpose of the investigation shall be the protection of the child." TEX. FAM.CODE § 261.301(d).

[10]    B.N. and K.N. are within the class of persons whom the child abuse reporting statute was meant to protect, and they suffered the kind of injury that the Legislature intended the statute to prevent. [5] But this does not end our inquiry. *See Praesel v. Johnson,* 967 S.W.2d 391, 395 (Tex.1998). The Court must still determine whether it is appropriate to impose tort liability for violations of the statute. *See Smith,* 940 S.W.2d at 607–08. This determination is informed by a number of factors, some discussed by the court of appeals in this case and others derived from past negligence per se decisions of Texas courts and from scholarly analyses. **\*306** These factors are not necessarily exclusive, nor is the issue properly resolved by merely counting how many factors lean each way. Rather, we set out these considerations as guides to assist a court in answering the ultimate question of whether imposing tort liability for violations of a criminal statute is fair, workable, and wise.

[11]    We first consider the fact that, absent a change in the common law, a negligence per se cause of action against these defendants would derive the element of duty solely from the Family Code. At common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress. *See Butcher,* 906 S.W.2d at 15; *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983). Although there are exceptions to this no-duty rule, *see, e.g., Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997) (noting that under some circumstances, person in control of premises has duty to protect invitees from crime), this case does not fall within any of the established exceptions, and Mr. and Mrs. N. have not asked this Court to impose on persons who are aware of child abuse a new common law duty to report it or take other protective action.

[12]    In contrast, the defendant in most negligence per se cases already owes the plaintiff a pre-existing common law duty to act as a reasonably prudent person, so that the statute's role is merely to define more precisely what conduct breaches that duty. *See Rudes,* 324 S.W.2d at 204 ("We adopt the

statutory test rather than that of the ordinarily prudent man as the more accurate one to determine negligence ....”); *see also Moughon,* 576 S.W.2d at 604; RESTATEMENT (SECOND) OF TORTS § 286 (1965) (both defining negligence per se as the judicial adoption of a statute to define the standard of conduct of a reasonable person). For example, the overwhelming majority of this Court's negligence per se cases have involved violations of traffic statutes by drivers and train operators—actors who already owed a common law duty to exercise reasonable care toward others on the road or track. *See, e.g., Murray v. O & A Express, Inc.,* 630 S.W.2d 633 (Tex.1982); *Impson v. Structural Metals, Inc.,* 487 S.W.2d 694 (Tex.1972); *Missouri–Kansas–Texas R.R. Co. v. McFerrin,* 156 Tex. 69, 291 S.W.2d 931 (1956); *Liberty Film Lines v. Porter,* 136 Tex. 49, 146 S.W.2d 982 (1941); *Texas Co. v. Betterton,* 126 Tex. 359, 88 S.W.2d 1039 (1936); *Lancaster & Wight v. Allen,* 110 Tex. 213, 217 S.W. 1032 (1920); *Missouri, K & T. Ry. Co. v. Saunders,* 101 Tex. 255, 106 S.W. 321 (1908); *San Antonio & A.P. Ry. Co. v. Bowles,* 88 Tex. 634, 32 S.W. 880 (1895).

When a statute criminalizes conduct that is also governed by a common law duty, as in the case of a traffic regulation, applying negligence per se causes no great change in the law because violating the statutory standard of conduct would usually also be negligence under a common law reasonableness standard. *See Praesel,* 967 S.W.2d at 395; *Parrott v. Garcia,* 436 S.W.2d 897, 900 (Tex.1969); *Rudes,* 324 S.W.2d at 204;￼ Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 COLUM. L.REV.. 21, 34 (1949). But recognizing a new, purely statutory duty “can have an extreme effect upon the common law of negligence” when it allows a cause of action where the common law would not. *See* Leonard, 23 SANTA CLARA L.REV. at 449 n. 92. In such a situation, applying negligence per se “bring[s] into existence a new type of tort liability.” *Burnette v. Wahl,* 284 Or. 705, 588 P.2d 1105, 1109 (1978). The change tends to be especially great when, as here, the statute criminalizes inaction rather than action. *See generally Otis Eng'g,* 668 S.W.2d at 309;￼ 3 HARPER ET AL., THE LAW OF TORTS § 18.6 (2d ed.1986); KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 56, at 373–77 (5th ed.1984); Thayer, *Public Wrong and Private Action,* 27 HARV. L.REV.. 317 (1914) (all discussing traditional tort law distinction between misfeasance and nonfeasance).

Some commentators contend that the term “negligence per se” does not even apply when the statute on which civil liability is based corresponds to no common law duty. *See*

KEETON ET AL. § 36, at 221 n. 9; Forell, *The Statutory Duty Action in Tort: A Statutory/Common Law Hybrid,* 23 IND. L.REV. 781, 782 (1990). While our definition has never been so restrictive, this Court in fact **\*307** has created a new duty by applying negligence per se on only one occasion. In *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985), a third party dragged the plaintiff into an unlocked vacant apartment owned by the defendant and raped her. Because the plaintiff was a trespasser according to traditional premises liability categories, the defendant landowner owed her no common law duty. *See id.* at 548. Although two members of this Court would have recognized a new common law duty of reasonable care toward trespassers, at least in certain cases, *see id.* at 551–54 (Kilgarlin, J., concurring); *id.* at 554 (Spears, J., concurring), a plurality instead found a duty only in a city ordinance requiring landowners to keep vacant buildings locked. *See id.* at 549. But in our next major negligence per se case, *El Chico Corp. v. Poole,* we returned to the norm of deriving duty from the common law and looking to the statute only for the standard of conduct. Only after we created a new common law duty not to sell alcohol to intoxicated persons, *see El Chico,* 732 S.W.2d at 309–12, did we adopt a relevant section of the Alcoholic Beverage Code as “the attendant standard of conduct.” *Id.* at 312–13. Thus, based on both this Court's past practice and the observations of noted scholars, we conclude that the absence of a relevant common law duty should be considered in deciding whether to apply negligence per se to the Family Code's reporting provision.

The court of appeals in this case listed several factors to consider in deciding whether to apply negligence per se. *See* 944 S.W.2d at 730 (citing Ratliff, Comment, *Negligence Per Se in Texas,* 41 TEX. L.REV. 104, 106 (1962)). According to the court of appeals, the principal factors favoring negligence per se are that the Legislature has determined that compliance with criminal statutes is practicable and desirable and that criminal statutes give citizens notice of what conduct is required of them. *See id.* As considerations against negligence per se, the court of appeals cautioned that some penal statutes may be too obscure to put the public on notice, may impose liability without fault, or may lead to ruinous monetary liability for relatively minor offenses. *See id.* The first of these factors is not helpful because it points the same way in every case: the very existence of a criminal statute implies a legislative judgment that its requirements are practicable and desirable. The court of appeals' remaining factors, however, are pertinent to our analysis.

On the question of notice, this Court has held that one consideration bearing on whether to apply negligence per se is whether the statute clearly defines the prohibited or required conduct. *See Praesel,* 967 S.W.2d at 395; *Carter,* 584 S.W.2d at 278; RESTATEMENT (SECOND) OF TORTS § 874A cmt. h(1). The Family Code's reporting requirement is triggered when a person "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect." TEX. FAM.CODE § 261.109(a). In this case, defendants allegedly were eyewitnesses to sexual abuse. Under these facts, there is no question that they had cause to believe abuse was occurring, and thus that the statute required them to make a report. In many other cases, however, a person may become aware of a possible case of child abuse only through second-hand reports or ambiguous physical symptoms, and it is unclear whether these circumstances are "cause to believe" that such conduct "may be" taking place. [6] *See Scott,* 906 S.W.2d at 20. A statute that conditions the requirement to report on these difficult judgment calls does not clearly define **\*308** what conduct is required in many conceivable situations. [7]

The next factor the court of appeals considered was whether applying negligence per se to the reporting statute would create liability without fault. *See* 944 S.W.2d at 730. We agree with the court of appeals that it would not, because the statute criminalizes only the "knowing[ ]" failure to report. [8] *See id.; see also El Chico,* 732 S.W.2d at 313 (holding under a similarly worded statute that "a liquor licensee is negligent as a matter of law under the statute when he *knowingly* sells an alcoholic beverage to an intoxicated person" (emphasis added)). This characteristic of the statute weighs in favor of imposing civil liability.

Our next consideration is whether negligence per se would impose ruinous liability disproportionate to the seriousness of the defendant's conduct. In analyzing this factor, the court of appeals treated child abuse as the relevant conduct. *See* 944 S.W.2d at 730 ("[T]he abuse of children has become notorious."). The conduct criminalized by section 261.109, however, is not child abuse but the failure to report child abuse. Through its penal laws, the Legislature has expressed a judgment that abuse and nonreporting deserve very different legal consequences. The abuser in this case committed the offense of aggravated sexual assault on a child under the age of fourteen, a first degree felony carrying a penalty of five to ninety-nine years in prison and a fine of up to $10,000. *See* TEX. PEN.CODE §§ 22.021, 12.32. Almost all of the other acts of abuse and neglect covered by the reporting requirement, *see* TEX. FAM.CODE § 261.001(1), (4) (defining "abuse" and "neglect"), are also felonies. *See* TEX. PEN.CODE § 22.04 (injury to a child); *id.* § 22.041 (abandoning or endangering child); *id.* § 22.011(a)(2), (f) (statutory rape). Even the lowest level of felony is punishable by 180 days to two years in jail and a $10,000 fine, *see id.* § 12.35, and automatically deprives the offender of certain civil rights such as the franchise, *see* TEX. ELEC.CODE § 13.001(a)(4), eligibility for public office, *see id.* § 141.001(a) (4), and the right to own a firearm, *see* TEX. PEN.CODE § 46.04(a). By contrast, failure to report abuse or neglect, no matter how serious the underlying crime, is a class B misdemeanor punishable by no more than six months in jail and a $2,000 fine. *See* TEX. FAM.CODE § 261.109(b); TEX. PEN.CODE § 12.22. This evidence of legislative intent to penalize nonreporters far less severely than abusers weighs against holding a person who fails to report suspected abuse civilly liable for the enormous damages that the abuser subsequently inflicts. The specter of disproportionate liability is particularly troubling when, as in the case of the reporting statute, it is combined with the likelihood of "broad and wide-ranging liability" by collateral wrongdoers that we condemned in *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d at 279.

Finally, in addition to the factors discussed by the court of appeals, we have also looked to whether the injury resulted directly or indirectly from the violation of the statute. *See Praesel,* 967 S.W.2d at 395. In *Carter v. William Sommerville & Son, Inc.,* we refused to apply negligence per se liability to a provision of the Texas Motor Carrier Act making it a misdemeanor to aid and abet any violation of the Act. *See Carter,* 584 S.W.2d at 278–79. We concluded that the aiding and abetting section was "too far removed to be adopted as a standard" for civil liability, in part because "[i]t is only by first finding a violation of some other section of the Act that the court may then find a violation" of that **\*309** provision. *Carter,* 584 S.W.2d at 279. Like the aiding and abetting provision in *Carter,* Family Code section 261.109 defines the misdemeanor of failure to report child abuse in terms of the wrongful act of a third party. Under *Carter* 's reasoning, the indirect relationship between violation of such a statute and the plaintiff's ultimate injury is a factor against imposing tort liability.

The lack of direct causation is not in itself dispositive; we have imposed civil liability for some statutory violations that caused the plaintiff's injury by facilitating the tort of

a third party. *See El Chico,* 732 S.W.2d at 312–13 (statute prohibiting sale of alcohol to intoxicated person); *Nixon,* 690 S.W.2d at 548–49 (building ordinance requiring security measures). But a reporting statute by definition places a *fourth* party between the defendant and the plaintiff: the person or agency to whom the defendant is required to make the report. Thus, the connection between the defendant's conduct and the plaintiff's injury is significantly more attenuated in a case based on failure to report than in *Nixon* or *El Chico.* We are not aware of any Texas case applying negligence per se to a statute that, like the child abuse reporting provision, interposes not one but two independent actors between the plaintiff and the defendant.

We conclude by noting that for a variety of reasons, including many of those we have discussed, most other states with mandatory reporting statutes similar to Texas's have concluded that the failure to report child abuse is not negligence per se. *See C.B. v. Bobo,* 659 So.2d 98, 102 (Ala.1995); *Fischer v. Metcalf,* 543 So.2d 785, 790–91 (Fla.Dist.Ct.App.1989); *Cechman v. Travis,* 202 Ga.App. 255, 414 S.E.2d 282, 284 (1991); *Borne v. Northwest Allen County Sch. Corp.,* 532 N.E.2d 1196, 1202–03 (Ind.Ct.App.1989); *Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.,* 249 Kan. 348, 819 P.2d 587, 604 (1991); *Valtakis v. Putnam,* 504 N.W.2d 264, 266 (Minn.Ct.App.1993); *Bradley v. Ray,* 904 S.W.2d 302, 312–14 (Mo.Ct.App.1995); *Marquay v. Eno,* 139 N.H. 708, 662 A.2d 272, 276–78 (1995). *But see Landeros v. Flood,* 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389, 396–97 (1976); *Curran v. Walsh Jesuit High Sch.,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030 (1995); *Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899, 909 (Tenn.Ct.App.1992).

In summary, we have considered the following factors regarding the application of negligence per se to the Family Code's child abuse reporting provision: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute. Because a decision to impose negligence per se could not be limited to cases charging serious misconduct like the one at bar, but rather would impose immense potential liability under an ill-defined standard on a broad class of individuals whose relationship to the abuse was extremely indirect, we hold that it is not appropriate to adopt Family Code section 261.109(a) as establishing a duty and standard of conduct in tort. Therefore, Mr. and Mrs. N. and their children may not maintain a claim for negligence per se or gross negligence based on defendants' violation of the child abuse reporting statute. Because plaintiffs did not appeal the court of appeals' adverse decision on their common law negligence claims, we do not consider whether Texas should impose a common law duty to report or prevent child abuse.

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.

**All Citations**

973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162

Footnotes

1    This Court was unable to address the negligence per se issue in *Butcher* for jurisdictional reasons. *See Butcher v. Scott,* 906 S.W.2d 14, 16 (Tex.1995). This case thus presents our first opportunity to consider this question.

2    This mandatory reporting statute was enacted in 1971. *See* Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790, 2791. Prior to that time, Texas did not require the reporting of child abuse, although there were statutes granting immunity from suit to doctors and other professionals who chose to report cases of suspected abuse. *See* Act of April 26, 1965, 59th Leg., R.S., ch. 117, 1965 Tex. Gen. Laws 277 (physicians); Act of May 5, 1969, 61st Leg., R.S., ch. 219, 1969 Tex. Gen. Laws 637 (other professionals).

The version of this provision in force at the time of the events in this case read "has been *or may be* adversely affected." *See* 944 S.W.2d at 729 (quoting former TEX. FAM.CODE § 34.01(a)) (emphasis added). The Legislature deleted the italicized language in 1997. *See* Act of Sept. 1, 1997, 75th Leg., R.S., ch. 1022, § 65, 1997 Tex. Gen. Laws 3733, 3760. However, the phrase "or may be" remains in the current version of § 261.109(a).

3      This provision criminalizing the failure to report was added in 1973. *See* Act of May 17, 1973, 63d Leg., R.S., ch. 398, § 1, 1973 Tex. Gen. Laws 881.

4      At times, our opinions have included language suggesting that any statutory violation is automatically negligence per se. *See, e.g., Southern Pac. Co. v. Castro,* 493 S.W.2d 491, 497 (Tex.1973) (stating that to prove negligence per se, one must prove the unexcused violation of a penal standard). Yet these same opinions recognize the Restatement of Torts as the law of Texas on negligence per se, and the Restatement expressly states that the adoption of criminal statutes into tort law is a matter of judicial discretion: "The correct rule is ...: 'The unexcused violation of a legislative enactment or an administrative regulation *which is adopted by the court as defining the standard of conduct of the reasonable man,* is negligence in itself.' " *Southern Pac.,* 493 S.W.2d at 497 (emphasis added)(quoting RESTATEMENT (SECOND) OF TORTS § 288B (1965)); *see also* RESTATEMENT (SECOND) OF TORTS § 286 (1965) ("The court *may* adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment ....") (emphasis added); *id.* cmt. d ("Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.").

5      A few courts in other jurisdictions have interpreted mandatory reporting statutes as intended to protect only the specific child the defendant suspects is being abused, not other potential victims of the same abuser. *See Curran v. Walsh Jesuit High School,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030–31 (1995); *Marcelletti v. Bathani,* 198 Mich.App. 655, 500 N.W.2d 124, 127 (1993). It is unclear from the pleadings whether B.N. and K.N. were among the children whom defendants saw being abused. But whether or not *Curran* and *Marcelletti*'s analysis applies to the Texas reporting statute, B.N. and K.N. are within the protected class on the facts of this case. According to the pleadings, defendants saw Daniel Keller take some of the children enrolled in the day care center out of the center into an adjoining room of the Kellers' home and sexually abuse them. This gave defendants "cause to believe" that the "physical or mental health or welfare" of all the children attending the day care center—not only the particular children they saw being abused on that occasion—"may be adversely affected by abuse or neglect." *See* TEX. FAM.CODE § 261.109(a). Thus, the statute required defendants to make a report concerning all the children at the center.

6      Determining whether abuse is or may be occurring in a particular case is likely to be especially difficult for untrained laypersons. Texas is one of a minority of states that require any person who suspects child abuse to report it. *See* O'Brien & Flannery, *The Pending Gauntlet to Free Exercise: Mandating that Clergy Report Child Abuse,* 25 LOY. L.A. L.REV. . 1, 24–25 & n. 127 (1991) (collecting statutes). Most states place such a requirement only on professionals who may be expected to know more than the average person about recognizing child abuse and who have a professional relationship with and responsibility for children. *See id.* at 19 n. 106 (collecting statutes); *id.* at 24. The Texas Family Code contains a separate mandatory reporting provision, not relevant here, specifically directed to members of certain professions. *See* TEX. FAM.CODE § 261.101(b).

7      We do not mean to suggest that section 261.109 is unconstitutionally vague. In fact, one court of appeals has already rejected an as-applied vagueness challenge to this provision. *See Morris v. State,* 833 S.W.2d 624, 627 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). A statute's lack of clarity need not rise to a constitutionally suspect level in order to be a factor in our determination of whether imposing negligence per se is appropriate.

8      Although the issue of strict liability is related to the problem of notice, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), a statute may require scienter and yet fail to define clearly the prohibited conduct. *Cf. Long v. State,* 931 S.W.2d 285, 289 (Tex.Crim.App.1996).

---

**End of Document**            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

215 S.W.3d 559
Court of Appeals of Texas,
Austin.

RAILROAD COMMISSION OF TEXAS and
Dos Republicas Resources Co., Inc., Appellants,
v.
Theodosia COPPOCK, Juanita Alvarado,
Guadalupe Davila, and Kickapoo
Traditional Tribe of Texas, Appellees.

No. 03–05–00097–CV.  |  Feb. 1, 2007.

**Synopsis**
**Background:** Neighboring landowners appealed Railroad Commission's decision to extend coal mining company's surface coal mining permit. The 201st Judicial District Court, Travis County, Scott H. Jenkins, J., entered judgment for landowners. Commission and company appealed.

**Holdings:** The Court of Appeals, David Puryear, J., held that:

[1] Commission had the authority to grant company's request for a permit extension, even though three-year deadline had expired, and

[2] company could obtain permit extension due to unfavorable market conditions beyond the control of and without the fault or negligence of the company.

Reversed and remanded.

**Attorneys and Law Firms**

**\*560** Chesley N. Blevins, Rebecca L. Fink, Lloyd Gosselink Blevins Rochelle & Townsend, P.C., Nathan M. Bigbee, Assistant Attorney General, Natural Resources Division, Austin, for appellants.

Enrique Valdivia, Texas RioGrande Legal Aid, San Antonio, David O. Frederick, Lowere & Frederick, John G. Soule, Scott Douglass & McConnico, L.L.P., Austin, for appellees.

Before Justices PATTERSON, PURYEAR and SMITH.[*]

**\*561** *OPINION*

DAVID PURYEAR, Justice.

Our opinion and judgment issued on December 29, 2006, are withdrawn, and the following opinion is substituted.

Dos Republicas Resources Co., Inc. ("Dos Republicas") asked the Railroad Commission of Texas (the "Commission") to extend its surface coal mining permit under the provisions of the Texas Surface Coal Mining and Reclamation Act codified in the natural resources code, but Theodosia Coppock, Juanita Alvarado, Guadalupe Davila, and Kickapoo Traditional Tribe of Texas (the "appellees") opposed the extension. Ultimately, the Commission granted the extension, and the appellees appealed the Commission's decision. The district court concluded that the Commission's basis for granting the extension, namely the lack of a market for Dos Republicas to sell its coal, was not authorized under the natural resources code. *See* Tex. Nat. Res.Code Ann. § 134.072 (West 2001). Dos Republicas and the Commission appeal the district court's judgment, and we will reverse the court's judgment.

**BACKGROUND**

In 1992, Dos Republicas applied to the Commission for a permit to allow it to engage in coal mining on a 2700–acre tract in Eagle Pass, Texas, and the Commission approved the permit in 1994. However, Dos Republicas did not request that the permit be issued at that time.

For years, Dos Republicas attempted to enter into an agreement to sell its coal to the Comision Federal de Electricidad ("CFE"), a state-owned electricity provider in Mexico that operates two coal-fired plants near Eagle Pass. In 1999, CFE became concerned about the financial security of the mining company that had been its coal supplier. As a result, it alerted Dos Republicas that, in early 2000, it would be issuing a request for proposals asking companies to submit bids offering to supply CFE with coal and asked Dos Republicas to issue a bid. To ensure that it would have a supply when necessary, Dos Republicas asked the Commission to issue the permit it had previously approved, and the Commission issued the permit in April 2000.

Due to a number of political changes and pressure from various interested parties, CFE never issued its request for proposals. Employees from mines in Mexico complained that importing coal from Texas might eliminate their jobs. In addition, during this time, the governing political party in Mexico changed, and the leaders of CFE were replaced.

Dos Republicas continued its efforts to enter into an agreement with CFE, and, in 2001, CFE again indicated that it would issue a request for proposals. However, as had happened previously, no request was ever issued. Instead, CFE entered into a long-term supply contract with a Mexican mining company, Coahuila Industrial Minera ("Coahuila").

Prior to and after CFE entered into a contract with Coahuila, Dos Republicas unsuccessfully attempted to find other market options for selling its coal. Even though Dos Republicas asked the Commission to issue it a mining permit, it never began mining coal at the Eagle Pass mine and, eventually, filed an application with the Commission seeking to terminate its permit. Although Dos Republicas asked that its permit be terminated, the natural resources code also contains an early termination provision mandating that a mining permit will expire within three years of **\*562** its issuance if the permit holder has not begun "surface coal mining" operations by that date. Tex. Nat. Res.Code Ann. § 134.072(a); [1] *see also id.* § 134.004(20) (West 2001) (definition of "surface coal mining operations"). Dos Republicas filed its application to terminate its permit shortly before the three-year termination date.

Just before the three-year termination deadline passed, Coahuila contacted Dos Republicas and indicated that it was interested in purchasing the Eagle Pass mining operation. Consequently, Dos Republicas filed a request to withdraw its application to terminate the permit and also filed a request to extend its permit beyond the three-year deadline. The natural resources code allows the Commission to grant "reasonable extensions" if it is shown that the extensions are necessary because of:

(1) litigation that precludes the beginning of operations or threatens substantial economic loss to the permit holder; or

(2) conditions beyond the control and without the fault or negligence of the permit holder.

*Id.* § 134.072(b). [2]

The Commission referred the matter to a hearings examiner. Coppock, a landowner near the Eagle Pass property,

opposed the extension. [3] She claimed that, because the three-year deadline had passed by the time of the hearing, the Commission had no authority to grant an extension. Alternatively, she argued that the Commission should deny the extension because the conditions allowing for an extension found in section 134.072 were not satisfied. Specifically, she asserted that the absence of a market in which Dos Republicas could sell its coal could not justify an extension.

The hearing examiner concluded that the Commission had jurisdiction to consider the request for an extension because the request for an extension was filed prior to the three-year deadline. Further, she concluded that the Commission should grant the extension because Dos Republicas's failure to begin mining was due to **\*563** the absence of a market for the coal and that the market condition was "beyond the control and without the fault or negligence" of Dos Republicas. The Commission adopted the examiner's proposal for decision and granted the extension.

The appellees appealed the Commission's order to the district court. *See* Tex. Gov't Code Ann. § 2001.171 (West 2000) (person who has exhausted all administrative remedies and is aggrieved by final agency decision is entitled to judicial review). In its judgment, the district court concluded that the Commission had jurisdiction over the extension request because the Commission has authority over a request as long as it is filed within three years of the permit's issuance. However, the court also concluded that "[s]ubsection 134.072(b) does not authorize the Commission to grant an extension based upon the absence of a market or other economic, political, or social conditions that are beyond the control of and without the fault or negligence of the permit holder." Dos Republicas and the Commission appeal the district court's judgment.

## STANDARD OF REVIEW

In addressing the issues raised in this appeal by the appellants and the appellees, we must necessarily construe the relevant provisions of the natural resources code. Statutory construction is a question of law, which we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). In determining the meaning of a statute, our primary purpose is to determine the legislature's intent when enacting the statute, and we begin with the language used in the statute. *Id.* Every word in a statute is presumed to have been used for a

purpose and every word excluded is presumed to have been excluded for a purpose. *Laidlaw Waste Sys., Inc. v. City of Wilmer,* 904 S.W.2d 656, 659 (Tex.1995). Further, we look to the entire act and do not look at a single provision isolated from the remainder of the act. *Watts v. City of Houston,* 126 S.W.3d 97, 100 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *see also* Tex. Gov't Code Ann. § 311.021(2) (West 2005) (presume that entire statute was meant to be effective). We should not adopt a construction of a statute that will render the statute meaningless or lead to absurd results. *See Watts,* 126 S.W.3d at 100; *see also* Tex. Gov't Code Ann. § 311.021(3) (West 2005) (in construing statutes, we presume that just and reasonable result was intended). Finally, the construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration so long as the construction is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993); *Anderson–Clayton Bros. Funeral Home, Inc. v. Strayhorn,* 149 S.W.3d 166, 178 (Tex.App.-Austin 2004, pet. denied) (even if there are other reasonable interpretations, we will accept agency's construction of statute if it is consistent with language and purpose of statute); *see also* Tex. Gov't Code Ann. § 311.023(6) (West 2005) (in construing statutes, courts may consider administrative construction of statute regardless of whether statute is considered ambiguous). This is particularly true when the statute involves a complex subject matter. *Buddy Gregg Motor Homes v. Motor Vehicle Bd.,* 156 S.W.3d 91, 99 (Tex.App.-Austin 2004, pet. denied). However, for nontechnical questions of law and other questions not lying within an agency's expertise, courts do not defer to an agency's interpretation. *Id.*

## DISCUSSION

On appeal, the Commission and Dos Republicas contend that the district court erred when it reversed the Commission's **\*564** order granting Dos Republicas's extension because the extension was authorized by the natural resources code. In response, the appellees assert that the extension was not authorized by statute and that the Commission did not have the authority to grant the extension after the three-year deadline.

**The Commission Possessed Authority to Address Dos Republicas's Extension Request**

 **[1]** On appeal, the appellees assert that the Commission lacked the authority to grant the permit extension because the three-year deadline specified in the statute had expired. Before we address this issue, we note that there is some question about whether the appellees may make this cross-claim without first filing a notice of appeal. The Commission and Dos Republicas contend that the appellees may not bring this cross-claim on appeal because they failed to file a notice of appeal. *See* Tex.R.App. P. 25.1 (party who seeks to alter trial court's judgment must file notice of appeal), 26.1 (specifying deadlines for filing notices of appeal). The appellees, on the other hand, insist that this issue may be considered on appeal. Specifically, they assert that it was unnecessary for them to file a notice of appeal because they are not seeking more favorable relief than that granted by the district court. *See First Gen. Realty Corp. v. Maryland Cas. Co.,* 981 S.W.2d 495, 503 (Tex.App.-Austin 1998, pet. denied) (because appellees' arguments did not ask for relief greater than that granted by trial court, appellees were not required to file notice of appeal). Rather, they argue that they are simply seeking to affirm the final judgment of the district court and that they raise this issue merely as an alternative ground for affirming the district court's judgment. *See Helton v. Railroad Comm'n,* 126 S.W.3d 111, 119–20 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (noting distinction between cross-points that require separate notice of appeal and claims that merely seek to raise alternate grounds opposing recovery by appealing party). In the interests of justice, we will address their argument.

 **[2]** The appellees insist that Dos Republicas's permit terminated *automatically* on April 11, 2003, because Dos Republicas had not commenced surface mining and had not *obtained* an extension by that date. In support of this assertion, the appellees contend that nothing in the natural resources code provides that requesting an extension within the three-year deadline will toll the termination deadline or allows for a conditional extension pending a final determination by the Commission. In response, the Commission argues that it may grant an extension request after the three-year deadline as long as the request was filed within the three-year cutoff.

The Commission's interpretation of the statute is consistent with the language of the statute. Nothing in the natural resources code necessitates that the Commission rule on an extension request before the three-year deadline passes in order for the extension to be effective. *See* Tex. Nat. Res.Code Ann. § 134.072. The lack of a Commission deadline for issuing its decision is instructive given that the code provides

specific deadlines for agency action in other contexts. For example, section 134.080 of the code mandates that the Commission issue a decision regarding a permit revision filed by a permit holder within 90 days of receiving the application for revision. *See id.* § 134.080 (West 2001); *see also* Tex. Gov't Code Ann. § 2001.146(c) (West 2000) (agency must act on motion for rehearing within 45 days or motion is overruled by operation of law).

 **\*565**  Moreover, the code does not mandate that a permit holder file an extension request within a given time prior to the termination date in order to allow the Commission to fully consider the request. The lack of a specific deadline by which a permit holder must file a request is noteworthy when looking at other code provisions. The section concerning permit renewals explicitly provides a deadline by which an applicant must file a permit renewal application that is prior to the permit expiration date. Specifically, section 134.078 provides as follows:

> Application for permit renewal must be made not later than the 120th day before the date the existing permit expires.

Tex. Nat. Res.Code Ann. § 134.078 (West 2001); *see also* 16 Tex. Admin. Code § 12.106(b)(2) (2006) (requiring permit holder to file permit renewal 180 days before permit expires), (b)(3) (2006) (requiring permit holder to file permit revision application 180 days before it expects to revise its operations). The absence of a similarly worded deadline in the extension context supports the Commission's interpretation, which allows for the filing of an extension request up to the three-year termination deadline. *See Laidlaw Waste Sys., Inc.,* 904 S.W.2d at 659 (presume that every word omitted was purposefully excluded).

Furthermore, if the appellees' interpretation of the statute were correct, applicants would have the onerous task of estimating how far in advance they would need to file an extension request in order to allow the Commission time to fully review the application and issue its decision prior to the expiration of the three-year deadline. In addition, the appellees' construction would effectively eliminate extensions for events occurring between the time a permit holder should file an extension request to ensure that a timely decision is issued and the three-year termination date. Given that the possible reasons for requesting an extension might vary in complexity, the amount of time necessary for full consideration of a request will vary, the extension may or

may not be opposed, hearings may or may not be scheduled on the proposed extension, and there is no statutory deadline for the Commission releasing its decision, this interpretation would lead to unfair results. For example, under the appellees' interpretation, a permit holder who files for an extension just prior to the termination deadline would receive an extension as long as the Commission issued the extension by the three-year deadline, whereas a permit holder who files a request for an extension well in advance of the deadline would not receive an extension if the Commission is unable to grant the extension by the cut-off date.[4] We cannot adopt an interpretation that would lead to such arbitrary results. *See Watts,* 126 S.W.3d at 100.

This construction is also supported by the effect of the extension provisions. *Cf.* Tex. Gov't Code Ann. § 311.023(1) (West 2005) (in interpreting statute, courts may consider "object sought to be attained"). Section 134.072 terminates a permit, regardless of the length of the permit's effective term, within three years of the permit's issuance if the permit holder has not begun mining operations. Tex. Nat. Res.Code Ann. § 134.072; *see also id.* § 134.071 (West 2001) (allowing Commission to issue permits with terms of five years or more). Given that section 134.072 can shorten the effective term of a mining permit by imposing a three-year deadline,  **\*566**  the Commission's interpretation that a request for an extension is effective if filed within the three-year deadline seems logical and equitable.

For all the reasons previously given, we conclude that the Commission's interpretation of the statute is consistent with section 134.072 and further conclude that the Commission had the authority to grant Dos Repulicas's extension request even though the three-year termination date had passed. Accordingly, we affirm that portion of the district court's judgment.

### The Statute Allows Extension Requests to be Granted for Market Reasons

 **[3]**   In their only issue on appeal, the Commission and Dos Republicas contend that the district court erred by reversing the Commission's order. Specifically, they argue that the absence of a market for the coal present at the Eagle Pass mine was a condition outside of Dos Republicas's control that occurred "in the absence of any fault or negligence" on behalf of Dos Republicas and that, therefore, the Commission was authorized by statute to grant the extension.[5]

The appellees, on the other hand, contend that the district court correctly concluded that the Commission was not authorized to issue an extension to Dos Republicas. First, the appellees argue that the language of subsection 134.072(b)(2), which is the subsection relevant in this appeal, acts as a *force majeure* provision that prohibits an extension unless the permit holder has physically been prevented from commencing operations due to "conditions beyond its control and without its fault or negligence." Further, the appellees contend that Dos Republicas was not actually prevented from mining and, therefore, insist that Dos Republicas should not have been given an extension for its conscious choice not to begin mining.

 [4]    [5]    We disagree with the appellees' assertion. There is no requirement listed in 134.072 that a permit holder must be "physically" prevented from engaging in mining operations to obtain an extension. Further, we have been unable to find any case applying the doctrine of *force majeure* to the issuance of a permit by a state regulatory authority. The doctrine is designed to protect parties to a contract and excuses a party's nonperformance because of events outside the control of the parties. *See Black's Law Dictionary* 445 (abridged 6th ed.1991); *see also Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1248 n. 5 (5th Cir.1990) (*force majeure* describes particular type of event, which may excuse performance under contract). The scope and applicability of the doctrine is dependent upon the terms specified in a contract. *See Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.,* 157 S.W.3d 462, 466 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *see also Perlman,* 918 F.2d at 1248 n. 5 (should look to language of contract to determine parties' intent concerning whether event complained of excuses performance); *Sun Operating Ltd. P'ship v. Holt,* 984 S.W.2d 277, 282–83 (Tex.App.-Amarillo 1998, pet. denied) (much of historic meaning of phrase *force majeure* is gone and, therefore, scope and application of doctrine is "utterly dependent upon the terms of the contract in which it appears"); 30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77:31 (4th ed. 1990 & Supp.2004) (specific language of clause indicates what events will excuse performance and typical clause **\*567** states that party's performance is subject to "acts of God, war, government regulation, terrorism, disaster, strikes ... civil disorder, curtailment of transportation facilities, or any other emergency beyond the parties control").

In addition, the cases the appellees refer to in support of their assertion that, under the doctrine of *force majeure,* market conditions cannot justify a permit extension are distinguishable. The appellees refer to *Day v. Tenneco, Inc.,* 696 F.Supp. 233 (S.D.Miss.1988); *Huffines v. Swor Sand & Gravel Co., Inc.,* 750 S.W.2d 38 (Tex.App.-Fort Worth 1988, no writ); and *Valero Transmission Co. v. Mitchell Energy Corp.,* 743 S.W.2d 658 (Tex.App.-Houston [1st Dist.] 1987, no writ), for the proposition that unfavorable market conditions cannot justify a permit extension under subsection (b)(2). Although the courts in these cases did conclude that poor market conditions do not excuse a party's obligation to perform under a contract, *see Day,* 696 F.Supp. at 236; *Huffines,* 750 S.W.2d at 40; and *Valero,* 743 S.W.2d at 663, this case does not involve a contractual dispute or a breach of contract claim. Furthermore, in two of the cases cited, *Day* and *Valero,* the contracts at issue specifically contained a *force majeure* clause that the courts were required to interpret: there is no comparable provision in this case. [6]

 [6]    Second, the appellees analogize the effect of Dos Republicas's failure to begin mining operations to the effect of a lessee's failure to undertake physical efforts to drill under the terms of an oil and gas lease. Specifically, they contend that, under an oil and gas lease, a lessee's failure to engage in physical activity on the leased property will terminate the lease at the end of the lease's primary term [7] and will not allow for renewal, and they insist that a similar result should apply here. *See* Smith & Weaver, *Texas Law of Oil & Gas* § 4.5 (2000) ("A lessee cannot safely rely upon activities which do not involve actual physical activity on the land such as ... applying ... for a drilling permit.... [T]he reported cases speak in terms of actual physical contact with the leased premises.").

However, the appellees have not referred us to cases holding that a permit holder's failure to engage in mining activities is equivalent to a lessee's failure to drill under an oil and gas lease, and we see no reason to adopt such a rule. The circumstances and expectations surrounding the issuance of a permit are remarkably different than those present during the formation of an oil and gas lease. Unlike a mining permit, an oil and gas lease involves two parties to an agreement, not a single party and a regulatory agency. Because **\*568** the issuance of a permit by the Commission does not involve two parties entering into a contract for mutual economic benefit, the need for a termination due to non-production is not as pressing because the Commission does not receive an economic benefit from a mining company corresponding to the amount of coal mined. *Cf. id.* (if lessee under oil and gas lease does not begin drilling, it is obligated to pay lessor delay rental). Further, the economic effects of a coal mining company's actions are only one factor for the Commission

to consider when issuing, extending, or terminating a permit; as highlighted by the appellees, the Commission is also charged with considering, among other things, the potential environmental effects from coal mining and the effects on neighboring landowners. *See* Tex. Nat. Res.Code Ann. § 134.003 (West 2001).

Third, the appellees urge that, because Dos Republicas was aware that it did not have a market established when it filed for a permit in 1994 and was aware of the social and political instability present in Mexico when it asked for the permit to be issued, Dos Republicas assumed those market risks knowing that it was obligated to begin mining operations within three years or lose the permit. Accordingly, they contend that the permit should not be extended because the potential market problems were foreseeable.

We disagree with the appellees' assertion that the fact that the event was foreseeable bars invocation of the extension provision. There is no requirement in section 134.072 mandating that conditions justifying a permit extension must have been unforeseeable to the permit holder. *See id.* § 134.072. Moreover, many of the conditions that the appellees insist would justify a permit extension will no doubt be foreseeable to a certain extent, including natural disasters and individuals filing suit against the company.

Fourth, the appellees note that subsection 134.072(b)(2) does not specifically authorize an extension for economic reasons but note that subsection 134.072(b)(1) does allow for extension due to economic concerns. Subsection 134.072(b)(1) allows the Commission to grant an extension if the permit holder is involved in "litigation that precludes the beginning of operations or threatens *substantial economic loss.*" *Id.* § 134.072(b)(1) (emphasis added). The appellees insist that if potential economic loss was a factor to be considered under subsection (b)(2), the legislature would have incorporated that language into the section. *Cf.* Laidlaw Waste Sys., Inc., 904 S.W.2d at 659 (Tex.1995) (when legislature employs term in one section of statute and excludes it from another, term should not be implied into section it was excluded from).

We cannot adopt the appellees' construction of section 134.072. Although subsection 134.072(b)(2) does not specifically list "economic conditions" or "the lack of a market" as permissible reasons justifying a permit extension, the subsection does not list any specific situation justifying an extension. Instead, the subsection uses very broad language authorizing the Commission to grant an extension when

it believes an extension is necessary due to "conditions beyond the control and without the fault or negligence of the permit holder." Tex. Nat. Res.Code § 134.072(b)(2); *see also Webster's Seventh New Collegiate Dictionary* 235 (7th ed.1973) ("condition" means "a restricting or modifying factor"). On its face, this language is broad enough to justify the Commission's extension for market conditions that are not caused by the permit holder.

Further, we disagree with the appellees' contention that the inclusion of the phrase **\*569** "substantial economic loss" in subsection 134.072(b)(1) and its exclusion in subsection 134.072(b)(2) indicates the legislature's intent that economic conditions, including the lack of a viable coal market, cannot be used to justify a permit extension. *See* Tex. Nat. Res.Code Ann. § 134.072(b); *see also* Mid–Century Ins. Co. of Tex. v. Kidd, 997 S.W.2d 265, 274 (Tex.1999) ( "doctrine of *expressio unius est exclusio alterius* is simply an aid .... [and] [a]s a rule of reason and logic, it should not be mechanically applied to compel an unreasonable interpretation"). The subsections apply in different contexts. Subsection (b)(1) applies only to situations where the permit holder is involved in litigation that either precludes the beginning of mining or threatens economic loss to the permit holder regardless of whether the litigation was initiated due to some fault of the permit holder. Subsection (b)(2) applies when conditions, which are not caused by the permit holder, are present and warrant an extension. Unlike subsection (b)(1), which is expressly limited to instances where the permit holder is involved in some type of litigation, subsection (b)(2) applies to a broader number of situations and provides no express limitation on its applicability except that the permit holder cannot be the cause of the condition resulting in the failure to mine. Due to the distinct situations in which these statutes apply, we believe that the legislature's failure to include the phrase "economic loss" in subsection (b)(2) is no indication that the lack of a market cannot be used to justify an extension. The legislature specified that economic conditions are permissible considerations when determining whether to grant an extension under the first part of subsection 134.072(b). We can discern no reason to exclude economic conditions as permissible factors for the Commission to consider when determining whether to grant an extension under the more broadly written second part of subsection 134.072(b).

Finally, the appellees refer to federal case law and to the legislative history accompanying the federal counterpart to the Texas Surface Coal Mining and Reclamation Act as

support for the proposition that market conditions cannot justify an extension. First, the appellees refer to *Shawnee Coal Co. v. Andrus,* 661 F.2d 1083 (6th Cir.1981). In *Shawnee,* the Office of Surface Mining, Reclamation, and Enforcement (the "Office") concluded that Shawnee was in violation of the Act because it had stockpiles of coal products that released toxic runoff and ordered Shawnee to comply with the Act and its accompanying regulations. The district court granted an injunction in favor of Shawnee preventing enforcement of the Office's orders, but the Sixth Circuit reversed because Shawnee had not exhausted its administrative remedies prior to filing suit. *Shawnee Coal Co.,* 661 F.2d at 1092. During a subsequent administrative proceeding, Shawnee argued that it was unable to comply with the Office's orders because it could not sell the stockpiled coal products due to a depressed market. *See* Coalex Report 305 *available at* http://www.osmre. gov/coalex/coalex305.htm (last modified Mar. 24, 1999). The administrative law judge concluded that Shawnee had to either comply with the regulations in question or no longer conduct operations. *Id.*

The appellees' reliance on this case is misplaced. Shawnee was ordered by the Office to comply with an environmental regulation relating to surface coal mining and subsequently sought injunctive relief from having to comply with the order. Dos Republicas has not failed to comply with nor has it been ordered to comply with a regulation. Further, it is not seeking injunctive relief from compliance with an environmental regulation. Rather, it is **\*570** attempting to extend the termination date of its mining permit, which is an action authorized by the natural resources code.

Next, the appellees refer to the legislative history accompanying the Surface Mining Control and Reclamation Act. Like the Texas statute, the federal statute also provides that a permit will terminate within three years if no mining activity is undertaken but allows a permit to be extended for reasons similar to those articulated in section 134.072. *See* 30 U.S.C.A. § 1256(c) (West 1986); *see also id.* § 1253 (West 1986 & Supp.2006) (states may obtain jurisdiction over mining if states develop program capable of implementing Act). The Senate Committee's 1977 analysis of the act recognized that permits may be issued and renewed without operations being undertaken and specified that one of the reasons for the three-year deadline is to ensure "that no one will be locked into outdated reclamation requirements" that were in effect when the permit was issued. S.Rep. No. 95–128, at 74 (1977), U.S.Code Cong. & Admin.News 1977, 593, 612. Based on the federal legislative history's emphasis

on maintaining current environmental reclamation standards and the fact that the Texas reclamation regulations in effect when Dos Republicas first obtained its permit are different from the regulations in effect now, the appellees insist that Dos Republicas's permit should not have been extended for economic reasons. *Cf.* 30 U.S.C.A. § 1201(d) (expansion of coal mining requires establishment of "appropriate standards to minimize damage to the environment"), (k) (West 1986) (Act is necessary to "mitigate adverse environmental effects").

However, the fact that the federal statute was enacted with a focus on implementing current environmental reclamation standards does not mandate a conclusion that a permit cannot be extended for market reasons under the Texas statute. If anything, the focus on reclamation standards indicates the need for agency expertise in determining what standards to enforce and whether a permit should be extended. Furthermore, the administrative code authorizes the Commission to review an existing permit and modify the permit's provisions to ensure compliance with the Surface Mining and Reclamation Act and the relevant administrative code provisions. *See* 16 Tex. Admin. Code § 12.225 (2006). Therefore, the Commission can compel a permit holder to comply with more recent reclamation requirements prior to the permit's termination.

Dos Republicas and the Commission's assertion that the Commission may consider market conditions when determining whether to grant an extension is also supported by the broad authority the legislature bestowed upon the Commission. The natural resources code specifies that the Commission has been granted exclusive jurisdiction over surface coal mining and reclamation activities, has been charged with enforcing the relevant portions of the code, and has been given the authority to issue rules pertaining to mining and reclamation activities that are consistent with the code. *See* Tex. Nat. Res.Code Ann. §§ 134.011 (Commission given broad powers, including power to adopt rules, issue and revoke permits, conduct hearings, issue orders requiring miners to take certain actions, and order cessation of mining activities), 134.012(a)(1) (Commission has exclusive jurisdiction), 134.013 (West 2001) (Commission required to adopt rules relating to surface coal mining and reclamation), 134.161–.181 (West 2001) (enforcement powers of Commission). It has also been specifically charged with determining whether a permit extension should be granted. Moreover, the two types of circumstances described by section 134.072 as **\*571**

justifying an extension are broadly written. Accordingly, the Commission's interpretation of section 134.072 is entitled to judicial respect. *See Hammack v. Public Util. Comm'n of Tex.,* 131 S.W.3d 713, 723 (Tex.App.-Austin 2004, pet. denied); *see also Moore,* 845 S.W.2d at 823.

Furthermore, the appellees' arguments ignore the need for agency expertise in determining whether a permit extension should be granted. *See Hammack,* 131 S.W.3d at 723 (legislature bestows powers upon agency with idea that its goals will be more effectively realized by employing agency's "specialized judgment, knowledge, and expertise"). The code specifies that the Commission "may" grant an extension and further states that, in determining whether to grant an extension, the Commission must consider whether the permit holder's failure to mine is the result of events beyond the control of the permit holder and must determine whether granting the extension is "necessary." *See* Tex. Nat. Res.Code Ann. § 134.072(b)(2); *see also* Tex. Gov't Code Ann. § 311.016(1) (West 2005) (word "may" creates discretionary authority). If the Commission determines that an extension is necessary, the agency must also determine a "reasonable" extension time. Tex. Nat. Res.Code Ann. § 134.072(b). These determinations necessarily involve an assessment of the circumstances surrounding the permit holder's activities and knowledge of the factual situations that might justify a permit extension. *Cf. State v. Public Util. Comm'n,* 883 S.W.2d 190, 195 n. 6 (Tex.1994) (determination of whether something should be considered capital or expense

should be "left to the agency created to centralize expertise in this area and granted broad authority concerning just such matters"). Accordingly, deference to the Commission's expertise regarding the conditions warranting an extension is appropriate.

For all the reasons previously given, we conclude that the Commission's interpretation of section 134.072 as allowing for a permit extension due to unfavorable market conditions "beyond the control and without the fault or negligence of the permit holder" is consistent with the plain language of the statute. Accordingly, we conclude that the Commission did not exceed its authority when it granted Dos Republicas's extension request because of unfavorable market conditions. Therefore, we sustain Dos Republicas and the Commission's issue on appeal.

### CONCLUSION

Having concluded that the Commission had the authority to issue Dos Republicas's extension and having sustained Dos Republicas and the Commission's issue on appeal, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

### All Citations

215 S.W.3d 559

Footnotes
*       Bea Ann Smith, Justice (retired), Third Court of Appeals, sitting by assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1       Subsection 134.072(a) reads as follows:
        A permit terminates if the permit holder has not begun the surface coal mining operation covered by the permit on or before the third anniversary of the date on which the period for which the permit is issued begins.
        Tex. Nat. Res.Code Ann. § 134.072(a) (West 2001).
2       The administrative rule interpreting section 134.072 contains nearly identical language. It provides:
        (b) Automatic termination shall occur as follows:
        (1) a permit shall terminate, if the permittee has not begun the surface coal mining and reclamation operation covered by the permit within 3 years of the issuance of the permit;
        (2) the Commission may grant reasonable extensions of time for commencement of these operations, upon receipt of a written statement showing that such extensions of time are necessary, if:
            (A) litigation precludes the commencement or threatens substantial economic loss to the permittee; or
            (B) there are conditions beyond the control and without the fault or negligence of the permittee
        16 Tex. Admin. Code § 12.219(b) (2006). Because the rule is nearly identical to the statute, we will limit our discussion to the statute.
3       Coppock owns a cattle ranch near Dos Republicas's proposed mine site. She opposed the extension because she was concerned about how mining operations might affect the groundwater under her ranch. The remaining appellees—Juanita

Alvarado, Guadalupe Davila, and Kickapoo Traditional Tribe of Texas—did not intervene until after the hearing examiner's proposal for decision was issued.

4    In this case, almost a year passed between Dos Republicas's filing for an extension and the Commission's decision granting the extension.

5    Whether the Commission's order was supported by substantial evidence is not at issue in this case. For this reason, we focus solely on whether the Commission exceeded its statutory authority by issuing the extension.

6    The appellees also assert that in *Day v. Tenneco, Inc.,* the Mississippi court concluded that market conditions cannot be used to excuse a party's performance under a statute. 696 F.Supp. 233, 235–36 (S.D.Miss.1988). The statute listed various events that would excuse a party's nonperformance under a contract and included a catch-all phrase for events "beyond the control of such party." *See id.* at 235–36 (citing former Miss.Code Ann. § 75–2–617 (1972)). However, as discussed previously, this case does not involve a contract dispute, and Dos Republicas is not attempting to avoid an obligation by invoking a statute excusing performance under a contract.

7    A primary term is "a period of time at the end of which the [leasehold] estate granted will terminate but which estate may be extended by some other provision, usually one for production." *Fox v. Thoreson,* 398 S.W.2d 88, 91 (Tex.1966); *see also Eastern Energy, Inc. v. SBY P'ship,* 750 S.W.2d 5, 6 (Tex.App.-Houston [1st Dist.] 1988, no writ) ("primary term of the lease is the maximum period of time for which the lessee can maintain lease rights without drilling").

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

398 S.W.3d 676
Supreme Court of Texas.

SOUTHERN CRUSHED
CONCRETE, LLC, Petitioner,
v.
CITY OF HOUSTON, Respondent.

No. 11–0270.  |  Argued Oct. 15,
2012.  |  Delivered Feb. 15, 2013.
|  Rehearing Denied June 13, 2013.

**Synopsis**
**Background:** Operator of portable concrete crushing facility, which had received an air quality permit from the Commission on Environmental Quality (CEQ), brought action against city after it denied operator's application for a municipal permit, seeking a declaration that the ordinance was preempted and an injunction against its enforcement. The 333rd District Court, Harris County, Joseph J. Halbach Jr., J., granted city summary judgment, and operator appealed. The Houston Court of Appeals, Fourteenth District, Tracy Christopher, J., 402 S.W.3d 1, 2010 WL 4638417, affirmed. Operator sought review which was granted.

**[Holding:]** The Supreme Court, Lehrmann, J., held that ordinance was preempted by CEQ permit.

Reversed.

**Attorneys and Law Firms**

**\*676** Benjamin Allen 'Ben' Geslison, Cristina Espinosa Rodriguez, Rebecca Gilliam Hengstenberg, Stephen G. Tipps, Baker Botts LLP, Houston, TX, Derek Raymond McDonald, Evan Andrew Young, Whitney Louis Swift, Baker Botts LLP, Austin, TX, for Southern Crushed Concrete, LLC.

Angus Joseph Dodson, Aundrea Kristine Gulley, Kathy D. Patrick, Gibbs & Bruns LLP, Houston, TX, Bertrand L. Pourteau II, Judith Lee Ramsey, Sr. Assistant City Attorneys, City of Houston Legal Dept., David M. Feldman, Lynette Fons, City of Houston Legal Department, Houston, TX, for City of Houston.

**\*677** Rock W.A. Owens, Assistant Harris County Attorney, for Amicus Curiae Harris County, Texas.

Chesley N. Blevins, Jackson Walker LLP, Austin, TX, for Amicus Curiae Texas Aggregates & Concrete Association.

Scott N. Houston, Texas Municipal League, Austin, TX, for Amicus Curiae Texas Municipal League.

**Opinion**

Justice LEHRMANN delivered the opinion of the Court.

We must decide whether the Texas Clean Air Act (TCAA) preempts a Houston ordinance. The City denied Southern Crushed Concrete's (SCC) municipal permit application to move a concrete-crushing facility to a new location, even though the Texas Commission on Environmental Quality had previously issued a permit authorizing construction of the facility at the proposed location, because the concrete-crushing operations would violate the Ordinance's location restriction. The TCAA provides that "[a]n ordinance enacted by a municipality ... may not make unlawful a condition or act approved or authorized under [the TCAA] or the [C]ommission's rules or orders." TEX. HEALTH & SAFETY CODE § 382.113(b). Because the Ordinance makes it unlawful to build a concrete-crushing facility at a location that was specifically authorized under the Commission's orders by virtue of the permit, we hold that the Ordinance is preempted. Accordingly, we reverse the judgment of the court of appeals and render judgment for SCC.

### I. Factual and Procedural Background

In October 2003, SCC applied to the Commission for an air quality permit to move an already-permitted concrete-crushing facility to a new location in Houston. While the application was pending, the Presbyterian School Outdoor Education Center was built near the property SCC proposed to use for its facility. In May 2007, after nearly four years of permit proceedings in which the City participated and opposed SCC's application, the City passed an ordinance requiring concrete-crushing facility operators to obtain a municipal permit. HOUS., TEX., CODE OF ORDINANCES ch. 21, art. VI, div. 3, § 21–168.

Under the Ordinance, new concrete-crushing operations must meet certain location requirements, which are more restrictive than those imposed under the TCAA and the Commission

rules. *Id.* §§ 21–168, –170. Specifically, the Ordinance prohibits concrete-crushing operations within 1,500 feet of a school facility and other enumerated land uses, measured from property line to property line, *id.* §§ 21–167 to –170, while the TCAA and Commission rules prohibit the operation of a concrete-crushing facility within 1,320 feet of any school and other enumerated land uses, measured from the nearest points of the buildings in question, TEX. HEALTH & SAFETY CODE § 382.065(a); 30 TEX. ADMIN. CODE § 116.112(b)(2).

Despite the Ordinance, the Commission granted SCC's requested air quality permit in August 2008, concluding that the concrete-crushing operations would not violate the location requirements contained in the TCAA and Commission rules. SCC then applied to the City for a municipal permit, which was denied because the concrete-crushing operations would violate the Ordinance's location restriction.

SCC sued the City, seeking both a declaration that the Ordinance is preempted and an injunction against its enforcement. SCC contended that the Ordinance is preempted under the Texas Constitution because it is impermissibly inconsistent with the TCAA. *See* **\*678** TEX. CONST. art. XI, § 5 ("[N]o ... ordinance ... shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State."). SCC also argued that the Ordinance is preempted by the TCAA, which provides that a city ordinance "may not make unlawful a condition or act approved or authorized under [the TCAA] or the [C]ommission's rules or orders." TEX. HEALTH & SAFETY CODE § 382.113(b). SCC further asserted that the Local Government Code's uniformity-of-requirements provision bars enforcement of the Ordinance because the Ordinance was adopted after SCC filed its permit application with the Commission. *See* TEX. LOC. GOV'T CODE § 245.002. The parties filed cross-motions for summary judgment, and the trial court granted the City's motion, denied SCC's motion, and dismissed SCC's claims with prejudice.

The court of appeals, with one justice dissenting, affirmed, holding that the Ordinance is neither preempted nor unconstitutional and does not violate the uniformity-of-requirements provision. —— S.W.3d ——. SCC raises the same arguments in this Court as it did in the trial court. Because the dispositive question is whether the Ordinance makes unlawful an act approved or authorized under the

TCAA or the Commission's rules or orders, we need only address that issue.

## II. Preemption of Ordinances Enacted by Home–Rule Cities

[1] When both parties move for summary judgment and the trial court grants one motion and denies the other, as here, we review both sides' summary judgment evidence and render the judgment the trial court should have rendered. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). SCC argues that the Ordinance is preempted by the TCAA because the Ordinance makes unlawful an act approved or authorized under the TCAA or the Commission's rules or orders in violation of section 382.113(b) of the Health and Safety Code. We agree.

[2] [3] The City of Houston is a home-rule city, deriving its power from article XI, section 5 of the Texas Constitution. TEX. CONST. art. XI, § 5. Home-rule cities have the full power of self-government and look to the Legislature, not for grants of power, but only for limitations on their powers. *Lower Colo. River Auth. v. City of San Marcos,* 523 S.W.2d 641, 643 (Tex.1975) (citing *Forwood v. City of Taylor,* 147 Tex. 161, 214 S.W.2d 282 (1948)). "[I]f the Legislature decides to preempt a subject matter normally within a home-rule city's broad powers, it must do so with 'unmistakable clarity.'" *In re Sanchez,* 81 S.W.3d 794, 796 (Tex.2002) (quoting *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 491 (Tex.1993)).

## III. The Ordinance is Preempted by the Plain Language of the TCAA

The TCAA's policy and purpose is "to safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants." TEX. HEALTH & SAFETY CODE § 382.002(a). Accordingly, any person who plans to construct a facility that may emit air contaminants, such as a concrete-crushing facility, must obtain a permit from the Commission. *Id.* § 382.0518; 30 TEX. ADMIN. CODE § 116.110. The TCAA lists general considerations the Commission may take into account in determining whether to grant a permit. TEX. HEALTH & SAFETY CODE § 382.0518. In issuing a permit, the Commission determines that the permit application satisfies the TCAA and applicable rules.

**\*679** **[4]** Section 382.113(b) states that a city ordinance "may not make unlawful a condition or act approved or authorized under [the TCAA] or the [C]ommission's rules or orders." TEX. HEALTH & SAFETY CODE § 382.113(b). The plain language of section 382.113(b) unmistakably forbids a city from nullifying an act that is authorized by either the TCAA or, as in this case, the Commission's rules or orders. Here, the Commission's authorization is evident from the face of the permit:

**A PORTABLE PERMIT IS HEREBY ISSUED TO**

**Southern Crushed Concrete, Inc.**

**AUTHORIZING THE CONSTRUCTION AND OPERATION OF**

**Concrete Crushing Facility**

**Regulated Entity Number: RN100904838**

The City counters that the Ordinance does not make unlawful an act authorized by the Commission, arguing that the permit merely removed one government-imposed barrier to operations but did not affirmatively authorize anything. We disagree. As Justice Brown noted in his dissent in the court of appeals, the City effectively argues that "the permit the Commission issued to [SCC] 'authorizing the construction and operation of' a concrete-crushing facility is not actually that." —— S.W.3d —— (Brown, J., dissenting). The City's argument is inconsistent not only with the permit language, but also with Texas law, which defines permit to mean "an

*authorization* by a license, certificate, registration, or other form that is required by law or state agency rules to engage in a particular business." TEX. GOV'T CODE § 2005.001(1) (emphasis added).

The City further contends that, even if the permit represents the Commission's authorization or approval, such authorization or approval is only for the purpose of protecting air quality, not for general purposes. And, because the Ordinance purports to regulate land use, not air quality, the Ordinance does not actually abrogate the permit. But, the statute does not draw that distinction, nor should it if state regulation is to be effective. If the City's contention were true, a city could almost always circumvent section 382.113(b) and vitiate a Commission permit that it opposes by merely passing an ordinance that purports to regulate something other than air quality.

### IV. Conclusion

We do not decide whether a city may more restrictively regulate an activity that the State also regulates, as that issue is not before us. But, the express language of section 382.112(b) compels us to give effect to the Legislature's clear intent that a city may not pass an ordinance that effectively moots a Commission decision. We hold that the Ordinance makes unlawful an "act approved or authorized under ... the [C]ommission's ... orders" and is thus preempted by the TCAA and unenforceable. TEX. HEALTH & SAFETY CODE § 382.113(b). We therefore reverse the judgment of the court of appeals and render judgment for SCC.

**All Citations**

398 S.W.3d 676, 56 Tex. Sup. Ct. J. 295

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**584 S.W.2d 352**
Court of Civil Appeals of Texas, Austin.

STARR COUNTY, Appellant,

v.

STARR INDUSTRIAL SERVICES, INC., Appellee.

No. 12899.    |    June 20, 1979.

Applicant was denied his application for solid waste permit by Water Quality Board. Intervenor county appealed judgment of the 98th District Court, Travis County, Hume Cofer, J., setting aside and vacating Board's order and remanding cause to its successor, Texas Water Commission, for further proceedings. The Court of Civil Appeals, Phillips, C. J., held that a significant part of Board's action was arbitrary and capricious where applicant had complied with requirements of Board's staff for permit and where Board based its decision, at least in part, on local opposition to application.

Judgment affirmed.

**Attorneys and Law Firms**

**\*353**  Robert Wilson, McGinnis, Lochridge & Kilgore, Austin, for appellant.

Edward C. Small, Dennis R. Reese, Small, Craig & Werkenthin, Austin, for appellee.

**Opinion**

PHILLIPS, Chief Justice.

Appellee filed an application with the Texas Water Quality Board requesting approval for a Class I industrial solid waste permit for a landfill to be located in Starr County, Texas. The Board [1] denied the application after a hearing. Appellee appealed the denial of the order to the district court wherein Starr County intervened.

The trial court reviewed the order and rendered judgment setting aside and vacating the Board's order and remanding the cause to its successor, Texas Water Commission, for further proceedings. Intervenor, Starr County, subsequently perfected its appeal from the judgment.

We affirm.

**I.**

Hearing was held on September 29, 1976, in Rio Grande City and testimony was concluded on that same day. The record was held open twenty days for certain supplemental information which was supplied and the record was then closed.

On January 7, 1977, the Board considered the application and the hearing examiner's report in connection with the application. On that same day the Board voted to deny the application and a written order was prepared in which the reasons for the denial of the permit were stated. The order was entered February 3, 1977.

The administrative record in this case is extensive and highly detailed. Appellee requested a permit to operate a commercial industrial solid waste management site to be located approximately nine miles northwest of Rio Grande City in Starr County, Texas. The site was to consist of a landfill type operation on an 81-acre tract leased by appellee wherein certain stabilized and neutralized industrial wastes would be buried in trenches and surrounded and covered **\*354**  with clay-rich soil. The anticipated active life of the site was three to four years, and the permit sought provided for various safeguards and monitoring of the site, both during its active life and for a period of time after closure.

The original application contained extensive and detailed information concerning the character of the wastes, operations and closing of the facility. The details of many aspects of the application were modified and supplemented by additional information and specifications subsequently submitted as a result of conferences with, and requests by, the Board's staff.

The Board's technical staff, using the application and information supplied by appellee, along with its own information resources, drafted a proposed permit which it felt would include all of the provisions necessary for the protection of ground and surface waters, public and private property and the general health and public welfare. The provisions of the proposed permit were explained by the staff and fully discussed at the public hearing which was held at Rio Grande City.

The principal opposition to the permit came from the county judge of Starr County, the Rio Grande City Chamber of

Commerce, and from a state senator. The general tenor of the objections was that the opponents were totally against any Class I toxic waste dump in Starr County.

Consequently, in a letter from the Board's executive director, Hugh Yantis, Jr., who was a member of the hearing commission, it was stated: "It appears that the site and the technical factors surrounding it are sustainable as permitting an industrial solid waste disposal operation," but concluded that the application could be denied "on the basis of the express views of the people within the county." At the hearing of the Board on January 7, 1977, a Board member moved that the permit be denied for the reason that:

> "I likewise am reluctant to imply that we have veto power over the local government and I must conclude, all the arguments possibly to the contrary, that there is considerable local opposition on the part of the local governments, more than just one, and I'm inclined to agree with Mr. Yantis."

The motion carried and the permit was denied.

A written order, denying the application, was entered on February 3, 1977, and included the following pertinent findings and conclusions.

### "FINDINGS OF FACT

1. The construction and management of the industrial solid waste disposal site as proposed is inadequate to prevent or minimize adverse public health and environmental impact from accidents resulting from the transportation, processing, and disposal of industrial solid waste, which includes hazardous and toxic materials, because of the following:

(a) the proposed staffing pattern at the site would allow for extended periods of time during which no one would be at the site; and

(b) the lack of resources or necessary equipment in Starr County to adequately handle the possibility of accidents from fire, explosions, or traffic mishaps.

2. The lease agreement for a term of only five years will not allow for adequate supervision, control or monitoring of the site after it is closed.

3. The operation of an industrial solid waste management site in Starr County at the location proposed is inconsistent with the future land use and development in the area.

4. The adamant local opposition to the application for a proposed industrial solid waste management site evidences that the granting of a permit would be contrary to the welfare of the people in the area.

### CONCLUSIONS OF LAW

Based on all findings of fact, the following conclusions of law are made:

> **\*355** 3. There has been full compliance with all applicable provisions of Chapter 21 of the Texas Water Code and Section 4 of the Solid Waste Disposal Act and the accompanying Rules of Practice and Procedure of the Texas Water Quality Board concerning the application for a permit."

In its motion for rehearing, appellee offered to comply with some of the new requirements, but the Board simply overruled the motion.

### II.

The Administrative Procedure and Texas Register Act (APA) provides that the courts shall remand the case for further proceedings ". . . if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) Not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Emphasis added). Tex.Rev.Civ.Stat.Ann. art. 6252-13a, s 19(e) (Supp.1978). [2]

**[1]** In distinguishing between paragraphs five and six, the legislature has decided that arbitrary and capricious action or abuse of discretion by an administrative board is of equal proscription as that action "not reasonably supported by substantial evidence." In other words, subsection six sets out a basis for invalidation of an agency order in addition to and distinct from subsection five.

This conclusion is more difficult than would appear merely from reading section 19(e). The well recognized explanation of the substantial evidence rule has blended the two concepts, substantial evidence and arbitrary or capricious, into one standard of review. The substantial evidence rule is generally described as a limitation on the power of the courts to overturn a decision by an administrative agency in that there must be a showing ". . . the administrative decision is illegal, arbitrary, or capricious; that is, that it is not reasonably supported by substantial evidence." Board of Firemen's Relief and Retirement Fund Trustees v. Marks, 150 Tex. 433, 242 S.W.2d 181, 182-83 (1951). Accord, e. g., Gerst v. Cain, 388 S.W.2d 168 (Tex.1965); Chemical Bank and Trust Co. v. Falkner, 369 S.W.2d 427 (Tex.1963); Industrial Accident Board v. O'Dowd, 157 Tex. 432, 303 S.W.2d 763 (1957). Stated in even stronger language, ". . . an arbitrary action cannot stand and the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence." Gerst v. Nixon, 411 S.W.2d 350, 354 (Tex.1966).

**[2]** The Texas Supreme Court has expressly qualified the language of Gerst v. Nixon, Supra, in Lewis v. Metropolitan Savings and Loan Association, 550 S.W.2d 11 (Tex.1977). There the Court made it clear that an order may be supported by substantial evidence and yet be invalid for arbitrariness. "(A)rbitrary action of an administrative agency cannot stand. There is arbitrariness where the treatment accorded parties in the administrative process denies them due process of law." Id. at 16.

**[3]** **[4]** In determining whether an agency has acted arbitrarily or capriciously the reviewing court must decide whether the agency order was based on a consideration of all relevant factors. The reviewing court may not substitute its

judgment for that of **\*356** the agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There must appear a rational connection between the facts and the decision of the agency. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); 5 B. Mezines, J. Stein and J. Gruff, Administrative Law s 51.03, at 51-33 (1979). Stated differently, the reviewing court must remand ". . . if it concludes that the agency has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making." Texas Medical Association v. Mathews, 408 F.Supp. 303, 305 (W.D.Tex.1976). That court set aside an order because the agency had been subjected to pressure from congressional sources.

The major factor that runs throughout arbitrary-capricious review cases is that parties must be able to know what is expected of them in the administrative process. We believe this notice was lacking in the present case.

**[5]** As we stated above, the appellee worked quite closely with the Board's staff, and, apparently, had complied with all of the staff's requirements for a permit when, to its surprise, the Board denied the permit citing additional requirements that had neither been expected by appellee nor proposed by the Board's staff. In addition, the Board found: "The adamant local opposition to the application for a proposed industrial solid waste management site evidences that the granting of a permit would be contrary to the welfare of the people in the area." Nowhere in the Act is local opposition mentioned for consideration as a standard to govern the Board's decision and such opposition, standing alone, should have no part in the Board's decision-making process. Yet obviously it did.

**[6]** Inasmuch as we find that a significant part of the Board's action herein was arbitrary and capricious under Section 19(e) (6) of the Administrative Procedure Act, we need not reach the substantial evidence question raised by appellant. Because appellee's substantial rights were prejudiced by entry of the agency order, the district court correctly set aside the order and remanded the cause to the agency for further proceedings.

The judgment is affirmed.

**All Citations**

584 S.W.2d 352

Footnotes

1    Now consolidated into the Texas Department of Water Resources.

2    Section 19(e) (and its subsections) is applicable where the relevant statute ". . . authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review." The Solid Waste Disposal Act is silent as to the scope of judicial review; therefore, section 19(e) applies to this case.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**554 S.W.2d 924**
Supreme Court of Texas.

TEXAS ANTIQUITIES
COMMITTEE et al., Appellants,
v.
DALLAS COUNTY COMMUNITY
COLLEGE DISTRICT, Appellee.

No. B-6107. | July 13, 1977.
| Rehearing Denied July 27, 1977.

County community college district filed suit for injunction against Antiquities Committee and its members to set aside order of Committee denying a permit to demolish three buildings owned by college district. The 53rd District Court, Travis County, Jones, J., rendered judgment for college district, and Antiquities Committee appealed. The Supreme Court, Pope, J., held that: (1) section of antiquities code giving Antiquities Committee power to refuse to demolish building that was of historical interest was unconstitutionally vague, (2) and evidence did not support Antiquities Committee's refusal to permit demolition of three buildings owned by college district.

Affirmed.

Greenhill, C. J., concurred with opinion.

Denton, J., dissented with opinion in which Daniel, Johnson and Yarbrough, JJ., joined.

**Attorneys and Law Firms**

**\*925** John Hill, Atty. Gen., Austen H. Furse, Asst. Atty. Gen., Austin, for appellant.

Strasburger, Price, Kelton, Martin & Unis, Patrick F. McGowan, H.P. Kucera, Dallas, Clark, Thomas, Winters & Shapiro, Barry K. Bishop and Mary Joe Carroll, Austin, for appellee.

**Opinion**

POPE, Justice.

Dallas County Community College District filed this suit for injunction against the Texas Antiquities Committee and its members to set aside an order of the Committee

denying a permit to demolish three buildings owned by the College District. The trial court rendered judgment for the College District, stating that in its judgment section 6 of the Antiquities Code is both unconstitutional and unconstitutionally applied. This court has jurisdiction by direct appeal. Tex.Rev.Civ.Stat.Ann. art. 1738a (1962); Tex.R.Civ.P. 499a.

Dallas County Community College District came into existence in 1965 as authorized by section 130.005 of the Texas Education Code. Its Board of Trustees "constitutes a body corporate" which may "acquire and hold real and personal property, sue and be sued," and has "the exclusive power to manage" the College District's affairs. Tex.Educ.Code Ann. s 23.26. Acting under its legislative authorization, the College **\*926** District in 1966 purchased land in downtown Dallas on which there were four buildings; the cost of the purchase was 2,150,000 dollars. The City of Dallas permitted temporary limited use of the three older buildings upon assurance that they would be demolished within three to five years. Plans for the demolition of the three older buildings were announced to the public as early as 1969.

The Board of Trustees of the College met in 1972 and voted to restore the one building that was structurally sound and to demolish the three older buildings so the space could be used for new college facilities. The Board met on April 1, 1975, to consider demolition bids, but a group of citizens requested a ten-day delay during which time the group hoped to find funds for rebuilding the three buildings which were set for demolition. The group was unsuccessful in finding any funds, but it reported to the Board that on April 8 the buildings had been placed on the National Register of Historical Buildings. No prior notification was given the College District that an expedited application was being made for inclusion of the buildings in the National Register.

After the College District purchased the land and buildings in 1969 and made its plans for the College's efficient use of the land, the legislature enacted the Antiquities Code. Tex.Rev.Civ.Stat.Ann. art. 6145-9 (1969). The Antiquities Code provided for an Antiquities Committee consisting of seven members. Tex.Rev.Civ.Stat.Ann. art. 6145-9, s 3 (1969). Section 4 of the Code gives the Antiquities Committee the authority "to determine the site of, and to designate, State Archeological Landmarks . . . ." Section 10 proscribes any construction on any State Archeological Landmark without first obtaining a permit from the Antiquities Committee.[1] Section 10 is the only provision of the Code which in any way entitles the Committee to

grant or deny a permit for the demolition of the buildings. The Antiquities Committee has not designated any of the three buildings at issue as State Archeological Landmarks, but the Committee has denied the College District's request to demolish the buildings based upon the buildings' expedited inclusion in the National Register of Historic Sites and Buildings. The Antiquities Code does not give the Antiquities Committee authority over buildings in the National Register; instead, the Code only gives the Committee authority over buildings which the Committee has designated as a State Archeological Landmark. Since the Committee has not designated the buildings as State Archeological Landmarks, the College District does not need the Committee's permission before demolishing the buildings.

The trial court grounded its judgment upon two separately stated and separately numbered adjudications:
1. Section 6, Article 6145-9, V.T.C.S., reading as follows:

Sec. 6. All other sites, objects, buildings, artifacts, implements, and locations of historical, archeological, scientific, or educational interest, including but expressly not limited to, those pertaining to prehistoric and historical American Indian or aboriginal campsites, dwellings, and habitation sites, **\*927** their artifacts and implements of culture, as well as archeological sites of every character that are located in, on or under the surface of any lands belonging to the State of Texas or by any county, city or political subdivision of the state are hereby declared to be State Archeological Landmarks and are the sole property of the State of Texas and all such sites or items located on private lands within the State of Texas in areas that have been designated as a "State Archeological Landmark" as hereinafter provided, may not be taken, altered, damaged, destroyed, salvaged, or excavated without a permit from, or in violation of the terms of such permit of, the Antiquities Committee.

is unconstitutional and void, and the orders of the Defendants based thereon are unconstitutional and invalid.

2. Plaintiff need not obtain a permit from the Defendants before demolishing the three buildings in question situated on Plaintiff's El Centro Campus in the City of Dallas, Dallas County, Texas, and bounded by Elm, Austin, Main and Lamar Streets in said city; and the application of the Texas Antiquities Act, Article 6145-9, to these buildings is unconstitutional as applied.

We affirm the trial court judgment and will now examine each of its separate adjudications.

### UNCONSTITUTIONALLY VAGUE STATUTE

The first basis of the trial court's judgment was that section 6 of the Antiquities Code, stated above, was unconstitutionally vague. There has been no contention that the three buildings in question possess archeological, scientific, or educational interest. The Antiquities Committee only contends that the buildings are of "historical interest." The sole basis for the exercise of the Antiquities Committee's power over the three buildings is found, if it can be found, in these words of the statute:

> Sec. 6. All . . . buildings . . . and locations
> of historical . . . interest.

The Antiquities Committee, although it has the power, by article 6145-9, section 11, has adopted no rules or standards which state criteria for "buildings . . . and locations of historical . . . interest." The Antiquities Committee does not contend that section 6 gives any predictable standard or safeguard. Its position is that the law which strikes down statutes because they are vague, overbroad, and uncertain should be overruled. It argues that the power of the legislature to delegate its powers to state boards and commissions should be unlimited so long as there are experts who constitute the membership of the Committee.

There has been called to our attention no case in Texas or elsewhere in which the powers of a state board are more vaguely expressed or less predictable than those permitted by the phrase in question. The word "buildings" comprehends all structures; "historical" includes all of the past; "interest" ranges broadly from public to private concerns and embraces fads and ephemeral fascinations. All unrestorable structures ordinarily hold some nostalgic tug upon someone and may all qualify as "buildings . . . of historical . . . interest."

 **[1]** Upon the basis of the statute now before us, we are unconvinced that we should renounce the settled law of Texas that the legislature may not delegate its powers without providing some criteria or safeguards. Depending upon the nature of the power, the agency, and the subject matter, varying degrees of specific standards have been required in testing the reasonable breadth of statutes. 1 Sutherland, Statutory Construction, s 4.05 (4th ed. 1975); Jordan v. State Board of Insurance, 160 Tex. 506, 334 S.W.2d 278 (1960). Sound reasons support the rule that some reasonable standard

is essential to the constitutionality of statutory delegations of powers to state boards and commissions.

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give **\*928** the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. (Footnote omitted.) Second, if arbitrary or discriminatory enforcement is to be prevented, laws must provide explicit standards to those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on ad hoc and subjective basis, with the attended dangers of arbitrary and discriminatory applications. Grayned v. City of Rockford, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222 (1972).

We adhere to the settled principle that statutory delegations of power may not be accomplished by language so broad and vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). We are not persuaded that we should overrule or disapprove such cases as Key Western Life Ins. Co. v. State Board of Insurance, 163 Tex. 11, 350 S.W.2d 839 (1961); Lone Star Gas Co. v. Kelly, 140 Tex. 15, 165 S.W.2d 446 (1942); Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79 (1940); Martinez v. Texas State Board of Medical Examiners, 476 S.W.2d 400 (Tex.Civ.App.1972, writ ref'd n.r.e.), appeal dism., 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312; Commissioners Court of Lubbock County v. Martin, 471 S.W.2d 100, 105 (Tex.Civ.App.1971, writ ref'd n.r.e.); E.S.G. v. State, 447 S.W.2d 225 (Tex.Civ.App.1969, writ ref'd n.r.e.).

Professor Davis concludes that the non-delegation doctrine in federal courts has been less than successful, but he would not abolish all standards. Davis, Administrative Law

Treatise, s 2.16 (1st ed. 1970). Instead, he would substitute administrative standards in the form of published rules and regulations for statutory standards. See Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424 (1947). We have, in this case, no standard or criteria either by statute or rule which affords safeguards for the affected parties.

### *Unconstitutional Application*

**[2]** **[3]** The second basis for the trial court's judgment is that "the application of the Texas Antiquities Act, Article 6145-9, to these buildings is unconstitutional as applied." We agree with this conclusion. Since the Antiquities Committee is a state agency, the Antiquities Committee's application of section 6 of the Antiquities Code must be judged by the substantial evidence rule. Railroad Commission v. Shupee, 57 S.W.2d 295 (Tex.Civ.App.1933), aff'd, 123 Tex. 521, 73 S.W.2d 505 (1934). The substantial evidence rule demands that we hold section 6 unconstitutional as applied if the evidence is such that reasonable minds could not have reached the conclusion that the Antiquities Committee must have reached in order to justify its actions. Trapp v. Shell Oil Co., supra ; (Railroad Comm.) TremCarr v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942). We hold that there is no substantial evidence in support of the action of the Antiquities Committee.

There are two reasons for this conclusion. This first one is that a program to restore the buildings would compel the misuse of public funds that were obtained by approving a bond issue for educational purposes. The college delayed its contract for demolition so that those seeking to save the buildings might come forward with funds necessary to do so. If those funds had been available, the public school money would not have been needed. No source of funds for salvage and restoration is suggested by any of the witnesses, other than the school funds. The school funds were already dedicated and allocated to the College District's educational purposes. The testimony shows that the large sums of money required to restore the buildings would exhaust the College funds essential to its authorized educational purposes. Restoration of the buildings would also require the reconstruction of five times more space than is needed for educational purposes. The Antiquities Committee recognized this fact. A witness **\*929** for the Committee stated that funds might be granted by the National Park Service provided the buildings are usable, but not if they are simply restored to be exhibited as old buildings. An architect testifying for the Committee expressed the opinion

that "the only source I know of for the money would be . . . the Community College . . . ." The President of the College said that the public would be considerably upset if it thought there was a possibility of diverting school funds to the restoration for non-educational purposes. Upon the basis of this kind of evidence from both those who favored and opposed the restoration of the buildings, the trial court quite properly concluded that the Act was unconstitutionally applied to a situation in which property and funds committed to a public trust for the benefit of the people in the school district would be arbitrarily diverted to a wholly different purpose.

The second reason for our decision is that the buildings are incapable of restoration except upon an unreasonable expenditure of money. The inferior materials used in the original construction of the buildings requires complete reconstruction from the foundation up and at a cost greater than original new construction. The engineering and architectural evidence is that the only way to bring the buildings up to code standards or to save them is to rebuild them. Even the foundations would have to be rebuilt. The cost of rebuilding all three buildings would be in excess of 10,500,000 dollars. There is danger of collapse of the outside walls if reconstruction is undertaken. Estimates for the cost of reconstruction range from thirty-five dollars to eighty-one dollars per square foot. One witness for the Antiquities Committee said that anything can be built if you construct a building out of money, but the reconstruction would cost more than new construction. He stated that the diversion of the College District's funds from education to the preservation of the three buildings presented an unsolvable conflict. Another witness for the Antiquities Committee suggested that the solution to the construction problem was to gut the buildings, use the facades as curtain walls, and put a new structural frame inside. Sandstone and brick have been falling from the buildings since 1967. Both the sandstone and the windowsills have now been purposely chiseled away from the outside of the buildings to avoid their falling on people in the streets below. Of three hundred core samples taken from the building, all came out as dust, chips, or loose bricks. The buildings have already outlasted by more than forty years the time for which they were designed. The exterior walls support the floor load. One building, eight stories high, uses wood columns. All three buildings are at least nine times below the code requirements.

The only use for the buildings suggested by the Antiquities Committee, even after the costly rebuilding would be as commercial office space. The buildings cannot be made usable for educational purposes. Classrooms with many occupants, books, and furniture would impose weight loads that the buildings could not bear even if restored. If usable as commercial rented space, there would be a continuing financial burden to the College District. For example, one building could be restored at a cost of 6,000,000 dollars and then rented for commercial purposes with a maximum return of no more than 2.98 percent. But leasing for business purposes would be difficult because the commercial offices would be in the midst of an inappropriate academic community. That part of downtown Dallas already has an eighteen to twenty percent vacancy rate for its buildings. From this record, there is no substantial evidence that the buildings, even after reconstruction and renovation could be usable for educational purposes.

The Antiquities Committee confronts the trial court's judgment with the contention that the College District, as a political subdivision of the state is subordinate to the powers of the Antiquities Committee; has no contract or property rights which are protectable against the Committee's superior powers. We need not in this case, decide which of two state agencies is charged with **\*930** the "higher" trust. In this case that question would cast the educational needs of the state's citizens against the preservation of the 1910 buildings described above. The Committee, relying upon the language of Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), argues that "the State is supreme, and its legislative body . . . may do as it will, unrestrained by any provision of the Constitution of the United States." That expression of statism satisfies neither the protections of the United States Constitution or the Texas Constitution.

The United States Supreme Court has closely restricted Hunter's broad and loose language in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Justice Frankfurter, writing for the court in Gomillion, circumscribed its dicta by an analysis of the matters before the court in Hunter and wrote:

> In short, the cases that have come before this Court regarding legislation by States dealing with their political subdivisions fall into two classes: (1) those in which it is claimed that the State, by virtue of the prohibition against impairment of the obligation of contract (Art. I, s 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that

the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage. 364 U.S. 342-343, 81 S.Ct. 128.

In a society when so many rights are subject to the regulation of administrative agencies, Gomillion brought the "plenary power" doctrine of Hunter under appropriate limitations, stating:

a correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

 [4]     The Texas law has developed in a similar fashion. One agency of the state does not possess powers to divest vested property and contract rights of another state agency "unrestrained by the particular prohibitions of the Constitution." In Milam County v. Bateman, 54 Tex. 163 (1880), the legislature granted land to the county for public school purposes. Subsequently, the legislature took this land from the county and transferred it to private individuals. This court held that the legislature could not do this. The legislature's extensive control over its subdivisions' political rights was recognized, but it was held that a subdivision's property rights, "are protected by the same constitutional guarantees which shield the property of individuals." 54 Tex. at 166. Milam County went on to state that, "the purpose for which the property was originally acquired shall, as far as circumstances will admit, be kept in view; and that it shall not arbitrarily be diverted as in the case before us, to private parties and to a wholly different purpose." 54 Tex. at 166.

 [5]     Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20 (1931) faced the issue whether the legislature had plenary power over a school district's property and functions. The question in Love was whether a school district must, as the legislature had enacted, use its funds to educate non-residents of the local district. Writing for the court, Chief Justice Cureton rejected the idea that the legislature has plenary powers over its creature when the school district holds its

property as trustee for the public. This court held, instead, that the school district's property must be used for the purposes for which it was acquired. This court stated that the school district:

has no contract right to exist as a corporation, but the public that it represents has a vested right in the municipal property acquired for its benefit, and is entitled to demand that such property be applied to its uses. 40 S.W.2d at 27.

 *931  Love cited with approval the principle enunciated in 24 Ruling Case Law, Schools ss 45-47 (1919), that school funds and property are trust funds for educational purposes; consequently, they should not:

be diverted to other even though closely kindred uses, no matter how meritorious the project may appear to be either in its practical or ethical or sentimental aspects. Even the legislature, itself, the fountain head of matters educational, cannot divert school funds to other uses. 40 S.W.2d at 27.

Since the Antiquities Committee's application of section 6 diverts the buildings to uses other than educational purposes, Love demands that we hold section 6 unconstitutional as applied.

 [6]     On the basis of the trial court's findings that section 6 of the Antiquities Code is both unconstitutional and unconstitutionally applied, we affirm the trial court judgment.

GREENHILL, C. J., concurs with an opinion.

DENTON, J., dissents in an opinion in which DANIEL, JOHNSON and YARBROUGH, JJ., join.

GREENHILL, Chief Justice, concurring.

I agree that the judgment of the trial court should be affirmed; and, therefore, I concur in the judgment of the Court.

It clearly appears to me that this particular determination of the Antiquities Committee is not supported by substantial

evidence. Stated differently, for the reasons set out in the Court's opinion, the action of the Board is arbitrary and without a sound basis.

My conclusion is based on the application of the substantial evidence rule and not upon constitutional grounds. When a controversy may be resolved on a non-constitutional ground, then the court should rest its decision on that ground, and should not decide the constitutional questions presented. Neese v. Southern Railway Co., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955); Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955). I therefore, do not reach any constitutional question.

DENTON, Justice, dissenting.

I respectfully dissent. Four of my brothers hold that section six of the Antiquities Code is too vague, so it violates the Due Process Clause of both the State and Federal Constitutions. I disagree; the College District does not have standing to assert deprivation of property without due process, and under what I perceive as the proper scope of review in this case there exists no justiciable controversy.

My first disagreement with the plurality is in the application of the Fourteenth Amendment and Art. I, s 19 of the Texas Constitution:

> nor shall any State deprive any person of life, liberty, or property, without due process of law . . . .

U.S.Const. Amend. XIV, s 1.

> No citizen of this State shall be deprived of . . . property . . . except by due course of law . . . .

Tex.Const. Art. I, s 19. Essential to a holding that the College District has not been afforded due process is a holding that the District is a person, or a citizen. There exists no authority to support the holding, implicit in the plurality opinion, that the College District is a "person," and I can think of no rationale for such a holding.

The College District is a body politic, or political subdivision of the State of Texas, created pursuant to the legislative authority of article 2815h of the civil statutes. The College District is authorized to levy taxes, acquire title in its own name to real and personal property, and generally to administer such property for educational purposes. It is not given the right to vote, the freedoms of speech, press, and religion, the right to counsel, or any other right enjoyed by people under the Constitution. This is because a political subdivision is not now and never has been a "person" in any sense of the term. It was early established by this Court that a public political subdivision is merely an agent of the State in the **\*932** administration of its power. In Bass v. Fontelroy, 11 Tex. 698 (1854) the Legislature had repealed the charter of the City of Brownsville; the repeal was challenged as an unlawful taking of vested property rights without just compensation. Justice Lipscomb, denying the City's claim, stated that:

> The establishment of counties, their boundaries, courthouses, jails, bridges, ferries, are all matters of public policy, dependent on the legislative will for their creation; and . . . are equally dependent upon the same for their continued existence.

11 Tex. at 705. And in Guadalupe County v. Wilson County, 58 Tex. 228 (1882), the Legislature in creating Guadalupe County had taken portions of Wilson County without compensation. The ensuing boundary dispute was held a political question, resolved beyond judicial interference by the Act creating Guadalupe County and defining its boundaries to the exclusion of Wilson County. The agency concept of municipal corporation law was specifically relied upon in City of Victoria v. Victoria County, 100 Tex. 438, 101 S.W. 190 (1907), where this Court, in upholding a legislative transfer of title from the county to the city stated:

> The principle is that insofar as a corporation strictly municipal or quasi-municipal holds property for the purposes of government, it holds merely as a governmental agency, and it is within the power of the Legislature of the State to confer that agency upon some other proper governmental instrumentality.

100 Tex. at 451, 101 S.W. at 196. See also, Herget, The Missing Power of Local Government, 62 Va.L.Rev. 999 (1976).

Decisions of the United States Supreme Court establish that political subdivisions, as agencies of the State in the

exercise of governmental powers, have no rights assertible under the Federal Constitution against the State. The famous case of Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), established that public corporations, as distinguished from private business corporations, enjoy no protection assertible under the contract clause of the Federal Constitution against legislative alteration of organic charters. See Campbell, John Marshall, The Virginia Political Economy, and the Dartmouth College Decision, 19 Am.J.Legal Hist. 40 (1975). Cases following Dartmouth College have reiterated that the charter of a political subdivision, being a mere delegation of State authority, is subject to alteration or revocation at the will of the Legislature. Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); Covington v. Kentucky, 173 U.S. 231, 19 S.Ct. 383, 43 L.Ed. 679 (1899); Meriwether v. Garrett, 102 U.S. 472, 26 L.Ed. 197 (1880); East Hartford v. Hartford Bridge Co., 51 U.S. (10 How.) 511, 13 L.Ed. 518 (1850). A municipality thus was denied the power to assert denial of due process of law in City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923). And Mr. Justice Cardozo in Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933) made it clear that no protection is offered a political subdivision by the Fourteenth Amendment. To the Supreme Court, a political subdivision simply is not a person; and is not, therefore, entitled to due process. See Schulz, The Effect of the Contract Clause and the Fourteenth Amendment upon the Power of the States to Control Municipal Corporations, 36 Mich.L.Rev. 385 (1938).

The plurality cites Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) as providing the necessary exception to the rule. In that case voters, that is People of Tuskeegee, Alabama argued that a legislative redistricting of the city deprived them of the voting rights under the Fifteenth Amendment. There were no "rights" of the city, a political subdivision, before the Court. The plurality quote the following from the Gomillion opinion:

> (A) correct reading of the seemingly unconfined dicta of Hunter and kindred cases is . . . that the State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.

**\*933** 364 U.S. at 344, 81 S.Ct. at 128 (emphasis mine). As stated above, City of Trenton v. New Jersey and Williams v. Mayor of Baltimore, supra, two of "those cases" referred to in Gomillion, involved claims under the Fourteenth Amendment. To reiterate, Gomillion involved the rights of private persons ; it has no application to the controversy at hand. The plurality cite no case in which a political subdivision has been held entitled to due process and there is none.

This Court has, on two occasions, enunciated the proper scope of judicial review over legislative control of political subdivisions. Far from holding that political subdivisions are entitled to due process of law, this Court has stated that the only protection is against arbitrary diversion of property held by political subdivisions in such a fashion that the public would be deprived of the use of such property. The only judicial question is arbitrariness vel non of the legislative action.

In Milam County v. Bateman, 54 Tex. 163 (1880), the Court commented:

> Counties in their relation toward the state may be viewed in a two-fold aspect: one, which pertains to their political rights and privileges; the other, to their rights of property.

54 Tex. at 165. Concerning "political rights and privileges," including the right of organic existence, the Court noted that a county has no assertible rights against the State; the latter was said to be in complete control. Different considerations were deemed applicable as to "rights of property."
A different principle, however, obtains as regards the rights of counties to property which they may acquire.

If given for a specific object, the state may very properly, as in the instance under consideration of our school lands granted to counties, exercise such supervision and control over the actions of the counties as to compel the proper execution of the trust, or prevent its being defeated; but it is believed that this control, unless by consent of the county, should be subject to the restriction, that the purpose for which the property was originally acquired shall, as far as circumstances will admit, be kept in view ; and that it shall not arbitrarily be diverted . . . to private parties and to a wholly different purpose.

54 Tex. at 165-66 (emphasis mine).

The quoted portions of the Milam County opinion were genesis to this Court's consideration of legislative power

in Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20 (1931). In Love the Court was concerned with whether the Legislature could impose upon the City the obligation to employ City funds for the education of nonresident children. It was determined that such an imposition would violate Tex.Const. Art. VII, s 3, in that it would divert special school funds. [*] In spite of such holding the Court went on to discuss the legislative power over its subdivisions in general:

The rule is that the ownership of (local government) property is in the local district or municipality for the benefit of the public, within the boundaries of the district or municipality. The Legislature may control or dispose of the property without the consent of the local bodies, so long as it does not apply it in contravention of the trust.

120 Tex. at 367, 40 S.W.2d at 27 (emphasis mine).

The limitations upon legislative power in Milam County and Love are founded upon sound reason. Local government property is, in principle and in fact, trust res conveniently held and managed by local officials for the benefit of the local public. Where, **\*934** as here, such property has been acquired with governmental funds pursuant to specific approval of the local voting public, there arises special reason for enforcing the trust; justifiably, the public has a reliance interest in the disposition of property acquired for and devoted to a designated use. Milam County instructs the Legislature in its supervision of local government property to keep in view "the purpose for which the property was originally acquired," and prohibits arbitrary diversion to a "wholly different purpose." Love goes further to say that Legislative power over local government property is regulatory only; while the entity is subject to legislative destruction, the property held by that entity remains in the public trust. On the other hand, neither Milam County nor Love can be considered authority for the proposition that local government entities have judicial standing to challenge legislative regulation of property in the same manner or to the same degree as owners of private property. The judicial touchstone is arbitrariness. Management of property held in the public trust is a matter of legislative concern. Cf., Note, Proprietary Duties of the Federal Government Under the Public Land Trust, 75 Mich.L.Rev. 586, 592-94 (1977).

Turning now specifically to section six of the Antiquities Code, it becomes apparent to me that it effects no diversion of College District property in a manner prohibited by Milam County and Love. The mere fact that "State archeological landmarks" are declared to be the "sole property of the State" gives rise to no justiciable complaint on the part of the local

government entity in which title was theretofore reposed. The interest protected by Milam County and Love is the public's interest in use of the property, not the local entity's interest in nominative title. Change in nominative title effects no change in use. The nominative title to public property is a patently political matter to which the words of Justice Bonner in Milam County are peculiarly applicable: "If (the State) could not exercise such power over the delegated political rights and privileges of . . . subdivisions of state governmental authority, we might have a system of petty discordant governments within a government, without unity of design or action." 54 Tex. at 165. See also Chester County Institution District v. Commonwealth, 341 Pa. 49, 17 A.2d 212 (1941). And although the grant of power to the Antiquities Committee to prohibit or regulate alteration, damage or destruction of an "archeological landmark" indirectly might effectuate some change in a use, the legislative decision to vest power to make that change in a committee of seven experts cannot be considered arbitrary. It is as I have said, only arbitrary regulation of local government property which gives rise to a justiciable interest on the part of local government officials. In the instant case, the College District claims that the buildings cannot compatibly be used for both educational and cultural (historical preservation) purposes. It might indeed be a justifiable implication from the Antiquities Committee's action that the educational function of the College District would be promoted rather than impaired by the requirement that the cultural integrity of school buildings be maintained. But making such an implication is not a judicial function. It is not the duty of the courts in a case of this nature to view structures, deemed by one State agency as culturally insignificant and by another as worthy of preservation, and decide which is in the right. This is especially true where the Legislature has granted the other the power to preserve without granting the one the right to question. Firemen's & Policemen's Civil Service Comm'n v. Kennedy, 514 S.W.2d 237 (Tex.1974). The Legislature, in section six of the Antiquities Code, has delegated authority to the Antiquities Committee to protect that which it deems worthy of protection. The Antiquities Committee is made a final checkpoint prior to possible effacement of property deemed by the Legislature to be of intangible value. The legislative decision that property held by its political subdivisions may not be altered when such alteration would efface the property's historical integrity is not a decision with which the courts should interfere. If **\*935** the plurality intends to hold, under Love v. City of Dallas that historical preservation is such a wholly incompatible use of property acquired for educational purposes so as to constitute an unlawful diversion

of a public trust, it would be difficult to discern any situation in which historical preservation would not be antipathetic to the public trust. I can see no operative distinction between property acquired for educational purposes and property acquired for, say, a City Hall, a courthouse or a park. Indeed, such a holding is tantamount to a judicial declaration that no property held by a political subdivision can be protected under the legislative banner of historical preservation unless the property originally was acquired for its aesthetic characteristics, or unless the Legislature takes the property by exercise of eminent domain. I would hold that restriction of the use of College District property in order to protect that property's aesthetic integrity does not deprive the local public of the benefit of the property to the degree prohibited by Love and Milam County. In imposing a higher, general trust upon property held by political subdivisions in the public trust, the Legislature acted within its authority. When such is the case, the remedy lies in the legislative process, not in the courts. See Henkin, Is There a "Political Question" Doctrine ? 85 Yale L.J. 597 (1976). This is a dispute between different departments of the same branch of government. The "boss" of that branch, the Legislature, has decided that one department's power exceeds the other's. As long as no specific constitutional provision is violated,

and absent arbitrary legislative action, the courts cannot and should not interfere with the manner in which the Legislature conducts its affairs.

I would not in this case reach the questions of vagueness discussed by four members of the Court. Such questions should, and will be raised at such time as this Court is faced with governmental interference with private property under the banner of historical preservation. But in reply I do point out that this Court very recently stated that the protection of cultural property may indeed be a duty of the Legislature. San Antonio Conservation Soc'y, Inc. v. City of San Antonio, 455 S.W.2d 743, 748 (1970). Not every historical structure worthy of protection can be an Alamo; vagueness in describing cultural property may to a degree be an inherent difficulty.

I would reverse the district court's judgment and dissolve the injunction.

DANIEL, JOHNSON and YARBROUGH, JJ., join in this dissent.

**All Citations**

554 S.W.2d 924, 18 A.L.R.4th 973

Footnotes

1 Sec. 10. The Antiquities Committee shall be authorized to issue permits to other state agencies or institutions and to qualified private institutions, companies, or individuals for the taking, salvaging, excavating, restoring, or the conducting of scientific or educational studies at, in, or on State Archeological Landmarks as in the opinion of the Antiquities Committee would be in the best interest of the State of Texas. Such permits may provide for the retaining by the permittee of a portion of any recovery as set out for contracting parties under Section 9 hereof. Such permit shall provide for the termination of any rights in the permittee thereunder upon the violation of any of the terms thereof and to be drafted in compliance with forms approved by the Attorney General. All such permits shall specifically provide for the location, nature of the activity, and time period covered thereby. No person, firm, or corporation shall conduct any such operations on any State Archeological Landmark herein described without first obtaining and having in his or its possession such permit at the site of such operation, or conduct such operations in violation of the provisions of such permit.

* The Court stated:

Since the Constitution, art. 7, sec. 3, contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts, it is obvious that the education of nonresident scholastics is not within their ordinary functions as quasi-municipal corporations; and under the authorities cited the Legislature is without power to impose such an obligation on them, without just compensation.

120 Tex. at 367, 40 S.W.2d at 27.

665 S.W.2d 446
Supreme Court of Texas.

TEXAS HEALTH FACILITIES
COMMISSION et al., Petitioner,
v.
CHARTER MEDICAL–DALLAS, INC., Respondent.

No. C–2478.  |  Feb. 15, 1984.

Appeal was taken from orders of the Health Facilities Commission granting certificates of need to two hospitals and denying certificate of need for another hospital. The 250th Judicial District Court, Travis County, Charles D. Mathews, J., sustained the Commission's order. On appeal, the Austin Court of Appeals, Third Supreme Judicial District, Powers, J., 656 S.W.2d 928, reversed and remanded with instructions, and appeal was taken. The Supreme Court, Barrow, J., held that Commission's decision was supported by substantial evidence and was not arbitrary or capricious.

Court of Appeals reversed and trial court affirmed.

**Attorneys and Law Firms**

**\*448** Jim Mattox, Atty. Gen., Steven L. Martin, Asst. Atty. Gen., Austin, Law Offices of Earl Luna, Mary Mildord, Dallas, Heath, Davis & McCalla, Dudley D. McCalla, Austin, for petitioner.

Wood, Lucksinger & Epstein, Bruce Bigelow, Austin, Trotter, Bondurant, Miller and Hishon, Glen A. Reed, Atlanta, Ga., for respondent.

**Opinion**

BARROW, Justice.

This is an appeal from three consolidated orders of petitioner Texas Health Facilities Commission. The orders of the Commission granted certificates of need to petitioners Healthcare International and Memorial Hospital of Garland and denied a similar request made by respondent Charter Medical-Dallas, Inc. The action of the Commission was upheld by the trial court. The court of appeals, with one justice dissenting, reversed the judgment of the trial court and remanded the cause to the Commission for further proceedings. *Charter Medical-Dallas, Ins. v. Texas Health Facilities Com'n,* 656 S.W.2d 928. We reverse the judgment

of the court of appeals and affirm the judgment of the trial court.

The Texas Health Facilities Commission is the Texas administrative agency charged with governing the availability of health care facilities in this state. *See* Health Planning and Development Act, Tex.Rev.Civ.Stat.Ann. art. 4418h, §§ 1.01–6.04 (HPDA). The Commission's primary function is to prevent the development of new health care facilities with services that are not needed or that cannot feasibly be developed, staffed, or operated. This function is performed primarily by the Commission's administration of a state certificate of need program. *Id.,* § 2.06. Under this program, a person proposing to establish or modify a health care facility must obtain a certificate of need from the Commission. *Id.,* § 3.01.

**\*449** In December of 1979 and January of 1980, the parties to this appeal filed applications seeking certificates of need for proposed projects. Memorial sought permission to convert a portion of its general hospital into psychiatric use; Healthcare proposed to construct a new facility, "Green Oaks;" and Charter Medical applied for permission to construct "Dallas Psychiatric Hospital." All three projects were planned for the area encompassing north Dallas County and Collin County. These three applications were consolidated by the Commission, and a hearing was held to determine whether one or more of the applications should be granted. The Commission rendered its orders in October of 1980 granting certificates of need to Healthcare and Memorial and denying the application of Charter Medical.

The trial court rendered judgment sustaining the orders of the Commission as to all three applications. This judgment was reversed by the court of appeals and the cause remanded to the Commission. The stated reason for the court of appeals' decision is that the Commission's orders contain insufficient underlying (basic) facts to support the ultimate findings or conclusions of the Commission on the three applications. The court of appeals held that the absence of underlying facts rendered the Commission's ultimate findings arbitrary and capricious. The court of appeals remanded all three applications to the Commission since the Commission's denial of Charter Medical's request may have been based upon the granting of the other two applications.

In reaching its decision, the court of appeals set forth a lengthy recitation of the facts and Commission rules applicable to this appeal; we refer the reader to that opinion for a more complete

statement on these matters. We limit our discussion to the specific points properly before this Court and upon which we base our decision.

This administrative appeal arises under the authority of the HPDA in conjunction with the Texas Administrative Procedure and Texas Register Act. Tex.Rev.Civ.Stat.Ann. art. 6252–13a (APTRA). Under the legislative scheme of the APTRA, the manner of review of agency actions is governed by the enabling statute in the area under adjudication. APTRA, § 19(e); *Southwestern Bell Telephone Co. v. Public Utility Commission,* 571 S.W.2d 503, 508 (Tex.1978). Section 1.04 of the HPDA incorporates the APTRA "except to the extent inconsistent with" the HPDA. Therefore, the scope of judicial review in this case must be discerned from both the HPDA and the APTRA.

In determining the role of the reviewing court, we must first ascertain the legislative standards to which the Commission must adhere in making its decisions, i.e., what findings and conclusions the Commission must make before it properly may grant a certificate of need. Subsection 3.10(a) of the HPDA requires the Commission to promulgate rules establishing criteria to determine whether an applicant is to be issued a certificate of need for a proposed project. Subsection 3.10(b) sets forth five specific factors that must be included among the Commission's criteria:

Criteria established by the commission must include at least the following:

(1) whether a proposed project is necessary to meet the healthcare needs of the community or population to be served;

(2) whether a proposed project can be adequately staffed and operated when completed;

(3) whether the cost of a proposed project is economically feasible;

(4) if applicable, whether a proposed project meets the special needs and circumstances for rural or sparsely populated areas; and

(5) if applicable, whether the proposed project meets special needs for special services or special facilities.

Thereafter, subsection 3.10(c) contains six factors that the Commission "shall consider" in developing its criteria.

The Commission has promulgated "General Criteria for Use in Certificate of NeedReviews" **\*450** that incorporate both the factors required by subsection 3.10(b) and the factors that the legislature has directed the Commission to "consider." [1] These criteria include thirteen broad categories addressing such matters as "Community Health Care Requirements," "Service Area Population," and "Relationship to Existing Services and Existing Facilities."

Under these broad, general categories are approximately fifty-four subcategories or factors that the Commission considers relevant to its decision on the ultimate factors. These subcategories are referred to by the court of appeals as "intermediate facts." The findings of the Commission on the totality of these criteria form the basis of the Commission's decision to grant or deny a certificate of need. "An applicant or party who is aggrieved by an order of the commission ... is entitled to judicial review under the substantial evidence rule." HPDA, § 3.15.

Having determined the prerequisites to agency action under the HPDA, we look to the APTRA to determine its guidelines for judicial review. Section 16(b) of the APTRA states: "A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." The exact manner of judicial review is stated in section 19(e):

The scope of judicial review of agency decisions is as provided by the law under which review is sought.... Where the law authorizes review under the substantial evidence rule, ... the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the statutory authority of the agency;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

The above-quoted portions of the APTRA are the primary guidelines to be used by a court in reviewing the actions of administrative agencies.

In this case, there are allegations challenging the adequacy of the Commission's findings of fact, contending that the Commission's action is not supported by substantial evidence, and asserting that the Commission's orders are arbitrary and capricious. The court of appeals purported to base its decision solely on the conclusion that the Commission's findings of fact are arbitrary and capricious. In its opinion, however, the intermediate court touched upon each of the above three contentions. Hence, we shall address each of these matters.

### Findings of Fact

 **[1]**   The logical first step in evaluating the Commission's order is to examine the agency's fact findings to determine whether they meet the statutory requirements. *See Auto Convoy Co. v. Railroad Commission,* 507 S.W.2d 718, 719 (Tex.1974). Section 16(b) of the APTRA requires that all findings of fact, "if set forth in statutory **\*451** language," must be accompanied by a supporting statement of underlying facts. We must determine the meaning of these words in the present context.

In *Lewis v. Gonzales County Savings and Loan Association,* 474 S.W.2d 453 (Tex.1971), we were asked to construe an analogous fact-finding requirement in the Savings and Loan Act. Tex.Rev.Civ.Stat.Ann. art. 852a, § 11.11(4). Therein, we held:

> We are of the view this requirement applies only to findings of fact in the commissioner's orders which are "set forth in statutory language." [footnote omitted]. When findings are made in the language of the Rules and Regulations that do not embody statutory language, they need not be

accompanied by a concise and explicit statement of the underlying facts.

*Gonzales County,* 474 S.W.2d at 457. We went on to explain that, generally, statutory findings are broadly stated and require discretion or judgment on the part of the agency based on a multitude of factors. Conversely, non-statutory findings usually are more factual in nature and carry with them the supporting underlying facts. Thus, the latter need no accompanying facts to support them.

Judicial review would be enhanced if all general conclusions of an agency were accompanied by a statement of underlying facts. The plain language of the statute, however, precludes such a construction of section 16(b). By limiting the fact-finding requirement to findings "set forth in statutory language," the legislature has expressed its intention in this matter. We may not impose an additional fact-finding requirement under the guise of statutory construction. *Cf. Goldman v. Torres,* 161 Tex. 437, 341 S.W.2d 154, 158 (1960).

*Gonzales County* holds that an accompanying statement of underlying facts is required when an ultimate finding of fact embodies statutory language. This construction has been followed in post-APTRA cases. *See, e.g., Gage v. Railroad Commission,* 582 S.W.2d 410, 414 (Tex.1979); *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280, 286 (Tex.1977). Therefore, we hold that section 16(b) of the APTRA requires an accompanying statement of underlying facts only when the ultimate fact finding embodies a mandatory fact finding set forth in the relevant enabling act. [2]  An agency may not avoid this statutory requirement by simply rewording its criteria; section 16(b) extends to all statutory fact findings that represent the criteria that the legislature has directed the agency to consider in performing its function.

 **[2]**   **[3]**   **[4]**   The characteristics of proper findings of fact, as well as their purposes, are well established. Valid findings of fact must be clear and specific. *Gage,* 582 S.W.2d at 414. A mere conclusion or a recital of evidence is inadequate. *Thompson v. Railroad Commission,* 150 Tex. 307, 240 S.W.2d 759, 761–62 (1951). The required underlying facts may not be presumed from findings of a conclusional nature. *Morgan Drive Away, Inc. v. Railroad Commission,* 498 S.W.2d 147, 152 (Tex.1973). In general, underlying findings of fact must be such that the reviewing court can fairly and reasonably say that the underlying findings support the

statutorily required criteria. *Railroad Commission v. Entex, Inc.,* 599 S.W.2d 292, 298 (Tex.1980); *Railroad Commission v. Graford Oil Corp.,* 557 S.W.2d 946, 950 (Tex.1977).

The underlying findings of fact required by the APTRA have a substantial statutory purpose and are more than a technical prerequisite. **\*452** *Morgan Drive Away, Inc.,* 498 S.W.2d at 150. This Court set forth the purposes of such findings of fact in *Miller v. Railroad Commission,* 363 S.W.2d 244, 245–46 (Tex.1962) as follows:

> One purpose no doubt is to restrain any disposition on the part of the [agency] to grant a certificate without a full consideration of the evidence and a serious appraisal of the facts. Another is to inform protestants of the facts found so that they may intelligently prepare and present an appeal to the courts. Still another is to assist the courts in properly exercising their function of reviewing the order.

 **[5]**   **[6]**   This Court has neither the right nor the authority to lay out a precise form of findings to be made by the Commission. *Id.* at 246. On the other hand, we may make suggestions as to the form of the agency record in the interest of proper judicial review. *See Graford Oil Corp.,* 557 S.W.2d at 952 n. 6. Proper underlying (basic) findings of fact should follow the guidelines we previously have noted: they should be clear, specific, non-conclusory, and supportive of the ultimate statutory finding. Mere recitals of testimony or references to or summations of the evidence are improper. Such findings should be stated as the agency's findings. The findings should relate to material basic facts and should relate to the ultimate statutory finding that they accompany. In general, the findings of fact required by APTRA § 16(b) should be sufficient to serve the overall purposes evident in the legislative requirement that they be made.

 **[7]**   The record of this case discloses that the Commission made almost five hundred findings of fact covering approximately forty-eight pages. The orders of the Commission includes ultimate findings on each of the criteria required by HPDA section 3.10(b). In addition, the Commission's findings contain numerous underlying facts in support of these statutory findings. Many of these findings do not satisfy the requirements previously stated since they are nothing more than recitals of evidence. Nevertheless,

there are sufficient findings such that we can fairly and reasonably say that the underlying or basic facts support the Commission's conclusions on the ultimate or statutory criteria. We hold, therefore, that the underlying findings of fact made by the Commission satisfy the requirements of section 16(b) of the APTRA.

### *The Substantial Evidence Rule*

 **[8]**   **[9]**   The APTRA codifies the principle of judicial review under the substantial evidence rule. Section 19(e)(5) authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *See Railroad Commission v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1029–30 (1942). In applying the test, the court is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion. *See Gerst v. Guardian Savings and Loan Association,* 434 S.W.2d 113, 115 (Tex.1968). The reviewing court may reverse an agency decision because of the absence of substantial evidence only if such absence has prejudiced substantial rights of the litigant. APTRA, § 19(e).

 **[10]**   **[11]**   **[12]**   Although substantial evidence is more than a mere scintilla, *Alamo Express, Inc. v. Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 823 (1958), the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence. *Lewis v. Metropolitan Savings and Loan Association,* 550 S.W.2d 11, 13 (Tex.1977). The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. *Gerst v. Nixon,* 411 S.W.2d 350, 354 (Tex.1966). A reviewing court is not bound by the reasons given by an agency in its order, provided there is a valid basis for the action taken by the agency. **\*453** *Railroad Commission v. City of Austin,* 524 S.W.2d 262, 279 (Tex.1975). Thus, the agency's action will be sustained if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Suburban Utility Corp. v. Public Utility Commission,* 652 S.W.2d 358, 364 (Tex.1983).

 **[13]**   The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported

by substantial evidence, and the burden is on the contestant to prove otherwise. *Imperial American Resources Fund, Inc. v. Railroad Commission,* 557 S.W.2d 280, 286 (Tex.1977). Hence, if there is evidence to support either affirmative or negative findings on a specific matter, the decision of the agency must be upheld. *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968); *see also Lewis v. Jacksonville Building and Loan Association,* 540 S.W.2d 307, 311 (Tex.1976).

 **[14]**    The record before this Court is extensive and contains substantial information relevant to the Commission's inquiry. This controversy was hotly contested, and the record contains evidence favoring all three applicants. We will address one statutory criterion that supports the Commission's decision in this case. Under HPDA section 3.10(b)(1), the Commission considers "whether a proposed project is necessary to meet the healthcare needs of the community or population to be served...." The Commission found that Memorial and Green Oaks were necessary, but that Charter Medical was not.

On judicial review, we look first to the underlying findings of fact made in support of the ultimate finding of fact contrary to Charter Medical's position. Factors unfavorable to Charter Medical include the following: Charter Medical would not be near or connected with a general hospital and ambulance service would be required to transfer a patient to a general hospital for medical treatment; Charter Medical was not accessible by public transportation; Charter Medical failed to establish physician interest in its facility similar to the interest expressed in the other two facilities by testifying physicians; and Charter Medical failed to support its projected occupancy rates with competent evidence. Findings on these matters were relatively more favorable regarding both Memorial and Green Oaks. Other material findings concerned the probable absence of certain recreational facilities at Charter Medical, the unnecessary duplication of specified services and equipment by Charter Medical, and the negative report on Charter Medical by the Texas Area 5 Health Systems Agency.

Because the Commission correctly found that Charter Medical failed to establish that its facility was necessary to meet the healthcare needs of the community, as required by the statute, the Commission's order must be upheld. *Cf. Gerst v. Goldsbury,* 434 S.W.2d at 667. We note that many of the Commission's 213 findings on this criterion are improper and irrelevant and were not considered by this Court. Moreover, we doubt the sufficiency of other ultimate findings made by the Commission, although we reach no conclusion thereon.

We do admonish the Commission to adhere to the guidelines we have set forth previously regarding findings of fact.

Our second inquiry concerns whether the findings, inferences, and conclusions that relate to health care needs are supported by substantial evidence. We hold that they are. Our conclusion is based upon the principles of judicial review that we have reiterated herein. As required by APTRA section 19(e), we have tested each material finding, inference, and conclusion for evidentiary support. There is in the record substantial evidence to support the underlying facts discussed above and the ultimate fact to which they relate.

### *Arbitrary and Capricious Standard of Review*

 **[15]**    The court of appeals held that the validity of an agency's inferences of ultimate facts or its reasoning process is judged by whether such inferences are arbitrary **\*454** and capricious. The court also concluded that the sole purpose of the substantial evidence rule is to measure the validity of the process by which the agency has inferred stated basic facts from the evidence and matters officially noticed. Our discussion of the substantial evidence rule discloses the erroneous nature of these conclusions. Because the court of appeals has, in effect, engaged in a substantial evidence review of the Commission's order, we also have addressed that point. We now turn to a discussion of the arbitrary and capricious standard of review.

Throughout the long history of the substantial evidence rule the existence of substantial evidence has been equated with fair and reasonable conduct on the part of the agency. Conversely, agency decisions that are unsupported by substantial evidence have been deemed arbitrary and capricious. Thus, the two terms have many times been considered two sides of the same coin. *See, e.g., Benson v. San Antonio Savings Association,* 374 S.W.2d 423, 427 (Tex.1963); *City Savings Association v. Security Savings and Loan Association of Dickinson,* 560 S.W.2d 930, 932 (Tex.1978). On the other hand, cases have arisen in which a line of demarcation was drawn between these two concepts.

In *Lewis v. Metropolitan Savings and Loan Association,* 550 S.W.2d 11 (Tex.1977), this Court was faced with an allegation that the agency action in question, in admitting and excluding evidence, had resulted in a denial of due process of law. The agency contended that the only issue on appeal was whether the decision was supported by substantial evidence;

a denial of due process would not provide a basis for reversal so long as the agency's decision was upheld under substantial evidence scrutiny. We held that instances may arise in which the agency's action is supported by substantial evidence, but is arbitrary and capricious nonetheless. One such instance is when a denial of due process has resulted in the prejudice of substantial rights of a litigant.

Another example of arbitrary action by an agency is *Railroad Commission v. Alamo Express,* 158 Tex. 68, 308 S.W.2d 843 (1958). Therein, this Court found that the agency had acted in an arbitrary manner when it failed totally to make findings of fact and instead based its decision on findings in another case. Arbitrary and capricious agency action also may be found when an agency improperly bases its decision on non-statutory criteria. *Public Utility Commission v. South Plains Electric Cooperative, Inc.,* 635 S.W.2d 954, 957 (Tex.App. —Austin 1982, writ ref'd n.r.e.).

In enacting the APTRA, it is clear that the legislature intended to distinguish between agency action that is not supported by substantial evidence and agency action that is arbitrary and capricious. We construe section 19(e)(6) of the APTRA to be a safeguard against agency conduct that is arbitrary

or constitutes an abuse of discretion although that conduct does not amount to a violation of any other provision of the APTRA or the agency's enabling act. The arbitrary and capricious standard of review historically has been construed narrowly, and we do not think that the legislature intended it to be interpreted as a broad, all-encompassing standard for reviewing the rationale of agency actions. Under the foregoing definition of the arbitrary and capricious standard of review, we hold that the Commission's orders in this case are not arbitrary nor do they constitute an abuse of discretion.

We conclude that the findings of fact made by the Commission comply with section 16(b) of the APTRA. The Commission's findings, inferences, conclusions, and decisions are supported by substantial evidence and do not constitute an abuse of discretion.

The judgment of the court of appeals is reversed, and the judgment of the trial court is affirmed.

**All Citations**

665 S.W.2d 446

---

Footnotes

1    The matters required by section 3.10(b) to be included within the Commission's criteria may be found primarily in subsections 513.5, 513.11, 513.13, and 513.17 of Title 25 of the Texas Administrative Code. The non-mandatory factors are scattered throughout the other subsections of section 513. *See* Tex. Health Fac. Comm'n, 25 Tex.Admin.Code §§ 513.1–513.21 (May 1, 1982) (compiling Tex. Health Fac. Comm'n Rules 315.19.01.010 to .130, 3 Tex.Reg. 1361–64 (1978), as amended 4 Tex.Reg. 2949–50 (1979)).

2    The HPDA does not *require* that the Commission make findings on certain factors before it may act; rather, the statute directs the Commission to include certain matters within its criteria for review and directs the Commission to act upon applications within established time limits. HPDA, §§ 3.10, 3.11. Nonetheless, the factors that the Commission *must* include among its criteria are the type of factors that fall within the scope of section 16(b) so that these findings of fact must be accompanied by a statement of underlying facts. *Cf. Miller v. Railroad Commission,* 363 S.W.2d 244, 245 (Tex.1962).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3771302
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
Court of Appeals of Texas,
Houston (1st Dist.).

Doreatha WALKER, Appellant
v.
HITCHCOCK INDEPENDENT
SCHOOL DISTRICT, Appellee.

No. 01–11–00797–CV.   |   July 16, 2013.

On Appeal from the 405th District Court, Galveston County,
Texas, Trial Court Case No. 09–CV–1439.

**Attorneys and Law Firms**

Doreatha Walker, pro se.

Christopher B. Gilbert, for Hitchcock Independent School
District.

Panel consists of Justices KEYES, MASSENGALE, and
BROWN.

**MEMORANDUM OPINION**

MICHAEL MASSENGALE, Justice.

 **\*1** Appellant Doreatha Walker sued the Hitchcock
Independent School District for suspending her and
recommending termination from her job as Head Start
Director. She contended that the District had retaliated against
her for reporting unsafe mold levels and other improprieties.
The jury found that Walker had not made those reports in
good faith or that the reports were not the cause of her
suspension and recommendation of termination. The trial
court entered judgment in favor of the school district.

On appeal, Walker alleges that the trial court erroneously
charged the jury, improperly admitted evidence, incorrectly
applied the res judicata doctrine, and unfairly imposed time
limits during the trial. She also complains that her directed
verdict motion was improperly denied, and she challenges the

sufficiency of the evidence to support the judgment. Finally,
Walker questions the composition and conduct of the jury.
We affirm the trial court's judgment.

**Background**

Doreatha Walker was hired as Head Start Director on a
one-year probationary contract. In February 2009, several
months into her tenure and after concerns were raised about
high levels of mold in the Head Start building, District
Superintendent Dr. Michael Bergman held a meeting with
Head Start staff and parents to clarify the progress that had
been made on addressing the mold problem. A few days later,
Walker filed a workers' compensation form indicating she
would be going on leave for mold-related health reasons. She
also filed a grievance against Bergman for allegedly yelling at
her during the meeting, although no one present at the meeting
remembered his doing so.

For the rest of February and most of March, Walker was
absent on medical leave. Although absent, she continued to
email Bergman and Head Start board members about the
mold issue and her fear of losing her job in retaliation for
reporting the issue. In early March, days before her contract
was eligible for renewal, she threatened Bergman with a
wrongful termination suit if the board did not vote to extend
her employment as Head Start director. Despite concerns that
Walker was not getting along well with Head Start board
members and District personnel, Bergman recommended
Walker's employment be extended for another year. The next
day Walker rescinded her grievance against Bergman.

A few weeks later, Walker attempted to return to work at
the Head Start building. However, Bergman had directed
her not to return to work because her medical leave form
stated that she could not yet return to the Head Start building,
which was the only place she could perform her duties as
director. When Walker nevertheless arrived on campus, an
assistant superintendent directed her to leave on Bergman's
instructions. Walker refused to obey the directive, the police
were called, and she was escorted off the campus. After the
incident, Walker informed Bergman that she felt the removal
from campus was in retaliation for her raising the mold
issue and again threatened to file suit if anyone attempted to
fire her. Bergman responded by warning Walker that further
unprofessional and insubordinate conduct would result in a
recommendation that her contract be terminated.

**\*2** Walker's relations with Head Start board members and staff deteriorated throughout the following month. Rather than heed Bergman's earlier advice to listen to others and to cooperate with Head Start board members, Walker acted imperiously and took control of a Head Start board meeting—a meeting which she attended only at the invitation of board members. The next day the president of the Head Start policy board declared her refusal to attend any future meetings with Walker. Then, after a meeting during which Walker verbally accosted her, the Head Start staff administrative assistant filed a harassment grievance against her. Subsequently, the secretary of the Head Start policy board, a parent volunteer, resigned, followed by the early retirement of the Head Start nurse a few weeks later. Each expressed frustration with Walker as the reason for leaving.

Soon thereafter, on May 1, Bergman suspended Walker by placing her on administrative leave with pay. He was concerned about her failure to obey directives, her insubordination, and the grievances and resignations of Head Start volunteers and staff. Two days later, Walker filed a report with the Texas Education Agency alleging the District was claiming Head Start students for reimbursement of transportation services that the District never provided. After a District board meeting at which Bergman failed to recommend that the board renew her contract, Walker filed another grievance against Bergman. She alleged that Bergman had retaliated against her for making whistleblower reports about the alleged violations of transportation reimbursement rules and her mold complaints.

Three months later, the District board accepted Bergman's recommendation to terminate Walker's contract. Walker appealed the termination to the TEA. After a hearing, the TEA hearing examiner agreed with the District's proposed termination, documenting Walker's failure to follow directives, disrespect for authority, and imperious tone with superiors, subordinates, and parent volunteers. Thereafter, the District board officially terminated Walker. The Texas Commissioner of Education upheld the termination.

After the board agreed to terminate her contract, Walker filed suit against the District. She represented herself at all stages of the trial court proceedings. She alleged that her May 1 suspension violated the Texas Whistleblower Act, [TEX. GOV'T CODE ANN. §§ 554.001–.010 (West 2012). She alleged that Bergman violated the Whistleblower Act because he had suspended her for complaining to the local, state, and federal health agencies about the mold in the Head Start building and for her allegations that the District had improperly claimed Head Start students for state transportation reimbursement.

The trial court determined that the findings of the TEA hearing examiner and the education commissioner from the termination appeal could be used in Walker's whistleblower suit. After a ten-day trial, two questions were submitted to the jury. Question One asked whether Walker's report of possible improprieties in how the District sought reimbursement for transportation was made in good faith and was a cause for Bergman's recommendation that she be terminated. Question Two asked whether Walker's reports of mold to health agencies were made in good faith and were a cause of her suspension with pay. The jury answered "No" to both questions, and the trial court entered judgment in favor of the District. Walker then filed this appeal.

### Analysis

**\*3** Pro se litigants must comply with all applicable laws and rules of procedures, and they are held to the same standards as are licensed attorneys. *See [Mansfield State Bank v. Cohn,](#) 573 S.W.2d 181, 184–85 (Tex.1978)*; *[Kanow v. Brownshadel,](#) 691 S.W.2d 804, 806 (Tex.App.-Houston [1st Dist.] 1985, no writ)*. A pro se litigant is required to properly present her case on appeal, and we do not make allowances or apply different standards for litigants appearing without the advice of counsel. *See [Morris v. Am. Home Mortg. Servicing, Inc.,](#) 360 S.W.3d 32, 36 (Tex.App.-Houston [1st Dist.] 2011, no pet.)*. The Rules of Appellate Procedure require appellate briefs to contain clear and concise arguments with appropriate citations to the record and supporting authorities. [TEX.R.APP. P. 38.1(i).](#) Nevertheless we construe briefs liberally, and substantial compliance with the rules is sufficient. *See[TEX.R.APP. P. 38.9.](#)*

In her brief, Walker raises 29 points of error. Many of these lack supporting authority or citations to the record. Other points refer to hundreds or thousands of pages from the record, which does not substantially comply with the briefing rules. *See [Saldana v. Garcia,](#) 155 Tex. 242, 285 S.W.2d 197, 200–01 (Tex.1955)* (holding that it is not the duty of the courts of appeals to independently search a voluminous record to find evidence in support of a theory); *[Labrador Oil Co. v. Norton Drilling Co.,](#) 1 S.W.3d 795, 803 (Tex.App.-Amarillo 1999, no pet.)*. Many of the points of error are duplicative or incapable of being distinguished from other

points of error. But construing Walker's brief liberally, we discern seven main issues. Walker complains of (1) error in the jury charge, (2) incorrect application of the res judicata doctrine, (3) improper admission of evidence, (4) unfair time limits imposed during the trial, (5) denial of her directed verdict motion, (6) the sufficiency of the evidence to support the judgment, and (7) the composition and conduct of the jury.

## I. Jury charge

Walker challenges the jury charge and instructions. She argues that the jury should have had more instructions about the causation element of her whistleblower claim, including a specific instruction that an incorrect but good faith belief that a law was violated is sufficient for a whistleblower claim. She also argues that the instruction for actual damages should have used her preferred wording, and that the damages questions should have included an option for the jury to award injunctive relief reinstating her to her former position.

We review a trial court's decision to submit or refuse a particular jury instruction for abuse of discretion. *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000). The trial court has considerable discretion to determine proper instructions. *Id.* An appellate court will not reverse a judgment for charge error unless that error "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts."*Thota v. Young,* 366 S.W.3d 678, 687 (Tex.2012) (citing TEX.R.APP. P. 44.1(a)). When the findings of the jury are sufficient to support the judgment, error in omitting an issue is harmless. *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex.2006). The trial court should refuse to submit unnecessary instructions even if they represent correct statements of the law. *Rigdon Marine Corp. v. Roberts,* 270 S.W.3d 220, 228 (Tex.App.-Texarkana 2008, pet. denied); *Riggs v. Sentry Ins.,* 821 S.W.2d 701, 704–05 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

### a. Liability questions

**\*4** To prove a claim under the Whistleblower Act, a public employee must demonstrate that she reported a violation of law in good faith and that the adverse employment action by the employer would not have occurred had the report not been made. *City of Houston v. Levingston,* 221 S.W.3d 204, 226 (Tex.App.-Houston [1st Dist.] 2006, no pet.)(citing *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 67 (Tex.2000)); *see also*TEX. GOV'T CODE ANN. §§ 554.002, 554.004 (West 2012) (requiring good faith report to authorities and

placing burden of proof on public-employee plaintiff). To meet the causation requirement, the employee is not required to show that her reports of illegal conduct were the sole reason for the employer's adverse action. *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 634 (Tex.1995). Instead, she must present some evidence that "but for" her reports, the employer's suspension or termination would not have occurred when it did. *Id.* at 636;*see also Zimlich,* 29 S.W.3d at 68.

In this case the trial court submitted two Whistleblower Act questions based on the Texas Pattern Jury Charge. The questions asked the jury if Walker's reports to the authorities were made in good faith and were a cause of her suspension and the recommendation of termination.[1] Walker requested an alternate charge that included slightly different wording, left out the good-faith element in the mold-report question, and omitted the good-faith instruction.[2] However, Walker does not explain how the questions that were in the charge were incorrect or resulted in the rendition of an improper judgment. *See Shupe,* 192 S.W.3d at 579–80 (explaining how even improper instructions are harmless when there are answers sufficient to support the judgment).

The trial court acted within its discretion. The broad-form charge used in this case is appropriate for whistleblower cases. *See Zimlich,* 29 S.W.3d at 68, 71 (upholding a jury verdict using a broad-form submission). The charge includes the good-faith and causation elements, while Walker's proposed question on her report about mold lacked the good-faith element required by the Whistleblower Act. *See*TEX. GOV'T CODE ANN. § 554.002; *Levingston,* 221 S.W.3d at 226.Her mold question also unnecessarily required that she establish that the mold reports were "the" cause of her suspension, rather than merely "a" cause. *See Hinds,* 904 S.W.2d at 634–36 (holding that the employee is not required to prove making a report was the sole cause of the employer's adverse action). Thus, the trial court did not abuse its discretion in not adopting Walker's proposed charge.

For the first time on appeal, Walker also complains that the submitted charge was incorrect because it omitted additional instructions on causation and definitions from the Whistleblower Act. Preservation of the issue of an omitted instruction, however, requires that the appellant tender a written request to the trial court for submission of the instruction that is "in substantially correct wording." *See*TEX.R. CIV. P. 278; *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002); *see also*TEX.R.APP. P.

33.1(a) (preserving a complaint for appellate review requires the complaint be made to the trial court). Because Walker did not submit a request for these additional instructions or definitions to the trial court, she has failed to preserve her complaint for appellate review.

### b. Damages question

**\*5** Walker next complains that the damages section of the jury charge did not include an option for reinstatement and misstated the proper standard for actual damages. These complaints fail to demonstrate harm, because any alleged error with respect to damages did not affect the rendition of the judgment against Walker when the jury did not find in her favor for liability. *See Thota,* 366 S.W.3d at 686–87; *Shupe,* 192 S.W.3d at 579–80; *see also City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) (noting an improper question is immaterial and harmless when the answer cannot alter the effect of a verdict). Walker also cannot complain of the actual-damages measure because the trial court adopted her proposed measure of damages. *See* TEX.R. CRV. P. 274 (requiring a party disputing the charge to point out distinctly the objectionable matter for each part of the charge the party objects to); *In re A.V.,* 113 S.W.3d 355, 362–63 (Tex.2003).

For the foregoing reasons, we overrule Walker's points of error 1, 2, 11–14, 17, 19, and 23.

### II. Collateral estoppel

Walker alleges that the District was allowed to use material from her administrative proceedings while she was not and that this was an improper application of the res judicata and collateral estoppel doctrines.[3] Before trial, Walker had appealed her termination in administrative proceedings before a TEA hearing examiner and commissioner of education. Under the doctrine of collateral estoppel, the trial court allowed the parties to present the findings from the administrative hearing, but not to dispute those findings. In the administrative action, it was found that Walker had increasingly poor relations with her superiors and other adults involved in the Head Start program in the months before her suspension. The hearing examiner found that Walker's policies and behavior violated several of her job requirements and described several incidents in which her attitude led to conflict, such as when she refused to leave the Head Start building and had to be escorted away by police. From these findings, the examiner concluded that the District was authorized to terminate her probationary contract.

Collateral estoppel, also known as issue preclusion, prevents relitigation of particular issues already resolved in a prior suit. *Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.,* 837 S.W.2d 627, 628 (Tex.1992). A party asserting collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) those facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action. *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 288 (Tex.2002); *Houtex Ready Mix Concrete & Materials v. Eagle Constr. & Envtl. Servs., L.P.,* 226 S.W.3d 514, 519 (Tex.App.-Houston [1st Dist.] 2006, no pet.). To invoke collateral estoppel on the basis of a prior administrative order, a party must show the administrative agency was acting in a judicial capacity and had jurisdiction to resolve the disputed issues of fact, which the parties had an adequate opportunity to litigate. *In re Edwards Aquifer Auth.,* 217 S.W.3d 581, 588 (Tex.App.-San Antonio 2006, no pet.).

**\*6** The TEA has jurisdiction over an educator's disputed employment contract, as the agency has jurisdiction over disputes involving any person aggrieved by the actions of any board of education. *Muckelroy v. Richardson Indep. Sch. Dist.,* 884 S.W.2d 825, 831 (Tex.App.-Dallas 1994, writ denied). Since the agency issued a final decision after Walker and the District had an adequate opportunity to fully and fairly litigate her termination, the hearing examiner's findings were binding on the trial court. *See id.; see also Mullinax v. Texarkana Indep. Sch. Dist.,* 252 F.3d 1356 (5th Cir.2001) (TEA hearing examiner's findings made in judicial capacity entitled to preclusive effect).

The hearing examiner found that Walker was validly terminated due to her "intransigence, duplicity, and defiance of authority" in almost every conflict between her and District employees. The examiner catalogued the numerous disputes and incidents that took place in the spring of 2009 which preceded Walker's suspension and termination. The course of these events was relevant to the District's argument that Walker's insubordination, not her whistleblowing, was the cause of her suspension and ultimate termination. Because the issue of why she was terminated was fully and fairly litigated in the administrative proceeding, the District was entitled to the preclusive effect of those findings. Walker does not indicate where in the record that the District did anything more than reference the examiner's findings, as it was entitled to do. Because she attempted to dispute the administrative

findings, however, the trial court acted properly in stopping her from relitigating the issue of why she was terminated. Thus, the trial court did not err in its application of the collateral estoppel doctrine.

Accordingly, we overrule Walker's points of error 3, 5, 15, and 29. [4]

### III. Evidentiary rulings

Walker challenges several of the trial court's evidentiary rulings. She complains that the court refused to admit a newspaper article about mold in the Head Start building, and that it admitted several email messages offered by the District over her hearsay objection.

The inclusion and exclusion of evidence is committed to the trial court's sound discretion. *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000). The party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in an improper judgment, usually by showing that the judgment turns on the particular evidence excluded or admitted. *Id.;City of Brownsville,* 897 S.W.2d at 753–54.We review the entire record to determine whether the complaining party has demonstrated that the judgment turns on the particular evidence admitted. *Bay Area Healthcare Grp., Ltd. v. McShane,* 239 S.W.3d 231, 234 (Tex.2007).

With respect to the news reports unsuccessfully offered into evidence by Walker, newspaper articles that are offered to prove the truth of what the article is reporting are inadmissible hearsay. TEX.R. EVID. 801(d); *Deramus v. Thornton,* 160 Tex. 494, 333 S.W.2d 824, 831 (Tex.1960). Walker offered them to prove that there was mold in the Head Start building-an inadmissible hearsay purpose. TEX.R. EVID. 802. Because the articles were inadmissible hearsay, the trial court did not abuse its discretion in refusing their admission. The newspaper articles in question were also duplicative of facts in evidence. They show only that there was mold in the Head Start building, which was an undisputed fact in this case.

**\*7** Walker complains that the trial court admitted several email messages to which she objected. The messages were reports from several people involved in the Head Start program which included complaints about Walker's argumentativeness and strange behavior. The trial court did not err in admitting these messages because they were offered to prove that Bergman received reports of the contentiousness and conflict caused by Walker's management of the Head

Start program. *See, e.g., In re Bexar Cnty. Criminal Dist. Attorney's Office,* 224 S.W.3d 182, 188–89 (Tex.2007) (statements are admissible if offered for their effect on the listener rather than the truth of the matter asserted).

Walker also complains that the trial court prevented her from pursuing a line of questioning into the District's alleged past retaliation against other employees. The trial court sustained the District's objection because the alleged retaliation was not related to Walker's whistleblower claims. Walker does not indicate how this testimony would have altered the judgment in the case and we find any possible error to be harmless.

Because the trial court did not err in admitting or excluding the evidence it did, and in any case no harm has been shown, we overrule Walker's points of error 6,7, 16, and 20.

### IV. Time limits on questioning

Walker complains that the trial court admonished her to speed up the presentation of her case, imposed time limits on the trial length, and shortened her time for questioning witnesses and presenting her deposition testimony. The trial court has great discretion in the conduct of the trial.*Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 240 (Tex.2001). A trial judge is afforded the discretion to express himself while controlling the trial. *Bott v. Bott,* 962 S.W.2d 626, 631 (Tex.App.Houston [14th Dist.] 1997, no pet.). A trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time.*Francis,* 46 S.W.3d at 241; *Hoggett v. Brown,* 971 S.W.2d 472, 495 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *see also Landis v. N. Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (a trial court has the inherent power to control the disposition of cases with economy of time and effort for itself, for counsel, and for litigants).

The trial court in this case acted within its authority in managing the trial's time limits. The trial court often attempted to help Walker by encouraging her to speed up her questioning to keep the jury's interest. The trial judge warned her that the trial was taking longer than anticipated and that he might have to impose time limits. When the trial court did begin to impose time limits, it was to the detriment of the District's time for presenting its case in chief, not Walker's. Walker spent a vastly larger portion of the trial's length questioning witnesses than the District did. Critically, Walker identifies no particular instance when she was prevented from finishing an important line of questions or she was unable to

present important evidence due to a time limit imposed by the trial court.

**\*8** Accordingly, we overrule points of error 8 and 24 to 27.

### V. Denial of Walker's request for directed verdict
Walker complains that the trial court denied her motion for a directed verdict. Specifically, she argues that she should have had the opportunity to orally argue her motion, which was an opportunity afforded to the defendant but not to her.

The record does not reflect that Walker was denied an opportunity to argue her motion. The District was permitted to argue its motion for directed verdict orally, but Walker submitted a written argument in support of her motion, so she did not need the opportunity to make an additional oral argument. *See Dillard v. Broyles,* 633 S.W.2d 636, 645 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.) (Texas Rule of Civil Procedure 268 only requires specificity in directed verdict motions, and this can be met with an oral or written argument). She also did not object to the trial court about her argument being transmitted in writing rather than orally. *See* TEX.R.APP. P. 33.1.

We overrule Walker's points of error 4, 9, and 10.

### VI. Sufficiency of the evidence
Walker argues the evidence was not legally and factually sufficient to support the jury verdict. In reviewing a verdict for legal sufficiency, we "must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Harris Cnty. v. Norris,* 240 S.W.3d 255, 258 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998)). In reviewing a factual sufficiency complaint, we must first examine all of the evidence. *Lofton v. Tex. Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *Airgas–Sw., Inc. v. IWS Gas & Supply of Tex., Ltd.,* 390 S.W.3d 472, 478 (Tex.App.Houston [1st Dist.] 2012, pet. denied). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Marine Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Airgas–Sw.,* 390 S.W.3d at 478. The jurors are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller,* 168 S.W.3d at 819.

To prove a claim under the Whistleblower Act, an employee must prove by a preponderance of the evidence that the retaliatory conduct by the employer would not have occurred when it did if the employee had not reported the violation of law. *Zimlich,* 29 S.W.3d at 67. There is a rebuttable presumption that the report of a law violation caused the employee's termination or suspension if the termination or suspension occurs no later than 90 days after the report. TEX. GOV'T CODE ANN. § 554.004(a). If the employer presents positive evidence to rebut the presumption that the adverse employment action was due to the report, then the presumption of a causal connection between the report and termination or suspension is disregarded. *Tex. A & M Univ. v. Chambers,* 31 S.W.3d 780, 784 (Tex.App.-Austin 2000, pet. denied). Then the employee must produce evidence to support the contention that reporting the violation of law caused the employer to retaliate. *Zimlich,* 29 S.W.3d at 68.

**\*9** The District presented ample evidence to rebut the presumption that Walker was suspended and recommended for termination because she filed reports of safety and funding violations. In addition to numerous emails and letters describing Walker's poor working relationship with others associated with the Head Start program, numerous witnesses testified that she instigated conflict and problems as Head Start director. The jurors were able to weigh Bergman's testimony that he had not suspended Walker or recommended termination due to her filing the reports. *See City of Keller,* 168 S.W.3d at 819. The findings of the administrative hearing examiner attested to the same problems with Walker's conduct. There was also evidence that Walker threatened to file suit against the District if she were fired, and then dropped the threat when Bergman recommended renewal of her contract. This supports the conclusion that Walker had not necessarily filed the reports in good faith, but instead as a means of pressuring Bergman.

Accordingly, there was sufficient evidence, both legally and factually, to support the jury's verdict that Walker was not suspended for whistleblowing. We overrule Walker's points of error 18 and 22.

### VII. Jury issues

Walker questions the composition and conduct of the jury in her points of error 21 and 28. She alleges that the trial court abused its discretion by seating an alternate juror, who was only seated after she had called most of her witnesses. Additionally, she questions the propriety of the jurors sending notes to the judge regarding the length of the trial.

There is no requirement that the twelve original jurors render the ultimate verdict with no substitutions. *See Schlafly v. Schlafly,* 33 S.W.3d 863, 869–70 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (noting neither the Texas Constitution nor the Texas Rules of Civil Procedure prevent seating alternate jurors). Walker had the same opportunity to conduct voir dire on the alternate juror as on the original jurors, and she failed to object to seating the alternate juror during the trial. *See id.*(considering these factors in holding the seating of an alternate juror harmless). And jurors are allowed to communicate using notes with the trial court. *See*TEX.R. CIV. P. 285 (allowing jury to communicate with the court either orally or in writing).

Any error in replacing the original juror with an alternate or allowing the jury to send notes to the judge was harmless in this case. We cannot reverse a judgment unless the error probably caused the rendition of an improper judgment.

*See*TEX.R.APP. P. 44.1. The alternate juror in this case was seated, not after the testimony of many of her witnesses as Walker alleges, but on the second day of trial and without objection from Walker. The jury verdict against Walker was unanimous, so even if the original juror had voted in her favor, the judgment against her would stand. *See*TEX.R. CIV. P. 292 (allowing non-unanimous verdicts or unanimous verdicts by fewer than twelve jurors); *Yanes v. Sowards,* 996 S.W.2d 849, 852 (Tex.1999) (upholding trial court's decision to proceed with trial and render judgment with only eleven jurors after dismissing juror due to his grandfather's illness).

 **\*10**  Accordingly, we overrule Walker's points of error 21 and 28.

### Conclusion

Having overruled all of Walker's points of error, we affirm the judgment of the trial court.

### All Citations

Not Reported in S.W.3d, 2013 WL 3771302

Footnotes

1      Specifically, Question One stated:
> Was Doreatha Walker's report to the Texas Education Agency ("TEA") on May 3, 2009, in which she accused the District of improperly reporting Head Start students to the State to gain additional transportation funding, made in good faith and a cause of Dr. Michael Bergman's statements to the Board of Trustees at the May 19, 2009 Board meeting?

Question Two stated:
> Were Doreatha Walker's reports to the Galveston County Health Department, the Texas Department of State Health, and the Environmental Protection Agency in February 2009 regarding the presence of mold in the Kids First Head Start Building made in good faith and a cause of her suspension on May 1, 2009?

Both questions included this instruction about "good faith":
> "Good faith" means that (1) Doreatha Walker believed that the conduct reported was a violation of law, and (2) her belief was reasonable in light of her training and experience.

2      Walker's proposed jury charge questions were:
> 1. Was Doreatha Walker's report to the (TEA) on May 3, 2009, in which she accused the District of improperly reporting Head Start students to the State to gain additional transportation funding, made in good faith and a cause of Dr. Michael Bergman's statements to the Board of Trustees at the May 19, 2009 Board meeting?
> 2. Were the reports of mold to the Galveston County Health Department, Texas Department of State Health and Environmental Protection Agency the cause of Walker's suspension on May 1, 2009?

3      In point of error 3, Walker claims the trial court abused its discretion because "it allowed Hitchcock ISD to create a new 'Affirmative Defense' during the Trial to ambush and prejudice Mrs. Walker."The new affirmative defense was "when they told the Jury Plaintiff did not identify a law being violated," and she objected. She has not identified where in the record the District made this argument or where the trial court allowed it to be presented. Instead she cited the entire thirteen-volume record. As we cannot find where in the record an allegedly improper act occurred, we overrule plaintiff's point of

error 3 for failure to provide appropriate record citations. *See* TEX.R.APP. P. 38.1(i); *Saldana v. Garcia,* 155 Tex. 242, 285 S.W.2d 197, 200–01 (Tex.1955) (explaining that the appellate courts are not required to search through voluminous records to find the parties' citations for them).

4    In point of error 29, Walker claims the trial court abused its discretion because "it allowed Hitchcock ISD to bring up things ... denied in their Motion for Limine."She offers no argument to support this allegation and provides no citations for guidance beyond this bare assertion. As we cannot find where in the record an allegedly improper act occurred, we overrule plaintiff's point of error 29 for failure to reference authority or the record. *See* TEX.R.APP. P. 38.1(i).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Natural Resources Code (Refs & Annos)
    Title 4. Mines and Mining (Refs & Annos)
      Chapter 134. Texas Surface Coal Mining and Reclamation Act (Refs & Annos)
        Subchapter A. General Provisions

V.T.C.A., Natural Resources Code § 134.002

§ 134.002. Findings and Declaration of Policy

Currentness

The legislature finds and declares that:

(1) the Congress of the United States has enacted the federal Act, which provides for the establishment of a nationwide program to regulate surface coal mining and reclamation and which vests exclusive authority in the Department of the Interior over the regulation of surface coal mining and reclamation in the United States;

(2) Section 101 of the federal Act contains the finding by Congress that because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to that Act should rest with the states;

(3) Section 503 of the federal Act provides that each state may assume and retain exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in that state by obtaining approval of a state program of regulation that demonstrates that the state is able to carry out the provisions and meet the purposes of that Act;

(4) Section 503 of the federal Act further provides that a state wishing to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state must have a state law that provides for the regulation of surface coal mining and reclamation operations in accordance with that Act; and

(5) this state wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state under the federal Act.

**Credits**
Added by Acts 1995, 74th Leg., ch. 76, § 12.02(a), eff. Sept. 1, 1995.

V. T. C. A., Natural Resources Code § 134.002, TX NAT RES § 134.002
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Natural Resources Code (Refs & Annos)
    Title 4. Mines and Mining (Refs & Annos)
      Chapter 134. Texas Surface Coal Mining and Reclamation Act (Refs & Annos)
        Subchapter B. Powers and Duties of Commission

V.T.C.A., Natural Resources Code § 134.020

§ 134.020. Designation of Area as Unsuitable for Surface Coal Mining

Currentness

(a) On petition under Section 134.017, the commission shall designate an area unsuitable for all or certain types of surface coal mining operations if the commission determines that reclamation under this chapter is not technologically and economically feasible.

(b) On petition under Section 134.017, the commission may designate a surface area unsuitable for certain types of surface coal mining operations if those operations will:

(1) be incompatible with existing state or local land use plans or programs;

(2) affect fragile or historic land in which the operations could result in significant damage to important historic, cultural, scientific, and aesthetic values and natural systems;

(3) affect renewable resource lands, including aquifers and aquifer recharge areas, in which the operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products; or

(4) affect natural hazard land, including areas subject to frequent flooding and areas of unstable geology, in which the operations could substantially endanger life and property.

(c) Sections 134.016 through 134.019 and this section do not apply to land:

(1) for which substantial legal and financial commitments in a surface coal mining operation or proposed operation were in existence before January 4, 1977;

(2) on which surface coal mining operations were being conducted on August 3, 1977; or

(3) on which surface coal mining operations are being conducted under a permit issued under this chapter.

**Credits**
Added by Acts 1995, 74th Leg., ch. 76, § 12.02(a), eff. Sept. 1, 1995.

V. T. C. A., Natural Resources Code § 134.020, TX NAT RES § 134.020
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle C. Water Development
        Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
          Subchapter I. Flood Insurance (Refs & Annos)

V.T.C.A., Water Code § 16.312

§ 16.312. Purpose

Currentness

The State of Texas recognizes the personal hardships and economic distress caused by flood disasters since it has become uneconomic for the private insurance industry alone to make flood insurance available to those in need of such protection on reasonable terms and conditions. Recognizing the burden of the nation's resources, congress enacted the National Flood Insurance Act of 1968, as amended (42 U.S.C. Sections 4001 through 4127), whereby flood insurance can be made available through coordinated efforts of the federal government and the private insurance industry, by pooling risks, and the positive cooperation of state and local government. The purpose of this subchapter is to evidence a positive interest in securing flood insurance coverage under this federal program and to so procure for those citizens of Texas desiring to participate and in promoting the public interest by providing appropriate protection against the perils of flood losses and in encouraging sound land use by minimizing exposure of property to flood losses.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977.

V. T. C. A., Water Code § 16.312, TX WATER § 16.312
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle C. Water Development
        Chapter 16. Provisions Generally Applicable to Water Development (Refs & Annos)
          Subchapter I. Flood Insurance (Refs & Annos)

V.T.C.A., Water Code § 16.3145

§ 16.3145. National Flood Insurance Program Orders or Ordinances

Currentness

The governing body of each city and county shall adopt ordinances or orders, as appropriate, necessary for the city or county to be eligible to participate in the National Flood Insurance Program.

**Credits**

Added by Acts 1999, 76th Leg., ch. 1360, § 1, eff. Aug. 30, 1999.

V. T. C. A., Water Code § 16.3145, TX WATER § 16.3145
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.011

§ 26.011. In General

Currentness

Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter. Waste discharges or impending waste discharges covered by the provisions of this chapter are subject to reasonable rules or orders adopted or issued by the commission in the public interest. The commission has the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities. This chapter does not apply to discharges of oil covered under Chapter 40, Natural Resources Code.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.065, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 10, § 4, eff. March 28, 1991.

Notes of Decisions (8)

V. T. C. A., Water Code § 26.011, TX WATER § 26.011
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.023

§ 26.023. Water Quality Standards

Currentness

The commission by rule shall set water quality standards for the water in the state and may amend the standards from time to time. The commission has the sole and exclusive authority to set water quality standards for all water in the state. The commission shall consider the existence and effects of nonpoint source pollution, toxic materials, and nutrient loading in developing water quality standards and related waste load models for water quality. The commission shall develop standards based on all quality assured data obtained by the commission, including the local watershed and river basin database described by Section 26.0135(c)(2). In this section, "quality assured data" has the meaning assigned by Section 26.0135(i).

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.072, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 294, § 3, eff. June 7, 1991; Acts 1997, 75th Leg., ch. 101, § 3, eff. Sept. 1, 1997.

Notes of Decisions (1)

V. T. C. A., Water Code § 26.023, TX WATER § 26.023
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Water Code (Refs & Annos)
        Title 2. Water Administration (Refs & Annos)
            Subtitle D. Water Quality Control
                Chapter 26. Water Quality Control (Refs & Annos)
                    Subchapter E. Authority of Local Governments

V.T.C.A., Water Code § 26.171

§ 26.171. Inspection of Public Water

Currentness

A local government may inspect the public water in its area and determine whether or not:

(1) the quality of the water meets the state water quality standards adopted by the commission;

(2) persons discharging effluent into the public water located in the areas of which the local government has jurisdiction have obtained permits for discharge of the effluent; and

(3) persons who have permits are making discharges in compliance with the requirements of the permits.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.103, eff. Sept. 1, 1985.

Notes of Decisions (1)

V. T. C. A., Water Code § 26.171, TX WATER § 26.171
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter E. Authority of Local Governments

V.T.C.A., Water Code § 26.172

§ 26.172. Recommendations to Commission

Currentness

A local government may make written recommendations to the commission as to what in its judgment the water quality standards should be for any public water within its territorial jurisdiction.

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.103, eff. Sept. 1, 1985.

V. T. C. A., Water Code § 26.172, TX WATER § 26.172
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter E. Authority of Local Governments

V.T.C.A., Water Code § 26.176

§ 26.176. Disposal System Rules

Currentness

(a) Every local government which owns or operates a disposal system is empowered to and shall, except as authorized in Subsection (c) of this section, enact and enforce rules, ordinances, orders, or resolutions, referred to in this section as rules, to control and regulate the type, character, and quality of waste which may be discharged to the disposal system and, where necessary, to require pretreatment of waste to be discharged to the system, so as to protect the health and safety of personnel maintaining and operating the disposal system and to prevent unreasonable adverse effects on the disposal system.

(b) The local government in its rules may establish the charges and assessments which may be made to and collected from all persons who discharge waste to the disposal system or who have conduits or other facilities for discharging waste connected to the disposal system, referred to in this subsection as "users." The charges and assessments shall be equitable as between all users and shall correspond as near as can be practically determined to the cost of making the waste disposal services available to all users and of treating the waste of each user or class of users. The charges and assessments may include user charges, connection fees, or any other methods of obtaining revenue from the disposal system available to the local government. In establishing the charges and assessments, the local government shall take into account:

(1) the volume, type, character, and quality of the waste of each user or class of users;

(2) the techniques of treatment required;

(3) any capital costs and debt retirement expenses of the disposal system required to be paid for from the charges and assessments;

(4) the costs of operating and maintaining the system to comply with this chapter and the permits, rules, and orders of the commission; and

(5) any other costs directly attributable to providing the waste disposal service under standard, accepted cost-accounting practices.

(c) A local government may apply to the commission for an exception from the requirements of Subsections (a) and (b) of this section or for a modification of those requirements. The application shall contain the exception or modifications desired, the reasons the exception or modifications are needed, and the grounds authorized in this subsection on which the commission

should grant the application. A public hearing on the application shall be held in or near the territorial area of the local government, and notice of the hearing shall be given to the local government. If after the hearing the commission in its judgment determines that the volume, type, character, and quality of the waste of the users of the system or of a particular user or class of users of the system do not warrant the enactment and enforcement of rules containing the requirements prescribed in Subsections (a) and (b) of this section or that the enactment and enforcement of the rules would be impractical or unreasonably burdensome on the local government in relation to the public benefit to be derived, then the commission in its discretion may enter an order granting an exception to those requirements or modifying those requirements in any particular in response to circumstances shown to exist.

(d) At any time and from time to time as circumstances may require, the commission may amend or revoke any order it enters pursuant to Subsection (c) of this section. Before the commission amends or revokes such an order, a public hearing shall be held in or near the territorial area of the local government in question, and notice of the hearing shall be given to the local government. If after the hearing the commission in its judgment determines that the circumstances on which it based the order have changed significantly or no longer exist, the commission may revoke the order or amend it in any particular in response to the circumstances then shown to exist.

(e) In the event of any conflict between the provisions of this section and any other laws or parts of laws, the provisions of this section shall control.

**Credits**
Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.105, eff. Sept. 1, 1985.

Notes of Decisions (3)

V. T. C. A., Water Code § 26.176, TX WATER § 26.176
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle D. Water Quality Control
        Chapter 26. Water Quality Control (Refs & Annos)
          Subchapter E. Authority of Local Governments

V.T.C.A., Water Code § 26.180

§ 26.180. Nonpoint Source Water Pollution Control Programs of Certain Municipalities

Currentness

(a) This section applies to a municipality to which Section 42.903, Local Government Code, applies.

(b) The municipality shall exercise the powers granted under state law to a municipality to adopt ordinances to control and abate nonpoint source water pollution or to protect threatened or endangered species.

(c) The municipality by ordinance shall adopt a nonpoint source water pollution control and abatement program for the municipality and its extraterritorial jurisdiction before the municipality adopts a resolution or ordinance creating an extraterritorial jurisdiction under Section 42.903, Local Government Code. The municipality shall submit the ordinance creating the program to the commission. Notwithstanding any other law requiring the adoption of an ordinance creating an extraterritorial jurisdiction and approval by the commission, the ordinance creating the program becomes effective and is enforceable by the municipality on the 90th day after the date the municipality submits the ordinance unless the ordinance is disapproved by the commission during the 90-day period.

(d) If the commission disapproves a program submitted under Subsection (c) of this section, the commission shall make recommendations to the municipality. The municipality shall adopt and incorporate the commission's recommendations in the program.

(e) The nonpoint source water pollution controls of the municipality that had extraterritorial jurisdiction over an area before the area was included in the extraterritorial jurisdiction of another municipality under Section 42.903, Local Government Code, are effective during the 90-day period that the program is pending before the commission or until an amended program satisfactory to the commission is adopted. The municipality, including the area in its extraterritorial jurisdiction under Section 42.903, Local Government Code, shall enforce the controls during the 90-day period.

(f) If a nonpoint source water pollution control and abatement program is adopted by a river authority that has boundaries that encompass the extraterritorial jurisdiction of the municipality, the standards under the program adopted by the municipality must meet or exceed the standards under the program adopted by the river authority.

(g) The municipality may not grant a waiver to its nonpoint source water pollution control and abatement program unless granting the waiver would demonstrably improve water quality.

**Credits**

Added by Acts 1991, 72nd Leg., ch. 16, § 13.01(b), eff. Aug. 26, 1991. Renumbered from V.T.C.A., Water Code § 26.178 by Acts 1995, 74th Leg., ch. 76, § 17.01(52), eff. Sept. 1, 1995. Renumbered from V.T.C.A., Water Code § 26.179 by Acts 1997, 75th Leg., ch. 165, § 31.01(75), eff. Sept. 1, 1997.

V. T. C. A., Water Code § 26.180, TX WATER § 26.180

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# NATIONAL FLOOD INSURANCE PROGRAM

# PROGRAM DESCRIPTION

**August 1, 2002**



Federal Emergency Management Agency
Federal Insurance and Mitigation Administration

# National Flood Insurance Program

The U.S. Congress established the National Flood Insurance Program (NFIP) with the passage of the National Flood Insurance Act of 1968. The NFIP is a Federal program enabling property owners in participating communities to purchase insurance as a protection against flood losses in exchange for State and community floodplain management regulations that reduce future flood damages. Participation in the NFIP is based on an agreement between communities and the Federal Government. If a community adopts and enforces a floodplain management ordinance to reduce future flood risk to new construction in floodplains, the Federal Government will make flood insurance available within the community as a financial protection against flood losses. This insurance is designed to provide an insurance alternative to disaster assistance to reduce the escalating costs of repairing damage to buildings and their contents caused by floods.

## Purpose of this Document:

The purpose of this document is to provide a comprehensive description of the NFIP intended for use by FEMA staff and NFIP constituents. It provides an overview and history of the Program and covers all three aspects of the Program: 1) floodplain identification and mapping; 2) floodplain management; and 3) flood insurance.

NFIP activities that are described in detail in this document include:

- How flood-prone areas are identified and mapped;
- FEMA's map modernization initiative;
- The floodplain management requirements a community must adopt and enforce;
- FEMA's community assistance and monitoring activities;
- How flood insurance is sold;
- What structures are eligible for flood insurance coverage and the amount of coverage available;
- How flood insurance policies are rated and claims are paid;
- The Community Rating System; and
- The Flood Mitigation Assistance program.

This document also includes a description of the Mandatory Purchase of Flood Insurance Requirement and how this requirement relates to the NFIP. Finally, it includes a description of other FEMA programs and activities that provide mitigation assistance and planning assistance in reducing the Nation's flood losses.

A list of acronyms used in this description is provided at the end of the document.

**Federal Emergency Management Agency's Mission**.............................................1

**Overview of the NFIP** ........................................................................................1

**Flood Hazard Identification and Risk Assessment**...........................................4

The "100-year" Standard ................................................................................................5

Identifying and Mapping Flood-Prone Areas .................................................................5

Flood Mapping Process ..................................................................................................7

Depiction of Levee Systems and Floodwall Systems on NFIP Maps ...........................8

Changes to the Flood Maps ...........................................................................................9

Mapping the Coastal Barrier Resource System or Otherwise Protected Areas ...................10

Map Modernization Program...........................................................................................10

Mapping Future Conditions.............................................................................................12

**Floodplain Management**.....................................................................................12

Minimum NFIP Floodplain Management Requirements .................................................13

Ordinance Adoption ........................................................................................................16

Monitoring Community Compliance...............................................................................17

Actions Against Communities For Failure to Enforce ...................................................18

Actions Against Individual Properties For Failure to Comply .......................................19

State Floodplain Management Role..................................................................................20

Post-Disaster Assessments ..............................................................................................20

Providing Technical Assistance.......................................................................................21

**Flood Insurance**................................................................................................22

Sale of Flood Insurance ...................................................................................................22

Flood Insurance Policy ....................................................................................................23

Eligible Structures ...........................................................................................................23

Coastal Barrier Resources System...................................................................................24

Waiting Period..................................................................................................................25

Coverage Amounts ..........................................................................................................25

Other Coverages ..............................................................................................................26

Ratemaking.......................................................................................................................26

Claims...............................................................................................................................27

Marketing .........................................................................................................................29

**Mandatory Flood Insurance Purchase Requirement**......................................29

**Other NFIP Activities** ...................................................................................**31**

Community Rating System.................................................................................31

Flood Mitigation Assistance Program .............................................................33

**Other FEMA Programs**...............................................................................**34**

Hazard Mitigation Grant Program....................................................................34

Disaster Mitigation Act of 2000 .......................................................................35

Planning Initiatives............................................................................................36

**A Key To The Acronyms Used In This Document** .............................................**37**

# Federal Emergency Management Agency's Mission

The Federal Emergency Management Agency (FEMA) is an independent Federal agency reporting to the President. Founded in 1979, FEMA's mission is to:

*Lead America to prepare for, prevent, respond to, and recover from disaster.*

FEMA is responsible for coordinating the Federal response to floods, earthquakes, hurricanes, and other natural or man-made disasters and providing disaster assistance to States, communities and individuals. Disasters are declared by the President at the request of the Governor of the impacted State if the impacts of the disaster exceed the ability of the State and the affected communities to respond. For declared disasters, FEMA activates the Federal Response Plan with 27 signatory agencies. The Federal Response Plan provides a framework for the coordination of assistance to States, communities, and individuals by Federal agencies.

The Federal Insurance and Mitigation Administration (FIMA) within FEMA is responsible for administering the National Flood Insurance Program (NFIP) and administering programs that provide assistance for mitigating future damages from natural hazards.

FEMA also provides training and technical assistance to governmental and non-governmental entities in preparing for and responding to disasters and for protecting against future disasters through mitigation. In addition to a headquarters office in Washington, D.C., FEMA has 10 regional offices.

# Overview of the NFIP

Up until 1968, Federal actions related to flooding were primarily responses to significant events that resulted in using structural measures to control flooding. Major riverine flood disasters of the 1920's and 1930's led to considerable Federal involvement in protecting life and property from flooding through the use of structural flood-control projects, such as dams and levees, with the passage of the Flood Control Act of 1936. Generally, the only available financial recourse to assist flood victims was in the form of disaster assistance. Despite the billions of dollars in Federal investments in structural flood-control projects, the losses to life and property and the amount of assistance to disaster victims from floods continued to increase.

As early as the 1950's, when the feasibility of providing flood insurance was first proposed, it became clear that private insurance companies could not profitably provide such coverage at an affordable price, primarily because of the catastrophic nature of flooding and the inability to develop an actuarial rate structure which could adequately reflect the risk to which flood-prone properties are exposed. Congress proposed an experimental program designed to demonstrate the feasibility of the private sector providing flood insurance by enacting the Federal Insurance Act of 1956, but this Act was never implemented.

In recognition of increasing flood losses and disaster relief costs, major steps were taken in the 1960's to redefine Federal policy and approaches to flood control. In 1965, Congress passed the Southeast Hurricane Disaster Relief Act. The Act was as a result of the extensive damage

caused by Hurricane Betsy in the Gulf States. The Act provided financial relief for the flooding victims and authorized a feasibility study of a national flood insurance program. The resulting report was entitled, "Insurance and Other Programs for Financial Assistance to Flood Victims". Shortly thereafter, the Bureau of the Budget Task Force on Federal Flood Control in 1966 advocated a broader perspective on flood control within the context of floodplain development in House Document 465, "A Unified National Program for Managing Flood Losses". House Document 465 included five major goals:

- Improve basic knowledge about flood hazards;
- Coordinate and plan new developments in the floodplain;
- Provide technical services;
- Move toward a practical national program of flood insurance; and
- Adjust Federal flood control policy to sound criteria and changing needs.

House Document 465 and the prior feasibility study provided the basis for the National Flood Insurance Act of 1968. The primary purposes of the 1968 Act creating the NFIP are to:

- Better indemnify individuals for flood losses through insurance;
- Reduce future flood damages through State and community floodplain management regulations; and
- Reduce Federal expenditures for disaster assistance and flood control.

Section 1315 of the 1968 Act is a key provision that prohibits FEMA from providing flood insurance unless the community adopts and enforces floodplain management regulations that meet or exceed the floodplain management criteria established in accordance with Section 1361(c) of the Act. These floodplain management criteria are contained in 44 Code of Federal Regulations (CFR) Part 60, Criteria for Land Management and Use. The emphasis of the NFIP floodplain management requirements is directed toward reducing threats to lives and the potential for damages to property in flood-prone areas. Over 19,700 communities presently participate in the NFIP. These include nearly all communities with significant flood hazards.

In addition to providing flood insurance and reducing flood damages through floodplain management regulations, the NFIP identifies and maps the Nation's floodplains. Mapping flood hazards creates broad-based awareness of the flood hazards and provides the data needed for floodplain management programs and to actuarially rate new construction for flood insurance.

When the NFIP was created, the U.S. Congress recognized that insurance for "existing buildings" constructed before a community joined the Program would be prohibitively expensive if the premiums were not subsidized by the Federal Government. Congress also recognized that most of these flood-prone buildings were built by individuals who did not have sufficient knowledge of the flood hazard to make informed decisions. Under the NFIP, "existing buildings" are generally referred to as Pre-FIRM (Flood Insurance Rate Map) buildings. These buildings were built before the flood risk was known and identified on the community's FIRM. Currently about 26 percent of the 4.3 million NFIP policies in force are Pre-FIRM subsidized compared to 70 percent of the policies being subsidized in 1978.

In exchange for the availability of subsidized insurance for existing buildings, communities are required to protect new construction and substantially improved structures through adoption and enforcement of community floodplain management ordinances. The 1968 Act requires that full actuarial rates reflecting the complete flood risk be charged on all buildings constructed or substantially improved on or after the effective date of the initial FIRM for the community or after December 31, 1974, whichever is later. These buildings are generally referred to as "Post-FIRM" buildings.

Early in the Program's history, the Federal Government found that providing subsidized flood insurance for existing buildings was not a sufficient incentive for communities to voluntarily join the NFIP nor for individuals to purchase flood insurance. Tropical Storm Agnes in 1972, which caused extensive riverine flooding along the east coast, proved that few property owners in identified floodplains were insured. This storm cost the Nation more in disaster assistance than any previous disaster. For the Nation as a whole, only a few thousand communities participated in the NFIP and only 95,000 policies were in force.

As a result, Congress passed the Flood Disaster Protection Act of 1973. The 1973 Act prohibits Federal agencies from providing financial assistance for acquisition or construction of buildings and certain disaster assistance in the floodplains in any community that did not participate in the NFIP by July 1,1975, or within 1 year of being identified as flood-prone.

Additionally, the 1973 Act required that Federal agencies and federally insured or regulated lenders had to require flood insurance on all grants and loans for acquisition or construction of buildings in designated Special Flood Hazard Areas (SFHAs) in communities that participate in the NFIP. This requirement is referred to as the Mandatory Flood Insurance Purchase Requirement. The SFHA is that land within the floodplain of a community subject to a 1 percent or greater chance of flooding in any given year, commonly referred to as the 100-year flood.

The Mandatory Flood Insurance Purchase Requirement, in particular, resulted in a dramatic increase in the number of communities that joined the NFIP in subsequent years. In 1973, just over 2,200 communities participated in the NFIP. Within 4 years, approximately 15,000 communities had joined the Program. It also resulted in a dramatic increase in the number of flood insurance policies in force. In 1977, approximately 1.2 million flood insurance policies were in force, an increase of almost 900,000 over the number policies in force in December of 1973.

The authors of the original study of the NFIP thought that the passage of time, natural forces, and more stringent floodplain management requirements and building codes would gradually eliminate the number of Pre-FIRM structures. Nevertheless, modern construction techniques have extended the useful life of these Pre-FIRM buildings beyond what was originally expected. However, their numbers overall continue to decrease. The decrease in the number of Pre-FIRM buildings has been attributed to a number of factors such as, severe floods in which buildings were destroyed or substantially damaged, redevelopment, natural attrition, acquisition of flood damaged structures, as well as flood control projects.

In 1994, Congress amended the 1968 Act and the 1973 Act with the National Flood Insurance Reform Act (NFIRA). The 1994 Act included measures, among others, to:

- Increase compliance by mortgage lenders with the mandatory purchase requirement and improve coverage;
- Increase the amount of flood insurance coverage that can be purchased;
- Provide flood insurance coverage for the cost of complying with floodplain management regulations by individual property owners (Increased Cost of Compliance coverage);
- Establish a Flood Mitigation Assistance grant program to assist States and communities to develop mitigation plans and implement measures to reduce future flood damages to structures;
- Codify the NFIP's Community Rating System; and
- Require FEMA to assess its flood hazard map inventory at least once every 5 years.

Funding for the NFIP is through the National Flood Insurance Fund, which was established in the Treasury by the 1968 Act.  Premiums collected are deposited into the fund, and losses, and operating and administrative costs are paid out of the fund.  In addition, the Program has the authority to borrow up to $1.5 billion from the Treasury, which must be repaid along with interest.  Until 1986, Federal salaries and program expenses, as well as the costs associated with flood hazard mapping and floodplain management were paid by an annual appropriation from Congress.  From 1987 to 1990, Congress required the Program to pay these expenses out of premium dollars.  When expressed in current dollars, $485 million of policyholder premiums were transferred to pay salary and other expenses of the Program.  Beginning in 1991, a Federal policy fee of $25 dollars, which was increased to $30 in 1995, is applied to most policies in order to generate the funds for salaries, expenses, and mitigation costs.

The three basic components of the Program – identifying and mapping flood-prone communities, the requirement that communities adopt and enforce floodplain management regulations, and the provision of flood insurance – are described in detail below.  Other aspects and components of the Program, including the Mandatory Purchase Requirement, the Community Rating System and the Flood Mitigation Assistance program, are also described.

# Flood Hazard Identification and Risk Assessment

The Director of FEMA is required by statute to identify and map the Nation's flood-prone areas and to establish flood-risk zones in such areas.  Flood hazard maps have been issued for over 19,200 communities at a cost of over $1.5 billion (actual dollars) [$2.8 billion in 2001 dollars]. To date, approximately 100,000 flood map panels have been produced depicting approximately 150,000 square miles of floodplain areas.

The FEMA flood hazard maps are used an estimated 15 million times annually for State and community floodplain management regulations, for calculating flood insurance premiums, and for determining whether property owners are required by law to obtain flood insurance as a condition of obtaining mortgage loans or other Federal or federally related financial assistance. FEMA's flood hazard maps are also used by States and communities for emergency management

and for land use and water resources planning and by Federal agencies implementing Executive Order 11988, Floodplain Management for Federal actions proposed in or affecting floodplains.

## The "100-year" Standard

The NFIP would not be able to offer insurance at affordable rates without the existence of risk management (floodplain management) to reduce flood losses. In order to assess and manage the flood risk, a national standard was needed. The U.S. Department of Housing and Urban Development, which initially administered the NFIP before FEMA was created, began its administration of the NFIP by calling on a group of experts to advise the agency as to the best standard to be used as the basis for risk assessment, insurance rating, and floodplain management for the Program. After extensive study and coordination with Federal and State agencies, this group recommended the 1-percent-annual-chance flood (also referred to as the 100-year or "Base Flood") be used as the standard for the NFIP.

The 1-percent-annual-chance flood was chosen on the basis that it provides a higher level of protection while not imposing overly stringent requirements or the burden of excessive costs on property owners. The 1-percent-annual-chance flood (or 100-year flood) represents a magnitude and frequency that has a statistical probability of being equaled or exceeded in any given year, or, stated alternatively, the 100-year flood has a 26 percent (or 1 in 4) chance of occurring over the life of a 30-year mortgage.

In 1973, the Senate Committee on Banking, Housing and Urban Affairs, which had oversight responsibility for the NFIP, heard arguments on both sides on the appropriateness of the 100-year base flood standard. The Committee concluded that the 1-percent-annual-chance flood was reasonable and consistent with national objectives in reducing flood losses. In 1981, the Office of Management and Budget (OMB) directed FEMA to review the use of the 1-percent-annual-chance flood as part of the President's 1981 Task Force on Regulatory Relief. In its report to OMB, FEMA reaffirmed the overwhelming support for the Base Flood standard in responses from the public and private sector.

The 1-percent-annual-chance flood is a regulatory standard used by Federal agencies, and most States, to administer floodplain management programs. The 1-percent-annual-chance flood standard has been used since the inception of the NFIP and is used for floodplain management purposes in all of the 19,200 participating communities that have been issued flood hazard maps.

## Identifying and Mapping Flood-Prone Areas

To meet the objective that studies be conducted to accurately assess the flood risk within each flood-prone community, the 1968 Act called for: 1) the identification and publication of information within five years for all floodplain areas that have special flood hazards; and 2) the establishment of flood-risk zones in all such areas to be completed over a 15-year period following passage of the Act.

When the NFIP was initially established, communities had to have been mapped and have flood-risk zones established before they could participate in the Program. Within the first year of

NFIP's operation, it became evident that the time required to complete the detailed flood insurance studies would markedly delay implementation of the Program in many flood-prone communities. As a result, an interim means for more rapid community participation in the NFIP had to be provided. The Housing and Urban Development Act of 1969 expanded participation by authorizing an Emergency Program under which insurance coverage could be provided at non-actuarial, federally subsidized rates in limited amounts during the period prior to completion of a community's Flood Insurance Study (FIS).

Until an FIS could be conducted, Flood Hazard Boundary Maps, which delineated the boundaries of the community's SFHAs, were prepared using approximate methods. These methods identified on an approximate basis a 1-percent-annual-chance floodplain, but did not include the determination of Base Flood Elevations (BFEs) (100-year flood elevations), flood depths, or floodways. The Flood Hazard Boundary Map was intended to assist communities in managing floodplain development, and to assist insurance agents and property owners in identifying those areas where the purchase of flood insurance was advisable.

FISs that use detailed hydrologic and hydraulic analyses to develop BFEs and designate floodways and risk zones for developed areas of the floodplain were subsequently produced for most NFIP communities. Once more detailed risk data were provided to communities, the community could enter the Regular Program whereby the community is required to adopt more comprehensive floodplain management requirements and owners of structures could purchase higher amounts of insurance.

In producing and updating FISs, FEMA typically uses a combination of two study approaches (approximate and detailed) in identifying a community's flood hazards. Detailed study methods typically employ the use of engineering models and, at a minimum, result in the determination of BFEs or flood depths and floodways that will be displayed on the FIRM. In general, the decision whether to use the approximate method or detailed method is based on existing and anticipated development in and near the floodplain. Flood hazard information for flooding sources that affect developed or developing areas are based on detailed studies whenever possible; approximate study methods, which are less rigorous than detailed methods and do not determine BFEs or floodways, may be used for undeveloped or sparsely developed areas.

An FIS usually generates the following flood hazard information:

- BFEs are presented as either water-surface elevations or average depths of flow above the ground surface. These elevations and depths are usually referenced to either the National Geodetic Vertical Datum of 1929 (NGVD29) or the North American Vertical Datum of 1988 (NAVD88).
- Water-surface elevations for the 10-year (10-percent-annual-chance), 50-year (2-percent-annual-chance), 100-year (1-percent-annual-chance), and 500-year (0.2-percent-annual-chance) floods.
- Boundaries of the regulatory 100-year floodway. The regulatory floodway is defined as the channel of a stream plus any adjacent floodplain areas that must be kept free of encroachment so that the entire Base Flood (100-year flood) discharge can be conveyed with no greater than a 1.0-foot increase in the BFE.

- The boundaries of the 100- and 500-year floodplains. The 100-year floodplain is referred to as the Special Flood Hazard Area (SFHA).

The results of the FIS are presented on a map, referred to as a Flood Insurance Rate Map (FIRM), and presented in the FIS report in a narrative and graphically as flood profiles attached to the narrative. FEMA determines the 1-percent-annual-chance flood, shown on the FIRMs as A Zones or V Zones, from information that obtained through consultation with the community, and from floodplain topographic surveys, detailed hydrologic and hydraulic analyses, and historic records. FEMA uses commonly accepted computer models and engineering methods that estimate hydrologic and hydraulic conditions to determine the 1-percent-annual-chance flood, to determine BFEs, and to designate flood-risk zones.

FEMA defines technical requirements, product specifications for Flood Hazard Maps and related NFIP products, and associated coordination and documentation activities in *Guidelines and Specifications for Flood Hazard Mapping Partners*, dated February 2002. The Guidelines, which are used to prepare FISs and restudies, provide information for the evaluation of riverine and alluvial fan flood hazards, coastal flooding and flood-related erosion, and flood hazards along the Great Lakes. The Guidelines also include procedures for conducting hydrologic and hydraulic analyses of a flooding source or sources in order to establish BFEs. Also, included in the Guidelines is information on process and products associated with the Cooperative Technical Partners initiative, digital Flood Insurance Rate Map (DFIRM) specifications, and the option of including a flood hazard zone reflecting future conditions on the FIRM when requested by the community.

Along rivers, streams, and lakes within the United States, FEMA computes flood elevations using computer models, statistical techniques, or both. These elevations are a function of the amount of water expected to enter a particular system by means of precipitation and runoff. The SFHAs in riverine areas are primarily identified as "A Zones" on the FIRM.

Along the coast, FEMA determines SFHAs by an analysis of storm surge, wind direction and speed, wave heights, and other factors. FEMA designates these areas along the coast as both V Zones and A Zones on the FIRM. V Zones are the more hazardous coastal flood zones because they are subject to high velocity wave action. FEMA applies the V-Zone designation to those areas along the coast where water depth and other conditions would support at least a 3-foot wave height. FEMA also considers other factors in identifying V Zones, such as wave run-up. FEMA usually designates A Zones in coastal areas landward of the V Zone. Coastal flood hazards areas mapped as A Zones can be subject to storm surge and damaging waves; however, the waves are less than 3 feet in height.

## Flood Mapping Process

Over 10,000 communities have been provided detailed FISs and have been issued FIRMs that include BFEs for Zones AE, A1-30, AH, AO, AR/AE, AR/A1-30, AR/AO, AR/AH, VE, and V1-30. Most of these NFIP communities will have FIRMs that include a combination of SFHAs that have been studied in detail with BFEs and floodway data and SFHAs that have been studied

using approximate methods which have been designated Zone A without BFEs or floodway designations.

A draft FIS can be prepared by a study contractor to FEMA under the NFIP Regulations at 44 CFR Part 66 or by appellants under 44 CFR Part 65 for the purpose of establishing or revising BFE and floodway data. FEMA reviews and modifies, as appropriate, the draft FIS to ensure it complies with established NFIP criteria. Once FEMA has received and approved the draft FIS, FEMA releases the information to the public as a Preliminary FIS and FIRM for review and comment during a statutory 90-day appeal period before proposed elevations become effective.

During the appeal period, any owner or lessee of real property within the community where the proposed elevation determination has been made may file a written appeal. The appeal must be based on a demonstration that the elevations proposed by FEMA are scientifically and/or technically incorrect. Until such time as the 90-day appeal period is completed and the community is provided with a notice of final flood elevation determination, the BFE and floodway data in the FIS are considered preliminary and subject to change. During the preparation and review of the FIS and the appeals, FEMA coordinates closely with State and local officials and presents its findings at public meetings.

## Depiction of Levee Systems and Floodwall Systems on NFIP Maps

FEMA does not design, construct, fund, or approve levee systems or floodwall systems. However, FEMA has developed stringent criteria that must be met before any system can be depicted as providing protection from the 1-percent-annual-chance flood on a FIRM. Once the criteria in the NFIP regulations have been met, FEMA will remove the property behind the levee or floodwall from the 1-percent-annual-chance floodplain. FEMA's review of a levee or floodwall system is for the sole purpose of establishing appropriate risk-zone determinations for NFIP maps and does not constitute a determination or warranty by FEMA as to how a structure or system will perform in a flood event. Because of the potentially devastating effects to life and property should a levee or floodwall fail or be overtopped, FEMA takes special care in considering the impacts of such structures on flood hazards.

FEMA recognizes only a levee system or floodwall system that meets, and continues to meet, minimum design standards that provide protection from the 1-percent-annual-chance flood. Specifically, the criteria established in 44 CFR §65.10 must be satisfied before a levee may be credited and mapped as providing protection from the 1-percent-annual-chance flood event. The criteria include:

- **Design criteria,** which address minimum freeboard above flood height, closure devices for any openings, embankment protection, embankment and foundation stability, settlement, and interior drainage. All data submitted to demonstrate compliance with these structural requirements must be certified by a registered professional engineer. In lieu of submitting these data, a Federal agency with responsibility for levee design may certify that the levee and/or levee system provides adequate protection against the 1-percent-annual-chance flood.

- **Operations plan and criteria**, which address operation of closures and interior drainage systems during a flood event. Operations for a levee system must be under the jurisdiction of a Federal or State agency, an agency created by Federal or State law, or an agency established by a community participating in the NFIP.

- **Maintenance plans and criteria** require an officially adopted maintenance plan. At a minimum, the plan must specify the maintenance activities to be performed, the frequency of their performance, and the person responsible for their performance. All maintenance activities must be performed under the jurisdiction of a Federal or State agency, an agency created by a Federal or State law, or an agency of a community participating in the NFIP.

## Changes to the Flood Maps

The flood risk information presented on the FIRM and in the FIS report forms the technical basis for the administration of the NFIP. FEMA exercises great care to ensure that the analytical methods employed in the FISs are scientifically and technically correct, that the engineering standards followed meet professional standards, and, ultimately, that the results of the FIS are accurate. Although the NFIP maps and FIS reports are prepared according to rigorous technical standards, FEMA recognizes that changes to the maps and reports may be necessary. Some reasons for the changes are due to improvements in the techniques used in assessing flood risks, changes in physical conditions in the floodplains or watersheds, and the availability of new scientific or technical data.

In addition, the limitations imposed by the scales at which the maps are prepared may result in individual properties being inadvertently included in SFHAs. FEMA has developed a process, referred to as a Letter of Map Amendment (LOMA), to correct these inadvertent inclusions. A LOMA results from an administrative procedure that involves the review of technical data submitted by the owner or lessee of property who believes the property has incorrectly been included in a designated SFHA. A LOMA amends the currently effective FEMA map and establishes that a specific property is not located in an SFHA, thereby removing the Mandatory Flood Insurance Purchase Requirement.

FEMA has similarly established administrative procedures for changing effective maps based on new or revised scientific or technical data that reflect other changes to the floodplain including projects such as fill and flood control measures. The map actions are referred to as Letter of Map Revision based on Fill (LOMR-F) and Letter of Map Revision (LOMR) respectively.

The NFIP regulations allow FEMA to revise and amend maps and FIS reports, as warranted, or after it receives requests from community officials and individual property owners. To help FEMA ensure that the maps and reports present information that accurately reflects existing flood risks, the NFIP regulations require that each NFIP community inform FEMA of any physical changes that affect BFEs in the community and, within 6 months of the date that such data are available, submit those data that show the effects of the changes.

In making revisions and amendments, FEMA must adhere to the same engineering standards applied in the preparation of the original NFIP maps and FIS reports. Therefore, when

requesting changes to NFIP maps and reports, community officials and property owners are required to submit adequate supporting data. Those data enable FEMA to review and evaluate the requests and to carry out its responsibility of ensuring that the flood-risk information presented is scientifically and technically correct.

Because LOMAs, LOMR-Fs, and LOMRs officially amend or revise the flood maps, they must reflect existing conditions, such as an "as-built" project. Communities, developers, and property owners also frequently submit requests for proposed projects in floodplain areas to FEMA for review and comment. Such requests typically include data and analyses of the pre- and post-project conditions so that FEMA can ascertain the impact on flood hazards of the proposed project. FEMA reviews such requests using the same data and engineering standards that are used for "as-built" requests. FEMA's response is provided in the form of a "conditional" LOMA, LOMR-F, or LOMR, which state whether the proposed project, if built as proposed, would justify a map revision. A conditional LOMA, LOMR-F, or LOMR does not constitute a building permit; the authority to approve projects and issue building permits lies with the local community and, in some instances, State agencies.

## Mapping the Coastal Barrier Resource System or Otherwise Protected Areas

Congress passed the Coastal Barrier Resources Act in 1982 and the Coastal Barrier Improvement Act in 1990, defining and establishing a system of protected coastal areas (including the Great Lakes) and Otherwise Protected Areas (OPAs) known as the Coastal Barrier Resources System (CBRS). The Acts provide protection to CBRS areas by prohibiting most expenditures of Federal funds in CBRS areas, including the sale of flood insurance for buildings constructed or substantially improved after the effective date of the CBRS area. These prohibitions refer to "any form of loan, grant, guarantee, insurance, payment, rebate, subsidy or any other form of direct or indirect Federal assistance," with specific and limited exceptions.

Congress designated the initial CBRS areas in 1982 and is the only entity that may authorize a revision to CBRS boundaries. Revisions to CBRSs are typically authorized by Congress based on State and local requests as well as recommendations made by the U.S. Fish and Wildlife Service. Because of the prohibition on the sale of flood insurance for buildings constructed or substantially improved after the CBRS effective date, it is critical to depict these areas on FIRMs. Thus, FEMA, in cooperation with the U.S. Fish and Wildlife Service, transfers the boundaries from Congressionally-adopted source maps, titled "Coastal Barrier Resource System," to FIRMs so that insurance agents will not inadvertently sell flood insurance policies for buildings not eligible for the purchase of flood insurance.

## Map Modernization Program

Nationwide, approximately 75 percent of the FEMA flood maps are more than 10 years old. Because flood hazards are dynamic and usually increase over time as development occurs, old maps tend to understate actual, existing flood hazards. Additionally, most of the maps were produced using now antiquated manual cartographic techniques. The primary reason for the existing backlog of outdated maps has been inadequate program funding over the past 20 years.

As a result, in 1997, FEMA designed a plan to modernize the FEMA flood-mapping program. With implementation of the modernization plan, the flood hazard information provided to communities would be more accurate and extensive, resulting in safer communities.  The plan proposes a 7-year upgrade to the flood map inventory and an enhancement of products, services, and process that entails:

- Converting Level-1 Flood Map Upgrades that entail converting the maps to a digital format for approximately 11,140 communities (55,700 map panels)—this includes resolving community-identified map maintenance needs for 16,500 map panels; upgrading existing digitally produced 20,700 map panels to the new digital FIRM specifications; and when feasible, cost-effectively enhancing the flood theme (e.g., redelineation of floodplain boundaries on updated topography or limited detailed studies to update approximate flood zones).

- Conducting Level-2 Flood Map Upgrades that entail all of the features of Level 1 Flood Map Upgrades plus incorporating updated detailed flood data through studies and restudies for approximately 4,700 communities with inadequate floodplain mapping (23,540 map panels);

- Flood map creations for approximately 2,700 flood-prone communities without flood maps (13,700 map panels);

- Integrating communities, States, and regional agencies into the mapping process through the Cooperating Technical Partners (CTP) initiative;

- Converting the maps to metric, as required by Executive Order 12770, and to the North American Vertical Datum of 1988; and

- Improving customer service to make the maps easier to obtain and use, including electronic and digital printing and distribution.

Over the proposed 7-year modernization period, the entire flood map inventory would be converted to a digital format.  Additionally, approximately 13,700 new digital map panels would be created for flood-prone communities that do not currently have flood maps.

As a cornerstone of the plan, FEMA continues to fully integrate communities, States, and regional agencies in the flood mapping process through the Cooperating Technical Partners (CTP) program.  To date, more than 115 partners have joined the CTP program, which includes two large remapping efforts for the States of New York and North Carolina.  The program initiated for the State of North Carolina is the first statewide flood mapping initiative and includes 16 other Federal agencies.  The CTP initiative allows partnering entities to perform all or portions of data collection and mapping tasks.  Cooperating Technical Partners can use the *Guidelines and Specifications for Flood Hazard Mapping Partners* in performing supporting technical analyses and preparation of flood hazard maps.

To date, funding to implement the map modernization plan has not been made available.

**Mapping Future Conditions**

Historically, flood hazard information presented on NFIP flood maps has been based on the existing conditions of the floodplain and watershed. The primary reason is that future land-use development, such as urban growth, is uncertain and difficult to predict and has not, therefore, been considered in FISs.

In recent years, a number of communities that are experiencing urban growth have expressed interest in using hydrology based on future conditions to regulate floodplain development. FEMA conducted an extensive evaluation to determine whether future conditions flood hazard information could and should be placed on FIRMs and in the accompanying FIS. On November 27, 2001, FEMA issued a final rule that allows for floodplains that reflect future conditions hydrology to be shown on the FIRM at the request of the community.

The future conditions flood hazard information will be provided for informational purposes only and it is up to the community to decide whether to use the information to regulate floodplain development. When future conditions floodplains are included on the FIRM, both the existing conditions floodplain and the future conditions floodplain will be shown. The existing conditions data will continue to be used to establish flood insurance rates and to determine if flood insurance is required. The new procedure will allow FEMA to maintain national standards while at the same time providing additional information for use by the community.

# Floodplain Management

Section 1315 of the 1968 Act prohibits FEMA from providing flood insurance to property owners unless the community adopts and enforces floodplain management criteria established under the authority of Section 1361(c) of the Act. These criteria are established in the NFIP regulations at 44 CFR §60.3. The community must adopt a floodplain management ordinance that meets or exceeds the minimum NFIP criteria. Under the NFIP, "community" is defined as:

> *"any State, or area or political subdivision thereof, or any Indian tribe or authorized tribal organization, or Alaska Native village or authorized native organization, which has authority to adopt and enforce floodplain management regulations for the areas within its jurisdiction."*

The Program has served as an important impetus for the establishment of floodplain management programs nationwide in the approximately 19,700 participating communities and most States and territories. Community participation in the NFIP is voluntary. Prior to the creation of the NFIP, floodplain management as a practice was not well established – only a few States and several hundred communities actually regulated floodplain development. For many communities, the NFIP was the community's initial exposure to land use planning and community regulations. The power to regulate development in the floodplain, including requiring and approving permits, inspecting property, and citing violations, is granted to communities under a State's police powers. FEMA has no direct involvement in the administration of local floodplain management ordinances. Since the Federal Government does not have land use authority, the NFIP is based

on the Federal government's power to spend under the Constitution rather than any Federal authority to regulate land use.

## Minimum NFIP Floodplain Management Requirements

Under the NFIP, the minimum floodplain management requirements that a community must adopt depends on the type of flood risk data (detailed FIS and FIRMs with BFEs or approximate A Zones and V Zones without BFEs) that the community has been provided by FEMA. Under the NFIP regulations, participating NFIP communities are required to regulate all development in SFHAs. "Development" is defined as:

> *"any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials."*

Before a property owner can undertake any development in the SFHA, a permit must be obtained from the community. The community is responsible for reviewing the proposed development to ensure that it complies with the community's floodplain management ordinance. Communities are also required to review proposed development in SFHAs to ensure that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law, such as 404 wetland permits from the Army Corps of Engineers or permits under the Endangered Species Act.

Under the NFIP, communities must review subdivision proposals and other proposed new development, including manufactured home parks or subdivisions to ensure that these development proposals are reasonably safe from flooding and that utilities and facilities servicing these subdivisions or other development are constructed to minimize or eliminate flood damage.

In general, the NFIP minimum floodplain management regulations require that new construction or substantially improved or substantially damaged existing buildings in A Zones must have their lowest floor (including basement) elevated to or above the Base Flood Elevation (BFE). Non-residential structures in A Zones can be either elevated or dry-floodproofed. In V Zones, the building must be elevated on piles and columns and the bottom of the lowest horizontal structural member of the lowest floor of all new construction or substantially improved existing buildings must be elevated to or above the BFE. The minimum floodplain management requirements are further described below:

For all new and substantially improved buildings in A Zones:

- All new construction and substantial improvements of residential buildings must have the lowest floor (including basement) elevated to or above the BFE.

- All new construction and substantial improvements of non-residential buildings must either have the lowest floor (including basement) elevated to or above the BFE or dry-floodproofed to the BFE. Dry floodproofing means that the building must be designed and constructed to be watertight, substantially impermeable to floodwaters.

- Buildings can be elevated to or above the BFE using fill, or they can be elevated on extended foundation walls or other enclosure walls, on piles, or on columns.
- Because extended foundation or other enclosure walls will be exposed to flood forces, they must be designed and constructed to withstand hydrostatic pressure otherwise the walls can fail and the building can be damaged. The NFIP regulations require that foundation and enclosure walls that are subject to the 100-year flood be constructed with flood-resistant materials and contain openings that will permit the automatic entry and exit of floodwaters. These openings allow floodwaters to reach equal levels on both sides of the walls and thereby lessen the potential for damage. Any enclosed area below the BFE can only be used for the parking of vehicles, building access, or storage.

In addition, to the above requirements, communities are required to select and adopt a regulatory floodway in riverine A Zones. The area chosen for the regulatory floodway must be designed to carry the waters of the 1-percent-annual-chance flood without increasing the water surface elevation of that flood more than one foot at any point. Once the floodway is designated, the community must prohibit development within that floodway which would cause any increase in flood heights. The floodway generally includes the river channel and adjacent floodplain areas that often contain forests and wetlands, an area estimated at 5.8 million acres (or over 9,000 square miles) on the FIRMs. This requirement has the effect of limiting development in the most hazardous and environmentally sensitive part of the floodplain.

For all new and substantially improved buildings in V Zones:

- All new construction and substantial improvements of buildings must be elevated on piles and columns so that the bottom of the lowest horizontal structural member of the lowest floor is elevated to or above the BFE. No fill can be used for structural support.

- All new construction and substantial improvements of buildings must be properly anchored to resist flotation, collapse, and lateral movement.

- In V Zones, the velocity water and wave action associated with coastal flooding can exert strong hydrodynamic forces on any obstruction to the flow of water. Standard foundations such as solid masonry walls or wood-frame walls will obstruct flow and be at risk to damage from high-velocity flood forces. In addition, solid foundation walls can direct coastal floodwaters into the elevated portion of the building or into adjacent buildings. The result can be structural failure of the building. For these reasons, the area below the lowest floor of the elevated building in V Zones must either be free of obstruction, or any enclosure must be constructed with open wood lattice-panels or insect screening or, be constructed with non-supporting/non-load bearing breakaway walls which meet applicable NFIP criteria. Any enclosed area below the BFE can only be used for the parking of vehicles, building access, or storage.

- In order to further protect structures from damaging wave impacts, structures must be located landward of the reach of mean high tide. Furthermore, man-made alteration of sand dunes and mangrove stands, which would increase potential flood damage, are prohibited within V Zones.

In responding to the public's desire to have an enclosed area below an elevated building, but recognizing the potential risks to lives and property, the NFIP floodplain management regulations permit certain limited uses of enclosures below the lowest floor in A Zones or V Zones.  Under the NFIP, the enclosed area below an elevated building in an A Zone or V Zone can only be used for the parking of vehicles, building access, or storage.  The allowance of these uses below the BFE is permitted because the amount of damage caused by flooding to these areas can easily be kept to a minimum by following the performance standards for the design and construction of enclosures in A Zones and V Zones described above and by using flood-resistant building materials.  To further minimize flood damages, mechanical, electrical, plumbing equipment, and other service facilities must be designed and/or located above the BFE so as to prevent damage during conditions of flooding.

The Program has led to a large reduction in potential average annual flood damages for new construction (Post-FIRM structures).  The NFIP's loss experience indicates that $1 billion in flood damages are avoided each year as a result of the NFIP floodplain management regulations for new construction.  Structures built to NFIP criteria experience 80 percent less damage through reduced frequency and severity of losses.

On the other hand, there is still significant flood damage potential for existing flood-prone buildings (Pre-FIRM structures).  According to estimates developed in a 1997 study, there are 6.6 million structures located in SFHAs identified on the FIRMs.  These 6.6 million structures include 6.2 million residential structures (representing about 8 million housing units) and 0.4 million non-residential structures.  Of the 6.6 million structures, 4.3 million Pre-FIRM structures were built prior to the issuance of a community's FIRM and the adoption of floodplain management regulations.  The problem is not with the total universe of Pre-FIRM buildings.  The 4.3 million Pre-FIRM structures have varying degrees of flood risk with just over half of these structures estimated to have their lowest floor below the BFE.  Of those Pre-FIRM structures that have their lowest floor below the BFE, a smaller group of Pre-FIRM structures have their lowest floor well below the BFE and are subject to the severest risk.

The NFIP substantial improvement requirement and substantial damage requirement provides a mechanism to ensure that a significant increase in investment in existing Pre-FIRM buildings will receive needed protection from the flood risk.  If a community determines that the cost of improvements to a home or business equals or exceeds 50% of the market value of the building, the building is considered a "substantial improvement".  If a community determines that the cost of restoring a home or business equals or exceeds 50 of the market value of the building before the damage from any origin occurred, the building is considered "substantially damaged".  A substantially improved building or substantially damaged building must meet the minimum requirements of the NFIP.  It is the community's responsibility to make substantial improvement or substantial damage determinations

The substantial damage requirement of the NFIP has been difficult for some communities to enforce.  One of the primary reasons for this has been that local officials find it difficult to enforce the requirement on property owners who do not have the financial resources to both repair and bring the buildings into compliance.  In the last ten years, financial resources to mitigate substantially damaged buildings have improved.  With passage of the National Flood Insurance Reform Act of

1994, activities that support reducing future damages to existing flood-prone buildings that have been substantially damaged now include: Increased Cost of Compliance coverage and the Flood Mitigation Assistance (FMA) program.

In addition, FEMA's Hazard Mitigation Grant Program (HMGP) under Section 404 of the Robert T. Stafford Disaster Relief and Emergency Relief Act of 1988, as amended, also provides considerable resources in reducing or eliminating future flood damages to existing structures after a flood disaster. The Disaster Mitigation Act of 2000, which amended the Stafford Act, will provide additional resources for mitigation projects and planning. These activities are further described under "Other NFIP Activities" below. FEMA's resources combined with resources from other Federal agencies, such as the Department of Housing and Urban Development and the Small Business Administration, have improved the level of compliance with the substantial damage requirement by providing property owners with the financial help they need to meet Program requirements.

A number of the existing Pre-FIRM structures experience repeat flood damages and represent a significant problem for the Program. NFIP Repetitive Loss Properties have been generally defined as those that have had at least two losses of $1,000 or more within any 10-year period. Currently there are about 45,000 insured repetitive loss structures in the country. These buildings represent a serious drain on the National Flood Insurance Fund and have accounted for nearly one-third of all paid losses. The NFIP Regulations do not include specific criteria to address repetitively damaged structures similar to the substantial damage requirement. However, FEMA has developed a Repetitive Loss Strategy to identify properties throughout the country that are most at risk for repeat flooding, and to reduce their exposure through targeted buyouts, relocation, and elevation. The strategy targets a subset of Repetitive Loss Properties that includes currently insured properties that have 2 or 3 losses where the cumulative flood insurance claim payments are greater than the building value or those properties that have had 4 or more losses. These represent around 10,000 buildings. FEMA's mitigation programs are being focused on these buildings, which will result in significant reductions in NFIP claims and overall flood damages as they are mitigated.

## Ordinance Adoption

Once FEMA provides a community with the flood hazard information upon which floodplain management regulations are based, the community is required to adopt a floodplain management ordinance that meets or exceeds the minimum NFIP requirements. FEMA can suspend communities from the Program for failure to adopt once the community is notified of being flood-prone or for failure to maintain a floodplain management ordinance that meets or exceeds the minimum requirements of the NFIP. The procedures for suspending a community from the Program for failure to adopt or maintain a floodplain management ordinance that meets or exceeds the minimum requirements of the NFIP are established in the NFIP regulations at 44 CFR §59.24(a) and (d).

Since 1968, just over 2,300 communities have been suspended for failure to adopt. Most of these communities subsequently adopted a compliant ordinance and were eventually reinstated into the Program. A community either has or does not have a compliant ordinance. There are currently 261 communities suspended from the Program for failure to adopt floodplain

management regulations that meet or exceed the minimum NFIP requirements. These are generally small communities with little or no floodplain development.

In these suspended communities, flood insurance is not available to property owners. In addition, these communities are subject to limitations on Federal financial assistance in Section 202(a) of 1973 Act which prohibits Federal officers or agencies from approving any form of loan, grant, guaranty, insurance, payment, rebate, subsidy, disaster assistance loan or grant, for acquisition or construction purposes within SFHAs. For example, this would prohibit mortgage loans guaranteed by the Department of Veterans Affairs, insured by the Federal Housing Administration, or secured by the Rural Economic and Community Development Services. In the case of disaster assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988, as amended, this prohibition only applies to assistance in connection with a flood.

Furthermore, Section 202(b) of the 1973 Act requires federally regulated lending institutions to notify the purchaser or lessee of improved real property situated in a SFHA whether Federal disaster assistance will be available when such property is being used to secure a loan that is being made, increased, extended or renewed.

## Monitoring Community Compliance

FEMA monitors communities to ensure that they have adopted an ordinance that meets or exceeds the minimum NFIP floodplain management criteria and to ensure that they are effectively enforcing their ordinance. While the NFIP floodplain management criteria are administered by States and communities through their floodplain management regulations, FEMA's role is to provide technical assistance and to monitor communities for compliance with the minimum NFIP criteria. If communities do not adequately enforce their floodplain management regulations, they can be placed on probation and potentially suspended from the Program following probation.

FEMA or States on behalf of FEMA conduct Community Assistance Visits (CAVs) and Community Assistance Contacts (CACs) to monitor community floodplain management programs. A CAV is a scheduled visit to an NFIP community for the purpose of conducting a comprehensive assessment of the community's floodplain management program. The CAV is also used as an opportunity to provide technical assistance to the community. A CAV typically involves a tour of the floodplain, a meeting with local floodplain management officials, and an examination of the community's floodplain development permit and variance files. The visit is documented in a follow-up letter to the community. If any issues are identified during the CAV, such as a possible floodplain violation or program deficiency, these issues are also addressed in the follow-up letter. The community is responsible for resolving any program deficiencies or remedying any violations identified.

A CAC is used to establish a contact with a community for the purpose of determining if any problems or issues exist and to offer the community assistance if necessary. CACs can be conducted by means of a telephone call or brief visit. While CACs are a less comprehensive assessment of a community's floodplain management program, sufficient information about the

17

community's floodplain management program can be obtained in order to determine whether there are more serious floodplain management problems in the community.

Several thousand local officials are contacted annually through CAVs, CACs, and other activities such as workshops and formal floodplain management courses.  Also, a number of local officials directly contact State or FEMA regional staff for technical assistance.  Because of resource limitations in conducting CAVs and CACs in any given year, FEMA has established criteria in prioritizing which communities will be visited or contacted.  Basically, a CAV should be conducted in communities with known or suspected program deficiencies or potential violations or communities experiencing development in the floodplain. CACs are not conducted in communities where more serious floodplain problems or issues are known or suspected.  CACs are generally used as a screening tool for determining whether a community should receive the level of attention of a CAV.  Together, they provide FEMA with an effective means of monitoring participating communities and providing technical assistance.

FEMA staff can also monitor enforcement by communities through applications for flood insurance policies, which often identify buildings that are potentially in violation of the NFIP minimum floodplain management requirements.  In addition, FEMA can monitor enforcement by communities through the LOMR (Letter of Map Revision) process.  Requests through the LOMR process to remove land from the floodplain designation based on fill may indicate that floodplain areas have been improperly filled such as in a floodway or in a coastal V Zone or that a building has its lowest floor below the BFE.  The respective FEMA regional office will follow-up with the community to determine whether the building or floodplain development is in compliance with the community's floodplain management regulations and may conduct a CAV if warranted.

## Actions Against Communities For Failure to Enforce

Most deficiencies in a community's floodplain management program or violations of local ordinances are generally due to lack of understanding of the NFIP requirements, lack of technical skills, failure to understand the rationales behind the NFIP requirements, or lack of an appreciation of the insurance implications and other consequences of a decision.  Most problems that are identified can be solved through community assistance efforts.  When this does not happen, FEMA has procedures in place to conduct an enforcement action in order to obtain compliance by the community.  If a community does not adequately enforce its floodplain management regulations, it can be placed on probation or suspended from the Program.

Following a CAV, the community must be given reasonable time to demonstrate buildings are compliant with the ordinance or it must correct any program deficiencies and remedy any violations identified during the visit. This affords the community the appropriate due process.  It also makes placing a community on probation, if necessary, and potentially suspending a community legally defensible.  As long as a community is making adequate progress toward correcting program deficiencies and remedying violations, FEMA will not initiate formal probation. It is important that the community work toward resolving its problems to ensure that future flood damages and potential loss of life are mitigated.  FEMA, however, will initiate probation in a community that does not make sufficient progress in resolving its floodplain management issues or chooses not to address them.  The procedures for placing a community on

probation or suspending a community from the Program are established in the NFIP regulations at 44 CFR §59.24(b) and (c).

When it becomes necessary to initiate probation, FEMA notifies the community that it will be placed on probation upon 120 days if the community does not demonstrate it has corrected its program deficiencies and has remedied violations to the maximum extent possible. While probation has no effect on the availability of flood insurance, an additional charge of $50 is added to the premium for each policy for a period of at least one year. A 120-day notice is provided to the community so that FEMA can then give policyholders adequate notification of the impending probation and the additional premium that will be charged. According to the NFIP regulations, FEMA must provide policyholders a notice at least 90 days before the probation is to begin. During the 120-day period, the community has the opportunity to avoid probation by demonstrating compliance with the NFIP requirements.

When a community is placed on probation, FEMA sends a letter to the community establishing new compliance deadlines. If the community fails to take remedial measures during the period of probation, the community may be suspended from the NFIP. When a community is suspended from the NFIP, flood insurance is no longer available. Also, the community is subject to limitations on Federal financial assistance described above under Ordinance Adoption.

As of July 23, 2002, there are 7 communities currently on probation nationwide. Since 1986, 107 communities have been sent a formal notice that they will be placed on probation if they do not address the program deficiencies or violations identified. Out of the 107 communities, 51 have actually been placed on probation. The remaining communities satisfactorily resolved their program deficiencies and violations before being placed on probation. Nine communities were eventually suspended from the Program for failure to enforce the community's floodplain management ordinance and 4 of those communities are currently suspended for noncompliance. The 5 remaining communities corrected their deficiencies and were reinstated into the NFIP.

Most communities comply with NFIP requirements prior to FEMA's issuing a probation notice. Communities often recognize that it is in everyone's best interest to bring the community into compliance before probation or suspension occurs. One of the primary reasons communities comply is to avoid disruptions in the real estate market that would result with the potential loss of flood insurance.

FEMA must follow its procedures for placing communities on probation or suspending communities from the Program to ensure that adequate notifications and due process are provided.

## Actions Against Individual Properties For Failure to Comply

There are certain options that can be applied to individual structures that are determined to be in violation of the community's floodplain management ordinance. If an insured structure is identified as a violation of the community's floodplain management ordinance, FEMA can have the insurance company that insures the building review the information and possibly rerate the structure to reflect

the increased risk to the structure.  This can result in significantly higher flood insurance rates on the structure, which may cause the property owner to bring the building into compliance.

In addition, Section 1316 of the 1968 Act provides for the denial of flood insurance coverage for any property which the Administrator of the FIMA finds has been declared by a duly constituted State or community to be in violation of State or community floodplain management regulations.  Section 1316 can only be implemented in instances when an appropriate authority in the State or community submits a declaration to the Administrator of the FIMA specifically stating that the structure is a violation.  Currently, there are over 500 structures that have been denied flood insurance coverage under Section 1316.

## State Floodplain Management Role

States also have a role in the NFIP and many have established State floodplain management programs.  Each State has designated an NFIP State Coordinating Agency as a point of contact for the NFIP.  Generally, the State Coordinating Agency is the State environmental or natural resources agency or the State emergency management agency.  Most States provide technical assistance to communities using FEMA funding under the Community Assistance Program (CAP) – State Support Services Element, their own funding, or a combination of the two.  CAP was developed in recognition that there were not sufficient FEMA staff resources to provide technical assistance to or monitor compliance with all the participating NFIP communities (currently 19,700) and that other resources would have to be used.

Many States have adopted floodplain management statutes and regulations and have established and funded their own floodplain management programs.  States must also have floodplain management regulations or executive orders in place that meet the minimum requirements of the NFIP for State-owned properties in SFHAs.  Where a State requires that communities adopt more restrictive requirements than the NFIP minimum requirements, such as a more restrictive floodway or additional freeboard (requiring new construction to be elevated to a level 1 or more feet higher than the BFE), the State requirements take precedence over the NFIP minimum.

## Post-Disaster Assessments

The Federal Insurance and Mitigation Administration (FIMA) and the FEMA Regional Offices conduct field investigations following major flood disasters to evaluate how well the NFIP floodplain management requirements performed.  During these investigations, a team of experts inspect disaster-induced damages to residential and commercial buildings and other structures and infrastructure; conduct forensic engineering analyses to determine causes of structural and building component failures and successes; and evaluate local design practices, construction methods and materials, building codes, and building inspection and code enforcement processes.  In addition, the teams make recommendations of actions that State and local governments, the construction industry, building code organizations, and individual property owners can take to reduce future damages and to protect lives and property in flood hazard areas.

Lessons learned by analyzing these building performance findings are also used by FIMA to fine-tune and improve NFIP Floodplain Management Regulations related to building

performance, designs, methods, and materials and to develop technical guidance. These assessments are documented by FIMA in Flood Damage Assessment Reports and Building Performance Assessment Team (BPAT) reports. The information and findings in these reports are distributed widely using a variety of methods including technical manuals, workshops, and the Internet, and through formal training courses.

## Providing Technical Assistance

In addition to technical assistance provided to communities as part of a CAV or CAC, FEMA staff provides technical and planning assistance through workshops and other contacts with community officials, property owners, builders and developers, architects and engineers, surveyors, lenders, and other NFIP constituents. Following major flood disasters, FEMA staff work closely with communities in providing technical assistance on the NFIP floodplain management requirements, particularly the substantial damage requirement, and on developing a reconstruction strategy for property impacted by floods to determine appropriate mitigation measures, such as elevation, acquisition, or relocation of flood-damaged structures.

FEMA conducts extensive training of local and State officials responsible for administering floodplain management programs. FEMA conducts a weeklong Resident Floodplain Management Course at FEMA's Emergency Management Institute (EMI) several times a year. Through this course, FEMA has trained over 1,000 State and local floodplain management officials. An Independent Study Floodplain Management Course is also offered through EMI. FEMA also offers Resident Courses at EMI on mitigation, including a course on retrofitting flood-prone residential structures and a course on coastal construction. The FEMA regional offices and States deliver field-deployed versions of the EMI Floodplain Management Course as well as conduct throughout the year a number of floodplain management workshops that they develop.

Extensive publications have been produced on the NFIP, including mitigation measures that can be undertaken to minimize or eliminate future flood damages. Examples of these publications include:

- *Homeowner's Guide to Retrofitting: Six Ways to Protect Your House from Flooding*
- *Answers to Questions about Substantially Damaged Buildings*
- *Guidance for State and Local Officials on Increased Cost of Compliance Coverage*
- *Managing Floodplain Development in Approximate Zone A Areas*
- *Coastal Construction Manual*
- *Floodplain Management Bulletin 1-98 Use of Flood Insurance Study (FIA) Data as Available Data*
- Technical Bulletin series on NFIP building criteria, such as TB 1-93, *Openings in Foundation Wall* and TB 2-93 *Flood-Resistant Materials Requirements*. (Note: there are currently 11 Technical Bulletins published.)

A complete list of publications can be found on FEMA's website at www.FEMA.gov.

FEMA and the American Planning Association  (APA) jointly developed a publication entitled *Subdivision Design in Flood Hazard Areas* that encourages use of innovative planning tools to limit development in the floodplain.  This document was published in 1997 as part of their Planning Advisory Service series in an effort to use APA's distribution system to reach out to the planning community.

FEMA also promotes and coordinates governmental and non-governmental floodplain management activities and is a consulting agency to other Federal agencies on issues relating to implementation of Executive Order (E.O.) 11988, Floodplain Management.  E.O. 11988 establishes a decision-making process for Federal agencies to avoid the long- and short-term adverse impacts on floodplains unless no practicable alternatives exist.  If there is no practicable alternative, the Federal agency must mitigate to ensure that the action minimizes any loss of life and property and loss of natural and beneficial values.

# Flood Insurance

Section 1304 of the 1968 Act authorizes the Director of FEMA to establish and carry out "*a national flood insurance program which will enable interested persons to purchase insurance against loss resulting from physical damage to or loss of real property or personal property*" resulting from flood.  Flood insurance provides the mechanism by which floodplain occupants are compensated for flood damages.  Flood insurance also provides a way for some of the financial burden of flood losses to be removed from taxpayers, such as for Federal disaster assistance and casualty loss deductions under Federal income taxes.

The number of policies in force in the United States has increased from about 95,000 before the Flood Disaster Protection Act of 1973, to 2.2 million in 1989, to over 4.3 million currently.  Any property owner of insurable property may purchase flood insurance coverage, provided that the community in which the property is located is participating in the NFIP.  The amount of flood insurance coverage in force as of March 31, 2002 is over $606 billion.

The National Flood Insurance Fund (NFIF) is the instrument through which the Federal Government fulfills its financial responsibilities for the NFIP.  In fiscal year 2001, FIMA took in about $1.5 billion in revenue, mostly from insurance premiums and a $30 Federal Policy fee on each policy sold or renewed.  Revenues from insurance premiums are used to pay losses, pay interest to the Treasury, service the policies, and pay Increased Cost of Compliance claims that provide financial resources for protecting buildings from future flood damages.  Revenue from the Federal Policy Fee supports almost all the flood mapping and floodplain management activities of the Program including the Flood Mitigation Assistance program.

## Sale of Flood Insurance

FEMA works closely with the insurance industry to facilitate the sale and servicing of flood insurance policies.  Flood insurance under the NFIP is sold to owners of property located in NFIP communities through two mechanisms: 1) through state-licensed property and casualty insurance agents and brokers who deal directly with FEMA; and 2) through private insurance companies with a program created in 1983 known as "Write Your Own" (WYO).

The WYO Program was started to increase the NFIP policy count and geographic distribution of policies by taking advantage of the private insurance industry's marketing channels and existing policy base to sell flood insurance. Eighty-six private insurance companies issue policies and adjust flood claims in their own names under the NFIP. The insurers receive an expense allowance and remit premium income in excess of this allowance to the Federal Government. FEMA pays losses through a letter of credit and sets the rates, coverage limitations, and eligibility requirements. The premium charged for NFIP flood coverage by a WYO Company is the same as that charged by the Federal Government through the direct program. Currently about 95% of the flood policies issued under the NFIP are written through the WYO Program.

The NFIP is not the only source of flood insurance. Businesses have been able to purchase flood insurance under Difference In Conditions policies from some insurance companies over the years. Flood coverage for residential homeowners has been more difficult to acquire from the private insurance market. The often-catastrophic nature of flooding has kept most insurers, outside of the NFIP, from writing this coverage. There are companies, such as Lloyds of London, that will, on a limited basis, provide flood insurance to some properties.

## Flood Insurance Policy

The Standard Flood Insurance Policy (SFIP) specifies the terms and conditions of the agreement of insurance between FEMA or a WYO company as the Insurer and the Insureds. Insureds in NFIP communities include owners, renters, builders of buildings that are in the course of construction, condominium associations, and owners of residential condominium units.

"Flood" is defined in the SFIP, in part, as:

> *"A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (at least one of which is your property) from overflow of inland or tidal waters, from unusual and rapid accumulation or runoff of surface waters from any source, or from mudflow."*

The SFIP is issued on one of three available policy forms, depending on the occupancy of the building, to provide coverage for the peril of flood.

- The Dwelling Form is used to insure 1-4 family buildings and individual residential condominium units.
- The General Property Form covers residential buildings of more than 4 families as well as non-residential risks.
- The Residential Condominium Building Association Policy (RCBAP) Form insures associations under the condominium form of ownership.

## Eligible Structures

Sections 1305 of the 1968 Act establishes the scope of the flood insurance program for eligible structures. As a priority, the 1968 Act requires that flood insurance be made available to 1-4 family residential buildings, small businesses, and churches. It gave permission after study to

extend flood insurance to other residential properties, other business properties, agricultural properties, properties occupied by private nonprofit organizations, and properties owned by State or local governments. Currently insurance is available for all these types of properties and their contents with limited exceptions. Property owners in NFIP communities may purchase flood insurance whether the building or its contents is located in or outside the floodplain.
In order to be eligible for flood insurance, a structure must have at least 2 solid walls and a roof, be principally above ground, and not entirely over water. This includes manufactured (i.e., mobile) homes that are anchored to permanent foundations and travel trailers without wheels that are anchored to permanent foundations and are regulated under the community's floodplain management and building ordinances or laws. Contents of insurable walled and roofed buildings are insurable under the policy as a separate coverage.

Buildings entirely over water or principally below ground, gas and liquid storage tanks, animals, birds, fish, aircraft, wharves, piers, bulkheads, growing crops, shrubbery, land, livestock, roads, machinery or equipment in the open, and generally motor vehicles are <u>not</u> insurable. Most contents and finishing building materials located in a basement are not covered. Similarly, this coverage limitation applies to enclosures below the lowest elevated floor of an elevated building constructed after the FIRM became effective.

Section 1316 of the 1968 Act authorizes FIMA to deny flood insurance *"for any property which the Director finds has been declared by a duly constituted state or local zoning authority, or other authorized public body, to be in violation of a state or local laws, regulations, or ordinances"*. Section 1316 is initiated when an appropriate authority in the State or community submits a declaration to the Administrator of the FIMA specifically stating that the structure is a violation. When the Administrator of the FIMA makes a finding of a valid declaration of a violation, flood insurance is not available and no new policy can be written to cover the building, nor can an existing policy be renewed.

## Coastal Barrier Resources System

The purchase of flood insurance is also limited in the Coastal Barrier Resources System. Congress passed laws limiting Federal expenditures in certain coastal areas and designating them as a part of the Coastal Barrier Resources System (CBRS) or as Otherwise Protected Areas (OPAs). In these areas, there is a prohibition for the expenditure of most Federal funds. These prohibitions refer to "any form of loan, grant, guarantee, insurance, payment, rebate, subsidy or any other form of direct or indirect Federal assistance," with specific and limited exceptions.

Older buildings constructed before dates established by the Coastal Barrier Resources Act of 1982 and the Coastal Barrier Improvement Act of 1990 remain eligible for Federal flood insurance while new construction or substantially improved structures located within these designated areas are not eligible for flood insurance. If, at the time of a loss, it is determined that a policy has been inadvertently issued on new construction or substantial improvements located in a CBRS area, any claim will be denied, the policy canceled, and the premium refunded. The CBRS areas are located in nearly 400 communities on the Atlantic and Gulf coasts and along the Great Lakes shores, and are delineated on the communities' flood maps and cover an estimated 3 million acres.

## Waiting Period

Unlike other property insurance, agents who write policies under the NFIP cannot "bind" coverage. A purchaser of flood insurance must wait 30 days from the date the application is completed and the premium presented before the policy becomes effective. A change in the waiting period from 5 days to 30 days was included as part of the National Flood Insurance Reform Act of 1994. This addressed a problem encountered where individuals with properties on larger rivers could wait until properties many miles upriver were flooding before purchasing coverage.

There are however a several exceptions to the 30-day waiting period. For example, the 30-day waiting period will not apply when a new flood insurance policy is required in connection with the making, increasing, extension, or renewal of a loan, such as a second mortgage. The 30-day waiting period will not apply when an additional amount of insurance is required during the 13-month period beginning on the effective date of a map revision. Also, the 30-day waiting period does not apply when a lender discovers that a loan that they have made is in a SFHA and is required to carry flood insurance under the Mandatory Flood Insurance Purchase Requirement.

## Coverage Amounts

Under the NFIP there are maximum amounts of coverage available under the Emergency Program and the Regular Program. Under the Emergency Program, non-actuarial, federally subsidized rates in limited amounts are available prior to completion of a community's Flood Insurance Study (FIS). Once more detailed risk data is provided to the community in the form of a FIRM and a FIS, the community is entered into the Regular Program and full limits of coverage are made available. Nearly all participating communities are in the Regular Program, and individuals can purchase flood insurance up to the following amounts.

- Residential 1-4 family unit buildings and individual residential condominium units are written under the Dwelling Form and are eligible for up to $250,000 in building coverage and up to $100,000 in personal property coverage.
- Residential buildings containing more than 4 units are eligible for up to $250,000 in building coverage and up to $100,000 on personal property.
- Non-residential buildings are eligible for up to $500,000 in building coverage and up to $500,000 on personal property written on the General Property Form.
- Under the RCBAP Form a condominium association can purchase coverage on a building, which includes all the units within the building and the improvements within the units, up to $250,000 times the number of units within the residential building. Personal property coverage on the form is limited to $100,000 per building.

The average amount of insurance coverage purchased under the NFIP is $131,670, which includes coverage for the building and its contents.

## Other Coverages

In addition to providing coverage for Building and Personal Property, the SFIP also provides Other Coverage for Debris Removal, Loss Avoidance Measures, and, under the Dwelling Form, coverage for Condominium Loss Assessments if the policy insures a condominium unit. The SFIP includes coverage for Pollution Damage if the damage results from a flood. All of these coverages are provided within the purchased policy limits.

All three policy forms provide Increased Cost of Compliance (ICC) coverage. ICC coverage provides for the payment of a claim to help pay for the increased costs to comply with State or community floodplain management laws or ordinances after a flood in which a building has been declared substantially damaged or repetitively damaged. When an insured building is damaged by a flood and the community declares the building to be substantially or repetitively damaged, thus triggering the requirement to comply with a community floodplain management ordinance, ICC will help pay for the cost to elevate, relocate, demolish, or floodproof (non-residential buildings only) up to a maximum of $20,000. This coverage is in addition to the building coverage for the repair of actual physical damages from flood under the SFIP, but the total paid cannot exceed the maximum limit set by Congress for that type of building.

The maximum limit of $20,000 will help property owners insured under the NFIP to pay for a portion or, in some cases, all of the costs of undertaking actions to protect homes and businesses from flood losses. In addition, an ICC claim payment can be used to complement and supplement funds under other mitigation programs such as the Flood Mitigation Assistance program and FEMA's Hazard Mitigation Grant Program to assist communities in implementing measures to reduce or eliminate the long-term risk of flood damage to buildings insured under the NFIP. As of November 30, 2001, approximately 689 claims have been paid under the ICC coverage to elevate, relocate, demolish, or floodproof structures for just over $7.5 million.

## Ratemaking

The 1968 Act separated the flood insurance ratemaking process into two distinct categories: subsidized rates and actuarial rates. Congress authorized the NFIP to offer policies at subsidized rates (at less than full actuarial risk rates) to existing buildings constructed on or before December 31, 1974 or before the effective date of the initial FIRM, whichever is later. Congress concluded that these buildings were built without the occupants' full knowledge and understanding of the flood risk, and to rate them using the actuarial rates might make the flood insurance prohibitively expensive. FEMA estimates that risks in this class are paying on average only 35 to 40 percent of what the full risk premium should be to fund the long-term expectation of the flood losses to the building. Only such general rating factors as flood-risk zone, occupancy type, and building type are used to rate these buildings for flood insurance. Even though premiums for policies on existing buildings are subsidized, floodplain occupants pay for at least part of the cost of the insurance and no longer need most disaster assistance. (Note: Subsidized premiums mean that the insured is paying less than their full-risk premium. The difference between this full-risk premium and the amounts the insured pays is revenue that is foregone by the NFIP. There is no annual transfer from general taxpayer revenue.)

In exchange for this subsidized insurance, participating communities must require new construction and substantially improved structures to meet the minimum requirements of the NFIP. The 1968 Act requires that FEMA charge full actuarial rates reflecting the complete flood risk to buildings constructed or substantially improved on or after the effective date of the initial FIRM for the community or after December 31, 1974, whichever is later. Once FEMA identifies the flood risk and makes the information available to communities, actuarial rating assures that those located in such areas bear the full risks associated with buildings in flood-prone areas. The flood insurance rates take into account a number of different factors including the flood-risk zone shown on the FIRM, the elevation of the lowest floor above or below the BFE, the type of building, the number of floors, and the existence of a basement or an enclosure.

The flood-risk zone and the BFE are specific factors that can differentiate the flood risk in various areas of the country. For example, FEMA designates certain shallow flooding areas as AO and AH zones and some riverine areas as A and AE zones. FEMA designates areas subject to damage by waves and storm surge as V and VE zones and usually designates coastal areas landward of the V zone as A and AE zones. This difference reflects both the lower expectation of loss and our actual loss experience for these zones.

While FEMA prints rate tables showing all possible flood risk zones and uses them for the entire country, FEMA does not show the same zones on every FIRM. For example, communities in Utah or Kansas do not have V zones because they are not subject to wave action and storm surge. However, where the same zone designation is used in two different areas of the country, it is because our engineering studies have shown that the degree of risk is very similar. Policyholders in AE and VE zones in one State are paying the same rates as policyholders in another State, if the lowest floor elevation of buildings is the same in relation to the BFE. This is because their risk of flooding is statistically the same.

The insurance aspects of the NFIP have important implications for floodplain management. Buildings that comply with community floodplain management regulations pay premiums based on flood insurance rates that are in most cases significantly lower than the subsidized rates charged Pre-FIRM buildings. However, buildings constructed in violation of the community's floodplain management ordinance pay much higher rates, which can be thousands of dollars a year for buildings substantially below the required elevations. FEMA bases the flood insurance rates for Post-FIRM structures on a building's exposure to flood damage. Based on our loss experience on older structures built before establishment of NFIP minimum floodplain management requirements, FEMA can generally expect that they will suffer as much as 5 times the flood damage that compliant new structures experience. New buildings with non-compliant ground level enclosures in coastal areas can actually represent risks that are at least as poor as the average older Pre-FIRM buildings.

## Claims

Claims under the NFIP require, as in other insurance, that the insured file a Proof of Loss. This must be submitted within 60 days of the loss, unless waived by the Administrator of the FIMA. Claims can be adjusted using either an independent adjuster or an adjuster employed by a WYO company. Under all NFIP policies, the insured pays a portion of the loss through the application

of a deductible.  In FY 2001, the NFIP paid 43,525 claims with an average claim payment of $26,079.

The largest loss payout from a single flood event occurred in June 2001 as a result of Tropical Storm Allison, the NFIP's first "billion dollar storm".   The second largest flood event in dollars paid was in Louisiana in May 1995 with payments totaling $583,952,604 and the third largest flood event in dollars paid resulted from Hurricane Floyd in September 1999 with payments totaling $433,384,943.

The long-term goal of the NFIP is to be actuarially sound, including consideration for potential catastrophic loss years.  In the near term, in establishing a fiscally sound program, the NFIP overall is intended to generate premium at least sufficient to cover expenses and losses relative to what is called the "historical average loss year".  Since the NFIP's underwriting experience does not include truly catastrophic loss years, the historical average is less than the true long-term average.  However, the premium income to the program is made up of two distinct pieces – Pre-FIRM polices charged less than full-risk premiums and Post-FIRM (and other) policies charged full-risk premiums including catastrophic loss considerations.

The NFIP's historical average loss year is approximately $700 million in loss payments. At this level, FIMA can maintain a Program that is self-supporting for that year.  The NFIP has not been capitalized, but generates surplus during less-than-average-loss years and has borrowing authority with the U.S. Treasury to cover losses in the event that policyholder funds and investment income are inadequate.  It does not use taxpayer funds to pay claims, operating expenses, or offset any shortfalls in premium from policies paying a subsidized flood insurance rate.  Having twenty-six percent of policyholders paying significantly less than full-risk premiums impedes the ability to generate surplus or to repay borrowed funds, which depends on levels of annual losses that are highly variable.

However, the possibility of borrowing funds from the Treasury would be present even if all NFIP policyholders paid full-risk premiums should a catastrophic or a series of catastrophic flood events occur.  When the NFIP borrows money, it pays the Treasury back with interest. The NFIP paid off the Treasury debt in June 2001 from a high of $922 million in 1999.  However, because of the extent of the flooding from Tropical Storm Allison in Texas and Louisiana resulting in over 30,000 claims, FEMA had to borrow funds from the Treasury.

Since 1969, the NFIP has paid $11.9 billion in losses that would otherwise have been paid by taxpayers through disaster assistance or borne by home and business owners themselves. Moreover, NFIP floodplain management and hazard identification activities have significantly reduced the frequency and severity of flood damages to buildings built in compliance with NFIP standards.  Structures built to NFIP criteria experience 80% less damage through reduced frequency and severity of losses. The NFIP floodplain management requirements are estimated to save $1 billion per year.

**Marketing**

Today, many Americans are either unaware that flood damage is not covered by their homeowner's insurance policy or they are in denial about the serious flood risks to which they are exposed.  Definitive figures on the potential market for flood insurance are difficult to obtain. A conservative estimate is that only one-third to one-half of those in SFHAs have coverage.  For a number of flood disasters in the past few years, only 10-20% of the victims in SFHAs had flood insurance coverage. The remaining 80-90% must rely on taxpayer-funded Federal disaster assistance, which is very limited, loans which must be paid back, tax write-offs, or savings to help them recover.

The insurance industry, which has been the major mechanism for the sale of flood insurance since the Program's inception, has repeatedly stated that the key to selling flood insurance is public awareness on a national scale.  Working with them, FEMA has designed and continues to refine flood insurance advertising and promotional activities to educate consumers, heighten awareness, and make the insurance agent's job easier.

FEMA's strategy for increasing the number of Americans insured against flood damage includes:

- Financial incentives for WYO insurance companies to increase and retain policyholders.
- Cover America II—a public awareness and education campaign primarily targeting consumers to stimulate interest in buying flood insurance. (The campaign also reaches insurance agents and lenders, encouraging their active involvement in flood insurance.)
- Facilitating lender compliance with statutory flood insurance requirements through training, guidance materials, and regular communication with lending regulators, government sponsored enterprises, and lender trade associations.
- NFIP training for insurance agents via live seminars and on-line training modules.
- Simplifying NFIP processes to make it easier for agents to sell and consumers to buy.
- Improving retention of policies.

# Mandatory Flood Insurance Purchase Requirement

From 1968 until the adoption of the Flood Disaster Protection Act of 1973, the purchase of flood insurance was voluntary.  Property owners could make their own decision whether to purchase flood insurance.  Unfortunately, the response nationwide to purchasing flood insurance voluntarily was less then enthusiastic.  Just over 95,000 policies were in force in 1972, and very few victims from Tropical Storm Agnes that hit that same year had flood insurance.

The 1973 Act mandated flood insurance coverage for many properties.  For the first time, regulated lending institutions could not make, increase, extend, or renew any loan secured by improved real estate located in a SFHA in a participating NFIP community unless the secured building and any personal property securing the loan were covered for the life of the loan by flood insurance.  Congress established this requirement because, after major flood disasters, it became evident that relatively few individuals in eligible communities who sustained flood damage had purchased flood insurance.

Also, Federal officers or agencies could not approve any form of loan, grant, guaranty, insurance, payment, rebate, subsidy, disaster assistance loan or grant, for acquisition or construction purposes within a SFHA in a participating community unless the building and any personal property to which such financial assistance relates were covered during the life of the property.

The Housing and Community Development Act of 1977, which amended section 202(b) of the 1973 Act, permitted regulated lending institutions to make conventional loans in a SFHA of a non-participating community. It required them to notify the purchaser or lessee of improved property situated in a SFHA of a non-participating community and used to secure a loan being made, increased, extended, or renewed, whether Federal disaster assistance for flood damage will be available.

Furthermore, Section 202(a) of the 1973 Act prohibits Federal officers or agencies from approving any form of loan, grant, guaranty, insurance, payment, rebate, subsidy, disaster assistance loan or grant, for acquisition or construction purposes within SFHAs of non-participating communities. For example, this would prohibit mortgage loans guaranteed by the Department of Veterans Affairs, insured by the Federal Housing Administration, or secured by the Rural Economic and Community Development Services. In the case of disaster assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988, as amended, this prohibition only applies to assistance in connection with a flood.

Following the multi-billion dollar flood disaster in the Midwest in 1993, Congress enacted the National Flood Insurance Reform Act of 1994. One of the purposes of the 1994 Act is to improve compliance with the mandatory purchase requirements of the NFIP by lenders, servicers, and secondary-market purchasers. Congress was concerned over the low level of insurance participation among eligible property owners and resulting increases in Federal disaster relief payments. While FEMA administers the NFIP, it has no responsibility or authority under either the 1973 Act or 1994 Act with respect to lender compliance with the Mandatory Flood Insurance Purchase Requirement – this responsibility falls on the Federal agency lender regulators and secondary-market purchasers though FEMA prepares guidance materials with respect to the NFIP and the Mandatory Flood Insurance Purchase Requirement.

The law requires Federal agency lender regulators to develop regulations to direct their federally regulated lenders not to make, increase, extend, or renew any loan on applicable property unless flood insurance is purchased and maintained. The law also addresses the responsibility of regulated lending institutions and Government-Sponsored Enterprises (GSEs) (i.e., Fannie Mae and Freddie Mac) in providing a notice of and requiring flood insurance coverage for the term of the loan on buildings located in any SFHA in participating NFIP communities.

The 1994 Act significantly tightens the 1973 Act by imposing important new obligations on both mortgage originators and servicers, including mandatory escrow requirements for flood insurance and mandatory provisions for "forced placement" of insurance. Specifically, the 1994 Act requires the force placement of flood insurance if a lender or servicer determines that the building securing the loan is not adequately insured. Also, the 1994 Act grants statutory authority to a lender or servicer to purchase flood insurance for the building and charge a

premium to the borrower if the building is in an SFHA. In addition, Congress designated for the first time in the 1994 Act a specific range of regulatory civil monetary penalties that may be imposed administratively when it is found that a "pattern or practice of committing violations" has occurred by regulated lenders.

It is the responsibility of the lender to:
- Determine whether the building offered as security for a loan is, or will be located in an SFHA;
- Document the determination using the Standard Flood Hazard Determination Form;
- Require flood insurance to the appropriate amount when necessary;
- Ensure that flood insurance is maintained during the life of the loan; and
- Ensure that flood insurance is purchased and maintained if the lender becomes aware that the building involved subsequently is located in an area that has been remapped as a SFHA.

Although the intent of the 1994 Act is to require borrowers to purchase flood insurance, the Act's directives and prohibitions are directed to federally-regulated primary lenders and to secondary market entities involved in mortgage loan transactions. The flood insurance requirement does not apply to lenders or servicers that are not federally regulated or do not sell loans to GSEs such as Fannie Mae and Freddie Mac or other GSEs.

It is a prerequisite that a designated loan have flood insurance as a condition of closing. If a borrower will not voluntarily obtain coverage and a lender is unable to force place coverage, the lender must deny the loan or exercise the sanction provisions of the loan document if the loan already has been made. A lender cannot accept a borrower's assurance that he or she will obtain insurance coverage in the future or grant the lender indemnity while seeking coverage. Closing a designated loan without flood insurance coverage in place constitutes a violation of the regulation implementing the Mandatory Purchase Requirement.

Lenders on their own initiative may require the purchase of flood insurance even if a structure is located outside the SFHA. A decision to require coverage under such circumstance is not compelled by statute. Lenders have this prerogative to require flood insurance to protect their investments.

# Other NFIP Activities

## Community Rating System

The NFIP's Community Rating System (CRS) provides discounts on flood insurance premiums in those communities that establish floodplain management programs that go beyond NFIP minimum requirements. Under the CRS, communities receive credit for more restrictive regulations, acquisition, relocation, or floodproofing of flood-prone buildings, preservation of open space, and other measures that reduce flood damages or protect the natural resources and functions of floodplains.

The CRS was implemented in 1990 to recognize and encourage community floodplain management activities that exceed the minimum NFIP standards. Section 541 of the 1994 Act amends Section 1315 of the 1968 Act to codify the Community Rating System in the NFIP, and to expand the CRS goals to specifically include incentives for reducing the risk of flood-related erosion and for encouraging measures that protect natural and beneficial floodplain functions. These goals have been incorporated into the CRS and communities now receive credit towards premium reductions for activities that contribute to them.

Under the CRS, flood insurance premium rates are adjusted to reflect the reduced flood risk resulting from community activities that meet the three goals of the CRS:

(1) Reduce flood losses, i.e.,
   - Protect public health and safety,
   - Reduce damage to property,
   - Prevent increases in flood damage from new construction,
   - Reduce the risk of erosion damage, and
   - Protect natural and beneficial floodplain functions;

(2) Facilitate accurate insurance rating; and

(3) Promote the awareness of flood insurance.

There are 10 CRS classes: Class 1 requires the most credit points and gives the largest premium reduction; Class 10 receives no premium reduction. CRS premium discounts on flood insurance range from 5 percent for Class 9 communities up to 45 percent for Class 1 communities. The CRS recognizes 18 creditable activities, organized under four categories: Public Information, Mapping and Regulations, Flood Damage Reduction, and Flood Preparedness.

For example, credits are provided for use of future conditions hydrology and more restrictive floodway standards, prohibiting fill in the floodway, and adopting compensatory storage regulations, innovative land development criteria, stormwater management regulations, other higher regulatory standards, and local floodplain management plans. Credits are also provided in the CRS for preserving open space in their natural state and for low-density zoning and for acquiring and clearing buildings from the floodplain and returning the area to open space. The 2002 *CRS Coordinator's Manual* includes a new section, "Land Development Criteria," which specifically credits community land development regulations that limit development in the floodplain or provide incentives to limit floodplain development. Communities receive credits for adopting smart growth land development criteria and for creating open space through their land development process.

There are now over 900 communities receiving flood insurance premium discounts based on their implementation of local mitigation, outreach, and educational activities that go well beyond minimum NFIP requirements. Although premium discounts are one of the benefits of participation in the CRS, these communities are carrying out important activities that save lives, reduce property damage, and protect the natural and beneficial functions of floodplains. These 900-plus communities represent a significant portion of the nation's flood risk as evidenced by

the fact that they account for over 66% of the NFIP's policy base. Communities receiving premium discounts through the CRS cover a full range of sizes from small to large, and a broad mixture of flood risks, including coastal and riverine.

The CRS – its development and implementation – has benefited from the advice and effort of Federal, State, and local officials, professionals with expertise in floodplain management and insurance, and academics.  A multidisciplinary approach led to successful implementation of the program and this same approach has been employed in reviewing and refining the CRS over the last 10 years.

## Flood Mitigation Assistance Program

The Flood Mitigation Assistance (FMA) program provides funding to assist States and communities to accomplish flood mitigation planning and implement measures to reduce future flood damages to structures.  This program is authorized under the 1994 Act.  These funds can be used before disaster strikes.

The FMA program provides funding up to $20 million a year with a 75/25 cost share.  Examples of eligible activities for planning grants include conducting local planning meetings to obtain citizen input; contracting for engineering or planning technical assistance; surveying structures at risk of flooding; and assessing repetitive losses.  Only projects for mitigation activities specified in an approved Flood Mitigation Plan are eligible for project grants.  For example, a community may determine in its plan that acquisition of structures would be the preferred alternative for floodway areas, while elevation may be more appropriate solution in other areas of the floodplain.

The purpose of FMA project grants is to assist States and communities in implementing flood mitigation projects to reduce the risk of flood damage to NFIP-insurable structures.  Examples of eligible types of projects include:

- Elevation of NFIP-insured residential structures and elevation or dry-floodproofing of non-residential structures in accordance with 44 CFR §60.3.
- Acquisition of NFIP-insured structures and underlying real property.
- Relocation of NFIP-insured structures from acquired or restricted real property to sites not prone to flood hazards.
- Demolition of NFIP-insured structures on acquired or restricted real property.
- Beach nourishment activities that focus on facilitating natural dune replenishment through the planting of native dune vegetation and/or the installation of sand fencing.  Placement of sand on beach is not eligible.
- Minor physical flood control projects that do not duplicate the flood-prevention activities of other Federal agencies that address localized flood problem areas such as stabilization of stream banks, modification of existing culverts, creation of small stormwater retention basins.  Major structural flood control structures, such as levees, dams, and seawalls are not eligible.

To be eligible for funding, a project must be:

- Cost-effective;

- Conform with applicable Federal and State regulations and executive orders;
- Be technically feasible;
- Conform with the Flood Mitigation Plan; and
- Be located physically in a participating NFIP community that is not on probation.

The 1994 Act directs FEMA to "make every effort to provide mitigation assistance for mitigation plans proposing activities for repetitive loss structures and structures that have incurred substantial damage." FEMA is focusing the FMA program on repetitive loss properties. The NFIP's Repetitive Loss Strategy is to identify properties throughout the country that are most at risk for repeat flooding, and to reduce their exposure through targeted buyouts, relocation, and elevation. Approximately 45,638 repetitive loss properties are currently insured. These buildings are projected to cost the program $200 million per year in claims. New repetitive loss properties continue to emerge each year. FEMA has identified target buildings that are currently insured and have the greatest risk. There are 8,753 buildings with four or more losses, and l,160 buildings with two or three loses that exceed building value. Most of these target buildings are single-family residences. The limited FMA program funds ($20 million) are a key resource toward achieving this goal.

For projects that directly affect individual structures, such as elevation, acquisition, or relocation, each structure must have a flood insurance policy in force. FMA will be available to States and communities for mitigation activities that may benefit insurable properties not insured under the NFIP. For minor structural flood control projects, the effectiveness of the project can be based on benefits provided to insurable structures not insured under the NFIP.

Since 1996, FMA program funds have been used to acquire 484 flood-prone structures, relocate 16 flood-prone structures, elevate 491 flood-prone structures, and dry-floodproofed 8 flood-prone non-residential structures. To date, FEMA has allocated through FMA $97.6 million for projects; $9 million for plans; and $10.8 million for technical assistance.

The predecessor to the FMA program was Section 1362 of the 1968 Act, which was also intended to address existing flood-prone structures. This provision authorized the NFIP to purchase certain insured properties that had been either substantially or repetitively damaged and transfer the land to a public agency for open space. Funds were appropriated for Section 1362 annually from 1980 until 1994, when the FMA program replaced the Section 1362 program. Over the period during which funds were available, approximately 1,400 properties were purchased at a total cost of about $51.9 million.

# Other FEMA Programs

The following are other FEMA programs and activities that provide mitigation assistance and planning assistance in reducing the Nation's flood losses.

### Hazard Mitigation Grant Program

The Hazard Mitigation Grant Program (HMGP) was created in 1988 by Section 404 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (amendments

include the Hazard Mitigation and Relocation Assistance Act of 1993 and the Disaster Mitigation Act of 2000).  The HMGP assists States and communities in implementing long-term hazard mitigation measures for all hazard types following a major disaster declaration.  A key purpose of the HMGP is to ensure that the opportunity to take critical mitigation measures to protect life and property from future disasters is not lost during recovery and reconstruction process following a disaster.

HMGP funds are made available based on 15% of the estimated Federal funds to be spent on the Public and Individual Assistance programs (minus administrative expenses) for each disaster.  States whose mitigation planning process meets enhanced criteria will be able to receive 20% funding under the regulations implementing the Disaster Mitigation Act of 2000.  As of September 2001, 5,560 projects have been approved at a total Federal expenditure of approximately $2.6 billion.

Eligible mitigation measures under the HMGP include acquisition or relocation of flood-prone structures, elevation of flood-prone structures, seismic rehabilitation of existing structures, and strengthening of existing structures against wildfire.  Additionally, up to seven percent of the HMGP funds may be used to develop State and/or local mitigation plans.

The State, as grantee, is responsible for administering the HMGP.  Communities develop HMGP project applications and apply for funds through the State.  The State notifies potential applicants of the availability of funding, defines a project selection process, ranks and prioritizes projects for funding, and forwards projects to FEMA for approval.  The applicant, or subgrantee, carries out approved projects.  The State or local government must provide a 25 percent match, which can be from a combination of cash and in-kind sources.

In response to flood hazards, FEMA's primary emphasis is on nonstructural hazard mitigation measures.  Nonstructural measures include the acquisition and demolition, relocation, elevation, or floodproofing of flood-damaged or flood-prone properties.

Since the program's inception to September 2001, FEMA has permanently eliminated or significantly reduced future flood damages for over 25,801 at-risk structures through nonstructural measures as follows: acquisition of 22,564 properties; relocation of 733 properties; and elevation of 2,504 properties.  The total Federal expenditure for these measures was $826,943,785.

## Disaster Mitigation Act of 2000

The Disaster Mitigation Act (DMA) of 2000 amended the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988.  The DMA authorizes the creation of a pre-disaster mitigation program to make grants to State, local and tribal governments.  It also includes a provision that defines mitigation planning requirements for State, local and tribal governments.  This new section (Section 322) establishes a new requirement for local and tribal mitigation plans; authorizes up to 7 percent of the HMGP funds available to a State to be used for development of State, local and tribal mitigation plans; and provides for States to receive an increased percentage of HMGP funds from 15 percent to 20 percent if, at the time of the disaster

declaration, the State has in effect a FEMA approved State Mitigation Plan that meets the criteria established in regulations.

## Planning Initiatives

In addition to providing pre-and post-disaster planning assistance to States and communities, FEMA has undertaken a number of other initiatives to encourage communities to undertake mitigation planning and to incorporate natural hazards into their comprehensive land use planning. FEMA and the American Planning Association (APA) jointly developed a publication entitled *Planning for Post-Disaster Recovery and Reconstruction* that encourages use of planning tools to guide the rebuilding process for a safer and more sustainable community. This document was published in 1998 as part of their Planning Advisory Service series in an effort to use APA's distribution system to reach out to the planning community.

FEMA also participated in and provided financial support to HUD's *Growing Smart* initiative working with APA to develop a natural hazards element for a local comprehensive or general plan. FEMA has prepared a publication on "sustainability," *Planning for a Sustainable Future, The Link Between Hazard Mitigation and Livability. A* series of "how-to" manuals on natural hazards planning is being developed for publication in Fall 2002. One of the "how-to" manuals, *Understanding Your Risks: Identifying Hazards and Estimating Losses*, was published in August 2001. FEMA expects to encourage State and community planning through the new pre-disaster mitigation provisions of Disaster Mitigation Act of 2000. Information on mitigation planning programs and guidance can be found at www.fema.gov/fima/planning.shtm.

# A Key To The Acronyms Used In This Document

APA      -  American Planning Association
BFE      -  Base Flood Elevation
BPAT    -  Building Performance Assessment Team
CAC      -  Community Assistance Contact
CAP      -  Community Assistance Program
CAV      -  Community Assistance Visit
CBRS    -  Coastal Barrier Resources System
CFR      -  Code of Federal Regulations
CRS      -  Community Rating System
CTP      -  Cooperative Technical Partners
DFIRM  -  Digital Flood Insurance Rate Map
DMA      -  Disaster Mitigation Act of 2000
EMI       -  Emergency Management Institute
E.O.       -  Executive Order
FEMA   -  Federal Emergency Management Agency
FIA        -  Federal Insurance Administration
FIMA     -  Federal Insurance and Mitigation Administration
FIRM    -  Flood Insurance Rate Map
FIS        -  Flood Insurance Study
FMA      -  Flood Mitigation Assistance program
GSE       -  Government-Sponsored Enterprise
HMGP  -  Hazard Mitigation Grant Program
HUD     -   Housing and Urban Development (Department of)
ICC       -  Increased Cost of Compliance
LOMA  -  Letter of Map Amendment
LOMR  -  Letter of Map Revision
LOMR-F- Letter of Map Revision based on Fill
NFIP      -  National Flood Insurance Fund
NFIP     -  National Flood Insurance Program
NFIRA  -  National Flood Insurance Reform Act
OMB      -  Office of Management and Budget
RCBAP  -  Residential Condominium Building Association Policy
OPAs     -  Otherwise Protected Areas
SFHA     -  Special Flood Hazard Area
SFIP       -  Standard Flood Insurance Policy
TB         -  Technical Bulletin
WYO     -  Write-Your-Own

# Texas Nonpoint Source Management Program



**Texas Commission on Environmental Quality**

**Texas State Soil and Water Conservation Board**

SFR-068/04

December 2005

When your publication is complete,
Agency Communications will put the page
containing the agency logo, other agency
information, and the ADA statement here.

# Texas Nonpoint Source Management Program



# 2005



Prepared by the

Texas Commission on Environmental Quality
and the
Texas State Soil and Water Conservation Board



SFR-068/04
December 2005

# Contents

**Chapter 1  Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Nine Elements of Texas' NPS Management Program . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Major Issues Facing Water Quality in Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Chapter 2  Texas' Plan for Nonpoint Source Pollution Management** . . . . . . . . . . . 9

The Nonpoint Source Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      State Priorities for CWA §319 Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      Resource Leveraging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Clean Water Act State Revolving Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Partnerships for Conducting Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Goals for NPS Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      Long-Term Goal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      Short-Term Goals and Milestones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Chapter 3 Texas' Watershed Approach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A Watershed Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      Managing Surface Water by Geographic Area . . . . . . . . . . . . . . . . . . . . . . . . 18
      The Water Quality Management Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      Standards and Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      Assessment and Targeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      Strategies for Protecting and Improving Water Quality . . . . . . . . . . . . . . . . . . 32
      Implementing Plans to Restore Water Quality . . . . . . . . . . . . . . . . . . . . . . . . 35

A Joint Effort-Stakeholder Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Gauging Success . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Chapter 4  Coordination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Interstate and International Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      Interstate Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      International Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      Environmental Protection Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      U.S. Geological Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

National Oceanic and Atmospheric Administration  . . . . . . . . . . . . . . . . . . . . . 46
U.S. Army Corps of Engineers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
U.S. Coast Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
U.S. Department of Agriculture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

State Agencies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Texas State Soil and Water Conservation Board . . . . . . . . . . . . . . . . . . . . . 48
Texas Commission on Environmental Quality  . . . . . . . . . . . . . . . . . . . . . . 48
Texas Water Development Board  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Texas Parks and Wildlife Department . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Texas Agricultural Experiment Station . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Texas Department of Agriculture  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Texas Institute for Applied Environmental Research  . . . . . . . . . . . . . . . . . . 50
Texas Water Resources Institute  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Texas Forest Service  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Texas Cooperative Extension  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Texas Department of Licensing and Regulation  . . . . . . . . . . . . . . . . . . . . . 51
Texas General Land Office  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Railroad Commission of Texas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Texas Department of Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Texas Department of State Health Services  . . . . . . . . . . . . . . . . . . . . . . . . 52

Interagency Agreements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Stakeholder Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Coordinated Monitoring  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Stakeholder Groups  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
National Natural Resources Conservation Foundation  . . . . . . . . . . . . . . . . . 55
Texas Forestry Association  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Clean Rivers Program Stakeholder Workgroup  . . . . . . . . . . . . . . . . . . . . . . 55
Clean Rivers Program Basin Steering Committees . . . . . . . . . . . . . . . . . . . . 56
Local Watershed Action Committees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
NPS Stakeholders Forum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Texas Watershed Protection Committee  . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Texas Groundwater Protection Committee  . . . . . . . . . . . . . . . . . . . . . . . . . 57
Coastal Coordination Council  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Texas Alliance of Groundwater Districts  . . . . . . . . . . . . . . . . . . . . . . . . . . 58
Soil and Water Conservation Districts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Importance of Local Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**Chapter 5 Assessment**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **67**

Surface Water Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
Protecting Surface Water Quality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
Data Collection  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
Assessing the Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Total Maximum Daily Loads (TMDLs) .............................. 75
Monitoring the Results ........................................ 79

Groundwater Assessment ............................................ 80
Measuring Groundwater Quality ..................................... 80
Aquifer Vulnerability .......................................... 81
Data Collection ............................................... 82
Assessing the Data ............................................ 82
Monitoring the Results ........................................ 84

**Chapter 6  Implementation ........................................ 85**

Surface Water Plans ............................................... 86
TMDL Implementation Plans ...................................... 88
Watershed Protection Plans ..................................... 88
Water Quality Trading ......................................... 88

Groundwater Plans ................................................. 89
Joint Groundwater Monitoring and Contamination Report .............. 89
Groundwater Protection Strategy ................................ 89
Groundwater Conservation Districts ............................. 90

Remediation of Contaminated Sites ................................. 90
Superfund Program ............................................. 91
Brownfields Program ........................................... 91
Voluntary Cleanup Programs ..................................... 91
Corrective Action Program ...................................... 92
Leaking Petroleum Storage Tank Program ......................... 92

Emergency Response and Disaster Recovery .......................... 92
Floodplain Management ......................................... 93
Emergency Response Program .................................... 94
Coastal Oil Spill Prevention and Response ........................ 95
Kills and Spills Team .......................................... 96

Hydromodification ................................................ 97
Clean Water Act § 401/404 Water Quality Certification ............. 98
Water Rights Permit Review .................................... 99

Marinas and Recreational Boating .................................. 100
The Clean Marina Initiative .................................... 100
The Clean Texas Marinas Program ............................... 101

Solid and Hazardous Waste Management ............................. 102
State Solid Waste Permitting Programs ........................... 102
The Beneficial Use Sludge Permitting Program .................... 103
The Illegal Disposal Abatement Program ......................... 104
Texas Environmental Enforcement Task Force ..................... 104

Citizen Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
Citizen Environmental Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
Composting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
Used Oil Recycling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
Oil and Gas Waste Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
The TCEQ Household Hazardous Waste Management Program . . . . . . . . . 108
Tire Disposal Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
The City of San Antonio Waste Management Programs . . . . . . . . . . . . . . . 109
City of Austin Biosolids Composting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Wastewater Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
The On-Site Sewage Facility Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
The Texas On-Site Wastewater Treatment Research Council . . . . . . . . . . . 111
The City of El Paso Reclaimed Water System . . . . . . . . . . . . . . . . . . . . . . . 111
The Brazos River Authority Technical Assistance Program . . . . . . . . . . . . . 112

Storm Water Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
State Storm Water Permitting Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
Texas Department of Transportation Storm Water Management Guidelines . 114
The City of Dallas Trinity River Corridor Project . . . . . . . . . . . . . . . . . . . . 115
The San Antonio River Tunnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
Integrated Storm Water Management Project . . . . . . . . . . . . . . . . . . . . . . . 116
The San Angelo Urban Nonpoint Source Abatement Program . . . . . . . . . . . 116

Pesticide Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Groundwater Pesticide Management Plan . . . . . . . . . . . . . . . . . . . . . . . . . . 118
Surface Water Pesticide Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
Pesticide Review Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
Agricultural Pesticide Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
The Structural Pest Control Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
Agriculture Resource Protection Authority . . . . . . . . . . . . . . . . . . . . . . . . . 122
The Agricultural Waste Pesticide Collection Program . . . . . . . . . . . . . . . . . 122

Agricultural Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
Agricultural Waste Permitting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
TSSWCB Water Quality Management Plan Program . . . . . . . . . . . . . . . . . . 124
The Dairy Outreach Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
The Texas Brush Control Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
The Agricultural Loan Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
The Private Lands Enhancement Program . . . . . . . . . . . . . . . . . . . . . . . . . . 125
The Environmental Quality Incentives Program . . . . . . . . . . . . . . . . . . . . . 126
The Watershed Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
Conservation Technical Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . 127
Conservation Reserve Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
USDA-Agricultural Research Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
The Texas Institute for Applied Environmental Research . . . . . . . . . . . . . . . 128
The Texas Water Resources Institute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
The Lower Colorado River Authority - Creekside Conservation Program . . . 129

Silvicultural Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
  The Texas Forest Service Resource Development Program . . . . . . . . . . . . . . 130
  The Forest Stewardship Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
  The Forest Land Enhancement Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Pollution Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
  The Site Visit Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
  The Small Towns Environment Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131
  The Texas Country Cleanup Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  Supplemental Environmental Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  The Clean Texas Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  Oil and Gas Waste Minimization Program . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  Texas Chemical Council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Protection for Drinking Water Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
  Underground Injection Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
  The Source Water Assessment and Protection Program . . . . . . . . . . . . . . . . 134

Aquifer Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
  The Texas Groundwater Protection Committee . . . . . . . . . . . . . . . . . . . . . . . 136
  Underground Storage Tank Installer Licensing Program . . . . . . . . . . . . . . . . 137
  Texas Department of Licensing and Regulation . . . . . . . . . . . . . . . . . . . . . . 137
  Edwards Aquifer Protection Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139
  Environmental Permitting Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
  The Railroad Commission of Texas - Oil and Gas Well Plugging Program . . 141

Wetlands Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
  The Wetlands Reserve Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
  The Texas Wetlands Conservation Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
  Wetlands Planning Efforts in Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
  Wetlands Assistance for Landowners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Coastal Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
  The Texas Coastal Management Program/Coastal Coordination Council . . . 145
  The National Estuary Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
  Coastal Habitat Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148
  The BEACH Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
  The Gulf of Mexico Community-Based Restoration Program . . . . . . . . . . . 149
  The Bilge Water Reclamation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
  Coastal Texas 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
  The Adopt-A-Beach Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Border Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
  The TCEQ Border Pollution Prevention Initiative . . . . . . . . . . . . . . . . . . . . 151
  The Border Environment Infrastructure Fund . . . . . . . . . . . . . . . . . . . . . . . 152
  The International Boundary and Water Commission . . . . . . . . . . . . . . . . . . . 152
  The Economically Distressed Areas Program . . . . . . . . . . . . . . . . . . . . . . . 153

The Colonias Initiatives Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
Border Recycles Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154
Friends of the Rio Grande . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

**Chapter 7 Educational Programs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **155**

Education Through Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
Texas Watch Volunteer Environmental Monitoring & Education Program . . 155
The Lower Colorado River Authority - Colorado River Watch Program . . . . 156
The Aquatic Experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157
The City of Denton Watershed Protection Program . . . . . . . . . . . . . . . . . . . . 157

Education Through Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Nonpoint Source Consumer Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Storm Drain Marking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Back Yard Composting and Xeriscaping . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Teaching Environmental Sciences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
Environmental News You Can Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
Publications and Videos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
Environmental Information Line . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
Small Spill Prevention Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
The Texas Cooperative Extension Agricultural Outreach Program . . . . . . . . 160
The Texas A & M University On-Site Wastewater Treatment Training Center 161
Don't Mess With Texas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
Keep Texas Beautiful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162
The Texas Wildscapes Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
The Edwards Aquifer Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
The Barton Springs/Edwards Aquifer Conservation District . . . . . . . . . . . . 164
The City of Austin's "Grow Green" and "Earth Camp" . . . . . . . . . . . . . . . . . 164
The City of Houston's WET in the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165
The City of Fort Worth Environmental Education Programs . . . . . . . . . . . . . 166
The City of San Antonio's Curbside Recycling Program . . . . . . . . . . . . . . . . 167

**Chapter 8 Best Management Practices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **168**

Definition of Best Management Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

Categories of Nonpoint Source Pollution Management . . . . . . . . . . . . . . . . . . . . . . . 168

Categories of Nonpoint Sources and Associated Pollutants . . . . . . . . . . . . . . . . . . . . 171
Major Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
Special Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

**Appendix A Certification of Authority** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **177**

TCEQ-General Counsel's Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

TSSWCB-Attorney General's Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

**Appendix B  Priority Water Bodies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **184**

Surface Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

**Appendix C  Overview of Current Priority Watersheds, Impairments, Milestones, and Estimated Timelines** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **195**

**Appendix D  Aquifer Vulnerability Ranking System** . . . . . . . . . . . . . . . . . . . . . . . **253**

**Appendix E  The History of Nonpoint Source Management** . . . . . . . . . . . . . . . . . **256**

Clean Water Act of 1972 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256
      National Urban Runoff Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
      National Pollutant Discharge Elimination System . . . . . . . . . . . . . . . . . . . . 257
      Rural Clean Water Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
      Clean Water Action Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259
      Total Maximum Daily Load Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
      National Estuary Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

Other Federal Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
      Coastal Zone Nonpoint Source Management . . . . . . . . . . . . . . . . . . . . . . . . 261
      Safe Drinking Water Act: Source Water Protection . . . . . . . . . . . . . . . . . . . 263
      Intermodal Surface Transportation Efficiency Act . . . . . . . . . . . . . . . . . . . . 263
      The Food Security Act of 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
      Federal Agriculture Improvement and Reform Act of 1996 . . . . . . . . . . . . . 264
      Farm Security and Rural Investment Act of 2002 . . . . . . . . . . . . . . . . . . . . . 264

State of Texas Nonpoint Source Control Programs . . . . . . . . . . . . . . . . . . . . . . . . . 264
      General Discharge Prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264
      Texas Local Government Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265
      Municipal Pollution Abatement Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265
      Livestock and Poultry Production Operations . . . . . . . . . . . . . . . . . . . . . . . 265
      Edwards Aquifer Protection Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266
      On-Site Sewage Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266
      Soil Conservation Laws and Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267
      Water Quality Management Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

**Appendix F Clean Water Act, § 319** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **269**

**Appendix G  Federal Consistency** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **279**

TCEQ Review of Federal Assistance Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
      Department of Commerce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
      Department of Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
      Department of Housing and Urban Development . . . . . . . . . . . . . . . . . . . . . 280

Department of the Interior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
Department of Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
General Services Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
Small Business Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
Environmental Protection Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
Department of Energy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
TCEQ Review of Federal Development Projects . . . . . . . . . . . . . . . . . . . . . . 283
USDA, Forest Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 283
USDA, Natural Resources Conservation Service/Farm Service Agency . . . . 284
Department of the Interior, Bureau of Land Management . . . . . . . . . . . . . . . 284
Department of the Interior, Bureau of Reclamation . . . . . . . . . . . . . . . . . . . . 285
Department of the Interior, Fish and Wildlife Service . . . . . . . . . . . . . . . . . . 285
Department of the Interior, Surface Mining . . . . . . . . . . . . . . . . . . . . . . . . . . 285
Department of Defense, Defense Installations . . . . . . . . . . . . . . . . . . . . . . . . 285
Department of Defense, Corps of Engineers . . . . . . . . . . . . . . . . . . . . . . . . . 285
Department of Transportation, Federal Aviation Administration . . . . . . . . . 286
Department of Transportation, U.S. Coast Guard . . . . . . . . . . . . . . . . . . . . . 286
General Services Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

**Appendix H  Funding** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **287**

Federal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Specific Funding for TCEQ Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

Funding Sources for Agricultural & Silvicultural Nonpoint Source Pollution Abatement
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

**Appendix I  Summary of Public Responses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **292**

**Appendix J  Acronyms and Abbreviations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **293**

**Appendix K  Web Sites of Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **296**

Bay and Estuary Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

Cities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

Council of Governments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297
Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297

Groundwater Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 297

Industrial Councils . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298
Interstate and International Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

River Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 298

State Agencies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

# TABLES AND FIGURES

Figure 3.1  Major River Basins and Planning Areas in Texas . . . . . . . . . . . . . . . . . . . .  20
Figure 3.2  The Water Quality Management Cycle of the Watershed Approach  . . . . .  21
Figure 3.3  Stakeholder Forums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

Table 1.1  Nonpoint Source Pollution:  Sources and Activities  . . . . . . . . . . . . . . . . . . .  7

Table 2.1  The Nonpoint Source Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Table 3.1  Categories of Use Attainment in the Water Quality Inventory  . . . . . . . . . .  29
Table 3.2  Criteria for Prioritizing TMDLs (Category 5A waters) for Development  .  31

Table 4.1  Federal, State, and Local Agreements to Facilitate Cooperation on NPS Issues
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
Table 4.2  Federal, State, and Local Programs and Activities for Assessment,
        Implementation, and Education within the Texas Nonpoint Source Pollution
        Management Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

Table 5.1  Categories of the *Texas Water Quality Inventory and 303(d) List* . . . . . . . .  74
Table 5.2  TGPC Groundwater Classification System  . . . . . . . . . . . . . . . . . . . . . . . . .  81

Table 6.1  Texas Coastal NPS Management Program. Remaining Conditions and
        Anticipated Year of Condition Resolution  . . . . . . . . . . . . . . . . . . . . . . . . .  146

Table 8.1  Best Management Practices by Category . . . . . . . . . . . . . . . . . . . . . . . . . . .  170
Table 8.2  Best Management Practices by Source . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  172

Table B.1 Priority Water Bodies - Surface Water . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  184
Table B.2 Priority Water Bodies - Groundwater . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  194

Table C.1 Milestone Summary Table  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  196
Table C.2 Individual Priority Waterbody Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  202

Table D.1 Aquifer Vulnerability Ranking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  254

# CHAPTER 1  INTRODUCTION

Water quality is degraded when storm water runoff carries pollutants such as motor oil from automobiles, fertilizers from landscapes or farms, and sediments from construction sites into downstream creeks, rivers, lakes, aquifers, and estuaries. This is nonpoint source (NPS) water pollution. Decisions made today about how to manage nonpoint sources of pollution determine the quantity and quality of water resources for future generations. A dynamic and effective nonpoint source program, implemented now, that focuses on planning, good science, and fiscal responsibility will save future generations the expense of cleaning up what we leave behind and provide good-quality water for the use and enjoyment of all Texans.

> *NPS pollution* is caused by rainfall or snowmelt moving over and through the ground. As the water moves over, or through, the ground, it picks up and carries away natural and human-made pollutants, eventually depositing them into lakes, rivers, wetlands, coastal waters, and groundwater. These pollutants include:
> - excess fertilizers, herbicides, and insecticides from agricultural lands and residential areas;
> - oil, grease, and toxic chemicals from urban runoff and energy production;
> - sediment from improperly managed construction sites, crop and forest lands, and eroding streambanks;
> - salt from irrigation practices, petroleum production, acid drainage from abandoned mines, and natural salt deposits;
> - bacteria and nutrients from livestock, pet wastes, faulty septic systems, and wildlife;
> - atmospheric deposition and hydromodification.

This report outlines Texas' comprehensive management strategy to protect and restore water impacted by nonpoint sources of pollution and is jointly developed by the Texas Commission on Environmental Quality (TCEQ) and the Texas State Soil and Water Conservation Board (TSSWCB). NPS management is a collaborative effort and the responsibility of all programs described in this document. This document represents a toolbox for the state to manage NPS pollution by listing the programs and processes throughout the state that address NPS pollution. This plan provides for the coordination of NPS related activities, establishment of statewide goals, prioritization of assessment and implementation activities, and elimination of duplication of effort among participating stakeholders.

## Nine Elements of Texas' NPS Management  Program

As prescribed by current Nonpoint Source EPA guidelines, Texas' program incorporates EPA's nine key elements of an effective program, which allow for maximum flexibility in managing NPS pollution. These elements are listed below, with a summary of how the state has addressed them in its program. Many specific examples of the state's application of the nine key elements may be found throughout this document in the

descriptions of various state programs and their management strategies for NPS pollution.

**Element 1**

*Explicit short- and long-term goals, objectives and strategies that protect surface and groundwater.*

The section "Goals for NPS Management", as described in Chapter 2, details TSSWCB and TCEQ long and short term goals of the Nonpoint Source Program. Many individual programs have also established long and short term goals that are compatible with these goals.

**Element 2**

*Working partnerships and linkages to appropriate state, interstate, tribal, regional, and local entities, private sector groups, and Federal agencies.*

Surface water and aquifers are not limited by political boundaries and, as a result, environmental solutions often cross federal, state, and local levels of responsibility. With the extent and variety of water quality issues across Texas, the need for cooperation at all levels is essential.

The state coordinates, develops, and implements the NPS program by using the existing infrastructure of the Clean Rivers Program (CRP), Soil and Water Conservation Districts (SWCDs), Texas Groundwater Protection Committee (TGPC), and the University System in order to leverage the efforts of state, federal, regional, and local entities. Through this infrastructure, the state establishes working partnerships for obtaining consensus and input on NPS issues. TCEQ and TSSWCB programs use the statewide Watershed Approach, as described in Chapter 3, to organize the participation of all stakeholders to:

- identify priority watersheds with NPS water quality problems;
- formulate the steps necessary to alleviate any known water quality problems within those watersheds; and
- secure and target resources in order to develop and implement NPS strategies that restore water quality.

A description of various agencies and stakeholder programs, along with coordination of roles and table of MOAs / MOUs between the partners, can be found in Chapter 4.

**Element 3**

*Balanced approach that emphasizes both state-wide nonpoint source programs and on-the-ground management of individual watersheds.*

Activities in Texas that address NPS pollution involve both statewide strategies and local initiatives. NPS activities are managed with a

geographical focus where work is directed at the level in which it can be most effective. For example, one of the Texas' primary statewide efforts is public outreach and education, which is accomplished through activities of the TCEQ and TSSWCB Nonpoint Source Programs. The TSSWCB educates producers throughout the state on how their activities may contribute to NPS pollution, measures they can take to minimize their impacts, and money that is available to help them implement these measures. This is accomplished through state-wide conferences, news articles, and educational brochures. The TCEQ has numerous programs throughout the agency that play significant roles in the area of statewide public education. In addition to statewide public outreach and education efforts, the Texas Clean Rivers Program and local Soil and Water Conservation Districts provide the framework for public outreach on a local watershed level. Other nonpoint source state, regional, and local management efforts are described in detail throughout this Management Program document.

**Element 4**
*Abatement of water quality impairments from nonpoint source pollution and prevention of significant threats to water quality from present and future nonpoint source activities.*

The TCEQ and TSSWCB Nonpoint Source Programs use a Watershed Approach to focus on the most significant NPS water quality problems. The *Texas Water Quality Inventory and 303(d) list* and category structure provide a basis for prioritizing assessment, implementation, and education projects to address water quality impairments from existing sources. In selecting projects for funding, the TCEQ and the TSSWCB give the highest consideration to projects which address the most significant threats to water quality and have the best potential to prevent or reduce nonpoint sources of pollution and improve water quality.

Many TSSWCB and TCEQ programs are preventive in nature or incorporate pollution prevention activities. Texas also uses regulatory approaches to prevent pollution. The TCEQ, TSSWCB, and other state programs that carry out nonpoint source management activities are described in Chapter 6.

**Element 5**
*The state program identifies waters and their watersheds impaired by nonpoint source pollution and identifies important unimpaired waters that are threatened or otherwise at risk. Further, the state establishes a process to progressively address these identified waters by conducting more detailed watershed assessments and developing watershed implementation plans, and then by implementing the plans.*

Texas routinely assesses and monitors water quality under programs administered by the TCEQ. These data are collected by federal, state, regional, and local agencies and are compiled into the Clean Water Act

§305(b) Report and §303(d) List (otherwise known as the *Texas Water Quality Inventory and 303(d) list*). The Texas Water Quality Inventory categorizes water bodies impaired by nonpoint source pollution, according to their status, and sets forth the method by which the state will approach identified nonpoint source problems. CWA§303(d)-listed water bodies are further categorized to determine the priorities for doing further water quality assessments or implementing restoration activities. This strategy is described in Chapter 3 under TCEQ's Watershed Approach.

The management strategies detailed in the Watershed Approach lay out the processes that the TCEQ will use to progressively address impaired or threatened water bodies. The TSSWCB works closely with the TCEQ in each water body impaired by agricultural or silvicultural activities to perform additional targeted water quality assessments. The TSSWCB leads the development of TMDLs, implementation plans, and watershed protection plans for water bodies primarily impacted by agricultural or silvicultural sources, and will implement practices in those watersheds to mitigate the water quality problems. The TCEQ leads the development of TMDLs, implementations plans and watershed protection plans in areas affected by all other nonpoint sources.

**Element 6**
*The state reviews, upgrades, and implements all program components required by §319(b) of the Clean Water Act, and establishes flexible, targeted, and iterative approaches to achieve and maintain beneficial uses of water as expeditiously as practicable. The state programs include:*

- *A mix of water quality-based and/or technology-based programs designed to achieve and maintain beneficial uses of water; and*
- *A mix of regulatory, non-regulatory, financial, and technical assistance as needed to achieve and maintain beneficial uses of water as expeditiously as practicable.*

The state's Watershed Approach is based on a water quality management cycle which has five phases that are iterative in nature as described in Chapter 3. If water bodies are identified during the Assessment and Targeting phase as being impaired, the state considers a variety of approaches to implement solutions.

Since the state does not have statutory authority to enact certain types of NPS regulatory measures, it must work cooperatively with local authorities to implement solutions. As noted in Key Element 2, annual meetings with the CRP partners and stakeholders are used to coordinate data collection on a regional level. CRP partners assist the state with the development of strategies for restoring water quality and are actively involved in implementation solutions.

Development of a TMDL or a watershed protection plan (WPP) are the first steps of an effective NPS implementation program. The TMDL is the scientific basis for the second step, which is the formulation of an implementation plan to restore water quality. Where a NPS TMDL has not yet been developed and approved or is not yet being developed for an impaired water body, a WPP may be developed in the absence of the TMDL. The successful implementation of these protection plans will largely be dependent on the early participation and involvement of stakeholders in the watershed. Participation and involvement of a large number of local stakeholders are critical to developing accurate and comprehensive data for each plan. Early stakeholder participation and buy-in also provides the best possible setting for implementing subsequent management strategies called for in the action plans. Chapters 5, 6, and 7 describe established implementation strategies and activities, regional and local programs and best management practices that the state and regional agencies use.

### Element 7

*The state identifies federal lands and activities which are not managed consistently with state nonpoint source program objectives. Where appropriate, the state seeks EPA assistance to help resolve issues.*

As described in Chapter 4, the state has established formal agreements with key state and federal agencies to enhance the state's ability to provide a coordinated response to needs identified in priority watersheds.

### Element 8

*The state manages and implements its nonpoint source program efficiently and effectively, including necessary financial management.*

The state takes its fiduciary responsibilities, related to the management of public funds, very seriously. The TSSWCB and TCEQ have established operating procedures and tracking systems to ensure the effective use of CWA §319 grant funds for addressing identified water quality problems. Both agencies conduct training at the beginning of all projects, with all contractors, to review what will be required of them throughout the course of the project. Agency staff maintain close contact with project managers and provide oversite throughout the course of each project, provide review of all invoices, and stay in continuous contact with the EPA project officer regarding the status of the program. In order to enhance the efficiency and effectiveness of grant management as well as strengthen policies and procedures that govern the contracting process, both agencies continually review and update contractor performance criteria, invoice review criteria, contract manager qualification criteria, and contract shells.

### Element 9

*The state periodically reviews and evaluates its nonpoint source management program using environmental and functional measures of*

*success, and revises its nonpoint source assessment and its management program at least every five years.*

The TCEQ and TSSWCB are committed to thoroughly updating the state's Nonpoint Source Management Program every five years. TSSWCB and TCEQ Nonpoint Source Program staff will produce and review the management program and provide annual updates to the management program as necessary to reflect any new activities planned through the watershed approach. These updates will serve as the basis for work plans with specific targeted output measures that can be reviewed for success at the end of the year.

## Major Issues Facing Water Quality in Texas

In response to a favorable climate, adequate water, and a strong economy, Texas' population has shown robust growth since 1900. The forecast is for continued moderate growth, with the population nearly doubling to 36,671,000 residents by 2050. Currently, agricultural irrigation accounts for the largest percentage of water use, but as the population continues to grow, combined water use by municipalities and industries is projected to surpass agricultural usage.

Physical changes in the environmental landscape can greatly increase the amount and effects of NPS pollution. For example, urban growth typically results in dramatic increases in the amount of land covered by impervious surfaces, such as buildings, roadways, and parking lots. An EPA report on coastal NPS pollution (EPA, 1993) identifies many impacts from impervious cover. These changes can result in higher runoff volumes, increased pollutant loadings, a greater potential for downstream flooding, erosion of stream channels, reduced base flows, and reduced groundwater infiltration. Urban development also results in modifications to natural drainage systems. The loss of wetlands, riparian areas, and stream buffers reduces the environment's natural ability to absorb storm flows and to filter contaminants before they reach nearby water bodies.

Effective state and local management and oversight of decentralized wastewater treatment systems are crucial to correcting and avoiding NPS problems in many developing areas where On-Site Sewage Facilities (OSSFs), or septic tanks, may be the most cost effective option available. About 25 percent of the population in the United States depend upon decentralized wastewater treatment systems or OSSFs, and these systems are expected to be used in almost 40 percent of new development, primarily in low-density urban and suburban areas. Results of a survey by the Texas On-Site Wastewater Treatment Research Council in 2000 indicated that 13 percent of OSSFs in Texas were malfunctioning. Improved operation and performance of on-site or decentralized systems are essential to NPS management.

Possible nonpoint source pollutants associated with agricultural and silvicultural activities include sediment, nutrients, pesticides, organic matter, and bacteria. Sediment, resulting from erosion from cropland, pastureland, rangeland, forest lands and stream banks, fills up ponds and drainage ditches, chokes streams, and fills in estuaries. Sediment can also carry fertilizers and pesticides to surface waters. Excess nutrients and pesticides can also be carried in solution by runoff into surface waters and can seep into groundwater. Nutrients, pesticides, and other pollutants can come from a variety of sources including over-fertilized fields, runoff from improperly managed animal operations and waste applications, inaccurate pesticide sprayer settings, and dozens of other sources. Chapter 6 discusses, in greater detail, the problems the state faces with regards to NPS pollution and some of the programs in place to address the issue. The table below lists some of the sources and activities that contribute to NPS pollution.

**Table 1.1 Nonpoint Source Pollution: Sources and Activities**

| Urban/Suburban Development | Industrial/Commercial Operations | Agricultural Operations |
| --- | --- | --- |
| Impervious Cover | Impervious Cover | Pesticides-crops |
| Storm Water Runoff | Storm Water Runoff | Fertilizers-crops |
| Construction | Materials Storage/Handling | Concentrated Animal Feeding Operations (CAFO) |
| Roadways and Vehicle Use | Leaks/Spills | |
| Pesticides: lawns/gardens | Waste Management | Silviculture |
| Fertilizers: lawns/gardens | Air Deposition | Irrigation |
| Septic Systems | Oil Field Brine Discharges | Wetland and Riparian Loss |
| Stream Channelization | Wetland and Riparian Loss | |
| Wetland and Riparian Loss | Stream/Estuary Modification | |
| Illegal Dumping | | |

Despite the abundance of water available in Texas, it is not uniformly distributed around the State. During recent periods of drought, surface water and groundwater supplies have been nearly depleted in some localized areas. Surface and groundwater supplies have already limited growth and agricultural production in some areas of the state. As the Texas population has continued to grow at a rapid pace, the need to conserve, protect, and restore surface water and groundwater supplies has never been more paramount.

The future success of reducing NPS pollution impacts will depend upon a coordinated effort of state and local officials, planners, developers, and

citizens. Technical assistance and outreach to local and regional governments is an integral component of urban NPS implementation efforts. Land use management decisions are best made in the local arena where buy-in by the affected parties is crucial to success. Government planners and zoning authorities around the United States are beginning to tie together the disciplines of urban planning with the need for water conservation, NPS pollution abatement and water quality improvement.

Other challenges to NPS pollution management in Texas are low public awareness of the issues, the size and complexity of the problem, the lack of rigorous scientific definition of NPS problems, institutional barriers to directing multiple sources of funding to a single problem, and availability or lack of awareness of funding sources other than CWA§319(h) grants to address the problems or conduct assessment activities. In addition, it is difficult, and in some cases impossible, to measure NPS pollution or to quantify in-stream load reductions due to NPS implementation activities.

Because of its diffuse nature, NPS pollution is more difficult and costly to characterize and control than point source pollution. The amount and variety of precipitation, land use, and geography all determine the effects from nonpoint source pollution. The lack of a single identifiable source of pollution sometimes makes it difficult to establish specific cause-and-effect relationships. In addition, there is a problem of cumulative impacts resulting from what may be very small problems at an individual source.

# CHAPTER 2 TEXAS' PLAN FOR NONPOINT SOURCE POLLUTION MANAGEMENT

## THE NONPOINT SOURCE PROGRAM

Because they cannot be easily distinguished, nonpoint sources of pollution are largely unregulated and a majority of the activities designed to reduce their impact on water quality falls on the states' Nonpoint Source Programs administered under CWA§319. Texas addresses the requirements of CWA§319, to manage nonpoint source pollution in surface and ground water, through the Nonpoint Source Program jointly administered by the TCEQ and the TSSWCB. The TSSWCB administers the Nonpoint Source Program for agricultural and silvicultural NPS management and the TCEQ administers the Nonpoint Source Program for all other nonpoint sources. The CWA§319 Nonpoint Source Program consists of three broad components as defined by §319(a), §319(b) and §319(h). Table 2.1, below, lists those requirements.

**Table 2.1 The Nonpoint Source Program**

| Assessment Report CWA §319(a) | Management Program CWA §319(b) | Grant Program CWA §319(h) |
|---|---|---|
| Identifies water bodies impacted by nonpoint sources that do not meet water quality standards | Identifies the BMPs and measures to reduce pollutant loadings from nonpoint sources. | Outlines application requirements, including an identification and description of the best management practices and measures |
| Identifies categories of nonpoint sources which add significant pollution to impacted water bodies | Identifies programs* to achieve implementation of the BMPs | Identifies how grant funds will be allocated |
| Describes the process for identifying best management practices and measures to control nonpoint sources | Includes a schedule with milestones for utilization of the program* implementation methods and implementation of the BMPs | Identifies priorities for grant funds |
| Identifies and describes State and local programs for controlling pollution added from nonpoint sources | Identifies sources of federal and other assistance and funding and purposes for which it will be used | States the requirement for annual reporting to the EPA regarding progress toward milestones and as appropriate, reductions in loadings and improvements in water quality |

*Programs may include: nonregulatory or regulatory programs for enforcement, technical assistance, financial assistance, education, training, technology transfer, and demonstration projects.

## State Priorities for CWA § 319 Funding

One of the tools to assist states in NPS management is the CWA§319 Nonpoint Source grant. Funding is provided to states under CWA§319(h), defined in the above chart, to implement its *Nonpoint Source Management Program*. Due to a lack of adequate resources, Texas must establish priorities for its CWA§319 grant funding. Highest priority is given to funding those projects or activities which address water bodies not meeting water quality standards due to NPS pollution, as identified in the Texas CWA§303(d) List of impaired water bodies. To ensure fiscal responsibility and adequately focus limited resources, the state's Nonpoint Source Program uses the *Texas Water Quality Inventory and 303(d) List* process to establish its priorities (see Chapter 5). Appendices B and C represent a listing of the state's priority water bodies based on the *2002 Texas Water Quality Inventory and 303(d) List*. This list will change as the *Texas Water Quality Inventory and 303(d) List* is updated.

In addition, Texas will adopt TMDLs in impaired waterbodies identified as impacted by nonpoint source pollution in the state's CWA§305(b) assessment. The state will facilitate 100 percent of the state-approved Implementation Plans developed for NPS TMDLs adopted to eliminate significant impacts to water quality from present and future activities to the extent practicable under state and federal statutes, programs, and resources. Texas will also implement Watershed Protection Plans to address NPS water quality issues which, may not have a TMDL Implementation Plan to the extent practicable under state statutes, programs, and resources. The state will continue to conduct activities to prevent the degradation of water quality. The state will also facilitate implementation of activities to restore and protect groundwater quality where feasible.

The TCEQ and TSSWCB encourage the participation of all eligible grant recipients in the CWA §319(h) grant program. Local participation in the program provides the following benefits: improves the quality and quantity of information used to identify and develop water quality restoration activities, ensures a local perspective in decision making, helps stakeholders gain insight into the nature of water quality problems and solutions, and promotes local stewardship of water resources through voluntary actions to curb or prevent nonpoint source pollution.

## Resource Leveraging

The majority of the State of Texas' annual CWA §319 grant allocation is "passed through" to political subdivisions by the TCEQ and TSSWCB through the execution of interagency or interlocal contracts. CWA§319(h) contractors are considered sub-recipients and, as such, are subject to all applicable federal regulations and statutes.

For the State's NPS Program to be effective on both a statewide and watershed level, the TCEQ and TSSWCB must work closely with other state, regional, and local organizations to implement management measures and optimize the use of all available resources. The magnitude of resources needed to restore beneficial uses and address nonpoint sources of pollution is much larger than the amount of funding available from the CWA§319(h) grant program. Therefore, the State of Texas NPS Program encourages the use of leveraged resources when feasible.

### Federal Match Requirement

The Nonpoint Source Grant Program requires that federal funds be matched forty percent (40%) with non-federal funds. "Match" refers to funds or services used to conduct a project that are not borne by grant funds. All project match must:  (1) relate directly to the project for which the match is being applied;  (2) be reasonably valued;  and (3) be supported by documentation. The cost share does not have to originate with the grant recipient but can come from individuals, outside organizations, other local governments, or state agencies as long as the source of the matching funds is non-federal and is not being used to match another federal grant program.

Matching or cost share can be financed in several ways:

### *Cash*

These are costs that relate directly to the project for which the match is being applied and which are paid by the grant recipient. This is the most common method of fulfilling the federal match requirement.

### *In-Kind Services*

In-kind services are typically defined as a donation separate from the grantee which has a cash value associated with it but may not require a cash outlay during the grant period. In-kind contributions may consist of the donation of  real property, space and equipment, or a donation of time or services directly benefitting the grant project and specifically identifiable with it. The use of "third-party" or "in-kind" donations to meet grant matching requirements is regulated in 40 CFR 30.307, 40 CFR 31.24 (6) and (7) and is also covered in OMB Circular A. Third party in-kind contributions may be necessary to accomplish program activities and are allowable under applicable cost principles if the grantee was required to pay for them.

# Clean Water Act State Revolving Fund

Another funding tool available to Texas for NPS management is the Clean Water Act State Revolving Fund (CWSRF). The Texas Water Development Board (TWDB)  can provide loans for NPS pollution abatement projects through the CWSRF at interest rates lower than the market offers. Loans can be made to towns, counties, conservation

districts, and other public agencies, as well as private individuals and non-profit organizations. A water quality based priority system is used to rank potential applicants and fund projects with the greatest environmental benefits. Some of the activities that are eligible for funding include agricultural, rural, and urban runoff control, estuary improvement, nonpoint source education, wet weather flow control including stormwater and sewer overflows that are not associated with a Texas Pollutant Discharge Elimination System (TPDES) permit. Repayments on CWSRF loans provided from non-federal sources can be used as eligible match to CWA §319(h) grant funds.

# Partnerships for Conducting Work

The State primarily uses the infrastructure of the Clean Rivers Program (CRP), Soil and Water Conservation Districts (SWCDs), Texas Groundwater Protection Committee (TGPC), and the University System to coordinate, develop, and implement its NPS Program. These entities are each charged with certain water quality stewardship responsibilities and can bring a great deal of experience related to research, assessment, laboratory analysis, and implementation and education activities. In addition, these entities conduct meetings and coordinate activities with a variety of local, regional, and state level stakeholders to pursue effective solutions to reduce or prevent nonpoint source pollution.

A group, consisting of nonpoint source stakeholders, was established to assist in the preparation and review of the *Texas Nonpoint Source Pollution Management Program*. This stakeholder group was established to ensure involvement by local public and private agencies and organizations which have expertise in control of nonpoint sources of pollution.

# Goals for NPS Management

The state's management program for nonpoint source pollution utilizes baseline water quality management programs and regulatory, non-regulatory, financial, and technical assistance approaches to achieve a balanced NPS management program. Nonpoint source pollution is managed through assessment, implementation, and education. The TCEQ and TSSWCB have established long and short-term goals and objectives for NPS management for guiding and tracking the progress of NPS management in Texas. The goals describe high-level guiding principles for all activities under the Program. The objectives specify the key methods that will be used to accomplish the goals. Success in achieving the goals and objectives are reported annually in the State's NPS Annual Report, which is submitted to EPA in accordance with CWA§319(h)(11). This report is also available by contacting the TCEQ or TSSWCB or visiting their Web sites.

## *Long-Term Goal*

The long-term goal of the State of Texas nonpoint source pollution program is to protect and restore water quality from nonpoint source pollution through assessment, implementation, and education.

### Objectives

- Focus NPS abatement efforts, implementation strategies, and available resources in watersheds identified as impacted by nonpoint source pollution.

- Support the implementation of state, regional, and local programs to prevent nonpoint source pollution through assessment, implementation, and education.

- Support the implementation of state, regional, and local programs to reduce NPS pollution, such as the implementation of strategies defined in state-approved TMDL Implementation Plans and Watershed Protection Plans.

- Support the implementation of state, regional, and local programs to reduce NPS pollution to groundwater through the Groundwater Protection Strategy, based on the potential for degradation with respect to use.

- Develop partnerships, relationships, memoranda of agreement, and other instruments to facilitate collective, cooperative approaches to manage NPS pollution.

- Increase overall public awareness of NPS issues and prevention activities.

- Enhance public participation and outreach by providing forums for citizens and industry to contribute their ideas and concerns about the water quality management process.

## *Short-Term Goals and Milestones*

### Goal One - Data Collection and Assessment

Coordinate with appropriate federal, state, regional, and local entities, private sector groups, and citizen groups and target CWA §319(h)grant funds towards water quality assessment activities in high priority, nonpoint source-impacted watersheds, vulnerable and impacted aquifers, or areas where additional information is needed.

### *Objectives*

Evaluate the condition of the State's water bodies, on a biennial basis, and prepare a report containing this evaluation, as required by CWA§305(b) to determine: a) water bodies not meeting water quality standards due, at least in part, to nonpoint source pollution, and; b) the cause of the impairment.

- Identify surface waterbodies and aquifers from the *Texas Water Quality Inventory and 303(d) List* and *Joint Groundwater Report* that need additional information to characterize non-attainment of designated uses and quality standards. This information is used during annual coordinated monitoring meetings and during special project planning to focus on high priority waters.

- Ensure that monitoring procedures meet quality assurance requirements and are in compliance with EPA-approved TCEQ and/or TSSWCB Quality Management Plans.

- Conduct special studies to determine sources of NPS pollution and gain information to target TMDL activities and BMP implementation.

- Develop and adopt, at the state level, TMDLs, Implementation Plans and Watershed Protection Plans to maintain and restore water quality in waterbodies identified as impacted by NPS pollution.

- Conduct monitoring to determine effectiveness of TMDL Implementation Plans, Watershed Protection Plans, and BMP implementation as appropriate.

## Goal Two - Implementation

Coordinate and administer the NPS program to support the implementation of TMDL Implementation Plans and/or Watershed Protection Plans and other state, regional, and local plans/programs to reduce NPS pollution. Manage all CWA§319 grant funds efficiently and effectively to target implementation activities to the areas identified as impacted, or potentially degraded with respect to use by NPS pollution.

### *Objectives*

Prevent and reduce NPS pollutant loadings in the surface water bodies, groundwater aquifers, wetlands, and coastal areas, through the execution of TMDL implementation Plans, Watershed Protection Plans, recommendations from the Joint Groundwater Monitoring and Contamination Report, the Groundwater Protection Strategy, and various agricultural / silvicultural activities.

- Work with regional and local entities to determine priority areas and develop and implement strategies to address NPS pollution in those areas.

- Develop and implement  BMPs to address constituents of concern or water bodies not meeting water quality standards in watersheds identified as impacted by NPS pollution.

- Develop and implement  BMPs to address NPS constituents of concern or water bodies not meeting water

quality standards in aquifers identified with impacts or as vulnerable in the latest state approved *Texas Water Quality Inventory and 303(d) List* or in Chapter 5 of this document.

- Implement state-approved TMDL Implementation Plans and Watershed Protection Plans developed to restore and maintain water quality in water bodies identified as impacted by nonpoint source pollution.

## Goal Three - Education

Conduct education and technology transfer activities to help increase awareness of NPS pollution and prevent activities contributing to the degradation of water bodies, including aquifers, by NPS pollution.

### *Objectives*

Reduce the amount of NPS pollution entering the water bodies of Texas through pollution prevention activities and education.

- Enhance existing outreach programs at the state, regional, and local levels to maximize the effectiveness of NPS education.
- Administer programs to educate citizens about water quality and their potential role in causing NPS pollution.
- Where applicable, expedite development of technology transfer activities to be conducted upon completion of BMP implementation.
- Conduct outreach through the Clean Rivers Program, Texas Cooperative Extension, Soil and Water Conservation Districts, and others to facilitate broader participation and partnerships. Enable stakeholders and the public to participate in decision-making and provide a more complete understanding of water quality issues and how they relate to each citizen.
- Implement outreach activities identified in the *Texas Groundwater Protection Strategy* to prevent NPS impacts to groundwater.
- Implement public outreach and education to maintain and restore water quality in waterbodies impacted by NPS pollution.

The long-term goal will remain the goal of NPS management as long as nonpoint source water pollution is an issue. Short- term goals will be examined every five years. Measurement of the goal achievement progress, within the priority water bodies, will be reported on an annual basis in the State's NPS Annual Report. The TCEQ and the TSSWCB will evaluate the management program, on an annual basis, to determine a need for revision and revise the document at least every five years.

**Milestones**

Water bodies with completed TMDLs, those undergoing current TMDL-work, and water bodies currently implementing Watershed Protection Plans have been listed in Appendix C, in table format, in order to gauge progress, through a time line, against the detailed milestones that are included below and in the first column of each table within the appendix.

■ Employ or develop a local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.

■ Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.

■ Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.

■ Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.

■ Develop a detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocation, strategy for load allocation, timetable for implementation, and a list of expected results.

■ Implement voluntary and regulatory actions in the watershed and adust the BMP implementation based on follow-up verification monitoring of effectiveness.

The programs discussed throughout this document are responsible for NPS management and implementation of the goals, objectives, and milestones. Nonpoint source management must be a coordinated effort to be successful. Therefore, the goals and milestones are over-arching for all nonpoint source programs of Texas.

# CHAPTER 3  TEXAS' WATERSHED APPROACH

The watershed approach described in this chapter provides an overview of Texas' management strategy for surface water quality. Some of the topics in this chapter are covered in more detail in other parts of this document.

In order to protect water quality, we must define and measure it, identify the types and sources of pollution, and implement plans to protect or restore it. Under the federal Clean Water Act, Texas and other states must establish standards that describe how the water bodies are used, and carry out a program to regularly monitor the status of water quality against those standards. Texas uses several strategies to protect water quality, such as issuing permits for discharges to streams and lakes, or devising watershed protection plans with local stakeholders. When these protective strategies are not sufficient to keep surface water bodies clean enough to be used in ways that meet the standards for them, the state takes action to restore water quality.

## A WATERSHED APPROACH

By looking at a *watershed*—the geographic area that drains to a common body of water—Texas can evaluate all the sources of pollution that may be affecting water quality. This approach is used to identify water quality problems and issues, to establish statewide and local water quality priorities, to develop community-based solutions, and to cooperate with local stakeholders to implement those solutions. The watershed approach is based on four basic principles:

> A watershed is a geographic area in which water, sediments, and dissolved materials drain into a common outlet. This outlet could be a stream, lake, playa, estuary, or ocean. Watersheds are also commonly called basins or drainage areas.
>
> Everything that is done in a watershed can affect the quality of the receiving water body.

- geographic focus based on hydrology rather than political boundaries
- water quality-based objectives based on scientific data
- coordinated priorities and integrated solutions
- diverse, well-integrated partnerships

These principles guide all activities of the TCEQ water quality programs. They provide the framework for coordinating people and activities to achieve the state's clean water goals.

Protecting our lakes, bays, and streams is a complex process—not only in terms of the number of sources of pollution and the variety of water body types and interactions, but also in the number of people that must be involved. Using a watershed approach, we often find that problems seen at

one point in a stream or lake are caused further upstream. With this in mind, we identify and remedy water quality problems at their source.

# Managing Surface Water by Geographic Area

Texas uses the major watersheds—or river and coastal basins—of the state as the geographic units around which it builds its watershed approach to managing surface water quality.

Surface waters in the state include lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or non-navigable. This includes the beds and banks of all water-courses and bodies of surface water that are wholly or partially inside or bordering the state or subject to the jurisdiction of the state; except that waters in treatment systems that are authorized by state or federal law, regulation, or permit, and that are created for the purpose of waste treatment are not considered to be water in the state.

## *Classifying Waters by Geographic Area*

Because of the vast extent of surface waters in Texas, and the ecological diversity of the state, the major rivers, lakes, and estuaries have been subdivided and assigned tracking numbers, called classified segments. The classified segments are given numbers that correspond to the major river basin in which they are located.

For example, the Brazos River, one of the state's longest rivers, has been divided into 57 separate segments and designated as Basin 12. Many lakes also lie within the Brazos River basin, and are given segment numbers. All the segment numbers have four digits—the first two indicate the basin number, and the second two indicate the specific segment. For example, Segment 1210 is Lake Mexia in the Brazos River Basin; Segment 1427 is Onion Creek in the Colorado River Basin.

The areas of the classified segments are defined in the Texas Surface Water Quality Standards. Most of the perennial (always flowing) rivers in the state, and lakes and estuaries with large areas, are classified. Figure 3.1 shows the state's major rivers and coastal basins, and the basin numbers assigned to them.

However, not all bodies of water in Texas are classified in the Standards. For example, when managing a classified segment of the Brazos River, it may be necessary to examine water quality in the tributaries that flow into that segment—which are part of the segment's watershed. Some of these tributaries may not be part of the classified segment system. When that happens, for management purposes, the tributary is assigned a tracking number, which is referred to as an *unclassified segment*.

This unclassified tributary will be assigned the number of the classified segment in whose watershed it resides, along with a letter. For instance, Segments 1806A, 1806B, and so on. The same numbering system applies to unclassified lakes. Both classified and unclassified segments are referred to generically as *segments*. The term water body is used to refer to entire rivers, reservoirs, or estuaries.



## Texas River Basins and Clean Rivers Program Planning Areas

### Clean Rivers Program Planning Areas

- Red River Authority
- Sulphur River Basin Authority
- Northeast Texas MWD
- Sabine River Authority
- Angelina & Neches River Authority
- Lower Neches Valley Authority
- Trinity River Authority
- Houston-Galveston Area Council
- Brazos River Authority
- Lower Colorado River Authority
- Lavaca-Navidad River Authority
- Guadalupe-Blanco River Authority
- San Antonio River Authority
- Nueces River Authority
- International Boundary & Water Commission

### River and Coastal Basins

1. Canadian River Basin
2. Red River Basin
3. Sulphur River Basin
4. Cypress Creek Basin
5. Sabine River Basin
6. Neches River Basin
7. Neches-Trinity Coastal Basin
8. Trinity River Basin
9. Trinity-San Jacinto Coastal Basin
10. San Jacinto River Basin
11. San Jacinto-Brazos Coastal Basin
12. Brazos River Basin
13. Brazos-Colorado Coastal Basin
14. Colorado River Basin
15. Colorado-Lavaca Coastal Basin
16. Lavaca River Basin
17. Lavaca-Guadalupe Coastal Basin
18. Guadalupe River Basin
19. San Antonio River Basin
20. San Antonio-Nueces Coastal Basin
21. Nueces River Basin
22. Nueces-Rio Grande Coastal Basin
23. Rio Grande Basin

**Figure 3.1 Major River Basins and Planning Areas in Texas**

20

# The Water Quality Management Cycle

The *water quality management cycle* is the process through which the state works with other organizations and with local residents who have a stake in water quality. This approach is used to continuously identify water quality problems, to establish statewide and local water quality priorities, to develop community-based solutions, and to collaborate with local stakeholders to implement those solutions.



Because environmental planning and implementation are rarely one-time activities, the water quality management cycle has five phases that are repeated regularly (Figure 3.2). This iterative cycle reflects the dynamic nature of watershed management.

A successful management framework must be flexible enough to accommodate this dynamic nature in an orderly manner over time.

Figure 3.2 demonstrates the dynamic nature of this cycle and the major steps in the process of managing the quality of the state's surface waters.

**Figure 3.2. The Water Quality Management Cycle**

Managing water quality through a watershed approach requires an ongoing cycle of tasks:

- **Standards and Planning**: setting standards for surface water quality and revising or formulating monitoring plans;
- **Monitoring**: collecting data to monitor the condition of surface waters;

- **Assessment and Targeting**: assessing data to determine water quality status and to identify any impairments;
- **Developing Strategies**: for protecting, improving, or restoring water quality with pollutant source controls and practices; and
- **Implementing Pollution Controls**: for both point and non-point sources and evaluating progress, which may lead back to revising those plans or formulating new ones.

# Standards and Planning

Water quality standards are the foundation for managing surface water quality. A water quality standard is the combination of:

- a designated use and
- the criteria necessary to attain and maintain that use

Standards define the goals for a body of water. The uses prescribe the purposes for which the water should be fit—such as recreation, support of aquatic life, or drinking water supply.

Five general categories for water use are defined under the Texas Surface Water Quality Standards:

- aquatic life use
- contact recreation
- public water supply
- fish consumption
- general uses

The criteria define the instream conditions necessary to support those uses. Criteria are either:

- numeric—a limit on the amount of a certain pollutant that a water body may contain; or
- narrative—a prohibition on a certain condition in the water, such as color, odor, or turbidity.

Water quality standards are the basis for :

- evaluating monitoring data to see if water quality is being maintained,
- setting levels of treatment for permitted wastewater discharges, and

- establishing water quality targets to set total maximum daily loads of pollutants.

Some standards are applied generally to many different water bodies, while some are site-specific. Any one water body will usually have multiple uses designated for it. For example, a lake or stream may be designated for use as a source of drinking, for recreation, and as a healthy environment for fish and other aquatic organisms.

The standards also define an antidegradation policy that protects existing uses and the state's highest quality waters. The complete Texas Surface Water Quality Standards are available in Title 30 of the Texas Administrative Code (TAC), Chapter 307.

> Water quality standards are the foundation for managing surface water quality. A standard consists of two parts:
>
> - a use, or the purposes for which surface water will be used; and
>
> - criteria, or the indicators that will be used to determine if the use is met.
>
> Uses and criteria are paired to set the standards for water quality. For example, one use is habitat for fish and other aquatic organisms. It is called the "aquatic life use" in the standards. Criteria used to determine whether the aquatic life use is met may include how much dissolved oxygen is present in the water, how much water flows through a stream and how deep it is, and how diverse the population of aquatic organisms.

The standards assign specific uses for most medium to large water bodies, and general uses for all water bodies. For example, Possum Kingdom Lake must meet requirements for the specific uses of public water supply, swimming and other recreation, and a high quality environment for fish and other aquatic species. Each use defined in the standards is linked to measurements for specific conditions or pollutants. These measurements are used to evaluate whether water quality is good enough to maintain its designated uses.

Other basic uses — such as navigation, agricultural water supply, and industrial water supply — are applicable to all water in the state where they can be achieved.

Some indicators of water quality, such as the narrative requirements in the general criteria, are intended to protect multiple uses and aesthetic conditions.

## *Aquatic Life*

Standards associated with the *aquatic life use* are designed to protect plant and animal species that live in and around the water. Some pollutants or conditions that may result in harm to aquatic species include low levels of dissolved oxygen or the presence of toxic substances such as metals or pesticides in water. Because oxygen is necessary to support life, its concentration in water is an easy-to-measure characteristic that generally reflects the ability of a water body to support a healthy, diverse aquatic population. Other important indicators of suitability for the aquatic life use include concentrations of substances that can be toxic, such as certain

metals—like selenium, mercury, and zinc, and some toxic organic pollutants—such as pesticides and some industrial chemicals).

## Contact Recreation

The standard associated with the *contact recreation use* is designed to ensure that water is safe for swimming or other water sports that involve direct contact with the water, especially with the possibility of ingesting it. High concentrations of certain bacteria in water indicate that there may be a risk of becoming ill from recreational activities. Though it is possible to swim in water that does not meet this standard without becoming ill, the probability of becoming ill is higher.

## Public Water Supply

Standards associated with the *public water supply* use indicate whether water from a lake or river is suitable for use as a source for a public water supply system. Source water is treated before it is delivered to your tap; a separate set of standards governs treated drinking water. Indicators used to measure the safety or usability of surface water bodies as a source for drinking water include the presence or high concentrations of substances such as pesticides or some metals. Concentrations of dissolved minerals, such as sulfate or chloride, are also measured, since treatment to remove high levels of minerals from drinking water may be expensive. Too many dissolved minerals in drinking water may cause a disagreeable taste, odor or color, even after it is treated by public water supply organizations.

## Fish Consumption

Standards associated with the *fish consumption use* are designed to protect people from eating fish or shellfish that may be contaminated. These standards identify levels at which certain toxic substances dissolved in water may accumulate in the tissue of aquatic species. In addition, fish tissue is examined for accumulated toxins to determine the risk to human health from consuming fish or shellfish. If significant risk is identified, the Texas Department of Health issues advisories for such water bodies that restrict or limit consumption of fish taken from them. The standards also specify limits on bacteria levels in marine waters to ensure that oysters or other shellfish are safe for public sale and consumption.

# Monitoring

Water quality data are gathered regularly to monitor the condition of the state's surface waters. For example, chemical, physical, biological, hydrological, hydraulic, and land use data are collected by the TCEQ, the regional agencies of the Clean Rivers Program, and other organizations, such as state and federal agencies, educational institutions, volunteer monitoring groups, and private organizations under contract to the state. Monitoring plans are guided by quality assurance project plans (QAPPs)

that ensure that data are collected according to generally accepted practices and are of sufficient quality to be used in making scientific assessments and management decisions.

Texas conducts five main types of data collection to monitor the status of water bodies:

- routine monitoring
- systematic monitoring
- targeted monitoring
- permit support monitoring
- effectiveness monitoring

**Routine monitoring** is designed to assess the status and trends of overall water quality throughout the state, and for each river basin. Data are collected using a monitoring network of key sites on the major water bodies in each basin on a regular basis. Monitoring sites may also include smaller water bodies to support characterization of ecoregions and/or basin-specific conditions.

**Systematic monitoring** focuses on evaluating subwatersheds and unclassified water bodies. Its purpose is to investigate and detect areas of concern, and isolate issues that require further study. It also includes monitoring at sites to check the status of water bodies (identify improvements or concerns). This monitoring strategy rotates resources around the river basin to gather information on water bodies that would not normally be included in the routine monitoring program.

**Targeted monitoring** is conducted on water bodies where there is reason to believe there is a threat or a concern for water quality, to establish the extent and degree of an impairment, or to determine the best strategy for restoring water quality. Sometimes called special studies, targeted monitoring activities usually involve intensive periods of data collection at sites where routine or systematic monitoring identified impacts, concerns, or impaired uses.

**Permit support monitoring** is used to address specific areas where additional information is need to support the development of permits that allow wastewater discharges. This may include studies to gather site-specific information for use in developing permits.

**Effectiveness monitoring** is conducted to evaluate whether management practices, regulatory measures, and watershed improvement and restoration plans are producing the desired results.

The CRP plays a key role in the TCEQ's yearly integration of these various monitoring needs into a coordinated monitoring schedule for the

entire state. The schedule shows all surface water monitoring being conducted by the TCEQ or under its contracts or cooperative agreements for each planning year. It does not include coordination of monitoring by wastewater dischargers that is reported to the state as a condition of their permits.

Planning and development of the coordinated monitoring schedule takes place from January through May preceding the state fiscal year for which the plan is developed. To support coordinated monitoring, the TCEQ has developed guidance for selecting sites and for sampling methods for routine, systematic, and targeted monitoring. The coordinated monitoring schedule is hosted by the Lower Colorado River Authority, a CRP agency, on its Web site at *http://cms.lcra.org/*.

## *Coordination of State and Regional Priorities*

The TCEQ works in partnership with the Texas Clean Rivers Program (CRP) to set regional priorities for protecting and improving the state's surface waters. The CRP brings together state, regional, and federal agencies to:

- eliminate duplication in monitoring surface water quality and thereby leverage resources;
- support data sharing and quality assurance by creating uniformity in methods;
- establish regional stakeholder forums to involve the public in identifying, prioritizing, and managing local water quality issues;
- set priorities and schedules for monitoring; and
- identify problems and preventive or remedial measures.

To support those goals and the TCEQ's overall water quality management program, the CRP's long-term action includes nine key methods:

- Ensure efficient use of public funds.
- Enhance public participation and outreach.
- Encourage comprehensive and cooperative watershed planning.
- Maintain basin-wide water quality monitoring programs.
- Develop and maintain a river basin water quality database clearinghouse.
- Provide quality-assured data to the TCEQ for use in water quality decision-making.
- Focus on priority issues and address local initiatives.

- Identify, analyze, and report on water quality issues and potential causes of pollution.
- Identify and evaluate alternatives for preventing and reducing pollution.

Through its activities, the CRP plays a vital role in ensuring clean, useable water supplies for Texas. The partner agencies for the CRP, and the regions for which they are responsible, are shown in Figure 3.1.

# Assessment and Targeting

Every two years, the states must assess the quality of their water and target those water bodies for which additional data collection or restoration efforts are required. This information is submitted to the U.S. Environmental Protection Agency (EPA) in a report that details the extent to which each water body in the state meets water quality standards. The TCEQ publishes this biennial assessment as the *Texas Water Quality Inventory and 303(d) List*.

Assessment is the evaluation of data and information against a set of standards or benchmarks.

In the past, Texas published two different reports, often referred to as the 305(b) Report and 303(d) List, after the sections in the Clean Water Act that describe the requirements of the assessment. Since 2002, both reports have been published as one document, in accordance with guidance from the EPA. The document still has essentially two main parts: the Inventory, which gives the status of all the waters in the state, and the 303(d) List, which identifies waters that do not meet one or more of the standards established to ensure the beneficial use of the water body.

## *The Inventory*

The Inventory describes the status of all surface water bodies of the state that were evaluated for the given assessment period. The TCEQ uses data collected during the most recent five-year period in making its assessment. The data are gathered by many different organizations that all operate according to approved quality control guidelines and sample collection procedures. The quality of waters described in the Inventory represents a snapshot of conditions during the time period considered in the assessment. Water quality is dynamic and constantly changing.

The assessment guidance is based on a set of methods that apply the surface water quality standards and criteria. These methods are developed by the TCEQ with the advice of a diverse group of stakeholders, and are made available to partner organizations and stakeholders every two years, prior to the biennial assessment in which they will be used.

## The 303(d) List

The 303(d) List is an important management tool produced as part of the assessment. It identifies waters for which preventive measures have not been sufficient to achieve water quality standards. The 303(d) List is subject to review and approval by the EPA.

When a water body is identified on the 303(d) list, certain new requirements may apply for facilities that discharge wastewater into the listed water body. Importantly, the TCEQ may not allow any new or expanded discharges of a listed pollutant into a Category 5 water body if it contributes to the impairment. Other possible effects on permits that may result from a restoration plan for the water body include:

- TCEQ may initiate amendments to impose new limits, or may impose them with routine renewals or amendments.
- Permitted loading from existing facilities may be substantially reduced.
- New facilities may be required to meet more stringent effluent limits than expected.
- In some cases or areas, storm water permits may receive new or more stringent limits.
- Dischargers may no longer be eligible for general permits.
- Additional monitoring and reporting requirements may be added.

Additional nonpoint source management practices may also be required, such as:

- Management of runoff by such means as detention basins, filter strips, infiltration basins, porous pavement, retention ponds, and swales.
- Management of operations to decrease or eliminate pollutants in runoff, such as spill prevention and control, source controls, and education.

## Categories Indicate Water Quality Status

The Inventory assigns each assessed water body to one of five categories to provide information to the public, the EPA, and internal agency programs about water quality status and management activities (see Table 1). The categories indicate the status of the water body, and how the state will approach identified water quality problems.

Higher category numbers correspond to higher levels of effort required to manage water quality. For example, water bodies in Category 5 constitute the 303(d) List, and require remedial action by the state to restore water

quality. For water bodies in Category 5a, the state must develop a scientific model called a *total maximum daily load* (TMDL) and a plan to implement it (these are discussed in more detail in the section "Restoring Water Quality"). Water bodies in Category 1 are meeting all their uses, and require routine monitoring and preventive action.

**Table 3.1    Categories of Use Attainment in the Water Quality Inventory**

| Category 1 | Attaining all water quality standard and no use is threatened. |
|---|---|
| Category 2 | Attaining some of the designated uses; no use is threatened; and insufficient or no data and information are available to determine if the remaining uses are attained or threatened. |
| Category 3 | Insufficient or no data and information to determine if any designated use is attained. |
| Category 4 | Standard is not supported or is threatened for one or more designated uses but does not require the development of a TMDL. |
| Category 4a | TMDL has been completed and approved by EPA. |
| Category 4b | Other pollution control requirements are reasonably expected to result in the attainment of the water quality standard in the near future. |
| Category 4c | Nonsupport of the water quality standard is not caused by a pollutant. |
| Category 5 | Category 5 is the 303(d) list. The water body does not meet applicable water quality standards or is threatened for one or more designated uses by one or more pollutants. |
| Category 5a | A TMDL is underway, scheduled, or will be scheduled. |
| Category 5b | A review of the water quality standards will be conducted before a TMDL is scheduled. |
| Category 5c | Additional data and information will be collected before a TMDL or review of the water quality standard is scheduled. |

**Impairment**
The combination of one designated use with one pollutant or condition of concern.

**Parameter**
A pollutant or condition affecting a body of water; also, a criterion used to measure attainment of a particular use. Examples include low dissolved oxygen concentrations, a particular metal such as zinc, or a particular pesticide such as DDT.

Further, these categories must be applied to each combination of designated use and the *parameter* (pollutant or condition of concern) that determines support of beneficial uses. The combination of the use with the parameter is called an *impairment*. For example, the concentration of dissolved oxygen is one of the criteria used to determine the support of the aquatic life use. If dissolved oxygen concentrations are too low, one impairment would exist for the water body under examination.

Since a water body has multiple uses, it may fall into different categories for different uses. In that

case, the overall category for the water body is the one with the highest category number.

For example, Spring Creek, Segment 1008 in the San Jacinto River Basin, does not support the contact recreation use (Category 5c) nor the aquatic life use (Category 5b). It supports the public water supply and general uses, and the fish consumption use has not been assessed. The designation for the entire water body is Category 5b, since that is the highest category associated with any one of its uses.

## Ranking Category 5a Segments

After the draft 303(d) List is compiled, the TCEQ assigns a rank of High, Medium or Low to each impairment (see Table 3.1) of Category 5a segments. This rank is used in determining the priority for implementing TMDLs. The rank is based on criteria such as the degree to which the water quality standard is exceeded, and the level of public concern (as judged, in part, by the interest of local groups). Comments are accepted during the public review period and changes may be made as a result of public comment.

Factors considered in the ranking include:

- whether the impairment affects human health
- proximity of one impaired segment to others that have similar or related pollutants
- local and regional support for TMDL development
- data availability for immediate TMDL development
- similarity of the strategies and actions needed to address impairments

The specific criteria and point system used for scheduling waters for TMDL development is shown in Table 3.1.

## Scheduling Management Activities for Listed Waters

The amount of time it takes to address a listed segment varies greatly. In some cases, a segment may be addressed within one to three years of its listing; in other cases, several years may be needed.

Several factors influence the scheduling of management activities for all three categories (5a, 5b, and 5c) of the list, such as the number of successive years a segment has been on the list, scheduled permit renewals, or administrative demands. Available funding ultimately determines how many new restoration or management projects will be initiated annually.

### Schedule for TMDL Development

The TCEQ is committed to beginning development of TMDLs for all segments in Category 5a within 10 years of their initial listing. In compliance with the federal regulations, the TCEQ prepares a schedule after each Water Quality Inventory is completed that identifies the TMDLs that will be initiated within the next two years.

The most important factor in determining the schedule is the priority ranking assigned to each impairment. Others factors include additional data or information gathered since the listing and ranking, and the availability of funding. The TMDL schedule is submitted to the EPA in April of even-numbered years along with the 303(d) List.

**Table 3.2   Criteria for Prioritizing TMDLs (Category 5a Waters) for Development**

| 1. **The pollutant causing the impairment is a:** | Points |
|---|---|
| A.   Threat to human health *Includes nonsupport of the following uses: public water supply, contact recreation, fish consumption, oyster waters.* | 50 |
| B.   Threat to aquatic life *Includes nonsupport of the following uses: aquatic life, general, and narrative criteria* | 30 |
| C.   Threat to both human health and aquatic life | 30 |
| 2. **Watershed proximity, related pollutants, and the ease of incorporating a newly identified parameter of nonsupport into an existing project.** | **Points** |
| A.   Ongoing TMDL in the same segment for a different pollutant | 10 |
| B.   Ongoing TMDL in the same segment watershed for the same pollutant | 20 |
| C.   Ongoing TMDL in the same segment watershed for a different pollutant | 10 |
| D.   Ongoing TMDL in a contiguous watershed for the same pollutant | 10 |
| E.   No ongoing TMDL in the same segment or contiguous watershed | 0 |
| 3. **Data availability for TMDL development** | **Points** |
| A.   Ongoing modeling activities in the segment | 10 |
| B.   Recent targeted data collection activities within the segment, other than routine monitoring | 10 |
| C.   TMDL tools still in development (for example, bacteria source tracking, mercury) | -30 |
| 4. **Local and regional support for TMDL development** | **Points** |
| A.   River Authority and/or Council of Government active in current or recent TMDL project | 20 |
| B.   TSSWCB or other state agency active in current or recent project | 20 |
| C.   Dedicated regional staff are available in TCEQ region of the project | 10 |
| D.   Positive stakeholder interest within the segment watershed | 10 |

| | | |
|---|---|---|
| E.    Strong opposition to the project | | -10 |
| **5.    Year of listing: under the commitment by TCEQ leadership in 1997 to begin development of TMDLs within 10 years of listing, water bodies listed earlier have a higher priority. If original listing year is:** | | **Points** |
| A.    1998 | | 50 |
| B.    2000 | | 40 |
| C.    2002 | | 30 |
| D.    2004 | | 20 |
| E.    2006 | | 10 |
| **6.    Best available funding information, with first priority given to ongoing projects. If project status is:** | | **Points** |
| A.    $\geq$ 50% complete | | 50 |
| B.    < 50% complete | | 20 |
| C.    New project | | 0 |

| Total Points | Priority |
|---|---|
| < 80 | Low |
| 90-160 | Medium |
| > 160 | High |

# Strategies for Protecting and Improving Water Quality

At all times, the TCEQ is protecting water quality through various programs. Just the act of monitoring and assessing water quality is a form of protection, since it informs state officials and the public about the status of Texas rivers, lakes, and estuaries and about water quality management needs. More water bodies are being assessed each year, leading to more timely identification of problems. But much more is being done on a regular basis—such as issuing permits that limit pollutant discharges to protect rivers, lakes, and bays, developing plans to protect sources of drinking water, and educating people about water quality issues.

The TCEQ's pace and progress in addressing impairments on the 303(d) list has risen sharply over the past five years. More TMDLs are being developed and implemented. The water quality standards were revised in 2000, and numerous analyses are being conducted to determine whether the currently defined uses are attainable at specific sites. In addition, other studies are underway to further improve the existing standards. More data are gathered each year to ensure that we have as sound a basis as possible for establishing existing and new controls. The TCEQ water quality programs strive at all times to provide accurate assessment, and to

continually improve the tools and information used to manage water quality.

## *Permits to Protect Water Quality*

The TCEQ issues permits that control discharges of wastewater into the surface waters of the state. Many types of discharges are regulated, such as the effluent from industries, domestic wastewater from city treatment plants, discharges from certain agricultural operations, and the storm water that runs off urban areas. The TCEQ also requires pretreatment permits for some wastewater treatment plants that are publicly owned.

The owners and operators of these facilities, called dischargers or permittees, are responsible for using the best technologies that are both available and practical to reduce pollutants in the effluent from their facilities. Many different kinds of pollutants are regulated by permit, including metals, pesticides, organic compounds, and treated human waste. Permit limits on the emission of pollutants into the air may also prevent water pollution, since pollutants in the air can settle into creeks and lakes. However, this issue is very complex, and scientists currently do not have a good understanding of how to control water pollution from air deposition.

The TCEQ works to conserve potable water sources through permits that regulate the recycling, beneficial reuse, and disposal of sludge. Sludge is the muddy solid waste produced during the water and sewage treatment processes. Texas' federal and state requirements for wastewater and sludge permitting are codified in the Texas Administrative Code.

The TCEQ also protects wetlands and other surface waters through its certification of federal permits that regulate the discharge of dredge or fill material into the waters of Texas. The state's certification that federal dredge and fill activities will not degrade wetlands or other surface waters is required under Section 401 of the federal Clean Water Act. The U.S. Army Corps of Engineers issues dredge and fill permits after certification by the TCEQ.

The TCEQ's wastewater and sludge permitting activities are required under Section 402 of the federal Clean Water Act, and implemented federally through the National Pollutant Discharge Eliminations System. In 1998, the TCEQ was authorized by the EPA to issue Section 402 permits on behalf of the federal government, with the exception of discharges associated with oil, gas, and geothermal exploration and development activities, which are regulated by the Railroad Commission of Texas. The TCEQ combined its state-issued wastewater permits with the federal permits that were delegated to it under the Texas Pollutant Discharge Elimination System.

## Protecting Stream Flows

Water availability is an issue in Texas due to the increasing difficulty of meeting the needs of people, industry, wildlife, and habitats. Across the state, naturally occurring periods of low water availability are exacerbated by the increases in human population and in activities that require water. According to the State Water Plan published by the TWDB, the total demand for water is expected to increase 18 percent from 2000 to 2050.

The availability of water in streams is an issue of quality as well as quantity. Insufficient water flows in streams can affect the quality of the aquatic environment, or can reduce a stream's capacity to assimilate wastewater discharges. It can also limit the flows of fresh water into downstream estuaries, which are dependent on fresh water for their ecological health and fisheries uses.

The TCEQ cooperates with the TPWD and the TWDB to collect instream flow data collection and analyze and evaluate the information to determine the flow conditions necessary to support a sound ecological environment.

The TCEQ also conducts environmental reviews of water rights applications to assess the possible impacts of granting of a water right on fish and wildlife habitat, water quality and the instream uses associated with the affected body of water. Possible impacts to bays and estuaries are also addressed for those permits within 200 miles of the Gulf of Mexico.

The monitoring of stream flows and protection of instream uses is required and authorized under TCEQ rules, and by Texas House and Senate bills.

## Protecting Sources of Drinking Water

The aquifers, lakes, and rivers that are designated by law for use as sources of drinking water are called source waters. The TCEQ protects source waters by:

- assessing their susceptibility to pollution.
- assisting local communities to develop source water protection programs.

A report assessing the vulnerability of each source water is provided to the operators of systems that supply public drinking water. The assessments consider the location of pollutant sources, intrinsic characteristics, contaminant occurrence, well construction, geology, known point sources, and land uses that occur within the capture zone of groundwater wells and within the watersheds of surface water intakes.

The assessments provide the scientific basis for the implementation of source water protection projects. Water systems are encouraged to take an

active role in verifying the completeness and accuracy of the data used in the assessment report.

> A water body is called "impaired" if it does not meet one or more of the standards established for its use. For example, a water body may be designated as impaired for the aquatic life use if dissolved oxygen concentrations are chronically low. The water body may be attaining all its other uses—as a source for drinking water, and as a safe place to fish or swim—but still be designated as impaired because *all* uses are not attained.

Source water protection is a program to prevent contamination of groundwater or surface water that is used as a source of public drinking water. Water suppliers implement source water protection programs by working cooperatively with community members and by educating people about issues that affect their drinking water. All public water supply systems may receive assistance in developing plans and implementation measures free of charge. Priorities for state assistance with plan development are set according to the results of the susceptibility assessments.

The protection and assessment of source waters is required and authorized under Section 1453 of the federal Safe Drinking Water Act.

### Watershed Protection Plans

Watershed protection plans may be developed to protect high-quality waters, to address threatened waters before they become impaired, or to restore water bodies for which TMDLs are not planned or developed. These plans are still based on environmental targets, usually maintaining the applicable water quality standards. The types of goals and strategies that may be used in watershed protection plans are outlined in the EPA's guidance for federal nonpoint source grants authorized under Section 319 of the Clean Water Act.

Watershed protection plans:

- describe the sources of pollution affecting a particular water body.
- define the actions needed to reduce pollution or restore water quality, both regulatory and voluntary.
- are developed in cooperation with regional and local stakeholders.

Watershed protection plans provide the opportunity to improve and protect water quality so that potential problems are addressed before the stream, lake, or bay actually fails to meet water quality standards.

# Implementing Plans to Restore Water Quality

After a water body is listed in Category 5 [the 303(d) list], several different courses may be pursued to bring it into compliance with the standards. Further evaluation may be necessary to determine if the current

standard is appropriate, or to determine the cause of the impairment. The TCEQ may begin a project to reduce pollution and restore the impaired use under its Total Maximum Daily Load (TMDL) Program. The TCEQ undertakes new projects to restore water quality with each new assessment, while continuing to complete and implement plans for waters listed in previous years.

For water bodies that are impaired due wholly or in part to nonpoint source (NPS) pollution, federal grant funds provided under Section 319 of the Clean Water Act play a key role in implementing restoration projects. These grants provide support for management practices that improve the quality of impaired or threatened waters, and are often used to support development and implementation of TMDLs. NPS grants are also used to implement watershed protection plans that are not associated with TMDLs; to conduct special projects that assess impacts due to NPS pollution; and to prevent the degradation of healthy rivers, lakes, and bays.

## Standards Analysis

Water bodies are placed in Category 5b if there is reason to believe that one or more of the assigned standards may be inappropriate because of local conditions that are not due to human impacts. Waters in this category are slated for an analysis of their standards, called a *use attainability analysis*, or UAA.

For example, to determine appropriate aquatic life uses and related dissolved oxygen criteria, a UAA may consider aspects such as regularity of flow, habitat structure, typical water chemistry, and fish and other aquatic organisms that are characteristic in the area. Some rivers and lakes naturally support an abundant and diverse aquatic community, while other water bodies—such as small streams with intermittent flow—tend to have fewer types and total numbers of aquatic organisms. In addition, some water bodies might support a diverse aquatic community and fishery even though some components of their overall water quality are not superior under natural conditions.

Depending on the results of the UAA, uses and/or supporting criteria may be revised to be more or less stringent. Revisions of the standards are reviewed by the public, adopted by the Commission, and approved by the EPA. When a review and any resulting revisions of the standard are completed, the water body may be moved to another subcategory of the 303(d) List, or to another category of the Inventory.

## Targeted for Monitoring and Additional Assessment

Water bodies in Category 5c are targeted for additional monitoring and assessment. Water bodies may be placed in this category when there is insufficient information to determine the best course of action. The TCEQ and its monitoring partners collect the additional data and information

needed to determine if a standards review is appropriate, if a TMDL should be scheduled, or, more rarely, to determine the degree and geographic extent of nonsupport. Depending on the results, the water body may be moved to another subcategory of the 303(d) List, or to Category 1 or 2.

## *TMDLs and Implementation Plans*

TMDLs and their implementation plans are developed to address water bodies listed in Category 5a. States must establish a TMDL for each impairment in each water body in Category 5a. This may mean that several TMDLs may be developed for one river or lake. A TMDL must also allocate this load to the point and nonpoint sources of pollution in the watershed. The state must then develop an implementation plan to achieve the loading allocations defined in the TMDL. TMDLs are subject to EPA approval; implementation plans are not.

### Total Maximum Daily Loads

In order to restore water quality, it is first necessary to be reasonably certain of the sources and causes of pollution. One way to accomplish this is to develop a scientific model called a *total maximum daily load* (TMDL).

**TMDL Implementation Plans (IPs) and Watershed Protection Plans (WPPs)**

Both IPs and WPPs have the same goal — improving water quality in rivers, lakes, or bays.

❏ How they differ:
- ✓ IPs are remedial actions for impaired waters; WPPs may be either remedial or preventive.
- ✓ IPs are based on total maximum daily loads; WPPs use other measurable environmental goals for water quality.

❏ How they are alike:
- ✓ Define actions needed to reduce pollution and restore water quality.
- ✓ Include both regulatory and voluntary actions.
- ✓ Are developed in cooperation with regional and local stakeholders.
- ✓ Are based on the best available scientific methods and tools.

A TMDL:

- determines the maximum amount of a pollutant that a water body can receive and still both attain and maintain its water quality standards; and
- allocates this allowable amount (load) to point and nonpoint sources in the watershed.

TMDLs must be submitted to the Environmental Protection Agency (EPA) for review and approval. A TMDL is normally prepared for each pollutant in each impaired water body. In general, a TMDL should be completed within 13 years of the initial listing of a water body.

### Implementation Plans

After a TMDL is completed, an *implementation plan* is developed that describes the regulatory and voluntary activities necessary to achieve the

pollutant reductions identified in the TMDL. Management activities incorporate both nonregulatory and regulatory mechanisms, such as permit effluent limits and recommendations, nonpoint source pollution management practices, stream standard revisions, special projects, pollution prevention, public education, and watershed- specific rule recommendations. The best strategies for each individual watershed are developed in cooperation with regional and local stakeholders.

The implementation plan describes these various activities, the schedule for implementing them, and the legal authority for the regulatory measures. It also provides reasonable assurance that the voluntary practices will be undertaken. For instance, the plan may identify grant funds that have been secured to implement voluntary actions. The plan also includes the measurable results that will be achieved through the plan, along with a follow-up monitoring plan to determine its success. The ultimate goal is always the attainment of the water quality standard, but additional, interim results may be evaluated to assess progress toward that goal.

Even after plans are fully implemented, it is difficult to accurately predict how long it will take for improvements to occur in the stream, or how much improvement will be seen. For this reason, there is a schedule for phasing in implementation activities, especially those that address non-point sources of pollution. Less expensive, time-tested activities are implemented first, and their impacts are assessed. If water quality standards are not yet achieved, then another set of regulatory and/or nonregulatory activities is implemented. Through this adaptive management approach, the water body is reassessed, and adjustments are made in the implementation activities as needed to attain water quality standards in the stream.

# A Joint Effort—Stakeholder Involvement

Stakeholders are involved in each of the water quality management cycle through participation in standing and special committees.

The TCEQ is designated by law as the lead state agency for water quality in Texas. The Texas State Soil and Water Conservation Board (TSSWCB) also plays an important role as the lead agency in the state for the management of agricultural and silvicultural (forestry) nonpoint source runoff. The Texas Clean Rivers Program—a partnership of regional water management authorities—plays a key role in providing forums for stakeholder involvement and coordinating water quality management activities (see Figure 3.1 - Major River Basins and Planning Areas in Texas).

Many other local, regional, state, and federal agencies have specific responsibilities that are critical to the restoration of polluted water bodies.

Nongovernment organizations, especially at the watershed level, can provide information about local concerns and infrastructure, and can help build support for the kind of pollution controls that may be required to restore water quality.

A coalition of government agencies and citizens is necessary to develop and implement water quality protection and restoration strategies. Public participation in watershed protection plans and TMDL implementation plans provides the following benefits:

- improves the quality and increases the quantity of information used as the basis for plans,
- promotes government accountability,
- ensures that state government considers the local perspective in its decisions,
- helps stakeholders gain insight into the nature of water quality problems and alternate solutions in their communities,
- leads to voluntary individual actions to curb pollution, and
- local ownership of water quality.

## Who Are Stakeholders?

Stakeholders include all individuals or organizations in the watershed who have one or more of these attributes:

- are significant contributors of pollutant loadings or other impacts to water quality;
- are significantly affected by water quality problems;
- are directly affected by project outcomes or decisions;
- may be required to undertake control measures because of statutory or regulatory requirements;
- have statutory or regulatory responsibilities closely linked to water quality—for example, flood control;
- can help develop or implement actions to remedy water quality problems;
- live in the watershed or use the water resource.

Although not an exhaustive list of possible stakeholders, these categories give some examples of the kinds of groups and people who may become involved in protecting and restoring water resources:

- Wastewater dischargers–municipal and industrial.
- Public–individuals; civic groups such as those representing environmental, consumer, recreational, and community interests; schools, universities, and private landowners.
- Agriculture and aquaculture – corporate and individual farmers, ranchers, and producers; subsistence and commercial harvesters of fish and shellfish; agricultural groups and organizations.
- Business –commercial, residential, and industrial firms; utilities, business groups, and trade associations.
- Government–city, county, regional, state, federal, and international government agencies, tribes, utility districts, and river authorities.



**Figure 3.3 Stakeholder Forums**

## *Coordination of Stakeholders*

Coordination of stakeholders takes place at three levels (see Figure 3.3 - Stakeholder Forums):

- **statewide** for agencies and organizations that conduct water quality management activities across the entire state, to target and synchronize their efforts.
- **regionally** to assess conditions within a basin and establish basin-specific goals and priorities.
- **locally** to develop watershed protection plans and TMDL implementation plans that have local support and input.

### Clean Rivers Program Stakeholders Work Group

Comprised of staff from the regional planning agencies of the Clean Rivers Program (CRP), the work group represents stakeholder interests at the state level. The CRP Stakeholders Work Group coordinates with the TCEQ and other state agencies at annual meetings. See Figure 1 for a list of the CRP planning agencies and the regions they manage.

### Basin Steering Committees

Basin steering committees of the Clean Rivers Program provide the primary forum for coordinating stakeholder involvement at the regional level. These committees carry out educational activities within the basin, such as workshops and volunteer programs. They also produce public information products and conduct promotional campaigns through various media.

### Local Watershed Work Groups

These work groups, comprised of key stakeholders in priority watersheds, provide valuable input about local conditions. They develop site-specific strategies for developing watershed protection plans or TMDL implementation plans.

## *Education*

The TCEQ has numerous projects and programs to inform the public and their representatives about issues that affect water quality and ways individuals and regulated organizations can act to protect and improve the environment. These programs range from technical assistance to business owners to ad campaigns to formation of stakeholder groups to advise the agency.

Education is integrated into most water quality programs at the TCEQ. Educational activities may include presentations to stakeholder groups, forums to share pollution reduction technologies, public awareness campaigns, or distribution of educational materials to schools and volunteer groups.

# GAUGING SUCCESS

Success of the state's water quality management program is gauged by progress made toward protecting or restoring water quality uses that benefit wildlife, people, and the environment. Some of the reports of success that the TCEQ is charged with producing include:

- progress report on environmental and program goals for the Texas Legislative Budget Board
- biennial reports to the Texas Legislature

- annual reports of TMDL implementation and nonpoint source management activities
- the Texas Water Quality Inventory and 303(d) List.

With the exception of the report to the Legislative Budget Board, these documents are available on the TCEQ's Web site at www.tceq.state.tx.us.

Making successful management decisions depends on understanding the relationships among water quality, water use, and conditions within a watershed. With the watershed approach, Texas integrates policy, science, and people to ensure clean water for years to come.

# Chapter 4 Coordination

The State of Texas Nonpoint Source Program envisions a partnership among many organizations, both public and private, to protect and restore water quality. With the extent and variety of water quality issues across Texas, the need for cooperation at all levels is essential. Surface water bodies and aquifers are not limited by political boundaries and therefore environmental solutions often cross federal, state, and local levels of responsibility. By establishing a coordinated framework to share information and resources, while minimizing unnecessary duplication, the State can more effectively focus its water quality protection efforts. Chapters 6, 7, and 8 describe the programs and best management practices that are implemented to address NPS pollution. This chapter provides a description of the agencies and organizations that implement the tools described in Chapters 5, 6, and 7 to protect and restore water quality.

# Interstate and International Coordination

The State of Texas coordinates with neighboring U. S. states and Mexico in protecting water resources in those watersheds or aquifers which cross political boundaries. Cooperation is multidimensional, involving governments at every level; voluntary, non-governmental organizations; private businesses; and the public. A number of programs and activities are in place to facilitate collaboration between jurisdictions.

## *Interstate Coordination*

The TCEQ and TSSWCB are involved in interstate coordination of water resource protection activities through membership in national organizations such as American Water Works Association (AWWA), Association of State Drinking Water Administrators (ASDWA), Association for State and Interstate Water Pollution Control Administrators (ASIWPCA), Council of State Governments (CSG), National Association of State Conservation Agencies (NASCA), National Association of Conservation Districts (NACD), and the Ground Water Protection Council (GWPC).

The TCEQ and TSSWCB, working through EPA Region 6, coordinate with the states of Arkansas, Louisiana, New Mexico, and Oklahoma through scheduled State-EPA meetings and conferences. These gatherings provide a forum for information exchange and discussions on the future direction and implementation of the Nonpoint Source Program.

## *International Coordination*

At the international level, the Border Environment Cooperation Commission and the North American Development Bank work with states and communities to develop needed water and waste infrastructure

projects. In addition, Texas is one of the participants in the Ten State Initiative, which brings together environmental representatives from the U.S. and Mexican border states to discuss and act on environmental priorities.

As a result of that commitment, the TCEQ has implemented State-to-State Strategic Environmental Plans with the environmental agencies of each of Texas' four neighboring Mexican states (Tamaulipas, Nuevo León, Coahuila, and Chihuahua). A variety of programs has evolved from the communication brought about by these plans, including industry recognition and pollution prevention programs, as well as a Border Recycles Day.

The need to engage on a broad set of environmental issues resulted in the signing by the U.S. and Mexico of the La Paz Agreement in 1983. Ten years later, the North American Free Trade Agreement (NAFTA) further reinforced ties between the U.S. and Mexico. It included environmental side agreements that established both trilateral and binational entities to address environmental issues.

Various state agencies in Texas have developed programs that have an important effect on the border. Some, such as the Texas Water Development Board's Economically Distressed Areas Program, help communities plan and develop needed infrastructure. The programs discussed below are designed to improve the environment of the border region.

### TCEQ Border Affairs Program

The TCEQ Border Affairs Program works closely with TCEQ regional offices in Laredo, Harlingen, El Paso, and San Antonio to resolve concerns for border residents. As an information clearinghouse, the group has daily contact with government officials on both sides of the border. Border Affairs has helped foster cross-border environmental agreements and programs with Mexican counterparts at the local, state, and federal levels and with stakeholders in the private sector and non-governmental organizations. The group has worked on environmental infrastructure matters with the Border Environment Cooperation Commission and the North American Development Bank.

### Border 2012 Program

The U.S. Environmental Protection Agency, its Mexican counterpart, the Secretaría de Medio Ambiente y Recursos Naturales (SEMARNAT), the U.S. and Mexican border states, and U.S. border tribes, have developed the Border 2012 program to protect the environment and public health in the border region. The program focuses on decreasing pollution and lowering the risks of exposure to pesticides and other chemicals. The goal of the program is to achieve measurable improvements in air, water and soil quality in the border region by the year 2012.

The focus of Border 2012 is to address environmental issues at the local level by decentralizing the decision making and priority setting processes, with implementation driven by four Regional Workgroups, three Borderwide Workgroups and three Policy Forums. Regional Workgroups address environmental issues affecting specific sub-regions. The border-wide workgroups address binational and transboundary aspects of environmental health, emergency preparedness and response, and cooperative enforcement and compliance. Policy Forums focus on broad issues concerning air and water quality, and the effective management of hazardous and solid waste and toxic substances. In addition, task forces will be created, as needed, to implement projects at the local level consistent with the needs of the region and the goals of the program.

**The Rio Grande/Río Bravo Basin Coalition**

The Rio Grande/Río Bravo Basin Coalition is a multinational, multicultural organization with leadership from the U.S., Mexico, and the Pueblo Nation. Its purpose is to help local communities restore and sustain the environment, economies, and social well-being of the Rio Grande/Río Bravo Basin. The coalition has 50 partner organizations from around the watershed which share a commitment to the health and long-term sustainability of the Río Grande/Río Bravo Basin. The belief is that building coalitions across borders is the best way to solve international environmental problems.

The Coalition organizes the Día del Río citizen-led event. The event is both a call to action and a celebration of the basin's rich diversity, and it draws public attention to the critical state of the basin's rivers, groundwater, and wildlife. Activities focus on raising awareness and include public talks, tree planting, and river cleanups.

**International Boundary and Water Commission**

The International Boundary and Water Commission (IBWC) encourages and coordinates the establishment of cooperative relationships with federal, state, and local agencies, both in the U.S. and in Mexico, in carrying out activities along the border. The U.S. and the IBWC may undertake cooperative projects to implement existing treaties and other agreements between the two Governments. Projects may originate with the emergence of an environmental problem requiring the agreement and cooperation of the two Governments for a solution. Because of the international nature of the Rio Grande, the State of Texas has contracted with the U.S. Section of the IBWC to implement the Clean Rivers Program, including the *Friends of the Rio Grande* initiative, in its 1,254-mile international boundary section.

# Federal Agencies

## Environmental Protection Agency

EPA works to develop and enforce regulations that implement environmental laws enacted by Congress. EPA is responsible for researching and setting national standards for a variety of environmental programs, and delegates to states and tribes the responsibility for issuing permits and for monitoring and enforcing compliance. While EPA protects the nation's natural resources primarily through regulation, EPA has also developed a wide variety of funding, planning, and education programs that are effective in protecting environmental quality.

## U.S. Geological Survey

The U.S. Geological Survey (USGS) has the principal responsibility within the Federal Government to provide the hydrologic information and understanding needed by others to achieve the best use and management of the Nation's water resources. Through the National Water Quality Assessment Program (NAWQA), USGS scientists collect and interpret data about water chemistry, hydrology, land use, stream habitat, and aquatic life. The NAWQA Program is a primary source for long-term, nationwide information on the quality of streams, groundwater, and aquatic ecosystems. This information supports national, regional, State, and local decision making and policy formation for water-quality management. The goals of NAWQA are to assess the status and trends of national water quality and to understand the factors that affect it.

## National Oceanic and Atmospheric Administration

Programs work to protect, restore, and responsibly develop the nation's coastal communities and resources while ensuring their protection for future generations.

## U.S. Army Corps of Engineers

The U.S. Army Corps of Engineers is a worldwide organization that provides engineering services, environmental restoration, and construction support for a wide variety of civil and military projects. The Corps' primary civil mission is developing and managing the nation's water resources. The Corps develops projects to reduce flood damage; improves navigation channels and harbors; protects wetlands; and preserves, safeguards, and enhances the environment.

## U.S. Coast Guard

The U.S. Coast Guard is a military, multi-mission, maritime service and one of the nations five Armed Services. Its mission is to protect the public, the environment, and U.S. economic interests – in the nations ports and

waterways, along the coast, on international waters, or in any maritime region as required to support national security. The Coast Guard addresses the wide ranging problems associated with preventing, responding to, and paying for pollution associated with oil spills and leaks. It does so by creating a comprehensive programs that deal with prevention, response, liability, and compensation of spills from vessels and facilities in our navigable waters.

## U.S. Department of Agriculture

The U.S. Department of Agriculture (USDA) is committed to helping America's farmers and ranchers. The USDA is the steward of the nation's 192 million acres of national forests and rangelands. It is the country's largest conservation agency, encouraging voluntary efforts to protect soil, water, and wildlife on the 70 percent of America's lands that are in private hands. USDA is a research leader in everything from human nutrition to new crop technologies that allow us to grow more food and fiber using less water and pesticides.

### USDA-Natural Resource Conservation Service

The mission of the Natural Resources Conservation Service (NRCS) is to provide technical and financial assistance to landowners and operators on soil and water conservation matters. Work is directed through local soil and water conservation districts in Texas, according to the terms of memoranda of understanding with each district.

### USDA-Farm Services Agency

The principal mission of the Farm Services Agency (FSA) includes stabilizing farm income, helping farmers conserve land and water resources, providing credit to new or disadvantaged farmers and ranchers, and helping farm operations recover from the effects of disaster. Many of the FSA operated programs are funded through the Commodity Credit Corporation (CCC), a government owned and operated corporation established in 1933.

### USDA-Agricultural Research Service

The Agricultural Research Service (ARS) is the principal in-house research agency of the U.S. Department of Agriculture (USDA). ARS conducts research to develop and transfer solutions to agricultural problems of high national priority. Two of the twenty-two ARS National Programs, Water Quality and Management and Soil Resource Management, are strongly committed to applied nonpoint source pollution research as part of their mission to increase understanding and develop solutions to protect the Nation's soil and water resources. In Texas, ARS is conducting ongoing research on nonpoint source related issues such as: land application of municipal and agricultural wastes; improved management of soil, water, nutrients, and chemicals in agricultural production systems; and enhanced simulation tools for water quality,

hydrology, and crop growth. ARS research, conducted by laboratories throughout the state, is often carried out in cooperation with universities, state research and extension centers, and private organizations.

### USDA-Forest Service

Congress established the Forest Service in 1905 to provide quality water and timber for the Nation's benefit. Main activities include (1) protection and management of natural resources on National Forest System lands, (2) research on all aspects of forestry, rangeland management, and forest resource utilization (3) community assistance and cooperation with State and local governments, forest industries, and private landowners to help protect and manage Non-Federal forest and associated range and watershed lands to improve conditions in rural areas. The Forest Service is also the largest forestry research organization in the world, and provides technical and financial assistance to state and private forestry agencies.

# State Agencies

## Texas State Soil and Water Conservation Board

The Texas State Soil and Water Conservation Board (TSSWCB) is the lead agency in Texas for activity relating to abating agricultural and silvicultural nonpoint source pollution. As the lead agency, the TSSWCB is mandated to: 1) plan, implement, and manage programs and practices for abating agricultural and silvicultural nonpoint source pollution; 2) administer a Technical Assistance Program for Soil and Water Conservation Land Improvement Measures; and 3) administer a Cost-Share Assistance Program for Soil and Water Conservation Land Improvement Measures. The TSSWCB meets these mandates by working with local soil and water conservation districts to administer its TMDL Program, 319(h) Grant Program, Conservation Planning Programs (i.e. Water Quality Management Plan and Comprehensive Nutrient Management Plan Programs), NPS compliant resolution process, Poultry Initiative, and involvement in the implementation of the Coastal Management Plan.

## Texas Commission on Environmental Quality

The Texas Commission on Environmental Quality (TCEQ) strives to protect the state's human and natural resources consistent with sustainable economic development. The TCEQ implements many sections of the Texas Water Code, federal Clean Water Act, and Safe Drinking Water Act. The TCEQ develops water quality requirements designed to protect attainable uses and to maintain the quality of waters in the state. The TCEQ has a number of programs that address various aspects of nonpoint source pollution management through planning, the setting of standards,

data collection, assessment, targeting and prioritization, and implementation.

## Texas Water Development Board

The Texas Water Development Board (TWDB) is responsible for long-term water planning and financing water-related development for the state. Its duties include the preparation and update of the State Water Plan, collection and maintenance of water data, and administration of various funds designed to help finance state and local water-related projects.

## Texas Parks and Wildlife Department

The Texas Parks and Wildlife Department's (TPWD's) primary functions are to manage and conserve the natural and cultural resources of Texas and to provide hunting, fishing and outdoor recreation opportunities.

To this end, TPWD operates and maintains a system of public lands, including state parks, historic sites, fish hatcheries and wildlife management areas; monitors conserves and enhances the quality of public and private lands, rivers, streams, lakes, coastal marshes, bays, beaches, and Gulf waters; manages and regulates fishing, hunting and boating activities; assists public and private entities in providing outdoor recreational opportunities; conducts education and outreach events and programs; and cooperates with other governmental entities in these areas. TPWD's efforts focus on programs that affect habitat, in the belief that preservation and creation of appropriate habitat will result in the protection of fish, wildlife, and recreation.

## Texas Agricultural Experiment Station

The Texas Agricultural Experiment Station (TAES) is the official state agricultural research agency in Texas. It is administered by the Board of Regents of the Texas A&M University System. The TAES cooperates with other state and federal agencies and colleges and universities in planning and conducting agricultural research. Programs of the TAES are designed to provide the scientific base to develop the full agricultural potential of Texas and improve the utilization and conservation of natural resources.

## Texas Department of Agriculture

The Texas Department of Agriculture (TDA) is the State's lead regulatory agency for agricultural pesticide regulation. The Texas Pesticide and Herbicide Laws grant TDA the authority to enforce the provisions of the law pertaining to the registration, distribution, and use of all agricultural pesticides. TDA is responsible for licensing all agricultural pesticide applicators and the labeling, storage, sales, usage, and disposal of all pesticides. TDA also cooperates with other state agencies that have statutory pesticide responsibilities, such as the TCEQ, the Structural Pest

Control Board, and the DSHS. TDA is also responsible for the enforcement of federal pesticide laws under a cooperative agreement with the EPA.

## Texas Institute for Applied Environmental Research

The Texas Institute for Applied Environmental Research (TIAER) was established as part of the Texas A&M System in 1992. The first mandate in its enabling legislation is to conduct applied research on environmental issues that have public policy implications. The legislation also calls for TIAER to provide national leadership on emerging environmental policy and to provide a setting for environmental studies on the interface between government and the private sector. Establishing interdisciplinary programs or partnerships to develop and implement new policies, technologies, strategies, and relationships is another TIAER mandate.

The TIAER goal is to impact state and national environmental policy. A principal that is fundamental to this goal is that improvements in the environment are best accomplished not by simply conducting scientific research, but by using research results to formulate policy recommendations that will actually be implemented by government and other institutions. TIAER seeks to use cutting-edge strategies and technologies to assist developers and implementers of environmental policy. Partnerships with other universities and state agencies are integral aspects of Institute work. These partnerships build on the strengths of each entity to produce an effective, efficient program.

## Texas Water Resources Institute

The Texas Water Resources Institute is a unit of the Texas Agricultural Experiment Station and Texas Cooperative Extension. It is part of a national network of institutes created by the Water Resources Research Act of 1964. The Institute is funded by the United States Geological Survey and is affiliated with the National Institutes for Water Research.

The Texas Water Resources Institute serves as a focal point for water-related research at Texas universities, encouraging discussion of statewide issues through meetings and multi-university studies. The Institute links academic expertise with state and federal agencies, strengthening water research and education. Additionally, the Institute provides leadership for water resources programs through grant administration, pre-award services, project management, communications, and facilitation of interagency collaboration.

## Texas Forest Service

The Texas Forest Service (TFS), a member of the Texas A&M University System, provides statewide leadership and professional assistance to

assure that the state's forest, tree, and related natural resources are wisely used, nurtured, protected, and perpetuated for the benefit of all Texans.

## Texas Cooperative Extension

The Texas Cooperative Extension (TCE) is a partnership between the USDA, Texas A&M University, and County Commissioners Courts. The basic mission of the TCE is education and dissemination of information relating to agriculture, home economics/consumer sciences, community development, and 4-H/youth. County Extension Agents deliver most of the educational programs of the TCE. These county agents, supported by specialists based at College Station and 12 regional centers throughout Texas, provide technical information and respond to individual problems 1and questions, conduct educational meetings, and establish and evaluate demonstrations to show the benefits of using practices based on the latest scientific research. They also provide educational information through radio and television programs, newspapers, newsletters, and bulletins. Water quality and conservation is one of six major program issues being addressed by agents and specialists on an interdisciplinary basis.

## Texas Department of Licensing and Regulation

The Texas Department of Licensing and Regulation (TDLR) is the primary state agency responsible for the oversight of businesses, industries, general trades, and occupations that are regulated by the state and assigned to the department by the legislature. TDLR ensures public safety and welfare in many diverse areas. Issuing licenses, conducting inspections, investigating complaints, issuing penalties, setting rules and standards, and holding hearings, names just a few of the agency's activities. The TDLR activities as they relate to occupational certifications ensures that environmental professionals operate in compliance with federal and state laws and regulations.

## Texas General Land Office

The Texas General Land Office (GLO) is the state agency responsible for the management of state-owned public lands not specifically purchased by or deeded to other agencies. The GLO is a proprietary state agency. The GLO is also the state's lead agency for coordinating the Coastal Management Plan designed to help preserve public beach access, protect coastal wetlands and other coastal natural resources, and respond to beach erosion along the Texas coast.

## Railroad Commission of Texas

The Railroad Commission of Texas (RRC) is the state agency with primary regulatory jurisdiction over the oil and natural gas industry, pipeline transporters, natural gas utilities, rail safety matters, and surface mining operations. The main functions of the RRC are to protect the environment, protect public safety, protect the correlative rights of mineral

interest owners, prevent waste of natural resources, and assure fair and equitable utility rates in those industries over which it has been granted authority.

## *Texas Department of Transportation*

The Texas Department of Transportation (TxDOT) is the lead state agency for construction and maintenance of state roads, which includes responsibility for the management of road and highway nonpoint sources of pollution. The goal of TxDOT as it relates to nonpoint source pollution, is to prevent the degradation of receiving waters due to storm water runoff from highway operations. TxDOT has developed a comprehensive storm water management program aimed at achieving this goal.

## *Texas Department of State Health Services*

The Texas Department of State Health Services (DSHS) is the lead agency to protect, promote, and improve the health of the people of Texas. DSHS administers several programs that support public health and environmental programs. The Environmental Sciences Branch provides analytical chemistry laboratory support to the EPA Safe Drinking Water Program and analyzes fish and shellfish from Texas coastal waters, inland lakes, and rivers for organic chemicals and toxic metals. The Division for Regulatory Services-Seafood and Aquatic Life Group protects consumers of fish and shellfish from disease or other health hazards transmissible by these products produced in or imported into Texas. The Seafood and Aquatic Life Group also protects the recreational fishers from disease or contaminants found in fish and other aquatic species caught in Texas' lakes, rivers, bays or nearshore State waters.

# Interagency Agreements

Maximizing the utilization of local, state and federal resources is essential if limited resources are to be effective. Texas has implemented a variety of mechanisms to ensure and improve coordination among and between Federal, State, and local officials for addressing water quality. A list of some of the agreements and strategic partnerships is provided below.

**Table 4.1  Federal, State, and Local Agreements to Facilitate Cooperation on NPS Issues**

| Cooperative Entities | Type of Agreement | Purpose of Agreement |
|---|---|---|
| TCEQ and TSSWCB | Memorandum of Understanding | Facilitate cooperation between the two primary Texas NPS control agencies in achieving program goals. |
| TCEQ and TSSWCB | Memorandum of Agreement | Sets for the cooperating responsibility and authority regarding development of total maximum daily loads (TMDLs). |
| TSSWCB and Texas A&M University System | Memorandum of Understanding | Establishes commitments to work together to accomplish statewide NPS pollution reduction goals with the state's agricultural and silvicultural producers. TAES will conduct soil and water conservation and nonpoint source management demonstrations and related educational activities, and TAES will cooperate with TSSWCB and SWCDs to identify research needs relative to soil and water conservation and nonpoint source management. |
| TCEQ and RRC | Memorandum of Understanding | Clarifies the division of jurisdiction between TCEQ and RRC with regards to wastes generated in connection with oil and gas exploration, development, and production activities. |
| TCEQ and GLO | Memorandum of Understanding | Sets forth the mutual coordination of program responsibility and procedural mechanisms for the Galveston Bay Estuary Program to address threats arising from pollution, development, and overuse, and enhancing ecosystems-based management of Galveston Bay. |
| TCEQ with other state agencies: TPWD, DSHS, TWDB, Tx A&M University System | Memorandum of Agreement | Establishes agreements with key state and federal partners to set priorities, achieve water quality goals, and plan and implement watershed projects to protect and restore NPS-impacted water bodies. |
| USDA-NRCS with local Soil and Water Conservation Districts | Memorandum of Agreement | Sets forth the cooperation for SWCDs to furnish technical assistance to farmers and ranchers in the preparation of soil and water conservation plans. |
| TCEQ and TWDB | Memorandum of Agreement | Sets forth the cooperation, responsibility and authority regarding the development of TMDLs. |
| TCEQ and TDA | Memorandum of Agreement | Sets forth the cooperation, responsibility and authority regarding the development of TMDLs. |
| TCEQ and TAES, TCE and TFS | Memorandum of Agreement | Sets forth the cooperation, responsibility and authority regarding the development of TMDLs. |

| TSSWCB and USDA-Forest Service | Memorandum of Understanding | Sets forth the responsibilities and activities to be performed by each agency in carrying out the State Water Quality Management Plan and Nonpoint Source Management Program as related to activities on National Forest System Lands. |
|---|---|---|
| TPWD and TxDOT | Memorandum of Understanding | Provides a formal mechanism by which the TPWD may review TxDOT transportation projects, including those that have the potential to affect natural resources and to promote the mutually beneficial sharing of information which will assist TxDOT in making environmentally sound decisions. |
| TCEQ and U. S. Coast Guard | Memorandum of Agreement | Outlines the responsibilities for the recovery of abandoned sealed containers on Texas beaches for pollution prevention and response. |
| GLO and U.S. Coast Guard | Memorandum of Agreement | Provides for agreement to cooperate and to coordinate efforts in implementing and exercising their respective statutory and regulatory duties related to pollution prevention and response. |

# Stakeholder Involvement

In order to achieve water quality goals, including those discussed in this Management Program, the State of Texas enlists the cooperation of affected entities, or stakeholders, to solicit input, assistance and cooperation in developing and implementing solutions. Within a particular watershed, stakeholders may include individuals and civic groups, farmers and ranchers, local industry, environmental organizations, wastewater dischargers, as well as local, state, and federal government entities.

## *Coordinated Monitoring*

The development of the annual coordinated monitoring schedule is an exceptional example of stakeholder involvement. Monitoring priorities and issues are discussed among state, federal, regional, and local governmental entities as well as other interested parties and the public. The implementation of coordinated statewide monitoring is a priority of the TCEQ and the Clean Rivers Program (CRP) to minimize duplication of effort, improve spatial coverage of monitoring sites, and improve consistency of parametric coverages (parametric coverages typically include field measurements, flow measurements, routine water chemistry, and fecal coliform analysis).

At least one meeting is held in each major river basin, hosted by the CRP planning agency, during the spring of each year. The purpose of the meeting is to develop a coordinated basin-wide monitoring schedule. All

water quality monitoring groups that collect Surface Water Quality Monitoring data and commit to comply with TCEQ requirements for collecting quality-assured data are invited to participate. New sites are added, existing sites may be relocated, and parametric coverages may be changed based on the discussions at the meetings.

The preliminary basin-wide monitoring schedules developed at the coordinated monitoring meetings are reviewed by the CRP planning agencies, CRP stakeholders, and TCEQ staff to ensure that proposed revisions to monitoring locations and parametric coverages are appropriate. After review, a statewide coordinated schedule is posted on the internet developed and maintained under contract by the Lower Colorado River Authority at: http://cms.lcra.org/

# Stakeholder Groups

## National Natural Resources Conservation Foundation

The National Natural Resources Conservation Foundation (NNRCF) promotes innovative solutions to natural resource problems and conducts research and educational activities to support conservation on private land. The NNRCF is a private, nonprofit corporation. The foundation builds partnerships among agencies and agricultural, public, and private constituencies interested in promoting voluntary conservation on private lands.

## Texas Forestry Association

The Texas Forestry Association (TFA) is a tax-exempt, non-profit organization which serves as the voice of the forest industry in eastern Texas. Within the TFA, information and training are provided for both the logger and the landowner through the work of various committees. The TFA provides an excellent avenue for reaching those who own and manage forest resources and those employed in the forest industry. Members of TFA are committed to carrying out programs in water quality, education, and the continued production of forest resources.

## Clean Rivers Program Stakeholder Workgroup

The Stakeholder Workgroup meets annually to ensure the Clean Rivers Program is functioning in a manner that considers the needs of all stakeholders. Representatives from government, industry, business, agriculture, and environmental interest groups participate in the Workgroup. Surface water quality issues are discussed, and decisions are made through a consensus-based approach.

The Stakeholder Workgroup was originally formed solely as an advisory group for the Clean Rivers Program. However, in recent years the

Workgroup's scope and membership has been expanded to include input on the focus, goals, and functionality of the <u>Nonpoint Source Management Program,</u> the <u>Total Maximum Daily Load Program</u>, and the <u>Surface Water Quality Monitoring Program.</u> The group also works with the TCEQ on setting priorities for addressing water quality problems related to both point and nonpoint sources.

## *Clean Rivers Program Basin Steering Committees*

CRP Basin Steering Committees meet at least annually in each of Texas' major river basins. The purpose of these meetings is for the CRP Planning Agency to present water quality issues for the basin and request input from the local citizens and stakeholders in identifying potential sources of pollution and setting local priorities. In addition, the meeting provides a way for state agency representatives to communicate statewide NPS goals to stakeholders at the local level. The CRP Planning Agency responsible for monitoring and assessing water quality for each basin plans and conducts the meeting. Basin Status Reports prepared by the CRP Planning Agencies outline recommended actions for nonpoint source pollution management and other water quality issues in each river basin.

## *Local Watershed Action Committees*

Throughout the Total Maximum Daily Load (TMDL) development process, stakeholder work groups or existing community forums are used to obtain public input toward project design, sampling, load allocations, and options for implementation measures. After a TMDL has been established for a particular water body, the TCEQ develops an implementation plan with the participation of local stakeholders, describing the voluntary and regulatory measures needed to achieve reduction of the pollutants addressed in the TMDL.

## *NPS Stakeholders Forum*

The TCEQ and the TSSWCB established a statewide stakeholder workgroup comprised of CRP Stakeholders and other state and local entities with an interest in NPS management. The NPS Stakeholders Forum provides TSSWCB and TCEQ an opportunity to seek input and feedback on the State's NPS management programs and activities. The NPS Stakeholders Forum meets at least annually. The TSSWCB and TCEQ NPS and CRP programs coordinate meetings of this group as needed. The meetings provide an opportunity for the NPS program to provide information about NPS management and the 319 program to state and local government entities for implementation of the goals and milestones of the NPS Management Program.

## Texas Watershed Protection Committee

In 1997 the Texas Watershed Protection Committee (TWPC) was formed for the purpose of coordinating actions on numerous atrazine detects found in surface water bodies that were sources of public drinking water. The TWPC is informal in that its existence is not mandated by any state law or regulation; however, it meets an important need for coordinating responses to pesticide contamination of surface water. As well as coordinating general activities aimed at preventing contamination, the TWPC actively seeks and identifies opportunities to improve existing surface water quality programs and promotes coordination between agricultural and surface water related agencies. Response to pesticide contamination is coordinated through the TWPC. Information is provided to the TWPC upon detection of pesticide contamination in surface water for evaluation and recommendations. Response to pesticide contamination in surface water falls under the jurisdiction of a number of state agencies including the TSSWCB, TCEQ, and TDA.

## Texas Groundwater Protection Committee

The Texas Groundwater Protection Committee (TGPC) was formally created by the 71st Legislature in 1989. The TGPC was created to bridge gaps among existing state water and waste regulatory programs in order to focus protection on groundwater resources and to optimize water quality protection by improving coordination among agencies involved in groundwater activities. Texas Water Code sections 26.401 through 26.407 established the TGPC and outlined its powers, duties, and responsibilities. The TGPC is responsible for preparing the *Texas Groundwater Protection Strategy*, which provides guidelines for the prevention of contamination and for the conservation of groundwater and that provides for the coordination of the groundwater protection activities of the agencies represented on the committee.

The state's groundwater protection policy was adopted by the Legislature as part of the Act that created the TGPC. The policy sets out non-degradation of the state's groundwater resources as the goal for all state programs. The state's groundwater protection policy recognizes:

- the variability of the state's aquifers in their potential for beneficial use and susceptibility to contamination,
- the importance of protecting and maintaining present and potentially usable groundwater supplies,
- the need for keeping present and potential groundwater supplies reasonably free of contaminants for the protection of the environment and public health and welfare, and
- the importance of existing and potential uses of groundwater supplies to the economic health of the state.

The TGPC actively attempts to identify opportunities to improve existing groundwater quality programs and promote coordination between agencies. The TGPC strives to identify areas where new or existing programs could be enhanced to provide additional needed protection.

## Coastal Coordination Council

The Coastal Coordination Council (Council) administers the Coastal Management Program (CMP). The Commissioner of the General Land Office chairs the Council. Other members of the Council include the chair, or a member designated by the chair, of the following agencies' Commissions: the Texas Parks and Wildlife Department (TPWD); the Texas Commission on Environmental Quality; the Railroad Commission of Texas; the Texas Water Development Board; the Texas Transportation Commission; the State Soil and Water Conservation Board; the director of the Texas A&M University Sea Grant Program serving as a non-voting member; and four gubernatorial appointees. The appointees consist of a local elected official who resides in the coastal area, a business owner in the coastal area, a resident from the coastal area, and a representative of agriculture.

The Council is charged with adopting uniform goals and policies to guide decision-making by all entities regulating or managing natural resource use within the Texas coastal area. The Council reviews significant actions taken or authorized by state agencies and subdivisions that may adversely affect coastal natural resources to determine their consistency with the CMP goals and policies. In addition, the Council oversees the CMP Grants Program and the Small Business and Individual Permitting Assistance Program.

## Texas Alliance of Groundwater Districts

The Texas Alliance of Groundwater Districts (TAGD), formerly the Texas Groundwater Conservation Districts Association, was formed on May 12, 1988, as a nonprofit §501©)(3) corporation. The TAGD was formed to further the purpose of groundwater conservation and protection activities. The TAGD provides a means of communication and exchange of information between individual districts regarding the day-to-day operation of local groundwater management. Members of TAGD are part of a network which provides valuable technical and operational experience. This often provides information that saves districts time and money. The TAGD maintains contact with members of the private sector and various elected, local, state, and federal officials, providing them with timely information on activities and issues relevant to groundwater management. Members of TAGD also serve on various local, state, and federal agency committees and subcommittees, providing input and information on behalf of the member district.

One of the primary intents of Chapter 36 of the Texas Water Code, the chapter empowering groundwater conservation districts, is for the districts to develop and carry out educational programs for their constituency. Many districts have developed educational programs directed toward water conservation, well-head protection and overall environmental awareness that has contributed to the mitigation of NPS pollution.

### *Soil and Water Conservation Districts*

There are currently 217 soil and water conservation districts (SWCDs) organized across the state. Each district is an independent political subdivision of state government that is governed by five directors elected by landowners in the district. Local SWCDs provide assistance to agricultural landowners or operators.

Various federal, state, and local agencies provide assistance to SWCDs. The TSSWCB was designed to organize and serve as the state-level administrative agency for local SWCDs. Through Memoranda of Understanding with the USDA-NRCS, local SWCDs are able to furnish technical assistance to farmers and ranchers in the preparation of a complete soil and water conservation plan to meet each land units's specific capabilities and needs.

Senate Bill 503 of the 73rd Texas Legislature created the Water Quality Management Plan Program authorizing the TSSWCB, through local SWCDs to provide agricultural and silvicultural producers with an opportunity to comply with state water quality laws through traditional, voluntary, incentive-based programs. Landowners and operators may request the development of a site-specific water quality management plan through local SWCDs. Plans include appropriate land treatment practices, production practices, and management and technology measures to achieve a level of pollution prevention or abatement consistent with state water quality standards.

SWCDs work to bring about the widespread understanding of the needs of soil and water conservation. In addition, they work to activate the efforts of public and private organizations and agencies into a united front to combat soil and water erosion and to enhance water quality and quantity in the state. It is the purpose of SWCDs to instill in the minds of local people that it is their individual responsibility to do the job of soil and water conservation.

# Importance of Local Participation

The 1987 amendment to the Clean Water Act was the first comprehensive attempt by the federal government to control nonpoint sources of pollution. Since that time, other state, federal and local programs have been created or expanded to protect water quality. Many local, regional, state, and federal agencies have specific responsibilities that are critical to

the restoration of NPS impacted waterbodies. Organizations, especially at the watershed level, can provide information about local concerns and infrastructure, and can help to implement and build support for pollution control measures necessary to restore water quality.

The table below presents an overview of some of the programs involved in implementing the State's Nonpoint Source Management Program by achieving the milestones and goals defined in this document. For more information about these programs, see chapter 5 for a detailed discussion. These programs are implemented by the agencies described above.

**Table 4.2  Federal, State, and Local Programs and Activities for Assessment, Implementation and Education within the Texas Nonpoint Source Pollution Management Program**

| Program | Lead Agency | Program Type | Funding Source |
|---|---|---|---|
| NPS Grant Program | TCEQ<br>TSSWCB | Assessment<br>Implementation<br>Education | Federal |
| Clean Rivers Program (CRP) | TCEQ<br>River Authorities<br>Councils of Government | Assessment<br>Education | Fees |
| TMDL Implementation Plans | TCEQ<br>TSSWCB | Assessment<br>Implementation<br>Education | Federal<br>State |
| Superfund Program | TCEQ | Implementation | Federal<br>State |
| Brownfields Program | TCEQ<br>EPA | Implementation | Federal<br>State |
| Voluntary Cleanup Program | TCEQ | Implementation | State<br>Fees |
| Corrective Action Program | TCEQ | Implementation | State |
| Leaking Petroleum Storage Tank Program | TCEQ | Implementation | Federal<br>State |
| Floodplain Management | TCEQ | Implementation | State |
| Emergency Response Program | TCEQ<br>RRC<br>DSHS<br>EPA | Implementation | State |
| Coastal Oil Spill Prevention and Response | GLO<br>U. S. Coast Guard | Implementation | State |
| Kills and Spills Team | TPWD | Implementation | State |

| | | | |
|---|---|---|---|
| 401/404 Water Quality Certification | Corps<br>TCEQ<br>RRC<br>TPWD | Implementation | Federal<br>State |
| Water Rights Permit Program | TCEQ | Implementation | State |
| Clean Marina Initiative | NOAA | Implementation<br>Education | Federal |
| Clean Texas Marinas | TCEQ<br>GLO | Implementation<br>Education | Federal<br>State |
| Small Spill Prevention Program | GLO | Implementation<br>Education | State |
| Solid Waste Permitting Programs | TCEQ | Implementation | State |
| Beneficial Use Sludge Permitting Program | TCEQ | Implementation | State |
| Illegal Disposal Abatement Program | TCEQ | Implementation<br>Education | State |
| Texas Environmental Enforcement Task Force | TCEQ<br>TPWD<br>GLO<br>RRC<br>Atty General's Office<br>Governor's Office | Implementation<br>Education | State |
| Citizen Complaints | TCEQ | Implementation | State |
| Citizen Environmental Watch | TCEQ | Implementation | State |
| Composting | TCEQ<br>TSSWCB | Implementation<br>Education | Federal<br>State<br>Local |
| Used Oil Recycling | TCEQ | Implementation | Fees |
| Household Hazardous Waste Management Program | TCEQ | Implementation<br>Education | State |
| Tire Disposal Program | TCEQ | Implementation | Fees |
| City of San Antonio Waste Management Programs | City of San Antonio | Implementation<br>Education | Local |
| City of Austin Biosolids Composting | City of Austin | Implementation | Local<br>Fees |
| Municipal and Industrial Wastewater Permitting | TCEQ | Implementation | Fees |
| On-Site Sewage Facility Program | TCEQ<br>Local Authorities | Implementation | Fees |

| | | | |
|---|---|---|---|
| Texas On-Site Wastewater Treatment Research Center | Established by the Legislature | Implementation Education | State |
| City of El Paso Reclaimed Water System | City of El Paso | Implementation | Federal State Local Fees |
| Brazos River Authority Technical Assistance Program | Brazos River Authority | Implementation | Local |
| State Storm Water Permitting Programs | TCEQ EPA | Implementation | State |
| Storm Water Management Guidelines | TxDOT | Implementation | State |
| Trinity River Corridor | City of Dallas | Implementation | Local |
| Dallas Floodway Extension | City of Dallas Corps of Engineers | Implementation | Local |
| San Antonio River Tunnel | City of San Antonio | Implementation | Local |
| Integrated Storm Water Management Program | North Central Texas Council of Govts. | | Local |
| San Angelo Urban Nonpoint Source Abatement Program | City of San Angelo UCRA | Implementation Education | Federal Local |
| Groundwater Pesticide Management Plan | EPA | Implementation | Federal State |
| Pesticide Review Program | EPA | Implementation | Federal |
| Agricultural Pesticide Regulation | TDA EPA TCEQ DSHS | Implementation | State |
| Structural Pest Control Board | SPCB TDA EPA | Implementation | State |
| Agriculture Resource Protection Authority | ARPA TDA TSSWCB TAES DSHS TCEQ SPCB | Implementation | State |
| Texas Watershed Protection Committee | TWPC TCEQ TSSWCB TDA | Implementation Education | State |
| Agricultural Waste Pesticide Collection Program | TCEQ TCE | Implementation | State |

| | | | |
|---|---|---|---|
| Agricultural Waste Permitting | TCEQ<br>TSSWCB<br>USDA-NRCS | Implementation | Federal<br>State |
| TSSWCB Water Quality Management Program | TSSWCB | Implementation<br>Education | Federal<br>State |
| Dairy Outreach Program | TCEQ | Implementation<br>Education | Federal<br>State |
| Texas Brush Control Program | TSSWCB | Implementation | State |
| Agricultural Loan Program | TWDB | Implementation | State |
| Private Lands Enhancement Program | TPWD | Implementation<br>Education | State |
| Environmental Quality Incentives Program | USDA-NRCS | Implementation<br>Education | Federal |
| Watershed Program | USDA-NRCS | Implementation | Federal |
| Conservation Technical Assistance Program | USDA-NRCS | Implementation | Federal |
| Conservation Reserve Program | Farm Services Agency | Implementation | Federal |
| Agricultural Research Service | USDA | Implementation | Federal |
| TX Institute for Applied Environmental Research | TIAER | Assessment<br>Implementation | State |
| Texas Water Resource Institute | TWRI | Assessment<br>Implementation | State |
| Creekside Conservation Program | LCRA | Implementation<br>Education | Local |
| Resource Development Program | TFS | Implementation | State |
| Forest Stewardship Program | USDA Forest Service | Implementation | Federal |
| Forest Land Enhancement Program | USDA Forest Service | Implementation<br>Education | Federal |
| Site Visit Program | TCEQ | Implementation | State |
| Small Towns Environmental Program | TCEQ | Implementation | State |
| Texas Country Cleanup Program | TCEQ<br>TCE<br>TDA | Implementation | State |
| Supplemental Environmental Projects | TCEQ | Implementation | Local |
| Clean Texas Program | TCEQ | Implementation<br>Education | State |
| Texas Chemical Council | Trade Association | Implementation<br>Education | Local |

| | | | |
|---|---|---|---|
| Underground Injection Control | TCEQ | Implementation | State |
| Source Water Assessment and Protection Program | TCEQ | Assessment Implementation | State |
| Texas Groundwater Protection Committee | TCEQ RRC DSHS TDA TSSWCB TAGD TAES BEG TDLR | Implementation | Federal State |
| Underground Storage Tank Installer Licensing | TCEQ | Implementation | State |
| Texas Department of Licensing and Regulation | TDLR | Implementation | State |
| Edwards Aquifer Protection Program | TCEQ | Implementation | Federal State |
| Oil and Gas Well Plugging Program | RRC | Implementation | Fees |
| Wetlands Reserve Program | NRCS | Implementation | State |
| Texas Wetlands Conservation Plan | TPWD | Implementation Education | State |
| Seagrass Conservation Plan | TPWD | Implementation Education | State |
| Coastal Management Plan | CCC- GLO | Implementation | Federal State |
| Wetland Conservation Plan for State-Owned Coastal Wetlands | TPWD GLO | Implementation Education | State |
| Texas Wetlands Conservation Plan | TPWD | Implementation | Federal |
| Local Governments Wetland Plan | GLO | Education Implementation | State |
| Wetlands Assistance for Landowners | TPWD | Education | State |
| Texas Coastal Management Program / Coordination Council | CMP-CCC | Implementation Education | Federal State |
| Galveston Bay Estuary Program | GBEP | Implementation Education | Federal State Local |
| Coastal Bend Bays & Estuaries Program | CBBEP | Implementation Education | Federal State Local |

| | | | |
|---|---|---|---|
| Coastal Habitat Restoration Program | TPWD | Implementation Education | State |
| BEACH Act | GLO | Assessment | Federal Local |
| Gulf of Mexico Community-Based Restoration Program | GCRP | Implementation | Federal State |
| Bilge Water Reclamation Program | GLO | Implementation Education | Federal State Local |
| Coastal Texas 2020 | GLO | Implementation | Federal State Local |
| Adopt -A-Beach Program | GLO | Implementation Education | State Local |
| Border Pollution Prevention Initiative | TCEQ | Implementation Education | Federal State Local |
| Border Environment Infrastructure Fund | NADB | Implementation | Federal Local |
| International Boundary and Water Commission | IBWC | Assessment Implementation Education | Federal Local |
| Economically Distressed Area Program | TWDB | Implementation Education | Federal State Local |
| Colonias Initiatives Program | SOS | Implementation Education | State |
| Border Recycles Day | TCEQ | Implementation Education | State Local |
| Texas Watch Program | EPA TCEQ Texas State Univ. | Assessment Education | Federal State |
| Colorado River Watch Program | LCRA | Assessment Education | Federal Local |
| The Aquatic Experience | UCRA | Assessment Implementation Education | Federal Local |
| The City of Denton Watershed Protection Program | City of Denton | Assessment Education | Federal Local |
| Nonpoint Source Consumer Education | TCEQ | Education | Federal State |
| Storm Drain Stenciling | TCEQ | Education | State |
| Back Yard Composting and Xeriscaping | TCEQ | Education | Federal State |

| Teaching Environmental Sciences | TCEQ | Education | State |
|---|---|---|---|
| Environmental News You Can Use | TCEQ | Education | State |
| Publications and Videos | TCEQ TSSWCB | Education | Federal State |
| Environmental Hotlines | EPA TCEQ | Education | Federal State Local |
| Small Spill Prevention | GLO | Education | Fees |
| Agricultural Outreach Program | TCE | Education | Federal State |
| On-Site Wastewater Treatment Training Center | TAMU | Education | State Local |
| Don't Mess With Texas | TxDOT | Education | State |
| Keep Texas Beautiful | TxDOT | Education | State |
| Texas Wildscapes Program | TPWD | Education | State |
| Edwards Aquifer Authority | Edwards Aquifer Authority | Education | Local |
| Barton Springs/Edwards Aquifer Conservation District | BSEACD | Education | Local |
| Grow Green and Earth Camp | City of Austin | Education | Local |
| WET in the City | City of Houston | Education | Local |
| City of Fort Worth Environmental Education | City of Fort Worth | Education | Local |
| City of San Antonio Curbside Recycling | City of San Antonio | Implementation Education | Local |

# CHAPTER 5  ASSESSMENT

In order to protect water quality, we must define and measure it, identify the types and sources of pollution, and implement plans to protect, maintain, and restore water quality. The state of Texas uses a dynamic, flexible cycle of activities to manage water quality. Steps in the cycle include:

- **Standards and Planning**: setting standards for surface water quality and revising or formulating monitoring plans;

- **Monitoring**: collecting data to monitor the condition of surface waters;
- **Assessment and Targeting**: assessing data to determine water quality status and to identify any impairments;
- **Developing Strategies**: for protecting, improving, or restoring water quality with pollutant source controls and practices; and
- **Implementing Pollution Controls**: for both point and non-point sources and evaluating progress, which may lead back to revising those plans or formulating new ones.

Implementing this cycle of activities involves coordination between many different entities and programs around the state of Texas. The development of implementation plans and the implementation of those plans will be discussed in Chapter 7.

## Surface Water Assessment

The major surface waters of Texas have been divided into classified water segments. A single river may consist of several classified segments. The term segment refers to a defined, basic unit for assigning site-specific standards, and is intended to have relatively common biological, chemical, hydrological, and physical characteristics. Segments will also normally exhibit common reactions to external stresses such as discharges or

Texas has a large number of water bodies. There are 11,247 streams and rivers large enough to be named, with a total combined length of 191,228 miles. However, only 40,194 miles of streams and rivers (21%) are considered perennial, meaning that they have sustained flow throughout the year. Texas also has 9,993 inland reservoirs and lakes 10 acres or larger in size that together cover approximately 1,994,600 acres. Of those, 211 are major reservoirs which are greater than 5,000 acre-feet each. Texas bays and estuaries cover approximately 2,393 square miles along a coastal shoreline that stretches 624 miles in length. The Gulf of Mexico, within Texas' jurisdiction covers approximately 3,879 square miles. In the conterminous United States, Texas ranks first in total square miles covered by fresh water and saltwater with 4,959.

pollutants. The establishment of segments facilitates planning activities, issuance of permits, and allocation of grant funds necessary to implement various sections of the federal Clean Water Act. Texas currently recognizes 225 stream segments, 100 reservoir segments, and 48 estuary segments. The Gulf of Mexico is treated as one segment. Texas surface water quality standards and the assessment of water quality are based on these classified segments.

## *Protecting Surface Water Quality*

The TCEQ Water Quality Standards Team is responsible for establishing and revising standards to protect surface water quality. The Texas Surface Water Quality Standards (TSWQS), §30, Chapter 307 of the Texas Administrative Code, recognize the regional and geologic diversity of the state. Appropriate water uses are designated for each of the classified segments. Numerical and narrative criteria established in the TSWQS provide a basis for assessing water quality, evaluating use support, and managing point and nonpoint source loadings in Texas surface waters. The TSWQS are designed to:

- establish numerical and narrative criteria for water quality throughout the state;
- provide a basis on which TCEQ regulatory programs can establish reasonable methods to implement and attain the state's standards.

Water quality standards are protective; that is, if one or more water quality standard is not being met in a classified segment, there is some possibility that water quality may be inadequate to meet the designated uses. For example, a water body fails to meet the dissolved oxygen standard established to support aquatic life use, yet no fish kills are observed. However, a decline in the variety or number of aquatic species and an increased probability of fish kills may exist.

## Uses

Four general categories of use are defined in the Texas Surface Water Quality Standards: aquatic life use, contact recreation, domestic water supply, and fish consumption.

### *Aquatic Life Use*

The standards associated with this use are designed to protect plant and animal species that live in and around the water. They establish optimal conditions for the support of aquatic life and define indicators used to measure whether these conditions are met. Some pollutants or conditions that may jeopardize this use include low levels of dissolved oxygen, toxic substances such as metals or pesticides, or excess turbidity.

*Contact Recreation*

The standard associated with this use measures the level of certain bacteria in water to estimate the relative risk of swimming or other water sports involving direct contact with the water. It is possible to swim in water that does not meet this standard without becoming ill; however, the probability of becoming ill is higher than it would be if bacteria levels were lower.

*Domestic Water Supply*

Domestic water supply consists of two subcategories: Public Water Supply and Aquifer Protection.

*Public Water Supply*. Standards associated with this use indicate whether water from a lake or river is suitable for use as a source for a public water supply system. Source water is treated before it is delivered to the tap and must meet a separate set of standards established for treated drinking water. Indicators used to measure the safety or usability of surface water bodies as a source for drinking water include the presence or absence of substances such as metals or pesticides. Concentrations of salts, such as sulfate or chloride, are also measured, since treatment to remove high levels of salts from drinking water is expensive.

*Aquifer Protection*. Segments designated for aquifer protection are capable of recharging the Edwards Aquifer. The principal purpose of this use designation is to protect the quality of water infiltrating and recharging the aquifer. The designation for aquifer protection applies only to those designated portions of the segments that are on the recharge zone, transition zone, or contributing zone of the Edwards Aquifer.

*Fish Consumption*

The standards associated with this use are designed to protect the public from consuming fish or shellfish that may be contaminated by pollutants. The standards identify levels at which there is a significant risk that certain toxic substances dissolved in water may accumulate in the tissue of aquatic species. However, because pollutant concentrations in water do not always predict when toxic substances will accumulate in fish, the state also conducts tests on fish and shellfish tissue to determine if there is a risk to the public from consuming fish caught in state waters. The standards also specify bacterial levels in marine waters to assure that oysters or other shellfish that may accumulate bacteria from the water are safe for commercial harvest, sale, and consumption by the public.

## Water Quality Indicators

Specific indicators of water quality such as bacteria, dissolved solids, and organics are also described in the standards. Several different parameters may be measured to determine whether a water body meets its designated

uses. Some of the most common are listed here, with an explanation of why they are important to the health of a water body.

**Fecal Coliform, E. Coli, and Enterococci Bacteria**

These bacteria are measured to determine the relative risk of swimming or other water sports. These bacteria are found in the waste of warm-blooded animals. Their presence may indicate that pathogens also in these wastes may be reaching a body of water from sources, such as, inadequately treated sewage, improperly managed animal waste from livestock, pets in urban areas, or failing septic systems.

**Dissolved Oxygen**

The concentration of dissolved oxygen is a single, easy-to-measure characteristic of water that positively correlates with the abundance and diversity of aquatic life in a water body. A water body that can support diverse, abundant aquatic life is a good indication of high water quality. However, highly variable dissolved oxygen concentrations may indicate a related problem associated with an excess of nutrients in water. High concentrations of nutrients in water may stimulate excessive growth of vegetation which may result in very high dissolved oxygen concentrations during the day and very low dissolved oxygen concentrations at night. These conditions may have a negative impact on aquatic life use.

**Dissolved Solids**

High levels of dissolved solids, such as chloride and sulfate, can cause water to be unusable, or simply too costly to treat for the drinking water supply use. Changes in dissolved solids concentrations also adversely affect the water quality for aquatic life use.

**Metals**

Concentrations of metals can pose a threat to drinking water supplies and human health. Eating fish contaminated with metals can cause these toxic substances to accumulate in tissue, posing a risk to human health. Metals also pose a threat to livestock and aquatic life. Potentially dangerous levels of metals and other toxic substances are identified through chemical analysis of water, sediment, and fish tissue.

*Organics*

Toxic substances from pesticides and industrial chemicals, called organics, pose the same concerns as metals. Polychlorinated biphenyls (PCBs), for example, are industrial chemicals that are toxic and probably carcinogenic. Although banned in the United States in 1977, PCBs remain in the environment, and they accumulate in fish and human tissues when consumed. Potentially dangerous levels of toxic substances are identified through chemical analysis of water, sediment, and fish tissue.

**Fish Consumption Advisories and Closures**

The Texas Department of State Health Services (DSHS) conducts chemical testing of fish tissue to determine whether there is a risk to human health from consuming fish or shellfish caught in Texas streams, lakes, and bays. Fish seldom contain levels of contaminants high enough to cause an imminent threat to human health, even to someone who eats fish regularly. Risk increases for those persons who regularly consume larger fish and predatory fish from the same area of contaminated water over a long period of time. When a fish consumption advisory is issued, a person may legally take fish or shellfish from the water body under the advisory, but should limit how much fish he or she eats, and how often. When a fish consumption closure is issued, it is illegal to take fish from the water body.

## Data Collection

Better understanding the relationship between land and water starts with monitoring the condition of water quality. The mission of the TCEQ Surface Water Quality Monitoring (SWQM) program is to characterize the water quality of the ambient surface waters of the state.

Monitoring activities can be grouped into five categories: routine monitoring, systematic monitoring, targeted monitoring, permit support monitoring and effectiveness monitoring:

**Routine monitoring** is designed to assess the status and trends of overall water quality throughout the state, and for each river basin. Data are collected using a monitoring network of key sites on the major water bodies in each basin on a regular basis. Monitoring sites may also include smaller water bodies to support characterization of ecoregions and/or basin-specific conditions.

**Systematic monitoring** focuses on evaluating subwatersheds and unclassified water bodies. Its purpose is to investigate and detect areas of concern, and identify issues that require further study. It also includes monitoring at sites to check the status of water bodies (identify improvements or concerns). This monitoring strategy rotates resources around the river basin to gather information on water bodies that would not normally be included in the routine monitoring program.

**Targeted monitoring** is conducted on water bodies where there is reason to believe there is a threat or a concern for water quality, to establish the extent and degree of an impairment, or to determine the best strategy for restoring water quality. Sometimes called special studies, targeted monitoring activities usually involve intensive periods of data collection at sites where routine or systematic monitoring identified impacts, concerns, or impaired uses.

**Permit support monitoring** is used to address specific areas where additional information is need to determine appropriate limits for wastewater discharges. This may include studies to gather site-specific information for use in developing permits.

**Effectiveness monitoring** is conducted to evaluate whether management practices, regulatory measures, and watershed improvement and restoration plans are producing the desired results.

## Monitoring Coordination

The CRP plays a key role in the TCEQ's yearly integration of these various monitoring needs into a coordinated monitoring schedule for the entire state. The schedule shows all surface water monitoring being conducted by the TCEQ or under its contracts or cooperative agreements for each planning year.

Planning and development of the coordinated monitoring schedule takes place from January through May preceding the state fiscal year for which the plan is developed. To support coordinated monitoring, the TCEQ has developed guidance for selecting sites and for sampling methods for routine, systematic, and targeted monitoring. The coordinated monitoring schedule is hosted by the Lower Colorado River Authority, a CRP Planning Agency, on its Web site at *http://cms.lcra.org/*.

## Texas Commission on Environmental Quality
## Surface Water Quality Monitoring Program

The TCEQ's Surface Water Quality Monitoring (SWQM) Program is coordinated by the Surface Water Quality Monitoring Team and by staff in the TCEQ's 16 regional offices. Routine monitoring and special studies are conducted by SWQM personnel.

Finished drinking water data is collected by the TCEQ's Drinking Water Quality Program. Additional supporting information is provided by the Source Water Assessment and Protection Program (discussed in Chapt 5).

## Clean Rivers Program

The CRP is a collaboration of 15 regional water agencies with the TCEQ. It is a unique, water quality monitoring, assessment, and public outreach program that is funded by state fees assessed on the number and size of wastewater treatment plants and surface water right permittees that reside within each river basin. The CRP provides the opportunity to approach water quality issues at the local level through coordinated efforts among diverse agencies, various programs, and the public.

Cost-effective watershed management decisions must be based on scientifically valid and complete assessments of water quality conditions and contributing causes of impact. Water bodies should be selected upon

the importance of the resource, risk from pollution, and with input from the Steering Committees (discussed in Chapter 4). Monitoring activities include fixed monitoring, systematic monitoring, targeted monitoring, and special studies.

### United States Geological Survey

The United States Geological Survey (USGS) also conducts a large amount of monitoring statewide and much of the data are utilized by the TCEQ. The USGS surface water collection network in Texas is primarily established to monitor stream flow continuously at many permanent sites. Field measurements, routine water chemistry, and metals in water are also collected at many of the fixed sites. Sites are chosen to represent a mix of natural and human factors that influence water quality. Chemical variables are then related by the USGS to hydrologic conditions to interpret water-resource conditions and meet water quality management needs. Estimation of point and nonpoint source loadings, stormwater management, and chemical-contaminant controls are some of those needs.

### Other Sources

Additional data from other state and federal agencies, cities, and other monitoring groups can be assessed in the evaluation of water quality if the data meet clearly defined acceptance and time line criteria established by the TCEQ. Previous contributors of data of this type include the Texas Department of State Health Services (DSHS), Texas Parks and Wildlife Department (TPWD), Texas Institute for Applied Environmental Research (TIAER), and Texas Watch.

## Assessing the Data

The current condition of Texas surface water resources and the effectiveness of protection and restoration activities are evaluated by assessing the available data. The physical, chemical, and biological characteristics of aquatic systems are assessed in relation to human health concerns, ecological conditions, and designated uses. Water quality data may be used to:

- characterize existing conditions,
- evaluate spatial and temporal trends,
- determine water quality standards compliance,
- identify emerging problems, and
- evaluate the effectiveness of water quality control programs.

### Water Quality Inventory

The TCEQ evaluates the condition of the state's water bodies on a periodic basis as required by CWA§305(b). The results of this evaluation are contained within the *Texas Water Quality Inventory and 303(d) List* which is prepared by the TCEQ's SWQM team and submitted to the EPA for

approval. One of five categories is assigned to each parameter and area of a water body, known as an assessment unit, to provide more information to the public, EPA, and agency staff about water quality status, management plans, and management activities. When an assessment unit has multiple parameters, the highest category is assigned to the assessment unit. When a water body has multiple assessment units, an overall category is assigned to the entire water body. The table below summarizes the categorization of water bodies in Texas. Categories four and five represent the list of impaired water bodies as required by CWA§303(d).

**Table 5.1  Categories of the Texas Water Quality Inventory and 303(d) List**

| | |
|---|---|
| Category 1 | Attaining the water quality standard and no use is threatened. |
| Category 2 | Attaining some of the designated uses; no use is threatened; and insufficient or no data and information are available to determine if the remaining uses are attained or threatened. |
| Category 3 | Insufficient or no data and information to determine if any designated use is attained. |
| Category 4 | Standard is not supported or is threatened forone or more designated uses but does not require the development of a TMDL. |
| Category 4a | TMDL has been completed and approved by EPA. |
| Category 4b | Other pollution control requirements are reasonably expected to result in the attainment of the water quality standard in the near future. |
| Category 4c | Nonsupport of the water quality standard is not caused by a pollutant. |
| Category 5 | Category 5 is the 303(d) list. The water body does not meet applicable water quality standards or is threatened for one or more designated uses by one or more pollutants. |
| Category 5a | A TMDL is underway, scheduled, or will be scheduled. |
| Category 5b | A review of the water quality standards will be conducted before a TMDL is scheduled. |
| Category 5c | Additional data and information will be collected before a TMDL or review of the water quality standard is scheduled. |

### Nonpoint Source Assessment

The CWA §319(a) assessment focuses only on those waters which have been identified as being degraded, at least in part, by nonpoint source pollution. Texas' CWA §319(a) assessment of impaired waters is based on the Texas Water Quality Inventory and 303(d) List. In order to address the most current priorities for Texas and have a NPS program based on the most current information, the latest state approved Texas Water Quality Inventory and 303(d) List will serve as the state's 319(a) assessment.

NPS-degraded surface waters appearing in the report will be targeted by the state for additional NPS monitoring and restoration activities.

With regards to CWA §319(h) grant funding, priority for assessment dollars is given to those water bodies that fall under categories 5a, 5b, and 5c of the Texas Water Quality Inventory and 303(d) List. Assessment dollars may also be used to fund development of TMDL Implementation Plans or Pollution Reduction Strategies for water bodies in categories 4a, 4b, and 4c. These plans are discussed in Chapter 6.

### Basin Status Reports

Each CRP partner agency collects information on potential sources of pollution throughout its planning area or river basin. This information is used to correlate water quality to the environmental factors that influence it, such as soils, climate, hydrology, wastewater treatment plans, urban runoff, and agricultural runoff. An annual basin status report, the Basin Highlights Report, is produced by each regional water agency, and provides an overview of water quality issues and the status of ongoing projects/tasks. A detailed and in-depth data analysis is provided for each basin in the Basin Summary Report once every five years. This report provides trend analysis, spatial analysis (correlating environmental factors to water quality), an explanation for why certain water quality issues exist, and recommendations for addressing persistent water quality problems. The CRP strives to report water quality data in a user-friendly format to inform the public. The information contained in these reports is utilized by the TCEQ in the development of the Texas Water Quality Inventory and 303(d) List, subsequent statewide rankings, and prioritization of management strategies.

## Total Maximum Daily Loads (TMDLs)

A TMDL, or Total Maximum Daily Load, is a tool for achieving water quality standards and is based on the relationship between pollution sources and in-stream water quality conditions. TMDLs are developed to provide an analytical basis for planning and implementing pollution controls, land management practices, and restoration projects needed to protect water quality. The TMDL establishes the allowable loadings or other quantifiable parameters for a water body and thereby provides the basis to establish water quality-based controls. These controls provide the pollution reduction necessary for a water body to meet water quality standards.

CWA§303(d) and its implementing regulations (40 CFR §130.7) require states to identify waters that do not or will not meet applicable  water quality standards after the application of technology-based or other required controls, and to establish TMDLs for pollutants that are causing non-attainment of water quality standards. For listed waters, States must develop TMDLs allowing for seasonal variations and an appropriate

margin of safety. A TMDL is a quantitative assessment of water quality problems, contributing sources, and load reductions or control actions needed to restore and protect individual water bodies.

TMDLs address all significant stressors which cause water body use impairment, including: point sources (e.g., sewage treatment plant discharges), nonpoint sources (e.g., runoff from fields, streets, range, or forest land), and naturally occurring sources (e.g., runoff from undisturbed lands). A TMDL is the sum of the individual wasteload allocations for point sources, load allocations for nonpoint sources and natural background pollutants, and an appropriate margin of safety. TMDLs may address individual pollutants or groups of pollutants, as long as they clearly identify the links between the water body use impairment, the causes of the impairment, and the load reductions needed to remedy the impairment.

Public participation is an integral part of the TMDL process. Therefore, the TMDL process provides many opportunities for the public to participate. Listed below are a few of the ways the public can participate in the TMDL process:

- In most cases a watershed committee is established to provide local input on TMDL projects. The public is encouraged to work on these committees or attend these committee meetings.
- TMDL meetings are open to the public. Public notices are provided for these meetings. These meetings provide an opportunity to make comments and get answers to questions.
- The public is given a chance to review and provide comments on the development of the current CWA§303(d) list for the state.
- Before the state adopts a TMDL, a formal public comment period is provided in which the draft TMDL is made available, a public comment hearing is conducted, and responses to all comments are published.
- Resources are available to assist the public's participation in the TMDL process. The TCEQ website provides information about the TMDL program, the status of individual TMDL projects, and links to other TMDL-related websites. The TCEQ has also published printed materials such as Developing Total Maximum Daily Load Projects in Texas: A Guide for Lead Organizations, which provides valuable information on the TMDL process in Texas.

The development of TMDLs begins with the review of existing data and/or the collection of additional data related to water quality, point source discharge, precipitation, soils, geology, topography, and land use (construction, agriculture, mining, etc.) within the watershed. Next, models or other analytical methods are used to calculate pollutant loads and the water quality response of the receiving water. The appropriate

analytical method/model is selected based on the pollutants of concern, the amount of data available, and the type of water body. If a computer model is selected, data collected from the watershed may be used to calibrate and verify the model so that the computed values match those of known field data. The model can then be used to develop different scenarios, by first determining the amount of specific pollutants each source contributes, then calculating the amount each pollutant needs to be reduced, and finally specifying how the reduced pollutant load would be allocated among the different sources. In some cases, TMDLs can be based on readily available information and studies using simple analytical efforts to provide a basis for stressor assessment and implementation planning. In other cases, more complex, data intensive computer simulations are required.

Upon completion of data collection and analyses, a TMDL report is developed adopted by the state after a thorough public review and comment period. The state-adopted TMDL is submitted to EPA for review and approval. The TMDL Report consists of six component parts, each of which is presented and discussed below.

**Problem Statement:** The TMDL report includes an indication whether the segment is on the latest CWA§303(d) list and its priority, applicable water quality standards are identified, the pollutant or stressor of concern is identified, and the beneficial use impairment of concern is described. Historical water quality data from the impaired water body and its contributing watershed is presented and assessed. The TMDL report describes the characteristics of the water body such as drainage area, length, flow rates, depth, etc. The watershed is described including characterization of soil types, land uses, population, wildlife resources, and topography. The TMDL report includes a general description of the location of the impaired water body including information about the river basin, ecoregion, and political jurisdictions in which it is located.

**Endpoint Identification:** Numeric water quality target(s) for the TMDL are identified in the TMDL report, and the basis for target(s) as interpretation of water quality standards is documented. These targets identify the specific instream (and potentially watershed) goals or endpoints for the TMDL which equate to attainment of the water quality standard. In some cases, multiple indicators and associated numeric target values may be needed to interpret an individual water quality standard. In addition, some TMDLs may incorporate multiple numeric targets to account for seasonal differences in acceptable pollutant levels in a particular water body. In many cases where applicable standards are expressed in numeric terms, it is appropriate to set the numeric target equal to the numeric water quality standard.

In situations where applicable water quality standards are expressed in narrative terms, it is necessary to develop a quantitative interpretation of

narrative standards. Since a TMDL is an inherently quantitative analysis, it is necessary to determine appropriate quantitative indicators of the water quality problem of concern in order to calculate a TMDL. It is sometimes possible to supplement instream indicators and targets with watershed targets-- measures of conditions within the watershed which are directly associated with water bodies meeting their water quality standards for the pollutant(s) of concern.

**Source Analysis:** Point, nonpoint, and background sources of pollutants of concern are described in the TMDL report, including the magnitude and location of sources. The TMDL document demonstrates all sources have been considered. The TMDL document provides estimates of the amounts of pollutants entering the receiving water of concern or, in some cases, the amount of pollutant that is bioavailable based on historic loadings stored in the aquatic environment. These pollutant sources or causes of the problem are documented based on site-specific studies, literature reviews or other sources of information. Sources can be categorized in many ways, including but not limited to discharge source, land use category, ownership, pollutant production process (e.g. sedimentation processes), and/or tributary watershed areas. The source analysis discusses the data and methods used to estimate source contributions.

**Linkage Between Pollutant Sources and Water Quality in the Receiving Water:** The TMDL document describes the relationship between numeric target(s) and the identified pollutant sources, leading to an estimate of the total assimilative capacity (loading capacity) of the waterbody for the pollutant of concern. The loading capacity is the critical quantitative link between the applicable water quality standards (as interpreted through numeric targets) and the TMDL. Thus, a maximum allowable pollutant load is estimated to address the site-specific nature of the impairment. The loading capacity reflects the maximum amount of a pollutant that may be delivered to the water body and still achieve water quality standards. A number of different loading capacity approaches can be used as part of TMDLs.

The loading capacity section discusses the methods and data used to estimate loading capacity. A range of methods can be used from predictive water quality models to inferred linkages based on comparison of local reference conditions with existing conditions in the watershed of concern. In some cases, loading capacity may vary within the watershed of concern (e.g., toxics loading capacity may be higher in areas with high water mixing rates than in backwater areas with poor water exchange), and in different time periods (e.g. nutrient loading capacity may be lowest during high temperature summer low flow periods). The basis for spatial and temporal variations in loading capacity estimates is discussed.

**Margin of Safety:** A margin of safety is included in the TMDL report to account for uncertainty in the understanding of the relationship between

pollutant discharges and water quality impacts. The TMDL document describes an explicit and/or implicit margin of safety for each pollutant. An explicit margin of safety can be provided by reserving (not allocating) portion of the loading capacity identified for the water body for the pollutant of concern. An implicit margin of safety can be provided by making and documenting conservative assumptions used in the TMDL analysis. The TMDL report provides an explanation of the basis for margin of safety which shows why it is adequate to account for uncertainty in the TMDL. Where an implicit margin of safety is provided, the report includes a discussion of sources of uncertainty in the analysis and how individual analytical assumptions or other provisions adequately account for these sources of uncertainty.

**Load Allocations:**  The TMDL report identifies the total allowed pollutant amount and its components: appropriate wasteload allocations for point sources; load allocations for nonpoint sources; load allocation for an appropriate margin of safety; and, natural background. Allocation of allowable loads or load reductions among different sources of concern are determined. These allocations are usually expressed as wasteload allocations to point sources and load allocations to nonpoint sources. Allocations can be expessed in terms of mass loads or other appropriate measures. The TMDL equals the sum of allocations and cannot exceed the loading capacity. Load allocations for nonpoint sources are generally expressed as specific allocations for "gross allotments" to nonpoint source discharger categories. Separate nonpoint source allocations are established for background loadings. Allocations may be based on a variety of technical, economic, and political factors. The methodology used to set allocations is discussed.

## Monitoring the Results

There are many different programs in place throughout the state that are responsible for conducting implementation activities. Upon implementing a best management practice (BMP) or other implementation activity it is necessary to determine the effectiveness of the activity. Data collected after implementation must be compared to data collected prior to implementation to determine effectiveness. These data may be historical, like that collected for a special study, or collected as part of the project tasks prior to implementation. In some cases, routine monitoring can be used to evaluate effectiveness. In other cases, it will be necessary to collect data in a specific project area to evaluate the effectiveness of the implementation activities. Certain types of BMPs or implementation activities will not show immediate results. Effectiveness and water quality improvements will be determined over time, and not immediately upon implementation. More about implementation activities will be discussed later in this document.

# Groundwater Assessment

Groundwater supplies about 58% of all water used by Texans for domestic, municipal, industrial, and agricultural purposes. Approximately 36% of the water used for municipal supplies, and 75% of the water used for agricultural purposes is obtained from groundwater sources. This groundwater is produced from aquifers, which are underground layers of rock with water stored in pore spaces, cracks or voids. Major aquifers are defined as producing large quantities of water in a comparatively large area of the state, whereas minor aquifers produce significant quantities of water within smaller geographic areas or small quantities in large geographic areas. Minor aquifers are very important as they may constitute the only significant source of water supply in some regions of the state.

Nine major aquifers and twenty-one minor aquifers have been delineated within the state. These major and minor aquifers underlie approximately 76% of the state's surface area. Other undifferentiated, local aquifers may represent the only source of groundwater where major or minor aquifers are absent. These local aquifers, which provide groundwater that is used for all purposes, vary in extent from very small to several hundred square miles.

## *Measuring Groundwater Quality*

The Texas Water Development Board (TWDB) is authorized by the Texas Water Code to conduct studies and map the state's water resources. The TWDB has identified the state's aquifers, and delineated the boundaries of major and minor aquifers based on yields and significance of aquifer production. These maps depict the extent of each aquifer, including where it is exposed at the surface, which is commonly where recharge occurs, as well as, the portion of the aquifer underground. For most aquifers, a Total Dissolved Solids (TDS) concentration of 3,000 milligrams per liter is used to mark the boundary of usable quality water when mapping aquifers. The boundary of the Edwards Aquifer, for mapping purposes, is defined by a TDS concentration of 1,000 milligrams per liter.

TDS are constituents in groundwater dissolved from the surrounding rock and are the basis for the Texas Groundwater Protection Committee's (TGPC) groundwater classification system.

Under this groundwater classification system, four classes are defined based on quality as determined by TDS concentration. Through classification, groundwater can be categorized, and protection or restoration decisions can be made according to the water quality present or potential use of the groundwater.

**Table 5.2 TGPC Groundwater Classification System**

| CLASS | QUALITY* | EXAMPLES OF USE |
|---|---|---|
| Fresh | Zero to 1,000 | Drinking and all other uses |
| Slightly Saline | More than 1,000 to 3,000 | Drinking (if freshwater is unavailable), livestock watering, irrigation, industrial, mineral extraction, oil and gas production |
| Moderately Saline | More than 3,000 to 10,000 | Potential/future drinking and limited livestock watering and irrigation (if fresh or slightly saline water is unavailable); industrial, mineral extraction, oil and gas production |
| Very Saline to Brine | More than 10,000 | Mineral extraction, oil and gas production |

*Concentration range of total dissolved solids in milligrams per liter.

The state has developed surface water quality standards applicable to certain water bodies that are protective of groundwater affected by surface water. For the recharge zone of the Edwards Aquifer, the state has developed water quality protection measures that specify groundwater recharge as a "designated use" in the state's surface water quality standards. The state has not developed standards for pollutant discharge to groundwater, although, the legislatively mandated (TWC §26.401) goal of non-degradation of use guides the priorities of groundwater programs. However, comparison of measured values for constituents of concern in major and minor aquifers with TDS concentration of 3000 mg/L, or less, against adopted Safe Drinking Water Act (SDWA) Maximum Contaminant Levels (MCL's) provides an effective method of evaluating groundwater quality in aquifers for the intended use of drinking water.

## Aquifer Vulnerability

Since groundwater contamination can remain latent for a lengthy period of time, and since groundwater is difficult to clean up once it has become impacted, the majority of Texas groundwater programs focus on prevention of contamination, rather than remediation. This is true of point-source regulatory and permitting programs, as well as NPS related programs like the Pesticides in Groundwater Program conducted under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) by TCEQ.

**DRASTIC**
**D** - **D**epth to water
**R** - annual **R**echarge
**A** - **A**quifer media
**S** - **S**oil media
**T** - **T**opography
**I** - vadose zone **I**mpact
**C** - hydraulic **C**onductivity

Previous NPS assessments have contained an aquifer vulnerability ranking system based on the average DRASTIC index for the aquifers of Texas. This ranking system is used (Appendix D), because it is a reasonable method of determining the

relative vulnerability of aquifers to surface activities, and by extension, possible NPS contamination.

## *Data Collection*

The TWDB has the responsibility for collecting and maintaining an inventory of ambient groundwater conditions throughout the state. The TGPC relies upon ambient monitoring data  from the TWDB for state groundwater quality information. The TWDB performs ambient groundwater monitoring on water wells in a particular number of Texas aquifers each year, so that all major and minor aquifers of the state are monitored approximately every five years. The TWDB maintains a database of ambient groundwater monitoring data for the state from over 51,000 water wells and is supplemented by data from the United States Geological Survey (USGS), the Bureau of Economic Geology (BEG), and the TCEQ. Also, many of the groundwater conservation districts throughout the state have well-developed monitoring programs that are primarily intended to monitor the volume of water in an aquifer, but also collect groundwater quality information. Data are maintained by the groundwater conservation district, and generally reported to the TWDB for inclusion in their ambient groundwater database.

## *Assessing the Data*

For the groundwater portion of the *Texas Water Quality Inventory and 303(d) List*, ambient groundwater quality data are drawn from the TWDB database. The number of wells reporting values for constituents of concern above the MCL, or between the Minimum Detection Level (MDL) and the MCL are determined, and these values are posted in a table for each aquifer, along with the total number of wells sampled in that aquifer.

The data are augmented by the data taken from the annual *Joint Groundwater Monitoring and Contamination Report* that lists groundwater contamination cases of the regulatory programs of the TCEQ, Railroad Commission of Texas (RRC) and groundwater conservation districts. TCEQ reports data for groundwater contamination related to industrial and hazardous waste sites, municipal solid waste sites, leaking underground and above ground storage tanks, public drinking water supplies, wastewater disposal facilities, and other occurrences of contamination that may not be directly linked to a specific source or program. The RRC collects and reports data regarding groundwater contamination that may be related to oil and gas well drilling and production activities, transmission (pipeline) spills, and surface mining operations. Groundwater conservation districts typically monitor only those groundwater contamination cases that are of specific interest to the individual district, or those that do not fall under the regulatory umbrella of other agencies.
In 1996, the Texas Groundwater Protection Committee (TGPC) began the groundwater quality assessment process, through a partnership of the

TCEQ and the TWD, two of its member agencies. Assessment of all thirty aquifers was completed in 2002. Each aquifer in the *2002 Water Quality Inventory and 303(d) List* is represented with a map showing the locations of water wells sampled and nitrate analyses exceeding EPA drinking water standards. Tables are included that show the parameters assessed against EPA drinking water standards, as well as, summaries of the sources and types of groundwater contamination at regulated facilities. This information is compiled from data contained in the *Joint Groundwater Monitoring and Contamination Report*.

Nitrate is readily soluble and mobile in water, and is considered one of the major human health concerns in drinking water. Coincidentally, nitrate concentration is an indicator of NPS pollution in groundwater, because it can move readily through the soil and vadose zone, entering aquifers by means of percolation. The vadose zone is the stratigraphic region between the soil surface and the water table, or the unsaturated zone. Nitrate in surface water indicates the potential for groundwater contamination.

Since no water quality standards have been designated for groundwater, an assessment standard of degradation or impairment with respect to use must be defined here. For the purposes of the NPS assessment, any measurements of groundwater quality taken from the aquifers listed in the *Texas Water Quality Inventory and 303d List* that exceed the Maximum Contaminant Levels (MCL) for nitrate in drinking water, are considered to be an indicator of either nonpoint source degradation or impairment, with respect to existing or potential use.

Constituents of concern that are above the Minimum Detection Level (MDL), but below the MCL, should be watched carefully over several report cycles. An increase in the number of detections of a constituent can signal a growing problem, even though the MCL has not been exceeded. Groundwater that indicates degradation with respect to existing or potential use will be targeted by the state for additional NPS monitoring and restoration activities.

The ranking for priority waterbodies that appear in Table B.2 are averaged and do not reflect the intrinsic vulnerability of outcrop areas and/or known areas where recharge is occurring. For this reason, spatial examination of contaminant distribution is vital to any true assessment of aquifer quality or vulnerability prediction.

Table B.2 ranks the Seymour, Edwards - Balcones Fault Zone in the San Antonio area, and Edwards - Balcones Fault Zone in the Austin area, as aquifers having "high" vulnerability rankings. The northern extent of the Ogallala, and Cenezoic Pecos Alluvium received "low" or low "medium" rankings, and the Hueco-Mesilla Bolsons rank "low" in the DRASTIC based aquifer vulnerability ranking scheme. The Joint Groundwater Monitoring and Contamination Reports document a number of significant

impacts to the usable groundwater zone of the Bolsons, and related investigations indicate a high potential for NPS impacts.

Upon further examination of the data from the *Texas Water Quality Inventory and 303d List*, it becomes readily apparent that constituent values exceeding the MCL occur predominantly in the "outcrop" portions of any aquifer with "outcrop" (unconfined) and "downdip" (confined) areas, or in the completely unconfined aquifers like the Ogallala, Seymour, and Cenezoic Pecos Alluvium. These "outcrop" areas of aquifers are more vulnerable to NPS impacts.

A spatial context reveals that a disproportionate number of high nitrate values occur in the Rio Grande Valley area of the aquifer. Therefore, this portion of the Gulf Coast aquifer must be labeled as impacted by NPS pollution.

Sampling sites exceeding an MCL for a given constituent will also be targeted. These would include the Lipan, Seymour, Marathon, Bone Spring-Victorio Peak, Edwards-Trinity (High Plains), Blaine, Ogallala, and Cenezoic Pecos Alluvium aquifers.

Future water quality inventories will contain more specific groundwater quality assessments for aquifers. This will allow the focus to be more narrow in determination of potential NPS impacts. The values for nitrate and other constituents in all reports may be revisited in the case of a change in the MCL values, as occurred with the 2003 EPA arsenic evaluation.

## Monitoring the Results

The Texas Groundwater Protection Committee (TGPC), through the *Texas Groundwater Protection Strategy*, has commissioned the development of a new statewide groundwater monitoring program that will better evaluate the effectiveness of regulatory programs in preventing impacts from both point sources and nonpoint sources. Future activities of the TPGC, and of its member agencies, may be guided by the results of the new monitoring program.

# CHAPTER 6 IMPLEMENTATION

Nonpoint source pollution management makes use of both regulatory and non-regulatory programs. Regulatory programs establish rules for certain activities in order to prevent harm to the environment resulting from these activities. The rules often require notification and reporting to a regulatory authority when the activity is engaged in, and specific prior authorization for the activity, such as registration, permitting, or certification. Regulatory activities also include inspections to determine whether rules are being complied with, as well as pursuit of apparent violations through investigations, enforcement activities, and litigation.

Non-regulatory programs do not establish or enforce environmental protection rules. Non-regulatory programs are voluntary. Regulation of everyday practices which individuals can use to control some nonpoint sources of pollution is impractical. In these cases, Texas encourages voluntary compliance through education and outreach. In addition, the size and complexity of the problem, low public awareness, and the lack of rigorous scientific definition of NPS problems make regulation difficult. Without regulation, a coordinated effort from the highest levels of government down to the citizens must occur to have an impact and reduce nonpoint source pollution.

The Texas Commission on Environmental Quality ( TCEQ) is designated by law as the lead state agency for water quality in Texas. The Texas State Soil and Water Conservation Board (TSSWCB) also plays an important role as the lead agency in the state for the management of agricultural and silvicultural (forestry) nonpoint source runoff. Local, regional, state, and federal agencies have specific responsibilities that are critical to the restoration and protection of polluted water bodies. Non-government organizations, especially at the watershed level, provide information about local concerns and infrastructure, and help build support for the kind of pollution controls necessary to restore water quality.

This chapter describes ongoing programs throughout the state which address NPS pollution. The programs are conducted by the agencies described in Chapter 4. This chapter is divided into the following types of NPS management issues:

- Surface Water Plans
- Groundwater Plans
- Remediation of Contaminated Sites
- Emergency Response and Disaster Recovery
- Hydromodification
- Marinas and Recreational Boating
- Solid and Hazardous Waste Management

- ■ Wastewater Management
- ■ Storm Water Management
- ■ Pesticide Management
- ■ Agricultural Management
- ■ Silvicultural Management
- ■ Pollution Prevention
- ■ Protection for Drinking Water Sources
- ■ Aquifer Protection
- ■ Wetlands Protection
- ■ Coastal Programs
- ■ Border Programs

# Surface Water Plans

An important tool in managing nonpoint source pollution is the development of implementation plans. Once the sources or causes of pollution have been identified through the development of TMDLs or special studies (described in Chapter 5), an implementation plan must be developed. Implementation plans describe the management measures necessary to achieve the pollutant reductions. Management measures incorporate both nonregulatory and regulatory mechanisms. These management measures may include permit effluent limits and recommendations, nonpoint source pollution management practices, stream standard revisions, special projects, pollution prevention, public education, and watershed-specific rule recommendations.

Implementation plans may include both control actions and management measures. Control actions are point source pollution reduction strategies like the construction of centralized wastewater treatment facilities. Management measures are nonpoint source pollution reduction strategies which are the focus of this document. The best management measures for each individual watershed are developed in cooperation with regional and local stakeholders.

There are two types of plans developed in the State of Texas, TMDL Implementation Plans and plans developed at the local level called Watershed Protection Plans.

Both types of implementation plans describe implementation activities, the schedule for implementing them, and the authority for the regulatory measures. It also provides reasonable assurance that the voluntary practices will be undertaken and identifies partners who may perform these tasks. For instance, the plan may identify funds needed to implement voluntary actions. The plan also includes the measurable results that will be achieved, along with a follow-up monitoring plan to determine its

success. Interim results are evaluated to assess progress toward the goal of the plan.

Even after plans are fully implemented, it is difficult to accurately predict how long it will take for improvements to occur in the water body, or how much improvement will be seen. For this reason, there is a schedule for phasing in implementation activities, especially those that address nonpoint sources of pollution. Less expensive, time-tested activities are implemented first, and their affects are assessed. If the water quality goal of the plan is not yet achieved, then another round of activities is implemented. Through this adaptive management approach, the water body is continually reassessed, and adjustments are made in the implementation activities as needed to attain the water quality goal of the plan.

The following elements will be addressed in plans implemented through the CWA §319(h) Grant Program as required by EPA Guidance:

- a. An identification of the causes and sources or groups of similar sources that will need to be controlled to achieve the load reductions estimated in the TMDL.

- b. An estimate of the load reductions expected for the management measures described in the implementation plan.

- c. A description of the NPS management measures that will need to be implemented to achieve the load reductions estimated in the implementation plan, and an identification of the critical areas in which those measures will be needed to implement the plan.

- d. An estimate of the amounts of technical and financial assistance needed, associated costs, and/or the sources and authorities that will be relied upon, to implement the plan.

- e. An information/education component that will be used to enhance public understanding of the project and encourage early and continued participation in selecting, designing, and implementing the NPS management measures that will be implemented.

- f. A schedule for implementing the NPS management measures identified in the plan.

- g. A description of interim, measurable milestones for determining whether NPS management measures or other control actions are being implemented.

- h. A set of criteria that can be used to determine whether loading reductions are being achieved over time and substantial progress is being made towards attaining water quality standards and, if not, the criteria for determining whether the TMDL needs to be revised.

- ■ i. A monitoring component to evaluate the effectiveness of the implementation efforts over time, measured against the criteria established in the plan.

## TMDL Implementation Plans

Chapter 5 explains how Total Maximum Daily Loads (TMDLs) serve as part of the assessment process to identify sources and quantities of pollutant loadings that are preventing a water body from meeting water quality standards. After a TMDL is completed, an implementation plan is developed that describes the management measures necessary to achieve the pollutant reductions identified in the TMDL. The ultimate goal of TMDL Implementation Plans is the attainment of the water quality standard, but additional, interim results may be evaluated to assess progress toward that goal as described above. The development of TMDL Implementation Plans and implementation of NPS management measures defined in these plans is a priority for CWA §319(h) funding (described in Chapter 2).

## Watershed Protection Plans

Watershed Protection Plans, are also developed at the local level to address water quality issues. Watershed Protection Plans are often based on special studies conducted to gather more data in certain areas where problems are known to exist but more intense monitoring is necessary to determine the source of the problem.

Watershed Protection Plans are developed by river authorities, cities, or other local government entities to determine how to best solve the water quality problems of that area and to define the implementation activities needed to attain or maintain water quality standards. Priority for CWA §319(h) funding (described in Chapter 2) is provided to develop and implement these plans.

## Water Quality Trading

The concept of water quality trading has often been discussed as a way to increase the efficiency of TMDL and Watershed Protection Plan implementation and/or provide more flexibility for sources required to achieve extreme load reductions. In the context of TMDL and Watershed Protection Plan implementation, "water quality trading" refers to theoretical trading of pollutant allocations among local or regional sources, and generally does not mean physical transfers of actual effluent discharge. Arranging pollutant trades amongst watershed sources typically would require that some entity tracks the trades and keeps the account balanced to remain within the planned load allocations. The accounting entity may also need to mediate legal agreements, or disagreements, between trading partners.

Action with regard to water quality trading studies or plans will depend largely on the initiative of others, and the TCEQ and TSSWCB cannot stipulate when or if such efforts will occur. However, the TCEQ and TSSWCB will attempt to cooperate with such efforts in a timely and helpful manner. The development of a water quality trading program is optional. Any such effort that uses CWA §319 grant funding will have the tracking/accounting assurance stipulated in the grant stipulations.

# Groundwater Plans

The Texas Groundwater Protection Committee strives to improve or identify areas where new or existing programs could be enhanced to provide additional protection for groundwater resources. The committee actively seeks to improve existing groundwater programs and promotes coordination among agencies and Groundwater Conservation Districts.

## *Joint Groundwater Monitoring and Contamination Report*

The TGPC uses many tools to verify pollutant and contamination sources and develop plans to address the sources. The *Joint Groundwater Monitoring and Contamination Report* is essential to this process. The report is a compilation of all known groundwater contamination cases in the state and their enforcement status. In general, once groundwater contamination has been confirmed through regulatory compliance monitoring, the case will follow a generic sequence of actions until the investigation concludes no further action is necessary. The sequence of actions to verify pollutant sources and develop plans based on this report generally consists of confirmation of the contamination, an investigation to study the extent, composition, and circumstances of the contamination, and the planning of corrective action measures based on the investigation.

## *Groundwater Protection Strategy*

There are no specific programs that routinely examine the quality of water being consumed by Texans utilizing private/domestic wells, the segment of Texas' population most likely to be impacted by NPS pollution of groundwater. Surveys of the groundwater quality of private wells in Texas are rare; however, studies that have been conducted by various agencies have indicated that both man-made and naturally occurring contaminants - (eg fecal coliform, nitrate, radioactive nuclides, pesticides and pesticide degradation byproducts, arsenic, and other heavy metals) have been found in some domestic wells at levels that exceed health-based maximum contaminant levels (based upon a lifetime exposure to the constituent). The TGPC has prepared the new *Texas Groundwater Protection Strategy* (AS-188, February 2003) that details actions to be taken to remedy this situation and address other aspects of NPS pollution.

The state's groundwater protection efforts are implemented through three types of groundwater program activities: groundwater protection, groundwater remediation, and groundwater conservation.

*Protection*. Groundwater protection is the first programmatic component that defines the state's efforts. TWC§26.401 sets out nondegradation of the state's groundwater resources as the goal for all state programs and asserts that groundwater be kept reasonably free of contaminants that interfere with the present and potential uses of groundwater.

*Remediation*. The second programmatic component of the state's efforts is groundwater remediation. Once contamination has occurred, the goal of remediation programs is to restore the quality of groundwater if feasible. The remediation of groundwater contamination is accomplished through the implementation of corrective action plans developed as a result of the *Joint Groundwater Contamination Report*, monitoring of the effectiveness of corrective action measures, and ultimately, the completion of the corrective action measures.

*Conservation*. Another component of groundwater programs is conservation. Groundwater Conservation Districts are the state's preferred method of managing groundwater resources. Groundwater Conservation Districts have the authority to adopt and enforce rules, require well permits, monitor groundwater quality and quantity, and provide public education. These activities are useful in assisting with the implementation of the Districts' management plans described above.

## Groundwater Conservation Districts

The legislature has stressed the importance and responsibility of groundwater conservation districts in developing and implementing comprehensive management plans to conserve and protect groundwater resources. Wastewater reuse, desalination, well spacing regulations, brush control, and other strategies are featured in the plans.

This chapter, and the following two chapters, represents the toolbox of programs in place throughout the state which attempt to achieve the goals defined in this management plan through implementation of the defined milestones. The implementation programs and measures described in the plan work together to manage nonpoint source pollution in the State of Texas and are often defined through planning to achieve specific water quality goals.

# Remediation of Contaminated Sites

Environmental contamination can occur in many ways. Some examples include, unreported spills of hazardous materials, undetected leaks from pipes or other malfunctioning industrial equipment, improper disposal of byproducts of industrial processes, abandoned municipal solid waste

landfills, and abandoned, inactive industrial sites. If not remedied, ground and surface water contamination may occur which can pose environmental and human health problems. Below is a discussion of several state programs in place which address remediation of contaminated sites.

## Superfund Program

The state Superfund program's mission is to remediate abandoned or inactive sites within the state that pose an unacceptable risk to public health and safety or the environment, but which do not qualify for action under the federal Superfund program. The state Superfund program is administered by the TCEQ.

The TCEQ manages or provides management assistance to the U.S. Environmental Protection Agency (EPA) with regard to the Superfund remediation process, after the site is identified as being eligible for listing on either the state Superfund registry or the federal National Priorities List. The TCEQ ensures that all Superfund activities are completed in a timely and efficient manner, and in accordance with all applicable state and federal laws and rules.

## Brownfields Program

In Texas, many former industrial properties lie dormant or underutilized due to liability associated with real or perceived contamination. These properties are broadly referred to as brownfields. The TCEQ, in close partnership with the EPA and other federal, state, and local agencies, facilitates cleanup, transferability, and revitalization of brownfields. This is accomplished through the development of regulatory, tax, and technical assistance tools. In addition, the TCEQ is available at no cost to local governments to provide technical advice, education, and project partnering for brownfields redevelopment projects.

## Voluntary Cleanup Programs

The Texas Voluntary Cleanup Program (VCP) provides administrative, technical, and legal incentives to encourage the cleanup of contaminated sites in Texas. Non-responsible parties, including future lenders and landowners, receive protection from liability to the state of Texas for cleanup of sites under the VCP. Therefore, constraints for completing real estate transactions at those sites are eliminated. Also under the VCP, site cleanups follow a streamlined approach to reduce future human and environmental risk to safe levels. As a result, many unused or under used properties may be restored and become economically productive and beneficial to the community.

In addition, the RRC has a Voluntary Cleanup Program, which oversees the remediation of oil and gas related pollution and provides an incentive to remediate the pollution through a release of liability to the state in

exchange for a successful cleanup. Applicants to the program may not have caused or contributed to the pollution.

## Corrective Action Program

The mission of the industrial and hazardous waste corrective action program is to oversee the cleanup of sites with soil and groundwater contamination from industrial and municipal hazardous and industrial non-hazardous wastes. This program is administered by the TCEQ. The goal of this program is to assure that the public is not exposed to hazardous levels of chemicals by requiring mitigation, and the removal of contamination to levels protective of human health and the environment.

The RRC is responsible for plugging and cleanup of abandoned wells and sites. The RRC oversees cleanup by responsible parties of pollution associated with oil and gas activities under RRC jurisdiction. Funding for the RRC's program comes from regulatory fees, permit fees, and bond fees paid by the oil and gas industry. Cleanup and prioritization of sites is based on protection of public health, public safety, and the environment.

## Leaking Petroleum Storage Tank Program

The TCEQ is responsible for administering the leaking petroleum storage tank (LPST) program. The program mission is to oversee the cleanup of spills from regulated storage tanks by recording and evaluating all reported incidents of releases of petroleum and other hazardous substances from underground and above-ground storage tanks. The program goal is to assure that the public is not exposed to hazardous levels of contamination by requiring the removal of contamination from LPSTs to levels protective of human health and the environment.

Any entity performing or coordinating regulated LPST corrective action services must be licensed by the TCEQ, as an LPST corrective action specialist. Any individual who supervises any corrective action required on a LPST site but is not a qualified professional engineer must be registered as an LPST corrective action project manager. Corrective action services include measures to determine and report the extent of a release in progress, attempts to halt and prevent future releases of regulated substances, cleanup of surface and subsurface contamination on site, site closures, post-remediation monitoring, or any other actions reasonably necessary to protect public health and preserve environmental safety.

# Emergency Response and Disaster Recovery

Nonpoint source pollution can occur as a result of natural disasters or spills of hazardous materials. Emergency response to these incidents can reduce the amount of impact pollutants from these activities present to the environment.

Severe storms can cause loss of vegetation, severe erosion, and runoff of contaminants, all of which can impact water quality. Clean-up efforts following severe storms often create large quantities of waste materials, which place additional pressures on the environment.

Spills on land are considered an emergency, because chemicals or other hazardous materials can enter nearby water resources and pose a threat to the environment and public health. Transportation and storage of hazardous materials increases the risk of the occurrence of spills. Some of the programs in the state of Texas that are responsible for response to spills and recovery from natural and manmade disasters are discussed below.

## *Floodplain Management*

Development in some Texas communities has raised the elevation of portions of the floodplain, increased drainage over impervious surfaces, channeled runoff away from new growth areas, and caused other physical changes to the environment. These changes can contribute to the severity of flooding events, and result in further damage to the environment.

The TCEQ serves as the state floodplain coordinator and implements the National Flood Insurance Program (NFIP) in Texas. As part of this program, the TCEQ provides guidance, support, and training to floodplain administrators to become participants in the NFIP. TCEQ staff visit communities throughout the state to provide planning, assistance, and information to community officials, and help coordinate disaster response to severe floods.

The Texas Water Code authorizes cities and counties in the state to adopt ordinances and court orders to create comprehensive floodplain management programs designed to protect public health, safety, and the general welfare of its citizens. To participate in the NFIP, a community must adopt and enforce a floodplain management ordinance which prevents new development from increasing the flood threat and protect new and existing buildings from anticipated flood events.

Local floodplain management programs are responsible for reviewing all construction plans and conducting inspections of approved projects to assure conformance with NFIP regulations. NFIP regulations ensure that construction methods and materials will minimize future flood damage and impacts to the environment from floods. Best management practices are required in floodplain areas to provide for water conveyance, and reduce runoff volumes associated with development. Examples of a few BMPs used include swales, detention and retention ponds, and infiltration basins.

# Emergency Response Program

The TCEQ Emergency Response team is on call 24-hours a day, year-round for response to oil and hazardous substance spills, emergencies, and human-caused disasters. The TCEQ responds to incidents such as, midnight dumping of abandoned drums, the breakup of the space shuttle Columbia in the skies over central and east Texas, and natural disasters.

The TCEQ collaborates with the EPA, the Coast Guard, other state agencies, counties, cities, local hazardous material teams, fire departments, law enforcement, and corporate response units. TCEQ staff lead response efforts when appropriate and provide planning or support.

The TCEQ assesses health and environmental risks in conjunction with the Texas Department of State Health Services (DSHS), the Railroad Commission of Texas (RRC), the Texas Parks and Wildlife Department (TPWD), Texas General Land Office (GLO) or other experts as necessary. DSHS identifies communities where people may be exposed to hazardous substances in the environment, assess a site's hazards, and recommends actions that need to be taken to protect human health. The RRC is responsible for response and clean-up of inland oil and gas related spills. TPWD is responsible for assessing impacts of spills to fish and wildlife. GLO responds to coastal oil spills.

Some of the services the TCEQ offers in response to spills and other pollution related emergencies include:

■ assisting water supply officials providing drinking water and making systems operational; evaluating water quality; assisting individuals in maintaining private water or sewer systems; and assessing damages to public drinking water systems;

■ providing information and aid to the State Emergency Management Council on matters of flood-hazard areas, floodplain management, flood hydrology, engineering, dam safety, reservoir operation, water rights and uses, water quality, and hazardous waste management;

■ making available the services of specialists (floodplain management, hydrology, meteorology, groundwater geology, water quality, dam safety, wastewater treatment, water rights and uses, solid waste management including hazardous waste and radioactive waste, and emergency response) that may be of assistance during a disaster;

■ providing spill response maps, as well as maps relating to flood-hazard areas;

- providing TCEQ data, including data from neighboring states and Mexico, needed for dealing with a disaster that transcends the boundaries of Texas;
- providing support for post-emergency weather and damage assessment;
- providing technical assistance to local governments in the physical siting of disposal facilities for debris including municipal wastes whenever a disaster generates excessive amounts of waste;
- providing cleanup funding as appropriate from funds under the TCEQ's statutory authorities; and
- providing contracting resources for cleanups.

To the extent possible, TCEQ ensures that the individuals or entities responsible for spills bear the cost of clean-up activities. Violators who intentionally or knowingly allow an unauthorized discharge of pollutants that causes or threatens to cause water pollution may be prosecuted. Failure to report a spill is also cause for prosecution.

## Coastal Oil Spill Prevention and Response

The Oil Spill Prevention and Response Act of 1991 (OSPRA) designated the GLO as the lead state agency for preventing and responding to oil spills in the marine environment. A two-cent-per-barrel fee on crude oil loaded or off-loaded in Texas supports funding for the GLO's response efforts. To ensure rapid response, field offices are located along the Texas coast. In preparation for spills, the program has pre-staged response equipment in sensitive and geographically advantageous locations. The GLO's Oil Spill Prevention and Response (OSPR) program functions include deploying state-owned response equipment, designating responsible parties, coordinating spill response strategies, investigating the spill causes, and conducting follow-ups to ensure that appropriate corrective actions are identified and implemented. The program maintains a substantial inventory of response equipment.

The OSPR program maintains an active outreach effort, visiting schools, associations, and interest groups. The outreach program emphasizes the environmental impacts of small, chronic spills. Pollution prevention methods are highlighted in every presentation. In addition, the OSPR sponsors the Clean Gulf Conference and Exhibition annually to bring experts from government and industry together to discuss the latest developments in oil spill technology and the issues facing both responders and industry.

The OSPR program has also completed construction of four bilge water reception facilities along the coast. The Oily Bilge Water Reception Facility Program deters disposal of bilge water containing oil directly into surface water by providing operators of pleasure and commercial boats

with disposal facilities. In addition, the GLO has increased its presence with additional boat and harbor patrols. The OSPR program maintains a comprehensive, unannounced oil spill drill and audit program designed to measure the readiness level of all sectors of the oil handling community: deep draft vessels, pipelines, and shore-based facilities.

The OSPR program is one of only a few state programs in the nation that funds oil spill prevention and response-related research. The Shoreline Environment Research Facility (SERF) enables oil spill researchers to conduct biological and chemical experiments in nine tanks that are capable of simulating a variety of coastal environments. The American Petroleum Institute has conducted two of the first "field conditions" dispersant experiments at the SERF facility, and works with program personnel to perfect response strategies for maritime applications.

The Texas Automated Buoy System (TABS) was developed to assist in predicting the movement of oil in offshore environments. Nine offshore buoys transmit real time ocean current data, which is then fed into computer trajectory models to produce a predicted pattern of oil movement.

To increase spill preparedness and streamline the OSPR program, the On-Line Vessel database was created to enable vessel operators to register response and preparedness information electronically, rather than submit hard copy plans.

The Texas Oil Spill Planning and Response Toolkit , produced by the OSPR program, with assistance from the Coast Guard, is the most comprehensive oil spill preparedness tool available. The toolkits are comprised of sensitivity maps, local knowledge guides, forms, and Area Contingency Plans for all of Texas. The program publishes the toolkit as both a downloadable program and CDRom. The toolkit is updated annually and is widely distributed free of charge throughout the Gulf Coast.

## Kills and Spills Team

The Texas Parks and Wildlife Department (TPWD) has assembled a Kills and Spills Team (KAST) comprised of biologists and team members headquartered in and assigned to five regions across Texas. The KAST assumes four key responsibilities: 1) respond to fish and wildlife kills and pollution incidents, including oil and hazardous material spills; 2) minimize environmental degradation resulting from pollution incidents and fish and wildlife kills; 3) obtain compensation, repair, and restoration for environmental damage; and, 4) act as a technical resource with respect to relationships between water quality, habitat, and living organisms.

The majority of incidents the KAST team responds to are fish kills. Natural causes responsible for fish kills include extreme weather temperatures, bacteria and disease, and toxic algal blooms. The actions of

humans can result in fish and wildlife kills through the introduction of toxic chemicals, pesticides, fertilizers, and contaminated storm water runoff. Low dissolved oxygen concentration is another cause of fish kills. Low dissolved oxygen concentrations may be natural or ma-induced. Low dissolved oxygen can result from large amounts of plant life depleting oxygen levels during the night. Other causes of low dissolved oxygen include hot, still days, dams, and dead end canals. A fish or wildlife kill is physical evidence that something is wrong. The sooner it is reported, the sooner it can be investigated and remedied.

A fish or wildlife kill is physical evidence that something is wrong. The sooner it is reported, the sooner it can be investigated and remedied. Immediately after a kill or spill is reported, an investigation begins to determine the source of a spill or the cause(s) of a kill. Though differences exist between investigating fish and wildlife kills and spills, the need for prompt response and accurate analysis applies in either case. Crucial details can be lost in a short amount of time. In addition, factors that may seem insignificant such as weather, vegetation, algal blooms, water chemistry, water flow, and pollution, can have serious impacts to an ecosystem when they change rapidly. Therefore, TPWD biologists must pay close attention to details, follow proper sampling procedures, and keep valid records. For large pollution events, TPWD biologists often work together with other state and local authorities.

Often in the case of a kill or spill, a responsible party is identified as having caused the incident. The responsible party may be asked to make restitution for the ecological damages. Restitution may consist of a monetary payment for the value of fish or wildlife killed, or may be some project that restores value to the ecosystem.

# Hydromodification

Hydromodification is defined by EPA as the alteration of the hydrologic characteristics of surface waters. Hydromodification may cause degradation of water resources. Three general types of hydromodification contribute to nonpoint source pollution:

*Channel modification*. Channel modification describes river and stream channel engineering undertaken for the purpose of flood control, navigation, drainage improvement, and reduction of channel migration potential. Activities such as straightening, widening, deepening, or relocating existing stream channels fall into this category. This term also refers to the excavation of borrow pits, canals, underwater mining, or other practices that change the depth, width, or location of waterways or bay formations in coastal areas. Channelization and channel modification activities can diminish suitability of instream and streamside habitat for fish and wildlife. They can also result in reduced flushing, lowered dissolved oxygen levels, saltwater intrusion, loss of streamside vegetation, accelerated discharge of pollutants, and changed physical and chemical

characteristics of bottom sediments in surface waters. In addition, hardening of banks along waterways can increase the movement of NPS pollutants from the upper reaches of watersheds into downstream or coastal waters.

*Dams*. Dams are defined as constructed impoundments that are either (1) 25 feet or more in height and greater than 15 acre-feet in capacity, or (2) 6 feet or more in height and greater than 50 acre-feet in capacity. Dams can adversely impact the quality of the surface waters and habitat in the stream or river where they are located. A variety of impacts can result from the siting, construction, and operation of these facilities. Construction activities from dams can cause increased turbidity and sedimentation in the waterway resulting from vegetation removal, soil disturbance, and soil rutting. The operation of dams can also generate a variety of types of nonpoint source pollution in surface waters. Controlled releases can change the timing and quantity of freshwater inputs into coastal waters, reduce downstream flushing, and create sediment deposition downstream of the dam. Dam releases can result in erosion of the streambed and scouring of the channel below the dam. Finally, reservoir releases can alter water temperature and lower dissolved oxygen levels in downstream waterbodies.

*Streambank erosion*. Streambank erosion refers to the loss of land along streams and rivers. The force of water flowing in a river or stream causes erosion. Eroded material can be carried downstream and deposited in the channel bottom or in point bars located along bends in the waterway. These deposits can have adverse impacts on the creation and maintenance of riparian habitat. Excessively high sediment loads can smother submerged aquatic vegetation, cover shellfish beds and tidal flats, fill in riffle pools, and contribute to increased levels of turbidity and nutrients.

The State of Texas achieves protection of water resources from hydromodification activities through a mixture of management measures. Below are examples of some of the programs that implement these measures.

## Clean Water Act §401/404 Water Quality Certification

CWA§401 provides for the protection of the state's surface water resources by ensuring that federal discharge permits are consistent with the Texas Surface Water Quality Standards. Under CWA§401, states are given the authority to review federally permitted or licensed activities that may result in a discharge of pollutants to waters of the U.S., such as the discharge of dredge or fill material. CWA§401 is a cooperative federal/state program that gives states authority to review federal activities in or affecting state waters and reflects the state's role at the forefront in administering water quality programs.

Only those activities that require a federal permit are subject to state review for §401 certification. However, any federally authorized activity which may result in a discharge is subject to CWA§401 certification. An important type of permit subject to CWA§401 certification is the U.S. Army Corps of Engineers (Corps) CWA§404 permit for discharges into wetlands or other navigable waters.

Before issuing a federal permit in Texas, the permitting agency must receive, from TCEQ or RRC, certification , conditional certification, or waiver stating that the discharge will not violate the Texas Surface Water Quality Standards. If the state denies certification, the federal permit is also denied. The TCEQ is responsible for certifying most federal permits, except for federal permits related to oil and gas production, which are certified by the Railroad Commission of Texas (RRC). The RRC certified permit activities include dredging an access channel to conduct drilling or production operations in a critical area; construction of a drilling pad or installation of a production platform in a critical area; or construction, operation, or maintenance of a crude oil or natural gas pipeline facility in waters of the state. The Texas Parks and Wildlife Department participates in the review of CWA§404 permits and CWA§401 wetland certifications to determine effects on fish and wildlife, and wetland habitats.

The CWA§401 certification program also plays an important role protecting coastal resources under the Texas Coastal Management Program (CMP). The CMP is designed to accomplish the goals set by the state legislature for coastal resource protection and to meet specific requirements for an approved plan under the federal Coastal Zone Management Act (CZMA). Certain activities, such as discharges authorized by CWA§404 permits, must be consistent with the state CMP when they occur within the coastal zone boundary. CWA§404 permits often involve impacts to coastal wetlands. Efforts to avoid and/or minimize adverse impacts to wetlands are taken to retain the important functions these water bodies provide for wildlife and aquatic habitat.

## Water Rights Permit Review

Water flowing in Texas' creeks, rivers, and bays is public property; however, the State of Texas confers on individuals and organizations the right to pump water from a stream, creek, pond, or lake or to impound water in a lake or pond, under the authority of Chapter 11 of the Texas Water Code. With a few exceptions, surface waters may be used only with explicit permission of the state, granted in the form of water rights. Water rights projects have the potential to cause, amplify, or exacerbate nonpoint source problems through flow modification, dam construction, sediment load alteration, loss of wetlands, and removal of riparian vegetation.

Each application for a water rights permit is reviewed for administrative and technical requirements by the TCEQ to evaluate its impact on other water rights, bays and estuaries, conservation, water availability, public

welfare, etc. TCEQ assesses the effects that the issuance of a water rights permit will have on existing instream uses including, water quality, fish and wildlife habitat, recreation, and freshwater inflows to bays and estuaries. In addition, Texas Parks and Wildlife Department reviews water rights applications, and is required by law to provide recommendations for permit conditions, mitigation, and schedules of flow or releases to protect fish and wildlife resources (Parks and Wildlife Code 12.024).

Factors that the TCEQ evaluates when performing an assessment of a water rights permit include the perennial nature of the stream, aquatic life use and biological integrity of the stream, water quality issues, presence of species of concern, and recreational uses. In addition to setting streamflow restrictions, mitigation may be recommended for altered, inundated, or destroyed terrestrial or riparian wetland habitats. The results of these assessments are incorporated into limitations and/or special conditions attached to water rights permits in order to protect the environmental integrity of the impacted stream reach.

# Marinas and Recreational Boating

Marinas and boating activities can be sources of nonpoint source pollution. Texas has over 350 coastal and inland marinas statewide encompassing slips and storage for more than 57,000 boats. Marinas, if not sited and constructed properly, can destroy wetlands, aquatic habitat and submerged aquatic vegetation, and can also restrict or alter water flows. Improper siting and construction can also lead to decreased dissolved oxygen levels and increases in pollutant concentrations. Activities that occur at marinas can create sources of nonpoint pollution including petroleum hydrocarbons such as fuel and oil. These substances can enter surface water directly from spills during refueling, may be present in bilge discharge, or can be transported in storm water runoff from these facilities. Other potential pollutants include copper and tin which are used in antifoulants used to prevent fouling of the submerged portions of ships, and iron and chrome which are contained in boats themselves. These substances may enter the water during boat cleaning.

Recreational boating can also degrade water quality and destroy aquatic habitat. Sewage, waste from fish cleaning, and food waste discharged from boats, either accidental or intentional, can lower dissolved oxygen levels, increase nutrients and impact aquatic life. In addition, discharges of sewage can elevate fecal coliform bacteria to levels that are unsafe for swimming and fishing. Some of the programs in place to address the nonpoint source problems resulting from marinas and recreational boating activities are discussed below.

## *The Clean Marina Initiative*

The Clean Marina Initiative is a voluntary, incentive-based program promoted by the National Oceanic and Atmospheric Administration

(NOAA) and others that encourages marina operators and recreational boaters to protect coastal water quality by engaging in environmentally sound operating and maintenance procedures. NOAA is jointly responsible for administering the Coastal Nonpoint Control Program with EPA, and plays an important role in protecting coastal waters from polluted runoff. The Coastal Nonpoint Program establishes a consistent set of management measures for all coastal states to use in controlling nonpoint source pollution. Management measures are designed to prevent or reduce runoff from a variety of sources, including marinas.

NOAA recognizes that the Clean Marina Initiative can serve a valuable role in protecting coastal waters from nonpoint source pollution and has promoted the program as a way for states to meet many of the marina management measure requirements under the Coastal Nonpoint Program. As a result, the Coastal Nonpoint Program has been responsible for driving the development of most of the state Clean Marina Programs existing today and developing a national interest in the initiative. NOAA continues to support the Clean Marina Initiative through targeted grant funding to states developing Clean Marina Programs.

## *The Clean Texas Marinas Program*

The Clean Texas Marinas Program is a proactive partnership designed to encourage marinas, boatyards and boaters to use simple, innovative solutions to keep Texas coastal and inland water resources clean. The basic goal of the program is pollution prevention by increasing awareness of environmental laws, rules, and jurisdictions, and increasing the number of designated Texas Clean Marinas. To be designated as a Texas Clean Marina and be recognized for environmental stewardship, marina owners are asked to identify opportunities and implement best management practices to control pollution associated with:

- Vessel maintenance and repair
- Petroleum storage and transfer
- Sewage disposal
- Solid, liquid and hazardous wastes
- Stormwater runoff
- Facilities management

The program also offers information, guidance, and technical assistance to marina operators, local governments, and recreational boaters on best management practices (BMP's) that can be used to prevent or reduce pollution. The Clean Texas Marinas Program was developed by the Texas Sea Grant College Program in partnership with the GLO, TCEQ, Marina Association of Texas, the Marina Advisory Board, and others.

# Solid and Hazardous Waste Management

Many county unincorporated areas in the state do not have organized waste collection services. Illegal dump sites are generally easily accessible to vehicles, somewhat hidden from view, and are perceived to be a no-man's land where dumping is permissible without costs. Approximately 70% of these sites are located in drainage swales or in creeks, resacas, or arroyos. Irrigation canals are also subjected to illegal dumping.

Environmental risks associated with illegal dumping and burning of solid waste include: surface and groundwater contamination; impact to wildlife and aquatic habitat; impact on endangered or threatened plants, animals, and species; and air pollution from open burning, especially in areas of concentrated population. Leachate from illegal dumping sites can contaminate water supplies, as can ash with concentrated contaminants created during illegal burning. Burn sites are often buried, creating potential for future water contamination.

Over one-fifth of the trash going to landfills in Texas is made up of yard trimming and vegetative food material. These materials can be used, instead of being wasted, as an organic, environmentally-friendly substitute for home chemical fertilizers. Practices by homeowners, such as the use of mulching lawnmowers and home composting, can reduce the amount of yard waste entering landfills. Manure from animal waste and sludge from human waste can also be used in this way. Private enterprise can make use of these materials to produce compost on the commercial level.

Another NPS contributor associated with waste management is the improper disposal of hazardous waste. Hazardous waste comes from industry, manufacturing, and households. Hazardous waste comes in many different shapes and forms. Chemical, medical, and furniture processing are some examples of processes that produce hazardous waste. Household products that contain corrosive, toxic, ignitable, or reactive ingredients such as paints, cleaners, oils, batteries, and pesticides are also hazardous wastes that contribute to NPS pollution. Oversided containers for household products can contribute to NPS due to overuse to get rid of the product, storage which can be unsafe, and improper disposal.

Hazardous and solid wastes, if not disposed of properly, can pollute the environment and pose a threat to human health. The State of Texas has several programs in place to address hazardous and solid waste management.

## State Solid Waste Permitting Programs

With a few exceptions, the TCEQ uses permitting to regulate the storage, transport, processing, and disposal of solid waste in Texas to prevent nonpoint source releases to the environment. TCEQ rules require that solid waste be processed and disposed of only in authorized facilities.

The TCEQ randomly audits a portion of waste stream notifications in order to ensure proper classification and coding of waste in Texas. Hazardous waste is defined as any solid waste listed as hazardous or possesses one or more hazardous characteristics as defined in federal waste regulations. Industrial waste is waste that results from or is incidental to operations of industry, manufacturing, mining, or agriculture. Under the definition of a waste, certain materials recycled in certain ways are excluded from being considered waste while others are not.

Facilities that aggregate, process, and return to use source-separated, non-putrescible recyclable materials from the municipal solid waste stream are exempt from permitting or registration requirements. All other recycling facilities must be authorized by the TCEQ.

The TCEQ certifies Municipal Solid Waste (MSW) technicians. The operating permits of most MSW facilities, including landfills, transfer stations, processing facilities, and recycling and resource recovery facilities, require the presence of a certified MSW technician. The responsibilities of an MSW technician include the proper screening, handling, transportation, collection, storage, and disposal of municipal solid waste.

## The Beneficial Use Sludge Permitting Program

Sewage sludge, also known as biosolids, must be properly processed, transported, and used or disposed of in order to prevent adverse environmental and public health impacts. Sludge is the material that remains after bacteria has digested the human waste from municipal water and wastewater treatment plants. Sludge can also originate from septic tanks, chemical toilets, grease and grit traps.

Because of the nutrient and soil-conditioning characteristics of most biosolids, local governments are encouraged to consider beneficial land application or composting of sludge. An activity to land-apply Class B biosolids for a beneficial use must be authorized by the TCEQ. An activity to land apply Class A biosolids (e.g. compost) for beneficial use does not require authorization by TCEQ. Beneficial use is defined as the land application of treated municipal sludge at or below the agronomic needs of a cover crop or the use of water treatment sludge as a soil amendment.

Because some municipal wastewater treatment plants also receive industrial wastewater, sewage sludge can contain pesticides and chemicals along with human waste. A permit is required for most activities that involve the processing, transportation, beneficial use, or disposal of sludge. If a sludge is not of domestic origin, it is regulated as either a municipal solid waste or an industrial solid waste.

## The Illegal Disposal Abatement Program

To successfully address illegal dumping problems, communities must develop long-term comprehensive solutions. The TCEQ has developed a model approach for use in developing solutions for illegal dumping and other municipal solid waste problems. This model approach focuses on developing and maintaining a program that includes the following four components:

- Garbage collection services. Provide residents with convenient and affordable ways to dispose of their garbage, such as citizen collection stations for rural communities.
- Public awareness campaigns. Increase public awareness on the health and safety hazards of illegal dumping and available legal options for garbage disposal.
- Cleanup of existing dumps. Clean up illegal dump sites to discourage other dumpers, who are attracted to these existing sites, and to improve the community's awareness of the problem.
- Enforcement. Increase the cost of illegal dumping through increased enforcement and more severe punishments for offenders.

The TCEQ has an extensive outreach campaign to address the issue of illegal dumping. The TCEQ also provides funding to Councils of Government (COGs) through the Regional Solid Waste Grant program. Funds for the grant program are generated by state fees on Municipal Solid Waste (MSW) disposed of at landfills. The COGs use the funds to develop an inventory of closed MSW landfills; conduct regional coordination and planning activities; provide technical assistance and informational programs pertaining to solid waste management; serve as central point of contact for solid waste management outreach, education, and training programs; maintain a regional solid waste management plan; and administer pass-through grant programs to provide funding for regional and local MSW projects.

## Texas Environmental Enforcement Task Force

Intentional damage to the environment is a serious threat to the public's health and safety. In many cases, offenders favor rural areas or low-income neighborhoods for environmental crimes such as illegal dumping. The most common environmental crimes involve the dumping of various pollutants like septic waste, household garbage, used motor oil, auto batteries and barrels of hazardous waste.

Texas is a national leader in the investigating and prosecuting of environmental crime. This distinction is a direct result of the formation of the Texas Environmental Enforcement Task Force. The task force's sole

responsibility is to combat environmental crime, both directly and by informing and training Texas peace officers.

Each year TCEQ dedicates a week to educating Texas about environmental damage caused by dumping and other illegal pollution. Activities during the week include educational forums with community groups and law enforcement, a traveling exhibit on preventing environmental crime, police officer training, and a ceremony recognizing environmental crime fighters. Training sessions for police officers cover state and federal environmental statutes and emphasize the differences between criminal and civil cases. Primary instruction includes evidence collection and the use of scientific and technical expertise. Officers are led through re-enactments of illegal discharges and the execution of a search warrant.

The TCEQ heads up the Texas Environmental Enforcement Task Force with TPWD, Attorney General's Office, GLO, RRC, and the Governor's Office. While operating as a task force, these state agencies coordinate with various U.S. Attorney's Offices, the EPA, and the FBI. Task force membership has expanded to include a dozen more state, federal, and local entities. The task force meets bimonthly to review referrals for investigations. Tips come from many sources: employees at the offending company, business competitors, or task force members who come across leads. If the environmental task force adopts a case, each member agency appoints an investigator and the group consults with prosecutors to determine whether the case is better suited for state or federal courts. The participating agencies collaborate in conducting searches, taking and analyzing samples, and performing other functions necessary to support criminal investigations and prosecutions.

## Citizen Complaints

Responding to complaints from the general public about alleged environmental violations is an important part of TCEQ's regional office responsibilities. Each complaint is assigned a priority status to ensure that staff respond to the most environmentally serious complaints first. TCEQ has established procedures by which staff will investigate complaints once the most appropriate course of action is determined. An investigation may take the form of an on-site inspection or sampling.

Complaints are categorized as follows:

- conditions relating to air quality such as odor, dust, and smoke
- conditions that create a potential to pollute the water or land
- alleged violations of TCEQ permits or rules
- smoking vehicles
- spills

■    other environmental concerns

Matters not within TCEQ jurisdiction will be referred to the appropriate state agency. The TCEQ does not have the authority to regulate, enforce, or mediate private actions between citizens.

## Citizen Environmental Watch

The Citizen Environmental Watch Program allows information gathered by private individuals to be developed as evidence of environmental violations. This program provides an opportunity for citizens to get involved with environmental protection.

The program is implemented by the TCEQ regional offices. Regional staff review the complainant's information—such as photos, videotapes, and water samples—and decide on the appropriate course of action. If necessary, an investigator will visit the site or facility in question. Individuals must be willing to disclose their identities and, in some cases, asked to testify. Strict agency procedures for gathering and preserving evidence must be followed. The TCEQ can pursue an enforcement action only if the evidence is admissible at a hearing, based on Texas rules of evidence. The agency will not consider information gathered illegally.

If a serious or unresolved violation is found, the TCEQ will initiate an enforcement action. Individuals providing evidence in an enforcement case will be notified of the results of the investigation and any follow-up enforcement actions.

## Composting

Compost is produced by aerobic decomposition of organic matter. Compost feedstock may include, but is not limited to, leaves and yard trimmings, biosolids, food scraps, food-processing residuals, manure or other agricultural residuals, forest residues, bark, and paper. Composting benefits water quality by saving landfill capacity, reducing the use of chemical fertilizers, improving manure management which aids in the reduction of phosphorus and bacteria concentrations due to storm water runoff from dairy farms, and promoting establishing vegetation which helps reduce NPS pollution from rainfall runoff.

The TSSWCB and the TCEQ partnered to initiate an innovative solution to water quality problems in the North Bosque and Leon watersheds, the Composted Manure Incentive Program (CMIP). Storm water runoff containing manure from dairy farms is a significant source of phosphorous and bacteria in the two watersheds. Incentive payments, funded by CWA §319 funds, are given to governmental entities towards the purchase of eligible composted manure to be used in beneficial uses. The ultimate goal of the project is to ensure that markets are in place to support the continued export of manure from these two watersheds after rebate funds

have been exhausted. The Texas Department of Transportation (TxDOT) uses the compost throughout the state to promote establishment and maintenance of roadside vegetation.

The TCEQ provides outreach and technical assistance in the use of compost throughout the state. The outreach program provides workshops, demonstrations, and technical assistance specifically addressing the benefits, opportunities, and incentives for using composted manure. The TCEQ has an expanded outreach program in the North Bosque and Leon watersheds that is conducted in conjunction with the CMIP.

The Texas Cooperative Extension also has an expanded education and marketing campaign for composted manure. This campaign effort has surveyed existing and potential markets for composted manure in the CMIP watersheds, organized a comprehensive education and marketing campaign focused on these markets, and begun field trials and demonstrations to document and publicize the effectiveness of the appropriate uses of composted manure in a wide array of landscaping, horticultural, and agricultural applications.

## Used Oil Recycling

Texas law prohibits dumping used oil on land or into sewers or waterways. This includes the use of used oil as a dust suppressant. Texas has also banned used oil filters from being placed in or accepted for disposal in a landfill. TCEQ requires all transporters, handlers, and collection centers for used oil to register with the agency and report annual quantities of used oil handled. A facility which accepts used oil from household *do-it-yourselfers* may be exempted from the state fee on the sale of new automotive oil.

## Oil and Gas Waste Management

The Railroad Commission of Texas (RRC) regulates activities and the wastes generated as a result of activities associated with the exploration, development, or production of oil or gas or geothermal resources, including transportation of crude oil or natural gas by pipeline. These wastes are termed "oil and gas wastes", and include both hazardous and non-hazardous oil and gas wastes.

The RRC has responsibility for the prevention of pollution that might result from activities associated with exploration, development, and production of oil, gas, or geothermal resources of the State to prevent operations dangerous to life or property. The RRC uses rule-authorization and permitting to regulate the storage, transport, processing, and disposal of oil and gas wastes in Texas to prevent releases to the environment. RRC rules require that oil and gas wastes be processed and disposed of only in an authorized or permitted manner RRC's environmental and safety programs cover drilling, operation, and plugging of wells;

separation and treatment of produced fluids in the field or at natural gas processing plants; storage of crude oil before it enters the refinery; underground storage of hydrocarbons in slat caverns or natural gas depleted reservoirs; transportation of crude oil or natural gas by pipeline; drilling, operation and plugging of brine wells; and storage, hauling, reclamation, or disposal of wastes generated by these activities.

The RRC's environmental and safety regulations for oil and gas wastes are administered through the Environmental Services, the Well Plugging, the Site Remediation and Special Response, and the Compliance programs. The Environmental Services program includes permitting programs for management of wastes and protection of the public from surface storage or disposal, disposal and enhanced recovery wells, underground hydrocarbon storage and brine mining. The Environmental Services program also coordinates with other state and federal agencies on environmental and safety matters. The Compliance program coordinates the activities of nine district offices in inspecting oil and gas operations and enforcing the RRC's environmental and safety rules. The Well Plugging and the Site Remediation and Special Response programs handle special Oil Filed Cleanup Fund (OFCUF). The OFCUF is supported by the oil and gas industry through various fees, taxes, and penalties. The Site Rememdiation and Special Response program also reviews operator cleanup activities and coordinates the RRC's response to large spills an other major events.

## The TCEQ Household Hazardous Waste Management Program

TCEQ's Household Hazardous Waste (HHW) Management program primarily regulates HHW collections and programs. Technical and regulatory information is also provided to entities on setting up HHW collection programs as well as general information to citizens of Texas on HHW issues. Quarterly meetings of a HHW managers network are also coordinated.

## Tire Disposal Program

Scrap tires must be managed to prevent fires and control disease vectors (mosquitos and rats). The toxic air pollutants from tire fires can become nonpoint source water pollutants through atmospheric deposition. Prior to Texas' scrap tire management program, large illegal tire dumps often appeared on the beds and banks of streams, damaging riparian habitat. The TCEQ regulates the collection, processing and recycling/disposal of over 20 million tires discarded each year in Texas. Anyone who stores more than 500 scrap tires must register with the TCEQ as a scrap tire storage site. Scrap tires must be hauled by a registered transporter to either a permitted landfill or an authorized scrap tire facility. All facilities must keep manifest records showing the disposition of scrap tires.

## The City of San Antonio Waste Management Programs

The City of San Antonio's Household Hazardous Waste (HHW) Program operates a permanent HHW Drop-off Center (DoC). This service provides an environmentally safe means for citizens to dispose of items such as paint, pesticides, oil, anti-freeze, batteries and household cleansers. If thrown in the regular trash, these items could potentially harm the solid waste collectors and contaminate our environment. The program has developed an outreach campaign, "Take it to the Doc!", that urges the public to dispose of hazardous household waste properly by bringing it to the HHW DoC.

All collected HHW materials are handled and packaged for disposal by technically trained personnel. Following collection, the transport of all materials is performed by a licensed hazardous materials transporter. The method of disposal depends upon the type of material. Approximately 80% of all materials collected through the City of San Antonio HHW Program are recycled. Materials that cannot be recycled are disposed of by a licensed hazardous materials treatment, storage and disposal facility.

## City of Austin Biosolids Composting

Another innovative strategy for wastewater management was developed by the City of Austin in the 1950's. Originally established as a series of stabilization ponds used to treat wastewater residuals from the city's wastewater plants, the Hornsby Bend Beneficial Reuse Program has become a nationally recognized, EPA award-winning sludge-recycling facility.

Situated on 700 acres of land along the Colorado River, about 10 miles east of downtown Austin, the facility is a national model for innovative approaches to solving environmental problems. Each year, thousands of tons of wastewater sludge is anaerobically digested and composted into an EPA-certified soil conditioner called "Dillo Dirt". Waste products (tree trimming and yard waste), which would ordinarily be disposed of in a landfill, are utilized as bulking agents, significantly reducing the cost of waste disposal for Austin residents. This popular product is distributed to various city departments for use in park facilities and to commercial vendors for sale.

Water separated from the sludge flows through a 250-acre facultative pond system. After polishing in a 4-acre greenhouse enclosed aquatic plant facility, the treated effluent is used to irrigate approximately 160 acres of a 220-acre on-site farm. Hay and other feed crops are harvested from this land by a contract farmer, and the city receives a portion of the profits. Some digested and dried sludge is also land applied to the on-site farm to improve soil conditions. Plans are underway for the program, regulated by the TCEQ, to be expanded to off-site agricultural locations.

# Wastewater Management

Municipalities, industries, and agricultural operations can produce large volumes of wastewater. Unless proper disposal methods are used, wastewater can contaminate the state's surface and ground waters by contributing pathogens, organics, and metals to stormwater runoff.

Multiple segments around the state are not meeting water quality criteria and improperly treated on-site sewage (OSSF) effluent has been identified as a major nonpoint source contributor. Historically, individual OSSFs were found primarily in rural areas. However, rapidly increasing urban populations, combined with shifts in population from rural to urban areas, have led to pressure for widespread suburban development. One way to reduce the amount of NPS pollution resulting from on-site sewage effluent is to develop centralized wastewater collection and treatment facilities. These facilities are regulated in Texas by the TCEQ to ensure that the effluent they release into the waters of the state is treated to certain standards that minimize NPS pollution. This is an example of a point source solution to a nonpoint source problem.

Raw sewage and wastewater can increase levels of nutrients in water. Elevated nutrient concentrations encourage algal growth and decrease dissolved oxygen. Low dissolved oxygen endangers aquatic plants and animals. Following is a discussion of some of the programs in place to manage nonpoint source pollution from wastewater.

## The On-Site Sewage Facility Program

About 50,000 on-site wastewater treatment systems are installed annually in Texas to treat wastewater from rural and suburban homes and small businesses. An on-site wastewater treatment system collects, treats and applies wastewater to soil. By definition, wastewater managed by an on-site system cannot leave the property where it is generated. Texas has approximately 4-5 million households relying upon on-site sewage facilities (OSSF) for wastewater disposal and the numbers are increasing each year.

The Texas legislature passed legislation to regulate on-site sewage facility systems statewide. The law established parameters for delegation of authority to regional and local governments-such as counties, cities, river authorities and special districts to implement and enforce on-site sewage regulations with approval and oversight by the TCEQ. The TCEQ sets minimum standards, local authorities can adopt more stringent rules if approved by the TCEQ.

The TCEQ provides technical assistance for designers and installers of OSSF systems by reviewing plans to ensure that new facilities are designed and constructed using best current technology. TCEQ staff conduct plan reviews, installation inspections, and follow up inspections

to ensure that designated controls are used and compliance with regulations is achieved. These inspections also assist in pinpointing areas of concern. Existing, failing systems are generally identified by citizen complaints and required to be brought to current standards. TCEQ staff also provide oversight of delegated local authorities.

The TCEQ is also responsible for the certification of inspectors and installers of OSSFs. The responsibilities of a registered installer include the installation of treatment tanks and the installation or replacement of sewer lines or disposal components according to minimum state standards or the more stringent conditions in the authorized agent's order or ordinance. OSSFs must be constructed by licensed individuals who have been properly trained in appropriate installation procedures. Any individual who is compensated by another individual to construct, install, alter, or repair an on-site sewage facility must be licensed as an installer. Individuals who manage the on-site sewage program for an authorized agent must be licensed as a "designated representative." Designated representatives review planning materials, issue permits to construct, investigate and resolve complaints, initiate enforcement on violators, issue authorizations to operate, maintain records, and submit reports as required.

## The Texas On-Site Wastewater Treatment Research Council

Meeting the research and technology transfer needs of individuals involved in wastewater treatment in Texas is the major goal of the Texas On-site Wastewater Treatment Research Council. The Council was established by the Legislature to fund research that demonstrates the feasibility of on-site treatment alternatives. The Council awards competitive grants to accredited colleges and universities in Texas, governmental entities, or other acceptable public or private entities. Research funded by the grant must be for improvement in the quality, and reduction in cost, of on-site wastewater treatment technologies provided to Texans. The Council also awards grants to enhance technology transfer regarding on-site wastewater treatment by using educational courses, seminars, symposia, publications, and other forms of information dissemination. To support the research program, a $10 fee is charged to all property owners in Texas who apply to construct OSSFs for treatment and disposal of wastewater.

## The City of El Paso Reclaimed Water System

The City of El Paso Water Utilities (EPWU), one of the nation's most progressive water agencies, has been delivering reclaimed water since 1963. As a pioneer in water reclamation, EPWU has attained international recognition for its innovative and extensive use of recycled water. EPWU now operates the most extensive and advanced reclaimed water system in Texas for industrial use and landscape irrigation.

EPWU's philosophy is that water is too valuable to be used only once. Wastewater from within the EPWU collection area is collected and treated from one of four EPWU's Wastewater Reclamation Plants using advanced or tertiary treatment. The result is a high water quality that has earned the EPWU the reputation as operating the first wastewater treatment plant in the world to meet Drinking Water Standards for its reclaimed water. The other three plants meet the highest possible quality rating of Type I reclaimed water as described in state regulations monitored by the TCEQ. These facilities were constructed with funding from the U.S. Bureau of Reclamation grants, U.S. Economic Development Administration grants, Texas Water Development Board low interest loans, and City of El Paso Water and Sewer revenue bonds.

Reclaimed water use has been proven safe for the following types of applications throughout the U. S. and are approved for use by the TCEQ: city parks, school playgrounds and sports fields, landscape nurseries, sports complexes, golf courses, street median landscaping, construction projects, street sweeping, fire protection, residential and multi-family landscape, industrial cooling towers, and other industrial processes. The EPWU is also authorized to reinject wastewater treated to drinking water standards into the local aquifer.

## The Brazos River Authority Technical Assistance Program

The Brazos River Authority (BRA) is committed to its mission of developing, managing, and protecting the water resources of the Brazos River Basin to meet the needs of Texas. The diversity that exists within the 42,000 square mile Brazos River Basin is extreme. Annual rainfall ranges from about 19 inches in West Texas to more that 56 inches along the gulf coast. Rapid and localized population growth, and ever changing land uses, presents the BRA with many challenges that must be planned for and addressed appropriately. To meet the needs of Texas, innovative measures are utilized to deal with issues such as moving water from areas with surplus water to areas with water deficits and removing constituents such as salt from both inland and gulf coast waters.

Beginning in the early 1970's, the BRA pioneered the development of regional wastewater treatment systems to reduce the amount of NPS pollution resulting from OSSFs. Today BRA operates 4 regional wastewater treatment plants, 8 municipal wastewater treatment plants, one regional composting operation, and 3 water treatment plants. Over the years, BRA has received numerous awards from the TCEQ and EPA, recognizing the excellence of their operations, maintenance, and design.

The BRA is a prominent and active partner in numerous water quality improvement projects and studies throughout the Brazos River Basin with a major emphasis on non-point source agricultural issues such as confined animal feeding operations (poultry and dairy) and crop production, and non-agricultural sources such as on-site sewage facilities. The BRA is

committed to a positive and proactive approach to identify water quality problems and to follow through with appropriate restoration measures.

The BRA also offers programs such as the Technical Assistance Program to assist cities, water districts, and other entities with their particular water and wastewater treatment operations. These services include regulatory review, operations assistance, preventive maintenance, program preparation, laboratory testing, and industrial pretreatment. A key component of the industrial pretreatment program is to work with cooperating industries to reduce their pollutants before they enter the sewerage system, thereby reducing the potential to impact water quality.

# Storm Water Management

Storm water pollution is a form of water pollution that originates from urban and rural landscapes. Everyday activities such as landscape maintenance, the operation of automobiles, and building construction can cause water pollution under certain circumstances. Pollution occurs when rainfall or infiltrating groundwater carry accumulated pollutants to receiving water bodies such as surface lakes, streams, and coastal waters or groundwater aquifers.

The fertilizers used to maintain urban landscapes can cause excessive growths of aquatic vegetation and can lead to unhealthy concentrations of nitrates in groundwater used as drinking water supply. Metals and organic compounds associated with the operation of automobiles can be toxic or carcinogenic to human health and wildlife. Air emissions that originate from a multitude of industrial, urban, and mobile sources are deposited onto the ground, with the potential to add pollutants to surface and ground water when rainfall runoff occurs. Sediments that erode from land areas disturbed by construction activities can impair aquatic wildlife habitats, shorten the design life of reservoirs, and act as a carrier for contaminants. In addition, increased impermeable surface due to urbanization can alter the quantity and quality of storm water runoff by facilitating the transportation of runoff and accumulated sediments from paved surfaces. The water-related impacts of construction and urbanization can include habitat alteration, higher peak flows and flooding, erosion, and increased pollutant loads such as sediment, metals, nutrients, and bacteria. The following is a discussion of some of the programs in place throughout the state to address NPS pollution resulting from storm water runoff.

## State Storm Water Permitting Programs

The state of Texas assumed the authority to administer the National Pollutant Discharge Elimination System (NPDES) program in Texas on September 14, 1998. NPDES is a federal regulatory program to control discharges of pollutants to surface waters of the United States. The TCEQ's Texas Pollutant Discharge Elimination System (TPDES) program now has federal regulatory authority over discharges of pollutants to

Texas surface water, with the exception of discharges associated with oil, gas, and geothermal exploration and development activities, which are regulated by the Railroad Commission of Texas (RRC).

The urban storm water program administered through the TPDES program addresses small municipalities, growing urban fringe areas, and other urban development under the Phase II rules. If an urban area falls within the scope of the storm water program, a TPDES permit is required, a management plan for the reduction of the runoff impacts must be implemented locally, permit compliance must be evaluated, and maintenance of existing surface water quality must occur, consistent with the water quality standards. TPDES permits regulate storm water discharges from industrial activities, construction activities, and municipal separate storm sewer systems (MS4s) to Texas waters. The TCEQ issues and manages TPDES permits for storm water discharges from these activities and systems. Factors that EPA require states to consider in designating urban areas as so-called MS4s include discharges to sensitive waters, high growth areas or growth potential, contiguity to an existing urban area, significant contribution of pollutants to surface water, and ineffective protection of water quality by other state programs.

Texas Land Application Permits (referred to as no discharge permits) authorize individual facilities to manage storm water and/or wastewater through evaporation, subsurface disposal, or irrigation systems which prevent runoff and prevent accumulation of nutrients in the soil. The TCEQ has a general permit which provides authorization for qualifying manure composting facilities to dispose of storm water through irrigation and/or evaporation.

The RRC regulates discharges of waste from activities associated with the exploration, development, or production of oil, gas, or geothermal resources, including transportation of crude oil and natural gas by pipeline, and from solution brine mining activities (except solution mining activities conducted for the purpose of creating caverns in naturally-occurring salt formations for the storage of wastes regulated by the TCEQ). Discharges of waste regulated by the RRC into water in the state cannot cause a violation of the water quality standards. While water quality standards are established by the TCEQ, the RRC has the responsibility for enforcing any violations of such standards. In addition, the NPDES authority delegated to Texas by EPA does not include those discharges from activities under the RRC's jurisdiction; such a discharger must obtain authorization from both the RRC and the EPA.

## Texas Department of Transportation Storm Water Management Guidelines

Involvement in construction and urbanization makes the Texas Department of Transportation (TxDOT) a key player in the control of storm water pollution. It is TxDOT's responsibility to be aware of the

problem and to take measures to minimize and/or prevent storm water pollution. Therefore, it is the goal of TxDOT to prevent the degradation of receiving waters due to storm water runoff from highway operations. TxDOT is developing a comprehensive storm water management program aimed at achieving this goal.

TxDOT has published a document entitled, "Storm Water Management Guidelines for Construction Activities". Although other issues are mentioned such as project planning and maintenance, the focus of the document is to provide guidance on the use of storm water management measures during highway construction.

With this document, the user can develop a storm water management plan tailored to the needs of a particular project. In addition, the measures in this document will assist in meeting regulatory requirements where storm water is a concern. Although runoff control measures are required by law in some instances, these measures are applicable anywhere soil is disturbed and erosion and sedimentation are potential problems. The material in this manual is derived primarily from storm water guidance documents developed and adopted by the TCEQ.

## The City of Dallas Trinity River Corridor Project

The Trinity River Corridor Project is made up of several distinct elements. The overall effort will include the building of levees, wetlands, a downtown lake, gateway parks, trails, equestrian centers, and an interpretive center. It will also involve the expansion and preservation of the Great Trinity Forest through the acquisition of 2,700 acres of land along the Trinity River.

One element of the Trinity River Corridor project is the construction of a flood control project along the Trinity River that will reduce the flooding risk for about 12,500 structures in Dallas. The Dallas Floodway Extension (DFE) will restore standard project flood (800-year) protection to the downtown Dallas vicinity and the densely populated areas along the southern Trinity River corridor.

A Chain of Wetlands will be constructed in conjunction with the DFE. The Chain of Wetlands extends about four miles in length and is comprised of seven wetland cells that produce 170 acres of water surface. About 100 acres of grasslands will fill in between and around the wetland cells. The wetlands will be fed by treated wastewater discharge. The Chain of Wetlands also offer a secondary route for flood waters of the Trinity River lowering the flood elevations and filtering flood waters of nutrients and sediments prior to discharge into the Trinity River. The design team for the Chain of Wetlands includes the Corps, EPA, U. S. Fish and Wildlife Service, City of Dallas staff, TPWD, and the Trinity River Corridor Citizens Committee.

## The San Antonio River Tunnel

The San Antonio River Tunnel system was constructed to lower the risk of damage due to flooding and help reduce nonpoint source pollution in storm water runoff discharged into the San Antonio River. The system consists of 12 trash rakes cycled on a daily basis to prevent large bulky floatable debris from entering the tunnel system and eventually the San Antonio River. During a storm event, the trash rakes are run as needed to ensure operational efficiency of the system. Approximately 500 tons of floatable debris is removed annually, with three tons removed weekly and the remainder from storm events.

This facility also contains a re-circulation feature incorporating a Parkson screen that removes smaller debris prior to entering the San Antonio River. This re-circulation system helps maintain water quality in the famous downtown riverwalk during periods of low flow in the river. The tunnel is to remain full of water at all times allowing the re-circulation feature to ensure water quality is maintained in the tunnel itself so when initial flushing during a storm occurs, downstream water quality is not affected.

## Integrated Storm Water Management Project

The North Central Texas Council of Governments (NCTCOG) organized the integrated Storm Water Management (ISWM) project in order to protect streams and rivers from nonpoint source pollution and heightened flooding risks due to urban development. The project will foster partnerships with state and federal agencies to meet regulatory requirements and provide guidelines for communities to establish a successful comprehensive storm water management program. The project provides an innovative site development approach for addressing both storm water quantity and quality. The ISWM project is intended to be an essential element for ongoing and future cooperative storm water initiatives in North Central Texas.

The NCTCOG is working with approximately 55 local governments in order to create sound storm water management guidance documents for the region through the ISWM project. The ISWM Design Manual for Development will outline the most current and applicable storm water management techniques and provide criteria and rationales for the selection of structural and nonstructural storm water quality and quantity BMPs.

## The San Angelo Urban Nonpoint Source Abatement Program

The north fork of the Concho River winds through the City of San Angelo traversing residential, recreational, industrial, and commercial land use areas. This urban reach of the river has a long history of poor water

quality and a record of frequent fish kills encompassing a period of at least thirty years. Several water quality studies conducted by private and public entities have confirmed that urban runoff and nonpoint source pollution have been the primary cause of poor water quality conditions.

Recognizing the desire of city residents and stakeholders to improve water quality in the North Concho, the Upper Colorado River Authority (UCRA) partnered with the City of San Angelo to appoint a Citizen's Advisory Group to develop a plan for eliminating the fish kills and addressing nonpoint source pollution impacting the river. The work of the committee culminated in a Master Plan for pollution abatement targeting seven urban subwatersheds. The worst watersheds for pollutant loadings were identified and a priority system established for construction of facilities that would lessen the load of organic material and nutrients entering the river.

The implementation plan includes construction of a gabion retention structure, stormwater control structures, and streambank stabilization. The plan is still in the process of being implemented. The best management practices that have been implemented have produced improvements in water quality expressed by the absence of fish kills following major storm events. The program also has involvement and support from local elected officials and the initiation of an extensive public outreach program, the Aquatic Experience, which is discussed in Chapter 7.

# Pesticide Management

Texas Pesticide Laws define a pesticide as a substance or mixture of substances intended to prevent, destroy, repel, or mitigate any pest, or any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant. Pesticides enter water bodies through runoff from sites where there are applied such as farms, golf courses, parks, highway right-of-ways, and lawns and gardens; by leaching into groundwater; wastewater discharges; and atmospheric deposition. Pesticide contamination occurs as a result of improper or over use, spills, improper storage, and improper disposal. According to a USGS study of 48 drinking water reservoirs in Texas (September 2000), the pesticides most frequently detected in Texas drinking water reservoirs included atrazine, diazinon, metolachlor, and simazine. EPA has identified pesticide contamination as a nationwide problem in surface water and groundwater. In response, there has been a coordinated state effort to monitor pesticides and define roles and responsibilities in responding to the water quality effects of pesticide contamination.

In addressing pesticide contamination several major principles need to be taken into account. Agricultural pesticides are beneficial and important to the production of food and fiber, and are of significance to the state economy. However, the use of pesticides should not impair any use of waters of the state or cause a public health hazard. Drinking water

supplies, both groundwater and surface water, should especially be protected. State and local government should be the first line of protection, their efforts being complemented by federal expertise and information. Efforts in Texas in addressing these issues include, for groundwater, the adoption of the *Groundwater Pesticide Management Plan* and, for surface water, the incorporation into this document, of a similar elaboration of management measures. These surface water pesticide management measures were primarily developed under the guidance of the Texas Watershed Protection Committee.

## Groundwater Pesticide Management Plan

Considerable progress has been made in the prevention of groundwater contamination from pesticides by laying out specific management measures in *The State Management Plan for Prevention of Pesticide Contamination of Groundwater* – usually referred to as the *Groundwater Pesticide Management Plan* or *PMP*. This plan was published in January 2001 after several years of development under the guidance of the Texas Groundwater Protection Committee. A similar elaboration of management measures has been developed, by an interagency group, for the prevention of pesticide contamination of surface water. Many of the measures for preventing pesticide contamination of groundwater and surface water are the same, however, there are important differences.

## Surface Water Pesticide Management

The goal of surface water pesticide management is to provide a mechanism for the protection of surface water from pesticide contamination similar to that provided to groundwater under the *PMP*. The goal of surface water pesticide management is to protect and maintain the existing quality of surface water and to prevent the degradation of state surface water resources. This goal subscribes to unimpaired use of surface water, allowing for the normal use of pesticides without impairing surface water quality or posing a public health hazard. All used and potentially usable surface waters are subject to the same protection afforded by the antidegradation policy goal. This level of surface water protection complements the protection of groundwater influenced or hydrologically connected to surface water.

Pesticide contamination of surface water is detected through the state's assessment process as described in Chapter 5. Public water supplies are regularly monitored by the Public Drinking Water Section of the TCEQ. NPS pollution resulting from pesticides is managed through prevention and response to contamination. The Texas Watershed Protection Committee (defined in Chapter 4) coordinates these activities.

### Prevention and Mitigation

The Texas Watershed Protection Committee recommends and coordinates a five tiered approach for prevention of pesticide contamination.

- **General Education:** General information is shared statewide to raise awareness of the potential for pesticide contamination. Brochures, displays, and slide presentations are the tools used to raise awareness. These materials are created and distributed throughout the state by the cooperating agencies of the Texas Watershed Protection Committee (TWPC).

- **Education Focused on Affected Water Bodies:** Educational efforts will be expanded in areas where a surface drinking water source is identified as affected by specific pesticides. This effort will be applied even though monitoring has not shown contamination beyond the Maximum Contaminant Level (MCL). Dissemination of information will be through public presentations, articles in newsletters, and advertisement of available educational literature.

- **Education and Application of Best Management Practices (BMPs) in Areas with Lower Levels of Pesticides:** Where monitoring has revealed contamination of surface water used as a drinking water source, but at concentrations lower than the pesticide MCL or Health Advisory Level (HAL), a voluntary BMP program will be encouraged. Furthermore, cooperating agencies may take additional action through their standard education programs.

- **Education and Application of BMP's in Areas with Greater Levels of Pesticides:** In a surface water body used as a drinking water source, where monitoring has revealed a nonpoint source contamination by a pesticide at levels greater than the MCL or HAL, a voluntary education and BMP program will be initiated. If there is no evidence of sufficient improvement, use restrictions will be implemented.

- **Pesticide Use Restrictions:** If all previous levels of preventive measures fail, the final recourse will be use restriction of the pesticide in the water body which is contaminated. Such actions will be implemented by the TDA after consultation with the other involved agencies through the TWPC. Users will be notified of the restricted use status of the pesticide in their area.

## Response to Contamination

The response to contamination of surface water by pesticides falls under the jurisdiction of a number of agencies. Pesticide runoff is typically treated as an agricultural nonpoint source pollution therefore, the

TSSWCB plays a key role in response. The TCEQ Source Water Assessment and Protection (SWAP) program provides response assistance when the water body is a drinking water supply. The Texas Department of Agriculture (TDA), the lead regulatory agency for agricultural pesticides, provides expertise on pesticide regulation and education. When pesticide contamination results in a surface water body not meeting standards the response is addressed through the TMDL process as described in Chapter 5. When the pesticide contamination does not result in a standards violation response occurs through the preventive actions described above and, if the local entity responsible for the affected water body chooses to participate,  through the TCEQ's SWAP program described below. The TWPC coordinates all responses to pesticide contamination to ensure that the responsible agencies or programs are notified and take appropriate action.

### *Implementation Under Source Water Assessment Program*

Under the Source Water Assessment Program (SWAP) all surface waters that contribute to public drinking water supplies are investigated for potential contamination. Investigations proceed in the following stages:

- Identification of areas that supply public drinking water
- Delineation of the boundaries of the assessment areas needed to protect the water supplies
- Inventorying of potential sources of contamination within the assessment areas
- Informing the public of the results
- Implementation of a source water protection program (see page 113)

## Pesticide Review Program

The EPA reviews and registers pesticides to ensure they meet current scientific and regulatory standards. Through this process consideration is made for human health and ecological effects of pesticides. The EPA issues risk management decisions based on the reviews that may result in registration eligibility, risk reduction measures, or elimination of uses. Risk factors that are analyzed include risks to workers, risks associated with residential uses, and risks affecting drinking water. Measures used to address risks include requiring intensive monitoring programs, prohibition of use in specified geographic areas or watersheds, education programs to ensure proper use and mitigation requirements. The State of Texas has developed programs to enforce and ensure compliance with this EPA program at the state level.

## Agricultural Pesticide Regulation

The Texas Department of Agriculture (TDA) is the State's lead regulatory agency for agricultural pesticide regulation. The Texas Pesticide and Herbicide Laws grant TDA the authority to enforce the provisions of the law pertaining to the registration, distribution, and use of all agricultural pesticides. TDA is responsible for licensing all agricultural pesticide applicators and labeling, storage, sales, usage, and disposal of all pesticides. TDA also cooperates with other state agencies that have statutory pesticide responsibilities, such as the TCEQ, the Structural Pest Control Board, and the DSHS. TDA is responsible for the enforcement of federal pesticide laws under a cooperative agreement with the EPA.

The TDA cooperates with all agricultural producers and other users of pesticides to make certain that all pesticides are used safely and according to instructions. The Texas Pesticide Control Act requires that pesticides be stored in a manner that will reasonably ensure that human food, domestic and public water, pet foods, drugs, animal feeds, commercial fertilizers, seeds, or clothing will not be contaminated. The law also directs that pesticide containers be disposed of as directed on the label or by any other methods approved by the TDA. Any use of pesticides inconsistent with label directions is a violation of the law and may subject the user to penalties under federal and state law.

The TDA is also responsible for developing and implementing the State of Texas Plan for Certification of Pesticide Applicators. All application equipment used by commercial applicators must be registered, and is subject to inspection at any reasonable time. The Texas Cooperative Extension is responsible for training in relation to the state pesticide applicator certification program.

## The Structural Pest Control Board

The Structural Pest Control Board (SPCB) is authorized to promulgate rules and regulations governing the methods and practices pertaining to structural pest control to prevent adverse effects on human health and the environment. SPCB has established regulations which authorize it to enforce label instructions approved by EPA and TDA regarding application and disposal of pesticides in the urban environment. Many label instructions contain information relating to proper application and disposal of pesticides to prevent surface water contamination.

In addition, the SPCB licenses businesses, certified commercial applicators, certified noncommercial applicators, technicians, technician apprentices, non-commercial applicator apprentices, and management technicians in the structural pest control industry. The SPCB also has the authority to take action against any licensee for engaging in practices that could be detrimental to public health, safety, or the environment. The

SPCB also has the authority to perform inspections to monitor pesticide use and investigate complaints regarding label violations.

## *Agriculture Resource Protection Authority*

The Agriculture Resource Protection Authority (ARPA) is the coordinating body for TDA, TSSWCB, TAES, DSHS, TCEQ, and SPCB with respect to their policies and programs for management, regulation, and control of pesticides. In addition, ARPA helps to avoid overlapping responsibilities of the state agencies, facilitates all the involved agencies participation in the regulation of pesticides, and helps demarcate the various areas of responsibility of the participating agencies.

ARPA may cooperate with and advise the member agencies or any other state agency that may be concerned with the regulation of pesticides and review any rule relating to pesticides that is proposed by any of its member agencies, except rules under Chapter 125 of the Texas Agriculture Code. ARPA can inform and advise the governor on matters involving pesticides, prepare and recommend to the governor and to the legislature any legislation that ARPA considers proper for the management and control of pesticides, and make annual reports to the governor and the appropriate legislative oversight committees.

## *The Agricultural Waste Pesticide Collection Program*

The TCEQ, partners with Texas Cooperative Extension (TCE) and Texas Department of Agriculture (TDA), to organize regional waste pesticide collections held statewide. The free collections provide agricultural producers and other Texans with an opportunity to dispose of pesticides and other household hazardous wastes at no expense and with no questions asked. In addition, mercury fever thermometers are accepted and replaced at no charge with mercury-free thermometers. The program is strictly voluntary. Participants are asked to answer several survey questions. The survey responses are evaluated to determine program effectiveness.

# Agricultural Management

Texas has the largest number of farms and the most land in agricultural production in the United States. According to the 1997 Ag Census, 77% of the land area of Texas was in agricultural production. Of this, there are 26,762,000 acres of cropland, 15,807,000 acres of pastureland, and 95,323,000 acres of rangeland. In addition, there are almost 400 cattle feedlots, over 1200 dairies, approximately 100 hog operations, and over 1300 poultry operations in Texas.

Agricultural activities are a potential source of nonpoint source pollution. Possible nonpoint source pollutants associated with agricultural activities include nutrients, pesticides, organic matter, sediment and bacteria. These

pollutants may be transported to surface waters through runoff or eroded soil particles. Pesticides and nutrients may also leach into groundwater or be transported through avenues such as abandoned and improperly constructed wells or through naturally occurring hydrologic connections. Below is a discussion of some programs in place to address nonpoint source pollution resulting from agricultural activities.

## *Agricultural Waste Permitting*

Animal feeding operations, such as feedlots, dairies, and poultry operations, can be a source of pollutant discharges following rainfall events. An animal feeding operation is required to apply for a wastewater permit if it exceeds a given number of animals. These concentrated animal feeding operations (CAFOs) are prohibited from directly discharging into surface waters except under catastrophic rainfall or a chronic rainfall event.

Animal Feeding Operations (AFOs), which have fewer animals than CAFOs, do not require written authorization. AFOs are under the purvue of the Texas State Soil and Water Conservation Board (TSSWCB) and must meet the same technical requirements as a CAFO. All poultry operations must obtain a TSSWCB-certified water quality management plan (WQMP). However, by April 13, 2006, dry litter poultry operations meeting certain size requirements must obtain written authorization. AFOs and CAFOs may receive technical assistance from the TSSWCB and the U.S. Department of Agriculture-Natural Resources Conservation Service (USDA-NRCS).

The TCEQ Agriculture Permitting Program reviews technical designs of CAFOs for new facilities, facilities being modified or increased, and for facilities renewing their authorization. The designs are reviewed for selection, implementation, and use of environmentally sound BMPs to collect, store and utilize waste and wastewater and to control air emissions and odor in a manner to conform with good agricultural management practices. Waste and wastewater must be properly land-applied for beneficial use on agricultural land at agronomic rates.

A Pollution Prevention Plan (PPP) must be prepared for every CAFO facility in the State. The PPP must be prepared in accordance with good engineering practices and include measures necessary to limit the discharge of pollutants to waters in the state. The PPP must describe practices which are to be used to assure compliance with the CAFO rules. Specific components of a PPP include a site plan indicating all animal confinement areas, waste treatment/retention facilities, waste/wastewater application areas, management of waste/wastewater application areas at agronomic rates, as well as an identification of potential pollutant sources used, stored, or disposed of at the facility. Any recharge zone/features must be located, evaluated and protected. Procedures for monitoring discharges and sampling of land application areas are included in the PPP.

Also, descriptions of all other protective measures or BMPs used to control potential pollutant sources must be included in the PPP.

## *TSSWCB Water Quality Management Plan Program*

Texas Agriculture Code, §201.026 makes the TSSWCB responsible for planning, implementing, and managing programs and practices for abating agricultural and silvicultural nonpoint source pollution. This is primarily accomplished through the TSSWCB Water Quality Management Plan Program, which was established in 1993 by the Texas Legislature when it passed Senate Bill 503. Senate Bill 503 authorized the TSSWCB to assist agricultural and silvicultural producers in meeting the state's water quality goals and standards through this voluntary, incentive-based program.

Through this program, agricultural and silvicultural producers develop and implement site specific water quality management plans (WQMPs) in cooperation with local Soil and Water Conservation Districts (SWCDs). The WQMPs include appropriate land treatment practices, production practices, management measures, technologies or combinations thereof, and an implementation schedule.

Local SWCDs provide technical assistance to develop the plan through agreements with United States Department of Agriculture Natural Resources Conservation Service (USDA-NRCS) or the TSSWCB. After being approved by the district, the developed plan requires TSSWCB certification. Certified water quality management plans ensure farming or ranching operations are carried out in a manner consistent with state water quality goals. The state legislature provides funding through the TSSWCB for the implementation of WQMPs.

## *The Dairy Outreach Program*

Some areas of the state have been identified as having water quality problems and concerns resulting from point and NPS pollution as a result of animal feeding operations. These areas are involved in the TCEQ's Dairy Outreach Program and include Erath, Bosque, Hamilton, Comanche, Johnson, Hopkins, Wood, and Rains counties. The TCEQ, TCE, and TSSWCB conduct various NPS related activities in the Dairy Outreach Program Areas (DOPA):

- Presentations to producer groups on water quality protection and the NPS program
- Review of permit applications for dairies, feedlots, and poultry facilities
- Information on CAFOs rules
- Education and training to producers on NPS issues such as land application of manure

Owners/operators of CAFOs located in the Dairy Outreach Program Areas, and operating under the state's CAFO rules, must complete an initial eight-hour course and subsequent eight hours every two years of continuing education in animal waste management. Similarly, employees of any CAFO responsible for work activities relating to compliance must be regularly trained or informed of information pertinent to the proper operation and maintenance of the facility and waste disposal. Employees at all levels of responsibility shall be informed of the general components and goals of the PPP. Training topics include land application of waste, proper operation and maintenance, good housekeeping and material management practices, recordkeeping requirements, and spill response and cleanup.

## The Texas Brush Control Program

The TSSWCB also achieves nonpoint source abatement through the implementation of the Texas Brush Control Program. The Texas Brush Control Program was created to enhance the State's water resources through selective control of brush species. This program is a voluntary program in which landowners may contract with the state for cost-share assistance. Local SWCDs assist landowners with development of resource management plans addressing brush control, soil erosion, water quality, wildlife habitat and other natural resource issues.

## The Agricultural Loan Program

The Texas Water Development Board (TWDB) provides grants and loans for agricultural water conservation equipment and practices which promote, demonstrate, or evaluate more efficient use of irrigation in agriculture. Grants are available to political subdivisions and state agencies. Loans are also available to political subdivisions and individuals through political subdivisions or a linked deposit program. The use of more efficient practices can reduce agricultural NPS loadings in surface and groundwater.

## The Private Lands Enhancement Program

Through the Private Lands Enhancement Program, the Texas Parks and Wildlife Department (TPWD) provides technical assistance to persons who desire to include wildlife management considerations in present or future land use practices. On request, a TPWD biologist will meet with the land manager and conduct an inspection of the property. The land manager will be asked to define the various needs and uses of the property and to establish an objective for wildlife considerations. The biologist will provide recommendations which may include a written management plan. Field biologists work with individual landowners on request to develop land management plans which use environmentally and economically sound land use practices. Implementation of the management plan is

completely voluntary. Practices include grazing rotation and management for increased grass cover. Filter strips in riparian areas are established. Upland erosion controls and establishment of vegetative cover reduce runoff and allow filtration. Strip removal practices for cedar are used to decrease loss of subsurface water to cedar. These practices combined lead to improved infiltration, increased water retention, and in some instances the rejuvenation of natural springs.

## *The Environmental Quality Incentives Program*

Resources available to address issues related to nonpoint sources from privately owned agricultural land were significantly enhanced by the passage and implementation of the 2002 Federal Farm Bill. The Environmental Quality Incentives Program (EQIP) in the Conservation Title of the 2002 Farm Bill is a voluntary conservation program that promotes agricultural production and environmental quality as compatible goals. Through EQIP, farmers and ranchers may receive financial and technical assistance to install or implement structural and management conservation practices on eligible agricultural land. EQIP is administered by the USDA-NRCS, but the priorities for allocation and distribution of funds are established with input from a State Technical Committee that is composed of representatives from federal and state resource agencies and organizations that are associated with agriculture. The TSSWCB and TCEQ are represented on this committee. In Texas, financial assistance funds will be used to address both the local high priority practices identified by the Local Work Groups that are chaired by soil and water conservation districts and the statewide resource concerns identified by the State Technical Committee. The State Technical Committee and Local Work Groups recommend the practices eligible for cost share and the cost share rates that will be paid. Eligible persons may select to apply in the county-based program recommended by the Local Work Group or in one of the Statewide Resource Concerns recommended by the State Technical Committee. Landowners and operators will choose the practices and evaluation systems that best fit their needs.

The availability of EQIP, active participation in the State Technical Committee, Local Work Groups, and accommodation of recommendations from the State Technical Committee by the State Conservationist have provided opportunities to focus resources on problem areas that were previously difficult or impossible to address. The voluntary nature of the program has enabled the state technical committee and the USDA-NRCS to establish state level resource concerns. By bringing this program down to the state level they are able to provide a portion of funds as incentive payments to producers that implement structural and management practices to address specific environmental problems. Before, EQIP funding assistance for individual land owners and agricultural producers was unavailable or very difficult to obtain. Through the State Technical Committee, the USDA-NRCS has actively pursued information on areas of the state where changes or adjustments in practices by individual land

owners would be needed to contribute to the alleviation of identified environmental problems. This has enhanced the opportunities for regulatory agencies to use a combination of regulatory and voluntary practices to address specific problem areas impacted by nonpoint sources or a combination of point sources and nonpoint sources.

## The Watershed Program

The purpose of the Watershed Program, administered by the USDA-NRCS, is to assist Federal, State, local agencies, local government sponsors, tribal governments, and program participants to protect and restore watersheds from damage caused by erosion, floodwater, and sediment; to conserve and develop water and land resources; and solve natural resource and related economic problems on a watershed basis. The program provides technical and financial assistance to local citizens or project sponsors, builds partnerships, and requires local and state funding contribution.

Resource concerns addressed by the program include watershed protection; flood prevention; erosion and sediment control; water supply; water quality; opportunities for water conservation; wetland and water storage capacity; agricultural drought problems; rural development; municipal and industrial water needs; upstream flood damages; water needs for fish, wildlife, and forest-based industries; fish and wildlife habitat enhancement; wetland creation and restoration; and public recreation in watersheds of 250,000 or fewer acres.

Plans or surveys including watershed plans, river basin surveys and studies, flood hazard analyses, and flood plain management assistance are developed to identify solutions that use conservation practice and nonstructural measures to solve resource problems. If approved, technical and financial assistance is provided for installation of improvement measures specified in the plans.

## Conservation Technical Assistance Program

The Conservation Technical Assistance program, administered by the USDA-NRCS, provides voluntary conservation technical assistance to land-users, communities, units of state and local government, and other Federal agencies in planning and implementing conservation practices that address natural resource issues. The program encourages and assists citizens to voluntarily conserve, improve and sustain natural resources.

## Conservation Reserve Program

The principal mission of the Farm Services Agency (FSA) is designed to stabilize farm income, assist farmers with conservation of land and water resources, provide credit to new or disadvantaged farmers and ranchers, and help farm operations recover from the effects of disaster. Many of the

FSA operated programs are funded through the Commodity Credit Corporation (CCC), a government owned and operated corporation established to stabilize, support, and protect farm income and prices. The Conservation Reserve Program is a voluntary program administered by the FSA that offers annual rental payments, incentive payments, annual maintenance payments for certain activities, and cost-share assistance to establish approved cover on eligible cropland. The program encourages farmers to plant long-term resource-conserving cover to improve soil, water, and wildlife resources. The CCC makes available cost-share assistance in an amount equal to not more than 50% of the participant's costs in establishing approved practices. Contract duration is between 10 and 15 years. The NRCS, Cooperative State Research and Education Extension Service, state forestry agencies, and local soil and water conservation districts provide technical support for this program.

## USDA-Agricultural Research Service

The Agricultural Research Service (ARS) is the principal in-house research agency of the USDA. ARS conducts research to develop and transfer solutions to agricultural problems of high national priority. The mission of the ARS is to increase understanding and develop solutions to protect the Nations's soil and water resources. Two of the twenty-two ARS National Programs, Water Quality Management and Soil Resource Management, are strongly committed to applied nonpoint source pollution research. In Texas, ARS is conducting ongoing research on NPS related issues such as: land application of municipal and agricultural wastes; improved management of soil, water, nutrients, and chemicals in agricultural production systems; and enhanced simulation tools for water quality, hydrology, and crop growth. ARS research, conducted by laboratories throughout the state, is often carried out in cooperation with universities, state research and extension centers, and private organizations.

## The Texas Institute for Applied Environmental Research

The Texas Institute for Applied Environmental Research (TIAER) was established as part of the Texas A&M System to conduct applied research on environmental issues that have public policy implications. TIAER is also responsible for providing national leadership on emerging environmental policy and to provide a setting for environmental studies on the interface between government and the private sector. Establishing interdisciplinary programs or partnerships to develop and implement new policies, technologies, strategies, and relationships is another responsibility of TIAER. Partnerships with other universities and state agencies build on the strengths of each entity to produce an effective, efficient program.

The TIAER goal is to impact state and national environmental policy. A fundamental principal to this goal is improvements in the environment are

best accomplished by conducting scientific research and using research results to formulate policy recommendations that will actually be implemented by government and other institutions. TIAER seeks to use cutting-edge strategies and technologies to assist developers and implementers of environmental policy.

TIAER staff performs ambient monitoring and analyzes data to assess nonpoint source impacts to receiving waters and improvements to receiving water from best management practice implementation. TIAER also works to refine and apply computer models to simulate and evaluate nonpoint source management practices.

## The Texas Water Resources Institute

The Texas Water Resources Institute is a unit of the Texas Agricultural Experiment Station and Texas Cooperative Extension. It is part of a national network of institutes created by the Water Resources Research Act of 1964. The Institute is funded by the United States Geological Survey and is affiliated with the National Institutes for Water Research.

The Texas Water Resources Institute serves as a focal point for water-related research at Texas universities, encouraging discussion of statewide issues through meetings and multi-university studies. The Institute links academic expertise with state and federal agencies, strengthening water research and education. Additionally, the Institute provides leadership for water resource programs through grant administration, pre-award services, project management, communication, and facilitation of interagency collaboration.

## The Lower Colorado River Authority - Creekside Conservation Program

The Lower Colorado River Authority (LCRA) is dedicated to land stewardship through several innovative conservation programs. The LCRA has joined with numerous partners throughout the state to promote land conservation and preserve wildlife habitat in Central and South Texas.

As farmers and ranchers lose topsoil to erosion, land productivity decreases. Thousands of acres of valuable soil are washed into tributaries and lakes every year. This sediment can build up to create flood management problems, threaten aquatic habitats, and reduce groundwater recharge. Waterways also suffer from excessive sedimentation and nonpoint source pollution.

Since 1990, LCRA's Creekside Conservation Program has worked with landowners and state and federal agencies to reduce sedimentation and agricultural nonpoint source pollution on privately owned land in eleven counties. The LCRA strongly emphasizes brush management to improve

vegetative cover that reduces erosion, increases land productivity, filters groundwater, and enhances wildlife habitat. In recent decades, the spread of invasive brush species, particularly cedar and mesquite, over Central Texas rangelands has choked out native grasses and plants that benefit water quality and quantity.

Local Soil and Water Conservation Districts (SWCDs) help landowners with project planning in the Colorado River basin. The local office of the USDA-NRCS selects potential sites and qualified landowners to participate in the Creekside Conservation Program. Local SWCDs approve the projects and submit them to LCRA for final approval. Upon completion of the project, the landowner is reimbursed for up to half of the cost of the conservation project. The NRCS and LCRA staff monitor success of each project on an annual basis.

# Silvicultural Management

Texas has more than 23 million acres of forested land. Half of this area, roughly 11.8 million acres, is considered commercial timberland. Most streams that originate or flow through these timberlands are sources of water supply, prime recreation, and other high quality uses. Because of this, forest management programs have been developed to implement adequate measures to protect water quality. Below is a discussion of some of the programs in place to address the nonpoint source problems resulting from silvicultural activities.

## *The Texas Forest Service Resource Development Program*

The Texas Forest Service (TFS) resource development program provides professional assistance to non-industrial private landowners, including services such as, development of forest management plans, assistance in implementation of reforestation and timber stand improvement practices, prescribed burning, and fireline plowing. It administers several state and federal cost share programs which promote reforestation and stewardship. Emphasis is placed on developing the state's timber resource in an environmentally sound manner to meet present and future needs.

## *The Forest Stewardship Program*

The Forest Stewardship Program (FSP), a USDA Forest Service program, provides technical assistance, through State forestry agency partners, to nonindustrial private forest (NIPF) owners. The program encourages and enables active long-term forest management. A primary focus of the program is the development of comprehensive, multi-resource management plans that provide landowners with the information they need to manage their forests.

### The Forest Land Enhancement Program

The Forest Land Enhancement Program (FLEP), administered by the USDA Forest Service, is a voluntary program that provides technical, educational, and cost-share assistance to non-industrial private forest (NIPF) landowners. Eligible landowners must have an approved Forest Stewardship Plan.

# Pollution Prevention

The key to controlling nonpoint source pollution is often prevention. Preventing contaminants from reaching water in the first place mitigates environmental risks from pollution and eliminates the need for expensive clean-up programs. Community, business, and citizen involvement are integral to successful pollution prevention. There are many simple day to day activities citizens can do to prevent pollution. Educating citizens about what those activities are and implementing prevention programs can be accomplished on a larger scale by federal, state, or local government programs. Following is a discussion of several programs that work with citizens, businesses, and industry to encourage voluntary implementation of pollution prevention activities.

### The Site Visit Program

The TCEQ offers free, confidential on-site environmental compliance assessments (site visits) to local government facilities and independently owned and operated businesses with 100 or fewer total employees. After a site visit, the facility operator receives a report from the consultant outlining environmental compliance deficiencies and a copy of the consultant's compliance checklist. The consultant will provide specific recommendations on how the facility can achieve full compliance and possibly reduce regulatory burden.

### The Small Towns Environment Program

The Texas Small Towns Environment Project (STEP) was designed to assist small towns, unincorporated communities, subdivisions, colonias, or clusters of homes with urgent drinking and wastewater problems. The TCEQ provides technical assistance and support to community leaders and residents who are willing to solve problems through self-help. Texas STEP agents work collaboratively with community residents to pull together local resources to initiate a drinking water and/or wastewater project. The Texas STEP is a partnership between the TCEQ, Texas Department of Housing and Community Affairs, the DSHS, TWDB, and GLO with support from the national Small Towns Environment Program of the Rensselaerville Institute.

### The Texas Country Cleanup Program

The TCEQ, in cooperation with TCE and TDA, conducts free, one-day collections at 30-40 locations across the state annually for citizens in rural and agricultural communities to bring materials for recycling or disposal. Texas Country Cleanups offer residents recycling opportunities for materials specific to rural and agricultural materials. The materials accepted in these collections include triple-rinsed empty pesticide containers, used motor oil, used oil filters, and lead-acid batteries.

### Supplemental Environmental Projects

Supplemental Environmental Projects (SEPs) prevent or reduce pollution, enhance the quality of the environment, and increase environmental public awareness. The SEP program, administered by the TCEQ, provides the opportunity for the respondent in an enforcement action to negotiate an agreement to perform an SEP in return for a reduction in administrative penalties. Potential SEPs include cleanup of abandoned illegal dump sites; community household hazardous waste collections; purchase of Water Wise kits for local schools; and on-site pollution prevention projects that exceed regulatory requirements.

### The Clean Texas Program

The Clean Texas Program is a voluntary environmental leadership program to protect the state's air, water, and land. The program offers benefits and incentives to members who commit to improving the environment and sustaining a quality of life for future generations. The Clean Texas Program is open to industries, businesses, cities, counties, schools, universities, military bases, nonprofit groups, and other organizations. Clean Texas Program "partners" make commitments to measurable environmental improvement goals, internal environmental programs, and community environmental outreach programs or projects. Clean Texas Program "leaders" make these same commitments and in addition, pledge to implement a system to assure compliance and continuous improvement (environmental management system, strategic plan, business plan), a community communication program, and a system to review and measure the environmental impact of products, processes, and community services (product stewardship program).

### Oil and Gas Waste Minimization Program

The Oil and Gas Waste Minimization Program, administered by the Railroad Commission of Texas (RRC), offers assistance to oil and gas operators interested in minimizing wastes through source reduction and recycling of oil and gas wastes. The RRC's program includes several products and services, including a manual, workshops, technology transfer, waste minimization planning software, a newsletter, and on-site assistance.

### Texas Chemical Council

The Texas Chemical Council (TCC) is a statewide trade association of chemical manufacturing facilities in Texas. The TCC represents the Texas chemical industry in environmental protection, health and safety issues, tort reform, and energy policy. As a partner in the TCEQ Clean Texas program, the Texas Chemical Council (TCC) encourages all its member companies to participate as program members, committed to fulfilling the requirements of membership. The TCC and its member companies strive to conserve natural resources, cultivate environmentally responsible business activities, foster product stewardship, and handle waste responsibly. The TCC supports other environmental goals such as recycling and the protection of vital habitats, wetlands, and endangered species.

# Protection for Drinking Water Sources

Many Texans get their drinking water from large scale municipal water systems that rely on surface water resources, such as rivers, lakes, and reservoirs. Others depend on private sources, such as wells and aquifers. Contamination can occur in surface or groundwater supplies from wastewater discharges, urban and agricultural runoff, leaking underground storage tanks, improperly maintained on-site sewage facilities, waste sites, abandoned wells, and deposition of airborne pollutants. The State of Texas pays special attention to protecting surface and ground water supplies that serve as a source of drinking water. Protecting drinking water at the source makes good public health, economic, and environmental sense. Below is a discussion of the state programs that focus on the protection of drinking water sources.

### Underground Injection Control

Underground Injection Control (UIC) involves the protection of underground sources of drinking water (USDW) through the regulatory oversight of injection wells. Given the broadest interpretation for statutes covering Underground Injection Control (UIC), any water could be determined to be fresh water provided it has beneficial use. The UIC program interprets "fresh water" as water with 10,000 mg/l or less Total Dissolved Solids (TDS), with the understanding that the broader statutory definition may be strictly applied whenever necessary to protect water containing greater than 10,000 mg/l TDS (30 TAC §331.2).

The TCEQ's authorized UIC program has elected to not specifically designate or geographically delineate aquifers as underground sources of drinking water. Any aquifer or portion thereof that fits the definition is considered an underground source of drinking water (USDW), even if not affirmatively identified as such by the agency.

Injection wells are divided by class; specifically, Class I through Class V. In Texas, regulatory responsibility for the subsurface injection of fluids and waste lies with either the Railroad Commission of Texas (RRC) or the TCEQ, depending mainly on the class of injection well, the intended use of the well, or in the case of Class III wells, the mineral to be mined.

- Class I - hazardous wastes injected beneath the lowermost formation containing an USDW. All Class I wells are regulated by the TCEQ through injection well permits.
- Class II - "oil and gas waste", including salt water. All Class II wells are regulated by the RRC through injection well permits.
- Class III - extraction of minerals, exclusive of oil and natural gas (uranium, sodium sulfate (potash), brine and sulfur. Brine injection wells are regulated by the RRC through permits, all other Class III injection wells under TCEQ.
- Class IV -hazardous wastes into or above a formation which contains an USDW within one-quarter mile of the wellbore. Class IV injection wells are generally prohibited by the TCEQ rules (30 TAC §331.6).
- Class V - Miscellaneous injection wells that are not Class I, II, III, or IV wells, or single family residential cesspools or septic system disposal wells. Wells used for in-situ combustion of fossil fuels and geothermal wells are under the jurisdiction of the RRC. Aquifer storage and recovery wells, subsidence control wells, salt water intrusion barrier wells; air conditioning return flow wells; drainage wells; some septic system wells; cesspools; dry wells used to inject nonhazardous wastes other than domestic sewage into the unsaturated zone; and sand backfill wells used to reclaim some mines are under the jurisdiction of TCEQ.

For those facilities which handle hazardous waste, surface facilities are permitted separately by the TCEQ, under the authority of the Texas Solid Waste Disposal Act (Health and Safety Code, Chapter 361), and/or the federally delegated Resource Conservation and Recovery Act (RCRA) program. Strict application review procedures, and following monitoring and inspection programs by both the TCEQ and the Railroad Commission of Texas help prevent non-point source contamination of usable groundwater by salt water and non-hazardous wastes.

## *The Source Water Assessment and Protection Program*

The TCEQ Source Water Assessment and Protection (SWAP) program was created in 1996 by the Safe Drinking Water Act. SWAP combines source water assessment (SWA) and source water protection (SWP).

## Source Water Assessments

The Source Water Assessment (SWA) assesses a Public Water Supply system's susceptibility to 227 potential drinking water contaminants. Specific elements scrutinized include location, intrinsic characteristics, contaminant occurrence, point and nonpoint source pollution, and construction. These elements are compared with several hundred thousand database records to produce a technically defensible assessment product. The goal of the SWA component leads to local Source Water Protection (SWP) implementation.

A source water assessment report has been provided to each of 6,000 public water systems (PWS) and is intended to lead to the implementation of source water protection projects and BMP implementation. The source water assessments are used by the TCEQ SWAP program to drive the prioritization and implementation of Source Water Protection (SWP) activities, and the recommended best management practices (BMPs) aimed at minimizing or eliminating the affects of NPS contaminants.

## Source Water Protection

Source Water Protection (SWP) is a voluntary, pollution prevention program implemented at the local level. All public water supply systems are eligible to participate in the program. The TCEQ provides technical assistance and guidance to local Public Water Supply systems that implement recommended BMPs. The TCEQ coordinates BMP recommendations or implementation with other agencies/organizations with expertise and/or jurisdiction. These BMPs include signs to increase public awareness, educational programs, site-specific protection plans, and local ordinances. The TCEQ recommends communities participating in the program voluntarily implement BMPs based on results of potential contaminant source inventories. Most SWP participants have implemented programs by working cooperatively with community members and through public education programs. Costs associated with implementing a SWP program are much lower than cleaning up a contaminated water source. Implementation costs are eligible for funding through the Texas Water Development Board's Drinking Water State Revolving Fund loan program.

For over fifteen years, TCEQ has used funds from the NPS Program to fund source water protection activities. Additionally, information developed for the NPS Program serves as valuable information and data about land-based contamination sources which provide valuable input into the source water assessment process. An example of this coordination is the Regional Aquifer Protection Programs (i.e., Edwards Aquifer) which has provided a wealth of data for TCEQ's assessment and protection activities.

The hallmark of Source Water Protection is to identify a PWS's water source, sensitive contributing areas, possible sources of contamination

(PSOCs), and recommend BMPs to eliminate or minimize the threat of contamination. These recommendations often advocate the involvement of other agencies/organizations having relevant expertise and/or jurisdiction to provide increased public awareness, educational programs, site-specific protection plans (i.e. TMDL-IPs, WPPs), and local ordinances.

Most SWP participants have implemented their programs by working cooperatively with community members and providing public education. The costs for implementing a SWP program are minimal and dramatically less than remediating contaminated drinking water.

# Aquifer Protection

In addition to programs already identified in this document, multiple agencies have responsibilities related to protecting the groundwater in the state from impacts from NPS pollution. Groundwater is water that occurs beneath the land surface in porous or fractured rock and sediments. Groundwater is a major source of the water used by Texans for domestic, municipal, industrial, and agricultural purposes.

Vulnerability of an aquifer to contamination has two components: the environmental pathway that a contaminant would take to reach the groundwater, and the source and type of contaminants that result from activities conducted above the aquifer. Aquifer vulnerability is related to the physical, hydrological and biological characteristics of the soil, the unsaturated (non-water producing) upper portion of the aquifer and the water-bearing portion. Characteristics such as permeability and processes such as natural attenuation affect the movement and alteration of contaminants. These characteristics vary greatly among aquifers in Texas, such that aquifers have different vulnerabilities to contamination. Different parts of the same aquifer may have different vulnerabilities. The potential for impact on an aquifer is dependent on what activities are occurring above an aquifer or in its recharge zone.

Groundwater contamination occurs principally in heavily populated areas of the state, such as Houston, Dallas, Fort Worth, San Antonio, and El Paso. Petroleum storage tank facilities are the largest category of contamination sources, but other regulated surface activities have resulted in contamination as well. The following is a discussion of some of the programs in place to protect the aquifers of the state.

## The Texas Groundwater Protection Committee

The Texas Groundwater Protection Committee (TGPC) is an interagency committee that was created by the Texas Legislature in 1989 to bridge the gap between state groundwater programs and optimize groundwater quality protection by improving coordination among agencies involved in groundwater protection activities. The TCEQ is designated as the lead

agency for the committee and provides administrative support for its activities.

The TCEQ partners with the Railroad Commission of Texas (RRC), Texas Department of State Health Services (DSHS), Texas Department of Agriculture (TDA), TSSWCB, Texas Alliance of Groundwater Districts (TAGD), Texas Agricultural Experiment Station (TAES), Bureau of Economic Geology (BEG), and the Texas Department of Licensing and Regulation (TDLR). The committee works to effectively manage and protect Texas groundwater. The TGPC works on special issues through subcommittees composed of committee members and the general public.

The Nonpoint Source Subcommittee is an important mechanism for the TGPC to implement and evaluate NPS activities. Recognizing the dangers to human health and groundwater quality that abandoned water wells pose, for example, the TGPC initiated efforts to develop educational materials to promote low-cost, landowner-initiated closure (capping or plugging) of abandoned water wells through the Abandoned Water Well Closure Task Force, a sub-group of the Non-Point Source Subcommittee.

The Agricultural Chemicals Subcommittee is another group within TGPC that is concerned with NPS impacts resulting from the legal use of chemicals to control insect and animal pests and unwanted vegetation. The Agchem Subcommittee has produced the Texas State Management Plan for Prevention of Pesticide Contamination of Groundwater, (TCEQ, 2001, SFR-070/01), which describes the general policies and regulatory approaches the State will use in order to protect groundwater resources from risk of contamination by pesticides. The document describes a generic coordinating mechanism among all responsible and participating agencies during the implementation of the plan, and provides for specific responses when they are deemed necessary.

## Underground Storage Tank Installer Licensing Program

Any entity who engages in the business of underground storage tank installation, repair, or removal in Texas, must be registered with the TCEQ as an Underground Storage Tank (UST) contractor. Individuals who supervise the installation, repair, or removal of an underground storage tank must be licensed by the TCEQ as a Type "A" UST installer on-site supervisor, and any individual who supervises the permanent removal of a UST system must be licensed as a Type "B" UST remover on-site supervisor.

## Texas Department of Licensing and Regulation

The Texas Department of Licensing and Regulation (TDLR) is charged to protect ground water quality through the licensing of well drillers and assuring well construction standards are enforced. A Water Well Driller is defined as any individual who drills, bores, cores, or constructs a water

well. A driver may include an owner, operator, contractor, or drilling supervisor. The program has a mandatory apprenticeship which requires all applicants to have at least two years of drilling experience before taking the licensing exam. TDLR has the power to suspend or revoke licenses and set administrative penalties for incompetence or violations of any section of Texas Occupation Code Chapters 1901 and 1902 or any rule.

The Texas Legislature expanded the Water Well Driller functions to include pump installers that repair wells after they have been drilled. Pump Installers install and repair well pumps and equipment, locate and survey abandoned wells, and repair existing wells. Regulation of this function provides a mechanism to ensure that surface casing is completed on wells that were drilled before the rules on surface casing existed to prevent contamination of drinking water sources by improperly sealed wells.

Numerous state and local programs have identified abandoned water wells as having a significant, or potentially significant, negative impact on groundwater quality in the state. Abandoned water wells exist in every county and impact all of the state's aquifers. It is conservatively estimated that 150,000 of the wells drilled since 1965 are abandoned or deteriorated. Abandoned water wells not only serve as conduits or channels for contamination to reach groundwater, but large diameter wells can also be a hazard to human and animal life. In addition, uncapped, non-cemented, deteriorated or uncased wells completed in more than one water-bearing zone may allow poorer-quality water from one zone to co-mingle and impact the other(s). Abandoned municipal, industrial, irrigation wells and abandoned rig-supply, domestic or livestock wells, and unplugged test-holes also pose threats to groundwater quality.

State law requires landowners, who possess an abandoned or deteriorated well, to have the well plugged or capped under TDLR standards. The landowner is liable for any water contamination or injury due to such wells. The Abandoned Well Notification and Compliance Program, administered by the TDLR, compiles, identifies, and processes abandoned water well notification and enforcement cases. The TDLR can assess administrative and civil penalties against persons who do not comply with the provisions. Some groundwater conservation districts are implementing well-capping and plugging programs of their own.

Additionally, the Water Well Driller/Pump Installer Program provides advisories to water well drillers for areas with contaminant plumes or undesirable water quality. These advisories help water well drillers avoid impacting usable groundwater by unknowingly drilling through contaminated zones in the areas specified. Drillers are advised to case off and pressure grout those zones to prevent contaminant migration - another form of NPS pollution.

## Edwards Aquifer Protection Program

The State of Texas contains only one designated sole-source aquifer, the Edwards Aquifer found in the central and south central portion of the state. The Edwards Aquifer is an arcuate band of limestone and associated formations that stretch from Bell County through Williamson, Travis, Hays, Comal, Bexar, Medina and Uvalde counties, finally terminating in Kinney County. All of these counties, except Bell, are subject to TCEQ rules promulgated to protect the quality of groundwater within the aquifer.

The rules are the basis of the Edwards Aquifer Protection Program, administered by TCEQ's Field Operations Division staff in the Austin and San Antonio Regional Offices. The program requires anyone who plans to build on the recharge, transition, or contributing zones of the Edwards Aquifer, to first have an application, including construction plans, approved by the TCEQ. Staff in the regional offices review these plans. After a plan is approved, the site is monitored for compliance.

The rules are intended to mitigate NPS and point source impacts from regulated development over the recharge zone, transition zone and contributing zone of the Edwards aquifer, and, depending on location and type of development, may require any or all of the following:

- A water pollution abatement plan (WPAP) for any regulated activity proposed on the Edwards Aquifer recharge zone. This includes any construction-related activity on the recharge zone, such as, but not limited to, the construction of buildings, utility stations, roads, highways, railroads; clearing, excavation, or any other activities that alter or disturb the topographic, geologic, or existing recharge characteristics of a site; or any other activities which may pose a potential for contaminating the Edwards Aquifer and hydrologically connected surface streams.

- An organized sewage collection system (SCS) plan for any public or private sewerage system for the collection and conveyance of sewage to a treatment and disposal system that is regulated pursuant to rules of the commission and provisions of Chapter 26 of the Texas Water Code. A system includes lift stations, force mains, gravity lines, and all appurtenances necessary for conveying wastewater from a generating facility to a treatment plant.

- An underground storage tank (UST) facility plan for the installation or replacement of underground storage tanks or piping on either the recharge or transition zones of the Edwards Aquifer. In particular, storage tank (aboveground or underground) facilities that will store 500 gallons or more of static hydrocarbons or hazardous substances are regulated.

■ An aboveground storage tank (AST) facility plan for the installation of permanent aboveground storage tanks at a facility that will have a total capacity of 500 gallons or more on either the recharge or transition zones of the Edwards Aquifer. In particular, ASTs that will store static hydrocarbons or hazardous substances are regulated.

## *Environmental Permitting Programs*

The TCEQ, RRC, DSHS, and other regulatory agencies are responsible for permitting various activities ranging from application of pesticides to wastewater discharge. All of these permitting programs contain some form of NPS pollution prevention requirements, whether in the form of BMPs or through monitoring.

TCEQ's Wastewater Permitting program, for example, routinely issues "no discharge" permits for facilities disposing of treated wastewater effluent via irrigation or evaporation. The effluent disposal sites must meet certain criteria to insure that groundwater and surface water are not impacted by percolation of contaminants or runoff from application areas. Permits require facilities to monitor groundwater quality, sample soils for nutrient and salt loading, and provide information on the uptake of contaminants by cover crops in order to prevent contamination. Similar requirements are made for sites handling or disposing of post-treatment wastewater sludge, wastes from permitted confined animal feeding operations and wastes from drinking water treatment facilities.

TCEQ permits for industrial and hazardous waste generators and management units, and municipal solid waste disposal facilities contain provisions designed to protect groundwater and surface water from the effects of small levels of contaminants that may escape from a facility. This provisions include pond linings, numerous monitoring points, filter strip areas, leak detection systems for production piping and other measures.

The RRC establishes oil and gas well construction and plugging standards, and requires a letter from TCEQ that establishes the location of the base of usable quality groundwater. Wells must be constructed and plugged in such a manner that the usable quality groundwater is protected from contaminants that may migrate during the life of the well. In addition, RRC authorizations by rule and permits for storage, management and disposal of oil and gas waste, include requirements for pit liners, sampling and monitoring, and runoff control.

Texas Department of State Health Services (DSHS), Bureau of Radiation Control (BRC) regulates radioactive materials, including uranium recovery and radioactive waste disposal. The BRC monitors groundwater for radionuclides on a routine basis at several facilities. Additionally, BRC

regulates receipt, possession, storage, use and treatment of NORM (Naturally Occurring Radioactive Materials).

### *The Railroad Commission of Texas—Oil and Gas Well Plugging Program*

The RRC has long been active in regulating the exploration, development and production of oil and gas in Texas, which includes protecting the environment and maintaining public safety. The RRC began regulating oil and gas exploration and production operations in 1919 and over time has adopted increasingly stringent plugging standards and procedures. Statutes to prevent pollution from unplugged wells have also been modified over the years to increase RRC authority in this area.

The RRC has utilized the Oil Field Clean Up (OFCU) Fund to plug over 15,000 wells, however, thousands of additional abandoned wells remain. To ensure effective and efficient use of the OFCU Fund, the RRC has implemented a well plugging priority system to plug the wells that pose the greatest risk to the environment. The OFCU Fund is supported entirely by fees, penalties, and other payments collected from the oil and gas industry. The RRC has also been working with the TCEQ to utilize Clean Water Act CWA§319(h) grant funding to reduce chloride and total dissolved solids levels in several watersheds.

# Wetlands Protection

Wetlands are generally considered as a transition zone between land and water where the soil is occasionally or permanently saturated with water. Wetlands are populated with plants that are specially adapted to grow in standing water or saturated soils. There are many different types of wetlands, including marshes, bogs, swamps, mangroves, prairie playas, and bottomland hardwood forests. Wetlands may not always appear to be wet. Many wetlands dry out for extended periods of time. Other wetlands may appear dry on the surface but are saturated with water beneath the surface.

Saltwater wetlands fringe estuaries; freshwater wetlands border streams, rivers, and reservoirs or occur in isolation. Generally, wetlands improve water quality, provide critical habitat for a wide variety of fish and wildlife, provide storage for flood waters, and stabilize shorelines. Wetlands filter nutrient and sediment from water before it enters adjacent water bodies and underlying groundwater aquifers.

Wetlands can be physically destroyed by filling or dewatering. Wetlands can also be damaged by the same pollutants that degrade other water bodies, such as nutrients, toxic substances, and oxygen demanding wastes. Below is a discussion of some of the programs in place to protect this precious resource.

## The Wetlands Reserve Program

The Natural Resource Conservation Service (NRCS) administers the Wetlands Reserve Program (WRP). The Wetlands Reserve Program is a voluntary program that provides technical and financial assistance to eligible landowners to address wetland, wildlife habitat, soil, water, and related natural resource concerns on private land in an environmentally beneficial and cost effective manner. The program provides an opportunity for landowners to receive financial incentives to enhance wetlands in exchange for retiring marginal land from agriculture.

## The Texas Wetlands Conservation Plan

Ninety-seven percent of Texas' land is privately owned and managed. Management decisions on these lands are made by private landholders. Economics often dictate what these management strategies will be. The Texas Wetlands Conservation Plan focuses on providing private landowners with information to assist them in making informed, economically beneficial management decisions, which will protect wetland functions and maximize the benefits that wetlands provide. Development of the Wetlands Conservation Plan was coordinated by the Texas Parks and Wildlife Department (TPWD) and is intended as a guide for wetlands conservation efforts throughout the state.

The Texas Wetlands Conservation Plan, initiated in 1988 and last updated in 1997, focuses on non-regulatory, voluntary approaches to conserving Texas' wetlands. It has three major goals: to enhance the landowner's ability to use existing incentive programs and other land use options through outreach and technical assistance; to develop and encourage land management options that provide an economic incentive for conserving existing or restoring former wetlands; and to coordinate regional wetlands conservation efforts.

Wetland issues addressed in the Plan fall into five general categories: education; economic incentives; statewide and regional conservation; assessment and evaluation; and coordination and funding. The Plan, in addition to providing general information and goals, highlights many specific recommendations to enhance wetlands conservation in Texas. To date, a shortage of funding has slowed implementation of recommendations identified in the Plan.

## Wetlands Planning Efforts in Texas

Wetlands planning in Texas has been influenced by opportunities and requirements initiated at the national, state, and local levels. Many public and private sector organizations and individuals in Texas are involved in wetlands conservation and regulation. Each organization has a unique focus, which may include regulation, technical assistance to landowners, funding or land restoration sites. Alone, individual entities are often

ill-equipped to meet wetlands conservation opportunities and challenges. However, together they form a web of conservation opportunities. Several planning efforts are working at the state level to address different aspects of wetlands management and planning.

### Seagrass Conservation Plan

The Seagrass Conservation Plan was developed to address seagrass problems in Texas over the next ten years. The TCEQ, GLO, and TPWD endorsed conservation goals for the Seagrass Plan, which include defining seagrass research needs, addressing management concerns, and expanding environmental awareness in citizens through education.

### Conservation Plan for State-Owned Coastal Wetlands

The State Wetlands Conservation Plan for State-Owned Coastal Wetlands provides protection through specific actions for state-owned coastal wetlands. The TPWD and the GLO, with assistance from other agencies, are jointly developing this legislatively required plan. Eighteen specific items/actions must be included in the plan. Some of these actions include a goal of no overall net loss of state-owned wetlands, wetland mitigation policies, a requirement for freshwater inflows to estuaries, a navigational dredging and disposal plan, education and research regarding boating in wetlands, the reduction of nonpoint source pollution, improved coordination among federal and state agencies, and a plan to acquire coastal wetlands.

### Local Government Wetlands Plan

The Local Government Wetlands Plan is a demonstration project that will incorporate the tools contained in Texas Coastal Wetlands: A Handbook for Local Governments. The GLO will form a partnership with a local government to develop a local wetlands plan.

## *Wetlands Assistance for Landowners*

In 1995, a "Wetlands Assistance Guide for Landowners" was published which describes the programs, regulations and conservation options that affect landowners in Texas. The Landowner's Guide summarizes existing state, federal and private programs which provide financial and technical assistance for wetlands protection. Other topics discussed include an assessment of landowner options for wetlands protection, a summary of existing state and federal regulations affecting wetlands, a list of contacts, and a description of the roles of state and federal agencies which are involved in wetlands regulation and management.

# Coastal Programs

High freshwater inflows tend to frequently flush the estuaries of the upper coast. Lower coast estuaries have low freshwater inflows and high residence times for natural and man-made pollutant inputs. Pollutants

from both local and distant sources tend to accumulate in estuaries. Most pollutants that enter streams and rivers eventually migrate toward the coast. As rivers approach the coast, their mouths broaden and stream velocity decreases. The reduction in stream velocity and fluctuation of tides from the Gulf reduce flushing and entrap nutrients and pollutants at the head of estuarine waters. This natural trapping process establishes the basis for highly productive estuarine ecosystems, but also makes estuaries vulnerable to excessive pollutant loading. Thick clay soils, which persist throughout the coast except for areas directly adjacent to large rivers, prevent the exchange of surface and groundwater.

Rural and agricultural lands comprise almost half of the total land use/land cover within the coastal management area. The upper Texas coast's heavy rainfall and thick clay soils support rice cultivation. As rainfall declines further south, dryland row crops of cotton and grain sorghum dominate the agricultural scene. Extensive irrigation systems in the Lower Rio Grande Valley support such diverse crops as citrus, vegetables, sugar cane, and aloe vera.

> Estuaries are coastal waters where inflowing stream or river water mixes with, and measurably dilutes, sea water. In Texas, estuaries are the lower tidal portions of rivers and streams that directly enter the Gulf of Mexico or its bay systems. Estuaries serve as important nurseries for many commercial fish and shellfish populations, including shrimp, oysters, crabs, and scallops.

The Texas coast houses half the nation's petrochemical industry and more than a quarter of its refining capacity. There are four major urban and industrial centers on the Texas Coast: Beaumont-Port Arthur-Orange; Houston-Galveston; Corpus Christi; and the Lower Rio Grande Valley. In addition to dense urban and suburban development, significant oil refining and associated petrochemical industry infrastructure exist in the first three areas. The Rio Grande Valley is primarily a year-round agricultural center which is experiencing explosive population growth due to its proximity to Mexico and an improved economy in response to the North American Free Trade Agreement.

The steady growth of industry, as well as burgeoning marine commerce, agriculture, commercial and recreational fishing, and a thriving tourist trade, has intensified competition for coastal resources. Continued economic and population growth are projected for the Texas Coast, and as population and development increase, so do waste generation, environmental degradation, and the risks of damage to natural systems.

The coastal areas of Texas have to deal with the same nonpoint source pollution issues as the rest of the state, in addition to beach erosion, salinity, and protection of important coastal estuarine and wetland habitats. The following programs are specific to nonpoint source management along the Texas Coast.

## The Texas Coastal Management Program/Coastal Coordination Council

The Texas Coastal Management Program (CMP) was created to coordinate state, local, and federal programs for the management of Texas coastal resources. The program brings in federal Coastal Zone Management Act (CZMA) funds to Texas state and local entities to implement projects and program activities for a wide variety of purposes. The Coastal Coordination Council (CCC) administers the CMP and is chaired by the Commissioner of the GLO. It is comprised of the chair or appointed representatives from the TPWD, the TCEQ, the TWDB, TxDOT, a member of the State Soil and Water Conservation Board, a member of the RRC, the director of the Texas A&M University Sea Grant Program and four gubernatorial appointees. These members are selected to provide fair representation for all aspects concerning coastal issues.

The Council is charged with adopting uniform goals and policies to guide decision-making by all entities regulating or managing natural resource use within the Texas coastal area. The Council reviews significant actions taken or authorized by state agencies and subdivisions that may adversely affect coastal natural resources to determine their consistency with the CMP goals and policies. In addition, the Council oversees the CMP Grants Program and the Small Business and Individual Permitting Assistance Program.

The Coastal Zone Act Reauthorization Amendments (CZARA), §6217, requires each state with an approved coastal zone management program to develop a federally approvable program to control coastal nonpoint source pollution. The Texas CCC appointed a Coastal Nonpoint Source Pollution Control Program workgroup to develop this document.

On April 7, 2003, the National Oceanic and Atmospheric Administration (NOAA) recommended conditional approval of the Texas Coastal Nonpoint Source Pollution Control Program. The document discusses the coastal nonpoint source management area; an overview of program implementation and coordination; presentation of specific nonpoint source categories, the §6217 management measures, and the state rules and programs which address pollution sources and meet the federal requirements; information on additional management measures, technical assistance, and public participation; and program monitoring and evaluation.

### Coastal Nonpoint Source Program

The Coastal NPS Program for Texas has been under development since 1997. To facilitate the development of the NPS Program, the Coastal Coordination Council established a subcommittee comprised of staff from the General Land Office, Texas Commission on Environmental Quality,

Texas Railroad Commission, Texas Department of Transportation, Texas Parks and Wildlife Department, Texas State Soil and Water Conservation Board, and a public member from the Council. This subcommittee has addressed comments submitted by the National Oceanic and Atmospheric Administration (NOAA) and the Environmental Protection Agency (EPA) regarding Texas' Coastal NPS Program, reviewed and recommended proposed NPS pollution control projects, and researched possible options to enhance the program.

In December 1998, Texas submitted its Coastal NPS Program to NOAA and EPA. After two and a half years of discussion between Texas and the federal agencies, NOAA and EPA published in the Federal Register, in late September 2001, their intent to approve the Texas Coastal NPS Program with certain conditions. NOAA and EPA identified six areas that Texas must strengthen or correct prior to receiving full approval of the Coastal NPS Program. (Table 6.1)

The second notice to conditionally approve Texas' Coastal NPS Program was posted in the Federal Register on April 7, 2003. The Final Conditional Approval Letter was received on July 9, 2003. Texas was given five years to meet the remaining conditions.

Texas continues to seek full approval by addressing the remaining conditions in the Final Conditional Approval Letter. The Texas Coastal Coordinating Council is preparing responses to EPA and NOAA to address these conditions and will continue to negotiate with EPA and NOAA for full approval. Texas anticipates full approval of the Texas Coastal NPS Management Program by July 9, 2008, and full implementation of this program by July 9, 2018.

Table 6.1. Texas Coastal NPS Management Program. Remaining Conditions and Anticipated Year of Condition Resolution

| EPA/NOAA Condition | Projected Approval Year | | | |
|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 |
| New Development and Existing Development | | X | | |
| Site Development | | X | | |
| Watershed Protection | | X | | |
| New and Operating Onsite Disposal Systems | | | | X |
| Roads, Highways, and Bridges | | | | X |
| Hydromodification | | X | | |

## The National Estuary Program

The National Estuary Program (NEP) was established under §320 of the Clean Water Act to "identify nationally significant estuaries which are threatened by pollution, development, or overuse; promote comprehensive planning for, and conservation and management plans for estuaries of national significance; and enhance the coordination of estuarine research." There are two active estuary programs in Texas. The first was established for the Galveston Bay system and the second was established for the bays and estuaries along the Coastal Bend of South Texas. Each of these estuary programs developed a Comprehensive Conservation and Management Plan (CCMP) which recommends priority actions and implementation schedules to address impacts observed in the estuary. The CCMP development is a concensus-based process involving a partnership across federal, state, and local levels. With the completion of the CCMPs, each National Estuary Program formed a nonprofit, nonregulatory management structure to implement its plan.

### Galveston Bay Estuary Program

The Galveston Bay Estuary Program (GBEP) is a continuation of the National Estuary Program (NEP) established for Galveston Bay in 1989. The Galveston Bay Estuary Program is a partnership of bay stakeholders currently working to implement the Galveston Bay Plan. The plan contains action plans dealing with habitat and species protection, freshwater inflows, spills and dumping, exotic species, point sources of pollution, and nonpoint sources of pollution to protect and restore the health of the estuary, while supporting economic and recreational activities. Eighty-two initiatives are outlined under these nine action plans. The GBEP takes a leading role in facilitating and coordinating the implementation of these initiatives.

Nonpoint source pollution is the number one identified water quality problem in Galveston Bay. Implementation of the Galveston Bay Plan includes the following actions to address this problem: developing and implementing a Galveston Bay public education program aimed at reducing pollution from residential areas; compiling a Galveston Bay BMP Performance Document to inventory nonpoint source control techniques which have been evaluated; identifying and correcting priority watershed pollutant problems by maintaining and publishing an inventory of nonpoint source concerns in the bay watershed; adopting regional construction standards for nonpoint source reduction and implementing toxics and nutrient control practices; encouraging sewage pumpout, storage, and provisions for treatment; and implementing storm water programs for local municipalities.

To date, the GBEP has addressed nonpoint source pollution by convening a forum for information sharing among Galveston Bay stakeholders involved in nonpoint source pollution prevention/control activities,

providing technical assistance to local and county governments, and educating and reaching out to children and adults. The GBEP partners with the Houston-Galveston Area Council, the Galveston County Health District, the Galveston Bay Foundation, and the Texas A&M Sea Grant Program to provide technical assistance on stormwater management to local governments; provide technical assistance to small businesses on implementation of waste minimization strategies and general best management practices; develop, maintain, and publish an inventory of nonpoint source concerns in the bay watershed; implement a baywide public education program aimed at reduction of pollution from residential areas through illustration, presentations, and workshops; and to conduct voluntary inspections and provide information assistance to reduce bacterial pollution caused by malfunctioning septic systems.

### Coastal Bend Bays & Estuaries Program

The TCEQ and EPA helped establish the Coastal Bend Bays & Estuaries Program (CBBEP) to develop and implement a plan to protect and restore the bays and estuaries of the Texas Coastal Bend. The CBBEP has developed a Comprehensive Conservation and Management Plan to deal with a wide array of problems ranging from public health and education, freshwater flow, and loss of natural habitats. The CBBEP has implemented the following actions to protect bays and estuaries from nonpoint source pollution:

- A regional handbook of urban nonpoint source pollution BMPs for voluntary use by local governments seeking to implement nonpoint source pollution programs.
- Compliance assistance to small business and industries in the region which are subject to NPDES permit program or have nonpoint source controls needs.
- Assistance to local governments to implement on-site sewage facility programs.
- Coordinate and implement agricultural water quality management programs necessary to meet water quality standards.

## Coastal Habitat Restoration

Texas Parks and Wildlife Department has an active program to restore wetlands along the Texas Coast. These marsh creation projects establish intertidal marsh with emergent plants along bay shorelines that are suffering from severe erosion. These created marshes buffer shorelines from erosion and remove both sediments flowing into the bays and sediments that have been re-suspended by storms. These wetlands also help remove nutrients from stormwater runoff. These newly created and restored marshes provide habitat for a wide variety of ecologically and economically important marine life. Typically these restoration projects involve multiple local, state, and federal partners. Citizens also assist by

replanting the marshes. Including citizens increases awareness of the value of these marshes.

## The BEACH Act

In October 2000, the U.S. Congress passed the Beaches Environmental Assessment and Coastal Health Act of 2000 (BEACH Act) to protect the public health at our nation's beaches. The BEACH Act requires that states, in cooperation with the EPA, develop and implement a program to monitor coastal recreation waters adjacent to beaches that are used by the

public, and to notify the public if water quality standards for pathogens and pathogen indicators are exceeded.

The BEACH Act requires the state to identify all factors used to evaluate and rank beaches; identify coastal recreation waters in the state; identify bathing beaches adjacent to coastal recreational waters; develop a sampling, monitoring, and notification program; develop a method for issuing beach advisories and/or closings; and develop a method to notify the public. In July 2001, the Governor's office appointed the GLO as the lead state agency to implement the BEACH Act based upon the current Beach Watch Program.

The Texas Beach Watch Program gives Texans baseline data on the health of gulf waters, making sure that beaches are safe for swimmers, surfers, sailors and boaters. The Beach Watch Program involves county and city governments, universities, and organizations representing beach goers. Contractors test specified sites for Enterococcus bacteria and issue public advisories if water samples exceed the criteria recommended by the EPA.

## The Gulf of Mexico Community-Based Restoration Program

The Gulf of Mexico Community-Based Restoration Program (GCRP) Partnership invites proposals for its citizen-driven habitat restoration projects. The partnership funds on-the-ground activities to restore marine, estuarine and riparian habitats. This grant program seeks to restore and protect the health and productivity of the Gulf of Mexico in ways consistent with the economic well being of the region. Projects must be within the designated priority area, the Lower Laguna Madre, Texas Coastal Bend and Bays, and Galveston Bay.

The GCRP is a multi-year, regional partnership between the Gulf Ecological Management Sites (GEMS) Program and the NOAA Community-Based Restoration Program. The purpose of this partnership was designed to strengthen the conservation efforts of the GEMS Program by supporting on-the-ground habitat restoration benefitting living marine resources and fostering local stewardship of ecologically significant areas across the Gulf of Mexico.

### The Bilge Water Reclamation Program

The GLO initiated the Bilge Water Reclamation Program as an innovative response to the large number of spills from commercial and recreational vessels along the Texas coast. Facilities operating under the program collect and process bilge water that is often contaminated by petroleum hydrocarbons from local commercial fishing vessels. The facilities provide vessels with an environmentally responsible way to dispose of bilge water. There is no charge to use the facility, and the used oil collected is recycled by a local company. The cooperative development of the Bilge Water Reclamation Program, by the GLO and its partners, has proven to have a positive impact on water quality along the Texas coast.

### Coastal Texas 2020

Coastal Texas 2020 is a long-term, statewide initiative to unite local, state, and federal efforts to promote the environmental and economic health of the Texas coast. One goal of Coastal Texas 2020 is to increase the state's share of federal funding to fight rapid coastal erosion. Coastal Texas 2020 is designed to implement the vision of a comprehensive approach to coastal issues that mixes local, state, and federal funds with money from the private sector, while combining regulatory changes with market-based solutions.

### The Adopt-A-Beach Program

The Texas Adopt-A-Beach Program, sponsored by the GLO, is dedicated to preserving and protecting Texas beaches by raising public awareness; educating citizens about the source of debris; and generating public support for state, national, and international action to clean up coastal waters. Since the first Adopt-A-Beach Cleanup in 1986, more than 300,000 volunteers have come to the Texas coast to haul off tons of trash. At each cleanup site, volunteers record data about the trash to learn more about the cause of marine debris. This data has been instrumental in the passage of international treaties and laws aimed at reducing the amount of offshore dumping. The program's success is due to the generous efforts of dedicated volunteer county coordinators, coastal community leaders, sponsors, and citizens. Strong support from the private sector helps carry the anti-litter message to Texans all across the state.

# Border Programs

Urban populations are growing rapidly in the border region, exceeding growth throughout the rest of the state and much of the nation. The McAllen-Edinburg-Mission area is the fourth-fastest growing metropolitan statistical area in the U.S. On the Mexican side of the border, population is rising even more quickly, expanding by almost 50 percent in the past ten years. With this boom has come both an increased demand for

water supplies and a strain on communities' water, wastewater, and waste management infrastructure.

The region's economy depends on agriculture, ranching, oil and gas production, trade and commerce, industry, and tourism. Agriculture is particularly important in the Lower Rio Grande Valley, where the lack of an adequate supply of high quality water is threatening the livelihood of farmers. Per capita income is lower in the border region than other parts of Texas as a whole. Lower income results in fewer tax dollars for local governments to meet existing needs, to keep up with rapid growth, or to plan for the future. Communities are challenged to do more with less. One of the greatest threats to water quality is the lack of sufficient water and wastewater infrastructure to keep pace with border growth. A lack of adequate service increases the likelihood that raw sewage or poorly treated water can enter the river, elevating bacteria levels and the risk of contracting water-borne diseases like hepatitis A. Raw sewage, wastewater, and agricultural activity can also increase levels of nutrients in the river. Elevated nutrient concentrations encourage algal growth and decrease dissolved oxygen. Low dissolved oxygen endangers aquatic plants and animals.

In addition to the need for adequate infrastructure, water quantity problems also affect water quality in the Rio Grande. The less water available, the more concentrated pollutants can become in the river, and the less suitable the water becomes for municipal and agricultural use.

Groundwater throughout the border region is most threatened by increasingly high salt content. Overuse of a groundwater resource depletes water and increases movement of brackish water that requires more extensive treatment to meet drinking water standards. Other causes of high salinity include leaching of salts left in the soil by previous irrigation and seepage of oil-field brines into the ground. Pesticide residues can also travel into an aquifer with irrigation runoff or seepage into the soil.

Border growth also impedes communities' ability to manage the disposal of solid and hazardous wastes. Limited disposal options leads to an increase in illegal dumping. Improper disposal of used tires is a major concern in the region. Hazardous waste transportation is also a concern in border port-of entry cities , where chemical spills pose a potential threat to public health and water supplies. The following is a discussion of some of the programs in place to deal with the issue of water quality in the border region.

## *The TCEQ Border Pollution Prevention Initiative*

The Mexican government's in-bound maquiladora ("maquila") or twin plant program allows foreign companies to establish manufacturing and production facilities in Mexico and ship raw materials and components to those facilities under no or low tariffs. The Maquilas have affected Texas'

border environment in a number of ways. One of the most significant environmental impacts is the strain placed on the ability to manage additional wastewater, solid waste, and hazardous waste disposal needs. Since its inception in 1994, the TCEQ Border Pollution Prevention Initiative has worked with maquilas, local, state, and federal governments, and universities to reduce pollution along the border. The program has assisted Mexican federal and border-state governments, universities, and other institutions in developing pollution prevention and waste minimization capability. Pollution prevention capability has been furthered by facility site assistance visits, training events, partnerships with universities in Mexico, and border roundtables.

## The Border Environment Infrastructure Fund

The North American Development Bank established the Border Environment Infrastructure Fund (BEIF) in an effort to make projects affordable, especially for the smallest and poorest communities. The purpose of the BEIF is to make environmental infrastructure projects affordable for communities throughout the U. S.-Mexico border region by combining grant funds with loans or guaranties for projects that would otherwise be financially unfeasible. A primary objective of the BEIF assists communities in transition from highly subsidized projects to self-sustaining projects supported locally by user fees and other revenue. As a result, to access BEIF funds, project sponsors must demonstrate local "buy in" with the commitment of current revenues, capital reserves, and/or debt at the municipal or utility level.

## The International Boundary and Water Commission

The mission of the International Boundary and Water Commission (IBWC) is to apply the rights and obligations which the Governments of the United States and Mexico assume under the numerous boundary and water treaties and related agreements. The United States and Mexican sections of the IBWC, USIBWC and MxIBWC, have recently been taking a proactive approach in support of its obligations. For example, the USIBWC holds public meetings along the border to provide information to the local communities on issues such as water quality, ongoing projects, and illegal dumping, and solicits the input of the citizens in addressing these issues. Several of the main goals of the IBWC as they relate to nonpoint source pollution include finding solutions to border sanitation, and working to address other border water quality problems. In order to obtain these goals, the USIBWC has implemented the following objectives:

- promote successful resolution of a broad range of trans-boundary environmental issues
- investigate and report on the most feasible measures for solving border sanitation problems

- conduct various planning and environmental studies for groundwater and border sanitation (water quality) programs

One of the key projects for dealing with border sanitation is the construction of an international wastewater treatment plant in the City of Nuevo Laredo. The Nuevo Laredo International Wastewater Treatment Plant (NLIWTP) provides a high level of treatment for millions of gallons of sewage each day originating from the City of Nuevo Laredo. The NLIWTP directly impacts the water quality of the Rio Grande and reduces the health risk to residents on both sides of the river. As the project continues, the USIBWC is working with the MxIBWC and Nuevo Laredo's Comision Municipal de Agua Potable y Alcantarillado (COMAPA) on long-term planning for further improvements to the water and wastewater infrastructure in Nuevo Laredo with funds provided by the EPA.

The USIBWC also conducts water quality monitoring in support of its mission to address border sanitation problems along the border. USIBWC field offices located throughout the border provide local support for this mission. In 1998, because of the international nature of the Rio Grande, the State of Texas contracted with the USIBWC to implement the Clean Rivers Program (CRP) for the Rio Grande in its 1,254-mile international boundary section. This agreement has led to a more coordinated effort between federal, state, and local agencies in addressing the water quality of the Rio Grande.

## The Economically Distressed Areas Program

The Economically Distressed Areas Program (EDAP), administered by the Texas Water Development Board, provides financial assistance in the form of a grant, a loan, or a combination grant/loan to bring water and wastewater services to economically distressed areas, where present water and wastewater facilities are inadequate to meet the needs of residents. To be eligible for the program, projects must be located in economically distressed areas within affected counties and/or be located next to an international border. The EDAP will fund construction, acquisition, or improvements to water supply and wastewater collection and treatment works, including all necessary engineering work. The program also includes measures to prevent future substandard development.

## The Colonias Initiatives Program

The Colonias Initiatives Program is administered by the Texas Secretary of State's Office. One of the greatest concerns regarding the colonias is the lack of wastewater infrastructure, potable water, and the potentially serious consequences for public health and its effect on quality of life. The Colonia Incentives Program was initiated to advance efforts to get colonia residents' homes connected to water and wastewater services in a more expeditious manner.

## Border Recycles Day

Border Recycles Day involves a variety of environmental events in communities and schools as part of the statewide Texas Recycles Day (and National America Recycles Day) on November 15th. The first Border Recycles Day was celebrated in November 1998. Events initially were staged in Texas border cities by the TCEQ, but local communities have since taken ownership and created their own initiatives. Now Border Recycles Day has been formally incorporated in the State-to-State Strategic Environmental Plans that the TCEQ has developed with counterpart agencies in the neighboring states of Chihuahua, New Mexico, Coahuila, Nuevo Leon, and Tamaulipas. As a result, some Texas border communities host sister-city events with their Mexican counterparts.

## Friends of the Rio Grande

One of the goals of the USIBWC Clean Rivers Program (CRP) is to promote environmental awareness through public education and outreach. TCEQ and the USIBWC CRP have teamed together to form an initiative called Friends of the Rio Grande. The goals of this initiative are to increase public outreach programs throughout the border region, implement a volunteer monitoring program in cooperation with Texas Watch, promote environmental clean ups in the basin, and to provide recognition of outstanding efforts in environmental activities to encourage greater participation in environmental awareness.

# CHAPTER 7  EDUCATIONAL PROGRAMS

The active participation and cooperation of all Texans is necessary to safeguard Texas' natural resources. Everyone who lives or works in a watershed can potentially contribute to nonpoint source problems. Public education and awareness is essential to involving citizens in learning about their environment and taking appropriate actions to prevent pollution. Implementation programs typically include an education component to enhance public understanding and encourage participation. In addition, a number of state, regional, and local agencies and organizations have developed stand alone programs to educate and inform the public on environmental issues which promote stewardship and protection of natural resources.

## Education Through Assessment

One of the most effective ways citizens can learn about water quality and the problems associated with nonpoint source pollution is by conducting assessment activities. Learning about watersheds and how water quality is assessed leads to an understanding of city planning, waste treatment, land use and its effects on water quality, and environmental practices that lessen the impacts of urban growth, development, and agricultural practices on water quality. Volunteer monitoring and assessment programs that make data readily available and easy to understand gives citizens a sense of ownership and responsibility for their watersheds. Below is a discussion of some of the volunteer monitoring and assessment programs in place throughout the state that address nonpoint source pollution.

### *Texas Watch Volunteer Environmental Monitoring & Education Program*

The Texas Watch Program serves as a valuable resource for educating the public about water quality issues and fostering citizen participation in monitoring and protecting water quality. The Texas Watch Program is administered through a cooperative partnership between Texas State University, the TCEQ, and the EPA. The Texas Watch Program supports NPS and other environmental education and volunteer monitoring activities throughout the state. Texas Watch provides assistance to participating partners by promoting and maintaining environmental education activities, such as:

- statewide/regional meetings and workshops
- a centralized volunteer water quality database
- a comprehensive Web site
- quarterly newsletters
- a toll free information line

- NPS and environmental education materials
- certified monitoring training protocols and materials

The Texas Watch Program, through its varied outreach activities, encourages individuals to adopt activities and behaviors which contribute to the improvement of water quality and prevention of NPS pollution. The Texas Watch Program trains and certifies students, volunteers, and other partners to collect quality assured data that can contribute to environmental decision making. Volunteers monitor a wide variety of habitats from rivers, creeks, ponds, and lakes to bays, bayous, and estuaries. In addition, Texas Watch forms watershed-based partnership networks to help citizens identify and address local water quality issues and concerns. The Texas Watch Partners Program solicits public and private entities to help train, equip, manage, and offer general support to the growing number of volunteer monitors across the state. This program is establishing strong ties between citizens, industries, river authorities, councils of governments, water districts, cities, local, state, and federal agencies, students at all grade levels, and private foundations.

## The Lower Colorado River Authority— Colorado River Watch Program

The Lower Colorado River Authority (LCRA) is a participating Texas Watch partner. Protecting water quality in the lakes and rivers is a vital part of the LCRA's mission. In 1988, a handful of Austin citizens, teachers, and students began sampling water along a tributary of the Colorado River. Within two years, their program had expanded to about twenty sites along the Colorado. In 1992, the LCRA began to manage the Colorado River Watch Network program, and helped expand monitoring sites along the river from Brownwood to the Gulf of Mexico. The success of the program has earned grants from the National Science Foundation and the EPA. The Colorado River Watch Network has been honored by the EPA, the State of Texas, the City of Austin, and many other organizations.

LCRA ensures that Network monitors are well-trained. Certified monitors must complete a 10-hour training process provided by LCRA. Instructors show volunteers how to use the testing equipment and monitors their practice of new data collection skills in the river. Volunteers then visit their designated testing site along with the instructor to test for several water quality indicators.

Every year to coincide with Earth Day, the Colorado River Watch Network joins with other volunteer monitors to test rivers, creeks, and coastal waters along the Colorado River watershed. Hundreds of volunteers participate in 20 counties along the Upper and Lower Colorado River Basin. This one-day monitoring event provides LCRA with a snapshot of the water quality along the river. The Network continues to

support environmental stewardship of dedicated teachers, students, and other citizens who perform volunteer monitoring throughout the river basin.

## The Aquatic Experience

Public education and outreach has been an integral part of the Upper Colorado River Authority's (UCRA) efforts to educate the public about NPS and urban runoff abatement. The UCRA has developed an on-going program, "The Aquatic Experience" that offers assistance to area public schools by providing opportunities for teachers and students to be exposed to every aspect of the aquatic environment. All topics involve "hands on" activities to promote general water education and emphasize local water quality issues.

Curriculum and workshops have been developed focusing on volunteer water quality monitoring, water conservation, aquatic life, and brush control. Assistance is provided to individuals or groups of students wishing to plan and implement long range investigations, research, studies, or water pollution abatement projects. "Aquatic Experience" activities take place primarily at the UCRA offices and the adjacent North Concho River; alternative locations, such as classrooms, or school sponsored events are also utilized.

Future plans for the program include development of an on-site educational facility along the North Concho River for hands-on experiences that will allow for the collection and identification of aquatic organisms, identification of aquatic plants, and demonstration of an aquatic environment. The site will contain a native and invasive plant identification plot that will demonstrate both proper and improper conservation practices of area water resources. The site will also contain numerous BMPs located on existing stormwater outlets to the river.

## The City of Denton Watershed Protection Program

The City of Denton Watershed Protection Program was initiated as part of a plan to reduce the overall pollutants within the surface waters of Denton and to ensure compliance with the National Pollution Discharge Elimination System Storm Water Phase II rule. The Watershed Protection Program monitors water quality around the city and the results are made available to the public. The City of Denton received initial funding from the EPA Environmental Monitoring for Public Access and Community Tracking (EMPACT) grant to get the program started. Through the grant, physical and chemical water quality data is measured and the results are telemetered to the University of North Texas for additional analysis. Information on water quality, including realtime water quality data, is compiled and displayed in an easily understood format and made available to the public via the internet. The Watershed Protection Program has used EMPACT data and additional watershed monitoring data to establish a

preliminary baseline for the condition of the city's surface water resources. This preliminary baseline data will be used to evaluate future changes in water quality.

# Education Through Implementation

Everyday activities that go on in a watershed have a direct impact on the quality of water in the watershed. By learning how everyday activities affect water quality, Texans can change habits to protect water resources. The voluntary and preventive efforts of citizens, businesses, service organizations, and other groups are an essential part of the effort to address NPS pollution. The key to successful NPS management is making citizens aware of the existing voluntary and preventive efforts available to the public. The following is a discussion of the education programs in place to make citizens aware of the activities and practices that contribute to NPS pollution and their role in NPS management.

## *Nonpoint Source Consumer Education*

The TCEQ has developed a variety of educational outreach materials to increase general awareness of nonpoint source (NPS) water pollution and stimulate actions which can be undertaken by citizens to reduce NPS pollution. Outreach materials developed under this program target primarily urban nonpoint issues such as pet waste, yard care, household hazardous waste, and used motor oil. Campaign materials include radio and television public service announcements, pet waste posters, bilingual NPS bookmarks and door hangers, NPS fact sheets, and a Clean Water for Texas brochure. Many of the materials can be downloaded and adapted by organizations for local use.

## *Storm Drain Marking*

Many Texas communities are working to reduce nonpoint source pollution by labeling storm drain inlets with messages warning citizens not to dump polluting materials. TCEQ has developed a how-to guide for communities interested in starting a storm drain marking program to reduce nonpoint source pollution. The manual covers a range of methods for labeling storm drain inlets and offers examples of programs operating in selected Texas cities. The purpose of the manual is to give cities and community groups the tools to launch a successful citizen-education effort to reduce dumping and protect local water supplies. To order this manual (GI-212), send your request to educate@tceq.state.tx.us or call 512/239-0028.

## *Back Yard Composting and Xeriscaping*

Backyard mulching, composting, and xeriscaping not only reduce waste, but also benefit yards and the environment by producing healthier soil and reducing water and fertilizer demands. Other benefits include reduced erosion, run-off, and pollution. The TCEQ has developed a program to help citizens and communities (through a network of regional and local

coordinators) teach their residents practical waste reduction and pollution prevention through environmentally responsible yard care practices, including grass-cycling, composting, xeriscaping, and integrated pest management. TCEQ staff provides training programs, technical assistance, literature, audiovisual resources, and networking opportunities that promote voluntary diversion of yard trimmings, food scraps, clean wood material, unrecyclable paper, and other easily composted materials from landfills.

## *Teaching Environmental Sciences*

TCEQ's Teaching Environmental Sciences (TES) is a graduate credit course developed through local resources. Since 1994, TCEQ and its collaborators have presented classes at local colleges and universities throughout Texas. Each summer, the TCEQ sponsors this program for 200-400 teachers who will use information learned in the course to instruct K-12 students on the importance of air, water, and waste issues and their impact on communities. Each course is led by a professor of science or education and is tailored to the region in which it is offered. Typically, much of the forty hours of instruction is spent outside the classroom, as teachers take tours and perform field tasks, such as water sampling and analysis. Teachers visit local industries, environmentally sensitive sites, water and wastewater plants, air monitoring stations, landfills, and/or recycling centers. They also hear from representatives of regulatory agencies, businesses, and community organizations.

Several teacher workshops are held each summer for teachers interested in conservation and natural resource issues. The workshops are held in various parts of the state in cooperation with the TSSWCB. The Texas Environmental Education Advisory Committee of the Texas Education Agency approves the content of the TSSWCB sponsored workshops. As an approved Environmental Education Professional Development Provider, teachers are able to get credit hours toward their required continuing education units, while experiencing nature and the outdoors.

## *Environmental News You Can Use*

The TCEQ offers subscribers a free service called Environmental News You Can Use. This monthly newsletter highlights information on a particular theme to be used to educate customers, suppliers, employees, or students about why and how they can improve the environment. To subscribe, send your name, mailing address, and e-mail address to educate@tceq.state.tx.us or call 512/239-3150.

## *Publications and Videos*

The TCEQ has many publications available to provide assistance on everything from pollution prevention to regulatory guidance. Each year over 30,000 books, posters, and teacher guides are ordered for school

classrooms. Among the items most in demand are posters and coloring books. In addition to publications, almost a dozen videos are available on school recycling, waste reduction and management, and pollution prevention. The agency's publications and videos have caught the attention of educators and environmental agencies outside of Texas.

The Association of Texas Soil and Water Conservation Districts has established and updates a conservation related video library that is maintained by the TSSWCB staff on their behalf for the benefit of local districts and educators. Currently, there are over 180 conservation-related videos in the library available to districts and teachers at no charge. Videos can be ordered through local soil and water conservation districts or the TSSWCB.

## Environmental Information Line

The 1-800-CLEANUP information line is a partnership with the private sector, the EPA, and other states to provide citizens an environmental information system that can be customized for each community. The system provides a single source of community-specific environmental and recycling information. Texans can call the hotline or go to www.1800clenup.org and enter their five-digit ZIP code to find information on local recycling, household hazardous waste collections, and environmental events.

## Small Spill Prevention Program

The GLO's small spill prevention program works with marinas and other interested parties to educate the public on ways to properly dispose of oil and reduce small spills. Small amounts of petroleum products may not kill fish and other marine organisms, but they can affect the vision, sense of smell, growth, and reproductive ability of marine wildlife. While small petroleum spills may impact marine wildlife, multiple small spills have the potential to impact entire water bodies. The Small Spill Prevention Program is an effective way to educate the public about ways to reduce spills and protect our marine resources.

## The Texas Cooperative Extension Agricultural Outreach Program

The Texas Cooperative Extension (TCE) is a partnership between the USDA, Texas A&M University, and County Commissioners Courts. The basic mission of the TCE is education and dissemination of information relating to agriculture, home economics/consumer sciences, community development, and 4-H/youth. County Extension Agents deliver most of the educational programs of the TCE. These county agents, supported by specialists based at Texas A&M University in College Station and 12 regional centers throughout Texas, provide technical information, respond to individual problems and questions, conduct educational meetings, and

establish and evaluate demonstrations to show the benefits of using practices based on the latest scientific research. They also provide educational information through radio and television programs, newspapers, newsletters, and bulletins. Water quality and conservation is one of six major program issues being addressed by agents and specialists on an interdisciplinary basis.

The TCE has the organizational framework and outreach capabilities to help implement the informational and educational programs essential to any voluntary pollution abatement effort. The TSSWCB works with the TCE to develop educational programs concerning agricultural nonpoint source pollution.

## The Texas A & M University On-Site Wastewater Treatment Training Center

The On-Site Wastewater Treatment Training Center was established in 1997 to provide an educational mechanism for training inspectors, installers, site evaluators, home owners, elected officials, and others involved in the on-site wastewater treatment industry. The Texas Agricultural Extension Service, Texas On-Site Wastewater Association, Texas Engineering Extension Service, Texas Agricultural Experiment Station, Texas Commission on Environmental Quality, local installers and businesses, Texas On-Site Wastewater Treatment Research Council, and Hidalgo County Health Department played vital roles in the planning and construction of the South Texas International On-Site Wastewater Treatment Training Center. Texas currently has three training centers. The Training Centers demonstrate treatment units and land application systems for management of wastewater. The Cooperators believe that training centers meet the need for hands-on training concerning on-site wastewater treatment systems.

There are five types of wastewater processing techniques taught and demonstrated at the Training Center. These concepts include septic tanks, anaerobic treatment, sand filters, trickling filters and constructed wetlands. These techniques are described later in this document as examples of best management practices.

## Don't Mess With Texas

The Texas Department of Transportation (TxDOT) maintains more acres of right-of-way than any other state department of transportation in the U.S. After years of collecting an increasing amount of trash from state highways, the agency realized that a public service campaign was needed to educate Texans about litter prevention. Two of the main components in the campaign include the Adopt-a-Highway (AAH) program and the Don't Mess with Texas (DMWT) program.

The AAH program is implemented statewide to teach Texans about litter prevention by allowing citizens to pick up litter along Texas highways. The program encourages litter pick-up by establishing sections of the highway to be adopted by individuals or groups for clean-up. Upon adopting a section of the highway, a sign will be posted along the highway naming the individual or group who has adopted the section of the highway. The program concept has been adopted by 47 other states and several foreign countries.

In 1986, TxDOT secured a local, award-winning, advertising agency to develop a litter prevention campaign to encourage motorists to stop littering. Better known as "Don't Mess with Texas" (DMWT), this program was the first of its kind in the world. Research was completed to determine what groups were contributing the most litter. This group became the target of the litter prevention campaign. The target audience was men under the age of 35 who predominantly drove pickup trucks. Television and radio public service announcements featuring these targeted Texans were created. Research allows the program to reinvent itself periodically based upon changes in the target audience. The DMWT Partners program was established to allow entities to donate in-kind goods and services to the campaign.

## Keep Texas Beautiful

The vision of the Keep Texas Beautiful (KTB) organization was designed to make Texas the most beautiful state in the nation. KTB seeks to achieve this goal through partnerships involving government, business, civic groups and volunteers to address litter prevention, solid waste management, recycling, composting, beautification, and general community improvement. KTB programs empower Texans through education to take responsibility for enhancing their community's environment.

Any Texas community can become a Keep Texas Beautiful Affiliate. Affiliates receive a variety of services to improve their effectiveness in mobilizing grassroots volunteers to beautify their communities. KTB has established an annual certification and recognition program for communities with ongoing programs for litter prevention, beautification, community improvement, and the minimization of solid waste.

Keep Texas Beautiful sponsors and coordinates many of its education and cleanup programs in cooperation with state agencies including the TxDOT and the TCEQ. Keep Texas Beautiful (KTB) is currently under contract with the TCEQ to operate the River and Lakes Cleanup Program. Each year, KTB helps sponsor dozens of cleanups across the state in partnership with local governments, concerned citizens, community and nonprofit groups, schools, scout troops, businesses and companies. Volunteers pick up litter and debris along the shores and banks of Texas lakes and rivers.

In return, participants receive, free of charge: trash bags, posters, T-shirts, press releases, and volunteer incentives.

KTB has also taken a leadership role on the issue of illegal dumping and litter law reinforcement by offering seminars and conferences, and forming a statewide task force to share information, discuss the issue, and develop solutions.

## The Texas Wildscapes Program

The Texas Wildscapes Program emphasizes providing the basics for good habitat: food, water, and cover. With approximately 95% of Texas land use practices in the hands of private landowners, the importance of education toward a common bond is evident. The Wildscapes Program provides educational materials for the Texas urban residential landowner to promote a better-educated population which is more supportive of wildlife and conservation issues. The Texas Wildscapes Program can also be applied to community, rural, and corporate properties. The program introduces the concept of habitat, and provides information to the public regarding wildlife needs and the importance of landscaping with native plants. The program also promotes minimizing the use of pesticides and fertilizers, xeriscaping, mulching, composting, and watering practices to conserve water.

## The Edwards Aquifer Authority

The Edwards Aquifer Authority, a member of the Texas Alliance of Groundwater Districts, is a regulatory agency charged with preserving and protecting the Edwards Aquifer in an eight-county region including all of Uvalde, Medina and Bexar counties, plus portions of Atascosa, Caldwell, Guadalupe, Comal and Hays counties. The Authority was created by the Texas Legislature in 1993 with the passage of the Edwards Aquifer Authority Act to preserve and protect this unique groundwater resource. The Act created a 17-member board of directors which sets policy to manage, conserve, preserve, and protect the aquifer; works to increase the recharge; and prevent waste or pollution of the aquifer. The Act also established the South Central Texas Water Advisory Committee made up of representatives from downstream counties to interact with the Authority when issues related to downstream water rights are discussed.

The goals of the Edwards Aquifer Authority are designed to fully implement the requirements of the Edwards Aquifer Authority Act; develop an effective, comprehensive management plan based on sound, consensus-based scientific research and technical data; maintain continuous spring flow; protect and ensure the quality of ground to surface water in the Authority's jurisdiction; forge solutions that ensure public trust; promote healthy economies in all parts of the region; research and develop additional sources of water; and provide strong, professional management for the Authority.

## The Barton Springs/Edwards Aquifer Conservation District

The Barton Springs/Edwards Aquifer Conservation District (BSEACD) is an underground water conservation district created for the purpose of conserving, protecting and recharging the underground water bearing formations within the District, and for the prevention of waste and pollution of such underground water, particularly the waters in the formations known as the Edwards Limestone and Associated Formations in Northern Hays and Southern Travis Counties. The BSEACD, a member of the Texas Alliance of Groundwater Districts, initiates and administers clean up events within its district.

The BSEACD Staff contact local schools, scouting troops, neighborhood groups, and place ads in local papers to request volunteers for the event. Creek clean ups are typically held on a Saturday morning in the fall or spring when temperatures are comfortable. Volunteers meet to share safety information, distribute bags and gloves, and pair off in groups of two or three people to pick-up trash. Large items such as old tires, lumber, metal signs, fencing, and appliances are collected by adult volunteers and BSEACD staff for special pick-up and disposal.

Since many caves and sinkholes are located in rural areas which do not have trash collection, they become the target of illegal dumping. Cave cleanups are less frequent and require a special team of volunteers depending on the type of cave. Removal of debris from caves is labor and time intensive. Hoisting systems are used to remove debris from the cave. Final phases of cave cleanup include removal of sediment laden with broken glass and leached chemicals from debris.

In addition to cleanup events, the BSEACD administers the Aquifer Watch Program. The Aquifer Watch Program links junior high/middle school students with a well near their school which is appropriate for water quality sampling. Students visit their "adopted well" four times during the school year. Prior to the well visit, a staff member visits the class to provide hands-on demonstrations and training the various pieces of equipment. During the well visit, District staff accompanies the group and assists with measurements of the aquifer level, water sampling, and on-site chemical analysis using titrators and spectrophotometers. Students test their groundwater samples for temperature, pH, conductivity, alkalinity, chlorides and nitrates. In addition to time spent in the field collecting water samples and measuring water levels, District staff works with the teachers and students to help them learn more about their "adopted" well.

## The City of Austin's "Grow Green" and "Earth Camp"

Recognizing that one of the most effective ways to protect water quality is through pollution prevention, the City of Austin sponsors a variety of educational programs designed to encourage environmentally responsible

behavior. One of the most comprehensive programs is "Grow Green" which is a partnership between the City of Austin, the Texas Cooperative Extension (TCE), and local nurseries. This program is a model for how local government can work with the horticulture industry to protect water quality.

The concepts developed under this program are a result of sound science and research. The program stresses planting native and adapted plants which require little water and few pesticides to survive in Texas. One strategy, stressed by the City of Austin, includes reducing the use of turf grass. Turf grass can be a high maintenance yard material, often requiring fertilizing, disease control, and supplemental watering. Consideration of options such as increased native and adapted plant beds or mulched or native areas to reduce the need for additional chemicals, watering, and mowing is emphasized.

The program recommends such practices as having soil tested to ensure that only nutrients missing are added, leaving grass clippings on the lawn instead of bagging them to reduce the need for fertilizer, using organic fertilizers, and minimizing the use of pesticides and other chemical treatments. The "Grow Green Plant Guide" was created to help residents select beautiful native plants which are drought tolerant and resistant to pests and diseases. In doing so, it is easier to adhere to the principles outlined in the Grow Green Program.

Now in its ninth year, Earth Camp is the City of Austin's four-day, outdoor, watershed education program for fifth-grade elementary school students. The primary focus for Earth Camp Austin is educating students about the many things necessary to the preservation of water quality in Austin watersheds. The lessons entail study of the geography and natural history of Austin's watersheds, water quality, wildlife in our watersheds, hydrology and geology of the Barton Springs/Edwards Aquifer, green gardening, and other related topics. The approach is based on field trips with hands-on scientific investigations. Participating students are expected to do some homework that includes family involvement and group work.

The camp runs during the school year, from September through June. Participating teachers attend training, teach the Earth Camp curriculum before the students attend camp, and manage and assist the students during camp. The City of Austin provides the environmental expertise, teacher training, field trips, tours, lessons, and equipment.

## The City of Houston's WET in the City Program

Water Education for Teachers (WET), is a nationally recognized training for urban educators that includes an interdisciplinary activity and curriculum guide for kindergarten through 12th grades. The program helps students learn about their local environment and how to conserve precious natural resources.

Students, educators, and administrators in Team WET Schools make a commitment to increase environmental education and stewardship in their community. Each school's Team WET Coordinator receives technical assistance from the City of Houston Water Conservation staff and a Team WET Kit that includes a water test kit, guides for planning water festivals, instructions for conducting water quality audits, and other materials for successful student and community projects. First through 8th grade students create their own water conservation messages to help educate their peers and increase public awareness of conservation issues with the "Design-a-T-Shirt Contest".

Every year, the Mayor of Houston declares the month of May "Water Conservation Awareness Month". The two-day event features conservation skits, a conservation scavenger hunt, and booths sponsored by environmental organizations, city, and county departments. Public Works Engineering also conducts an annual program called "Water Wise and Energy Efficient."  This two-week education/retrofit program focuses on water and energy conservation.

In addition to the education and outreach activities, Public Works Engineering also targets water use customers by distributing more than 20,000 "water saver" kits to citizens to help them reduce their water consumption and water bills. The kits contain a displacement bag (½ gallon) for the toilet tank, dye tablets to test for leaks, a "tankee clipper", a flow restrictor, and an instruction sheet.

The City of Houston actively participates in other special events such as National Drinking Water Week, Earth Day events, Bay Day, Home & Garden Shows, school health fairs, and other environmentally focused festivals and community events in order to implement a comprehensive water conservation program for residents of all ages.

## The City of Fort Worth Environmental Education Programs

The City of Fort Worth's Environmental Management Department has established a Public Education division that offers adult information presentations, student programs, publications, and special events about environmental concerns in Fort Worth. Program components include composting, environmentally friendly lawn care practices, storm water and wastewater instruction curriculum, and waste reduction through recycling demonstrations.

The Department of Environmental Management has also launched a pilot Environmental Mapping Education web site for the Fort Worth ISD. The web site incorporates environmental science with the digital mapping of Geographic Information Systems. Students can log onto the site and work through online mapping, water quality, air quality, and spill response lessons. Students interactively map local area rivers, streets, parks, and

watersheds. Each lesson poses a problem, and explains a step-by-step mapping process to find a solution.

## *The City of San Antonio's Curbside Recycling Program*

The City of San Antonio's recycling program is the largest curbside recycling program in the State of Texas. In 1995, the program was initiated in a quadrant of the city and full implementation citywide was completed in three years. The program created "Binny" the Recycling Bin as their mascot and an advertising mechanism for the public. The program's ultimate success is a result of public and private cooperation.

The program provides service once a week, and recyclables are collected using an 18-gallon green recycling bin which the City has distributed to all residents at no cost. The recyclables are collected curbside for ease of collection. The City accepts newspaper, glass jars and bottles, aluminum cans, plastic household jars and bottles, aerosol cans, and steel and tin household containers.

# CHAPTER 8  BEST MANAGEMENT PRACTICES

Nonpoint source management programs in Texas make use of a wide variety of Best Management Practices (BMPs). This section provides an overview of the primary BMPs in use or identified for use in Texas. This is not a complete listing of all acceptable BMPs for nonpoint source pollution control programs and projects in Texas. Whether or not projects receive funding under CWA §319(h), the use and demonstration of innovative practices not listed here are acceptable and valuable, particularly where their effectiveness can be evaluated and monitored.

## Definition of Best Management Practices

Best Management Practices (BMPs) are those practices determined to be the most efficient, practical, and cost-effective measures identified to guide a particular activity or to address a particular problem. Nonpoint Source BMPs are specific practices or activities used to reduce or control impacts to water bodies from nonpoint sources, most commonly by reducing the loading of pollutants from such sources into storm water and waterways. Programs that implement these BMPs are addressed in Chapter 5.

There are many NPS BMPs in use in Texas. "Best" is relative to the particular needs or purposes and the specific site characteristics to be addressed.

Since most BMPs address specific management needs and site characteristics, it is helpful to identify and classify BMPs according to where they are most effective. The next section categorizes BMPs according to their use in managing the various parts of the NPS pollution pathway. The final section addresses which BMPs best address different activities and disturbances which are sources of NPS pollution.

A separate document, the BMP Finder (www.tceq.state.tx.us/compliance/monitoring/stakeholders/nps-stakeholders.html) provides a more comprehensive description and discussion of important Texas NPS BMPs and guidance on their use. The BMP Finder is extensively cross-referenced to help in identifying and comparing BMPs which are closely related and to sort out the many different names and variations in BMPs which are currently in use.

## Categories of Nonpoint Source Pollution Management

The management of nonpoint source pollution involves a strategic combination of practices designed to prevent and intercept the entry of nonpoint source pollutants into Texas waters along the entire storm water

pathway. Most BMPs address one specific stage of this pathway, although they may be applied in different situations and to different sources.

- Preventive practices: preventing or reducing the contact of pollutants with storm water

- Cleanup practices: recapturing pollutants that have spilled onto or contaminated a location

- Erosion control practices: protecting material at the soil surface from entering storm water runoff

- Sediment control practices: preventing materials already suspended in storm water from leaving a site

- Runoff control practices: reducing the volume, velocity, and/or erosive force of storm water runoff flow

- Channel protection practices: preventing erosion of channels, stream banks, and streambeds

- Habitat restoration practices: restoring natural communities that minimize erosion and remove water pollutants, especially along a waterway and its riparian zone

- In-stream remediation practices: removing nonpoint source pollutants or restoring water quality characteristics in a waterway

- Other BMPs, such as public education, for example, may address two or more of these stages in the storm water pathway simultaneously.

For optimum effectiveness, NPS programs should attempt to coordinate all BMPs in a watershed. BMPs can either complement each other – erosion control on a site typically increases the effectiveness and reduces the size and maintenance requirements of the site's sediment controls – or undermine each other – armoring a straight stretch of channel or stream banks may increase flow velocity and channel erosion downstream. In general, controlling NPS pollutants through prevention where possible is most cost effective. Control of these pollutants generally becomes more difficult and expensive the farther they travel down the storm water pathway.

The first table below presents selected Texas BMPs in each of these categories along the storm water pathway.

**Table 8.1  Best Management Practices by Category**

| Management Category and Description | Typical BMP Examples |
|---|---|
| **Preventive BMPs**<br><br>Preventive BMPs, sometimes called source controls, are management techniques or designs that prevent or reduce the exposure of substances to precipitation, storm water, or surface waters. All policies and practices that prevent the release of materials to the open air, soil, or water are preventive BMPs. Such practices and safeguards comprise a large part of the rules, guidelines, and permit requirements for facility management and for the storage, transport, processing, and disposal of wastes and hazardous materials administered by TCEQ and other regulatory agencies. | Planning, policy, and regulatory activities<br><br>Using alternate, less polluting materials<br><br>Housekeeping to contain and cover materials and wastes, or keep them indoors<br><br>Minimize the extent and duration of land disturbance activities<br><br>Well plugging<br><br>Recycling and composting, including rainwater harvesting<br><br>Household Hazardous Waste and similar collections |
| **Cleanup BMPs**<br><br>Cleanup BMPs remove or remediate nonpoint source pollutants which have contaminated a specific area. In most cases of significant contamination, the selection and implementation of these BMPs is governed specifically under agency rules. Other cleanup BMPs, such as cleanup of litter or illegally disposed materials, are more discretionary. | Spill response<br><br>Contaminated site cleanup<br><br>Trash-litter cleanup<br><br>Increased-efficiency street sweeping |
| **Erosion Control BMPs**<br><br>Erosion control BMPs maintain the integrity of the land surface to prevent material at the surface from entering storm water or surface water. | Mulches and blankets<br><br>Vegetation preservation and establishment<br><br>Riprap on temporary traffic areas |
| **Sediment Control BMPs**<br><br>For material that escapes erosion control BMPs and enters storm water runoff, the next line of defense is sediment control. Sediment control BMPs detain runoff before it leaves a site to filter out and/or precipitate suspended particles, including soluble pollutants which may be attached to solid particles. | Inlet protection<br><br>Extended detention basins<br><br>Vegetated filter strips<br><br>Sediment trap/stone outlet<br><br>Filter berms and silt fences<br><br>Sand filter systems<br><br>Constructed or restored wetlands |
| **Run-on and Runoff Control BMPs**<br><br>Runoff control BMPs reduce the volume, velocity, and erosive force of storm water through diversion, infiltration or absorption of storm water into the surface or through physical impediments which slow the flow of storm water. | Level spreaders<br><br>Interceptor swales<br><br>Diversion dikes to exclude storm water from off-site |

| Channel, Stream Bank, and Streambed Protection BMPs<br><br>These BMPs protect the integrity of stream beds and stream banks to prevent erosion and loss. Stream banks can be protected or restored either by increasing resistance of the bank to erosion or by decreasing the energy of the water at the point of contact with the bank, for example by deflecting or interrupting flows | Prevention of disturbance by exclusion of livestock, off-road vehicles, etc.<br>Channel shaping to reduce velocity and erosive force<br>Gabions or riprap lining of channels<br>Reinforcing or armoring exposed surfaces<br>Stream bank vegetation |
|---|---|
| Habitat Restoration BMPs<br>These are a special subset of biological erosion control and stream protection BMPs. They establish or protect the natural communities which most effectively protect waterways and riparian areas from erosion.. | Reestablish hydrology of wetlands and riparian areas<br>Restoration of wetland native plant communities |
| In-Stream and Lake Remediation BMPs<br>Once nonpoint source pollutants have affected a water body, another set of BMPs may reduce or reverse these effects. | Mechanical aeration to restore dissolved oxygen<br>Chemical treatments – e.g. pH adjustment |
| Other BMPs | Public education |

# Categories of Nonpoint Sources and Associated Pollutants

Best Management Practices can be classified not only by management category but also by the primary nonpoint sources of pollution and the types of pollutant loadings and other impacts that each of these sources tends to cause. Many BMPs are used to address a broad range of NPS sources, particularly the erosion and sediment control BMPs.

## *Major Sources*

- Agriculture
- Silviculture (Forestry)
- Urban storm water
- Construction (including road construction)

## *Special Sources*

- Atmospheric deposition
- Boats and marinas
- Septic and other on-site wastewater systems
- Mining and petroleum production
- Industrial sites
- Roads
- Spill containment and contaminant remediation

- Hydromodification and stream bank protection
- Habitat degradation
- Wildlife
- In-stream remediation
- Underground storage tanks

**Table 8.2  Best Management Practices by Source**

| Sources and Activities | Pollutants and Other Impacts | BMP Examples |
|---|---|---|
| **Agriculture**<br>Tilling, cultivation, harvesting, and other soil surface exposure and disturbances; chemical applications | Sediment from exposed soil; nutrients from fertilizers; chemicals from pesticides, streamflow and temperature increases caused by vegetation removal | Animal Mortality Facility, Alley Cropping, Brush Management, Closure of Waste, Impoundments, Composting Facility, Conservation Crop Rotation, Constructed Wetland, Contour Buffer Strips, Cover Crop, Cross Wind Stripcropping, Diversion Dam, Dike, Filter Strip, Firebreak, Grade Stabilization Structure, Grassed Waterway, Irrigation Land Leveling, Manure Transfer, Nutrient Management, Pest Management, Pond Sealing or Lining - Bentonite Treatment, Prescribed Grazing, Residue Management - No Till/strip till, Riparian Forest Buffer, Sediment Basin, Surface Roughening, Terrace, Use Exclusion, Waste Utilization, Water and Sediment Control Basin, Well Decommissioning |
| **Silviculture/Forestry**<br>Road construction and use, timber harvesting, mechanical equipment operation, prescribed burning, site preparation, fertilizer and pesticide application | Sediment; nutrients from forest fertilizer application; chemicals from pesticide application; temperature changes resulting from riparian vegetation removal and sediment additions; and streamflow increases caused by vegetation removal. | Broad-Based Dips; Cross-Road Drainage Culverts; Haul Roads; Log Sets, Field Chipping Sets and Portable Mill Locations; Revegetation of Disturbed Areas; Rolling Dips; Skid Trails; Stream Crossings; Streamside Management Zones (SMZ); Salvage & Sanitation in SMZs; Water Bars; Wing Ditch |

| Sources and Activities | Pollutants and Other Impacts | BMP Examples |
|---|---|---|
| **Urban and Industrial**<br>Industrial, commercial, and residential activities; lawn and landscape management; pets and wildlife; pavement and other impervious covering of the soil; vehicular traffic; production and use of synthetic chemicals; improper disposal of wastes | Sediment from disturbed land; nutrients and pesticides from lawn and landscape management; pathogens and nutrients from pet and wildlife waste; oil and grease; petroleum hydrocarbons | Clean-Up; Composting; Animal Waste Collection; Curb Elimination; Debris Removal; Exposure Reduction; Landscaping And Lawn Maintenance Controls; Minimization Of Pollutants, Parking Lot/Street Cleaning Operations, Road Salt Controls, Streambank Stabilization, Land Use Management Practices, Buffers, Easements, Solid Waste Collection Facilities, Extended Detention Basin, Infiltration Device, Oil and Grease Trap Device, Porous Pavement, Sand Filter, Rain Garden, Vegetative Practices, Filter Strip, Grassed Swale, Wetland, Wet Retention Pond |

| Sources and Activities | Pollutants and Other Impacts | BMP Examples |
|---|---|---|
| **Construction**<br>Removal of the soil's protective cover; unpaved traffic surfaces; earthmoving; open stockpiling of erodible materials; | Sediment from bare soil and stockpiles; nutrients from temporary and permanent vegetation establishment; streamflow increases caused by vegetation removal and impervious ground coverings; waste chemicals and debris from painting and other construction wastes; | MINIMIZE EXTENT &DURATION OF DISTURBANCE SURFACE STABILIZATION Mulching, Preserving Natural Vegetation, Recontouring, Permanent Seeding, Riprap, Sodding, Surface Roughening, Temporary Gravel Construction Access, Temporary Seeding, Topsoiling, Erosion Control Compost, Erosion Control Blanket Runoff Diversion RUNOFF CONVEYANCE MEASURES Grass-Lined Channel or Swale, Hardened Channel, Interceptor Swale, Temporary Slope Drain, Paved Flume, Runoff Diversion Dike OUTLET PROTECTION Level Spreader, Outlet Stabilization Structure SEDIMENT TRAPS AND BARRIERS Block and Gravel Drop Inlet Protection, Excavated Drop Inlet Protection, Fabric Storm Drain Inlet Protection, Sediment Basin, Rock Dam, Sediment Fence/Straw Bale Barrier, Sediment Trap, Sand Filter System, Sod Drop Inlet Protection, Vegetated Filter Strip, Filter Berm (rock, sandbag, compost, mulch), Filter Sock (compost or mulch), Brush Barrier, Wetlands, Wet Basin, Extended Detention Basin STREAM PROTECTION Streambank Stabilization, Streambed Stabilization, Temporary Stream Crossing |

| Sources and Activities | Pollutants and Other Impacts | BMP Examples |
|---|---|---|
| **Atmospheric deposition** Metals from volcanic activity, forest fires, windblown dust, vegetation, sea spray, the smelting of ores, and stack and fugitive dust (dust that escapes emission controls). Nitrogen from microbial decomposition, combustion of fossil fuels, fertilizer and explosives factories, and volatilization of applied ammonia-based fertilizers | Windblown pollutants of greatest concern include metals, such as mercury, and nitrogen. | Pollution prevention and emissions control measures to reduce the exposure and release of pollutants to the air; also, erosion and sediment control BMPs reduce the entry of soil-bound pollutants, including those from atmospheric deposition, into storm water. |
| **Boats and marinas** Discharge of sewage, fish cleanings, and food waste from recreational boats; bilge from boat ballast; paints, pesticide, and wood preservatives; chemicals used to deter metal corrosion; biocidal antifouling agents; boat and marina construction; boat hull bottom painting and scrapings; boat operation and dredging activities; refueling activities and bilge or fuel discharges | BOD (biological oxygen demand) and SOD (sediment oxygen demand); nutrients; pathogens; metals; arsenic from paint pigment, pesticide, and wood preservatives; zinc from anodes used to deter metal corrosion; copper and tin; copper and other metals. Both copper and tin (as butyltin) have been found at toxic concentrations in marina waters nationwide, deriving from boat hull bottom paints and scrapings; turbidity; petroleum hydrocarbons; oil and grease | No-Wake Zones, Protected Shallow Water Habitats, Proper Storage and Handling of Materials, No-Discharge Zones, Pumpout Facilities (Fixed-Point, Portable, and Dedicated Slipside Systems), Boat Repair and Maintenance Restrictions, Solid Waste Collection Facilities, Fish Cleaning Facilities/Controls |
| **Septic and other on-site wastewater systems** Discharges, seepage, or other releases from failing or improperly installed on-site wastewater treatment systems | Nitrogen, phosphorus, organic matter, toxic chemicals, and bacterial and viral pathogens | Chemical Additive Restrictions, Elimination of Garbage Disposals, Inspection and Maintenance, Phosphorus Detergent Restrictions, Denitrification Systems, Floating Aquatic Plant (Aquaculture) Systems, Upgrade or Replacement of Failing Systems, Alternating Bed System, Mound (Fill) System, Pressure Distribution (Low Pressure Pipe) System, Point-of-Sale Inspections, Inspection and Permitting of Installed Systems, Local Ordinances |
| **Mining and petroleum production** | Salt, sediment, petroleum hydrocarbons | Well and Testhole Inspection; Plugging Wells and Testholes |

| Sources and Activities | Pollutants and Other Impacts | BMP Examples |
|---|---|---|
| **Spill containment and contaminant remediation** Spills, leaks, or other releases of chemicals and other pollutants | Petroleum hydrocarbons and other toxic chemicals | HHW and Empty Pesticide Container Collection, Storm Drain Stenciling, Spill Cleanup, Slurry Walls, Grouting, Geomembranes, Hydrodynamic Control, Surface Seals, Surface Drainage, Excavation, Soil Venting, In-Situ Treatment of Contaminants |
| **Stream bed and stream bank protection** Increased stream flow and erosive force can damage and erode stream channels | Sediment, organic matter, nutrients | No-Wake Zones, Livestock Exclusion, Stream Bank Setbacks, Blankets and Mattresses, Branch Packs, Composite Revetment, Gabions, Live Fascines (Wattling Bundles), Live Staking, Tree Revetment, Vegetative Cover, Live Cribwall, Check Dam, Deflectors, Grade Stabilization Structure, Low-Head Dam (Weir) |
| **Underground storage tanks** Spills, leaks, and other releases | Petroleum hydrocarbons and related chemicals | Slurry Walls, Grouting, Geomembranes, Surface Seals, Surface Drainage, Hydrodynamic Control, Pumping, Interceptor Systems, Soil Venting, Excavation, Biological Degradation, Chemical Degradation, Inspection |

# APPENDIX A
# CERTIFICATION OF AUTHORITY



Kathleen White, *Chairman*
R. B. "Ralph" Marquez, *Commissioner*
Larry Soward, *Commissioner*
Glenn Shankle, *Executive Director*

### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
*Protecting Texas by Reducing and Preventing Pollution*

### GENERAL COUNSEL'S CERTIFICATION

The State of Texas, through the Texas Commission on Environmental Quality (commission or TCEQ), is currently in the process of seeking full approval for its *Texas Nonpoint Source Pollution Assessment Report and Management Program* ("NPS Program"). The Environmental Protection Agency (EPA) has given full technical approval to the NPS program.

In accordance with Section 319(b)(2)(D) of the Clean Water Act, each management program proposed for implementation must include:

> A certification of the attorney general of the State or States (or the chief attorney of any State water pollution control agency which has independent legal counsel) that the laws of the State or States, as the case may be, provide adequate authority to implement such management program or, if there is not such adequate authority, a list of such additional authorities as will be necessary to implement such management program .

Following a review of the referenced 2005 NPS Program, the General Counsel certifies, under Section 319(b)(2)(D) of the Clean Water Act, that the laws of the State of Texas provide adequate authority to implement the NPS Program, as more specifically described below.

### Relevant Legal Authority

The TCEQ is the state agency given primary responsibility for implementing the constitution and laws of the state relating to the conservation of natural resources and protection of the environment.[1]  Specifically, the commission has general jurisdiction over the state's water quality program, including:

- the issuance of permits;
- the enforcement of water quality rules, standards, orders and permits; and
- water quality planning.[2]

---

[1] Texas Water Code (TWC) §5.012.

[2] TWC §5.013.

The commission also has the power to perform any acts whether specifically authorized by the Texas Water Code (TWC) or other law or implied by the TWC, necessary and convenient to the exercise to the exercise of its jurisdiction and powers.[3] The commission is also authorized to adopt rules necessary to carry out its duties and powers.[4]

Chapter 26 of the TWC provides that the commission shall establish the level of quality to be maintained in, and shall control the quality of, the water in the state.[5] Waste discharges or impending waste discharges covered by the provisions of Chapter 26 are subject to reasonable rules or orders adopted or issued by the commission in the public interest. The commission has also been given the powers and duties specifically prescribed by Chapter 26 and all other powers necessary or convenient to carry out those statutory responsibilities.

Section 26.012 requires the executive director to prepare and develop a general, comprehensive plan for the control of water quality in the state, which shall be used as a flexible guide by the commission. Additionally, § 26.017 requires the commission to:

- encourage voluntary cooperation by the people, cities, industries, associations, agricultural interests, and representatives of other interests in preserving the greatest possible utility of water in the State;

- encourage the formation and organization of cooperative groups, associations, cities, industries, and other water users for the purpose of providing a medium to discuss and formulate plans for attainment of water quality control;

- establish policies and procedures for securing close cooperation among state agencies that have water quality control functions; and

- cooperate with the governments of the United States and other states and with official or unofficial agencies and organizations with respect to water quality control matters.

Section 26.023 of the TWC provides that the commission is the sole and exclusive authority for setting water quality standards, and must set water quality standards for the water in the state by rule, and may amend the standards from time to time. The standards must be based on all quality assured data obtained by the commission, including local watershed and river basin database. The commission may also issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to water in the state and may refuse to issue a permit when issuance would violate the provisions of any state or federal law or rule or

---

[3] TWC §5.102.

[4] TWC §5.103.

[5] TWC §26.011.

regulations.[6] The commission must also consider the compliance history of an applicant and its operator in considering issuance, amendment or renewal of a permit to discharge effluent.[7]

The commission may prescribe reasonable requirements for a person making discharges of any waste or of any pollutant to monitor and report on his activities concerning collection, treatment, and disposal of the waste or pollutant.[8] The executive director has the responsibility for establishing a water quality sampling and monitoring program for the state. All other state agencies engaged in water quality or water pollution control activities are statutorily required to coordinate those activities with the commission.[9] Additionally, the commission and employees or agents of the commission are authorized to enter any public or private property at any reasonable time for the purpose of inspecting and investigating conditions relating to the quality of water in the state.[10]

Local governments may also inspect the public water in its area and may execute cooperative agreements with the commission to provide for the performance of water quality management, inspection, and enforcement functions and for the transfer of money or property from any party to the agreement to another party for the purpose of water quality management, inspection, enforcement, technical aid and education, and the construction, ownership, purchase, maintenance, and operation of disposal systems.[11] Municipalities may also establish a water pollution control and abatement program for the city to include services and functions which, in the judgement of the city or as may be reasonably required by the commission, will provide effective water pollution control and abatement for the city.[12] Municipal water pollution control and abatement programs must be submitted to the commission for review and approval.[13] Further, the commission shall hold annual hearings in counties that include particularly sensitive areas, such as the Edwards Aquifer, to receive evidence on actions the commission should take to protect the aquifer from pollution.[14] To further this goal, the commission has adopted rules in 30 Texas Administrative Code (TAC) Chapter 213 which regulate development activities over the Edwards Aquifer.

---

[6] TWC § 26.027.

[7] TWC § 26.0281.

[8] TWC § 26.042.

[9] TWC §26.127.

[10] TWC §26.014.

[11] TWC § 26.171 and § 26.175.

[12] TWC § 26.177.

[13] *Id.*

[14] TWC § 26.046.

The commission also has broad authority over the location, design, construction, installation, and proper functioning of on-site sewage disposal systems[15] and has adopted corresponding rules in 30 TAC Chapter 285 to encourage the use of economically feasible alternative techniques and technologies.

Chapter 7 of the TWC establishes the enforcement authority of the commission. The commission may initiate an action to enforce provisions of the TWC, THSC within the jurisdiction of the commission and rules, orders, permits, or other decisions of the commission.[16] The commission must report at least once a month at a meeting of the commission on enforcement actions taken by the commission or others and the resolution of those actions.[17] The commission may assess an administrative penalty against a person for violations with a maximum amount of $10,000 a day for each violation.[18] Persons charged with a penalty have the option of paying it in full, paying the penalty, paying an installment, paying or not paying in full and filing a petition for judicial review.[19] If a person fails to comply with that section, then the commission or executive director may refer the matter to the attorney general for enforcement.[20]

### Texas Department of Transportation

The Texas Department of Transportation (TxDOT) is the primary agency in the State responsible for highway, road, and bridge construction. As described in the 2005 NPS Program, TxDOT's approach in addressing nonpoint source pollution is to limit impacts to receiving waters through implementation of highway design specifications. TxDOT has been conferred broad authority by the legislature.[21] TxDOT and TCEQ have entered into Memoranda of Understanding which has been adopted by reference in 30 TAC § 7.119 with regard to the assessment of water quality impacts resulting from certain transportation projects.

### Texas Railroad Commission

The Texas Railroad Commission (TRRC) is solely responsible for the control and disposition of waste and the abatement and prevention of surface and subsurface water pollution resulting from activities associated with the exploration, development, and production of oil and gas or geothermal resources, including:

---

[15] Texas Health and Safety Code (THSC) § 366.011.

[16] TWC §7.002.

[17] TWC § 7.003.

[18] TWC §7.051 and §7.052.

[19] TWC § 7.061.

[20] TWC § 7.066.

[21] Texas Transportation Code, Chapter 201.

- activities associated with the drilling of injection water source wells which penetrate the base of useable quality water;

- activities associated with the drilling of cathodic protection holes associated with the cathodic protection of wells and pipelines subject to the jurisdiction of the Railroad Commission of Texas;

- activities associated with gasoline plants, natural gas or natural gas liquids processing plants, pressure maintenance plants, or repressurizing plants;

- activities associated with any underground natural gas storage facility,

- activities associated with any underground hydrocarbon storage facility; and

- activities associated with the storage, handling, reclamation, gathering, transportation, or distribution of oil or gas before refining.[22]

To prevent pollution of streams and public bodies of surface water of the State, the Railroad Commission is must adopt and enforce rules in accordance with Texas Natural Resource Code § 91.101 relating to the drilling of exploratory wells and oil and gas wells. Additionally, TCEQ and TRRC have entered a Memorandum of Understanding adopted by reference in 30 TAC § 7.117 concerning cooperation and the division of jurisdiction between the agencies regarding wastes that result from, or are related to, activities associated with the exploration, development, and production of oil, gas, or geothermal resources, and the refining of oil.

**Texas Parks and Wildlife Department**
The Texas Parks and Wildlife Department is authorized to regulate the use of department lands for oil, gas, and other mineral recovery and associated activities as the department considers reasonable and necessary to protect the surface estate. The Texas Parks and Wildlife is authorized by TWC § 26.129 to enforce the provisions of the Texas Water Code to the extent that any violation affects aquatic life and wildlife.

**Wetlands**
The United States Army Corps of Engineers (Corps) is the principle authority for all dredging operations affecting bays and estuaries of Texas. While EPA has designated the Corps as the implementing agency under Section 404 of the CWA, the TCEQ is responsible for completing Section 401 Water Quality Certifications. The commission has enacted regulations in 30 TAC Chapter 279 establishing procedures and criteria for applying for, processing, and reviewing state certifications under CWA, §401, for activities under the jurisdiction of the agency for the purpose maintaining the chemical, physical, and biological integrity of the state's waters consistent with the Texas Water Code and the federal CWA. It is the policy of the commission to achieve no overall net loss of the existing wetlands resource base with respect wetlands functions and values in the State of Texas.

**Spill Response**

---

[22] TWC § 26.131.

The *Texas Oil and Hazardous Substances Spill Prevention and Control Act* provides that it is the policy of the State to prevent the spill or discharge of hazardous substances into waters in the State and to cause the removal of any such spills and discharges without undue delay.[23] In accordance with the Act, the commission is the lead agency in spill response matters and shall conduct spill response for the state, and shall otherwise administer the provisions of the Act. The commission has also been designated by the Governor as the state's lead agency for Superfund activities and as the state's representative to the federal Regional Response Team in accordance with the *Comprehensive Environmental Response, Compensation, and Liability Act,* 42U.S.C. §§ 9601- 9675; the *Water Pollution Prevention and Control Act,* 33 U.S.C. §§ 12511387; and the *National Oil and Hazardous Substances Pollution Contingency Plan,* 40 CFR Part 300. Under the authority of the *Solid Waste Disposal Act,* the commission has broad removal authorities with respect to the cleanup of a release or threatened release of hazardous substances at a facility on the State registry. [24]

**Funding Mechanisms**
The executive director, with the approval of the commission, may execute agreements with the United States Environmental Protection Agency or any other federal agency that administers programs providing federal cooperation, assistance, grants, or loans for research, development, investigation, training, planning, studies, programming, and construction related to methods, procedures, and facilities for the collection, treatment, and disposal of waste and other water quality control activities. The commission is authorized to accept federal funds for these purposes and for other purposes consistent with the objectives of Chapter 26 of the TWC and may use the funds as prescribed by law or as provided by agreement.

Derek Seal
General Counsel
Texas Commission on Environmental Quality

---

[23]TWC Chapter 26, Subchapter G.

[24]THSC Chapter 361.



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

May 2, 2005

Mr. Rex Isom, Executive Director
Texas State Soil and Water Conservation Board
P.O. Box 658
Temple, Texas 76503

Re: Statewide Agriculture/Silvicultural Nonpoint Source Management Program

Dear Mr. Isom:

I have reviewed the above management program document provided to me by TSSWCB staff. I have also reviewed Chapters 201 and 203 of the Texas Agricultural Code ("Code").

As you know, TSSWCB's statutory authority is contained in Chapters 201 and 203 of the Code. Section 201.026 of the Code gives the Board specific authority to "plan, implement, and manage programs and practices for abating agricultural and silvicultural nonpoint source pollution." Texas law therefore provides adequate authority for TSSWCB to promulgate and implement the Statewide Agriculture/Silvicultural Nonpoint Source Management Program set forth in the draft document provided to me by TSSWCB staff.

Please let me know if I can assist you further.

Sincerely,

George Noelke
Assistant Attorney General
Administrative Law Division

# Appendix B
# Priority Water Bodies

The following lists of priority water bodies are based on the Texas Water Quality Inventory and 303(d) List. In addition, the list includes some unimpaired water bodies targeted for pollution prevention efforts such as development of Watershed Protection Plans. The water bodies provided in these lists represent the state's priorities for CWA §319(h) funding for both implementation and assessment activities as defined. However, funding is not limited to these water bodies. These lists are subject to change and will be revised as needed.

## Surface Water

*Table B.1  Priority Water Bodies - Surface Water*

| Segment Number | Segment Name | Parameter of Concern | Assessment or Implementation |
|---|---|---|---|
| 0101A | Dixon Creek | bacteria | Assessment |
| 0102 | Lake Meredith | mercury in walleye | Assessment |
| 0199A | Palo Duro Reservoir | depressed dissolved oxygen | Assessment |
| 0201A | Mud Creek | bacteria | Assessment |
| 0202D | Pine Creek | bacteria | Assessment |
| 0203A | Big Mineral Creek | bacteria | Assessment |
| 0207A | Buck Creek | bacteria | Assessment |
| 0211 | Little Wichita River | dissolved oxygen | Assessment |
| 0211 | Little Wichita River | total dissolved solids | Assessment |
| 0212 | Lake Arrowhead | See Segment 0211 | Assessment |
| 0213 | Lake Kickapoo | See Segment 0211 | Assessment |
| 0214A | Beaver Creek | depressed dissolved oxygen | Assessment |
| 0218 | Wichita/North Fork Wichita River | selenium (chronic) in water | Assessment |
| 0218A | Middle Fork Wichita River | selenium (chronic) in water | Assessment |
| 0299A | Sweetwater Creek | bacteria | Assessment |
| 0302 | Wright Patman Lake | high pH | Assessment |
| 0302 | Wright Patman Lake | depressed dissolved oxygen | Assessment |
| 0302 | Wright Patman Lake | high pH | Assessment |
| 0306 | Upper South Sulphur River | bacteria | Assessment |
| 0306 | Upper South Sulphur River | high pH | Assessment |
| 0306 | Upper South Sulphur River | depressed dissolved oxygen | Assessment |
| 0307 | Cooper Lake | high pH | Assessment |
| 0307 | Cooper Lake | depressed dissolved oxygen | Assessment |
| 0401 | Caddo Lake | low pH | Assessment |
| 0401 | Caddo Lake | mercury in largemouth bass and freshwater drum | Assessment |
| 0401 | Caddo Lake | depressed dissolved oxygen | Assessment |
| 0401A | Harrison Bayou | depressed dissolved oxygen | Assessment |
| 0402 | Big Cypress Creek below Lake O' the Pines | mercury in fish tissue | Assessment |
| 0402 | Big Cypress Creek below Lake O' the Pines | depressed dissolved oxygen | Assessment |
| 0402 | Big Cypress Creek below Lake O' the Pines | low pH | Assessment |

| 0402A | Black Cypress Bayou | depressed dissolved oxygen | Assessment |
|---|---|---|---|
| 0402A | Black Cypress Bayou | mercury in fish tissue | Assessment |
| 0402D | Lake Daingerfield | mercury in fish tissue | Assessment |
| 0403 | Lake O' the Pines | depressed dissolved oxygen | Assessment |
| 0404 | Big Cypress Creek below Lake Bob Sandlin | bacteria | Assessment |
| 0404B | Tankersley Creek | bacteria | Assessment |
| 0404D | Welsh Reservoir | selenium | Assessment |
| 0407 | James' Bayou | depressed dissolved oxygen | Assessment |
| 0409 | Little Cypress Bayou (Creek) | depressed dissolved oxygen | Assessment |
| 0502A | Nichols Creek | bacteria | Assessment |
| 0502A | Nichols Creek | depressed dissolved oxygen | Assessment |
| 0502A | Nichols Creek | chronic toxicity in water | Assessment |
| 0504 | Toledo Bend Reservoir | depressed dissolved oxygen | Assessment |
| 0504 | Toledo Bend Reservoir | mercury in largemouth bass and freshwater drum | Assessment |
| 0504C | Palo Gaucho Bayou | chronic toxicity in water | Assessment |
| 0505 | Sabine River above Toledo Bend Reservoir | bacteria | Assessment |
| 0505B | Grace Creek | depressed dissolved oxygen | Assessment |
| 0505B | Grace Creek | bacteria | Assessment |
| 0505D | Rabbit Creek | bacteria | Assessment |
| 0505E | Brandy Branch Reservoir | selenium | Implementation Assessment |
| 0505F | Martin Creek Reservoir | selenium | Implementation Assessment |
| 0505G | Wards Creek | depressed dissolved oxygen | Assessment |
| 0506 | Sabine River below Lake Tawakoni | bacteria | Assessment |
| 0507 | Lake Tawakoni | depressed dissolved oxygen | Assessment |
| 0507A | Cowleech Fork Sabine River | bacteria | Assessment |
| 0507B | Long Branch | bacteria | Assessment |
| 0508 | Adams Bayou Tidal | bacteria | Assessment |
| 0508 | Adams Bayou Tidal | depressed dissolved oxygen | Assessment |
| 0508A | Adams Bayou above Tidal | bacteria | Assessment |
| 0508B | Gum Gully | depressed dissolved oxygen | Assessment |
| 0508B | Gum Gully | bacteria | Assessment |
| 0508C | Hudson Gully | bacteria | Assessment |
| 0508C | Hudson Gully | depressed dissolved oxygen | Assessment |
| 0511 | Cow Bayou Tidal | bacteria | Assessment |
| 0511A | Cow Bayou above Tidal | depressed dissolved oxygen | Assessment |
| 0511B | Coon Bayou | depressed dissolved oxygen | Assessment |
| 0511B | Coon Bayou | bacteria | Assessment |
| 0511C | Cole Creek | bacteria | Assessment |
| 0511C | Cole Creek | depressed dissolved oxygen | Assessment |
| 0511E | Terry Gully | bacteria | Assessment |
| 0512A | Running Creek | bacteria | Assessment |
| 0512B | Elm Creek | bacteria | Assessment |
| 0603 | B. A. Steinhagen Lake | mercury in white and hybrid white/striped bass | Assessment |
| 0603A | Sandy Creek | bacteria | Assessment |
| 0604 | Neches River below Lake Palestine | lead (chronic) in water | Assessment |
| 0604A | Cedar Creek | bacteria | Assessment |

| 0604B | Hurricane Creek | bacteria | Assessment |
|---|---|---|---|
| 0605A | Kickapoo Creek | bacteria | Assessment |
| 0606 | Neches River above Lake Palestine | low pH | Assessment |
| 0606 | Neches River above Lake Palestine | zinc (acute) in water | Assessment |
| 0606 | Neches River above Lake Palestine | zinc (chronic) in water | Assessment |
| 0606A | Prairie Creek | bacteria | Assessment |
| 0607A | Boggy Creek | depressed dissolved oxygen | Assessment |
| 0607B | Little Pine Island Bayou | depressed dissolved oxygen | Assessment |
| 0608A | Beech Creek | depressed dissolved oxygen | Assessment |
| 0608B | Big Sandy Creek | bacteria | Assessment |
| 0608C | Cypress Creek | depressed dissolved oxygen | Assessment |
| 0608F | Turkey Creek | bacteria | Assessment |
| 0608G | Lake Kimball | mercury in fish tissue | Assessment |
| 0610 | Sam Rayburn Reservoir | mercury in largemouth bass and freshwater drum | Assessment |
| 0610 | Sam Rayburn Reservoir | depressed dissolved oxygen | Assessment |
| 0610A | Ayish Bayou | bacteria | Assessment |
| 0611 | Angelina River above Sam Rayburn Reservoir | bacteria | Assessment |
| 0611A | East Fork Angelina River | bacteria | Assessment |
| 0611A | East Fork Angelina River | lead (chronic) in water | Assessment |
| 0611A | East Fork Angelina River | lead in water | Assessment |
| 0611B | La Nana Bayou | bacteria | Assessment |
| 0611C | Mud Creek | bacteria | Assessment |
| 0612B | Waffelow Creek | bacteria | Assessment |
| 0615 | Angelina River/Sam Rayburn Reservoir | mercury in largemouth bass and freshwater drum | Assessment |
| 0615 | Angelina River/Sam Rayburn Reservoir | impaired fish community | Assessment |
| 0615 | Angelina River/Sam Rayburn Reservoir | depressed dissolved oxygen | Assessment |
| 0701 | Taylor Bayou above Tidal | depressed dissolved oxygen | Assessment |
| 0702A | Alligator Bayou | ambient toxicity in water | Assessment |
| 0702A | Alligator Bayou | ambient toxicity in sediment | Assessment |
| 0702A | Alligator Bayou | impaired fish community | Assessment |
| 0704 | Hillebrandt Bayou | depressed dissolved oxygen | Assessment |
| 0803 | Lake Livingston | depressed dissolved oxygen | Assessment |
| 0803 | Lake Livingston | high pH | Assessment |
| 0805 | Upper Trinity River | chlordane in tissue | Implementation |
| 0805 | Upper Trinity River | bacteria | Assessment |
| 0805 | Upper Trinity River | PCBs in fish tissue | Assessment |
| 0806 | West Fork Trinity River below Lake Worth | bacteria | Assessment |
| 0806 | West Fork Trinity River below Lake Worth | PCBs in fish tissue | Assessment |
| 0806 | West Fork Trinity below Lake Worth | chlordane in tissue | Implementation |
| 0806A | Fosdic Lake | chlordane in tissue | Implementation |
| 0806A | Fosdic Lake | DDE in tissue | Implementation |
| 0806A | Fosdic Lake | dieldrin in tissue | Implementation |
| 0806A | Fosdic Lake | PCBs in tissue | Implementation |

| | | | |
|---|---|---|---|
| 0806B | Echo Lake | PCBs in tissue | Implementation |
| 0820C | Muddy Creek | bacteria | Assessment |
| 0823 | Lewisville Lake City of Denton | dissolved oxygen | Implementation Assessment |
| 0823A | Little Elm Creek | bacteria | Assessment |
| 0824 | Elm Fork Trinity River above Ray Roberts Lake | bacteria | Assessment |
| 0829 | Clear Fork Trinity River below Benbrook Lake | PCBs in fish tissue | Assessment |
| 0829 | Clear Fork Trinity below Benbrook Lake | chlordane in tissue | Implementation |
| 0829A | Lake Como | chlordane in tissue | Implementation |
| 0829A | Lake Como | DDE in tissue | Implementation |
| 0829A | Lake Como | dieldrin in tissue | Implementation |
| 0829A | Lake Como | PCBs in tissue | Implementation |
| 0841 | Lower West Fork Trinity River | PCBs in fish tissue | Assessment |
| 0841 | Lower West Fork Trinity River | bacteria | Assessment |
| 0841 | Lower West Fork Trinity | chlordane in tissue | Implementation |
| 0841A | Mountain Creek Lake | chlordane in tissue | Implementation |
| 0841A | Mountain Creek Lake | DDD in tissue | Implementation |
| 0841A | Mountain Creek Lake | DDE in tissue | Implementation |
| 0841A | Mountain Creek Lake | DDT in tissue | Implementation |
| 0841A | Mountain Creek Lake | dieldrin in tissue | Implementation |
| 0841A | Mountain Creek Lake | heptachlor epoxide in fish tissue | Implementation |
| 0841A | Mountain Creek Lake | PCBs in tissue | Implementation |
| 1001 | Houston Ship Channel | nickel | Implementation Assessment |
| 1005 | Houston Ship Channel / San Jacinto River Tidal | nickel | Implementation |
| 1005 | Houston Ship Channel/ San Jacinto River Tidal | dioxin in catfish and crab tissue | Assessment |
| 1006 | Houston Ship Channel Tidal | nickel | Implementation |
| 1006 | Houston Ship Channel Tidal | PCBs in fish tissue | Assessment |
| 1006 | Houston Ship Channel Tidal | dioxin in catfish and crab tissue | Assessment |
| 1006 | Houston Ship Channel Tidal | pesticides in fish tissue | Assessment |
| 1006 | Houston Ship Channel Tidal | temperature | Assessment |
| 1006 | Houston Ship Channel Tidal | chronic toxicity in sediment | Assessment |
| 1006D | Halls Bayou below US 59 | bacteria | Assessment |
| 1006E | Halls Bayou above US 59 | bacteria | Assessment |
| 1006F | Big Gulch above Tidal | bacteria | Assessment |
| 1006H | Spring Gully above Tidal | bacteria | Assessment |
| 1006I | Unnamed Tributary of Halls Bayou | bacteria | Assessment |
| 1006J | Unnamed Tributary of Halls Bayou | bacteria | Assessment |
| 1007 | Houston Ship Channel/Buffalo Bayou Tidal | nickel | Implementation Assessment |
| 1007 | Houston Ship Channel/Buffalo Bayou Tidal | PCBs in fish tissue | Assessment |
| 1007 | Houston Ship Channel/Buffalo Bayou Tidal | pesticides in fish tissue | Assessment |
| 1007 | Houston Ship Channel/Buffalo Bayou Tidal | acute toxicity in sediment | Assessment |

| 1007 | Houston Ship Channel/Buffalo Bayou Tidal | dioxin in catfish and crab tissue | Assessment |
|---|---|---|---|
| 1007B | Brays Bayou above Tidal | bacteria | Assessment |
| 1007C | Keegans Bayou above Tidal | bacteria | Assessment |
| 1007D | Sims Bayou above Tidal | bacteria | Assessment |
| 1007E | Willow Waterhole Bayou above Tidal | bacteria | Assessment |
| 1007F | Berry Bayou above Tidal | bacteria | Assessment |
| 1007G | Kuhlman Gully above Tidal | bacteria | Assessment |
| 1007H | Pine Gully above Tidal | depressed dissolved oxygen | Assessment |
| 1007H | Pine Gully above Tidal | bacteria | Assessment |
| 1007I | Plum Creek above Tidal | depressed dissolved oxygen | Assessment |
| 1007I | Plum Creek above Tidal | bacteria | Assessment |
| 1007K | Country Club Bayou above Tidal | depressed dissolved oxygen | Assessment |
| 1007K | Country Club Bayou above Tidal | bacteria | Assessment |
| 1007L | Unnamed Non-Tidal Tributary of Brays Bayou | bacteria | Assessment |
| 1007M | Unnamed Non-Tidal Tributary of Hunting Bayou | bacteria | Assessment |
| 1007N | Unnamed Non-Tidal Tributary of Sims Bayou | bacteria | Assessment |
| 1007O | Unnamed Non-Tidal Tributary of Buffalo Bayou | bacteria | Assessment |
| 1007O | Unnamed Non-Tidal Tributary of Buffalo Bayou | depressed dissolved oxygen | Assessment |
| 1007P | Brays Bayou above Tidal | bacteria | Assessment |
| 1007Q | Sims Bayou above Tidal | depressed dissolved oxygen | Assessment |
| 1007Q | Sims Bayou above Tidal | bacteria | Assessment |
| 1007R | Hunting Bayou above Tidal | bacteria | Assessment |
| 1007R | Hunting Bayou above Tidal | depressed dissolved oxygen | Assessment |
| 1008 | Spring Creek | bacteria | Assessment |
| 1009 | Cypress Creek | bacteria | Assessment |
| 1013 | Buffalo Bayou Tidal | bacteria | Assessment |
| 1013 | Buffalo Bayou Tidal | nickel | Assessment Implementation |
| 1013A | Little White Oak Bayou | depressed dissolved oxygen | Assessment |
| 1013A | Little White Oak Bayou | bacteria | Assessment |
| 1013C | Unnamed Non-Tidal Tributary of Buffalo Bayou Tidal | bacteria | Assessment |
| 1014 | Buffalo Bayou above Tidal | bacteria | Assessment |
| 1014 | Buffalo Bayou above Tidal | nickel | Assessment Implementation |
| 1014H | South Mayde Creek | bacteria | Assessment |
| 1014K | Turkey Creek | bacteria | Assessment |
| 1014M | Neimans Bayou | bacteria | Assessment |
| 1014M | Neimans Bayou | depressed dissolved oxygen | Assessment |
| 1014N | Rummel Creek | bacteria | Assessment |
| 1014O | Spring Branch | bacteria | Assessment |
| 1016 | Greens Bayou above Tidal | bacteria | Assessment |
| 1016 | Greens Bayou above Tidal | nickel | Assessment Implementation |
| 1016A | Garners Bayou | bacteria | Assessment |

| 1016B | Unnamed Tributary of Greens Bayou | bacteria | Assessment |
|---|---|---|---|
| 1016C | Unnamed Tributary of Greens Bayou | bacteria | Assessment |
| 1016D | Unnamed Tributary of Greens Bayou | bacteria | Assessment |
| 1016D | Unnamed Tributary of Greens Bayou | depressed dissolved oxygen | Assessment |
| 1017 | Whiteoak Bayou above Tidal | nickel | Assessment Implementation |
| 1017 | Whiteoak Bayou above Tidal | bacteria | Assessment |
| 1017A | Brickhouse Gully/Bayou | bacteria | Assessment |
| 1017B | Cole Creek | bacteria | Assessment |
| 1017D | Unnamed Tributary of White Oak Bayou | depressed dissolved oxygen | Assessment |
| 1017D | Unnamed Tributary of White Oak Bayou | bacteria | Assessment |
| 1017E | Unnamed Tributary of White Oak Bayou | bacteria | Assessment |
| 1101 | Clear Creek Tidal | chlordane in tissue | Implementation |
| 1101 | Clear Creek Tidal | bacteria | Implementation |
| 1101 | Clear Creek Tidal | dichloroethane in fish and crab tissue | Implementation |
| 1101 | Clear Creek Tidal | trichloroethane in tissue | Implementation |
| 1101B | Chigger Creek | bacteria | Implementation |
| 1102 | Clear Creek above Tidal | chlordane in tissue | Implementation |
| 1102 | Clear Creek above Tidal | dichloroethane in fish and crab tissue | Implementation |
| 1102 | Clear Creek above Tidal | bacteria | Implementation |
| 1102 | Clear Creek above Tidal | trichloroethane in tissue | Implementation |
| 1102A | Cowart Creek | bacteria | Assessment |
| 1102B | Mary's Creek/ North Fork Mary's Creek | bacteria | Assessment |
| 1103 | Dickinson Bayou Tidal | bacteria | Assessment |
| 1103 | Dickinson Bayou Tidal | depressed dissolved oxygen | Assessment |
| 1103A | Bensons Bayou | bacteria | Assessment |
| 1103B | Bordens Gully | bacteria | Assessment |
| 1103C | Geisler Bayou | bacteria | Assessment |
| 1103D | Gum Bayou | bacteria | Assessment |
| 1104 | Dickinson Bayou local Initiative Watershed Plan | bacteria | Assessment |
| 1113 | Armand Bayou above Tidal | dissolved oxygen | Implementation Assessment |
| 1113A | Armand Bayou above Tidal | bacteria | Assessment |
| 1202H | Allen's Creek | bacteria | Assessment |
| 1202J | Big Creek | bacteria | Assessment |
| 1205 | Lake Granbury | bacteria | Implementation Assessment |
| 1209 | Navasota River below Lake Limestone | bacteria | Assessment |
| 1209C | Carters Creek | bacteria | Assessment |
| 1209G | Cedar Creek | bacteria | Assessment |
| 1209I | Gibbons Creek | bacteria | Assessment |
| 1209I | Gibbons Creek | depressed dissolved oxygen | Assessment |
| 1209J | Shepherd Creek | bacteria | Assessment |
| 1209K | Steele Creek | bacteria | Assessment |
| 1210A | Navasota River above | bacteria | Assessment |

| | Lake Mexia | | |
|---|---|---|---|
| 1211A | Davidson Creek | bacteria | Assessment |
| 1212 | Somerville Lake | low and high pH | Assessment |
| 1212B | East Yegua Creek | bacteria | Assessment |
| 1214 | Colorado River | choloride | Assessment |
| 1214 | Colorado River | sulfate | Assessment |
| 1214 | Colorado River | total dissolved solids | Assessment |
| 1217 | Lampasas River above Stillhouse Hollow Lake | bacteria | Assessment |
| 1217A | Rocky Creek | depressed dissolved oxygen | Assessment |
| 1218 | Nolan Creek/ South Nolan Creek | bacteria | Assessment |
| 1221 | Leon River Below Proctor Lake | bacteria | Assessment |
| 1222 | Proctor Lake | depressed dissolved oxygen | Assessment |
| 1222A | Duncan Creek | bacteria | Assessment |
| 1226 | North Bosque River | orthophosphorus | Implementation |
| 1226B | Green Creek | bacteria | Assessment |
| 1226E | Indian Creek | bacteria | Assessment |
| 1226F | Sims Creek | bacteria | Assessment |
| 1227 | Nolan River | bacteria | Assessment |
| 1242 | Brazos River above Navasota River | bacteria | Assessment |
| 1242D | Thompson Creek | bacteria | Assessment |
| 1242D | Thompson Creek | depressed dissolved oxygen | Assessment |
| 1242I | Campbells Creek | bacteria | Assessment |
| 1242K | Mud Creek | bacteria | Assessment |
| 1242L | Pin Oak Creek | bacteria | Assessment |
| 1242M | Spring Creek | bacteria | Assessment |
| 1242N | Tehuacana Creek | bacteria | Assessment |
| 1242P | Big Creek | bacteria | Assessment |
| 1243 | Salado Creek | depressed dissolved oxygen | Assessment |
| 1245 | Upper Oyster Creek | depressed dissolved oxygen | Assessment |
| 1245 | Upper Oyster Creek | bacteria | Assessment |
| 1246E | Wasp Creek | bacteria | Assessment |
| 1247 | Lake Granger Watershed Plan | sediment | Assessment Implementation |
| 1247A | Willis Creek | bacteria | Assessment |
| 1248 | San Gabriel/North Fork San Gabriel River | total dissolved solids | Assessment |
| 1254 | Aquilla Reservoir | atrazine in finished drinking water | Assessment |
| 1254 | Aquilla Reservoir | atrazine in finished drinking water | Implementation |
| 1255 | Upper North BosqueRiver | orthophosphorus | Implementation |
| 1255A | Goose Branch | bacteria | Assessment |
| 1255B | North Fork Upper North Bosque River | bacteria | Assessment |
| 1255C | Scarborough Creek | bacteria | Assessment |
| 1255D | South Fork North Bosque River | bacteria | Assessment |
| 1255E | Unnamed tributary of Goose Branch | bacteria | Assessment |
| 1255F | Unnamed tributary of Scarborough Creek | bacteria | Assessment |
| 1255G | Woodhollow Branch | bacteria | Assessment |
| 1302 | San Bernard River above Tidal | bacteria | Assessment |
| 1305 | Caney Creek above Tidal | bacteria | Assessment |

| | | | |
|---|---|---|---|
| 1403 | Lake Austin | dissolved oxygen | Implementation |
| 1403A | Bull Creek | impaired macrobenthos community | Assessment |
| 1403J | Spicewood Tributary to Shoal Creek | bacteria | Assessment |
| 1403K | Taylor Slough South | bacteria | Assessment |
| 1411 | E.V. Spence Reservoir | sulfate | Implementation |
| 1411 | E.V. Spence Reservoir | total dissolved solids | Implementation |
| 1411 | E.V. Spence Reservoir | total dissolved solids | Assessment |
| 1420 | Pecan Bayou above Lake Brownwood | depressed dissolved oxygen | Assessment |
| 1421 | Concho River | impaired macrobenthos community | Implementation Assessment |
| 1422 | Lake Nasworthy | See Segments 1421 & 1425 | Implementation Assessment |
| 1423 | Twin Buttes Reservoir | See Segments 1421 & 1425 | Implementation Assessment |
| 1424 | Middle Concho/South Concho River | See Segments 1421 & 1425 | Implementation Assessment |
| 1425 | O.C. Fisher Lake | total dissolved solids | Implementation Assessment |
| 1425 | O.C. Fisher Lake | chloride | Implementation Assessment |
| 1426 | Colorado River below E. V. Spence Reservoir | chloride | Assessment |
| 1426 | Colorado River below E. V. Spence Reservoir | total dissolved solids | Assessment |
| 1427 | Onion Creek | depressed dissolved oxygen | Assessment |
| 1427A | Slaughter Creek | impaired macrobenthos community | Assessment |
| 1428C | Gilleland Creek | bacteria | Implementation |
| 1429B | Eanes Creek | bacteria | Assessment |
| 1429C | Waller Creek | impaired macrobenthos community | Assessment |
| 1604 | Lake Texana | depressed dissolved oxygen | Assessment |
| 1801 | Guadalupe River Tidal | depressed dissolved oxygen | Assessment |
| 1803A | Elm Creek | bacteria | Assessment |
| 1803B | Sandies Creek | bacteria | Assessment |
| 1803C | Peach Creek | bacteria | Assessment |
| 1806 | Guadalupe River above Canyon Lake | bacteria | Assessment |
| 1806A | Camp MeetingCreek | depressed dissolved oxygen | Assessment |
| 1901 | Lower San Antonio River | bacteria | Assessment |
| 1906 | Lower Leon Creek | bacteria | Assessment |
| 1906 | Lower Leon Creek | depressed dissolved oxygen | Assessment |
| 1908 | Upper Cibolo Creek | depressed dissolved oxygen | Assessment |
| 1910 | Salado Creek | dissolved oxygen | Implementation |
| 1910 | Salado Creek | bacteria | Assessment |
| 1910 | Salado Creek | depressed dissolved oxygen | Assessment |
| 1910A | Walzem Creek | bacteria | Assessment |
| 1911 | Upper San Antonio River | bacteria | Implementation Assessment |
| 1913 | Mid Cibolo Creek | depressed dissolved oxygen | Assessment |
| 2104 | Nueces River above Frio River | depressed dissolved oxygen | Assessment |
| 2107 | Atascosa River | bacteria | Assessment |
| 2110 | Lower Sabinal River | nitrate+nitrite nitrogen | Assessment |
| 2113 | Upper Frio River | depressed dissolved oxygen | Assessment |

| 2116 | Choke Canyon Reservoir | total dissolved solids | Assessment |
|---|---|---|---|
| 2116 | Choke Canyon Reservoir | bacteria | Assessment |
| 2117 | Frio River above Choke Canyon Reservoir | bacteria | Assessment |
| 2117 | Frio River Above Choke Canyon Reservoir | depressed dissolved oxygen | Assessment |
| 2201 | Arroyo Colorado Tidal | depressed dissolved oxygen | Implementation Assessment |
| 2201 | Arroyo Colorado Tidal | ambient toxicity in sediment | Assessment |
| 2202 | Arroyo Colorado above Tidal | organic compounds in fish tissue | Assessment |
| 2202 | Arroyo Colorado above Tidal | chlordane in tissue | Implementation |
| 2201 | Arroyo Colorado | depressed dissolved oxygen | Implementation Assessment |
| 2202 | Arroyo Colorado above Tidal | DDE in tissue | Implementation |
| 2202 | Arroyo Colorado above Tidal | other organic compounds in tissue | Implementation |
| 2202 | Arroyo Colorado above Tidal | toxaphene in tissue | Implementation |
| 2202A | Donna Reservoir | PCBs in tissue | Implementation |
| 2304 | Rio Grande below Amistad Reservoir | ambient toxicity in water | Assessment |
| 2306 | Rio Grande above Amistad Reservoir | ambient toxicity in water | Assessment |
| 2306 | Rio Grande above Amistad Reservoir | bacteria | Assessment |
| 2307 | Rio Grande below Riverside Diversion Dam | bacteria | Assessment |
| 2310 | Lower Pecos River | chloride | Implementation Assessment |
| 2310 | Lower Pecos River | sulfate | Implementation Assessment |
| 2310 | Lower Pecos River | total dissolved solids | Implementation Assessment |
| 2311 | Upper Pecos River | See Segment 2310 | Implementation Assessment |
| 2314 | Rio Grande above International Dam | bacteria | Assessment |
| 2421 | Upper Galveston Bay | bacteria (oyster waters) | Assessment |
| 2421 | Upper Galveston Bay | dioxin in catfish and crab tissue | Assessment |
| 2422 | Trinity Bay | bacteria (oyster waters) | Assessment |
| 2423 | East Bay | bacteria (oyster waters) | Assessment |
| 2424 | West Bay | bacteria (oyster waters) | Assessment |
| 2424A | Highland Bayou | bacteria | Assessment |
| 2424A | Highland Bayou | depressed dissolved oxygen | Assessment |
| 2424C | Marchand Bayou | depressed dissolved oxygen | Assessment |
| 2424C | Marchand Bayou | bacteria | Assessment |
| 2425 | Robinson Bayou | bacteria | Implementation |
| 2425B | Jarbo Bayou | bacteria | Assessment |
| 2425C | Robinson Bayou | bacteria | Assessment |
| 2426 | Tabbs Bay | nickel | Implementation Assessment |
| 2426 | Tabbs Bay | bacteria | Assessment |
| 2426 | Tabbs Bay | dioxin | Assessment |
| 2427 | San Jacinto Bay | dioxin | Assessment |
| 2428 | Black Duck Bay | dioxin | Assessment |
| 2428 | Black Duck Bay | nickel | Assessment Implementation |

| | | | |
|---|---|---|---|
| 2429 | Scott Bay | bacteria | Assessment |
| 2429 | Scott Bay | dioxin | Assessment |
| 2429 | Scott Bay | nickel | Assessment Implementation |
| 2430 | Burnett Bay | dioxin | Assessment |
| 2430 | Burnett Bay | nickel | Assessment Implementation |
| 2432 | Chocolate Bay | bacteria (oyster waters) | Assessment |
| 2436 | Barbours Cut | dioxin | Assessment |
| 2436 | Barbours Cut | nickel | Assessment Implementation |
| 3438 | Bayport Channel | dioxin | Assessment |
| 2439 | Lower Galveston Bay | bacteria (oyster waters) | Assessment |
| 2441 | East Matagorda Bay | bacteria (oyster waters) | Assessment |
| 2442 | Cedar Lakes | bacteria (oyster waters) | Assessment |
| 2451 | Matagorda Bay/Powderhorn Lake | bacteria (oyster waters) | Assessment |
| 2451 | Matagorda Bay/Powderhorn Lake | depressed dissolved oxygen | Assessment |
| 2452 | Tres Palacios Bay/Turtle Bay | bacteria (oyster waters) | Assessment |
| 2452 | Tres Palacios Bay/Turtle Bay | depressed dissolved oxygen | Assessment |
| 2453 | Lavaca Bay/Chocolate Bay | depressed dissolved oxygen | Assessment |
| 2453 | Lavaca Bay/Chocolate Bay | mercury in water | Assessment |
| 2453 | Lavaca Bay/Chocolate Bay | bacteria (oyster waters) | Assessment |
| 2453 | Lavaca Bay/Chocolate Bay | mercury in fish and crab tissue | Assessment |
| 2456 | Carancahua Bay | high pH | Assessment |
| 2456 | Carancahua Bay | depressed dissolved oxygen | Assessment |
| 2456 | Carancahua Bay | bacteria (oyster waters) | Assessment |
| 2462 | San Antonio Bay/Hynes Bay/Guadalupe Bay | bacteria (oyster waters) | Assessment |
| 2472 | Copano Bay/Port Bay/Mission Bay | bacteria (oyster waters) | Assessment |
| 2482 | Nueces Bay | zinc in oyster tissue | Assessment |
| 2482 | Nueces Bay | selenium | Assessment |
| 2483A | Oso Creek | depressed dissolved oxygen | Assessment |
| 2485 | Oso Bay | depressed dissolved oxygen | Implementation Assessment |
| 2491 | Laguna Madre | depressed dissolved oxygen | Assessment |
| 2501 | Gulf of Mexico | mercury in king mackerel > 43 inches | Assessment |
| 2501 | Gulf of Mexico | depressed dissolved oxygen | Assessment |

*Groundwater*

***Table B.2  Priority Water Bodies - Groundwater***

| Aquifer | Region | Constituent(s) of Concern | Implementation or Assessment? |
|---|---|---|---|
| Edward (BFZ) | Central Texas | Vulnerability | Implementation Assessment |
| Cenezoic Pecos Alluvium | West Texas | Nitrate, Chloride, Sulfate, and TDS | Assessment |
| Edwards Trinity (Plateau) | Terrell, Reagan, and Crockett Counties | Nitrate | Assessment |
| Ogallala | Southern High Plains, Panhandle | Nitrate | Assessment |
| Gulf Coast | Rio Grande Valley | Nitrate, Iron, TDS | Assessment |
| Seymour | North Central | Nitrate, Vulnerability | Assessment |
| Blaine | North Central | Nitrate, Chloride, Iron, Sulfate, TDS | Assessment |
| Lipan | Concho, Runnels, Tom Green, and Coke Counties | Nitrate, Chloride, TDS | Assessment |
| Bone Spring-Victorio Peak | Far West Texas | Nitrate, Chloride, Fluoride, Sulfate, TDS | Assessment |
| Trinity | Central Texas North - Outcrop Area Only | Nitrate | Assessment |
| Dockum | Panhandle, West Texas - Outcrop Area Only | Nitrate | Assessment |
| Edwards-Trinity (High Plains) | Southern High Plains | Nitrate | Assessment |
| Marathon | Big Bend Area | Nitrate | Assessment |
| Capitan Reef | West Texas | Chloride, Dissolved Solids, Radioactivity | Assessment |
| Hickory | Llano Uplift | Radioactivity | Assessment |
| Hueco - Mesilla | Far West Texas | Sulfate | Assessment |
| Brazos River Alluvium | Southeast Texas | Iron, Manganese | Assessment |
| Rustler | Culberson, Reeves Counties | Iron, Sulfate, TDS, Radioactivity | Assessment |

# APPENDIX C
# OVERVIEW OF CURRENT PRIORITY WATERSHEDS, MILESTONES, AND ESTIMATED TIMELINES

## *Priority Water Body Summary*

*The Milestone Summary Table presents an overview of estimated completion times for milestones on Texas' priority waterbodies. The individual tables for priority waterbodies, which follow the Milestone Summary Table, provide similar information but in greater detail.*

*Milestones:*

*A.* **Stakeholder Group** *-Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.*

*B.* **Data Review** *-Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.*

*C.* **Targeted Assessment** *-Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.*

*D.* **Modeling** *-Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.*

*E.* **Action Plan** *-Develop a detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.*

*F.* **Implementation** *-Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.*

**Table C.1. Milestone Summary Table**

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Assessing AquaticLife Use in Tidal Streams | Targeted Assessment | Modeling | Action Plan | | | |
| Aquilla Reservoir | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Armand Bayou Local Initiative Watershed Plan | Implementation | Implementation | Implementation | Action Plan / Implementation | Implementation | Implementation |
| Arroyo Colorado-D.O. | Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation | Implementation |
| Arroyo Colorado Legacy Pollutants | Implementation | Targeted Assessment / Implementation | Implementation | Implementation | Targeted Assessment / Implementation | Implementation |
| Brandy Branch Reservoir | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Buck Creek | Implementation | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Buffalo and White Oak Bayous | Data Review / Targeted Assessment | Action Plan | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Cedar Lake | Implementation | Stakeholder Group / Targeted Assessment / Modeling | Implementation | Action Plan / Implementation | Implementation | Implementation |
| City of Denton Watershed Plan (Hickory Creek) | Stakeholder Group / Data Review | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Clear Creek Legacy and VOC Pollutants | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment |
| | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Clear Creek Watershed | Implementation | Implementation | Implementation | Targeted Assessment | Implementation | Implementation |
| | | | | Implementation | | |
| Clear Fork of the Trinity | | Action Plan | | | | |
| Coastal Bend Bays Plan | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Colorado and San Gabriel Rivers, Brushy and Petronilla Creeks | Modeling | Implementation | Action Plan | Implementation | Implementation | Implementation |
| | Implementation | | Implementation | | | |
| Concho River Basin | Stakeholder Group | Targeted Assessment | Action Plan | Implementation | Implementation | Implementation |
| | Data Review | Implementation | Implementation | | | |
| Copano Bay Oysters | Implementation | Stakeholder Group | Implementation | Implementation | Implementation | Implementation |
| | | Modeling | | | | |
| | | Action Plan | | | | |
| | | Implementation | | | | |
| Dallas Legacy Pollutants | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment |
| | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Dickinson Bayou | Modeling | Action Plan | Implementation | Implementation | Implementation | Implementation |
| | | Implementation | | | | |

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| E.V. Spence | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Fort Worth Legacy Pollutants | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment |
| | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Galveston Bay Plan | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Gilliand Creek | Implementation | Stakeholder Group / Modeling / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Guadalupe above Canyon | Implementation | Stakeholder Group / Modeling / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Gulf Coast Oyster Waters | Action Plan / Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Houston Ship Channel Dioxin Study | Modeling / Implementation | Modeling / Implementation | Action Plan / Implementation | Action Plan / Implementation | Implementation | Implementation |
| Houston Ship Channel Nickel Study | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Lake Austin | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Lake Granbury | Stakeholder Group / Data Review | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| Lake Granger Watershed Plan | Stakeholder Group / Implementation | Stakeholder Group / Implementation | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation |
| Lake 'O the Pines | Action Plan / Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Lavaca and Chocolate Bays | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Little Wichita | Stakeholder Group / Data Review | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Martin Creek Reservoir | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Matagorda Bay / Tres Palacios Bay | Implementation | Stakeholder Group / Modeling / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Middle Brazos River Basin | Modeling / Action Plan | Implementation | Implementation | Implementation | Implementation | Implementation |
| North Bosque River | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| Nueces Bay Zinc Project | Implementation | Action Plan / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Orange County | Modeling / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation | Implementation |

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|-----------|------|------|------|------|------|------|
| Oso Bay | Targeted Assessment / Modeling | Modeling / Action Plan | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Oso Creek and Oso Bay | Implementation | Stakeholder Group / Data Review / Targeted Assessment / Modeling | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Pecos Watershed Plan | Stakeholder Group / Data Review | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| Sabinal River | Implementation | Stakeholder Group / Targeted Assessment / Modeling | Implementation | Action Plan / Implementation | Implementation | Implementation |
| Salado Creek | Implementation | Implementation | Implementation | Implementation | Implementation | Implementation |
| San Antonio River Authority | Stakeholder Group / Data Review | Targeted Assessment / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| San Antonio River Basin, Leon River, and Peach Creek | Modeling / Implementation | Modeling / Implementation | Action Plan / Implementation | Implementation | Implementation | Implementation |
| South Central Texas | Modeling / Action Plan | Implementation | Implementation | Implementation | Implementation | Implementation |

| Waterbody | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| *Tarrant Regional Water District Watershed Plans* | Stakeholder Group | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment | Targeted Assessment |
| | Data Review | Implementation | Action Plan | Implementation | Implementation | Implementation |
| | Targeted Assessment | | Implementation | | | |
| | Modeling | | | | | |
| | Implementation | | | | | |
| *Trinity River* | Implementation | Stakeholder Group | Action Plan | Implementation | Implementation | Implementation |
| | | Modeling | Implementation | | | |
| *Upper Oyster Creek* | Targeted Assessment | Targeted Assessment | Action Plan | Implementation | Implementation | Implementation |
| | Modeling | Modeling | Implementation | | | |
| *Welsh Reservoir* | | Implementation | Implementation | Implementation | Implementation | Implementation |

*Table C.2. Individual Priority Waterbody Tables*

### Armand Bayou Local Initiative Watershed Plan-*dissolved oxygen*
### Segment 1113

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1997)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1997)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(1999)-no aquatic life impairment found* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | *projected completion* | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

*Assessing Aquatic Life Use in Tidal Streams* -*dissolved oxygen*
*Segments 0511, 1501, 2453A*

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2004)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | *X* | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | *UAA to be developed* | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | *X* | *X* | *X* | *X* | *X* |

***Aquilla Reservoir -****Atrazine*
***Segment 1254***

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1998)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1998)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2000)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *TMDL - (2002)* | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *WQS met - routine monitoring continues* | *X* | *X* | *X* | *X* | *X* | *X* |

## *Arroyo Colorado* -dissolved oxygen
## Segment 2201

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1998)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1998)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2000)* | *X* | *X* | *X* | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *Standards unattainable* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *X* | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2000)* | *X* | *X* | *X* | *X* | *X* | *X* |

***Arroyo Colorado Legacy Pollutants*** *-DDE, DDT, DDD, Dieldrin, Endrin, Lindane, Hexachlorobenzene, Heptachlor, Heptachlor Epoxide, Chlordane, Toxaphene, PCBs*
***Segments 2201, 2202, 2202A***

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1998)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1998)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(1999)* | | *tissue samples* | | | *tissue samples* | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *(1999)* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *TMDL - (2001) revised-2003* | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(1998)* | *X* | *X* | *X* | *X* | *X* | *X* |

## Brandy Branch Reservoir -selenium
## Segment 0505E

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2001) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2001) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | advisory rescinded (2004) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | proposed delisting | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

***Buck Creek*** *-bacteria*
**Segments 0207A**

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | **(2003)** | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality* | **(2003)** | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | *X* | | | |
| *Develop and apply  model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *X* | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of  effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

## Buffalo and Whiteoak Bayous *-bacteria*
## Segments 1013, 1014, 1017

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2000) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2001) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | X | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | X | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | TMDL | IP | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | | | X | X | X | X |

***Cedar Lake****- bacteria*
***Segments 2442***

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | X | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | X | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

### City of Denton Watershed Plan (Hickory Creek) -bacteria
### Segment 0823

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | | X | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | | projected completion | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | | projected completion | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | projected completion | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

### Clear Creek Legacy and VOC Pollutants -*chlordane, trichloroethane, dichloroethane Segments 1101, 1102*

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1998) Technical Advisory Committee for VOCs* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2000)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2001)* | *tissue samples 2000-2005* | *con'td. sampling* | *X* | *X* | *X* | *X* |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *TMDL - 2001* <br> *IP- 2003* | *poss. revision if samples show no decline* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2001)* | *X* | *X* | *X* | *X* | *X* | *X* |

## Clear Creek Watershed - *total dissolved solids, bacteria*
## Segment 1101, 1101B, 1102, 1102A, 1102B, 2425

| *Milestones* | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *2003* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | | *X* | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | *X* | *X* | *X* | *X* | *X* |

## Clear Fork of the Trinity River *-dissolved oxygen*
## Segments 0831, 0833

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2000)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2000)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2001)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *UAA being developed* | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | | | | | |

### Coastal Bend Bays Plan

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | *(1998)* | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | *(1998)* | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | *Ongoing* | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | *(1998)* | | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | *(1998)* | X | X | X | X | X | X |

### Colorado and San Gabriel Rivers, Brushy and Petronilla Creeks -chloride, sulfate, total dissolved solids (TDS)
### Segments1214, 1244, 1426, 2204

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2002) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2003) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2004) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | X | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | X | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | (2002) | X | X | X | X | X | X |

**Concho River Basin** *- impaired macrobenthos community, chloride, total dissolved solids*
**Segments 1421, 1422, 1423, 1424, 1425**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | *X* | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | *projected completion* | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | *projected completion* | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *projected completion* | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

***Copano Bay Oysters*** *- bacteria*
***Segments 2472***

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | X | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

**Dallas Legacy Pollutants** - *chlordane, DDT, DDD, DDE, Dieldrin, Heptachlor Epoxide, PCBs*
**Segments 805, 841, 841A**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2000)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2000)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2000)* | *tissue samples 2000-2005* | *con't. sampling* | *X* | *X* | *X* | *X* |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *TMDL - (2001)* | *poss. revision if samples show no decline* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2001)* | *X* | *X* | *X* | *X* | *X* | *X* |

## Dickinson Bayou -*dissolved oxygen*
## Segment 1103

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2000)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2001)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2004)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *(2004)* | *new model* | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | *X* | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | *X* | *X* | *X* | *X* | *X* |

### E.V. Spence -*sulfate, total dissolved solids*
### Segment 1411

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1999)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1998)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2000)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *TMDL - (2003)* | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2001)* | *X* | *X* | *X* | *X* | *X* | *X* |

## Ft. Worth Legacy Pollutants *-chlordane, DDE, Dieldrin, PCBs*
## Segments 806, 806A, 806B, 829, 829A

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *omitted* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2000)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2000)* | *tissue samples 2000-2005* | *con'td sampling* | *X* | *X* | *X* | *X* |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *(2001)* | *poss. revision if samples show no decline* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2001)* | *X* | *X* | *X* | *X* | *X* | *X* |

### *Galveston Bay Plan*- *bacteria*
### *Segment*

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1994)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1994)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *Ongoing* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | *(1994)* | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(1994)* | *X* | *X* | *X* | *X* | *X* | *X* |

## Gilleland Creek - bacteria
## Segment 1428C

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | | | X | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | X | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | X | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

***Guadalupe above Canyon*** *- bacteria*
**Segment 1806**

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | | | | |
| *Develop and apply  model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | X | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of  effectiveness.* | | X | X | X | X | X | X |

## Gulf Coast Oyster Waters -*bacteria*
## Segments 2421, 2422, 2423, 2424, 2432, 2439, 2441, 2442, 2451, 2452, 2453, 2456, 2462, 2472

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2001) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2002) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2002) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | (2003) | BST to be completed | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | X | X | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

## Houston Ship Channel *-dioxin*
## Segments 0901,1001, 1005, 1006, 1007, 2421, 2426, 2427, 2428, 2429, 2430, 2436, 2438

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2000)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2001)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | *X* | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | *X* | *X* | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *TMDL* | *IP* | | |
| *Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

### Houston Ship Channel -nickel
### Segments 1001, 1005, 1006, 1007, 1013, 1014, 1016, 1017, 2426, 2427, 2428, 2429, 2430, 2436

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (1999) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (1990) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (1998) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | (1998) | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | (2001) TMDL (2003) IP | | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

### Lake Austin-dissolved oxygen
### Segment 1403

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (1999) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (1999) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2000) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | omitted | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | EPA recommendation to delist (2001) | | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | (2001) | X | X | X | X | X | X |

*Lake Granbury- bacteria*
*Segments 1205*

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | X | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | *projected completion* | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | *projected completion* | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | *projected completion* | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

## Lake Granger Watershed Plan-*sediment*
## Segments 1247

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | | X | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | | | | projected completion | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | | | | projected completion | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | | projected completion | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

## Lake O'the Pines *-dissolved oxygen*
## Segment 0403

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(1998)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(1999)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2002)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *(2003)* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | *X* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(1999)* | *X* | *X* | *X* | *X* | *X* | *X* |

### *Lavaca and Chocolate Bays* -*mercury and dissolved oxygen*
### *Segment 2453*

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2001)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2002)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2003)- indicated TMDL not necessary* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | *omitted* | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | *proposed delisting* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2001)* | *X* | *X* | *X* | *X* | *X* | *X* |

**Little Wichita**- *dissolved oxygen, total dissolved solids*
**Segments 0211, 0212**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | *X* | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | *projected completion* | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | *projected completion* | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *projected completion* | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

TCEQ/TSSWCB joint publication SFR-68/04

### Martin Creek Reservoir -selenium
### Segment 0505F

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2001) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2001) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | advisory rescinded (2004) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | proposed delisting | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

*Matagorda Bay / Tres Palacios Bay - dissolved oxygen*
*Segments 2451, 2452, 2456, 2483A*

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | X | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

### Middle Brazos River Basin -dissolved oxygen
### Segments 1217A, 1243

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | omitted | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2001) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2004) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | X | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | X | X | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | (1999) | X | X | X | X | X | X |

### North Bosque River -nutrients
### Segments 1226, 1255

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (1995) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (1996) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2000) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | (2000) | | | X | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | (2001) | | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | (2002) | X | X | X | X | X | X |

## Nueces Bay Zinc Project -selenium, zinc
## Segment 2482

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2001) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2002) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2003) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | (2004) | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | TMDL | IP | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | (2002) | X | X | X | X | X | X |

***Orange County** -bacteria, dissolved oxygen, pH*
***Segment 0511, 0511A***

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2002)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2002)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2004)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | *X* | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | *X* | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | *(2003)* | *X* | *X* | *X* | *X* | *X* | *X* |

### Oso Bay -dissolved oxygen
### Segments 2485, 2491

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2000) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2000) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | X | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | X | X | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | X | X | | | |
| Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of effectiveness. | (1999) | X | X | X | X | X | X |

## Oso Creek, Oso Bay - *Bacteria*
## Segment 2485, 2485A

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | X | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | X | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | X | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

**Pecos Watershed Plan** - *chloride, sulfate, and total dissolved solids*
**Segment_s 2310, 2311**

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | X | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | projected completion | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | projected completion | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | projected completion | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

**Sabinal River -** *nitrate-nitrite*
**Segment 2110**

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | X | | | | |
| *Develop and apply  model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | X | | |
| *Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of  effectiveness.* | | X | X | X | X | X | X |

## Salado Creek -dissolved oxygen
## Segment 1910

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (1998) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (1998) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2000) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation | (2001) | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | TMDL - (2002) | | | | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | IP was determined unnecessary | X | X | X | X | X | X |

## San Antonio River Authority- *bacteria*
## Segment 1911

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | | X | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | | projected completion | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | | | projected completion | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | | | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | projected completion | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

### San Antonio River Basin, Leon River, and Peach Creek -bacteria
### Segments 1221, 1803C, 1901, 1910, 1910A, 1911

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process. | (2003) | | | | | | |
| Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality. | (2001) | | | | | | |
| Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants. | (2004) | | | | | | |
| Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation. | | X | X | | | | |
| Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results. | | | | X | | | |
| Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness. | | X | X | X | X | X | X |

**South Central Texas** *-bacteria, dissolved oxygen*
**Segment 1427, 1806A, 1803A, 1803B, 2107, 2104, 2113, 1906, 1913, 1908**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2002)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2001)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *(2004)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | *X* | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | *X* | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | *X* | *X* | *X* | *X* | *X* | *X* |

## Tarrant Regional Water District Watershed Plans

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | X | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | X | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | X | X | X | X | X | X |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | X | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | projected completion | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | X | X | X | X | X | X |

**Trinity River** *-bacteria*
**Segments 0805**

| Milestones | completed | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | X | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | | | | | | |
| *Develop and apply  model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | | X | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP)  which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | X | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust  the BMP implementation based on follow-up verification monitoring of  effectiveness.* | | X | X | X | X | X | X |

***Upper Oyster Creek*** *-dissolved oxygen, bacteria*
**Segment 1245**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | *(2001)* | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | *(2002)* | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | | *X* | *X* | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | *X* | *X* | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | *X* | *X* | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | | *X* | *X* | *X* | *X* |

**Welsh Reservoir** - *selenium*
**Segment 404D**

| *Milestones* | *completed* | *2005* | *2006* | *2007* | *2008* | *2009* | *2010* |
|---|---|---|---|---|---|---|---|
| *Employ or develop a Local Watershed Committee to solicit input and encourage the participation of affected stakeholders in the decision-making process.* | | | | | | | |
| *Complete the assessment of pollutant problems by reviewing existing water quality data, conducting an inventory of point / nonpoint sources, land use data, and all known stressors influencing water quality.* | | | | | | | |
| *Complete water quality monitoring. Analyze data, assess loadings, and determine the origin and distribution of pollutants.* | *advisory rescinded (2004)* | | | | | | |
| *Develop and apply model(s) to determine numerical load allocations. Recommend control strategies for implementation.* | | *proposed delisting* | | | | | |
| *Develop A detailed action plan (TMDL, IP, or WPP) which establishes overall goals and objectives, load allocations, strategy for load allocation, timetable for implementation, and a list of expected results.* | | | | | | | |
| *Implement voluntary and regulatory actions in the watershed and adjust the BMP implementation based on follow-up verification monitoring of effectiveness.* | | | *X* | *X* | *X* | *X* | *X* |

# APPENDIX D  AQUIFER VULNERABILITY RANKING SYSTEM

*DRASTIC: A Standardized System for Evaluating Groundwater Pollution Potential Using Hydrogeologic Settings (EPA/600/2-87/035 June 1987).*

*DRASTIC is an acronym composed of letters for each of the measurable parameters for which data are generally available from a variety of reference sources, including the Texas Water Development Board, Natural Resource Conservation Service, Bureau of Economic Geology, USGS and others. These parameters are called DRASTIC factors, and include:*

*D - **D**epth to water*
*R - net **R**echarge*
*A - **A**quifer media*
*S - **S**oil media*
*T - **T**opography*
*I - **I**mpact of the vadose zone media*
*C - hydraulic **C**onductivity of the aquifer*

*In the DRASTIC methodology, each of these factors has a "range" and associated "rating" - for example, Depth to water has the following ranges and ratings:*

| Range | Rating |
|-------|--------|
| 0-5 feet | 10 |
| 5-15 feet | 9 |
| 15-30 feet | 7 |
| 30-50 feet | 5 |
| 50-75 feet | 3 |
| 75-100 feet | 2 |
| 100+ feet | 1 |

*As is evident, the "rating" has a higher numeric value for a shallower depth to water.*

*Net Recharge has a "range" based on inches of infiltration.*

*Aquifer media has a "range" based on rock type, as is Impact of vadose zone material. Soil media is similarly based on soil type.*

*Topography's range is based on percent slope.*
*The range for hydraulic Conductivity is based on gallons per day per square foot.*

*The "ratings" are then multiplied by an assigned "weight" for each of the factors - for Depth to water, the assigned "weight" is 5. For Topography, the assigned "weight" is 1. These "weights" are for a pollution potential from general, industrial, and municipal sources. The factors receive a different set of assigned "weights" for pollution potential from agricultural sources. Factor "weights" may also be based on the best professional judgement of a geo-scientist doing the analysis.*

*Factor "ratings", multiplied by their assigned "weights", are then added together to yield a DRASTIC index, a numerical indicator of an aquifer's relative susceptibility to impacts from surface activities in a given location. More information may be obtained from the publication referenced at the top of this section.*

**Table D.1  Aquifer Vulnerability Ranking**

| Major Aquifers | Average Drastic Index | Vulnerability Rank * |
|---|---|---|
| Seymour | 144 | High |
| Edwards (Balcones Fault Zone - San Antonio) | 135 | High |
| Edwards (Balcones Fault Zone - Austin) | 126 | High |
| Carrizo-Wilcox | 117 | Medium |
| Edwards-Trinity (Plateau) | 107 | Medium |
| Ogallala (South) | 99 | Medium |
| Gulf Coast | 95 | Medium |
| Trinity | 95 | Medium |
| Cenzoic Pecos Alluvium | 95 | Medium |
| Ogallala (North) | 87 | Low |
| Hueco-Mesilla Bolson | 84 | Low |
| **Minor Aquifers** | **Average Drastic Index** | **Vulnerability Rank *** |
| Brazos River Alluvium | 144 | High |
| Ellenberger-San Saba | 126 | High |
| Marble Falls | 126 | High |
| Hickory | 114 | Medium |
| Nacatoch | 111 | Medium |
| Blossom | 109 | Medium |
| Queen City | 108 | Medium |
| Lipan | 108 | Medium |
| Rustler | 106 | Medium |
| Blaine | 102 | Medium |

| Minor Aquifers | Average Drastic Index | Vulnerability Rank * |
|---|---|---|
| Bone Springs-Victorio Peak | 100 | Medium |
| Capitan Reef Complex | 98 | Medium |
| Sparta | 98 | Medium |
| Marathon | 96 | Medium |
| West Texas Bolsons | 90 | Low |
| Edwards-Trinity (High Plains) | 83 | Low |
| Rita Blanca | 83 | Low |
| Woodbine | 82 | Low |
| Igneous | 79 | Low |
| Dockum | 78 | Low |
| Yegua-Jackson | Not Available | Not Available |

# APPENDIX E   THE HISTORY OF NONPOINT SOURCE MANAGEMENT

*The need to protect the environment from nonpoint source pollution has resulted in the creation of a number of pollution control laws, regulations, and programs over the past 30 years. The implementation of these programs takes place at all levels - federal, state, and local. This Appendix presents a historical overview of some of the major legislation and programs that have been implemented to address nonpoint source pollution.*

## Clean Water Act of 1972

*The Clean Water Act (CWA) of 1972 forms the basis for water quality protection for surface water as well as groundwater. It was enacted as a series of amendments to the Federal Water Pollution Control Act of 1948. The 1972 Act was prompted by the worsening state of America's rivers and several high-profile oil spills. The stated objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  The Act instituted a national program for cleaning up the nation's waters and required state programs be put in place to achieve the water quality goals. The statute employed a variety of regulatory and nonregulatory tools to reduce pollutant discharges into waterways, finance municipal wastewater treatment, and manage polluted runoff.*

*Congress did not directly regulate nonpoint source pollution in the original 1972 Act. Instead, early efforts at nonpoint source management were relegated to state and local governments through general area-wide waste management planning conducted under §208 of the CWA. Under the 208 program, state governors designated local management authorities for areas with waste treatment problems. These local authorities, in turn, engaged in comprehensive area-wide waste treatment planning. The Plans were primarily devoted to treatment works, but were also to take account of various nonpoint sources of pollution, including agricultural, silvicultural, mine-related, and construction related sources. §208  provided cost share funds to those areas of States which had approved waste management plans.*

*In the late 1970's, initial Water Quality Management Plans for Texas were prepared by the Texas Department of Water Resources (now the TCEQ) under the provisions of §208. These plans contained an assessment of NPS pollution conditions in each of the classified waters in Texas. Based primarily on these assessments, some fifteen individual NPS-related studies were conducted over a period of three years.*

*During the development of these initial Plans, two executive orders were issued to delineate the responsibilities of the two principle agencies involved with nonpoint source controls in the State of Texas. In 1979, the Texas Department of Water Resources was designated the State agency responsible for coordinating §208 planning, while the Texas State Soil and Water Conservation Board (TSSWCB) was designated as the planning agency responsible for identifying management strategies for agricultural and silvicultural nonpoint sources of pollution.*

## National Urban Runoff Program

*For many years following the passage of the CWA, EPA and the states focused pollution control efforts mainly on regulating discharges from traditional "point source" facilities, such as municipal sewage plants and industrial facilities. These dischargers were considered the primary contributors to poor water quality conditions. However, as better point source control measures were developed, it became evident that more diffuse sources of water pollution were also contributing to water quality problems.*

*The National Urban Runoff Program (NURP) was developed by EPA in 1978 as a five-year program to obtain data on control of urban runoff quality and its impact on receiving waters. Between 1978 and 1983, NURP conducted studies that evaluated outfalls in 28 communities across the United States. These studies confirmed that contaminants contained in urban and suburban runoff, such as sediments, phosphorus, nitrates, coliform bacteria, as well as lead, and other heavy metals, impaired water quality in streams, lakes, wetlands, and estuaries. The data also showed that runoff from urban and industrial areas contained significant quantities of the same types of regulated pollutants that are found in wastewater and industrial discharges.*

## National Pollutant Discharge Elimination System

*To address the problem of stormwater runoff, Congress amended the Clean Water Act in 1987 to include urban stormwater discharges as a "point source," requiring the EPA to develop permit requirements for urban stormwater discharges even though the actual source of the pollution is from nonpoint sources. The National Pollutant Discharge Elimination System (NPDES) law was promulgated as a two-phase program. Phase One, implemented in 1990, addressed construction, industrial, and municipal discharges in cities with populations over 100,000. Phase Two for all municipalities under 100,000 became effective in 2003. The TCEQ assumed delegation of the Federal NPDES program (now known as TPDES) in September 1998.*

## Rural Clean Water Program

*In 1980, Congress established an experimental program to address agricultural nonpoint source pollution. The experiment was called the Rural Clean Water Program (RCWP). The RCWP combined land treatment and water quality monitoring to document the effectiveness of NPS pollution control measures.*

*Twenty-one experimental RCWP projects were selected throughout the country, representing a wide range of pollution problems and impaired water uses. Each of the projects involved the implementation of best management practices (BMPs) to reduce NPS pollution and water quality monitoring to evaluate the effects of the land treatment. BMP installation was targeted to land areas or sources of NPS pollutants identified as having significant impacts on the impaired or threatened water resource. Cost-share funds and technical assistance were offered to producers as incentives for*

*using or installing BMPs. The RCWP was administered by the U.S. Department of Agriculture in consultation with the U.S. Environmental Protection Agency.*

*The RCWP projects made significant contributions to the body of knowledge about NPS pollution, NPS pollution control technology, agricultural NPS pollution monitoring design and data interpretation, and the effectiveness of voluntary cost-share programs designed to assist producers in reducing agricultural NPS pollution. The RCWP program was phased out by 1990.*

*The 1987 Clean Water Act Amendment: Nonpoint Source Management*

*In 1987 Congress amended the 1972 Clean Water Act by adding §319. This amendment was the first concerted effort by the federal government to address pollution from nonpoint sources. §319 established a national policy requiring states to develop and implement programs for the control of nonpoint source pollution. The new §319 created a two step process for nonpoint source management. States first had to submit to EPA a report that identifies waters within the state that, without additional action to control nonpoint sources of water pollution, cannot reasonably be expected to attain or maintain applicable water quality standards or the goals and requirements of the Clean Water Act. States then had to submit a nonpoint source management program to the EPA for approval. In addition, §319 provided for continuing federal monitoring of state nonpoint source progress through annual reports to EPA, and EPA's annual reports to Congress.*

*Initially, the Texas Water Commission (predecessor to TCEQ) was given the authority to administer the §319 Nonpoint Source program for the State of Texas, and used its authority to provide federal funds to a small number of planning agencies and river authorities across the state. In response to the 1987 Amendment, the Commission completed its initial NPS Pollution Assessment Report and Management program in 1989, and prepared the first program update in 1991.*

*As part of the public participation process, the Texas Water Commission convened a 27 member panel representing industry, agriculture, environmental groups, and government from diverse areas of the state to recommend a program to reduce nonpoint source pollution in Texas. The group's initial meeting was held on March 30, 1989. The committee established three specialized subcommittees–Education, Monitoring & Database, and Best Management Practices –reflecting the major emphases and worked 16 months to produce a set of fourteen recommendations. The recommendations ranged from development of a BMP technical manual to enforcement activities and public education. The Funding Subcommittee recommended funding requirements of $3.6 million to implement the program and recommended the Commission seek to implement the entire recommendation package. Specific methods for funding were not identified in order to allow the Commissioners flexibility in identifying funding sources. All fourteen recommendations were adopted by the TWC.*

*In 1993, the Texas Legislature authorized the Texas State Soil and Water Conservation Board to implement voluntary programs to assist agricultural and silivicultural*

*producers to meet the state's water quality goals and standards. As a result of TSSWCB's new authority, the EPA began to award half of the annual Texas §319(h) grant allotment directly to the TSSWCB, with the other half awarded to the Texas Natural Resource Conservation Commission (renamed the Texas Commission on Environmental Quality in 2002.) The TSSWCB and TCEQ coordinate the §319 program for the State of Texas according to the terms of a Memorandum of Agreement executed in 1993 between the two agencies.*

*In 1996, the State of Texas initiated preparation of the second update to the State's Nonpoint Source Management Program which was approved by EPA in February 2000. The document was a collaborative effort between the TCEQ and the TSSWCB and was designed to complement the TMDL process underway in Texas.*

*Recent grant guidelines under §319 reflect the growing recognition that strategies built on specific watershed conditions are more effective at controlling nonpoint source than approaches based on jurisdictional roles of municipalities, counties, and states. Under the watershed approach, equal emphasis is placed on protecting healthy waters and restoring impaired ones. Involvement of stakeholder groups in the development and implementation of strategies for achieving and maintaining water quality goals will become an integral part of future nonpoint source management under the §319 PROGRAM.*

## CLEAN WATER ACTION PLAN

*A major enhancement to the §319 grant program came about in 1998 through the EPA's and USDA's Clean Water Action Plan (CWAP). In his 1998 State of the Union Address, President Bill Clinton announced a new Clean Water Initiative to speed the restoration of the nation's waterways. This new initiative aimed to achieve clean water by strengthening public health protections, targeting community-based watershed protection efforts at high priority areas, and providing communities with new resources to control polluted runoff.*

*The CWAP emphasized four tools in achieving water quality: (1) a watershed approach to water pollution; (2) stronger federal and state water quality standards; (3) better natural resource stewardship for cropland, pasture, rangeland, and forests; and (4) better information for citizens and government officials. All of these tools affect nonpoint source pollution control and incorporate federal and state or local measures. In conjunction with the plan, the CWAP initiative was budgeted additional funds by Congress for water pollution control. §319 nonpoint source control programs received $200 million of additional funding, known as incremental funding, and NOAA received a new allocation to control polluted runoff and toxic contaminants. Since award of the first incremental funds in 1999, Congress has budgeted both base and incremental grant funding to EPA and the States for control of nonpoint source pollution.*

## Total Maximum Daily Load Program

*The 1972 Clean Water Act did provide another mechanism for addressing nonpoint source pollution through §303. This Section required states to set ambient water quality standards for all water bodies within the state and identify the beneficial uses of each water body. In 1985 and 1992, EPA issued rules for implementing §303(d) under which States were required to identify those waters not meeting water quality standards; prioritize those waters; and set Total Maximum Daily Loads, or TMDLs, of pollutants for each such waterbody in order of priority. The TMDL process was designed to address load allocations for nonpoint sources as well as point sources. In addition, the rule required States TMDLs to restore those impaired waters but did not provide for actual implementation of the TMDLs.*

*In the 1970's and 1980's, EPA and the States focused on bringing point sources of pollution into compliance with NPDES requirements. Setting TMDLs for both point and nonpoint source pollution was viewed as an expensive and complicated process. The lack of widespread TMDL development was perceived by many groups around the country as a source of contention. As a result, a string of court cases filed in the early to mid-1990's, under the citizen suit provision of the CWA, forced EPA and the states to stop avoiding TMDL implementation.*

*Although the State of Texas was not involved in litigation, the TCEQ committed itself in 1998 to developing TMDLs for all impaired waterbodies within 10 years of their first placement on the state's 303(d) list. The 76th (1999) and 77th (2001) Texas Legislatures appropriated funds to the TCEQ and the TSSWCB to support the development of TMDLs. Texas has already completed a number of TMDLs for nonpoint source affected waterbodies and submitted them to the EPA. Currently, the TCEQ and TSSWCB operate under the 1992 EPA TMDL guidelines. Control of nonpoint sources remains voluntary through the implementation of best management practices.*

## National Estuary Program

*In response to pollution in coastal waters, Congress established the National Estuary Program (NEP) under §320 of the Clean Water Act of 1987. The mission of the NEP is to protect and restore the health of estuaries while supporting economic and recreational activities. Under the Act, the administrator of the EPA was given authorization to convene management conferences to develop Comprehensive Conservation and Management Plans (CCMPs) for estuaries of national significance that are threatened by pollution, development, or overuse. Two Texas estuaries were named Estuaries of National Significance under §320 and were accepted into the National Estuary Program: Galveston Bay in July 1988, and Corpus Christi Bay in October 1992.*

*Both Texas estuaries have been impacted by nonpoint source pollution. The Coastal Bend Bays & Estuaries Program (CBBEP), established in 1994, submitted a CCMP in 1998. Contaminated stormwater flowing into the bay has been identified as a primary water quality concern. With funds from federal, state, and local governments, private*

*industry and foundation grants, the CBBEP has provided funding for nonpoint source control projects in the coastal bend region. The Galveston Bay Estuary Program (GBEP), established in 1989, drafted and adopted a CCMP in April 1995 to improve water quality and enhance living resources in Galveston Bay. Water and sediments in tributaries and near-shore areas of Galveston Bay have been degraded by contaminated runoff from nonpoint sources, primarily from urbanized areas. During the 1995 Texas legislative session, funds were approved for the GBEP to proceed with Plan implementation.*

*In 1999, the Texas Legislature passed the Texas Estuaries Act (HB 2561), which recognized the economic and environmental value of publicly held resources in Texas estuaries. The Act identified the TCEQ as the lead management agency and directs other state agencies to work together.*

# Other Federal Programs

*The Clean Water Act, which recently celebrated its 30th anniversary, has been credited with significant water quality improvements to surface water. Under the CWA, municipal and industrial wastewater facilities have been built or upgraded and industrial point source discharges have been regulated and controlled. Despite this progress, many waterbodies remain impaired from nonpoint sources. Congress has not significantly amended the Clean Water Act's nonpoint source provisions since 1987, however, the CWA is not the only vehicle through which Congress has extended federal control over nonpoint source pollution.*

## Coastal Zone Nonpoint Source Management

*In 1972 Congress passed the Federal Coastal Zone Management Act (CZMA) in response to reports on coastal pollution and erosion. With this Act, the federal government established a program to encourage coastal states and territories to develop land-use plans that would protect coastal resources, including wetlands, dunes, and barrier islands. The CZMA provided funding to states to develop programs to define and regulate permissible land and water uses within this zone.*

*The Coastal Zone Management Reauthorization Amendments of 1990 (CZARA) created the Coastal Nonpoint Source Program under §6217. As a prerequisite for receiving continued CZMA funding, CZARA required the 29 coastal states, with federally approved coastal zone management plans, to develop and submit coastal nonpoint source pollution control programs for approval by the National Oceanic and Atmospheric Administration (NOAA) and the Environmental Protection Agency (EPA). States were required to issue management measures for certain categories of runoff and erosion, and to evaluate nonpoint sources and identify coastal areas that would be negatively affected by specified land uses. In 1991, EPA proposed guidance on management measures for five major categories of nonpoint sources. In 1992, EPA provided updated guidance for an agricultural management measure for erosion and sediment control and confined animal facility management, and a management measure for urban runoff in developing areas. The Coastal Nonpoint Source Program also*

*established shared responsibility for managing coastal waters between state Coastal Zone Management programs and state agencies responsible for overseeing implementation of §319 programs.*

*In 1991, the Texas Legislature directed the General Land Office to head up a Coastal Coordination Council, which developed a Coastal Zone Management Plan in response to the requirements of the CZARA. The Plan, which became effective in 1995, sets policies, standards and regulations affecting private and public property in all counties contiguous to the Texas coastline. Activities such as development permits, fill-and-dredge operations, siting of oil and gas waste-disposal pits, agricultural activities, and highway construction are addressed in the plan. The Texas Coastal Management Program was approved by the National Oceanic and Atmospheric Administration (NOAA) on January 10, 1997.*

*As a requirement for federal approval of its coastal management program, Texas was required to develop and implement a program to specifically address coastal nonpoint source pollution. The purpose of the Coastal NPS Program is to identify sources of coastal NPS pollution and develop recommendations for its prevention.*

*The Coastal NPS Program for Texas has been under development since 1997. To facilitate the development of the NPS Program, the Coastal Coordination Council established a work group comprised of staff from the General Land Office, Texas Commission on Environmental Quality, Texas Railroad Commission, Texas Department of Transportation, Texas Parks and Wildlife Department, Texas State Soil and Water Conservation Board, and a public member from the Council. This work group has addressed comments submitted by the National Oceanic and Atmospheric Administration (NOAA) and the Environmental Protection Agency (EPA) regarding Texas' Coastal NPS Program, reviewed and recommended proposed NPS pollution control projects, and researched possible options to enhance the program.*

*In December 1998, Texas submitted its Coastal NPS Program to NOAA and EPA. After two and a half years of discussion between Texas and the federal agencies, NOAA and EPA published in the Federal Register, in late September 2001, their intent to approve the Texas Coastal NPS Program with certain conditions. NOAA and EPA identified six areas (encompassing 18 of the 52 required management measures) that Texas must strengthen or correct prior to receiving full approval of the Coastal NPS Program. These areas are:*

- *development and site development*
- *watershed protection and existing development*
- *construction site chemical control*
- *new and operating onsite disposal systems*
- *roads, highways, and bridges; and*
- *hydromodification*

*On December 24, 2002, NOAA and EPA emailed a memo concerning policy clarification on the overlap of §6217 Coastal NPS Programs with Phase I and Phase II*

*Storm Water Regulations. This memo clarifies which activities are no longer subject to the requirements of the Coastal Zone Act Reauthorization Amendments of 1990 (CZARA) Coastal NPS Control Program.*

*The second notice to conditionally approve Texas' Coastal NPS Program was posted in the Federal Register on April 7, 2003. The Final Conditional Approval Letter was received on July 9, 2003. Texas was given five years to meet the remaining conditions. The Coastal NPS Program coordinates with other programs, such as the Galveston Bay Estuary Program and the Coastal Bend Bays and Estuaries Program, to ensure wide participation and input into the Coastal NPS Program.*

## Safe Drinking Water Act: Source Water Protection

*The Safe Drinking Water Act (SDWA), promulgated by Congress in 1974, established a Federal program to monitor and increase the safety of the nation's drinking water supply. The SDWA authorized the EPA to set and implement health-based standards to protect against both naturally occurring and man-made contaminants in drinking water. The 1986 Amendment to the SDWA included a provision for States to establish wellhead protection (WHP) areas to protect groundwater from all sources of contamination including nonpoint sources. Texas was the first state in the nation to implement a wellhead protection project, having adopted a voluntary approach. The 1996 Amendment to the SDWA expanded the WHP program to strengthen protection for all sources of drinking water  including surface water.*

## Intermodal Surface Transportation Efficiency Act

*Another major piece of legislation passed in 1991 was the Intermodal Surface Transportation Efficiency Act (ISTEA) designed to expand and improve the quality and condition of the nation's highway and transportation system. This Act contained provision for the planning and developing of highway systems and a host of transportation enhancement activities including the mitigation of water pollution due to highway runoff. ISTEA established a block grant program in which States could use a portion of their federal highway funding allotment for runoff pollution control devices and other best management practices to reduce the amount of polluted runoff that reaches lakes and rivers. ISTEA also required that Departments of Transportation develop national erosion control guidelines for states to follow when carrying out federal-aid construction projects. Federal Highway Administration guidelines for erosion and sediment control in coastal areas must be consistent with both CZARA Guidance and the state 319 program.*

## The Food Security Act of 1985

*Since 1985, farm bills have recognized the environmental problems caused by or associated with agricultural nonpoint source pollution. Congress passed the federal Food Security Act in 1985 to help prevent erosion of cropland and, incidentally, to control sediment runoff from farms. Conservation compliance provisions of the act required farmers who farm highly erodible land to have a conservation plan developed by 1990 and installed by 1995 to be eligible to participate in federal farm programs.*

*The Act also established the Conservation Reserve Program (CRP) to provide financial incentives to farmers who take highly erodible cropland and other environmentally fragile land out of production.*

## Federal Agriculture Improvement and Reform Act of 1996

*In 1996 Congress reauthorized the Farm Bill (the Federal Agriculture Improvement and Reform Act) which refunded and restructured the Conservation Reserve Program and made changes to the program including the addition of environmental criteria in recognition that agriculture is a major cause of nonpoint source pollution. The programs of the Farm Bill are administered by the USDA - Natural Resource Conservation Service (NRCS).*

*The 1996 Bill also created the Environment Quality Incentives Program (EQIP) which offered financial, educational, and technical assistance to encourage persons involved in agricultural or livestock production to adopt conservation practices to protect water quality.*

## Farm Security and Rural Investment Act of 2002

*The Farm Security and Rural Investment Act of 2002, authorized or reauthorized a number of conservation programs, including the Resource Conservation and Development Program. The legislation simplified existing programs and created new ones to address high-priority environmental and production goals. The new Farm Bill authorized an 80 percent increase in funding above levels previously available for USDA programs designed to protect and conserve natural resources. The 2002 Farm Bill also enhanced coordination between the EPA and the USDA by integrating funding and resources to minimize potential duplication of effort.*

# State of Texas Nonpoint Source Control Programs

*In addition to the CWA §319 grant program and other federally funded programs, the State of Texas has managed nonpoint source water pollution through a combination of programs and regulations at the regional and local level.*

## General Discharge Prohibition

*The Texas Water Code provides that, except as authorized, no person may "discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state," discharge other waste which in itself or in conjunction with any other discharge or activity causes pollution of any water of the state, or commit any other act which causes pollution of any water of the state. Exempted from this prohibition are: discharges authorized by permit, discharges in compliance with a certified water quality management plan as provided under the state agriculture code, and activities under the jurisdiction of the Parks and Wildlife Department, the General Land Office or the Railroad Commission of Texas. The TCEQ enforces these provisions.*

## Texas Local Government Code

*Texas law also puts authority to regulate land uses at the regional, county, and municipal level. Texas' local government code includes provisions allowing a home-rule municipality to prohibit the pollution of streams, drains, and tributaries that "may constitute the source of the water supply of any municipality." The law more broadly states that a home-rule municipality may provide protection for and police any watershed. A municipality may exercise other provisions inside or outside the municipality's boundaries.*

## Municipal Pollution Abatement Plans

*The TCEQ's regulatory approach to urban nonpoint source management is found in the Texas Water Code, §26.177, which defines the water pollution control duties of cities in Texas. The statute was originally passed by the legislature in 1967 and was amended in 1971, 1977, 1987 and 1997. Under this section, cities having a population of 10,000 or more inhabitants are required to establish a water pollution control and abatement plan when the Clean Rivers Basin assessments or other TCEQ assessments identify water pollution impacts arising within the respective city and not associated with permitted point sources. These plans are to be submitted to the TCEQ for review and approval to address pollution attributable to non-permitted sources, to implement measures to control and abate water pollution within the city's jurisdiction. The statute allows for TCEQ to establish criteria for water pollution control and abatement programs and allows the agency to assess fees to cover the costs to administer the program. The following requirements are specified for water pollution control and abatement: 1) Inventory, monitor, and obtain compliance for waste discharges; and 2) provide for "reasonable and realistic planning plans for controlling..." nonpoint source pollution. Rules implementing §26.177 of the Texas Water Code were developed in 1998 and were adopted by the TCEQ in 1999.*

## Livestock and Poultry Production Operations

*In 1987, the Texas Water Commission (now the TCEQ) adopted rules regulating animal feeding operations (AFOs) that can contribute to nonpoint source pollution. AFOs over a certain size, known as concentrated animal feeding operations (CAFOs), are required to obtain a NPDES permit. State regulations prohibit these facilities from discharging wastewater or animal waste directly into streams and rivers or allowing the waste to run off the site, where it could contaminate surface water or groundwater. The permit requires the operator to develop a pollution prevention plan that addresses water and air pollution as well as the land application of wastes and wastewater.*

*Recent rule changes for CAFOs have established stricter permit requirements in certain watersheds where water quality problems have been attributed to livestock operations. The TCEQ adopted rules on March 6, 2002, to implement the requirements of House Bill 2912, of the 77th Texas Legislature regarding permitting requirements for CAFOs located in major sole-source impairment zones and the protection of sole-source drinking water supplies. The EPA adopted changes to the federal CAFO regulations*

*and effluent guidelines that became effective on April 13, 2003, changing the requirements to operate CAFOs under the Clean Water Act. Specifically, the new federal regulations changed which animal feeding operations were defined as CAFOs and what management practices are required for those operations. The effluent guidelines changed the design standards for new source swine, veal, and poultry operations and added a requirement for nutrient management plans (NMPs). These new changes meant that under the state's NPDES MOA with EPA, all state CAFO rules must also meet federal requirements. On February 25, 2004, the TCEQ approved rules that incorporate changes necessary to support the recommendations of the Implementation Plan for the Total Maximum Daily Load evaluations for Segments 1226 and 1255 of the Bosque River.*

## Edwards Aquifer Protection Program

*Development activities in various portions of the Edwards Aquifer have been regulated since 1970 when the Texas Water Quality Board (a predecessor agency to the TCEQ) issued an order designed to protect the quality of water entering the Edwards Aquifer recharge zone. Sources of pollution such as underground storage tanks, above ground storage tanks, and sewer lines were regulated. The first Texas counties affected were Kinney, Uvalde, Medina, Bexar, Comal, and Hays. Upon petition by local government, construction activities in portions of Williamson County became regulated in 1986. In 1990, construction activities in portions of Travis county were also regulated.*

*The TCEQ's Edwards Aquifer Protection Program rules regulate certain activities having the potential to adversely affect the water quality of the Edwards Aquifer and hydrologically-connected surface water in order to protect existing and potential beneficial uses of groundwater. The rules require that developers obtain a letter of approval before beginning construction activity and require that developers implement both temporary and permanent best management practices during and after construction.*

*In 1999, Edwards rules were extended to cover the contributing zone to the recharge area. Other changes included a design performance standard for permanent best management practices. The standard applies to water quality systems used for stormwater treatment. Examples include sand filtration basins, extended detention basins, and retention ponds with irrigation systems. The rules also require engineers to certify the construction of the systems. There is also a mechanism in the rules to ensure maintenance of these systems. Regulated activities are those that have the potential for polluting surface streams that will cross the recharge zone. This includes large construction projects and installation of petroleum storage tanks.*

## On-Site Sewage Facilities

*Prior to the late 1960's, the regulation of on-site sewage facilities (OSSF) in Texas was administered primarily by municipal governments through local building inspection and plumbing inspection programs. There was no inspection of installation outside of municipal jurisdiction. In the late 1960's, the Texas Legislature adopted legislation*

*which empowered other local governmental entities (e.g., counties, river authorities, Municipal Utility Districts, etc.) to adopt OSSF control orders subject to approval by the Texas Water Quality Board (now TCEQ). These approved orders gave local governments authority to permit systems, conduct inspections, collect fees, and investigate complaints.*

## Soil Conservation Laws and Programs

*Early attempts at soil conservation legislation in Texas began during the "Dust Bowl" days of the 1930's when the problems of wind and water erosion began to get public attention. Legislation authorizing the establishment of Wind Erosion Conservation Districts was enacted by the 44th legislature in 1935. This law provided for the creation of districts to conserve the soil by prevention of unnecessary erosion caused by winds, and reclamation of lands that were depreciated or denuded of soil by wind. The TSSWCB, created in 1939, was charged with the responsibility of organizing soil conservation districts throughout the state. In 1941, the 47th Legislature passed House Bill 444 which is the basic conservation law under which the Texas State Soil and Water Conservation Board and the Soil and Water Conservation Districts operate today.*

*The TSSWCB is charged with the responsibility of administering and coordinating the state's soil and water conservation laws and programs with the State's 217 soil and water conservation districts. Through various educational and financial programs, the districts provide assistance to farmers and ranchers to encourage the wise and productive use of the state's soil and water resources. After passage of the 1972 Clean Water Act, the soil and water conservation district directors in Texas asked the TSSWCB to seek an appropriate role for them in nonpoint source planning and management. This request led to the passage of Senate Bill 229 passed during the 69th Texas Legislature. This legislation added §201.026 to the Texas Agricultural Code to give the TSSWCB responsibility to plan implement and manage programs and practices for abating agricultural and silvicultural nonpoint source pollution.*

## Water Quality Management Plans

*In 1993, the Texas Legislature took another major step toward controlling water pollution from agricultural and silvicultural nonpoint sources when it passed Senate Bill 503. SB 503 authorized the TSSWCB to assist agricultural and silvicultural producers in meeting the state's water quality goals and standards through a voluntary, incentive-based program. The Bill transferred much of the responsibility for regulating non-permitted, smaller animal feeding operations from the TCEQ to the TSSWCB. The move was designed to change the state's oversight of these operations from a traditional regulatory role to a technical assistance role.*

*SB503 provided for the development and certification of water quality management plans (WQMPs). These plans are site specific plans for agricultural or silvicultural lands which include appropriate land treatment practices, production practices, management measures, technologies, or combinations thereof. A water quality*

*management plan is a site-specific document indicating when, where, and how to implement conservation practices following standards in the USDA Natural Resource Conservation Service Field Office Technical Guide. These plans are tailored to each landowner's conservation needs and management goals while ensuring adherence to state water quality laws.*

*SB 503 legislation also set up a complaint resolution process and provided for a cost share assistance to help pay for some of the costs of installing water quality management practices. The provisions of the legislation are administered by the TSSWCB through and in cooperation with local soil and water conservation districts. The passage of Senate Bill 1339 during the 77th Session of the Texas Legislature expanded the water quality management program to include poultry facilities.*

*Although authorized by SB 503, the TSSWCB has yet to develop a certified water quality management program for silvicultural activities.*

# APPENDIX F   CLEAN WATER ACT, §319

*[§319 added by PL 100-4]*

*(a) State Assessment Reports. --*

> *(1) Contents. -- The Governor of each State shall, after notice and opportunity for public comment, prepare and submit to the Administrator for approval, a report which:*
>
> > *(A) identifies those navigable waters within the State which, without additional action to control nonpoint sources of pollution, cannot reasonably be expected to attain or maintain applicable water quality standards or the goals and requirements of this Act;*
> >
> > *(B) identifies those categories and subcategories of nonpoint source or, where appropriate, particular nonpoint sources which add significant pollution to each portion of the navigable waters identified under subparagraph (A) in amounts which contribute to such portion not meeting such water quality standards or such goals and requirements;*
> >
> > *(C) describes the process, including intergovernmental coordination and public participation, for identifying best management practices and measures to control each category and subcategory of nonpoint sources and, where appropriate, particular nonpoint sources identified under subparagraph (B) and to reduce, to the maximum extent practicable, the level of pollution resulting from such category, subcategory, or source; and*
> >
> > *(D) identifies and describes State and local programs for controlling pollution added from nonpoint sources to, and improving the quality of, each such portion of the navigable waters, including but not limited to those programs which are receiving Federal assistance under subsections (h) and (I).*
>
> *(2) Information Used in Preparation. -- In developing the report required by this section, the State (A) may rely upon information developed pursuant to  208, §303(e), §304(F),§305(B), AND §314, and other information as appropriate, and (B) may utilize appropriate elements of the waste treatment management plans developed pursuant to §208(b) AND §303, to the extent such elements are consistent with and fulfill the requirements of this section.*

*(b) State Management Programs. --*

> *(1) In General. -- The Governor of each State, for that State or in combination with adjacent States, shall, after notice and opportunity for public comment,*

*prepare and submit to the Administrator for approval a management program which such State proposes to implement in the first four fiscal years beginning after the date of submission of such management program for controlling pollution added from nonpoint sources to the navigable waters within the State and improving the quality of such waters.*

*(2) Specific Contents. -- Each management program proposed for implementation under this subsection shall include each of the following:*

> *(A) An identification of the best management practices and measures which will be undertaken to reduce pollutant loadings resulting from each category, subcategory, or particular nonpoint source designated under paragraph (1)(B), taking into account the impact of the practice on ground water quality.*

> *(B) An identification of programs (including, as appropriate, nonregulatory or regulatory programs for enforcement, technical assistance, financial assistance, education, training, technology transfer, and demonstration projects) to achieve implementation of the best management practices by the categories, subcategories, and particular nonpoint source designated under subparagraph (A).*

> *(C) A schedule containing annual milestones for (I) utilization of the program implementation methods identified in subparagraph (B), and (ii) implementation of the best management practices identified in subparagraph (A) by the categories, subcategories, or particular nonpoint sources designated under paragraph (1)(B). Such schedule shall provide for utilization of the best management practices at the earliest practicable date.*

> *(D) A certification of the attorney general of the State or States (or the chief attorney of any State water pollution control agency which has independent legal counsel) that the laws of the State or States, as the case may be, provide adequate authority to implement such management program or, if there is not such adequate authority, a list of such additional authorities as will be necessary to implement such management program. A schedule and commitment by the State or States to seek such additional authorities as expeditiously as practicable.*

> *(E) Sources of Federal and other assistance and funding (other than assistance provided under subsections (h) and (I)) which will be available in each of such fiscal years for supporting implementation of such practices and measures and the purposes for which such assistance will be used in each of such fiscal years.*

> *(F) An identification of Federal financial assistance programs and Federal development projects for which the State will review individual assistance applications or development projects for their effect on water quality*

*pursuant to the procedures set forth in Executive Order 12372 as in effect on September 17, 1983, to determine whether such assistance applications or development projects would be consistent with the program prepared under this subsection; for the purposes of this subparagraph, identification shall not be limited to the assistance programs or development projects subject to Executive Order 12372 but may include any programs listed in the most recent Catalog of Federal Domestic Assistance which may have an effect on the purposes and objectives of the State's nonpoint source pollution management program.*

*(3) Utilization of Local and Private Experts. -- In development developing and implementing a management program under this subsection, a State shall, to the maximum extent practicable, involve local public and private agencies and organizations which have expertise in control of nonpoint sources of pollution.*

*(4) Development on Watershed Basis. -- A State shall, to the maximum extent practicable, develop and implement a management program under this subsection on a watershed-by-watershed basis within such State.*

*(c) Administrative Provisions. --*

*(1) Cooperation Requirement. -- Any report required by subsection (a) and any management program and report required by subsection (b) shall be developed in cooperation with local, substate regional, and interstate entities which are actively planning for the implementation of nonpoint source pollution controls and have either been certified by the Administrator in accordance with §208, have worked jointly with the State on water quality management planning under §205(j), or have been designated by the State legislative body or Governor as water quality management planning agencies for their geographic areas.*

*(2) Time Period for Submission of Reports and Management Programs. -- Each report and management program shall be submitted to the Administrator during the 18-month period beginning on the date of the enactment of this section.*

*(d) Approval or Disapproval of Reports and Management Programs. --*

*(1) Deadline. -- Subject to paragraph (2), not later than 180 days after the date of submission to the Administrator of any report or management program under this section (other than subsections (h), (I), and (k)), the Administrator shall either approve or disapprove such report or management program, as the case may be. The Administrator may approve a portion of a management program under this subsection. If the Administrator does not disapprove a report, management program, or portion of a management program in such 180-day period, such report, management program, or portion shall be deemed approved for purposes of this section.*

*(2) Procedure for Disapproval. -- If, after notice and opportunity for public comment and consultation with appropriate Federal and State agencies and other interested persons, the Administrator determines that –*

*(A) the proposed management program or any portion thereof does not meet the requirements of subsection (b)(2) of this section or is not likely to satisfy, in whole or in part, the goals and requirements of the Act;*

*(B) adequate authority does not exist, or adequate resources are not available, to implement such program or portion;*

*(C) the schedule for implementing such program or portion is not sufficiently expeditious; or*

*(D) the practices and measures proposed in such program or portion are not adequate to reduce the level of pollution in navigable waters in the State resulting from nonpoint sources and to improve the quality of navigable waters in the State; the Administrator shall within 6 months of receipt of the proposed program notify the State of any revisions or modifications necessary to obtain approval. The State shall thereupon have an additional 3 months to submit its revised management program and the Administrator shall approve or disapprove such revised program within three months of receipt.*

*(3) Failure of State to Submit Report. -- If a Governor of State does not submit the report required by subsection (a) within the period specified by subsection (c)(2), the Administrator shall, within 30 months after the date of the enactment of this section, prepare a report for such State which makes the identifications required by paragraphs (1)(A) and (1)(B) of subsection (a). Upon completion of the requirement of the preceding sentence and after notice and opportunity for comment, the Administrator shall report to Congress on his actions pursuant to this section.*

*(e) Local Management Programs; Technical Assistance. -- If a State fails to submit a management program under subsection (b) or the Administrator does not approve such a management program, a local public agency or organization which has expertise in, and authority to, control water pollution, resulting from nonpoint sources in any area of such State which the Administrator determines is of sufficient geographic size may, with approval of such State, request the Administrator to provide, and the Administrator shall provide, technical assistance to such agency or organization in developing for such area a management program which is described in subsection (b) and can be approved pursuant to subsection (d). After development of such management program, such agency or organization shall submit such management program to the Administrator for approval. If the Administrator approves such management program, such agency or organization shall be eligible to receive financial assistance under subsection (h) for implementation of such management program as if such agency or organization were a State for which a report submitted*

*under subsection (a) and a management program submitted under subsection (b) were approved under this section. Such financial assistance shall be subject to the same terms and conditions as assistance provided to a State under subsection (h).*

*(f) Technical Assistance for States. -- Upon request of a State, the Administrator may provide technical assistance to such State in developing a management program approved under subsection (b) for those portions of the navigable waters requested by such State.*

*(g) Interstate Management Conference. --*

*(1) Convening of Conference; Notification; Purpose. -- If any portion of the navigable waters in any State which is implementing a management program approved under this section is not meeting applicable water quality standards or the goals and requirements of the Act as a result, in whole or in part, of pollution from nonpoint sources in another State, such State may petition the Administrator to convene, and the Administrator shall convene, a management conference of all States which contribute significant pollution resulting from nonpoint sources to such portion. If, on the basis of information available, the Administrator determines that a State is not meeting applicable water quality standards or the goals and requirements of this Act as a result, in whole or in part, of significant pollution from nonpoint sources in another State, the administrator shall notify such State. The Administrator may convene a management conference under this paragraph not later than 180 days after giving such notification, whether or not the State which is not meeting such standards requests such conference. The purpose of such conference shall be to develop an agreement among such States to reduce the level of pollution in such portion resulting from nonpoint sources and to improve the water quality of such portion. Nothing in such agreement shall supersede or abrogate rights to quantities of water which have been established by interstate water compacts, Supreme Court decrees, or State water laws. This subsection shall not apply to any pollution which is subject to the Colorado River Basin Salinity control Act. The requirement that the Administrator convene a management conference shall not be subject to the provisions of §505 of this Act.*

*(2) State Management Program Requirement. -- To the extent that the States reach agreement through such conference, the management programs of the States which are parties to such agreements and which contribute significant pollution to the navigable water or portions thereof not meeting applicable water quality standards or goals and requirements of the Act will be revised to reflect such agreement. Such a management program shall be consistent with Federal and State law.*

*(h) Grant Program. --*

*(1) Grants for Implementation of Management Programs. -- Upon application of a State for which a report submitted under subsection (a) and a management*

*program submitted under subsection (b) is approved under this section, the Administrator shall make grants, subject to such terms and conditions as the Administrator considers appropriate, under this subsection to such State for the purpose of assisting the State in implementing such management program. Funds reserved pursuant to §205(j)(5) of this Act may be used to develop and implement such management program.*

*(2) Applications. -- An application for a grant under this subsection in any fiscal year shall be in such form and shall contain such other information as the Administrator may require, including an identification and description of the best management practices and measures which the State proposes to assist, encourage, or require in such year with the Federal assistance to be provided under the grant.*

*(3) Federal Share. -- The Federal share of the cost of each management program implemented with Federal assistance under this subsection in any fiscal year shall not exceed 60 percent of the cost incurred by the State in implementing such management program and shall be made on condition that the non-Federal share is provided from non-Federal sources.*

*(4) Limitation on Grant Amounts. -- Notwithstanding any other provision of this subsection, not more than 15 percent of the amount appropriated to carry out this subsection may be used to make grants to any one State, including any grants to any local public agency or organization with authority to control pollution from nonpoint sources in any area of such State.*

*(5) Priority for Effective Mechanisms. -- For each fiscal year beginning after September 30, 1987, the Administrator may give priority in making grants under this subsection, and shall give consideration in determining the Federal share of any such grant, to States which have implemented or are proposing to implement management programs which will --*

*(A) control particularly difficult or serious nonpoint source pollution problems, including, but not limited to, problems resulting from mining activities;*

*(B) implement innovative methods or practices for controlling nonpoint sources of pollution, including regulatory programs where the Administrator deems appropriate;*

*(C) control interstate nonpoint source pollution problems; or*

*(D) carry out ground water quality protection activities which the Administrator determines are part of a comprehensive nonpoint source pollution control program, including research, planning, ground water assessments, demonstration programs, enforcement, technical assistance, education, and training to protect ground water quality from nonpoint sources of pollution.*

*(6) Availability for Obligation. -- The funds granted to each State pursuant to this subsection in a fiscal year shall remain available for obligation by such State for the fiscal year for which appropriated. The amount of any such funds not obligated by the end of such fiscal year shall be available to the Administrator for granting to other States under this subsection in the next fiscal year.*

*(7) Limitation on Use of Funds. -- States may use funds from grants made pursuant to this section for financial assistance to persons only to the extent that such assistance is related to the costs of demonstration projects.*

*(8) Satisfactory Progress. -- No grant may be made under this subsection in any fiscal year to a State which in the preceding fiscal year received a grant under this subsection unless the Administrator determines that such State made satisfactory progress in such preceding fiscal year in meeting the schedule specified by such State under subsection (b)(2).*

*(9) Maintenance of Effort. -- No grant may be made to a State under this subsection in any fiscal year unless such State enters into such agreements with the Administrator as the Administrator may require to ensure that such State will maintain its aggregate expenditures from all other sources for programs for controlling pollution added to the navigable waters in such State from nonpoint sources and improving the quality of such waters at or above the average level of such expenditures in its two fiscal years preceding the date of enactment of this subsection.*

*(10) Request for Information. -- The Administrator may request such information, data, and reports as he considers necessary to make the determination of continuing eligibility for grants under this section.*

*(11) Reporting and Other Requirements. -- Each State shall report to the Administrator on an annual basis concerning (a) its progress in meeting the schedule of milestones submitted pursuant to subsection (b)(2)(c) of this section, and (B) to the extent that appropriate information is available, reductions in nonpoint source pollutant loading and improvements in water quality for those navigable waters or watersheds within the State which were identified pursuant to subsection (a)(1)(a) of this section resulting from implementation of the management program.*

*(12) Limitation on Administrative Costs. -- For purposes of this subsection, administrative costs in the form of salaries, overhead, or indirect costs for services provided and charged against activities and programs carried out with a grant under this subsection shall not exceed in any fiscal year 10 percent of the amount of the grant in such year, except that costs of implementing enforcement and regulatory activities, education, training, technical assistance, demonstration projects, and technology transfer programs shall not be subject to this limitation.*

*(I) Grants for Protecting Groundwater Quality. --*

*(1) Eligible Applicants and Activities. -- Upon application of a State for which a report submitted under subsection (a) and a plan submitted under subsection (b) is approved under this section, the Administrator shall make grants under this subsection to such State for the purpose of assisting such State in carrying out groundwater quality protection activities which the Administrator determines will advance the State toward implementation of a comprehensive nonpoint source pollution control program. Such activities shall include, but not be limited to, research planning, groundwater assessments, demonstration programs, enforcement, technical assistance, education and training to protect the quality of groundwater and to prevent contamination of groundwater from nonpoint sources of pollution.*

*(2) Applications. -- An application for a grant under this subsection shall be in such form and shall contain such information as the Administrator may require.*

*(3) Federal Share; Maximum Amount. -- The Federal share of the cost of assisting a State in carrying out groundwater protection activities in any fiscal year under this subsection shall be 50 percent of the costs incurred by the State in carrying out such activities, except that the maximum amount of Federal assistance which any State may receive under this subsection in any fiscal year shall not exceed $150,000.*

*(4) Report. -- The Administrator shall include in each report transmitted under subsection (m) a report on the activities and programs implemented under this subsection during the preceding fiscal year.*

*(j) Authorization of Appropriations. -- There is authorized to be appropriated to carry out subsections (h) and (I) not to exceed $70,000,000 for fiscal year 1988, $100,000,000 per fiscal year for each of fiscal years 1989 and 1990, and $130,000,000 for fiscal year 1991; except that for each of such fiscal years not to exceed $7,500,000 may be made available to carry out subsection (I). Sums appropriated pursuant to this subsection shall remain available until expended.*
*(k) Consistency of Other Programs and Projects With Management Programs. -- The Administrator shall transmit to the Office of Management and Budget and the appropriate Federal departments and agencies a list of those assistance programs and development projects identified by each State under subsection (b)(2)(F) for which individual assistance applications and projects will be reviewed pursuant to the procedures set forth in Executive Order 12372 as in effect on September 17, 1983, the concerns of the State regarding the consistency of such applications or projects with the State nonpoint source pollution management program.*

*(l) Collection of Information. -- The Administrator shall collect and make available, through publications and other appropriate means, information pertaining to management practices and implementation methods, including, but not limited to, (1)*

*information concerning the costs and relative efficiencies of best management practices for reducing nonpoint source pollution; and (2) available data concerning the relationship between water quality and implementation of various management practices to control nonpoint sources of pollution.*

*(m) Reports of Administrator. --*

*(1) Annual Reports. -- Not later than January 1, 1988, and each January 1 thereafter, the Administrator shall transmit to the Committee on Public Works and Transportation of the House of Representatives and the Committee on Environment and Public Works of the Senate, a report for the preceding fiscal year on the activities and programs implemented under this section and the progress made in reducing pollution in the navigable waters resulting from nonpoint sources and improving the quality of such waters.*

*(2) Final Report. -- Not later than January 1, 1990, the Administrator shall transmit to Congress a final report on the activities carried out under this section. Such report, at a minimum, shall –*

*(A) describe the management programs being implemented by the States by types and amount of affected navigable waters, categories and subcategories of nonpoint sources, and types of best management practices being implemented;*

*(B) describe the experiences of the States in adhering to schedules and implementing best management practices;*

*(C) describe the amount and purpose of grants awarded pursuant to subsections (h) and (I) of this section;*

*(D) identify, to the extent that information is available, the progress made in reducing pollutant loads and improving water quality in the navigable waters;*

*(E) indicate what further actions need to be taken to attain and maintain in those navigable waters (I) applicable water quality standards; and (ii) the goals and requirements of this Act;*

*(F) include recommendations of the Administrator concerning future programs (including enforcement programs) for controlling pollution from nonpoint sources; and*

*(G) identify the activities and programs of departments, agencies, and instrumentalities of the United States which are inconsistent with the management programs submitted by the States and recommend modifications so that such activities and programs are consistent with and assist the States in implementation of such management programs.*

*(n) Set Aside for Administrative Personnel. -- Not less than 5 percent of the funds appropriated pursuant to subsection (j) for any fiscal year shall be available to the Administrator to maintain personnel levels at the Environmental Protection Agency at levels which are adequate to carry out this section in such year.*

# APPENDIX G  FEDERAL CONSISTENCY

*§319(b)(2)(F) calls for each State Management Program to contain an identification of federal financial assistance programs and federal development projects for which the state will review individual assistance applications or development projects for their effect on water quality, to determine whether such activities would be consistent with the State Management Program. The Texas Review and Comment System (TRACS) will be utilized to fulfill this requirement. Consistency review of urban, non-agricultural, non-silvicultural programs is the responsibility of the TCEQ. Consistency of agricultural and silvicultural programs is reviewed by the TSSWCB.*

## TCEQ Review of Federal Assistance Programs

*This list of Federal Assistance programs was developed from the 2004 Catalog of Federal Domestic Assistance for potential use by the TCEQ in the development and administration of its NPS Management Program. Some of these programs may be reviewed by the TCEQ for consistency with its NPS Management Program. Any federal programs which the State identifies as inconsistent with its management program will be brought to the attention of the EPA. No inconsistent programs have been identified at this time.*

## Department of Commerce

### Economic Development Administration

*11.300      Economic Development - Grants for Public Works and
           Economic Development Facilities*
*11.302      Economic Development - Support for Planning
           Organizations*
*11.303      Economic Development - Technical Assistance*
*11.307      Economic Adjustment Assistance*

### National Oceanic and Atmospheric Administration

*11.405      Anadromous Fish Conservation Act Program*
*11.407      Interjurisdictional Fisheries Act of 1986*
*11.415      Fisheries Finance Program*
*11.417      Sea Grant Support*
*11.419      Coastal Zone Management Administration Awards*
*11.420      Coastal Zone Management Estuarine Research Reserve*
*11.426    Financial Assistance for National Centers for Coastal Ocean Science*
*11.427    Fisheries Development and Utilization Research and Development Grants
           and Cooperative Agreements Program*
*11.429    Marine Sanctuary Program*
*11.441    Regional Fishery Management Councils*

# Department of Defense

### Department of the Army, Office of the Chief of Engineers

*12.100 Aquatic Plant Control*
*12.101 Beach Erosion Control Projects*
*12.104 Flood Plain Management Services*
*12.105 Protection of Essential Highways, Highway Bridge Approaches and Public Works*
*12.106 Flood Control Projects*
*12.107 Navigation Projects*
*12.108 Snagging and Clearing for Flood Control*
*12.109 Protection, Clearing and Straightening Channels*
*12.110 Planning Assistance to States*
*12.114 Collaborative Research and Development*

### Office of the Assistant Secretary (Economic Security)

*12.612 Community Base Reuse Plans*
*12.613 Growth Management Planning Assistance*

# Department of Housing and Urban Development

### Housing

*14.112 Mortgage Insurance for Construction or Substantial Rehabilitation of Condominium Projects*
*14.117 Mortgage Insurance - Homes*
*14.126 Mortgage Insurance - Cooperative Projects*
*14.127 Mortgage Insurance - Manufactured Home Parks*

### Community Planning and Development

*14.218 Community Development Block Grants/Entitlement Grants*
*14.219 Community Development Block Grants/Small Cities Program*

### Public and Indian Housing

*14.862 Indian Community Development Block Grant Program*

# Department of the Interior

### Bureau of Land Management

*15.214 Non-sale Disposals of Mineral Material*
*15.225 Recreation Resource Management*

### Office of Surface Mining Reclamation and Enforcement

15.250  *Regulation of Surface Coal Mining and Surface Effects of Underground Coal Mining*
15.252  *Abandoned Mine Land Reclamation (AMLR) Program*

### Fish and Wildlife Service

15.605  *Sport Fish Restoration*
15.611  *Wildlife Restoration*
15.614  *Coastal Wetlands Planning, Protection and Restoration Act*
15.615  *Cooperative Endangered Species Conservation Fund*

### Geological Survey

15.805  *Assistance to State Water Resources Research Institutes*
15.808  *U. S. Geological Survey - Research and Data Acquisition*

### National Park Service

15.916  *Outdoor Recreation - Acquisition, Development and Planning*
15.919  *Urban Park and Recreation Recovery Program*

## Department of Transportation

### Federal Aviation Administration

20.106  *Airport Improvement Program*

### Federal Highway Administration

20.205  *Highway Planning and Construction*
20.219  *Recreational Trails Program*

### Federal Railroad Administration

20.312  *High Speed Ground Transportation - Next Generation High Speed Rail Program*

### Federal Transit Administration

20.500  *Federal Transit Capital Investment Grants*
20.507  *Federal Transit Formula Grants*
20.509  *Formula Grants for Other Than Urbanized Areas*

### Maritime Administration

20.801  *Development and Promotion of Ports and Intermodal Transportation*
20.812  *Construction Reserve Fund*

# General Services Administration

*39.002    Disposal of Federal Surplus Real Property*

# Small Business Administration

*59.012    Small Business Loans*

# Environmental Protection Agency

### Office of Air and Radiation

*66.001    Air Pollution Control Program Support*

### Office of Water

*66.419    Water Pollution Control - State and Interstate*
*Program Support*
*66.424    Surveys, Studies, Demonstrations and Special Purpose - §1442 of the Safe*
*Drinking Water Act*
*66.433    State Underground Water Source Protection*
*66.439    Targeted Watershed Initiative*
*66.454    Water Quality Management Planning*
*66.456    National Estuary Program*
*66.458    Capitalization Grants for Clean Water State*
*Revolving Funds*
*66.460    Nonpoint Source Implementation Grants*
*66.461    Wetland Program Development Grants*
*66.463    Water Quality Cooperative Agreements*
*66.468    Capitalization Grants for Drinking Water State*
*Revolving Funds*
*66.472    Beach Monitoring and Notification Program Implementation Grants*
*66.474    Water Protection Grants to the States*
*66.475    Gulf of Mexico Program*
*66.476    Vulnerability Assessments and Related Security Improvements at Large*
*Drinking Water Utilities*
*66.477    Vulnerability Assessments and Related Security Improvements at Large*
*Privately-Owned Community Drinking Water Utilities*
*66.478    Water Security Training and Technical Assistance*
*Grant Program*

### Offices of Air and Radiation; Water; Environmental Justice; Environmental Information; Enforcement and Compliance Assurance; Pesticides, Prevention and Toxic Substances; and Solid Waste and Emergency Response

*66.500    Environmental Protection - Consolidated Research*
*66.600    Environmental Protection Consolidated Grants*
*Program Support*

66.605    *Performance Partnership Grants*

### Office of Enforcement and Compliance Assurance

66.700    *Consolidated Pesticide Enforcement Cooperative Agreements*

### Office of Prevention, Pesticides and Toxic Substances

66.708    *Pollution Prevention Grants Program*

### Office of Solid Waste and Emergency Response

66.805    *Leaking Underground Storage Tank Trust Fund Program*

### Office of Research and Development

66.807    *Superfund Innovative Technology Evaluation Program*

### Office of Environmental Education

66.951    *Environmental Education Grants*

## Department of Energy

### Civilian Radioactive Waste Management

81.065    *Nuclear Waste Disposal Siting*

### Office of Environmental Management

81.104    *Office of Technology Development and Deployment for   Environmental Management*

# TCEQ Review of Federal Development Projects

*The following is a list of the types of plans and development projects that are initiated and managed by Federal agencies which may have an impact on the State's nonpoint source management program. Not all of the activities listed below will be eligible for §319 federal consistency reviews pursuant to Executive Order 12372.*

## USDA, Forest Service

*Forest Plans*
*Resource Area Analyses*
*Integrated Resource Management Plans*
*Timber Activities/Sales*
*Range Activities/Game Range Analysis*
*Chemicals/Herbicides*
*Area Analysis/Cumulative Impacts Analysis*
*Recreation Development*
*Transportation Plans*

*Soil and Water Management*
*Water Uses and Development*
*Soil and Water Improvement Projects*
*Public Water Supply Watershed Management*
*Hydrologic Modification*
*Wetlands Protection*
*"Every Species Counts" - recovery of threatened/endangered flora, fauna, fish, wildlife, invertebrates, plants*
*Watershed, Fish, Wildlife, Air and Rare Plants Program*
*Riparian Management and Restoration and Wetlands Habitats Programs*
*Minerals Exploration and Development*
*Fuels Management*
*Applications for Permits to Drill*
*Oil and Gas Leasing/Reclamation Plans*
*Hydropower Licensing Activity in Coordination with Federal Energy Regulatory Commission (FERC)/Special Use Permitting*
*ORV (Off-road Vehicles) Activities*
*Forest Fire Protection*
*Soil and Water Monitoring Program*
*Allotment Management Planning and Administration*
*Road Construction and Maintenance*
*Municipal Watershed Management Program*
*Floodplain Modifications*

## USDA, Natural Resources Conservation Service/Farm Service Agency

*Small Watershed Program*

## Department of the Interior, Bureau of Land Management

*Watershed Projects*
*Mineral Exploration and Development*
*Coal, Oil and Gas Leasing*
*Coal Reclamation*
*Road Restoration, Upgrades and Closures*
*Timber Activities*
*Rangeland Management Program*
*Chemical Pest Control/Pesticide Use Report*
*"Bring Back the Natives" - Conservation of Native Fishes*
*Area Analysis/Cumulative Impacts*
*Resource Management Plans*
*Wetlands Protection*
*Riparian Management Areas and Riparian Reserves*
*Hydrologic Units Mapping*
*Transportation Plans*
*Areas of Critical Environmental Concern (ACEC) Plans*

### Department of the Interior, Bureau of Reclamation

*National Desalination Clearinghouse*
*Fisheries Applications Research*
*Flood Hydrology*
*Geotechnical Engineering*
*Hydroelectric Research*
*National Irrigation Water Quality Program (NIWQP)*
*Remote Sensing and GIS*
*Resource Management and Planning*
*River Systems and Meteorology*
*Sedimentation and River Hydraulics*
*Stream Corridor Restoration*
*Water Conservation Field Services Program*
*Water Operations - Upper and Lower Colorado River Regions*

### Department of the Interior, Fish and Wildlife Service

*Management of National Wildlife Conservation - Refuges and Proposed Acquisitions*

### Department of the Interior, Surface Mining

*Regulation of active mines and reclamation of abandoned mines*
*Abandoned Mine Lands (AML) Program*

### Department of Defense, Defense Installations

*Land Management Plans*
*Location, design and acquisition of new or expanded defense installations*

### Department of Defense, Corps of Engineers

*Dredging*
*Channel Improvement*
*Breakwaters*
*Harbors and navigation channels*
*Erosion control structures*
*Shoreline Protection - Beach Replenishment*
*Regulation/Permitting - including wetlands*
*Dams or flood control works*
*Ice management practices*
*Land acquisition for spoil disposal or other purposes*
*Selection of open water disposal sites*

### Department of Transportation, Federal Aviation Administration

*Location, design, construction, maintenance and demolition of Federal aids to air navigation*

### Department of Transportation, U.S. Coast Guard

*Location, design, construction, or enlargement of Coast Guard stations, bases, and lighthouses*
*Location, placement, or removal of navigation devices which are not part of the routine operations under the Aids to Navigation Program*
*Expansion, abandonment, designation of anchorages, lighting areas, or shipping lanes and ice management practices and activities*

### General Services Administration

*Acquisition, location, and design of proposed Federal government property or buildings, whether leased or owned by the Federal government*

# APPENDIX H  FUNDING

*Funding sources available to support programs related to nonpoint source pollution include:*

## Federal

- *CWA §104(b)(3)*
- *CWA §106 Funds*
- *CWA §319(h) Grant Funds*
- *CWA §604(b) Funds*
- *FIFRA Funds*
- *Safe Drinking Water Act Grant Funds*
- *Solid Waste Disposal Act, §8001*
- *Superfund*
- *Non-game and Endangered Species Fund*

## STATE

- *STATE GENERAL REVENUE FUNDS*
- *WATER QUALITY PERMIT FEES*
- *WATER RIGHTS PERMIT FEES*
- *STATE REVOLVING FUND*
- *TEXAS WATER DEVELOPMENT BOARD LOAN PROGRAMS AND DEVELOPMENT FUNDS*
- *GENERAL LAND OFFICE OIL SPILL FUND*
- *OSSF PERMIT AND LICENSE FEES*
- *FUND 0270, SOLID WASTE TIPPING FEES*
- *FUND 5500, STATE HAZARDOUS AND SOLID WASTE REMEDIATION FEES*
- *SOLID WASTE FUND*
- *FUND 4680, TEXAS IRRIGATORS FUND*
- *FUND 0790, WATER WELL DRILLERS*
- *TEXAS CONSERVATION FUND*
- *WILDSCAPES FEES AND POSTER AND STAMP SALES*
- *RIVER AUTHORITY FUNDS*

## SPECIFIC FUNDING FOR TCEQ PROGRAMS

*The Nonpoint Source Program Team is funded by Clean Water Act §319(h) and by State General Revenue Funds.*

*The Clean Rivers Program is supported by the water quality fees from wastewater discharge permits and water rights permits. Federal funding for Water Quality Management Plans is provided by EPA through a 1% reserve of annual allocated funds to the Texas Water Development Board for State Revolving Fund (SRF) loans. Of this amount, 40% is passed through to the seven designated area regional planning agencies.*

*Standards development and implementation and wetlands certification are funded by §106 of the Clean Water Act and by State General Revenue Funds.*

*The ongoing activities of the Surface Water Quality Monitoring Team are funded by §106 and State General Revenue Funds.*

*Water Quality Modeling is funded by Clean Water Act 604(b) funds and State General Revenue.*

*State General Revenue Funds, FEMA, and Clean Water Act §319(h) funds support the Resource Protection Team, Interstate Compacts Team, and Water Rights Permit Team (Water Rights Permitting and Availability Section) activities.*

*The Texas Watch Program (volunteer monitoring) is currently funded by Clean Water Act §319(h).*

*The Groundwater Planning and Assessment Team is funded from §106 ground water funds, FIFRA funds, and State General Revenue Funds.*

*The Galveston Bay Estuary Program is a continuation of the National Estuary Program receiving funding under §320 fo the Clean Water Act, State General Revenue Funds, Clean Water Act §104(b)(3) funds, and limited contributions from local governments.*

*Funding for the Coastal Bend Bays and Estuaries Program comes from Clean Water Act Sections 104(b)(3) and 320 funds and State General Revenue Funds.*

*Funding for the Source Water Assessment and Protection Program is from the Drinking Water State Revolving Fund. This fund was established under §1452 by Congress to achieve or maintain compliance with Safe Drinking Water Act requirements.*

*Funding for the Small Towns Environmental Program comes from two self-help funds: one administered by the Office of Rural Community Affairs, and one from the Texas Water Development Board.*

*Funding for the On-Site Sewage Facilities program comes from the Clean Water Act §319 portion of the Performance Partnership Grant awarded by EPA. However, legislation has also provided for the following methods of funding for continued program operations:*

- *Fees may be collected for all OSSF permits issued by TCEQ. The fees collected by the authorized agents are not controlled by the TCEQ and vary between entities.*
- *OSSF installers are required to pay a fee to obtain a license, and a yearly renewal fee to maintain the license.*

*Clean Texas- Cleaner World funds come from Fund 0270, solid waste tipping fees, and CWA Sections 319(h) and 106 grants.*

*Texas Country Cleanups and the Lake and River Cleanup are funded from the Solid Waste Fund. Fund 5500, from hazardous waste generation fees, provides funds for the Agricultural Waste Pesticide Program and the Household Hazardous Waste Program.*

*The Used Oil and Used Oil Filter Recycling Program is funded by revenues in the Used Oil Recycling Fund.*

*Funding for the Emergency Response Program, the Superfund Site Discovery and Assessment Team, and the Natural Resource Damage Assessment Team comes from Fund 5500, State Hazardous and the Solid Waste Remediation Fee Fund.*

*The Illegal Disposal Program is funded under the Solid Waste Disposal Act, §8001, and with State General Revenue Funds.*

*Occupational Certification Program funding comes from the following areas:*
- *Landscape Irrigation: Fund 4680*
- *On-site Sewage Facility Installation: General Revenue Fund 0010*
- *Water Well Drilling: Fund 0790*
- *Water Pump Installation: Fund 0790*

*Funding for the Edwards Aquifer Program comes from State funds supplemented by 319 grant funding.*

# Funding Sources for Agricultural & Silvicultural Nonpoint Source Pollution Abatement

*In Texas, planning, implementing, and managing programs and practices for the abatement of agricultural and silvicultural nonpoint source pollution is the responsibility of the Texas State Soil and Water Conservation Board. However, other organizations and their programs play major roles. Because nonpoint source control is costly, efforts in Texas tend to rely on cooperation and coordination to make use of existing resources where possible.*

*Nonpoint source management programs utilize existing information, education, and demonstration capabilities to educate and inform farmers, ranchers, and other producers of the potential for nonpoint source pollution to occur as a result of*

*agricultural or silvicultural activities. Technical assistance programs, both state and federal, are used to assist in the implementation of best management practices contained in nonpoint source management programs. Cost-share incentive programs are utilized where applicable and available to provide incentives for installation of best management practices. Research organizations are relied upon to provide needed research to advance the effectiveness of nonpoint source management programs and keep pace with advances in agricultural and silvicultural production methods. Loan programs, where applicable, help producers implement best management practices. Where necessary and desirable, new and innovative solutions are sought to address problems that cannot be handled by existing programs.*

*Below is a brief description of the major funding sources used in Texas to address agricultural and silvicultural nonpoint source pollution:*

■ *Water Quality Management Plan Program - Cost-share assistance for water quality benefits is available through the TSSWCB Water Quality Management Plan Program (a.k.a. Senate Bill 503 Program).*

■ *Nonpoint Source Implementation Grants (319 Program) - The 319 program administered by the TSSWCB provides funding to implement projects to abate agricultural and silvicultural nonpoint source pollution.*

■ *Watershed Protection and Flood Prevention Program - Projects eligible for funding through this NRCS administered program include watershed protection, flood prevention, erosion and sediment control, water supply, water quality, fish and wildlife habitat enhancement wetlands creation and restoration, and public recreation in watersheds of 250,000 or fewer acres.*

■ *Wetlands Reserve Program (WRP) - WRP is a voluntary program administered by NRCS that provides technical and financial assistance to eligible landowners to enhance degraded wetlands in exchange for retiring marginal land from agriculture.*

■ *Environmental Quality Incentives Program (EQIP) - EQIP is a voluntary conservation program administered by NRCS that provides farmers and ranchers with financial and technical assistance to install or implement structural and management conservation practices to address local natural resource concerns on eligible agricultural land.*

■ *Agricultural Loan Program (Farm Loan Program) - FSA makes direct and guaranteed farm ownership and operating loans to farmers and ranchers who are temporarily unable to obtain private, commercial credit for land purchases, livestock, equipment, feed, seed and supplies.*

■ *Conservation Reserve Program (CRP) - CRP is a voluntary conservation program administered by FSA, with NRCS providing technical assistance, that provides technical and financial assistance to eligible farmers and ranchers to address soil, water, and related*

resource concerns through conversion of sensitive acreage to vegetative cover in return for annual rental payments.

■ *Creekside Conservation Program - A partnership between Lower Colorado River Authority, NRCS and local SWCDs to provide technical and financial assistance to reduce sedimentation and nonpoint source pollution on privately owned land in 11 counties in the Colorado River Basin.*

■ *Forest Land Enhancement Program (FLEP) - FLEP, administered by the Texas Forest Service, provides financial, technical, educational and related assistance to private landowners in actively managing their land.*

■ *Coastal Zone Management Administration/Implementation Awards - Funds are available to support NPS projects in the coastal management zone and to implement agricultural and silvicultural management measures in the Texas Coastal Nonpoint Pollution Control Plan.*

■ *Clean Water State Revolving Funds - This program, administered by the TWDB, provides incorporated political subdivisions (Cities, Towns) with the authority to own and operate a wastewater system. It also provides incorporated political subdivisions, unincorporated political subdivisions (Counties, River Authorities, Water Supply Districts, Independent School Districts), and private individuals or non-profit entities (for nonpoint source pollution control loans only) loans for the financing, planning, design and construction of projects for wastewater treatment facilities, reuse and recycle facilities, collection systems, storm water pollution controls, and implementation of nonpoint source pollution controls.*

# APPENDIX I  SUMMARY OF PUBLIC RESPONSES

A public notice of final review was posted in the Texas Register on July 15, 2005 for a 30 day period, which ended on August 14, 2005.  No comments were received during this public final review period.

# APPENDIX J  ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| *AAH* | *Adopt-a-Highway* |
| *AFOs* | *animal feeding operations* |
| *ASDWA* | *Association of State Drinking Water Administrators* |
| *ASIWPCA* | *Association for State and Interstate Water Pollution Control Administrators* |
| *AST* | *aboveground storage tank* |
| *AWWA* | *American Water Works Association* |
| *BEG* | *Bureau of Economic Geology* |
| *BEIF* | *Border Environment Infrastructure Fund* |
| *BMPs* | *best management practices* |
| *BRC* | *Bureau of Radiation Control* |
| *BSEACD* | *Barton Springs/Edwards Aquifer Conservation District* |
| *CAFOs* | *concentrated animal feeding operations* |
| *CBBEP* | *Coastal Bend Bays & Estuaries Program* |
| *CCC* | *Commodity Credit Corporation* |
| *CCC* | *Coastal Coordination Council* |
| *CCMP* | *Comprehensive Conservation and Management Plan* |
| *CFR* | *Code of Federal Regulations* |
| *COGs* | *Councils of Government* |
| *COMAPA* | *Comision Municipal de Agua Potable y Alcantarillado* |
| *CMP* | *Coastal Management Program* |
| *CRP* | *Clean Rivers Program* |
| *CSG* | *Council of State Governments* |
| *CWA* | *Clean Water Act* |
| *CWSRF* | *Clean Water State Revolving Fund* |
| *CZMA* | *Coastal Zone Management Act* |
| *DFE* | *Dallas Floodway Extension* |
| *DSHS* | *Texas Department of State Health Services* |
| *DMWT* | *Don't Mess with Texas* |
| *DoC* | *Drop-off Center* |
| *DOPA* | *Dairy Outreach Program Areas* |
| *EDAP* | *Economically Distressed Areas Program* |
| *EMPACT* | *Environmental Monitoring for Public Access and Community Tracking* |
| *EPWU* | *City of El Paso Water Utilities* |
| *EQIP* | *Environmental Quality Incentives Program* |
| *FIFRA* | *Federal Insecticide, Fungicide and Rodenticide Act* |
| *FLEP* | *Forest Land Enhancement Program* |
| *GBEP* | *Galveston Bay Estuary Program* |
| *GCRP* | *Gulf of Mexico Community-Based Restoration Program* |
| *GLO* | *Texas General Land Office* |
| *GPC* | *Texas Groundwater Protection Committee* |
| *GWPC* | *Ground Water Protection Council* |
| *HHW* | *household hazardous waste* |
| *IBWC* | *International Boundary Water Commission* |

| | |
|---|---|
| *ISD* | *independent school district* |
| *iSWM* | *integrated Storm Water Management* |
| *KAST* | *Kills and Spills Team* |
| *KTB* | *Keep Texas Beautiful* |
| *LCRA* | *Lower Colorado River Authority* |
| *LPST* | *leaking petroleum storage tank* |
| *MCL's* | *maximum contaminant levels* |
| *MDL* | *minimum detection level* |
| *MSW* | *municipal solid waste* |
| *MxIBWC* | *Mexico International Boundary Water Commission* |
| *NADB* | *North American Development Bank* |
| *NAFTA* | *North American Free Trade Agreement* |
| *NAWQA* | *National Water Quality Assessment Program* |
| *NCTCOG* | *North Central Texas Council of Governments* |
| *NFIP* | *National Flood Insurance Program* |
| *NIPF* | *nonindustrial private forest* |
| *NLIWTP* | *Nuevo Laredo International Wastewater Treatment Plant* |
| *NNRCF* | *National Natural Resources Conservation Foundation* |
| *NOAA* | *National Oceanic and Atmospheric Administration* |
| *NPDES* | *National Pollutant Discharge Elimination System* |
| *NPS* | *nonpoint source pollution* |
| *NRCS* | *Natural Resources Conservation Service* |
| *OAG* | *Texas Office of Attorney General* |
| *OFCU* | *Oil Field Clean Up* |
| *OSPR* | *Oil Spill Prevention and Response* |
| *OSPRA* | *Oil Spill Prevention and Response Act of 1991* |
| *OSSF* | *on-site sewage facilities* |
| *PCBs* | *polychlorinated biphenyls* |
| *PMP* | *Pesticide Management Plan* |
| *PWE* | *Public Works and Engineering* |
| *RG/RBBC* | *Rio Grande/Rio Bravo Basin Coalition* |
| *RCRA* | *Resource Conservation and Recovery Act* |
| *RRC* | *Railroad Commission of Texas* |
| *SDWA* | *Safe Drinking Water Act* |
| *SEP* | *supplemental environmental project* |
| *SPCB* | *Structural Pest Control Board* |
| *SWA* | *source water assessment* |
| *SWCDs* | *Soil and Water Conservation Districts* |
| *SWP* | *source water protection* |
| *TAES* | *Texas Agricultural Experiment Station* |
| *TAGD* | *Texas Alliance of Groundwater Districts* |
| *TCC* | *Texas Chemical Council* |
| *TCE* | *Texas Cooperative Extension* |
| *TCEQ* | *Texas Commission on Environmental Quality* |
| *TDA* | *Texas Department of Agriculture* |
| *TDLR* | *Texas Department of Licensing and Regulation* |

*TDS*      *Total dissolved solids*
*TES*      *Teaching Environmental Sciences*
*TFA*      *Texas Forestry Association*
*TFS*      *Texas Forest Service*
*TGPC*      *Texas Groundwater Protection Committee*
*TIAER*      *Texas Institute for Applied Environmental Research*
*TMDL*      *Total Maximum Daily Load*
*TPDES*      *Texas Pollutant Discharge Elimination System*
*TPWD*      *Texas Parks and Wildlife Department*
*TSSWCB*      *Texas State Soil and Water Conservation Board*
*TSWQS*      *Texas Surface Water Quality Standards*
*TWC*      *Texas Water Code*
*TWDB*      *Texas Water Development Board*
*TWPC*      *Texas Watershed Protection Committee*
*TxDOT*      *Texas Department of Transportation*
*UCRA*      *Upper Colorado River Authority*
*UIC*      *underground injection control*
*USDW*      *underground sources of drinking water*
*USGS*      *United States Geological Survey*
*USIBWC*      *United States International Boundary Water Commission*
*UST*      *underground storage tank*
*VCP*      *Voluntary Cleanup Program*
*WET*      *Water Education for Teachers*
*WPAP*      *water pollution abatement plan*
*WQMP*      *water quality management plans*
*WRP*      *Wetlands Reserve Program*

# APPENDIX K  WEB SITES OF INTEREST

*This list offers readers with web addresses for web sites that contain information about the programs, agencies, and organizations discussed in this document. Many are organizational home pages that have links to more detailed information regarding nonpoint source pollution.*

## Bay and Estuary Programs

*Coastal Bend Bay and Estuaries Program*
*http://www.cbbep.org/*

*Galveston Bay and Estuaries Program*
*http://gbep.state.tx.us*

## Cities

*City of Abilene*
*http://www.abilenetx.com*

*City of Austin*
*http://www.ci.austin.tx.us/*

*City of Dallas*
*http://www.dallascityhall.com/*

*City of Denton*
*http://www.cityofdenton.com*

*City of El Paso*
*http://www.ci.el-paso.tx.us/default.asp*

*City of Fort Worth*
*http://www.fortworthgov.org*

*City of Houston*
*http://www.houstontx.gov/*

*City of Laredo*
*http://www.ci.laredo.tx.us/*

*City of San Angelo*
*http://www.sanangelotexas.org*

*City of San Antonio*
*http://www.sanantonio.gov*

## Council of Governments

*Council of State Governments*
*http://www.csg.org/csg/default*

*Houston Galveston Area Council*
*http://www.h-gac.com/HGAC/home/*

*North Central Texas Council of Governments*
*http://www.nctcog.org*

## Federal Agencies

*National Natural Resources Conservation Foundation*
*http://www.nrcs.usda.gov/*

*National Oceanic and Atmospheric Administration*
*http://www.noaa.gov/*

*U.S. Army Corp of Engineers*
*http://www.usace.army.mil/*

*U.S. Coast Guard*
*http://www.uscg.mil/USCG.shtm*

*U.S. Department of Agriculture*
*http://www.usda.gov/*

*U.S. Environmental Protection Agency*
*http://www.epa.gov/*

*U. S. Geological Survey*
*http://www.usgs.gov/*

## Groundwater Protection

*Barton Springs/Edwards Aquifer Conservation District*
*http://www.bseacd.org/*

*Edwards Aquifer Authority*
*http://www.edwardsaquifer.org/*

*Groundwater Protection Council*
*http://www.gwpc.org/*

*Texas Alliance of Groundwater Districts  or  Texas Groundwater Alliance*
*http://www.texasgroundwater.org/*

*Texas Groundwater Protection Committee*
*http://www.tgpc.state.tx.us/*

## Industrial Councils

*Texas Chemical Council*
*http://www.txchemcouncil.org/*

*Texas Nursery and Landscape Association*
*http://txnla.org/*

## Interstate and International Agencies

*American Water Works Association*
*http://www.awwa.org/*

*Association of State Drinking Water Administrators*
*http://www.asdwa.org*

*Association for State and Interstate Water Pollution Control Administrators*
*http://www.asiwpca.org/*

*Border Environment Cooperation Commission*
*http://www.cocef.org/ingles.php*

*International Boundary and Water Commission*
*http://www.ibwc.state.gov/*

*North American Development Bank*
*http://www.nadbank.org/*

*Pollution Control Administrators*
*http://www.asiwpca.org/*

*Rio Grande/Rio Bravo Basin Coalition*
*http://www.rioweb.com*

## River Authorities

*Brazos River Authority*
*http://www.brazos.org*

*Lower Colorado River Authority*
*http://www.lcra.org/index.html*

*San Antonio River Authority*
*http://www.sara-tx.org*

*Upper Colorado River Authority*
*http://www.ucratx.org*

# State Agencies

*Agriculture Resource Protection Authority*
*http://www.agr.state.tx.us/*

*Bureau of Economic Geology (University of Texas)*
*http://www.beg.utexas.edu*

*Coastal Coordination Council*
*http://www.glo.state.tx.us/coastal/ccc.html*

*Railroad Commission of Texas*
*http://www.rrc.state.tx.us*

*Structural Pest Control Board*
*http://www.spcb.state.tx.us/*

*Texas Agricultural Experiment Station*
*http://agresearch.tamu.edu/*

*Texas A&M On-Site Treatment Training Center*
*http://primera.tamu.edu/IRRGSYS/waste.htm*

*Texas Commission on Environmental Quality*
*http://www.tceq.state.tx.us/index.html*

*Texas Cooperative Extension Services*
*http://texasextension.tamu.edu/*

*Texas Department of Agriculture*
*http://www.agr.state.tx.us*

*Texas Department of State Health Services*
*http://www.DSHS.state.tx.us*

*Texas Department of Licensing and Regulation*
*http://www.license.state.tx.us/*

*Texas Department of Transportation*
*http://www.dot.state.tx.us*

*Texas General Land Office*
*http://www.glo.state.tx.us*

*Texas Farm Services Agency*
*http://www.fsa.usda.gov/tx/*

*Texas Forest Service*
*http://txforestservice.tamu.edu/*

*Texas Forestry Association*
*http://www.texasforestry.org/*

*Texas Institute for Applied Environmental Research (Tarleton State Univ.)*
*http://tiaer.tarleton.edu/*

*Texas Office of Attorney General*
*http://www.oag.state.tx.us/*

*Texas On-Site Wastewater Treatment Research Council*
*http://www.towtrc.state.tx.us/*

*Texas Parks and Wildlife Department*
*http://www.tpwd.state.tx.us*

*Texas Secretary of State Office*
*http://www.sos.state.tx.us/*

*Texas State Soil and Water Conservation Board*
*http://www.tsswcb.state.tx.us/*

*Texas Watch (Texas State University)*
*http://www.texaswatch.geo.swt.edu/*

*Texas Water Development Board*
*http://www.twdb.state.tx.us*

*Texas Water Resources Institute (Texas A&M University)*
*http://twri.tamu.edu/*

---

> Vernon's Texas Rules Annotated
>   Texas Rules of Appellate Procedure
>     Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
>       Rule 33. Preservation of Appellate Complaints (Refs & Annos)

TX Rules App.Proc., Rule 33.1

33.1. Preservation; How Shown

Currentness

(a) *In General.* As a prerequisite to presenting a complaint for appellate review, the record must show that:

  (1) the complaint was made to the trial court by a timely request, objection, or motion that:

    (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

    (B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure; and

  (2) the trial court:

    (A) ruled on the request, objection, or motion, either expressly or implicitly; or

    (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

(b) *Ruling by Operation of Law.* In a civil case, the overruling by operation of law of a motion for new trial or a motion to modify the judgment preserves for appellate review a complaint properly made in the motion, unless taking evidence was necessary to properly present the complaint in the trial court.

(c) *Formal Exception and Separate Order Not Required.* Neither a formal exception to a trial court ruling or order nor a signed, separate order is required to preserve a complaint for appeal.

(d) *Sufficiency of Evidence Complaints in Nonjury Cases.* In a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence--including a complaint that the damages found by the court are excessive or inadequate, as distinguished from a complaint that the trial court erred in refusing to amend a fact finding or to make an additional finding of fact--may be made for the first time on appeal in the complaining party's brief.

**Credits**
Eff. Sept. 1, 1997. Amended by Supreme Court Dec. 23, 2002, eff. Jan. 1, 2003.

---

**Editors' Notes**

**NOTES AND COMMENTS**

Comment to 2002 change: The last sentence of former Rule 52(d) of the Rules of Appellate Procedure has been reinstated in substance.

Notes of Decisions (3438)

Rules App. Proc., Rule 33.1, TX R APP Rule 33.1
Current with amendments received through 6/1/2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

| Vernon's Texas Rules Annotated |
| :--- |
|    Texas Rules of Appellate Procedure |
|       Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos) |
|         Rule 43. Judgment of the Court of Appeals (Refs & Annos) |

TX Rules App.Proc., Rule 43.2

43.2. Types of Judgment

Currentness

The court of appeals may:

(a) affirm the trial court's judgment in whole or in part;

(b) modify the trial court's judgment and affirm it as modified;

(c) reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered;

(d) reverse the trial court's judgment and remand the case for further proceedings;

(e) vacate the trial court's judgment and dismiss the case; or

(f) dismiss the appeal.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (119)

Rules App. Proc., Rule 43.2, TX R APP Rule 43.2
Current with amendments received through 6/1/2015

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Rules Annotated
   Texas Rules of Evidence (Refs & Annos)
     Article VIII. Hearsay (Refs & Annos)

TX Rules of Evidence, Rule 801

Rule 801. Definitions That Apply to This Article; Exclusions from Hearsay

Currentness

**(a) Statement.** "Statement" means a person's oral or written verbal expression, or nonverbal conduct that a person intended as a substitute for verbal expression.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Matter Asserted.** "Matter asserted" means:

   **(1)** any matter a declarant explicitly asserts; and

   **(2)** any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief about the matter.

**(d) Hearsay.** "Hearsay" means a statement that:

   **(1)** the declarant does not make while testifying at the current trial or hearing; and

   **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

**(e) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

   **(1)** *A Declarant-Witness's Prior Statement*. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

     **(A)** is inconsistent with the declarant's testimony and:

       **(i)** when offered in a civil case, was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition; or

**(ii)** when offered in a criminal case, was given under penalty of perjury at a trial, hearing, or other proceeding--except a grand jury proceeding--or in a deposition;

**(B)** is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

**(C)** identifies a person as someone the declarant perceived earlier.

**(2)** *An Opposing Party's Statement*. The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

**(3)** *A Deponent's Statement*. In a civil case, the statement was made in a deposition taken in the same proceeding. "Same proceeding" is defined in Rule of Civil Procedure 203.6(b). The deponent's unavailability as a witness is not a requirement for admissibility.

**Credits**

Adopted eff. March 1, 1998. Amended eff. Jan. 1, 1999. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.

**Editors' Notes**

**NOTES AND COMMENTS**

**Comment to 2015 Restyling:** Statements falling under the hearsay exclusion provided by Rule 801(e)(2) are no longer referred to as "admissions" in the title to the subdivision. The term "admissions" is confusing because not all statements covered by the exclusion are admissions in the colloquial sense--a statement can be within the exclusion even if it "admitted" nothing and was not against the party's interest when made. The term "admissions" also raises confusion in comparison with the Rule 803(24) exception for declarations against interest. No change in application of the exclusion is intended.

The deletion of former Rule 801(e)(1)(D), which cross-references Code of Criminal Procedure art. 38.071, is not intended as a substantive change. Including this cross-reference made sense when the Texas Rules of Criminal

Evidence were first promulgated, but with subsequent changes to the statutory provision, its inclusion is no longer appropriate. The version of article 38.071 that was initially cross-referenced in the Rules of Criminal Evidence required the declarant-victim to be available to testify at the trial. That requirement has since been deleted from the statute, and the statute no longer requires either the availability or testimony of the declarant-victim. Thus, cross-referencing the statute in Rule 801(e)(1), which applies only when the declarant testifies at trial about the prior statement, no longer makes sense. Moreover, article 38.071 is but one of a number of statutes that mandate the admission of certain hearsay statements in particular circumstances. *See, e.g.*, Code of Criminal Procedure art. 38.072; Family Code §§ 54.031, 104.002, 104.006. These statutory provisions take precedence over the general rule excluding hearsay, see Rules 101(c) and 802, and there is no apparent justification for cross-referencing article 38.071 and not all other such provisions.

Notes of Decisions (730)

Rules of Evid., Rule 801, TX R EVID Rule 801
Current with amendments received through 6/1/2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.